1
UNITED STATES DISTRICT COURT

2
EASTERN DISTRICT OF LOUISIANA

3
                                *

4
UNITED STATES OF AMERICA,    *      Criminal Action
                           *      No: 97-217

5
    Plaintiff,           *
                           *      Section "E"(2)

6
     v.                   *
                           *      New Orleans, Louisiana

7
LEON DUNCAN, ET AL,       *      August 14, 1997
                           *

8
    Defendant.          *
* * * * * * * * * * * * * * *

9
DETENTION HEARING

10
BEFORE THE HONORABLE LANCE M. AFRICK,
UNITED STATES MAGISTRATE JUDGE

11
APPEARANCES:

12

13
For the Government,       United States Attorney's Office
                        By:  ALBERT WINTERS, JR., ESQ.

14
                        By:  MICHAEL MCMAHON, ESQ.
                        501 Magazine Street
                        New Orleans, Louisiana 70130

15

16
For the Defendant        Office of the Public Defender
Lemmie Rodgers,         By:  BRUCE ASHLEY, II, ESQ.
                        501 Magazine Street, Room 318

17
                        New Orleans, Louisiana 70130

18
For the Defendant        Law Office of Edward Castaing, Jr.
Sidney Dubuclet,        By:  EDWARD CASTAING, JR., ESQ.

19
                        701 Poydras Street
                        New Orleans, Louisiana 70139

20

21
For the Defendant        Comarda & Associates
Leon Duncan,           By:  MICHAEL RIEHLMANN, ESQ.
                        3316 Canal Street

22
                        New Orleans, Louisiana 70119

23
Court Audio Operator:    Audry Steward

24
Transcriptionist:        Dorothy Bourgeois

25
Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1                            I N D E X

2                    Direct    Cross    Redirect    Recross

WITNESSES:

3

Freddie Cleveland        10       21        --          --

4

Robert Italiano          42       48        55          --

5

6   EXHIBITS:                                Marked   Received

7   Duncan-1    Letter                         70        72

8   G-1         Videotapes                     83        84

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


                                              3

1                    P R O C E E D I N G S

2               (Thursday, August 15, 1997)

3               (Call to Order of the Court)

                      Page 2

 4          MR. MCMAHON:  Your Honor, we move to sequester any

 5   witnesses.

 6          THE COURT:  All right.  Are there any Government

 7   witnesses or any Defense witnesses that are going to be

 8   testifying in connection with this hearing?

 9          MR. WINTERS:  Two Government witnesses, Your Honor;

10   the two gentlemen right there. (indicating)

11          THE COURT:  Okay.  Would you please identify yourself

12   for the record?

13          MR. ITALIANO:  Lieutenant Robert Italiano,

14   NewOrleans Police Department.

15          MR. CLEVELAND:  And, Freddie Cleveland, FBI.

16          THE COURT:  Are there any Defense witnesses?

17          MR. ASHLEY:  Judge, I have a lot of family members

18   here.  I don't anticipate, at this time, calling them.

19          THE COURT:  Well, that's fine, if you don't

20   anticipate calling them, but if they're going to testify as a

21   witness, they need to come forward now, or else they will not

22   be able to testify.

23          MR. ASHLEY:  As to the financial ability to make a

24   bond?

25          THE COURT:  As to whatever they're going to testify

                                        4

 1   to.  I'm not going to -- there's been a request for

 2   sequestration, so one witness doesn't know what the other one

 3   is testifying to.

 4          MR. RIEHLMANN:  Judge, as to Mr. Duncan, we do have

 5   witnesses that I intend to call.

 6          THE COURT:  Okay, could they just come forward, then?

 7          MR. RIEHLMANN:  Yes, sir.

8           MR. ASHLEY:  Judge, I mean, I might have 10 people

9    standing in this --

10          THE COURT:  Well, whatever.  I mean, it doesn't make

11   a bit of --

12          MR. ASHLEY:  Do you want me to just have them all

13   stand up?

14          THE COURT:  That's fine.  They can all stand up and

15   identify themselves.

16          MR. ASHLEY:  All the family and friends of Lemmie

17   Rodgers stand up, please.

18          THE COURT:  Mr. Riehlmann, all your witnesses are

19   standing?

20          MR. RIEHLMANN:  No, not yet.

21          THE COURT:  All right.  There's been a request to

22   sequester the witnesses.  Defense Counsel has indicated that

23   you may be called as a witness, so, therefore, from this point

24   forward I'm advising you and advising the Government not to

25   discuss the case amongst yourselves at any time, until the


                                        5

1    hearing is over with.

2           All right.  Why don't we go through and please state

3    your names for the record, just like the Government witnesses

4    did.  We'll start with the first row.

5    (Note:  The following witness names are spelled phonetically)

6           MRS. DUNCAN:  Tonice LaPierre Duncan.

7           MS. WILSON:  Debra Rodgers Wilson.

8           THE COURT:  Thank you.  You all can sit down.

9           MR. DUNCAN:  My name is Leminard Duncan, Sr.

10          THE COURT:  All right, sir; thank you.

11          MS. McGINNIS:  Cheryl McGinnis.

12          MS. RODGERS:  Theresa Rodgers.

13          MR. RODGERS:  Lemmie Rodgers, Sr.

14          MS. RODGERS:  Betty Rodgers.

15          MS. REYNOLDS:  Rhonda Scott Reynolds.

16          MR. McGINNIS:  Darryl McGinnis.

17          MS. BENSON:  Robin Benson.

18          MR. WILSON:  Benny Wilson, Sr.

19          MS. RODGERS:  Laura Rodgers.

20          MR. WOODS:  Ronald Woods.

21          MR. SAWYER:  Elton Sawyer.

22          MR. RODGERS:  Charles Rodgers.

23          MS. RODGERS:  Catherine Rodgers.

24          THE COURT:  All right.  Let me ask you this, Mr.

25  Winters, with respect to this sequestration, maybe this was

                                          6

1   what Mr. Ashley was getting at:  Obviously, when it comes to

2   their part of the case, these witnesses are going to be

3   sequestered.  Is there any problem with having them in the

4   courtroom during the testimony of the two agents?

5          MR. WINTERS:  We want them sequestered.

6          THE COURT:  What's the basis for that?

7          MR. WINTERS:  Your Honor, we're asking for

8   sequestration like we did the last detention hearing we had of

9   all witnesses.  The Government is willing to have -- I have

10  case agents that I'm sequestering, okay, and people that are

11  involved in the case.  So, I want all witnesses sequestered,

12  that's my request.

13          THE COURT:  Is there going to be evidence --

14          All of your witnesses relate to the financial

15    position of your client?

16         MR. ASHLEY:  The financial position and family ties.

17    They have nothing to do with the facts of the case or the

18    Indictment, the underlying Indictment.  They know nothing

19    about it.

20         MR. RIEHLMANN:  That would certainly be true with my

21    witnesses, as well, Judge.

22         THE COURT:  Is there going to be any testimony by the

23    Government agents with respect to these Defendants' financial

24    position and family ties?

25         MR. WINTERS:  No, sir.


                                                    7

1          THE COURT:  All right.  I'm going to allow the

2     witnesses to remain in the courtroom during the Government's

3     case in chief, and they will be sequestered when the Defense

4     begins to put on its case.

5          MR. ASHLEY:  Thank you, Judge.

6          THE COURT:  All right.  How are we going to proceed,

7     in connection with this matter?   Are there any stipulations?

8     We've all read the Pre-Trial Services report.  Can we have a

9     stipulation that if Pre-Trial Services were called to testify

10    that they would testify consistent with their reports and

11    recommendations?  Although not agreeing with the

12    recommendations; I understand that.

13         MR. RIEHLMANN:  Or with some of the factual

14    allegations made therein.

15         THE COURT:  Well, and that's a problem.  If we can't

16    resolve it, they'll testify, I assume.

17         MR. RIEHLMANN:  Well, then, maybe we better have them

18  testify.  I just don't want to stipulate to the things that
19  are noted in the nature of offense and arrest behavior.
20          THE COURT:  How about you, Mr. Castaing?
21          MR. CASTAING:  Your Honor, there's nothing we object
22  to in the Pre-Trial Services report regarding the background
23  and financial status of the Defendant.
24          THE COURT:  Okay, and you are here for, again?
25          MR. CASTAING:  Mr. Dubuclet.

8

1           THE COURT:  Mr. Dubuclet.  So, you have nothing that
2   you object to, factually, in the Pre-Trial --
3           MR. CASTAING:  That is correct, Your Honor.
4           THE COURT:  And you agree that the Pre-Trial Services
5   officer would testify --
6           MR. CASTAING:  Yes, sir.
7           THE COURT:  You don't agree, I assume, with that
8   recommendation?
9           MR. CASTAING:  That's correct.
10          MR. RIEHLMANN:  Judge, on further reflection, I'd
11  be --
12          THE COURT:  I'm sorry?
13          MR. RIEHLMANN:  Upon further reflection, I'm in
14  agreement with Mr. Castaing.  I'd stipulate that Mr. Torres
15  would testify as he reports.
16          There is one bit of testimony I would like to elicit
17  from him, though, that is not in the report, but I'll
18  stipulate to the facts.
19          MR. ASHLEY:  Judge, you're not going to release the
20  Pre-Trial people, are you?
21          THE COURT:  No.

22          MR. ASHLEY:  Okay.  Well, then, on behalf of my
23     client, I would stipulate that, if called to testify,
24     Mr. Gantner would testify that this is his report and that
25     it's accurate.


                                                            9
1          THE COURT:  All right.  So, we have those
2     stipulations.  You want to elicit one thing from him, from the
3     probation officer, Pre-Trial Services, --
4          MR. ASHLEY:  That's correct.
5          THE COURT:  -- on behalf of Mr. Duncan, is that
6     right?
7          MR. ASHLEY:  That's correct.
8          THE COURT:  All right.  Well, Mr. Winters, this is
9     your part of the case.  Do you want to do that now or do you
10     want him to do that on his part of the case?  He wants to
11     elicit one thing from the Pre-Trial Services officer.
12          MR. WINTERS:  I think he can do it on his part of the
13     case.
14          THE COURT:  All right, we'll do it then.
15          All right.  What else?  Can there be any other
16     stipulations or is that it?
17          Okay, I guess that's it.  Gentlemen, why don't you
18     have a seat next to your attorneys and the Government can call
19     its first witness.
20          MR. WINTERS:  Your Honor, what I was telling Counsel
21     is the videotape the Government is going to play into the
22     first witness' testimony applies more to his client --
23          THE COURT:  That would be great.
24          All right, Mr. Winters.

25          MR. WINTERS:  The Government would call Special Agent

                    Cleveland - Direct

  1    Freddie Cleveland.
  2          FREDDIE CLEVELAND, GOVERNMENT'S WITNESS, SWORN
  3                    *   *   *   *   *
  4                    DIRECT EXAMINATION
  5    BY MR. WINTERS:
  6    Q.  And how are you employed?
  7    A.  Special Agent with the FBI.
  8    Q.  And how long have you been with the FBI?
  9    A.  Over 31 years.
 10    Q.  And are you assigned to the NewOrleans Field Office?
 11    A.  Yes, sir.
 12    Q.  And what is your position in the NewOrleans Field Office?
 13    A.  I'm currently a Supervisory Special Agent in charge of the
 14    Public Corruption Squad, in NewOrleans.
 15    Q.  Did the Public Corruptions Squad work the investigation
 16    involving Len Davis and others?
 17    A.  Yes, sir.
 18    Q.  As a Supervisory Special Agent, did you write any reports
 19    at all in this investigation or in the Len Davis
 20    investigation?
 21    A.  No, sir.
 22    Q.  Did you generate any what we call Jencks Act material?
 23    A.  No, sir.
 24    Q.  Okay.  How many cops were convicted or policemen were
 25    convicted in the Len Davis investigation so far?

1  A.  Ten.

2  Q.  Were there any other convictions?

3  A.  Yes, sir, one civilian.

4  Q.  Did the FBI utilize electronic surveillance in that

5  investigation?

6  A.  Yes, sir.

7  Q.  Tell us what types were used.

8  A.  Telephone wire taps and microphones.

9  Q.  And the wire taps were all court ordered wire taps?

10  A.  Yes, sir.

11  Q.  Did you also use consentual recordings?

12  A.  Yes, sir.

13  Q.  And closed circuit or CC-TV?

14  A.  That's correct.

15  Q.  Okay.  Was an undercover operation utilized?

16  A.  Yes, sir.

17  Q.  All right.  You're familiar with the tape, which I've

18  marked as Government Exhibit 1, that we're about to play for

19  the Court, am I correct?

20  A.  Yes, I am.

21  Q.  It's actually three segments of a tape, am I correct?

22  A.  That's correct.

23  Q.  And, before we put it in, to save some time, would you

24  describe -- well, would you tell us on what day these tapes

25  were made?


                                              12
                        Cleveland - Direct

1  A.  The first two segments were on May the 4th, 1994.  The

2  third segment was on May 22nd, 1994.

3  Q.  And where were these tapes made?

4   A.  At the Hilton Hotel in NewOrleans.

5   Q.  By the riverfront?

6   A.  Yes, sir.

7   Q.  And were they consentual or were they court authorized

8   wire taps?

9   A.  Consentual.

10  Q.  Okay.  Now, in the first segment, tell us the individuals

11  involved in the first segment, so I don't have to stop the

12  tape.

13  A.  Ron Jackson, an undercover FBI agent; Lennie Davis, who

14  was at that time a NewOrleans police officer; Sammy Williams,

15  who was a NewOrleans police officer at that time; and the

16  informant in this case.

17  Q.  Okay, and do you recall what Len -- what Ron Jackson was

18  wearing, the undercover agent?

19  A.  Yes, sir.  He's a tall guy.  When the tape comes on, he's

20  standing in the middle.  He's wearing a baseball cap with a

21  dark shirt.

22      To his right is Sammy Williams, who has on a striped

23  shirt.

24      To his left is Len Davis, who has on a light colored

25  shirt.

Cleveland - Direct

1       And, during the video, you will see the informant sitting

2   or lying on the bed.

3   Q.  Okay.  Now, tell us, again, what occurred, briefly, in

4   this first segment of the tape.

5   A.  In the first segment, it's an initial meeting.  They

6   remove their clothing, so they can search each other for

7   hidden microphones or recording devices.

8   Q.  Okay.  Why don't you play the first segment of the tape.

9                   *   *   *   *   *

10    (The first segment of videotape is played in Open Court)

11                  *   *   *   *   *

12  BY MR. WINTERS:

13  Q.  Special Agent Cleveland, you can let it run.  What are

14  they doing now?  What are they getting ready to do now?

15  A.  (Tape continues to play)  They're searching the room,

16  looking for bugging devices and cameras.

17                  *   *   *   *   *

18              (The videotape is suspended)

19                  *   *   *   *   *

20  BY MR. WINTERS:

21  Q.  Now, we're getting ready to go to Phase 2, am I correct,

22  Special Agent?

23  A.  Yes, sir.

24  Q.  And that is on the same date, in the same conversation?

25  A.  That's correct.


                                               14
                    Cleveland - Direct

1   Q.  Okay.  And, at the same location, obviously.

2   A.  Yes, sir.

3                   *   *   *   *   *

4     (The second segment of videotape is played in Open Court;

5              after which videotape is suspended)

6                   *   *   *   *   *

7   BY MR. WINTERS:

8   Q.  Special Agent Cleveland, what are they talking about right

9   there?

10  A.  He's referring to protecting the narcotics dealer or

11   street-level drug dealer.

12   Q.  Who is referring to protecting a street-level narcotics

13   dealer?

14   A.  Len Davis.

15   Q.  And, what do you mean by "protecting" a narcotics dealer?

16   A.  He's talking about warning them when the police or

17   legitimate police officers are attempting to make an

18   undercover buy or send an informant in to purchase narcotics.

19   Q.  Is he also talking about getting information to do that?

20   A.  Yes, sir, and relaying it to the drug trafficker.

21          MR. WINTERS:  All right.  We can go to Phase 3.

22                    *   *   *   *   *

23     (The third segment of videotape is played in Open Court;

24              after which videotape is suspended)

25                    *   *   *   *   *


                                                    15
                        Cleveland - Direct

 1          THE COURT:  Would you just run it backwards to where

 2   it says "one of the guys I have in mind," so I can hear that

 3   again, please?

 4                    *   *   *   *   *

 5     (A segment of videotape is replayed in Open Court)

 6                    *   *   *   *   *

 7   BY MR. WINTERS:

 8   Q.  Let me ask you a couple of questions before -- where he

 9   says he's got somebody he used to ride with that's supposed to

10   go to Narcotics, okay, what's he talking about, a police

11   officer?

12   A.  Yes, sir.

13   Q.  And when he says that police officer is real "down," what

14   does he mean?

15   A.  He means he's dirty.  He's a dirty police officer.

16   Q.  And when he says he's the one that used to "inform me

17   about that boy I was protecting," what is he saying there?

18   A.  He's the police officer that relayed the information to

19   him.  He, in turn, passed it along to the dope dealer.

20   Q.  Now, have we been able to determine -- well, one other

21   question: --

22        MR. WINTERS:  Excuse me, Your Honor.

23   BY MR. WINTERS:

24   Q.  -- What does he mean when he said, "I used to ride with

25   him"?


                                                          16
                        Cleveland - Direct

1    A.  That means riding in a patrol car.  He was a partner.

2    Q.  Okay.  Have we determined if any of the Defendants in this

3    courtroom ever was a partner of Len Davis?

4    A.  Yes, sir.

5    Q.  And who is that?

6    A.  Leon Duncan.

7    Q.  And have we determined if Leon Duncan was ever assigned to

8    NOPD Narcotics?

9    A.  Yes, sir.

10   Q.  And was he?

11   A.  Yes, sir.

12   Q.  And has the FBI investigation, through witnesses,

13   determined who the individual on the street Len Davis was

14   protecting, who the drug dealer was he was protecting?

15   A.  Yes, sir.

16   Q.  And do you know his name?

17   A.  Yes, sir.

18  Q.  Please give it to us.

19      MR. RIEHLMANN:  Judge, I'm going to object, at this

20  time.  I don't think a foundation has been laid for this Agent

21  giving us his opinion as to who Mr. Davis may have been

22  referring to on this tape.  I mean, this is pure speculation

23  at this point, until he establishes a foundation for telling

24  us what the information is, where he got it from, how reliable

25  it was, et cetera.

                              Cleveland - Direct

1       THE COURT:  I mean, there had to be some factual

2   basis.  He testified that they were partners and that Mr.

3   Duncan also was assigned to Narcotics --

4       MR. WINTERS:  I'm getting ready to get into the

5   information, how we know who Mr. Davis was talking about.

6       THE COURT:  Why don't you go ahead and do that.

7       MR. WINTERS:  Okay.

8   BY MR. WINTERS:

9   Q.  Who is the individual on the street that Mr. Davis is

10  talking about?

11  A.  Charles Boutan.

12  Q.  And has Sammy Williams, Davis' partner, told us that?

13  A.  Yes, sir.

14  Q.  And do we have other witnesses that have told us that?

15  A.  Yes, sir.

16  Q.  And, who is the police officer that Davis was getting the

17  information on?  Who was the police officer that Davis was

18  getting the information from to protect Mr. Boutan?

19      MR. RIEHLMANN:  I make the same objection, Judge.  I

20  don't think that a foundation has been laid for how he knows

21  who the police officer is.

22    THE COURT:  Well, you'll be able to do some cross-
23  examination and I assume that the officer -- I mean, I assume
24  that Special Agent Cleveland is going to be asked and
25  questioned after this.


                                                        18
                        Cleveland - Direct
 1          So, go ahead and answer the question.
 2          It's overruled.
 3          THE WITNESS:  Yes, sir.  Leon Duncan.
 4  BY MR. WINTERS:
 5  Q.  And do we have witnesses that say it was Leon Duncan?
 6  A.  Yes, sir.
 7  Q.  Is one of them the partner, of Len Davis, Sammy Williams?
 8  A.  Yes, sir.
 9  Q.  Are there other witnesses to that?
10  A.  Yes, sir.
11  Q.  Now, --
12          THE COURT:  Let me just ask:  In other words, you
13  have spoken to witnesses or the FBI has spoken to witnesses,
14  who have provided information that Mr. Duncan was providing
15  information to Leon Davis with --
16          MR. WINTERS:  Len Davis.
17          THE COURT:  Len Davis, excuse me.
18          -- Len Davis, that was protecting, that was used to
19  protect Mr. Boutan, is that correct?
20          THE WITNESS:  Yes, sir, at least two.
21  BY MR. WINTERS:
22  Q.  Okay, now tell the Court about Mr. Boutan --
23      Let me ask:  How old is Mr. Boutan, approximately?
24  A.  He's 24.
                        Page 16

25   Q.  And does Mr. Boutan have any prior felony arrests, state

                          Cleveland - Direct
 1   felony arrests?

 2   A.  Yes, he does.

 3   Q.  How many?

 4   A.  Nineteen.

 5   Q.  For what?

 6   A.  For narcotics, concealed deadly weapon, assault, burglary,

 7   a whole series of arrests.

 8   Q.  Does he have any misdemeanor state arrests?

 9   A.  Yes, sir.

10   Q.  How many?

11   A.  Thirty-six.

12   Q.  He's got 19 felony arrests and 36 misdemeanor arrests?

13   A.  Yes, sir.

14   Q.  Okay, he's 24 years old?

15   A.  Yes, sir.

16   Q.  Has Mr. Boutan ever been convicted in federal court?

17   A.  Yes, he has.

18   Q.  And what was he convicted of in federal court?

19   A.  Drug violations.

20   Q.  And did he serve a sentence?

21   A.  Yes, sir.

22   Q.  Okay, and what happened after he served his sentence,

23   where did he go?

24   A.  He was released to a half-way house.

25   Q.  And that was fairly recently, right?

1   A.  Yes, sir.

2   Q.  And what happened when he was in the half-way house?

3   A.  While he was still in the half-way house, he was again

4   arrested regarding drug violations.

5   Q.  Do you know what kind of drug violations?

6   A.  Yes, sir.

7   Q.  What were they?

8   A.  It involved 75 grams of crack cocaine.

9   Q.  So, he's been indicted again?

10  A.  Yes, sir.

11  Q.  Now, with regard to Lemmie Rodgers, has the FBI

12  investigation, through witnesses, determined what his role

13  with Davis was early on in this investigation?

14  A.  Yes, sir.

15  Q.  And would you explain that to the Court?

16  A.  He provided information to Davis as to how he could run

17  this operation without being detected by the police.

18  Q.  And give me some -- give us some specifics, if you can

19  remember.

20  A.  One example was, if you go to the storage area, the

21  warehouse area where they cocaine was being stored, to do it

22  in the daytime, put signs on the outside of the trucks.

23  Q.  Signs, business signs?

24  A.  Business signs, make it appear there's a legitimate

25  business.  The drivers should be clean-cut in nature, so they

                                                    21
                    Cleveland - Direct/Cross

1   wouldn't draw suspicion of police officers.

2   Q.  That was advice from Mr. Rodgers to Mr. Davis, am I

3   correct?

4    A.  Yes, sir.

5    Q.  And Mr. Davis instructed the FBI -- I mean the undercover

6    agent how to do that?

7    A.  Yes, sir.

8         MR. WINTERS:  Excuse me one second, Your Honor.

9         THE COURT:  Do you have any information that Lemmie

10   Rodgers was involved in any conversations or any activity

11   involving physical violence to any persons?

12        THE WITNESS:  No, sir, I don't.

13        MR. WINTERS:  I tender, Your Honor.

14        MR. RIEHLMANN:  Just a minute, Judge, for my notes.

15                   *   *   *   *   *

16                   CROSS-EXAMINATION

17   BY MR. RIEHLMANN:

18   Q.  Good afternoon, Mr. Cleveland.  You were the supervising

19   agent in this case?

20   A.  Yes, sir.

21   Q.  The case agent was Stanley Hadden, though, correct?

22   A.  That's correct.

23   Q.  So, that's who you supervised, correct?

24   A.  Yes, sir.

25   Q.  And would you say that you or Stanley Hadden was more

                                              22
                       Cleveland - Cross

1    familiar with the actual facts and circumstances of this

2    investigation?

3    A.  Stanley Hadden.

4    Q.  All right, thank you.

5         You determined, at some point, that Leon Duncan had

6    previously ridden with Len Davis, correct?

7    A.  That's correct.

8   Q.   He had been partners with him, correct?

9   A.   Yes, sir.

10  Q.   And that had been in the Fifth District, or do you know?

11  A.   I believe that's correct.

12  Q.   And when was that?

13  A.   I believe it was in the early '90s.  I'm not sure of the

14  year.

15  Q.   For how long a period?

16  A.   I'm not sure.

17  Q.   How many partners had Len Davis had during his career?

18  A.   I don't know.

19  Q.   How many has he had since Leon Duncan was his partner?

20  A.   I don't know.

21  Q.   All right.  The tape seems to suggest -- and correct me if

22  I'm wrong -- that Mr. Davis is referring to someone who is

23  going to Narcotics?

24  A.   Yes, sir.

25  Q.   All right.  And you're saying that you determined that he

                                                        23
                        Cleveland - Cross

1   was referring to Leon Duncan, when he was making that

2   reference?

3   A.   I'm not sure when he's referring to somebody going to

4   Narcotics that he's referring to Duncan.  We believe that to

5   be the case, based on what we learned from Sammy Davis.

6   Q.   From Sammy Davis?

7   A.   Sammy Williams, I'm sorry.

8   Q.   Okay.  Did you learn anything through looking through the

9   NewOrleans Police Department records that Mr. Duncan was

10  scheduled for a transfer to Narcotics around this time?

11  A.  I haven't confirmed that, no, sir.

12  Q.  Correct me if I'm wrong, again, but that tape seems to

13  suggest that Len Davis is referring to a source of information

14  that he has, who is presently in Narcotics.  Does it reflect

15  that?

16  A.  I don't believe it reflects that.  I think he's referring

17  to somebody that plans on going to Narcotics at some point in

18  the future.

19  Q.  Now, you learned that Leon Duncan was in Narcotics?

20  A.  Yes, sir.

21  Q.  And when was he in Narcotics?

22  A.  I believe in the early '90s.

23  Q.  The early '90s.

24  A.  And '91, I believe, is the year.

25  Q.  He was in the Narcotics Division three years prior to the

24

Cleveland - Cross

1  taping of this conversation, approximately, correct?

2  A.  I'm not sure what time frame.  He could have been there

3  for a two- or three-year period, but I'm not sure.  There will

4  be somebody following me that could answer that question.

5  Q.  Now, you said that you learned that Len Davis was

6  referring to Leon Duncan, when he was talking about his source

7  of information from Sammy Williams, correct?

8  A.  Yes, sir.

9  Q.  And Sammy Williams is an individual who has pled guilty

10  and is awaiting sentencing, correct?

11  A.  That's correct.

12  Q.  And he's being rewarded in return for his information,

13  isn't that true?

14        MR. WINTERS:  Objection, Judge.  There's nothing in

15    the record to indicate that.

16          MR. RIEHLMANN:  Well, --

17          MR. WINTERS:  He hasn't been sentenced yet.

18          THE COURT:  I'll overrule the objection.  I don't

19    know whether the witness knows or not and, quite frankly, I

20    wish you'd be more specific about when you say "rewarded," --

21          MR. RIEHLMANN:  All right.

22          THE COURT:  -- exactly what you mean.

23    BY MR. RIEHLMANN:

24    Q.  Well, Mr. Williams has provided information to the FBI and

25    to the U.S. Attorney's Office, in hopes of gaining a more

25

Cleveland - Cross

1    lenient sentence, isn't that true?

2    A.  He has a plea agreement to cooperate with the Government,

3    and that's known to the sentencing judge, so, yes, sir, if

4    that's what you'd call -- if that's what you're referring to.

5    Q.  Well, I mean, we're all adults here and he intends or he

6    hopes to get a more lenient sentence in exchange for his

7    cooperation, isn't that true?

8    A.  I would think so.

9    Q.  Okay.  The other two witnesses that you claim have

10    identified Leon Duncan as the source of information for Len

11    Davis, who are those people?

12    A.  I said --

13          MR. WINTERS:  Objection; discovery.

14          THE COURT:  Sustained.

15    BY MR. RIEHLMANN:

16    Q.  And, can you tell me when you learned from these witnesses

17    that Leon Duncan was the source of information for Len Davis?

18          MR. WINTERS:  Objection.

19          THE COURT:  Sustained.

20  BY MR. RIEHLMANN:

21  Q.  Did I understand J.J., Ron Jackson, telling the other men,

22  Len Davis, Sammy Williams and Skaboo (phonetic), that the way

23  he wanted to run this operation was that, "when we're talking

24  about cocaine, we're going to talk in terms of cocaine, I

25  don't want to talk about apples and oranges"?  Is he saying

Cleveland - Cross

1  that he doesn't want to use code words for cocaine?

2  A.  No, to the contrary.  He's saying:  I use the word "load,"

3  rather than using "cocaine."

4  Q.  Okay.  So, he was identifying the code word that would be

5  used for this operation as instead of "apples" or "oranges,"

6  we're going to talk in terms of "loads," is that correct?

7  A.  That's what he said, he normally refers to cocaine as, he

8  refers to it as "load" and the other guy agrees that that's

9  fine.

10  Q.  Okay.  Through the remainder of the sting operation, did

11  Sammy Williams, Len Davis and the other officers refer to

12  cocaine as "loads"?

13  A.  I'm sure they did at varying times during this process.

14  Q.  Okay.

15         THE COURT:  Just so I understand:  There are

16  witnesses other than Sammy Davis (sic), who tie Mr. Duncan

17  into the providing information to Len Davis to protect this

18  drug dealer?

19         THE WITNESS:  There is at least one other witness,

20  Your Honor, that I'm familiar with.

21  BY MR. RIEHLMANN:

22  Q.  The officers who participated at Len Davis' and Sammy

23  Williams' behest, participated in the guarding of the

24  warehouse, did each and every one of those officers know that

25  they were guarding cocaine?

                          Cleveland - Cross

1   A.  Yes, sir.

2   Q.  Are you familiar with one of the officers that was

3   involved by the name of Chris Evans?

4   A.  I recognize the name and recognize he was one of the

5   officers indicted and pled guilty, yes, sir.

6   Q.  And isn't it true that in one of the telephone

7   conversations that was monitored concerning -- from Len Davis

8   to Officer Carlos Rodriguez, that Mr. Davis berated Officer

9   Rodriguez for informing Chris Evans of the nature of what he

10  was guarding was cocaine?

11          MR. WINTERS:  Objection, Your Honor.  What's the

12  relevance of that?

13          MR. RIEHLMANN:  Well, Judge, I mean, Mr. Winters, I

14  would imagine, is suggesting to the Court that Mr. Duncan

15  knew he was guarding cocaine on the dates in question, the

16  November 18th, 1994 escorting of these courier vehicles.

17          It's our contention that he didn't know, and if the

18  FBI is contending that each and every one of the police

19  officers who guarded the cocaine knew they were guarding

20  cocaine, I think it's relevant to show that that is not the

21  case, that some of the officers that were guarding the cocaine

22  did so unwittingly.

23          THE COURT:  Well, each of the officers pled guilty

24  before a district court judge, didn't they?

                          Page 24

25          MR. RIEHLMANN:  That might be, Judge, but the point

1   I'm trying to make is that, when they were initially brought
2   into the operation, they weren't told that they were guarding
3   cocaine.
4           He may have learned at a later point, but it's the
5   Government's contention that they were down from the beginning
6   that each and every one of these officers that was brought
7   into the sting operation knew from the start, and I'm trying
8   to develop the fact that that wasn't the case.
9           MR. WINTERS:  Your Honor, that's not the inquiry
10  we're doing here.  He's talking about guilt or innocence.
11  That's for a trial, okay.
12          THE COURT:  Well, also whether or not any of the
13  other previously convicted Defendants knew or didn't know
14  really isn't that significant to my determination -- I haven't
15  heard the evidence yet -- knowing whether your client knew or
16  did not know.
17          MR. RIEHLMANN:  All right.
18          THE COURT:  So, I sustain the objection.
19          MR. RIEHLMANN:  Note my exception.
20          THE COURT:  All right.
21          THE WITNESS:  Could I correct one thing, Your Honor?
22          THE COURT:  Yes.
23          THE WITNESS:  In response to your question:  I didn't
24  mean to imply that every one of those officers knew about it
25  from day one, either.  If they didn't know about it, they

1  learned it during the -- as it was in progress.  So, I didn't

2  mean to mislead you.

3  BY MR. RIEHLMANN:

4  Q.  So, am I to assume from your addition to your answer that

5  some of the officers that were involved, initially, were

6  involved unwittingly and didn't know that they were guarding

7  cocaine?

8  A.  Yes, I'm not testifying that every officer knew from the

9  first contact with Len Davis or Sammy Williams that they were

10  guarding cocaine.  I didn't mean to represent that.

11  Q.  All right.  Thank you.

12      Were you part of the November 18th, 1994 operation from

13  the Mardi Gras Truck Stop?

14  A.  I'm sure I played a role in it.  At this point, I don't

15  recall what my role was.

16  Q.  Well, you do know that Sammy Williams drove a car and was

17  accompanied by Lemmie Rodgers and Leon Duncan in that car,

18  isn't that true?

19  A.  Oh, yes, sir.

20  Q.  All right.  And you do know --

21      MR. WINTERS:  Your Honor, this is discovery, now.

22  What does it --

23      THE COURT:  That's been answered.  Ask your next

24  question.

25      And make an objection, if you have an objection to

30

Cleveland - Cross

1  the question.

2      MR. RIEHLMANN:  All right.

3      THE COURT:  Go ahead.

4 BY MR. RIEHLMANN:

5 Q.  There was a conversation between Sammy Williams, Leon

6 Duncan and Lemmie Rodgers that took place inside of that car

7 that was taped and monitored by the FBI, isn't that true?

8          MR. WINTERS:  Objection; discovery.

9          THE COURT:  I'm going to let him answer that

10 question.

11          Go ahead.

12          THE WITNESS:  Yes, sir.

13 BY MR. RIEHLMANN:

14 Q.  And does that -- the U.S. Attorney's Office is in

15 possession of that tape, isn't that true?

16 A.  Yes, sir.

17 Q.  Does that conversation indicate that Lemmie Rodgers and

18 Leon Duncan knew the illicit purpose of what they were doing?

19 A.  Yes, sir.

20 Q.  How does it indicate that they knew?

21          MR. WINTERS:  Objection.

22          THE COURT:  Sustained.

23          That was Lemmie Rodgers and who?

24          THE WITNESS:  Leon Duncan.

25          THE COURT:  Leon Duncan.

1          MR. RIEHLMANN:  Bear with me for a moment, Judge.

2          THE COURT:  Certainly.

3          To finish an unrelated question:  Is there any

4 evidence that Sidney Dubuclet was involved in any physical

5 acts of violence during the course of these allegations, or

6 threatened anyone physically?

7          THE WITNESS:  No, sir.

8    BY MR. RIEHLMANN:

9    Q.  Mr. Cleveland, during the course of your supervision of

10   this investigation, has there ever been any indication that

11   Mr. Duncan was preparing to flee the NewOrleans area?

12   A.  Not to my knowledge, no.

13   Q.  All right.  And he was advised that he was under

14   investigation 25 months ago, in July of 1995, isn't that true?

15   A.  Sometime ago.  I don't know whether it was 25 months, but

16   he knew for some time period that he's been under

17   investigation.

18          MR. RIEHLMANN:  Thank you.  I have no further

19   questions.

20          THE COURT:  All right.  Thank you.

21          Mr. Ashley?

22

23

24

25

                                                          32
                         Cleveland - Cross

1              *    *    *    *    *

2                    CROSS-EXAMINATION

3    BY MR. ASHLEY:

4    Q.  Mr. Cleveland, hello.  I'm Bruce Ashley, on behalf of

5    Lemmie Rogers.

6          You've been an agent for 31 years with the Bureau?

7    A.  I've been an agent since 1970.  I was a support employee

8    for four years prior to that.

9    Q.  And would you consider -- with your experience with the

10   Bureau, would you consider this particular investigation

11  involving Len Davis and 10 other NOPD officers, and one

12  civilian, to be a fairly massive investigation by the Bureau?

13  A.  It's significant, yes, sir.

14  Q.  Okay.  And, on direct examination, Mr. Winters asked you

15  about the nature of some of the elements of the investigation,

16  consental recordings, wire taps, closed circuit TV, PIN

17  registers?

18  A.  Yes, sir.

19  Q.  Surveillance, right?

20  A.  Yes, sir.

21  Q.  Would you hazard a guess for the Court's edification as to

22  the numbers of recordings that were made in connection with

23  this investigation?

24        MR. WINTERS:  Objection, Your Honor.  I don't know

25  the relevance of this.


                                                            33
                        Cleveland - Cross

 1        MR. ASHLEY:  It was elicited by the Government on

 2  direct examination.  I don't --

 3        THE COURT:  He mentioned the nature of the

 4  investigatory tools they used.  What relevance is it how many

 5  recordings that they had?  He said it's a massive

 6  investigation.  I don't see where that gets us anywhere.  The

 7  objection is sustained.

 8        MR. ASHLEY:  Okay.

 9  BY MR. ASHLEY:

10  Q.  In all of those -- let me withdraw that question.

11     You testified on direct examination that Mr. Rodgers

12  provided information to Len Davis on how to run the warehouse

13  operation, is that accurate?

14  A.  He gave him some suggestions, yes, sir.

15    Q.  And the basis for your testimony here today is what, sir?

16    A.  Primarily based on information provided to us by Sammy

17    Williams and recorded conversations where he did relay

18    information to the undercover agent.

19    Q.  Okay, and do you have -- of course, Mr. Rodgers doesn't

20    appear in these videotapes that have been played here for

21    Judge Africk, does he?

22    A.  That's correct.

23    Q.  He does not.  And are you prepared, at this time, to play

24    any sort of recordings in which Mr. Rodgers tells Mr. Davis on

25    how to run this operation?


                                                    34
                        Cleveland - Cross

1              MR. WINTERS:  Objection.

2              THE COURT:  He's just asking him whether he's going

3    to play any, that's all.

4              Can you answer that question?

5              THE WITNESS:  No, sir.

6    BY MR. ASHLEY:

7    Q.  You have nothing with you?

8    A.  No, sir.

9    Q.  Do you have the transcripts of any of those conversations

10   with you at this time?

11   A.  No, sir.

12   Q.  Are you aware that there was a wire tap placed on Mr.

13   Rodgers' personal phone for about a year or so, --

14             MR. WINTERS:  Objection.

15   BY MR. ASHLEY:

16   Q.  -- on his home phone?

17             MR. WINTERS:  Objection.

18    THE COURT:  Sustained.

19 BY MR. ASHLEY:

20 Q.  Are you aware that Mr. Rodgers self-surrendered to Agent

21 Stan Hadden of your office on this past Tuesday, and he drove

22 in some 1100 miles to do that?

23 A.  Yes, sir, I'm aware he self-surrendered.

24 Q.  And was Mr. Rodgers made aware of this investigation, of

25 his involvement in this investigation sometime ago, also?

1 A.  Yes, sir.

2 Q.  About two and a half years ago?

3 A.  I believe that's correct, yes, sir.

4 Q.  And do you have any knowledge of his -- has he made any

5 attempts to flee the jurisdiction or to do anything to

6 obstruct justice during that period of time?

7 A.  Not to my knowledge, no, sir.

8 Q.  So, is it fair to say that the testimony that you gave on

9 direct with regard to Lemmie Rodgers is -- the source of that

10 information is Sammy Williams?

11 A.  Yes, sir, and the recorded conversations where Davis

12 relays the information to the undercover agent.

13 Q.  To the undercover agent?

14 A.  Yes, sir.

15 Q.  After the fact or before the fact?

16 A.  It would be after the fact, if he was relaying

17 information.

18 Q.  And approximately how long after the fact?

19 A.  I don't know when Davis obtained it from Rodgers.

20 Q.  You don't know when --

21 A.  I don't know when Rodgers would have relayed -- would have

22   given these suggestions to Davis, who, in turn, relayed these
23   ideas to the undercover agent.
24   Q.  Is it your testimony before this Court that Sammy Williams
25   was not a party to the original conversation?

Cleveland - Cross

1    A.  No, I don't know when the conversation happened.
2    Q.  No, you testified on direct examination that Lemmie
3    Rodgers furnished information to Len Davis about how to run
4    this warehouse.  Is it your testimony under oath, now, that
5    Sammy Williams, the source of that information, was not
6    present for that original conversation?
7    A.  No, sir, that's not my testimony.
8    Q.  He was present for it?
9        MR. WINTERS:  Objection.
10       MR. ASHLEY:  Judge, I don't know if I'm dealing with
11   third-hand hearsay or just second or --
12       THE COURT:  All right.  Ask a question, okay.  Ask a
13   question, now.  I'm getting confused.
14       MR. ASHLEY:  All right.
15   BY MR. ASHLEY:
16   Q.  I'm trying to go back to your direct examination about
17   Lemmie Rodgers.  I'm just trying to focus on that, and
18   Mr. Winters asked you what you're prepared to testify to about
19   Lemmie Rodgers, and you said, as I recall, that he provided
20   information to Len Davis regarding the running of this
21   operation, i.e., the warehouse.
22       Is that fair?
23   A.  Yes, sir.
24   Q.  Okay.  And then I asked you what the basis, on cross-

25    examination, what the basis for your information was.

 1    A.  Yes, sir.

 2    Q.  Okay, and you said Sammy Williams, right?

 3    A.  That's correct.

 4    Q.  And some tapes?

 5    A.  Yes, sir.

 6    Q.  Okay.  Is it your testimony here under oath today that

 7    Sammy Williams was not present for this information being

 8    given by Lemmie Rodgers to Len Davis?

 9    A.  No, sir.

10    Q.  That's not your testimony?

11    A.  No.

12    Q.  Okay.  So, he was present?

13    A.  It's my information that he was present.  I just don't

14    know the time frame that elapsed from the time this

15    conversation occurred until he relayed it to the undercover

16    agent.

17    Q.  "He" being Sammy Williams?

18    A.  No, Len Davis.

19    Q.  Okay.  All right.  And the tape recordings that you have,

20    are those consentual tape recordings --

21    A.  We --

22    Q.  -- that corroborate this information?

23    A.  I believe they are, yes, sir.  Those are meetings with the

24    undercover agent, so those would have been consentual.

25         MR. ASHLEY:  I have no further questions.

```
 1              THE COURT:  Thank you, Mr. Ashley.
 2              Mr. Castaing.
 3                    *   *   *   *   *
 4                    CROSS-EXAMINATION
 5    BY MR. CASTAING:
 6    Q.  Agent Cleveland, Sidney Dubuclet was not a police officer
 7    at any time, to your knowledge, was he?
 8    A.  No, sir.
 9    Q.  And he never was a policeman acting to help Len Davis or
10    Sammy Williams in this operation, correct?
11    A.  Repeat it one more time.
12    Q.  I mean, he was never employed as a police officer at any
13    time, --
14    A.  That's correct.
15    Q.  -- in his whole life, to your knowledge?
16    A.  That's correct.
17    Q.  All right.  And he was first approached by agents of the
18    Government, I believe, in January of '95, and questioned about
19    his alleged involvement?
20    A.  I believe that would be correct.
21    Q.  And, since that -- and you have no evidence that since
22    that time he attempted to leave the jurisdiction or flee the
23    jurisdiction?
24    A.  That's correct.
25    Q.  All right.  As a matter of fact, he, at this present time,
```

                              Cleveland - Cross

```
 1    he was living in NewOrleans with his wife, his mother and was
 2    gainfully employed?
 3    A.  That's correct.
```

4  Q.  All right.

5       THE COURT:  What, exactly, was Mr. Dubuclet's role

6  in --

7       MR. CASTAING:  That was my next question.

8       THE COURT:  What was Mr. Dubuclet's role in this

9  conspiracy?

10      THE WITNESS:  He assisted in guarding -- it was in

11 November, the last scenario involving an 18-wheeler.  He and

12 Jones and another individual followed what they believed to be

13 cocaine in a vehicle, until it got out of the area.

14      THE COURT:  He was acting as security for the load?

15      THE WITNESS:  Yes, sir.

16 BY MR. CASTAING:

17 Q.  All right.  And that was his only involvement, correct?

18 A.  To my knowledge, yes, sir.

19 Q.  To your knowledge, he had not come into the Len Davis

20 organization any prior time and attempted to protect a

21 warehouse or a car or anything, correct?

22 A.  That's correct.

23 Q.  He was recruited by Mr. Davis on this one occasion and not

24 even told what it was he was going to guard, until after he

25 got into the car?

                                              40
                        Cleveland - Cross

1  A.  I'm not sure about that, so I can't respond.

2  Q.  Well, you said that some of the police officers, who

3  pleaded guilty or who were involved in this operation, did not

4  know, on day one, in your words, that they were there to

5  protect or act as surveillance for any narcotics, but they

6  later learned during the existence of the conspiracy?

7  A.  I believe that he knew when he got into the vehicle.

8  Q.  Well, --

9  A.  And --

10  Q.  -- after he got into the vehicle, Mr. Davis told him,

11  according to the tape, is that correct?

12  A.  Based on what I saw on the tape, he detailed more the

13  operation and exactly what they would be doing, but it was my

14  belief that he had some knowledge as to what they would be

15  doing before he got into the vehicle.

16  Q.  But, there's no evidence on that, is there?

17  A.  There's no recordings, no.

18  Q.  All right.  And no one told you that, either?

19  A.  Not me, personally, no, sir.

20  Q.  All right.  So, then, what he's charged in, to answer the

21  Judge's question, is -- and, by the way, he didn't drive a

22  vehicle that was acting as the lookout for the drug vehicle,

23  correct?

24  A.  That's correct.

25  Q.  He was picked up by Mr. Davis and all on the same evening

41

Cleveland - Cross

1  he was picked up by Mr. Davis and, with Mr. Davis driving, he,

2  Mr. Dubuclet, along with Mr. Davis and another gentleman,

3  followed the vehicle from the truck stop on Elysian Fields and

4  I-10, to the twin spans, then he returned home, correct?

5  A.  I believe that's correct, yes, sir.

6  Q.  And he received for that between $100 and $500?

7  A.  I think he received $1,000.

8  Q.  A thousand dollars?

9  A.  Yes, sir.

10  Q.  No more than that?

11  A.  Yes, sir; that's correct.

12        MR. CASTAING:  No further questions.

13        THE COURT:  Thank you.

14        MR. WINTERS:  No redirect.  We'd ask that the Witness

15  be excused, Your Honor.

16        THE COURT:  Thank you, you're excused.  Thank you.

17     (The witness is excused)

18        THE COURT:  Call your next witness, please.

19        MR. MCMAHON:  Your Honor, call Lieutenant Italiano.

20        Your Honor, my testimony is going to focus on Leon

21  Duncan, and I reurge the sequestration motion, and if any

22  other witness for Mr. Duncan gets on the stand and goes into

23  anything other than finances, we're going to object.

24        THE COURT:  Okay.  Well, the Defense Counsel told me

25  that all they're going into is things that could be done to

42

Italiano - Direct

1  secure their appearance and as far as any financial

2  obligations they may be able to provide.

3        MR. ASHLEY:  I may be able to do that by a proffer,

4  Judge.  That's --

5        MR. RIEHLMANN:  Judge, actually, out of an abundance

6  of caution, I think I'll ask that Mrs. Duncan, the Defendant's

7  wife, is sequestered.

8        MR. CASTAING:  Your Honor, the only evidence we would

9  have is Mr. Dubuclet's wife, to talk about a house his mother

10  had.  It's nothing more than that.

11        THE COURT:  Okay.  With respect to your witness --

12        Mrs. Duncan, please do not discuss the case with

13  anybody until I instruct you otherwise, okay?

14        MRS. DUNCAN:  (Nods head affirmatively)

15      THE COURT:  Thank you.

16          ROBERT W. ITALIANO, GOVERNMENT'S WITNESS, SWORN

17              *   *   *   *   *

18                  DIRECT EXAMINATION

19  BY MR. McMAHON:

20  Q.  Mr. Italiano, what is your occupation?

21  A.  I'm a Lieutenant with the NewOrleans Police Department.

22  Q.  What is your current assignment?

23  A.  I'm assigned to the Public Integrity Division.

24  Q.  Does the Public Integrity Division investigate complains

25  of misconduct against NewOrleans police officers, both in a


                                                        43
                    Italiano - Direct

1  criminal and administrative context?

2  A.  Yes, sir.

3  Q.  Has the Public Integrity Division received complaints in

4  the last several years regarding Leon Duncan?

5  A.  Yes, sir.

6  Q.  Have any of these complaints involved incidents of

7  violence?

8  A.  Yes, sir.

9  Q.  I'm going to direct your attention to June 9th, 1995.

10  Was there a complaint about his conduct that happened on that

11  date?

12  A.  Yes, sir, there was.

13  Q.  Who is the victim of the violence?

14  A.  LaDelle Vanderhorst. (phonetic)

15  Q.  Did Ms. Vanderhorst complain of any injuries she sustained

16  at the hand of Leon Duncan?

17  A.  She complained that she was punched in the face.

18  Q. Was Mr. Duncan either arrested or summoned, as a result of

19  that complaint?

20  A. He received a summons.

21  Q. Did Ms. Vanderhorst follow up on that complaint?

22  A. No, sir, she dropped the charges, when she went to court.

23  Q. I direct your attention to August 26th, 1995. Was there a

24  complaint filed against Duncan about his actions on that date?

25  A. Yes, sir, there was.


                                                        44
                        Italiano - Direct

1   Q. Who was the complainant?

2   A. Tonice Duncan.

3   Q. Did Tonice Duncan complain or allege that Mr. Duncan

4   injured her, on August 26th, 1995?

5   A. Yes, sir.

6   Q. What were the nature of those injuries?

7   A. She had scratches to her face and she complained of head

8   injuries.

9   Q. And, what was -- how did her head get injured?

10  A. She stated that Officer Duncan grabbed her by the hair,

11  dragged her to the kitchen counter and slammed her head

12  against the counter.

13  Q. Was Mr. Duncan arrested or summoned, as a result of that

14  complaint?

15  A. Yes, sir, he was.

16  Q. Did Tonice Duncan follow up?

17         THE COURT: Which one was it? Was he arrested or

18  summoned?

19         THE WITNESS: He was arrested on that one.

20  BY MR. MCMAHON:

21  Q. Did Mrs. Duncan continue to cooperate in reference to that

22  incident?

23  A.  No, sir.

24  Q.  I direct your attention four days later, August 30th,

25  1995.  Was there another complaint of violence against Leon

Italiano - Direct

1  Duncan?

2  A.  Yes, sir, there was.

3  Q.  Who was the complainant in reference to the August 30th

4  incident?

5  A.  LaDelle Vanderhorst.

6  Q.  Did she complain of injuries?

7  A.  Yes, sir, she did.

8  Q.  What kind of injuries?

9  A.  She claimed he choked her and she had some injuries to her

10  arm.

11  Q.  Was Mr. Duncan either arrested or summoned, as a result of

12  those complaints?

13  A.  Yes, sir, he was arrested.

14  Q.  Did Ms. Vanderhorst continue to cooperate?

15  A.  No, sir, she dropped the charges.

16  Q.  Was there any type of restraining order or peace bond

17  placed against Leon Duncan?

18  A.  On September -- excuse me -- yes, September 27th, 1995,

19  Judge Sean Early in Municipal Court issued a restraining order

20  against Leon Duncan, for him to remain separate and apart from

21  LaDelle Vanderhorst.

22  Q.  Did Duncan violate that order?

23  A.  Yes, sir.

24  Q.  How?

25   A.  On November 27th of that same year, LaDelle Vanderhorst

                        Italiano - Direct

1   called 9-1-1 to complain that Duncan was inside of her

2   residence at 5918 Baccich Street, and was attempting to remove

3   her stereo.

4   Q.  Lieutenant Italiano, was Leon Duncan ever assigned to the

5   Narcotics Division of the NewOrleans Police Department?

6   A.  Yes, sir, he was.

7   Q.  When?

8   A.  From February 16th of '92, until September of '93.

9   Q.  Are you familiar with an individual named Charles Boutan?

10  A.  Yes, sir.

11  Q.  I'm going to direct your attention to July the 7th of

12  1993.  Where was Mr. Boutan, on July the 7th of that year?

13  A.  He as in Central Lock-up.

14  Q.  And what was he in Central Lock-up for?

15  A.  He had been arrested on a warrant for failing to appear in

16  Municipal Court.

17  Q.  Was he bonded out?

18  A.  Yes, sir, he was.

19  Q.  Who bonded him out?

20  A.  Leon Duncan.

21  Q.  Explain a little bit about that to the Court.

22  A.  Leon Duncan met Mr. Boutan at Central Lock-up, obtained

23  $250 from Mr. Boutan.  He went to Ferro's Bonding Agency,

24  became the indemnitor on Mr. Boutan's bond, filled out the

25  paperwork, and then returned to Central Lock-up and effected

1  his release.

2  Q.  Was this a sanction, was this move in violation of any

3  NewOrleans Police Department rules or regulations?

4  A.  Yes, sir.  There are several rules that that violates.

5  Q.  Specifically, what?

6  A.  You can't secure the release of a prisoner from a jail,

7  unless it would be a very close relative.

8  Q.  Are there any regulations regarding NewOrleans police

9  officers associating with known criminals?

10 A.  Yes, sir.

11 Q.  Was he in violation of that rules, as well?

12 A.  Yes, sir.

13 Q.  Now, who else was involved in securing the release of

14 Charles Boutan, on July 7th, 1993?

15 A.  Lawrence Smith.

16     And also listed on the bond is Len Davis.

17 Q.  Is this the same Larry Smith who pleaded guilty in the

18 protection conspiracy involving Len Davis and other police

19 officers?

20 A.  Yes, sir.

21     THE COURT:  Excuse me, Mr. McMahon.

22     This all took place when Mr. Duncan was in the

23 Narcotics -- a sergeant in the Narcotics Division?

24     THE WITNESS:  Yes, sir.

25     MR. McMAHON:  Your Honor, the testimony was:


                                                    48
                      Italiano - Direct/Cross

1  Duncan was assigned to Narcotics, as Lieutenant Italiano

2  testified, from February 16, 1992 --

3      THE COURT:  To September '93.

4          MR. McMAHON:  -- until September 5th, 1993.  The

5    incident, of which this testimony is directed, occurred July

6    7th, 1993, within that period.

7    BY MR. McMAHON:

8    Q.  Lieutenant Italiano, how was Len Davis involved in this?

9    A.  Len Davis is listed on the bond as a relative of Charles

10   Boutan.

11         MR. McMAHON:  Tender.

12         THE COURT:  Is that, in fact, true?

13         THE WITNESS:  I have no way of knowing that, Your

14   Honor.

15                   *    *    *    *    *

16                      CROSS-EXAMINATION

17   BY MR. RIEHLMANN:

18   Q.  Lieutenant Italiano, did you handle the Internal Affairs

19   investigation of this incident, involving Mr. Boutan?

20   A.  No.

21   Q.  Have you reviewed any of the records of that Internal

22   Affairs investigation, so as to familiarize yourself with the

23   facts?

24   A.  Yes, sir.

25   Q.  Sergeant Eddie Selby, who was Mr. Duncan's supervisor in


                                                    49
                         Italiano - Cross

1    Narcotics, did not Mr. Selby or Sergeant Selby give a statement

2    to the IAD investigator, saying that Mr. Boutan was a source

3    of information or also known as a "snitch" for the Narcotics

4    people, specifically Mr. Duncan?

5    A.  I don't know that Selby said exactly that.  He said that

6    they were trying to develop him as a snitch.

7    Q.  Okay.  So, Mr. Boutan was trying to be developed by

8  Mr. Duncan and Sergeant Selby to give them information on

9  narcotics traffickers, isn't that true?

10  A.  I don't know if that's true.  That's what they say.

11  Q.  Well, according to Mr. Selby's statement, isn't that true?

12  A.  Yeah.

13  Q.  All right.  You said earlier that police officers don't

14  associate with criminals.  They do associate with criminals,

15  if they want those criminals to become sources of

16  information, isn't that true?

17  A.  They don't bond them out of jail.

18  Q.  Sir, answer my question.  They associate with criminals,

19  if they want to develop them as sources of information, isn't

20  that true?

21  A.  What do you mean by "associate"?

22  Q.  A snitch, somebody who is going to provide information

23  about other narcotics traffickers.  Do police officers do

24  that?

25  A.  Yes.


                                          50
                    Italiano - Cross

1          THE COURT:  Let me ask you something.  With respect

2  to there was money put up by Mr. Duncan to bond out

3  Mr. Boutan, is that correct?

4          THE WITNESS:  He put up -- he went to the Lock-up and

5  received Mr. Boutan's $250 from him and went to a bonding

6  agency with Mr. Boutan's $250.  I think he put up $7.50, as

7  the Sheriff's release costs.

8          THE COURT:  Did the supervisor, Officer Selby, did he

9  indicate whether or not he was aware that that was going on?

10          THE WITNESS:  He was not aware of that action.

11          THE COURT:  He said he was unaware of that?

12          THE WITNESS:  I don't know if he questioned about it,

13 but there is no -- no one mentions that he was aware of it.

14 BY MR. RIEHLMANN:

15 Q.  Now, Sergeant Selby gave that statement in support of

16 Mr. Duncan's bonding out Charles Boutan, though, didn't he?

17 A.  I don't know about it's in support.  He gave that

18 statement in connection with the investigation of Mr. Duncan.

19 Q.  Okay.  And he was brought to the Internal Affairs Division

20 by Mr. Duncan to give that statement, isn't that true?

21 A.  Wait, who was brought to --

22 Q.  Mr. Selby.

23 A.  Went to Internal Affairs and gave a statement, yes.

24 Q.  At the behest of Mr. Duncan, isn't that true?

25 A.  Yeah, I guess so.


                                                      51
                    Italiano - Cross

1 Q.  Okay.  Are you telling us, Lieutenant Italiano, on all

2 your years on the Police Department that you've never heard of

3 a situation where a police officer tries to secure the release

4 of a snitch, after that snitch has been incarcerated?  That

5 never happens?

6 A.  I haven't heard of any go to the Lock-up and get that

7 prisoner's money and go to a bail bonding agency for him, no,

8 sir.

9 Q.  Okay.  But, to answer my question.  You would agree that

10 police officers routinely attempt to secure the release of

11 their snitch, when their snitch is arrested, if they can?

12 Isn't that true?

13 A.  There is a routine for them to secure the release.

14 Q.  Okay.

15   A.   There is a mechanism.

16   Q.   All right.   Now, you said that Mr. Boutan was arrested on

17   a municipal charge, --

18   A.   Yes.

19   Q.   -- an attachment on a municipal charge?

20   A.   Yes, sir.

21   Q.   So, it was a bench warrant, he failed to appear for a

22   municipal court hearing, is that correct?

23   A.   Yes, sir.

24   Q.   Turning to municipal court, now you did conduct the

25   investigation of Mr. Duncan that resulted in his termination,

Italiano - Cross

 1   isn't that true?

 2   A.   Yes, sir.

 3   Q.   All right.   You talk about LaDelle Vanderhorst dropping

 4   the charges; the fact of the matter is, LaDelle Vanderhorst

 5   went to the Public Integrity Division and told the supervisors

 6   there that she had lied, when she accused Mr. Duncan of the

 7   physical abuse, isn't that true?

 8   A.   Which instance?

 9   Q.   In all of the instances.

10   A.   No, she didn't say that in all the instances, no, sir.

11   Q.   Did she tell Captain Ashbrock in Municipal Court, from

12   your review of the records, didn't she tell Captain Ashbrock

13   in Municipal Court that, insofar as the first incident that

14   you've referred to, that she fabricated the complaint in its

15   entirety, and wished to withdraw it?

16   A.   She told him that she fabricated one complaint that I know

17   of, yes, sir.

18  Q.  Okay.  And, insofar as the second charge, she appeared in
19  court and told the city attorney that she had fabricated that
20  charge as well, isn't that true?
21  A.  I'm not aware of that, no.
22  Q.  She dropped the charges?
23  A.  She dropped the charges, yes.
24  Q.  Okay.  Mrs. Duncan, you said that Mrs. Duncan complained
25  of physical abuse.  Mrs. Duncan was summoned, as well, for

1  physical abuse on Mr. Duncan, isn't that true?
2  A.  Yes, sir.
3  Q.  They were cross-summoned, isn't that true?
4  A.  I think he was arrested.  She got a summons.
5  Q.  Okay.  In other words, the investigating officers, after
6  conducting their investigation, couldn't tell who started the
7  altercation, isn't that true?
8  A.  She received a summons for throwing a toothpick holder at
9  him.
10  Q.  If she was determined to be using justifiable force, under
11  Louisiana law, there would have been no basis for her summons,
12  isn't that true?
13  A.  Yes.
14  Q.  Okay.  At any rate, the arrests that took place in the
15  summer of 1994, involving Leon Duncan, were all dropped, isn't
16  that true?
17  A.  In '95.
18  Q.  In '95; I'm sorry.
19      They were all dropped, --
20  A.  Yes.
21  Q.  -- isn't that true?

22  A.  Yes, sir.

23  Q.  You said that Mr. Duncan worked in Narcotics in September

24  of 1993, isn't that true?

25  A.  Until --

                    Italiano - Cross

 1  Q.  Until September of 1993.

 2  A.  -- September of '93.

 3  Q.  Okay.  So, in May of 1994, on that videotape that we just

 4  saw, where Len Davis is talking about a connection that he has

 5  with a man in Narcotics, he couldn't have been talking about

 6  Leon Duncan, because Leon Duncan wasn't assigned there then,

 7  isn't that true?

 8  A.  I didn't see a video.  What dates was the video?

 9          MR. McMAHON:  He was sequestered.

10          THE COURT:  He was sequestered.

11          MR. RIEHLMANN:  Oh, I'm sorry.

12  BY MR. RIEHLMANN:

13  Q.  In your review of the police files, there was no

14  suggestion that Leon Duncan was on his way back to Narcotics,

15  in 1994, is there?

16  A.  You mean back to work?

17  Q.  Going to be transferred back to Narcotics?

18  A.  Not that I've seen.

19  Q.  And you've reviewed his entire personnel file, isn't that

20  true?

21  A.  No.

22  Q.  You have not?

23  A.  I haven't reviewed his entire personnel file, no.

24  Q.  Following his arrests, in August -- June and August of

25   1995, Mr. Duncan continued his employment with the Police

1   Department until October of 1996, isn't that true?

2   A.  Yes, sir.

3   Q.  PID knew all about the allegations that LaDelle

4   Vanderhorst had made, yet he continued as a police officer for

5   another 13, 14 months, isn't that true?

6   A.  If that's 13.  I don't think --

7   Q.  That's all right.  I'll --

8   A.  He continued.

9        MR. RIEHLMANN:  I have no further questions.

10        THE COURT:  Thank you.

11        Does anybody else?

12        Any redirect?

13        MR. McMAHON:  Yes, Your Honor.

14                    *   *   *   *   *

15                    REDIRECT EXAMINATION

16   BY MR. McMAHON:

17   Q.  Lieutenant Italiano, are you aware of any documentation

18   whatsoever in the NewOrleans Police Department that indicates

19   Charles Boutan was Len Davis' snitch?

20   A.  No, sir.

21   Q.  Are you aware of any documentation in the NewOrleans

22   Police Department that Charles Boutan was Leon Duncan's

23   snitch?

24   A.  The statement that Leon Duncan and Selby gave, that they

25   were attempting to make him their snitch.

1   Q.  But, did they ever actually go through the process?  Isn't
2   that a rather involved process for an informant --
3           MR. RIEHLMANN:  Judge, I'm going to object to
4   Mr. McMahon leading Mr. Italiano.  I don't think Mr. Italiano
5   needs any --
6           MR. McMAHON:  It's a foundation question.
7           MR. RIEHLMANN:  No, it's a leading question.
8           MR. McMAHON:  All right, all right.  All right.
9   BY MR. McMAHON:
10  Q.  Lieutenant Italiano, what is the procedure for documenting
11  an informant with the NewOrleans Police Department?
12  A.  There is a person in Narcotics that's in charge of
13  confidential informants, recording them.  The informant must
14  be documented with him, going through all the way to the
15  Superintendent's office.  And, there's paperwork that has to
16  be filled out all along the way.
17  Q.  So, the question is:  Are you aware of any such paperwork
18  that indicates Charles Boutan was documented as an informant
19  with the NewOrleans Police Department?
20  A.  No, sir.
21  Q.  Did Ms. Vanderhorst ever claim that she lied, when she
22  filled out that peace bond, that restraining order?
23  A.  No, sir, not that I'm aware of.
24  Q.  Are those things filled out under oath, before a judge?
25  A.  Yes, sir.


                                                57


1           MR. McMAHON:  Nothing further.
2           THE COURT:  Okay.  Thank you.  You can step down,
3   sir.

4      (The witness is excused)

5          MR. McMAHON:  Can the Witness be excused, Your Honor?

6          THE COURT:  Yes.  Any further witnesses by the

7      Government?

8          MR. WINTERS:  No, sir.

9          THE COURT:  Let's start with Mr. Rodgers.  Any

10     witnesses on behalf of Mr. Rodgers?

11         MR. ASHLEY:  Judge, I may be able to do it without

12     witnesses, if that's --

13         As you saw, when I asked for family members to stand

14     up, the proffer I would make would have to do with his family

15     ties, which are not, unfortunately, elucidated that well in

16     the Pre-Trial Services report, and the proffer would be that

17     he has five siblings, who are present in the courtroom.  They

18     stood up and gave you their names.  Both of his parents are

19     living.

20         He's a lifelong resident of the city, I think that is

21     in there; a member of the NewOrleans Police Department for

22     some eight years.

23         He self-surrendered, Judge.  He actually got a phone

24     call.  He was somewhere outside of St. Louis, Missouri.  He's

25     now driving an 18-wheeler for a living, having resigned from

58

1     the NOPD.  He heard that there was an arrest warrant, and he

2     self-surrendered, drove 1100 miles through the night to self-

3     surrender on Tuesday past at the FBI headquarters to Stan

4     Hadden.

5         THE COURT:  Are you asking that the Government

6     stipulate to that?

7         MR. ASHLEY:  Well, or that you take it by way of

8    proffer.  I don't --

9           MR. WINTERS:  Your Honor, I will stipulate to

10   everything that he mentioned so far, as far as he has siblings

11   and he has parents and they're in the courtroom.  I will

12   stipulate that he did self-surrender, because I negotiated his

13   self-surrender with his attorney at the time, Mr. Kohnke.  I

14   have no problem with that.

15          The only stipulation and the only thing I would add

16   to this stipulation regarding the parents is that they know

17   nothing -- and the siblings -- they know nothing about the

18   facts of this case.

19          MR. ASHLEY:  Oh, I have no problems with that, Judge.

20          Additionally, the parents have talked with Pre-Trial

21   Services, and have told them about some properties that they

22   have that they're willing to put up for him, for a property

23   bond, so that's -- you know, of course, that's contained in

24   there.  Again, it's not elucidated in the context of the

25   report.


                                           59


1           Would you like me to argue --

2           MR. WINTERS:  And if they have property, I presume

3    they would put it up, okay.

4           MR. ASHLEY:  Right.

5           MR. WINTERS:  I mean, we don't have to stipulate to

6    that.

7           MR. ASHLEY:  No.  I'm trying to avoid calling them

8    and asking these --

9           THE COURT:  Well, the Government has not disagreed

10   with anything you've said so far.

11          MR. ASHLEY:  Okay.  Do you want me to argue, Judge?

12          THE COURT:  Would you like to make your argument now?

13    That would be fine.  I mean, the Government has the burden of

14    proof, so I guess, procedurally, the Government ought to go

15    first.

16          MR. ASHLEY:  Okay.

17          MR. WINTERS:  Your Honor, with regard to Lemmie

18    Rodgers, the main contention the Government has is that he was

19    a NewOrleans police officer, he obviously had some

20    sophistication, if he was advising Mr. Davis, as, I believe,

21    we've proved, as to how to avoid detection.

22          There is a presumption in this case.  There is a

23    strong presumption in this case.  The amount of drugs involved

24    in this case is 51 kilograms.  His guidelines are very, very

25    high.


                                          60


1          We do not believe that he has overcome the

2    presumption.  Obviously, that's what we're resting on, the

3    presumption and the limited evidence we produced on

4    Mr. Rodgers.  If I had evidence of threats, believe me, I

5    would have produced it.

6          THE COURT:  I understand that.

7          All right.  Anything you want to say, sir?

8          MR. ASHLEY:  Very briefly.  I'm in a position where I

9    really want to argue more the lack of evidence, as opposed to

10    the evidence that was put on, and I think that's fairly clear

11    here, when the agent testifies about a massive investigation

12    and Mr. Winters talks about consentual tapes, and Your Honor,

13    of course, is well aware of the number of people that have

14    pled guilty and the amount of tapes that were generated --

15    surveillance, wire taps, PIN registers, et cetera.

16          And he's not on the videotapes, he's not mentioned on

17    the videotapes.  The evidence against him -- and I'm still a

18    little unclear of this.  Apparently, the evidence against him

19    consists of a debriefing of Sammy Davis --

20          MR. MCMAHON:  Leon.

21          MR. ASHLEY:  I'm sorry, Sammy Williams.

22          -- at some point in the past, in which he, then,

23    tells them, the Government, about a conversation and we're not

24    sure if he's privy to the conversation at that time or if he

25    hears it later or whatever.


                                          61


1          So, you know, in terms of the weight of evidence

2     against Mr. Rodgers, I ask you to take that into

3     consideration, because that's one of the factors that you have

4     to, Judge.

5          No evidence of violence.  Of course, Detective

6     Italiano had nothing to say about him and I assume, if there

7     was something bad to say about him, that he would have done

8     so.

9          So, I ask you to give him a bond, and whatever

10    conditions you wish to place against him -- put him in a half-

11    way house, property bond, et cetera.

12          THE COURT:  Anything in rebuttal, Mr. Winters?

13          MR. WINTERS:  No, sir.

14          THE COURT:  All right.  I'm going to do each

15    individual Defendant, as we go along, if that's okay with

16    Counsel, if you all don't have a problem with that.

17          MR. WINTERS:  No problems, Judge.

18          THE COURT:  All right, sir.

19          In the past year, as I understand it, Mr. Rodgers has

20   been a truck driver.  He's been aware of the investigation.

21   There's no evidence of physical violence or threats.

22   Basically, he self-surrendered.  That's not to take away from

23   the seriousness of those offenses, but under the statute -- of

24   course, I'm not here to determine guilt or innocence.  Under

25   the statute, I have to see -- I have to impose the least

62

1    restrictive conditions that are sufficient to secure his

2    appearance and the safety of any other persons and the

3    community.

4          So, with respect to Mr. Lemmie Rodgers, Jr., I'm

5    going to impose a $100,000 cash or property bond, Pre-Trial

6    supervision, urinalysis as needed, 24-hour confinement in a

7    half-way house, monitoring of telephone calls, as I did with

8    the other officers, who I placed in a half-way house.  If he

9    has a passport, he needs to surrender it.

10          Is he able to make $100,000 property or cash bond?

11          MR. WINTERS:  Your Honor, can I just add one thing or

12   ask the Court to add one thing?  I want this Defendant to

13   understand, because we went through this, that he gets no

14   credit for any time he spends in the half-way house.  We went

15   through this and people served two years in the half-way house

16   on, you know, very confining circumstances and they got no

17   credit for it.

18          So, it's fine with me.  I just wanted him to know

19   that.

20          THE COURT:  That was decided by Judge Feldman.  As

21   you know, that was an issue with respect to the other police

22  officers.  As far as whether they should get credit for the

23  time in the half-way house, they did not.  They brought that

24  up before the district court.

25          I assume you know that.


                                                    63


1           MR. ASHLEY:  To the Fifth Circuit?

2           THE COURT:  I'm sorry?

3           MR. ASHLEY:  It went to the Fifth circuit?

4           THE COURT:  I don't know if it went --

5           MR. WINTERS:  There's a Supreme Court case on point,

6   Your Honor.

7           THE COURT:  All right.

8           MR. ASHLEY:  Well, but --

9           THE COURT:  But, knowing that, I mean, I've set the

10  bond and --

11          MR. ASHLEY:  Yes, and he can always just walk out of

12  the half-way and say:  I'm here to surrender and I want to go

13  to --

14          THE COURT:  Oh, no, he can't walk out of the half-way

15  house.

16          MR. ASHLEY:  No, he could --

17          THE COURT:  He can tell us if he wants to be

18  detained.

19          MR. ASHLEY:  If he decides that that is not the way

20  he wants to go.

21          THE COURT:  Right.

22          MR. WINTERS:  Your Honor, my point is, is that these

23  other Defendants said they didn't know that, so I just wanted

24  it made on the record.

25              THE COURT:  All right.  Can he make $100,000 cash or

1   property bond?

2              MR. ASHLEY:  We're working on it.  We're working on

3   it.  We're getting some appraisals of the property, Judge.

4              THE COURT:  That's how I'm setting the bond.  As you

5   know, under the Bail Reform Act, I cannot detain him just

6   because he's unable to meet a financial condition.  However,

7   if I determine -- if there are no other conditions short of

8   the bond that which would reasonably assure the appearance and

9   safety of the community, then he may be detained, and I have

10  to redetermine, at that point, what I should do.

11             So, I'm going to set the bond and, as I just stated,

12  -- he went to Pre-Trial?

13             MR. GANTNER:  (Pre-Trial Services)  Yes, sir, Your

14  Honor.

15             THE COURT:  Is there anything else I need to settle

16  with respect to this gentleman?

17             MR. GANTNER:  The only other suggestion we would

18  make, Your Honor, is that he possess no firearms or dangerous

19  weapons.

20             MR. ASHLEY:  No problem.

21             THE COURT:  Okay.  So, that's added.

22             MR. ASHLEY:  Yes, sir.

23             THE COURT:  To the extent that you're unable to make

24  that bond at a future date, you'll let me know and we'll go

25  ahead and revisit the issue.

```
 1              MR. ASHLEY:  Thank you, Judge.
 2              THE COURT:  Okay.
 3              MR. ASHLEY:  Am I free to leave?
 4              THE COURT:  Yes, you're free to leave.
 5              MR. ASHLEY:  Thank you.
 6              THE COURT:  And, your client, once he's able to make
 7    the bond, he'll be brought back before me and we'll discuss
 8    how he's going to get to the half-way house.
 9              MR. ASHLEY:  Okay.
10         (Defendant Rodgers and Mr. Ashley exit courtroom)
11              THE COURT:  Let's deal with Mr. Sidney Dubuclet.
12              MR. WINTERS:  Your Honor, the Government's position
13    is that, first of all, we've asked for detention.  We have no
14    acts of violence or, believe me, we would have produced them.
15              He was not a police officer.  There is a presumption,
16    same presumption that involves all these Defendants.
17              The Government, although it asks for detention, could
18    live with a similar bond, as set by the Court for Mr. Rodgers,
19    with regard to this Defendant.
20              THE COURT:  Well, let me ask you something,
21    Mr. Winters:  You say the Government can live with a similar
22    bond.  What amount of bond do you suggest?
23              MR. WINTERS:  A hundred thousand dollars.
24              THE COURT:  All right.  What about Mr. Rodgers?
25              MR. CASTAING:  Dubuclet, you meant, Your Honor.
```

```
 1              THE COURT:  I'm sorry;  Mr. Dubuclet.  You stand by
 2    your recommendation, is that correct?
 3              MR. GANTNER:  Your Honor, after hearing the testimony
```

4    put on, we would also concur with a secured bond and a half-

5    way house, and the additional conditions posted for

6    Mr. Rodgers, although, Your Honor, in Dubuclet's case, I

7    believe that we could also recommend a $50,000 secured bond.

8              MR. CASTAING:  I was going to suggest this, Your

9    Honor:  You heard the evidence, Your Honor.  It's a very

10   limited role for this man.  He was not a police officer.  He

11   was in the public trust.  He was recruited to do a job.  He

12   didn't know it was illegal until after he got into the

13   automobile.

14             No violence in connection with this case, Your Honor.

15   He is not a flight risk.  He was interviewed by the Government

16   two and a half years ago and made no attempt to leave.

17             He has lived at the same location, 2832-34 Cleveland

18   Avenue or Cleveland Street in NewOrleans for 25 years,

19   virtually his entire life.  His mother owns the house.  She is

20   an invalid, due to strokes.

21             THE COURT:  How much equity does she have in the

22   property?

23             MR. CASTAING:  Well, we figure -- it's a $70,000

24   value of the house, with approximately $30,000 mortgage.  It

25   could probably support $25,000 or $30,000 equity.


                                          67


1              But, Your Honor, I would ask for a bond to enlarge

2    him, so that he could be released from all custody, with any

3    other conditions, such as monitoring by Pre-Trial Services,

4    daily reporting and whatever.

5              There's no reason for this man to be locked up

6    completely during the pendency of this matter.

7              THE COURT:  Well, he isn't locked up.  He's in a

 8    half-way house, obviously.

 9         MR. CASTAING:  But, he can't leave, he can't work.

10         THE COURT:  Okay, anything else?

11         MR. CASTAING:  And, also, Your Honor, bear in mind

12    that he was employed by the federal government as a hearing

13    officer for Social Security at the time of the offense -- I

14    mean at the time of his arrest.

15         That's all, Your Honor.

16         THE COURT:  All right.  Thank you.

17         Anything else?

18         MR. WINTERS:  No rebuttal.

19         THE COURT:  All right.  With respect to Mr. Rodgers,

20    I'm going to set a $50,000 cash or property bond, 24-hour

21    confinement in the half-way house, pre-trial supervision,

22    urinalysis, if needed; no firearms, monitors, telephone calls,

23    as the other police officers.  If he has a passport, he's to

24    surrender it and we'll see how he does in the half-way

25    house --


                                        68

 1         MR. CASTAING:  Thank you, Your Honor.

 2         THE COURT:  -- and what transpires, before we go any

 3    further than that.

 4         MR. CASTAING:  We understand.

 5         THE CLERK:  You said Rodgers.

 6         THE COURT:  I'm sorry.  That's Mr. Dubuclet,

 7    Mr. Dubuclet.

 8       (Defendant Dubuclet and Mr. Castaing exit courtroom)

 9         All right.  Let's move on to -- where's Mr. Castaing?

10      (Defendant Dubuclet and Mr. Castaing reenter courtroom)

11          THE COURT:  Mr. Castaing, if you're unable to make
12   that bond, please let me know, so we can determine at that
13   point how we're going to handle it.
14          MR. CASTAING:  We'll check on the value of the
15   property, Your Honor.  Thank you.
16          THE COURT:  All right.   And nobody says it has to go
17   under her property; any other family members that are willing
18   to go ahead and --
19          MR. CASTAING:  Thank you.
20          THE COURT:  -- put together property.
21      (Defendant Dubuclet and Mr. Castaing exit courtroom)
22          THE COURT:  All right.  Let's talk about Mr. Duncan,
23   and let me tell you what I make a distinction I'm troubled as
24   to Mr. Duncan.  Notwithstanding, he may or may not have been,
25   apparently must not have been in Narcotics at the time this


                                     69

1    video was done, the fact is there is information from Sammy
2    Davis and another witness that he provided information --
3           MR. WINTERS:  Sammy Williams.
4           THE COURT:  Sammy Williams.
5           This information from Sammy Williams and another
6    witness that he was instrumental in helping to protect or
7    could help protect a career criminal involved in drug
8    trafficking, and that's where I have a problem, in addition to
9    the other things -- obviously, they're a very serious offense.
10   That's where I have a problem, and that's where the
11   distinction comes with respect to your client.
12          MR. RIEHLMANN:  Well, Judge, the first thing I would
13   say is:  Even assuming everything that the Government purports
14   to be true is true, since he's no longer a police officer,

15    he's not in the position to do any of those things again, and

16    I think that's one of the considerations, when the Court is

17    looking into whether or not he's a danger to the community is

18    that he is going to -- is he going to resume his illegal

19    activities?

20        Well, all the illegal activities that they allege he

21    is guilty of were done, allegedly, under the mantle of being a

22    police officer.  He now fills buses with gasoline for the

23    Regional Transit Authority.  I don't see how he's going to be

24    able to resume the sort of activities that they allege he was

25    doing while he was a police officer.

70

1        THE COURT:  Well, Mr. Riehlmann, I guess what it gets

2    down to is everybody has a certain comfort zone and it gets to

3    there being evidence and being rebuttable presumption under

4    the law that, to me, shows just such a lack of judgment and

5    such a threat to other persons that are involved in legitimate

6    law enforcement activities, somebody could certainly get hurt

7    or killed as a result of that information being passed on.

8        And then we have the issue with respect to the peace

9    bond.  Evidently, a violation of the peace bond --

10        MR. RIEHLMANN:  But, Judge, in connection with that,

11    I have offered as Exhibit Number 1, or I'd like to offer into

12    evidence a letter from Mr. Italiano's commanding officer,

13    Major Felix Loycano --

14        THE COURT:  Could I see it?

15        MR. WINTERS:  Can we see it, Your Honor?

16        THE COURT:  And I didn't mean to cut you off from

17    presenting any evidence that you want, Mr. Riehlmann.  I just

18  wanted to let you know what my concern was.

19          MR. RIEHLMANN:  Yes, sir, I appreciate that.

20          Is there an objection?

21          MR. WINTERS:  Yes, it's before the peace bond is in

22  effect.

23          MR. RIEHLMANN:  Judge, the testimony was that --

24          THE COURT:  Let me see it.

25          MR. RIEHLMANN:  Okay.


                                            71


1          THE COURT:  What date was the peace bond?

2          MR. McMAHON:  Your Honor, the peace bond was sworn

3   out September 27th, 1995, and this relates only to the

4   incident of July the 9th, 1995.  It speaks not at all to the

5   incidents of August 26th and August 30th, and it doesn't speak

6   at all to the peace bond.

7          THE COURT:  It may not speak to the peace bond, but I

8   don't see how that would make it inadmissible.  You're still

9   arguing that it's inadmissible?

10          MR. McMAHON:  Yes.

11          THE COURT:  Well, why is that?

12          MR. McMAHON:  Because the context in which

13  Mr. Riehlmann presented it was in the context of it's relative

14  to the peace bond.

15          MR. RIEHLMANN:  No, the context that I'm presenting

16  it to the Court is in the context of Ms. Vanderhorst's dubious

17  credibility.  Judge, had I know that LaDelle Vanderhorst was

18  going to be made an issue today, I have literally reams of

19  paperwork where she has repeatedly recanted and made

20  accusations against Mr. Duncan that I would love to present to

21  the Court.

                        Page 63

22    She has told Mr. Italiano's supervising officers that
23    she has lied over and over and over again.  I have a letter
24    from Superintendent Pennington to the City Attorney's Office,
25    saying that:  Throughout our investigations, we have learned


72

1     that this woman is of very dubious credibility.
2          THE COURT:  All right.  Well, --
3          MR. RIEHLMANN:  Had I known that this was going to be
4     an issue, I would have been prepared to rebut that.
5          THE COURT:  All right.  I'm going to admit the
6     exhibit, with respect to weight to be given to the June 9th,
7     1995 summons.
8          MR. RIEHLMANN:  Would you permit me an opportunity to
9     recess this at this time until tomorrow or whenever, when I
10    can come back with all the other paperwork that I have on
11    Ms. Vanderhorst?  Because it's --
12         THE COURT:  I will be glad to continue it.  I can't
13    do it tomorrow, because I won't be here, but I will be glad to
14    reset this matter for next week, if you'd like me --
15         MR. RIEHLMANN:  If it's a concern of the Court, then
16    I feel like I'd have to, because there's an awful lot that the
17    Court has to learn about LaDelle Vanderhorst, in order to
18    resolve that issue.
19         THE COURT:  Your other option, Mr. Riehlmann, if you
20    want to, is we can go forward, if you want, today with
21    whatever you have and then, should you feel a need to reopen
22    later on with additional evidence, you can get your ducks in a
23    row then and you can do that.
24         MR. RIEHLMANN:  Bear with me for a moment.

Page 64

25          Judge, I have several proffers to make to the

1    Government as well.

2          Insofar as Mr. Duncan's ties to the community,

3    there's not a person in this room that has stronger and more

4    numerous ties to the community than Mr. Duncan.  He's a father

5    of five and, despite the fact that he and his wife had each

6    other charged two and a half years go, they have been living

7    as man and wife since then, at the same address, for the last

8    seven years.

9          He is, in large measure, the breadwinner for the

10   family.  Without his salary, they will lose their house.  They

11   will lose their cars.

12         Mrs. Tonice Duncan is ready, willing and able to

13   testify to all that, but I believe it's all borne out by the

14   Pre-Trial Services report anyway.  There's a list of debts

15   that would be incumbent upon the Duncan family and

16   Mrs. Duncan's monthly income of $1,500 would not come close to

17   covering those debts.  To say that it would work a tremendous

18   hardship, financial hardship on Mr. Duncan's wife and five

19   kids is an understatement, for sure.

20         Mr. Duncan has known about this investigation since

21   July of 1995, when he and I and Al Winters and Stan Hadden met

22   in Mr. Winters' office.  He was told, at that time, that he

23   was a target, that he was probably going to be indicted.

24         Nevertheless, after he's fired by the Police

25   Department, at his behest, I file an appeal with the Civil

1   Service Commission, trying to get his job back, trying to show
2   that the allegation made by Sammy Williams were unsupported,
3   uncorroborated.  But, because of the restrictions at the U.S.
4   Attorney's Office placed on the evidence that we could adduce
5   at that Civil Service hearing, we've been stymied in an
6   attempt to show that those are incredible allegations.
7           At any rate, my point in bringing the Civil Service
8   up is that I hardly think that that is indicia of a guilty
9   man.  It would seem to me someone who knew he was guilty of
10  this offense would let sleeping dogs lie, rather than start
11  tilting at windmills and trying to get his job back.
12          To go on, his mother and father have a total of seven
13  pieces of real estate that they're willing to post as a
14  property bond.  Pre-Trial Services reports that the value of
15  those properties, at least the assessed values of those
16  properties is over $250,000.  They're willing to testify that
17  they are willing to put that property up.
18          I don't know what the equity is, yet, but I know the
19  equity, insofar as Mrs. Duncan's -- or Mrs. Williams, Leon's
20  mother, the equity in her pieces of property is going to be
21  somewhere in the neighborhood of $100,000 to $150,000.  That's
22  not even counting Mr. Duncan's property, Leon's father.
23          At any rate, I would rest on that.  I don't think
24  that the Government has come close to bearing its burden by
25  the preponderance of evidence showing that he's a flight risk

                                        75

1   and two domestic incidents, which were ultimately nolle
2   prosequied, and which at least one of which was made by a
3   former paramour of Mr. Duncan's, when he was separated from

4   his wife, who is of very dubious credibility, I don't think

5   that that's the sort of dangerousness that congress was

6   considering, when they decided that certain dangerous

7   individuals should be detained and not admitted to bond.

8           THE COURT:  To the extent that you have evidence in

9   your argument, things that people will testify to, I assume

10  you're proffering that to the Court, is that correct?

11          MR. RIEHLMANN:  I am, Judge.

12          THE COURT:  All right.  Once again, --

13          MR. McMAHON:  Any response, Judge?

14          THE COURT:  I'll get a response, but I just need --

15  the part that still troubles me is the information from Sammy

16  Williams and the other witness, as well as the violation -- to

17  a lesser extent the violation of the peace bond.

18          MR. RIEHLMANN:  Well, Judge, --

19          THE COURT:  And all those things that you mentioned,

20  I mean, you know, we've been through this before on many

21  times, not only with a police officer -- it always hard on the

22  families, and your heart goes out to the families, they're not

23  alleged to have done anything wrong.

24          But, you know, there are other considerations that I

25  have up here that I have to take into consideration as well in


                                    76


1   determining what to do.

2           MR. RIEHLMANN:  I would note, incidentally, Judge,

3   that Mr. McMahon alleges that the peace bond was violated.

4   Mr. Duncan was never arrested for that.  And, again, that was

5   nearly two years ago.  There's been no incidents of violence

6   with Ms. Vanderhorst since that time.

7           Insofar as the Count's concerns about Sammy Williams

8    saying that Leon Duncan was the leak, I mean, I would think
9    that all the Court really has to do is bear in mind the jury
10   charge that would certainly accompany Mr. Williams'
11   testimony, and that would be that it should be subjected to
12   very close scrutiny, given the consideration he'll be given
13   for that testimony.
14        And, what's more, I don't even know that -- that
15   testimony or those allegations are so vague in nature, I don't
16   even know that they pertain to the time period in the
17   Indictment.
18        Again, if we're to take Mr. Italiano's testimony,
19   Mr. Duncan was out of Narcotics in 1993.  In the period, the
20   time period being spoken about by Mr. Davis on that tape was
21   May of 1994, somebody that was in Narcotics -- he said that,
22   somebody that was in Narcotics was he source.
23        I asked both witnesses, but they didn't hear that.  I
24   heard that Mr. Davis referred to he has a guy in Narcotics,
25   speaking in the present tense, not speaking in the past tense,


                                                  77

1    and then he speaks again of an individual, who was going to
2    Narcotics, and there's no indication that Leon Duncan was
3    scheduled for a transfer to Narcotics.
4         I think that we're really relying solely on
5    Mr. Sammy Williams' assertion --
6         THE COURT:  And one other witness --
7         MR. RIEHLMANN:  We don't know what his credibility
8    problems might be.  We do know Sammy Williams has some
9    credibility problems.
10        But, the time frame set up by that videotape seems to

11  me to, by at least a preponderance of the evidence, exclude
12  Leon Duncan.  He is long-gone from Narcotics at the time that
13  -- Len Davis is speaking in the present tense and in the
14  future tense.  I just think that the evidence tends to suggest
15  that they're talking about someone else.
16          THE COURT:  All right.  Thank you, Mr. Riehlmann.
17          MR. RIEHLMANN:  Thank you, Judge.
18          THE COURT:  Thank you.
19          Anything in response?
20          MR. MCMAHON:  Your Honor, a couple of points.  First
21  of all, I don't put any stock in this reliance on the Civil
22  Service Commission and, in fact, we have tape recorded
23  conversations by Len Davis where Len Davis counted on Civil
24  Service restoring his lost time and his suspensions, after his
25  numerous violations of departmental policy.  What Civil Service

                                                78

1   does is of no moment.
2           Secondly, Your Honor, we adduced evidence of
3   Mr. Duncan's domestic violence as just an indication of his
4   character.  This is a man who can't follow the rules, who
5   won't follow the rules.  He's amoral.  This is --
6           THE COURT:  (Addressing audience)  You all are going
7   to need to please hold it up back there.  I know you may not
8   agree with what the Prosecutor says, but he has a right to say
9   it, just like Mr. Riehlmann, so I expect you all to act like
10  adults and please restrain yourselves.
11          MR. MCMAHON:  This is a person who, according to
12  witnesses -- and, about Mr. Williams' credibility, well, up to
13  this point, Mr. Williams' credibility, directly or indirectly,
14  has led to the convictions of 11 former employees of the
                            Page 69

15  Police Department and two civilians, and two of those persons
16  are on Death Row, with Mr. Williams' credibility being a major
17  factor in their convictions.
18        Now, the tape did not say, Len Davis did not say that
19  the person was in Narcotics at that time.  That's not what he
20  said.  He said he had somebody who was in Narcotics, who may
21  have been going back to Narcotics, who gave Len Davis
22  information to protect a little guy on the street, who was
23  Charles Boutan.
24        Now, we have to view this in context.  We also have a
25  situation where Boutan was arrested.  He was arrested.  For

                                        79

1   what?  Who cares.  He was arrested and he was got out of jail
2   in July of 1993, when Duncan was in Narcotics.
3         Now, I don't think Selby, whoever he is, knew, at
4   that time, that Mr. Duncan was providing information to Len
5   Davis, so that Len Davis can protect Charles Boutan.  That's
6   what Len Davis said on that tapes, that's what Sammy Williams
7   said and there are other Governmental sources, at least one,
8   who corroborate that.
9         The clear inference being that Charles Boutan was
10  released, not for a legitimate police purpose, in July of
11  1993.  He was released because Mr. Boutan had a relationship
12  with Duncan and Davis, a scurrilous relationship, a
13  relationship that, of course, as recent developments in the
14  last several years have indicated, was endemic to the
15  NewOrleans Police Department, where cops were protecting dope
16  dealers.  That's what that was all about.
17        This person has a demonstrated record of disregard

18  for court orders, that peace bond, and just for the general

19  good order of society.  He's not a peaceful man, and we have a

20  finding of probable cause that has not even been addressed.

21  This man has been indicted for protecting dope, and when you

22  put all the other evidence in context, we feel very strongly,

23  of the people who have appeared before the Court today, this

24  is the one who should be detained.  He's dangerous.

25          THE COURT:  All right.


                                            80


 1          MR. RIEHLMANN:  Judge, could I make one request?

 2          THE COURT:  Yes, sir.

 3          MR. RIEHLMANN:  Maybe my memory is mistaken, but --

 4  and I know you don't want to sit through all of it again, but

 5  could we just put on that portion of the tape where Len Davis

 6  is talking about the guy in Narcotics, and maybe I'll stop

 7  belaboring under this misconception, but I just want to find

 8  out if he --

 9          THE COURT:  Well, I don't have a problem with doing

10  that for the second time.  Let's see if we can get to that.

11          You don't have a transcript, do you?

12          MR. WINTERS:  No, sir.

13          THE COURT:  Okay.

14          MR. WINTERS:  Never have a transcript on a video.

15          THE COURT:  Okay.  That was on which segment?

16          MR. RIEHLMANN:  That's what I'm trying --

17          MR. WINTERS:  Segment 2, Your Honor.

18                      *   *   *   *   *

19      (The second segment of videotape is played in Open Court)

20                      *   *   *   *   *

21          MR. WINTERS:  It's Segment 3, Your Honor.
                        Page 71

22          *    *    *    *    *
23      (The third segment of videotape is played in Open Court)
24          *    *    *    *    *
25          MR. RIEHLMANN:  Judge, the way I heard it is the


                                81

1   opening statement by Mr. Davis is, "Once I get my people in
2   Narcotics on this," now that suggests to me that it's somebody
3   that's presently in Narcotics or is soon to be in Narcotics,
4   not somebody who was there 13 or 14 months previously.
5          And then he refers later to somebody going to
6   Narcotics, Mr. Italiano says that he did not -- he's not aware
7   of any scheduled transfer of Leon Duncan to the Narcotics
8   Division.
9          THE COURT:  But, he also talks about the same person,
10  somebody who has provided information to him in the past --
11         MR. WINTERS:  In the past, yes, sir.
12         THE COURT:  I'm not saying the issue is not without
13  argument, okay, but --
14         MR. RIEHLMANN:  But, they do bear the burden of
15  proving danger by clear and convincing evidence and, if the
16  Court is even somewhat concerned with how clear and convincing
17  it is, then I do think that it should not be an issue that
18  gives rise to --
19         MR. MCMAHON:  Your Honor, Mr. Riehlmann is arguing
20  that this person to whom Davis refers is not Duncan.  We are
21  saying our evidence, it is Duncan to whom Davis is referring,
22  nobody else; Leon Duncan.
23         MR. RIEHLMANN:  I realize that, Mr. McMahon.  I think
24  that's the whole bone of contention.

25          THE COURT:  And, again, the problem is:  He may or

1    may not have been in Narcotics at the time, and maybe he

2    wasn't, and I don't know why Davis saying go into Narcotics.

3    I don't know if there's some plan to go to Narcotics or what.

4          MR. RIEHLMANN:  Well, we certainly have to conclude

5    that, at this moment, he's being his most candid.

6          THE COURT:  Well, but they have two witnesses who are

7    saying that he is the one, that your client is the one who is

8    supplying that internal information, okay, so I understand

9    there's an issue whether that's clear and convincing, whether

10   that leads to the conclusion that the evidence is clear and

11   convincing with respect to danger, and I understand your

12   argument.

13         MR. RIEHLMANN:  Yes, sir.

14         THE COURT:  Anything else?

15         MR. RIEHLMANN:  No, sir.

16         THE COURT:  All right.  Anything else by the

17   Government?

18         MR. WINTERS:  No, sir.

19         THE COURT:  All right.  Notwithstanding,

20   Mr. Riehlmann, your zealous and articulate representation of

21   your client, -- and I mean that -- we have a police officer

22   who was there for 15 years.  We have a large amount of cocaine

23   involved in this conspiracy.  He's facing a penalty of 10 to

24   life.  He used his official position at the time, if the

25   evidence is, in fact, -- if the evidence bears out what the

1   Government has alleged to go ahead and protect narcotics.

2           There's information from a witness and Sammy Williams

3   that he used his confidential police information to protect a

4   career criminal, who was involved in drugs trafficking.

5           We have a Pre-Trial recommendation of detention.

6   There is evidence that he violated a court order.  Now,

7   whether or not he was charged with the violation of the court

8   order, I don't know, but the evidence is there was a court

9   order and there's also a rebuttable presumption under the Bail

10  Reform Act that if there are -- that can be rebutted, but I

11  don't find that it has been in this case, at this point, that

12  there are no conditions or combination of conditions which

13  would reasonably assure the safety of any other person and the

14  community, as well as the Defendant's appearance.

15          Accordingly, I find that there are no condition or

16  combination of conditions which would reasonably assure both

17  the safety and the -- the safety and danger issues, as well as

18  the flight issues, and I order the Defendant detained without

19  bond.

20          MR. RIEHLMANN:  Judge, can I approach the bench?

21          THE COURT:  Yes, sir.

22          MR. WINTERS:  Your Honor, before we -- can I offer to

23  introduce and file into evidence Government Exhibit 1, which

24  is the videotape?

25          THE COURT:  Any objection?


                                                        84


1           MR. RIEHLMANN:  No, sir.

2           THE COURT:  All right.  Approach the bench.

3      (Bench conference off-the-record)

4          THE COURT:  The conversation at the bench was as to

5   Defendant's representation by Counsel.  I'm going to set a

6   determination of counsel before Magistrate Judge Moore at 2:00

7   on Tuesday.

8          At that point, Mr. Riehlmann, you'll have some more

9   information and be able to advise the Court.

10          MR. RIEHLMANN:  Thank you.

11          THE COURT:  Is there anything further?

12          MR. WINTERS:  No, sir.

13          MR. RIEHLMANN:  No, sir.

14          THE COURT:  All right, thank you.  Court will be in

15   recess.

16                    *    *    *    *    *

17          (Whereupon, the hearing was adjourned)

18

19

20

21

22

23

24

25



                                                          85

1                    C E R T I F I C A T E

2

3          I certify that the foregoing is a correct transcript

4   from the electronic sound recording of the proceedings in the

5   above-entitled matter.

6

7

~1719843.dat

/S/DOROTHY M. BOURGEOIS                          8-21-97

8  _____         _____

   Dorothy M. Bourgeois                          Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25