1

1
2                    UNITED STATES DISTRICT COURT
3                    EASTERN DISTRICT OF LOUISIANA

4                                    *
5    UNITED STATES OF AMERICA,       *        Criminal Action
                                     *        No: 97-217
6         Plaintiff,                 *
                                     *        Section "E"
7         v.                         *
                                     *        New Orleans, Louisiana
     LEON R. DUNCAN,                 *        April 28, 1998
8    DARREL G. JONES,                *
                                     *
9         Defendants.                *
     * * * * * * * * * * * * * * *
10
                                  VOLUME 2
11
                                JURY TRIAL
12             BEFORE THE HONORABLE MARCEL LIVAUDAIS, JR.,
                     UNITED STATES DISTRICT JUDGE
13
     APPEARANCES:
14
     For the Government,           United States Attorney's Office
15                                 By:  MICHAEL E. MCMAHON, ESQ.
                                   By:  ALBERT J. WINTERS, ESQ.
16                                 501 Magazine Street
                                   New Orleans, Louisiana 70130
17
     For the Defendant             Comarda & Associates
18   Leon R. Duncan,               By:  MICHAEL G. RIEHLMANN, ESQ.
                                   3316 Canal Street
19                                 New Orleans, Louisiana 70119

20   For the Defendant             William Noland & Associates
     Darrel G. Jones,              By:  GREGORY K. VOIGHT, ESQ.
21                                 2739 Tulane Avenue

22                                 New Orleans, Louisiana 70119

23   Court Audio Operator:         James Crull

24   Transcriptionist:             Dorothy Bourgeois

25   Proceedings recorded by electronic sound recording,

     transcript produced by transcription service.

```
 1                    P R O C E E D I N G S
 2                   (Tuesday, April 28, 1998)
 3                   (Call to Order of the Court)
 4                   (Prospective jurors present)
 5            THE COURT:  Please be seated.  I started to say "Good
 6      morning, please be seated," but I don't think I can truthfully
 7      say that.
 8            What we're going to do now is complete the voir dire
 9      examination that I told you about yesterday.  Questions have
10      to be asked to enable the lawyers to exercise challenges, if
11      they choose to.  So, your answers should be complete and
12      truthful, and any particular question I ask that you want to
13      answer privately, feel free to raise your hand and come right
14      up here to the bench.
15            As you remember, yesterday we started this with a
16      questionnaire part of the voir dire.  You were placed under
17      oath and I want to remind you that that oath still applies to
18      this oral voir dire that I'm going to give now.
19            Your answers should be complete and truthful and, if
20      there's any particular question I ask that you want to answer
21      in private, step right up to the bench.  I'll be glad to do it
22      that way.
23            Now, those that seated in the jury box will not have
24      to stand to answer some questions, but those in the back, so
25      that we can all see and identify you, if there's some answers
```

```
 1      you're going to give, would you please stand.  I expect your
 2      answers to be complete and truthful, in order to make sure
 3      that this is a fair and impartial jury, in the eyes of the
```

4    Defendant and the attorney.

5         Yesterday, after you had done your questionnaires, I

6    met with Counsel.  We were to determine whether there was

7    unanimous agreement that some jurors might be excused.  The

8    Defendants waived -- Counsel waived the presence of the

9    Defendants at this conference in my office, and as a result of

10   it, these jurors have been excused:

11        Juror Number 10, Ridgeno B. Williams;

12        Number 22, John Crew, Jr.;

13        Number 38, Marilyn Hoffman;

14        Number 42, Wayne Chaisson;

15        Number 61, John W. Crane;

16        Number 62, Lawrence Nulty.

17        Those jurors were excused by unanimous consent.  A

18   remaining juror, one other juror, Number 52, Bessie M.

19   Bridges, there was an objection to an excuse.  I heard the

20   matter, I've overruled the objection and Juror Number 52, in

21   addition, has been excused.

22        Does Counsel agree that I have correctly reported

23   what occurred in my chambers yesterday?

24        MR. WINTERS:  Yes, sir.

25        MR. RIEHLMANN:  Yes, sir.


                                                        4

1         MR. VOIGHT:  Yes, Your Honor.

2         THE COURT:  Thank you.

3         The first thing I'll do is go through the list of

4    jurors and ask you certain questions, brief questions.

5    Basically, would you state your name and occupation, and if

6    you're married, the occupation of your spouse.

7          Evelyn Dorsey.

8          PROSPECTIVE JUROR NUMBER 1:  Evelyn Dorsey, home-- I

9     be at home all day.

10          THE COURT:  All right.  Jarrod Bourgeois.

11          PROSPECTIVE JUROR NUMBER 2:  Jarrod Bourgeois.  I

12    work at Cenac Towing Company.  I'm a tankerman.  I'm single.

13          THE COURT:  Wanda Williams.

14          PROSPECTIVE JUROR NUMBER 3:  I'm married.  My husband

15    is a welder, and I work for Burger King.

16          THE COURT:  James Payne.

17          PROSPECTIVE JUROR NUMBER 4:  I'm a Graphic Supervisor

18    and my wife is a production line operator.

19          THE COURT:  Victor Todaro, Sr.

20          PROSPECTIVE JUROR NUMBER 5:  My name is Victor Todaro

21    and my wife's name is Buret (phonetic) Todaro.  I'm a Private

22    Security Guard, and my wife works at Sears.

23          THE COURT:  Marilyn Solis.

24          PROSPECTIVE JUROR NUMBER 6:  Martin Solis.

25          THE COURT:  Martin, Martin Solis.


                                        5

1          PROSPECTIVE JUROR NUMBER 6:  Yes, sir.  Retired

2     technician.  My wife, Catherine, is also retired.

3          THE COURT:  Kenneth Livaudais.

4          PROSPECTIVE JUROR NUMBER 7:  I'm an outside salesman

5     for a food distributor in New Orleans, and my wife is a store

6     owner of a video store.

7          THE COURT:  Bruce Vallelungo.

8          PROSPECTIVE JUROR NUMBER 8:  Bruce Vallelungo.  My

9     wife's name is Sherrie.  I'm a Refrigeration Mechanic at

10    Lockheed Martin Space Systems and my wife, Sherrie, is a

11  bookkeeper.

12          THE COURT:  Roxanne Dufrene.

13          PROSPECTIVE JUROR NUMBER 9:  My name is Roxanne

14  Dufrene.  I'm a Deli Night Cook.  My husband, Anthony, is a

15  salesman with Alfonse (phonetic) Concrete.

16          THE COURT:  Gale Armand.

17          PROSPECTIVE JUROR NUMBER 11:  I work for Jefferson

18  Parish Public School System and my wife is a chemist.

19          THE COURT:  Leonard Medal.

20          PROSPECTIVE JUROR NUMBER 12:  I'm an Engineer and my

21  wife is a teacher.

22          THE COURT:  Zeffie Roth.

23          PROSPECTIVE JUROR NUMBER 13:  I'm --

24          THE COURT:  Did I have that right?

25          PROSPECTIVE JUROR NUMBER 13:  Zeffie, right, and my


                                                    6

1   husband's name is John, and he's a general manager for

2   Popeye's, and at this time I'm a housewife.

3           THE COURT:  Betty Adams.

4           PROSPECTIVE JUROR NUMBER 14:  I'm a Registered Nurse.

5   I work in the Emergency Room at Thibodaux Hospital.  My

6   husband is retired.

7           THE COURT:  Margaret Averill.

8           PROSPECTIVE JUROR NUMBER 15:  I'm a Data Entry Clerk.

9   I do billing for physician practices.  My husband is a

10  construction installer --

11          THE COURT:  Gary --

12          PROSPECTIVE JUROR NUMBER 15:  -- and also in the

13  Mississippi Air National Guard.

14      THE COURT:  Thank you.

15      Gary Bernard.

16      PROSPECTIVE JUROR NUMBER 16:  I'm a Field Sales

17  Representative for the Dr. Pepper Company, and my wife is a

18  homemaker.

19      THE COURT:  Ann Ocker.

20      PROSPECTIVE JUROR NUMBER 17:  I work for the

21  Jefferson Parish D.A.'s Office in Support Enforcement, and my

22  husband is an accountant with Blaine-Kern Industries.

23      THE COURT:  Melva Williams.

24      PROSPECTIVE JUROR NUMBER 18:  I'm Melva M.

25  Williams --

1      THE COURT:  Well, would the remainder of you stand,

2  so that we can identify you, please.

3      PROSPECTIVE JUROR NUMBER 18:  Melva M. Williams.  I'm

4  single.  I'm a Clinical Laboratory Scientist, and I work in a

5  chemistry laboratory at Ochsner Hospital.

6      THE COURT:  Johnny Vanderson.

7      PROSPECTIVE JUROR NUMBER 19:  Johnny Vanderson, I

8  work for Bell South.  I'm single.  I'm an Electronics

9  Technician.

10      THE COURT:  Bettie St. Romain.

11      PROSPECTIVE JUROR NUMBER 20:  I'm a retires secretary

12  and I'm a widow.

13      THE COURT:  Randy Davis.

14      PROSPECTIVE JUROR NUMBER 21:  My name is Randy Davis.

15  I work at J&D Transmission.  I'm married and my wife's name is

16  Tina Davis.

17      THE COURT:  Lisa Landry.

18          PROSPECTIVE JUROR NUMBER 23:  Lisa Landry.  My
19  husband and I both own our own business, commercial shelving.
20          THE COURT:  Gregory Riley.
21          PROSPECTIVE JUROR NUMBER 24:  Gregory Riley, I manage
22  a masonry supply company.  My wife runs a photo lab.
23          THE COURT:  Annette Turner.
24          PROSPECTIVE JUROR NUMBER 25:  Annette Turner, I'm
25  single.  I work for Wal-Mart, Department Manager.


                                        8
1          THE COURT:  Errol Mickens.
2          PROSPECTIVE JUROR NUMBER 26:  Errol Mickens, single,
3  a Heavy-Duty Mechanic.
4          THE COURT:  Cynthia Jones.
5          PROSPECTIVE JUROR NUMBER 27:  I'm a manager for
6  Circle K.  My husband is a cement finisher.
7          THE COURT:  Marie Margot.
8          PROSPECTIVE JUROR NUMBER 28:  My name is Marie.  I
9  work for Louisiana Workers' Comp, I'm an Underwriting Service
10  Rep.  My husband is Charles, he works for Entergy.
11          THE COURT:  Herman Coste.
12          PROSPECTIVE JUROR NUMBER 29:  Herman Coste.  I'm a
13  Brick Mason, and my wife is a payroll clerk.
14          THE COURT:  Jessie Magee.
15          PROSPECTIVE JUROR NUMBER 30:  I'm married, I'm a
16  Papermaker, and my wife is a housewife.
17          THE COURT:  Joan Diettel.
18          PROSPECTIVE JUROR NUMBER 31:  I'm a Middle School
19  Teacher in Jefferson Parish.  My husband is an electrical
20  engineer.

21          THE COURT:  Laura Morris.

22          PROSPECTIVE JUROR NUMBER 32:  I'm a Banking

23  Operations Manager and my husband, Glen, works with the

24  carpenters union.

25          THE COURT:  Juanita Hayes.

1          PROSPECTIVE JUROR NUMBER 33:  Juanita Hayes.  I'm

2  single and I'm a Typist/Clerk.

3          THE COURT:  Brent Brouillette.

4          PROSPECTIVE JUROR NUMBER 34:  My name is Brent

5  Brouillette.  I'm a Relief Operator for Bass Enterprises.  My

6  wife is a homemaker.

7          THE COURT:  Tyree Young.

8          PROSPECTIVE JUROR NUMBER 35:  My name is Tyree Young,

9  Truck Driver, Accardo Materials.  My wife works for the

10  parish.

11          THE COURT:  Warren Wagner.

12          PROSPECTIVE JUROR NUMBER 36:  Warren Wagner, I'm an

13  Investor.  My wife is a homemaker.

14          THE COURT:  Dianne Lagarde.

15          PROSPECTIVE JUROR NUMBER 37:  I'm Dianne Lagarde.  I

16  work at JoEllen Smith Convalescent Center.  I'm a Rehab

17  Technician and my husband is a pipefitter.

18          THE COURT:  Anthony Durel.

19          PROSPECTIVE JUROR NUMBER 39:  Anthony Durel, single.

20  I work at the Carnival Club.

21          THE COURT:  Carmella Hebert.

22          PROSPECTIVE JUROR NUMBER 40:  Carmella Hebert,

23  homemaker.  My husband is a retired pharmacist.

24          THE COURT:  Donald Conrad.

25            PROSPECTIVE JUROR NUMBER 41:  Don Conrad, Barge

1    Master, and I'm single.

2            THE COURT:  Harry Daigle.

3            PROSPECTIVE JUROR NUMBER 43:  I'm married.  My wife's

4    name is Grace, and I'm retired.

5            THE COURT:  Willis Luke.

6            PROSPECTIVE JUROR NUMBER 44:  I'm a Petroleum

7    Engineer for Texaco.  My wife is a school teacher for one of

8    the parochial schools.

9            THE COURT:  Bruce Pagluighi.  Have I pronounced that

10   correctly?

11           PROSPECTIVE JUROR NUMBER 45:  My name is Bruce

12   Pagluighi, I'm retired and my wife, Doris, is a homemaker.

13           THE COURT:  Eric Robinson.

14           PROSPECTIVE JUROR NUMBER 46:  My name is Eric

15   Robinson.  I'm single and I'm a Locomotive Engineer.

16           THE COURT:  Janet Keshk.

17           PROSPECTIVE JUROR NUMBER 47:  I'm Janet Keshk.  I'm

18   an Accounting Payroll Clerk at Robert Fresh Market and my

19   husband, Muhammad, is a cab driver.

20           THE COURT:  Horace Blakley.

21           PROSPECTIVE JUROR NUMBER 48:  My name is Horace

22   Blakley.  I'm an Automotive Technician.  My wife is chemical

23   engineer.

24           THE COURT:  Robert Kirk.

25           PROSPECTIVE JUROR NUMBER 49:  I'm Robert Kirk.  I'm a

1   Senior Material Operator for Entergy.  My wife, Gloria, is an
2   administrative manager for Hibernia Bank.
3           THE COURT:  Michelle Lambert.
4           PROSPECTIVE JUROR NUMBER 50:  My name is Michelle
5   Lambert.  I'm a Loan Processor with Green Tree; I'm divorced.
6           THE COURT:  Anna Marie Jones.
7           PROSPECTIVE JUROR NUMBER 51:  My name is Anna Marie
8   Jones.  I'm a Lead Syrup Technician for Delta Beverage Group.
9   My husband is a truck driver for BFI.
10          THE COURT:  Nolan Pertuit.
11          PROSPECTIVE JUROR NUMBER 53:  My name is Nolan
12  Pertuit.  I'm a supervisor for Houma Industries.  My wife is a
13  medical assistant.
14          THE COURT:  Lola Renee Lewis-Davis.
15          PROSPECTIVE JUROR NUMBER 54:  Lola Davis.  I'm a
16  Social Worker for Catholic Charities.  My husband is also a
17  social worker for Catholic Charities.
18          THE COURT:  Rickie Sampey.
19          PROSPECTIVE JUROR NUMBER 55:  Rickie Sampey.  I'm a
20  Chemical Process Technician at Union Carbide and I'm single.
21          THE COURT:  Michael Cooper.
22          PROSPECTIVE JUROR NUMBER 56:  Michael Cooper, I'm a
23  Maintenance Mechanic and my wife is a secretary.
24          THE COURT:  Shequeta Cyprain.
25          PROSPECTIVE JUROR NUMBER 57:  My name is Shequeta

1   Cyprain and I work at Rite Aid Pharmacy and my husband works
2   at TransAmerican.
3           THE COURT:  Anthony Jones.

4          PROSPECTIVE JUROR NUMBER 58:  I'm Anthony Jones.  I'm

5   a Motor Vehicle Operator at U.S.D.A.  My wife is a sales

6   supervisor.

7          THE COURT:  Kathryn Givens.

8          PROSPECTIVE JUROR NUMBER 59:  I'm a Registered

9   Respiratory Therapist at LSU Medical Center and my husband is

10  assistant athletic director at Southeastern University.

11         THE COURT:  Anna Ashley.

12         PROSPECTIVE JUROR NUMBER 60:  Yes, I'm a Teacher

13  Assistant and I'm also a Credit Clerk, and my husband works

14  for Tennessee Gas Pipleline.

15         THE COURT:  Madge Schexnaydre.

16         PROSPECTIVE JUROR NUMBER 63:  I'm Madge Schexnaydre.

17  I'm a Pre-School Teacher and my husband, Rod, is an insurance

18  agent.

19         THE COURT:  Bonnie McConnell.

20         PROSPECTIVE JUROR NUMBER 64:  I'm Bonnie McConnell.

21  I'm a homemaker.  My husband is the Protestant Chaplin of the

22  Veterans Administration Hospital.

23         THE COURT:  Veronica Boudreaux.

24         PROSPECTIVE JUROR NUMBER 65:  I'm Veronica Boudreaux

25  and my husband, Lionel, and I own an insurance agency, and I'm


                                                    13

1   an Accountant.

2          THE COURT:  Donald Lamotte.

3          PROSPECTIVE JUROR NUMBER 66:  Retired.  My wife is a

4   postal clerk for the U.S. Post Office.

5          THE COURT:  Charles Hunter.

6          PROSPECTIVE JUROR NUMBER 67:  Computer Technician.

 7    My wife is a homemaker.

 8         THE COURT:  Lucille Walker.

 9         PROSPECTIVE JUROR NUMBER 68:  Lucille Walker.  I'm a

10    Courtroom Deputy for the United States Bankruptcy Court and my

11    husband, Richard, is a foreman for Lockheed, Lockheed Martin.

12         THE COURT:  Anna Sieg.

13         PROSPECTIVE JUROR NUMBER 69:  Anna Sieg.  My husband

14    is a professor at the University of New Orleans.  I'm a

15    retired dental office manager, currently working part-time, on

16    and off.

17         THE COURT:  Robert Guillot.

18         PROSPECTIVE JUROR NUMBER 70:  Robert Guillot.  I'm

19    Press Room Supervisor at Syndistar Corporation.

20         THE COURT:  Thank you.  Have I missed anyone?

21         We've covered all of them, then.  The Defendants in

22    this case are charged in a three-count indictment.  An

23    indictment is only a statement of charges against the

24    Defendants, it is not evidence of guilt.

25         The Defendants, Leon R. Duncan and Darrel G. Jones,


                                        14
 1    are charged in Count 1 with conspiracy to possess, with intent

 2    to distribute, in excess of five kilograms of cocaine, which

 3    allegedly occurred from on or about December 1, 1993 until on

 4    or about December 7, 1994.

 5         In Count 2 of the indictment, Defendant Leon R.

 6    Duncan is charged with the knowingly using and carrying a

 7    firearm during an in relation to a drug trafficking crime,

 8    namely possession with intent to distribute cocaine, as

 9    charged in Count 1.

10         In Count 3 of the indictment, Defendant Darrel G.

11  Jones is charged with knowingly using and carrying a firearm
12  during and in relation to a drug trafficking crime, namely
13  possession with intent to distribute cocaine, as charged in
14  Count 1.
15          Let me again, just refresh you:  I'm going to ask
16  Counsel to stand and identify themselves.
17          MR. WINTERS:  Al Winters, Assistant United States
18  Attorney.  Good morning.
19          MR. McMAHON:  Good morning.  My name is Michael
20  McMahon.  I'm also an Assistant United States Attorney here in
21  the Eastern District of Louisiana.
22          MR. RIEHLMANN:  Good morning.  My name is Mike
23  Riehlmann and I represent Leon Duncan.
24          MR. VOIGHT:  My name is Greg Voight and I represent
25  Darrel Jones.


                                         15
1           THE COURT:  Do you know the lawyers on either side of
2   this case?  Ever have any dealings with them or the Defendants
3   themselves?
4           PROSPECTIVE JURORS:  (Negative response)
5           THE COURT:  Have you any opinion or have you ever
6   expressed any opinion as to the guilt or innocence of the
7   Defendants, at this time?
8           PROSPECTIVE JURORS:  (Negative response)
9           THE COURT:  Have you ever served as a juror in a
10  criminal or a civil case, either here in the United States
11  court or in a state court?
12          PROSPECTIVE JURORS:  (Affirmative response)
13          THE COURT:  All right, now we'll just go down the

14    line.  What I would like you to tell me is just a civil case,

15    state court or a criminal case state court.  Just say "civil,"

16    "criminal," "state," "federal."

17          We'll go down the line.

18          PROSPECTIVE JUROR NUMBER 4:  Civil --

19          THE COURT:  And, would you state your number, please?

20          PROSPECTIVE JUROR NUMBER 4:  I'm Juror Number 4.  I

21    was on a civil case just right here on the corner.

22          THE COURT:  In the state court.

23          PROSPECTIVE JUROR NUMBER 4:  Yes, sir.

24          THE COURT:  Fine.

25          Next.  Go --


                                            16

1          PROSPECTIVE JUROR NUMBER 5:  I was in civil court --

2    case in state court in Houma, Louisiana.

3          THE COURT:  That's Juror Number 5.

4          Number 6?

5          PROSPECTIVE JUROR NUMBER 6:  Five civil cases; two

6    criminal cases.

7          THE COURT:  State and federal or all in the state

8    court?

9          PROSPECTIVE JUROR NUMBER 6:  State and federal.

10          THE COURT:  All right.  Mr. Livaudais.

11          PROSPECTIVE JUROR NUMBER 7:  Civil case in state.

12          THE COURT:  We'll go to the back row.

13          PROSPECTIVE JUROR NUMBER 12:  Two criminal cases in

14    state court.

15          THE COURT:  All right.  You're number is?

16          PROSPECTIVE JUROR NUMBER 12:  Number 12.

17          THE COURT:  Twelve.

18          Anybody else in the box?

19          PROSPECTIVE JURORS:  (Negative response)

20          THE COURT:  All right.  We'll go back this way.

21   We'll start --

22          PROSPECTIVE JUROR NUMBER 18:  Juror Number 18,

23   criminal court in Orleans Parish.

24          THE COURT:  Thank you.

25          Yes, sir.


                                              17

1           PROSPECTIVE JUROR NUMBER 29:  Juror Number 29,

2    federal court.

3           THE COURT:  Civil or criminal case?

4           PROSPECTIVE JUROR NUMBER 29:  Criminal case.

5           THE COURT:  Thank you.

6           PROSPECTIVE JUROR NUMBER 26:  Twenty-six.  One civil

7    and one criminal in New Orleans.

8           THE COURT:  All right.  Just from now on, I guess,

9    just stand up and I'll take you one at time.

10          PROSPECTIVE JUROR NUMBER 37:  In civil court.

11          THE COURT:  And, state your number, so we'll have

12   that.

13          PROSPECTIVE JUROR NUMBER 37:  Thirty-seven.

14          THE COURT:  Thank you.

15          PROSPECTIVE JUROR NUMBER 47:  Forty-seven.  I had a

16   civil case in a federal court.

17          THE COURT:  All right.

18          PROSPECTIVE JUROR NUMBER 33:  Thirty-three.  A

19   criminal case, New Orleans.

20          PROSPECTIVE JUROR NUMBER 31:  Thirty-one.  I was on a

21    criminal case in Washington Parish.

22          THE COURT:  Thank you.

23          PROSPECTIVE JUROR NUMBER 44:  Forty-four; federal;

24    criminal.

25          THE COURT:  Thank you.

1          PROSPECTIVE JUROR NUMBER 51:  Fifty-one.  Criminal;

2    Edgard.

3          PROSPECTIVE JUROR NUMBER 56:  State; three criminals.

4          THE COURT:  State or federal?

5          PROSPECTIVE JUROR NUMBER 56:  State.

6          THE COURT:  Was it in the federal court or state

7    court?

8          PROSPECTIVE JUROR NUMBER 56:  State.

9          THE COURT:  State?  All right.

10          PROSPECTIVE JUROR NUMBER 57:  Fifty-seven; two

11    criminal in New Orleans.

12          PROSPECTIVE JUROR NUMBER 60:  Sixty; one criminal in

13    state; one civil in state and one criminal in United States

14    court; federal.

15          THE COURT:  Thank you.

16          PROSPECTIVE JUROR NUMBER 65:  Juror Number 65, and it

17    was state court, criminal.

18          PROSPECTIVE JUROR NUMBER 66:  Number 66; three

19    criminal cases in state court.

20          THE COURT:  Thank you.

21          PROSPECTIVE JUROR NUMBER 68:  Juror Number 68; one

22    criminal; one civil in state court.

23          PROSPECTIVE JUROR NUMBER 69:  Sixty-nine; three

24    criminals; one state civil and one federal civil.

25          THE COURT:  Thank you.

1          Have you or any member of your immediate family ever
2     served as a law enforcement officer?
3          PROSPECTIVE JURORS:  (Affirmative response)
4          THE COURT:  All right.  We'll start with the box and
5     go to the back.  Number 1, Juror Number 1.
6          PROSPECTIVE JUROR NUMBER 1:  My daughter was a
7     police.
8          THE COURT:  All right.
9          Who's next?
10         PROSPECTIVE JUROR NUMBER 4:  My father was a reserve
11    officer 30 years ago.
12         THE COURT:  Anybody else in the box?
13         PROSPECTIVE JUROR NUMBER 8:  (Affirmative response)
14         THE COURT:  Yes, sir.
15         PROSPECTIVE JUROR NUMBER 8:  Number 8.  My brother
16    was a detective for St. Bernard Parish.
17         PROSPECTIVE JUROR NUMBER 6:  My daughter-in-law is
18    with the District Attorney's Office.  She's a prosecutor.
19         THE COURT:  Now we go to the back.  Just stand up and
20    do it again, if you don't mind, please.
21         PROSPECTIVE JUROR NUMBER 29:  Juror Number 29.  My
22    brother is a former CID agent for the Department of the Army.
23         PROSPECTIVE JUROR NUMBER 27:  Juror Number 27.  My
24    mama was a jailer in St. Charles Parish.
25         THE COURT:  Whoever is next.

1          PROSPECTIVE JUROR NUMBER 48:  Juror Number 48,
2     military police, Army National Guard.
3          PROSPECTIVE JUROR NUMBER 50:  Number 50.  My ex-
4     husband works for the city, Sheriff Valteau.
5          PROSPECTIVE JUROR NUMBER 56:  Number 56.  I've got a
6     cousin and a brother, New Orleans Police Department.
7          PROSPECTIVE JUROR NUMBER 57:  Number 57.  I have a
8     cousin that works at LTI.
9          PROSPECTIVE JUROR NUMBER 58:  Number 58.  My father
10    retired from the Orleans Parish Sheriff's Department, and both
11    his brothers are with the Oakland P.D. and I have two first
12    cousins with NOPD.
13         THE COURT:  Thank you.  That covers it.
14         Have you or any member of your immediate family been
15    a victim of a crime?
16         PROSPECTIVE JURORS:  (Affirmative response)
17         THE COURT:  Has any member of your immediate family
18    ever been --
19         PROSPECTIVE JUROR NUMBER 4:  Yes.  My home was broken
20    into about two years ago, and I had some things stolen.
21         THE COURT:  Anybody else?
22         PROSPECTIVE JUROR NUMBER 6:  Number 6.  My home was
23    also broken into three times.
24         PROSPECTIVE JUROR NUMBER 12:  Number 12.  My car was
25    stolen about one and one-half year ago.

1          PROSPECTIVE JUROR NUMBER 11:  I'm Number 11.  My
2     house was broken into, burglarized and a car was stolen.
3          PROSPECTIVE JUROR NUMBER 1:  Juror Number 1.  My

4    daughter's car was stolen.

5              PROSPECTIVE JUROR NUMBER 18:  Number 18.  Home

6    burglary and auto theft.

7              PROSPECTIVE JUROR NUMBER 19:  Number 19; Automobile.

8              PROSPECTIVE JUROR NUMBER 27:  Number 27.  My Blazer

9    was stolen in Raceland.

10             PROSPECTIVE JUROR NUMBER 23:  Number 23.  I had

11   something stolen out of my car many years ago.

12             PROSPECTIVE JUROR NUMBER 31:  I had a car stolen.

13             THE CLERK:  What's your number?  Your number?

14             PROSPECTIVE JUROR NUMBER 31:  Oh, I'm sorry; 31.

15             PROSPECTIVE JUROR NUMBER 34:  My house was broken

16   into.  I'm Juror Number 34.

17             PROSPECTIVE JUROR NUMBER 44:  Forty-four; auto theft.

18             PROSPECTIVE JUROR NUMBER 55:  Fifty-five; auto theft.

19             PROSPECTIVE JUROR NUMBER 56:  Fifty-six; auto theft.

20             PROSPECTIVE JUROR NUMBER 60:  Sixty; boat theft.

21             PROSPECTIVE JUROR NUMBER 65:  Sixty-five; home broken

22   into and burglarized.

23             PROSPECTIVE JUROR NUMBER 66:  Sixty-six; home broken

24   into and automobile theft.

25             PROSPECTIVE JUROR NUMBER 67:  Sixty-seven; car


                                              22

1    stolen.

2              PROSPECTIVE JUROR NUMBER 69:  Sixty-nine; my car was

3    stripped, tires, everything, from my house.

4              PROSPECTIVE JUROR NUMBER 70:  Number 70; stuff stolen

5    out of my vehicle.

6              THE COURT:  All right.

 7          PROSPECTIVE JUROR NUMBER 36:  Thirty-six; attempted

 8    armed robbery by two blacks.

 9          THE COURT:  Has any member of your immediate family

10    ever been an official or employee of the United States

11    Government?

12          PROSPECTIVE JURORS:  (Affirmative response)

13          THE COURT:  Let's go.

14          PROSPECTIVE JUROR NUMBER 1:  Number 15.  My

15    husband --

16          Go ahead.

17          PROSPECTIVE JUROR NUMBER 1:  Juror Number 1.  My

18    daughter in the Air Force.

19          PROSPECTIVE JUROR NUMBER 15:  Number 15.  My husband

20    was active duty Air Force for many years, and is now Air

21    National Guard.

22          THE COURT:  Anybody else?

23          PROSPECTIVE JUROR:  (Affirmative response)

24          THE COURT:  Yes?

25          PROSPECTIVE JUROR NUMBER 32:  I'm Juror Number 32,


                                                        23

 1    and I have a sister that works for the United States District

 2    Court in Hale Boggs Building.

 3          THE COURT:  Yes, sir.

 4          PROSPECTIVE JUROR NUMBER 24:  Number 24.  My brother

 5    was in the Navy.  My father was in the Army.

 6          THE COURT:  Just whoever wants to stand up --

 7          PROSPECTIVE JUROR NUMBER 49:  Number 49 --

 8          THE COURT:  -- stand up.

 9          PROSPECTIVE JUROR NUMBER 49:  Number 49, retired from

10    the United States Coast Guard.

11          PROSPECTIVE JUROR NUMBER 48:  Number 48.  I served in
12     the Army and the National Guard.
13          PROSPECTIVE JUROR NUMBER 51:  Number 51; served in
14     the United States Army.
15          PROSPECTIVE JUROR NUMBER 55:  Number 55; served in
16     the United States Navy.
17          PROSPECTIVE JUROR NUMBER 56:  Fifty-six; postal
18     worker.
19          PROSPECTIVE JUROR NUMBER 57:  Fifty-seven; United
20     States Post Office.
21          PROSPECTIVE JUROR NUMBER 45:  Forty-five; my sister
22     worked for the Naval Department and I served in the Army.
23          PROSPECTIVE JUROR NUMBER 58:  Fifty-eight; my father
24     is retired from the Army.
25          PROSPECTIVE JUROR NUMBER 64:  Sixty-four; my father


                                              24
1     was State Department, USAID, and my husband is presently a
2     Reserve Chaplin in the U.S. Navy.
3          PROSPECTIVE JUROR NUMBER 65:  Number 65.  My husband
4     is out of the Air Force, 21 years.  He retired a Lieutenant
5     Colonel.
6          PROSPECTIVE JUROR NUMBER 66:  Sixty-six; retired from
7     the U.S. Postal Service.
8          PROSPECTIVE JUROR NUMBER 67:  Sixty-seven; United
9     States Army.
10          PROSPECTIVE JUROR NUMBER 68:  Sixty-eight.  My
11     husband served in the U.S. Air Force.
12          PROSPECTIVE JUROR NUMBER 70:  Number 70.  My dad was
13     in the United States Marine Corps Reservist.

14          PROSPECTIVE JUROR NUMBER 30:  Number 30.  I was six
15  years in the Army National Guard.
16          PROSPECTIVE JUROR NUMBER 29:  Twenty-nine; U.S. Army,
17  myself, and my brother was a CID agent for the U.S. Army.
18          PROSPECTIVE JUROR NUMBER 23:  Number 23.  My father
19  was in the Army.
20          PROSPECTIVE JUROR NUMBER 37:  Number 37.  My husband
21  was in the U.S. Navy.
22          PROSPECTIVE JUROR NUMBER 64:  Sixty-four; my son is
23  in the U.S. Coast Guard.
24          PROSPECTIVE JUROR NUMBER 6:  U.S. Air Force, eight
25  years.


                                                        25
1          PROSPECTIVE JUROR NUMBER 5:  U.S. Army, two years.
2  Number 5.
3          PROSPECTIVE JUROR NUMBER 6:  Number 6.
4          THE COURT:  Do you or any member of your immediate
5  family have any dealing with the United States or any agencies
6  thereof, or with the Defendants, from which you or they may
7  profit?
8          PROSPECTIVE JURORS:  (Negative response)
9          THE COURT:  Have you ever had or do you anticipate
10  having a dispute with or claim against the United States or
11  the Defendants?
12          PROSPECTIVE JURORS:  (Negative response)
13          THE COURT:  Have you or any member of your immediate
14  family ever been arrested, convicted of or pled guilty to a
15  crime, other than a routine traffic violation?
16          PROSPECTIVE JURORS:  (Affirmative response)
17          THE COURT:  You're free to step up here, if you want

18    to.  You can step up here.
19        THE CLERK:  Would you say that again, and state your
20    number?
21        PROSPECTIVE JUROR NUMBER 1:  Number 1.  My son is
22    incarcerated.
23        PROSPECTIVE JUROR NUMBER 51:  Number 51; my husband.
24        THE COURT:  Anybody else?
25        PROSPECTIVE JUROR NUMBER 3:  Number 3; my husband.


26

1         PROSPECTIVE JUROR NUMBER 56:  Fifty-six; myself.
2         PROSPECTIVE JUROR NUMBER 48:  Forty-eight; myself,
3    simple battery.
4         PROSPECTIVE JUROR NUMBER 30:  Number 30.  I pled
5    guilty in New Orleans to aggravated battery.
6         PROSPECTIVE JUROR NUMBER 39:  Thirty-nine; myself.
7         PROSPECTIVE JUROR NUMBER 27:  Number 27; my husband
8    for battery.
9         PROSPECTIVE JUROR NUMBER 37:  Number 37; my daughter.
10        PROSPECTIVE JUROR NUMBER 35:  Thirty-five; my son.
11        THE CLERK:  Wait, one at a time.
12        PROSPECTIVE JUROR NUMBER 9:  Number 9; my husband.
13        PROSPECTIVE JUROR NUMBER 70:  Number 70; myself.
14        PROSPECTIVE JUROR NUMBER 2:  Number 2; myself.
15        THE COURT:  Do you or does anyone in your immediate
16    family have problems with drug abuse or have they been
17    involved with drug dealing?  If so, do you think this would
18    affect your ability to be a fair an impartial juror?
19        PROSPECTIVE JURORS:  (Negative response)
20        THE COURT:  Do you have any belief or opinion that

Page 23

21  the offense, which the Defendants are charged with, is unique,

22  in the sense that it should be pursued with extraordinary

23  vigor, it should not constitute an offense, it may carry a

24  penalty, which you may consider improper?

25          PROSPECTIVE JURORS:  (Negative response)


27

1          THE COURT:  If you were the United States Attorney

2   charged with the responsibility of prosecution or, if you

3   were the Defendants on trial here today charged with the same

4   offenses, or if you were Counsel for the Defense, do you know

5   of any reason why you would not be satisfied to have this

6   case tried by someone in your frame of mind?

7          PROSPECTIVE JURORS:  (Negative response)

8          THE COURT:  It is anticipated the trial of this case

9   may require five days to complete.  Although I cannot make any

10  promise to you about the length of the trial, it may be

11  shorter than that.  It may be longer.  We're not going to be

12  sequestered, as you might wonder.  You can come and go each

13  day, go home every -- each evening, come back in the morning.

14          The case is before the court, as you know, by reason

15  of an indictment found by the grand jury.  The indictment is

16  only a charge.  It is not evidence of guilt.  No inferences of

17  guilt may be drawn by the jury from the mere fact that the

18  Government has charged the Defendants.

19          The Defendants have pled not guilty to the charges

20  and are presumed innocent unless and until proven guilty

21  beyond a reasonable doubt.

22          Although you, the jury are the judges of the facts in

23  this case, you must accept and apply the law applicable to the

24  case, as it is given to you by the Court.

25          If you are selected as a juror, or an alternate who

                                                        28
1   may later deliberate on the decision to be reached in this
2   case, it will be your sworn duty under the law to decide this
3   case solely on the evidence adduced during this trial and the
4   law applicable to the case as it is given to you by the Court.
5          If any of you would answer these following questions
6   with a "no," please raise your hand:
7          Do you understand that the indictment, that is, the
8   Government's charge against the Defendants is not evidence of
9   the Defendants' guilt?  Will you so regard the indictment?
10          Do you understand that you cannot draw any inferences
11   of guilt from the mere fact that the Government accuses the
12   Defendants?  Will you so refrain from drawing any such
13   inference?
14          Will you accept the law as given to you by the court
15   and disregard any ideas, beliefs or notions you may have or
16   which you may encounter in reaching your verdict as to what
17   the law should or should not be?
18          Will you decide the case solely and only on the
19   evidence adduced at this trial and the law as it is given to
20   you by the Court?
21          Will you give the Defendants the benefit of the
22   presumption of innocence?
23          Will you require the Government to prove the guilt of
24   the Defendants beyond a reasonable doubt before reaching a
25   verdict of guilty?

1   Would you firmly put aside any feelings of prejudice,

2 sympathy or passion and decide this case solely and only on

3 the evidence and the law and render a true verdict without

4 regard to the consequences to the Prosecution or to the

5 Defendants?

6   Now, for these next questions, if any of you would

7 answer "yes," please raise your hand:

8   Do you, of your own knowledge, know anything about

9 the facts of this case?

10   Has anyone who claims to have knowledge talked to you

11 about this case?

12   Do you know of any reason why you may be prejudiced

13 for or against the Government or the Defendants, because of

14 the nature of the charges involved in this case or any other

15 circumstances?

16   It is my function to decide all questions of law.

17 At the end of the case, I will instruct you as to what law you

18 must apply to the facts, as you find them.  In that regard,

19 you must accept my rulings and instructions as correct,

20 whether you privately agree or disagree with my ruling or the

21 wisdom of the law.

22   Would you, for any reason, be unwilling to apply the

23 law as I give it to you?

24   As a juror, it would be your solemn duty to render a

25 verdict based solely on the evidence presented in court at

1 this trial, without any consideration of sympathy or bias and

2 based on the law as I will give it to you in my instructions,

3 disregarding any other ideas, notions or beliefs about the law

    4    that you may have encountered or would you, for any reason, be

    5    unwilling or unable to fulfill this duty if you were chosen as

    6    a juror?

    7            PROSPECTIVE JURORS:  (Affirmative response)

    8            THE COURT:  Do any of you have any other --

    9            THE CLERK:  There was two hands.

   10            THE COURT:  If you'd just stand and recite your

   11    number.

   12            PROSPECTIVE JUROR NUMBER 36:  Number 36.

   13            THE COURT:  And, what would be your answer to my

   14    question?

   15            PROSPECTIVE JUROR NUMBER 36:  I don't believe I could

   16    make a fair determination.  I feel they're guilty.

   17            THE COURT:  Anybody else?

   18            PROSPECTIVE JUROR NUMBER 64:  I --

   19            THE COURT:  That's number?

   20            PROSPECTIVE JUROR NUMBER 64:  Sixty-four.  I have a

   21    commitment out of town that commences on the 16th, and all

   22    sorts of -- I mean, reservations and whatever.  I would have a

   23    very hard time at the end, if it went past that date.

   24            THE COURT:  Thank you.

   25            Now, do any of you have any other matter, which you

                                                        31

    1    feel should be called to the Court's attention, which may have

    2    some bearing on your qualifications as a juror?

    3            PROSPECTIVE JUROR:  (Affirmative response)

    4            THE CLERK:  There's a hand, Judge.

    5            PROSPECTIVE JUROR NUMBER 48:  Forty-eight.  I have a

    6    class in Dallas, Texas on the 5th of next month.

7          THE COURT:  As the lawyers and I were reviewing the

8    answers provided on --

9        (Off the record housekeeping discussion at bench)

10         THE COURT:  As the lawyers and I were reviewing the

11   answers provided on the questionnaire that you filled out

12   yesterday, we realized that there was a question which might

13   have been worded in a confusing way, so I'm going to ask you

14   this question; if there is anyone who would answer this

15   question "yes," please raise your hand and state your name and

16   number.

17         The question is:  Will the ethnic origin or race of

18   any witness or Defendant influence your verdict against him?

19         PROSPECTIVE JURORS:  (Affirmative response)

20         THE CLERK:  Judge, there's a hand up.

21         THE COURT:  Number 3.

22         PROSPECTIVE JUROR NUMBER 3:  I'd say yes.  I believe

23   they're guilty, too, so I'm not going to be able to have no

24   fair judgment on them, myself.

25         THE COURT:  All right.


                                              32

1          THE CLERK:  There's another hand in the box.

2          PROSPECTIVE JUROR NUMBER 36:  Number 36.

3          THE COURT:  What would be your answer, for the

4    record?

5          PROSPECTIVE JUROR NUMBER 36:  I just would have a

6    hard time making an unbiased opinion.

7          THE COURT:  All right.

8          Does Counsel want to step up, please.

9        (At side bar on the record)

10         THE COURT:  I've reached a point where I'm finished,

11  and we're going to shuffle them over there and are you all

12  ready?

13  　　　　MR. McMAHON:  I'm ready.

14  　　　　THE COURT:  So, what will we keep?

15  　　　　THE CLERK:  We can keep the ones on the box and the

16  rest back.

17  　　　　THE COURT:  Yes, but you all were talking yesterday

18  about one at a time.

19  　　　　MR. WINTERS:  Which we talked about yesterday?

20  　　　　THE COURT:  Yes.

21  　　　　MR. WINTERS:  Excusing all of them, but --

22  　　　　MR. McMAHON:  Calling them in one at a time.

23  　　　　MR. WINTERS:  Calling them in one at a time.

24  　　　　MR. McMAHON:  The ones you want to answer

25  individually.


　　　　　　　　　　　　　　　　　　　　　　　　　　　　33

1  　　　　MR. WINTERS:  Judge, we have about 25 or 26 we want

2  to ask brief questions to.

3  　　　　THE COURT:  Okay.  I plan to break around about 12:00

4  or a little after, so we can't complete this before lunch.  I

5  could say numbers one through such-and-such remain in the

6  courtroom across the hall.  They haven't even turned the

7  lights on in there.  It's probably locked.

8  　　　　So, why don't I tell the others to come back at about

9  1:15, something like that?

10  　　　　MR. WINTERS:  Okay.

11  　　　　THE COURT:  All right.  Now, they're coming in three

12  at a time or --

13  　　　　MR. WINTERS:  One.

14          THE COURT:  Do you have anything for Number 1,

15  questions for Juror Number 1?

16          MR. McMAHON:  Yes, sir.  She can stay.

17          THE COURT:  Okay.  All right.  Thank you.

18          Now, where are we going to break, about 30 --

19          MR. WINTERS:  About 20 to 12:00, Judge.

20          THE COURT:  Yeah, but, I mean, I'm going to excuse --

21  through 30 stay; 31 on -- 1:15?

22          MR. McMAHON:  Yes.

23          MR. WINTERS:  That's fine.

24          MR. RIEHLMANN:  That will work.

25          THE COURT:  Thank you.


                                              34

1      (End of discussion at side bar)

2          THE COURT:  All of the lawyers have questions that

3  they want to ask.  They'll be brief, but it will be on a one-

4  by-one basis.  So, at this time, Jurors Number 31 forward, all

5  the way through 70, you're excused for lunch and ask you if

6  you'll come back at 1:15.

7          Now, where -- are you --

8          THE CLERK:  I just called them and she's going to

9  open the courtroom and turn on the lights.

10          THE COURT:  Well, where are the jurors going to go?

11  Do you want them to come back here or in the jury room?  I

12  suggest they come back here.

13          THE CLERK:  Yes.

14          THE COURT:  All right.

15          Thirty-one through 70, you're excused until 1:15.

16      (Prospective Jurors 31 through 70 exit courtroom)

17          THE COURT:  Now, I'm sure we're not going to be able

18  to complete this matter with the first 30 jurors, but we'll
19  start, and it's 20 minutes to 12:00.  Come 12:00, we'll take
20  a break until 1:15, also.
21       So, all of the jurors, except Number 1, the marshal
22  will take you across the hall to an empty courtroom and we'll
23  call you one-by-one.
24       (Prospective Jurors 2 through 30 exit courtroom)
25       THE COURT:  Juror Number 1 is present in the box.


                                                35
1   Are there any questions of the juror?
2            MR. McMAHON:  Yes, Your Honor.
3            Good morning, Ms. Dorsey.
4            PROSPECTIVE JUROR NUMBER 1:  Good morning.
5            MR. McMAHON:  I just have -- my name is Mike McMahon,
6   one of the Prosecutors in the case.  We just have a couple of
7   questions about your responses on the jury questionnaire.
8            Do you remember filling that out yesterday?
9            PROSPECTIVE JUROR NUMBER 1:  Yes, I did.
10           MR. McMAHON:  Number 10, let me read it to you.
11  Question Number 10 stated:  "Can you believe the testimony of
12  a convicted felon, if it is supported by other evidence or
13  would you automatically disregard it?"
14           Now, we're going to call a couple of convicted felons
15  in the case.  Now, how would you view the testimony of a
16  convicted felon?
17           PROSPECTIVE JUROR NUMBER 1:  That's the one I had had
18  a little problem with.  I couldn't understand that one too
19  well.
20           MR. McMAHON:  Okay.  What would your answer be?

21  Could you believe the testimony of a convicted felon, if it's
22  supported by other evidence?
23          PROSPECTIVE JUROR NUMBER 1:  Well, I think so.  If
24  it's, you know, if -- it's by other evidence?
25          MR. MCMAHON:  Right.  I mean, you seem to be having

1  problems with that.
2          PROSPECTIVE JUROR NUMBER 1:  Yeah.
3          MR. MCMAHON:  Or would you disregard it?
4          PROSPECTIVE JUROR NUMBER 1:  I'd have to disregard
5  it.
6          MR. MCMAHON:  Thank you.
7          Ms. Dorsey, you also mentioned in the earlier voir
8  dire that you have a son who is incarcerated?
9          PROSPECTIVE JUROR NUMBER 1:  Yes.
10          MR. MCMAHON:  For what is he incarcerated?
11          PROSPECTIVE JUROR NUMBER 1:  Rape charge.
12          MR. MCMAHON:  Okay.  Now, we're prosecuting this
13  case.  Can you be fair?  Do you think you can give the
14  Prosecution a fair shake --
15          PROSPECTIVE JUROR NUMBER 1:  Yes, I could.
16          MR. MCMAHON:  Even in view of your son's --
17          PROSPECTIVE JUROR NUMBER 1:  Yes.
18          MR. MCMAHON:  All right.  That's all I have, Your
19  Honor.
20          THE COURT:  Mr. Riehlmann.
21          MR. RIEHLMANN:  Thank you, Judge.
22          Good morning, Ms. Dorsey, --
23          PROSPECTIVE JUROR NUMBER 1:  Good morning.
24          MR. RIEHLMANN:  -- I believe it's still morning.

25          Insofar as believing the testimony of a convicted

1   felon, if a convicted felon told you, for instance, that he
2   saw the Defendant rob somebody with a gun, and then they also
3   plead -- fortunately, the police had a video tape --
4          MR. McMAHON:  Your Honor, I'm going to object to the
5   hypothetical.  I mean, this is -- you know, it's getting --
6   you know, you start getting --
7          THE COURT:  Well, perhaps the objection to the form
8   of the question is appropriate.
9          MR. RIEHLMANN:  Well, I just -- but, what I'm --
10          THE COURT:  Rephrase the question, Counsel.
11          MR. McMAHON:  What I'm getting at, Ms. Dorsey, is the
12   question is:  Can you accept the testimony of a convicted
13   felon, if it is supported by other convincing, persuasive
14   evidence, like if they had a video tape of the Defendant doing
15   something wrong, and then the convicted felon told you, "Yeah,
16   he did this"?  I mean, it's corroborated by other evidence,
17   could you still accept the testimony of the convicted felon as
18   corroborated by other evidence and if you were convinced
19   beyond a reasonable doubt that the man did what they charged
20   him with, find him guilty?
21          PROSPECTIVE JUROR NUMBER 1:  And, you didn't see
22   that, you didn't see the felony do it?
23          MR. RIEHLMANN:  Well, I guess what I'm saying is:
24   Suppose the felon, the convicted felon that the Government
25   calls as a witness, --

1       PROSPECTIVE JUROR NUMBER 1:  Uh-huh. (affirmative
2  response)

3       MR. RIEHLMANN:  -- tells you, "I saw so-and-so commit
4  this crime."  And, then other witnesses come on and give you
5  other evidence the corroborates what he's saying --

6       MR. MCMAHON:  I'm objecting to the form, because --

7       THE COURT:  It's sort of repetitive in different
8  ways.  Rephrase the question.  This is suppose to be limited
9  voir dire, Counsel, let me remind you.

10      MR. RIEHLMANN:  Yes, sir.  I'm just trying to --

11      PROSPECTIVE JUROR NUMBER 1:  Well, if I didn't see
12  it, I don't think I could, you know, --

13      MR. RIEHLMANN:  Thank you.

14      PROSPECTIVE JUROR NUMBER 1:  -- just go by what they
15  said.  I have to see, just like they saw.

16      MR. RIEHLMANN:  Right.  But, if you heard, let's say
17  you heard --

18      MR. MCMAHON:  Objection, it's repetitive.  Judge,
19  she's answered the question.

20      THE COURT:  Yes, she's answered the question pretty
21  thoroughly.  What's your next question, sir?

22      MR. RIEHLMANN:  That's all I have, Judge.

23      THE COURT:  Thank you.

24      Mr. Voight.

25      MR. VOIGHT:  I have nothing, Your Honor.

1      THE COURT:  Juror Number -- whatever the next number
2  is.

3      Thank you, ma'am, you may be excused, now, for lunch

4    and if you would return at 1:15.  Thank you.

5             MR. WINTERS:  Juror Number 2, Your Honor.

6             THE COURT:  Two, and then get three or tell the

7    marshal to get -- tell them to get them set up with the next

8    one and they just roll in.

9             (Prospective Juror Number 1 exits courtroom)

10             (Prospective Juror Number 2 enters)

11             MR. WINTERS:  Mr. Bourgeois, how are you doing, sir?

12             PROSPECTIVE JUROR NUMBER 2:  Okay.

13             MR. WINTERS:  My name is Al Winters.  I'm one of the

14    Prosecutors in the case, along with Mr. McMahon, and I have

15    just, really, just two questions for you concerning this

16    questionnaire that you filled out yesterday.  Do you recall

17    filling this out?

18             PROSPECTIVE JUROR NUMBER 2:  Yes, sir.

19             MR. WINTERS:  The first question I have pertains to

20    Question Number 3, on the questionnaire, okay.  Let me read

21    the question to you, okay?

22             PROSPECTIVE JUROR NUMBER 2:  Okay.

23             MR. WINTERS:  "During the investigation of illegal

24    activities, undercover agents --"

25             And, there will be an undercover agent testify.


                                        40

1             PROSPECTIVE JUROR NUMBER 2:  Uh-huh. (affirmative

2    response)

3             MR. WINTERS:  "-- often must give government money to

4    people they are investigating, --"

5             People they're working undercover on.

6             PROSPECTIVE JUROR NUMBER 2:  Uh-huh. (affirmative

7    response)

8         MR. WINTERS:  "-- and many times that money is never

9    recovered."

10        PROSPECTIVE JUROR NUMBER 2:  Right.

11        MR. WINTERS:  Because the investigation goes on.

12        Do you have a problem with this?

13        PROSPECTIVE JUROR NUMBER 2:  Yes, if they don't get

14   the money back, you know.

15        MR. WINTERS:  Well, what type of a problem?  Would

16   the problem you have with this affect your ability to give the

17   Government a fair trial?

18        PROSPECTIVE JUROR NUMBER 2:  No.

19        MR. WINTERS:  Are you saying that you don't think --

20        PROSPECTIVE JUROR NUMBER 2:  I don't think it's right

21   if you can't recover the money, you know.

22        MR. WINTERS:  Okay.  You don't think criminals ought

23   to be able to keep the money?

24        PROSPECTIVE JUROR NUMBER 2:  Right.

25        MR. WINTERS:  Okay.  And, one other question I have

                                        41

1    for you, Question Number -- on 21, Question 21, you state that

2    you're on probation for a DWI until November of '98?

3         PROSPECTIVE JUROR NUMBER 2:  Right.

4         MR. WINTERS:  Would that in any way affect -- the

5    fact that you were prosecuted for DWI affect your ability to

6    give the Government a fair trial?

7         PROSPECTIVE JUROR NUMBER 2:  No.

8         MR. WINTERS:  I have nothing further, Your Honor.

9         THE COURT:  Mr. Riehlmann?

10        MR. RIEHLMANN:  Yes, sir.

11          I believe, Mr. Bourgeois, that you may have

12   overlooked a question -- I'm not sure, but Number 7?

13          PROSPECTIVE JUROR NUMBER 2:  Number 7.

14          MR. RIEHLMANN:  Do you remember what the question

15   was?

16          PROSPECTIVE JUROR NUMBER 2:  No.

17          MR. RIEHLMANN:  It was:  Would you give more

18   credibility or more weight to the testimony of a law

19   enforcement officer, as opposed to a non-law enforcement

20   officer witness?  And, you didn't check either one.

21          PROSPECTIVE JUROR NUMBER 2:  Depending on the

22   evidence, you know.

23          MR. RIEHLMANN:  So, in answering it "yes" or "no,"

24   how would you answer it?

25          PROSPECTIVE JUROR NUMBER 2:  Depending on the


                                          42

1    evidence.

2          THE COURT:  Read the question and let's see.

3          PROSPECTIVE JUROR NUMBER 2:  Yeah, --

4          THE COURT:  Would you read the question to him?

5          MR. RIEHLMANN:  "Would you give more weight to the

6    testimony of a law enforcement witness than any other witness?

7    Yes or No?"

8          PROSPECTIVE JUROR NUMBER 2:  Well, if the -- I

9    wouldn't do it just because he was an officer, you know.  I

10   wouldn't give him the weight.

11          MR. RIEHLMANN:  All right.  And, on Number 10, and

12   I'll read you the question again:  "Can you believe the

13   testimony of a convicted felon, if it is supported by other

14  evidence, or would you automatically disregard it?"  You

15  answered "yes."  That question was kind of confusingly worded.

16  Were you answering "yes" to the part that said, "Can you

17  believe the testimony of a convicted felon, if it is supported

18  by other evidence," or were you answering "yes" to you would

19  automatically disregard it?

20          PROSPECTIVE JUROR NUMBER 2:  To the first.

21          MR. RIEHLMANN:  All right.  Thank you so much,

22  Mr. Bourgeois.

23          No further questions.

24          THE COURT:  Mr. Voight.

25          MR. VOIGHT:  I have nothing, Your Honor.


                                                    43

1          THE COURT:  Thank you.  You're excused now for lunch

2   until 1:15.

3          MR. McMAHON:  Number 3, Your Honor.

4          MR. WINTERS:  Number 5 is next.

5          (Prospective Juror Number 2 exits courtroom)

6              (Prospective Juror Number 3 enters)

7          MR. McMAHON:  Good morning, Ms. Williams.

8          PROSPECTIVE JUROR NUMBER 3:  Good morning.

9          MR. McMAHON:  How are you doing?

10          PROSPECTIVE JUROR NUMBER 3:  Fine.

11          MR. McMAHON:  We have some questions about your

12  responses to the questionnaire, and on the first one is

13  Question Number 3.  Let me read it:  "During the investigation

14  of illegal activities, undercover agents often must give

15  government money to the people they're investigating and many

16  times the money is never recovered."  And, you indicated on

17  your questionnaire that you had a problem with this.

18          PROSPECTIVE JUROR NUMBER 3:  Yes, I did.

19          MR. McMAHON:  Can you elaborate on that?

20          PROSPECTIVE JUROR NUMBER 3:  I just -- I really think

21  -- I look at a lot of T.V. and that's what I get that from.  I

22  think a lot of policemen give the people that they're trying

23  to bring to jail money that -- I don't know.  I really

24  couldn't tell you.  I don't know nothing about that.  I don't

25  know too much about the law, so I couldn't say.


                                        44

1          MR. McMAHON:  Well, that's what happened in this

2  case.  Now, would that -- because of that fact happened, --

3          PROSPECTIVE JUROR NUMBER 3:  Yeah.

4          MR. McMAHON:  -- would you, in any way, hold it

5  against the Prosecution or would you --

6          PROSPECTIVE JUROR NUMBER 3:  About them not getting

7  the money back?

8          MR. McMAHON:  Right.

9          PROSPECTIVE JUROR NUMBER 3:  Yeah.

10          MR. McMAHON:  You would hold it against us?

11          PROSPECTIVE JUROR NUMBER 3:  No, not holding it

12  against you all.  I hold it against the person that gives --

13  if it was you all, yeah, I'd hold it against you all.  I think

14  they shouldn't be using the money to give to people they're

15  bringing to jail in the first place.  You know, I think they

16  should try another way.  I don't know.

17          MR. McMAHON:  Well, that's what happened here, so

18  what I'm going -- I'm going to tell you right up front.

19          PROSPECTIVE JUROR NUMBER 3:  Uh-huh. (affirmative

20  response)

21        MR. McMAHON:  So, knowing that, -- and it was a good

22  sum of money.

23        PROSPECTIVE JUROR NUMBER 3:  Yeah.

24        MR. McMAHON:  So, the fact that that happened, would

25  you be able to give the Prosecution a fair shake?

1        PROSPECTIVE JUROR NUMBER 3:  (Shakes head negatively)

2        MR. McMAHON:  You have to answer out loud.

3        PROSPECTIVE JUROR NUMBER 3:  Yes.  Yes, I can.  Okay.

4        MR. McMAHON:  You were shaking your head "no," then

5  you answered, so I'm a little confused.

6        PROSPECTIVE JUROR NUMBER 3:  I'm confused, too,

7  because I really don't understand the question.  I don't know,

8  you're saying they used the money to give to the people that's

9  crooks, right?

10        MR. McMAHON:  Right.

11        PROSPECTIVE JUROR NUMBER 3:  Okay, so why would they

12  use government money to give to crooks?  I don't understand

13  that, either.

14        MR. McMAHON:  Well, you'll find out as the testimony

15  would go on.

16        PROSPECTIVE JUROR NUMBER 3:  Oh, okay.

17        MR. McMAHON:  But, the fact is, it was a lot of

18  money and we never got it back.

19        PROSPECTIVE JUROR NUMBER 3:  You shouldn't have gave

20  it to them.  I don't -- I couldn't tell you, I don't know.  I

21  feel like they should have never gave it to them.

22        MR. McMAHON:  You also answered Number 10; let me

23  read Number 10:  "Can you believe the testimony of a convicted

24  felon, if it is supported by other evidence, or would you

25    automatically disregard it?"

1         Now, that question was -- it was kind of -- it wasn't
2    phrased very well.  You answered "No."  Now, is the "no"
3    "Could you believe the testimony of a convicted felon, if it's
4    supported by other evidence," --
5         PROSPECTIVE JUROR NUMBER 3:  Yes, I can.
6         MR. McMAHON:  You can?
7         PROSPECTIVE JUROR NUMBER 3:  Uh-huh. (affirmative
8    response)
9         MR. McMAHON:  You would not disregard it?
10        PROSPECTIVE JUROR NUMBER 3:  Uh-uh. (negative
11   response)
12        MR. McMAHON:  Okay.  You also mentioned on Number 23,
13   just to clear this up, that you have -- your brother was ill
14   and --
15        PROSPECTIVE JUROR NUMBER 3:  Yes, he is.  He have --
16   he carry seizures and my mom, she's kind of old and she's sick
17   and she can't keep him all the time.  Right now, I have a
18   friend over there watching him right now, until I could leave
19   out of here to go home.
20        MR. McMAHON:  Okay.  Now, this trial is going to last
21   several days.
22        PROSPECTIVE JUROR NUMBER 3:  That's what I'm saying.
23   It's going to be a problem for me, because I'm my mama only
24   daughter, so I have to be there to help my brother.  He catch
25   real bad seizures all the time.

1          MR. McMAHON:  Right.

2          PROSPECTIVE JUROR NUMBER 3:  He have to take

3    medication three times a day.

4          MR. McMAHON:  So, that would be a problem for you?

5          PROSPECTIVE JUROR NUMBER 3:  Yes, it would.

6          MR. McMAHON:  And, one other question you didn't

7    answer:  "Can you swear that you would not allow the ethnic

8    origin or race of any witness or Defendant to influence your

9    verdict in any way?"  And, you didn't answer the question.

10   Now, would you allow the race of any witness --

11         PROSPECTIVE JUROR NUMBER 3:  No.  No, I wouldn't.

12         MR. McMAHON:  And, earlier you --

13         PROSPECTIVE JUROR NUMBER 3:  I'm not prejudiced.

14         MR. McMAHON:  -- stated, Ms. Williams, that you

15   thought the Defendants were guilty, you couldn't be fair --

16         PROSPECTIVE JUROR NUMBER 3:  Reading through the

17   little bit that I had seen on the paper -- being policemens, I

18   don't know.  To me, they do a lot of bad things.  I'm not all

19   that good with -- I'm not saying I'm crazy about policemens.

20   That's where I could say I'm prejudiced at, me and policemen.

21         I'm not prejudiced against white, black, whatever

22   color you is; it doesn't matter, okay, but police -- you hear

23   so much about police on the news.  I mean, --

24         MR. McMAHON:  Well, the question is very simple.

25         PROSPECTIVE JUROR NUMBER 3:  Yeah.

1          MR. McMAHON:  One of the Defendants is a former

2    New Orleans cop.

3          PROSPECTIVE JUROR NUMBER 3:  Yeah, I know.

    4            MR. McMAHON:  Could you be fair or not --

    5            PROSPECTIVE JUROR NUMBER 3:  No, I can't.

    6            MR. McMAHON:  You can't?

    7            PROSPECTIVE JUROR NUMBER 3:  I'm sorry.

    8            MR. RIEHLMANN:  I have no questions, Judge.

    9            THE COURT:  Let's swap again.

   10            You're excused now for lunch, and come back at 1:15.

   11            PROSPECTIVE JUROR NUMBER 3:  Okay, thank you.

   12            (Prospective Juror Number 3 exits courtroom)

   13               (Prospective Juror Number 4 enters)

   14            MR. RIEHLMANN:  Hello, Mr. Payne.  I'm only going to

   15    detain you for a second, sir.  Number 10, apparently the

   16    question on Number 10 on the questionnaire gave people some

   17    problems, understandably.  It reads:  "Can you believe the

   18    testimony of a convicted felon, if it is supported by other

   19    evidence, or would you automatically disregard it?"

   20            You had checked off "yes," and you circled part of

   21    it.  Could you just elaborate on what your answer meant?

   22            PROSPECTIVE JUROR NUMBER 4:  If somebody is telling

   23    me something up there under oath, and somebody else is telling

   24    me the same thing, I'm going to believe what he's telling me.

   25            MR. RIEHLMANN:  All right.  But, I guess the question



                                      49

    1    is:  The fact that a witness, if the Government calls a

    2    witness who has a felony conviction, that fact that he has a

    3    felony conviction, that, alone, would that make you

    4    automatically disregard his testimony?

    5            PROSPECTIVE JUROR NUMBER 4:  I can't say that it

    6    would.

 7          MR. RIEHLMANN:  All right.  Thank you, sir.  I have

 8  no further questions.

 9          THE COURT:  Any other questions?

10          MR. VOIGHT:  No, Your Honor.

11          MR. WINTERS:  No.

12          THE COURT:  Thank you.  You're excused for lunch,

13  now.  Come back at 1:15.

14          MR. WINTERS:  Number 5, Your Honor.

15          THE COURT:  Number 5.

16          (Prospective Juror Number 4 exits courtroom)

17              (Prospective Juror Number 5 enters)

18          MR. RIEHLMANN:  The only question I had, Judge, and I

19  guess you could dispose it, is Number 7.  There's no

20  relationship between you and Mr. Livaudais, I take it?

21          THE COURT:  Not that I know of.

22          MR. RIEHLMANN:  Okay.  Then I wouldn't need 6 or 7.

23          THE COURT:  I've never seen him before today,

24  yesterday.

25          what are the next two numbers?


                                                50

 1          THE MARSHAL:  Eight and 11.

 2          THE COURT:  And then tell them to stand by and tell

 3  the others they can go to lunch until 1:15.

 4          MR. WINTERS:  How are you doing, sir?

 5          PROSPECTIVE JUROR NUMBER 5:  Okay.

 6          MR. WINTERS:  My name is Al Winters.  It's

 7  Mr. Todaro?

 8          PROSPECTIVE JUROR NUMBER 5:  Right.

 9          MR. WINTERS:  Is that right, sir?

10          Sir, I just have a couple of questions, based on the
                          Page 44

11    questionnaire you filled out yesterday.

12          PROSPECTIVE JUROR NUMBER 5:  Yes, sir.

13          MR. WINTERS:  And, I'm going to read them to you, to

14    be exact.  There's about three questions, okay?

15          PROSPECTIVE JUROR NUMBER 5:  Okay.

16          MR. WINTERS:  Question 2 read:  "Often the Government

17    pays expenses of individuals who give information about

18    criminal activity and who cooperate in criminal

19    investigations.  Sometimes these individuals are given lump

20    sum payments of money to help them restart their lives after

21    the investigations and prosecutions are over.  Do you have a

22    problem with this?"  And, you answered "yes," you have a

23    problem with that, sir?

24          PROSPECTIVE JUROR NUMBER 5:  Yes.  Yes, I just don't

25    think money should be across the table, you know, --


                                        51

1           MR. WINTERS:  I'm sorry, sir, I didn't hear you.

2           PROSPECTIVE JUROR NUMBER 5:  I just don't think money

3     should be on the table for any witnesses --

4           MR. WINTERS:  All right.  Well, let me ask you this:

5     Would the fact that you have a problem with this make you

6     unable to give the Government a fair trial, if the information

7     came out at trial that some individual was paid money after

8     the fact?

9           PROSPECTIVE JUROR NUMBER 5:  It could.

10          MR. WINTERS:  It could?

11          PROSPECTIVE JUROR NUMBER 5:  Yes, I think so,

12    because --

13          MR. WINTERS:  All right.  Question 3:  "During the

                              Page 45

14  investigation of illegal activities, undercover agents often

15  must give money to the people they're investigating and many

16  times the money is never recovered."  Now, I'm going to tell

17  you that happened in this case and it's quite a large sum of

18  money that you'll hear.  Do you have a problem with this?

19      PROSPECTIVE JUROR NUMBER 5:  Yes, I have a problem

20  with that.

21      MR. WINTERS:  Do you have a problem with -- what is

22  your problem that you have, the fact that the Government gave

23  the money or the fact that the criminal got the money?

24      PROSPECTIVE JUROR NUMBER 5:  Both.

25      MR. WINTERS:  Both?


                                              52

1       PROSPECTIVE JUROR NUMBER 5:  You know, I think they

2   were entrapped and it's taxpayer's money being wasted.

3       MR. WINTERS:  And, that could affect you rendering a

4   fair decision for the Government?

5       PROSPECTIVE JUROR NUMBER 5:  I think so.

6       MR. WINTERS:  It could?  Thank you, sir.

7       And, lastly, Question 8:  You are a member of the

8   so-called State Militia Group?

9       PROSPECTIVE JUROR NUMBER 5:  No, I'm not, but I share

10  their views.

11      MR. WINTERS:  You share the views of the State

12  Militia?  What views, particularly, do you share?

13      PROSPECTIVE JUROR NUMBER 5:  Well, I agree with them

14  that, like, when Ron Harvey fired a sniper's rifle and killed

15  Randy Weaver's wife in a cabin in Utah, on Ruby Ridge, that,

16  you know, that was cold blooded murder; her holding a baby in

17  her arms and just killed her for no reason, you know.
                        Page 46

18          MR. WINTERS:  All right.  Is there any other militias

19   that you sympathize with, any other, those type of issues?

20          PROSPECTIVE JUROR NUMBER 5:  Yeah.  In other words, I

21   don't know any militias, but I agree with some of the things

22   that they agree with, you know, that I know we agree with,

23   like the Waco -- if not for Waco, there wouldn't have been an

24   Oklahoma City bombing, you know.

25          MR. WINTERS:  You disagree with what the government


                                                  53

1   did in Waco?

2          PROSPECTIVE JUROR NUMBER 5:  Oh, sure.

3          MR. WINTERS:  You do?

4          PROSPECTIVE JUROR NUMBER 5:  Janet Reno should have

5   been brought to trial, I think.

6          MR. WINTERS:  And, that would affect your ability to

7   give the Government a fair trial?

8          PROSPECTIVE JUROR NUMBER 5:  I think so, yeah.

9          MR. WINTERS:  I have nothing further.

10          MR. RIEHLMANN:  Mr. Todaro, sir, you're here to judge

11   the guilt or innocence of these Defendants, despite the

12   problems that you have with the things that Mr. Winters has

13   explained to you.  If all the tapes that you see and hear and

14   the witnesses that the Government calls to the witness stand,

15   if they persuade you of the guilt of the Defendants, beyond a

16   reasonable doubt, could you still find them guilty as charged?

17          PROSPECTIVE JUROR NUMBER 5:  If the evidence is

18   there, you know.

19          MR. RIEHLMANN:  If the evidence is there, you could?

20          PROSPECTIVE JUROR NUMBER 5:  Yeah.

                              Page 47

21          MR. RIEHLMANN:  Okay.  Thank you, sir.

22          THE COURT:  Mr. Voight.

23          MR. VOIGHT:  Mr. Todaro, my name is Greg Voight.  I

24   represent Darrel Jones.  Now, you said that you don't belong

25   to any militia groups, is that correct?

1          PROSPECTIVE JUROR NUMBER 5:  No, sir -- right.

2          MR. VOIGHT:  The Government is going to have FBI

3    agents testifying in this case.  You're not going to hold it

4    against those agents, just that they work for the FBI, are

5    you?

6          PROSPECTIVE JUROR NUMBER 5:  I might.  You know, the

7    FBI admitted that they have tainted evidence in the crime lab

8    to favor the prosecution and, you know, -- I would have a

9    problem with anything doing with the FBI/ATF agents.

10          MR. VOIGHT:  I have nothing further.

11          THE COURT:  Thank you.  You are excused for lunch,

12   and come back at 1:15.  Thank you.

13          MR. WINTERS:  Wait, Judge.  Could I ask one other

14   question?

15          THE COURT:  Okay.

16          Just stay right there.

17          MR. WINTERS:  Mr. Todaro, the views that you just

18   gave us about State Militias and your sympathies for them.

19   Have you discussed that with any other jurors?

20          PROSPECTIVE JUROR NUMBER 5:  No, sir.

21          MR. WINTERS:  Thanks.

22          THE COURT:  Thank you.

23          Number 8?

24          (Prospective Juror Number 5 exits courtroom)

25        (Prospective Juror Number 8 enters)

                               55

1        MR. McMAHON:  Mr. Vallelungo, I just had one question

2  in reference to one of your questionnaire responses.

3        PROSPECTIVE JUROR NUMBER 8:  Uh-huh. (affirmative

4  response)

5        MR. McMAHON:  And, it was Number 3, let me just read

6  it to you, just to refresh your memory.  The question read:

7  "During the investigation of illegal activities, undercover

8  agents often must give government money to the people they're

9  investigating and many times the money is never recovered."

10  And, you indicated that you had a problem with this.  Well,

11  let me tell you, in this case, this is an undercover

12  operation, and a pretty substantial sum of money was expended,

13  given to the bad guys that we never got back.

14        PROSPECTIVE JUROR NUMBER 8:  Okay.

15        MR. McMAHON:  With that in mind, could you still be

16  fair to the Prosecution, knowing that?

17        PROSPECTIVE JUROR NUMBER 8:  No, I should have asked

18  before I answered that question yesterday.  I was just

19  confused, but that was a mistake on my part, the way it was

20  answered.

21        MR. McMAHON:  Okay.  You would not hold it against

22  us, because --

23        PROSPECTIVE JUROR NUMBER 8:  No, no, sir.

24        MR. McMAHON:  -- this money --

25        PROSPECTIVE JUROR NUMBER 8:  No, sir.

1          MR. McMAHON:  -- went out and we never got it back?

2          PROSPECTIVE JUROR NUMBER 8:  No, sir, I don't have a

3     problem with that.

4          MR. McMAHON:  Thank you, Mr. Vallelungo.  That's all

5     I have.

6          THE COURT:  Mr. Riehlmann.

7          MR. RIEHLMANN:  Mr. Vallelunga, one question that

8     some people had trouble with and I just want to clarify it

9     with you is Number 10, about "Could you believe the testimony

10    of a convicted felon, if supported by other evidence, or would

11    you automatically disregard it?"  My notes indicate that you

12    answered "Yes."

13         PROSPECTIVE JUROR NUMBER 8:  That's correct.

14         MR. RIEHLMANN:  Which part of the question did you

15    answer "yes," the first part or the second part?

16         PROSPECTIVE JUROR NUMBER 8:  The first part.

17         MR. RIEHLMANN:  All right.  So, you could consider

18    the testimony of a convicted felon, if supported by other

19    evidence?

20         PROSPECTIVE JUROR NUMBER 8:  Sure.

21         MR. RIEHLMANN:  All right.  Thank you.

22         THE COURT:  Mr. Voight?

23         MR. VOIGHT:  Nothing, Your Honor.

24         THE COURT:  Thank you, sir.  You're excused for

25    lunch, now, and would you return at 1:15.

1          THE COURT:  This is Number 11?

2          MR. McMAHON:  Yes, sir.

3          THE COURT:  Pardon?

4          MR. McMAHON:  Yes.

5          MR. WINTERS:  Yes, sir, Number 11.

6          THE COURT:  That's the last one we have here?

7          THE MARSHAL:  Yes, Your Honor.

8          THE COURT:  Everybody else has gone to lunch.  All

9     right.

10          (Prospective Juror Number 8 exits courtroom)

11               (Prospective Juror Number 11 enters)

12          MR. WINTERS:  Sir, my name is Al Winters, and I have

13     a couple of questions.  I'm one of the Prosecutors in the

14     case, along with Mr. McMahon.

15          Particularly, I'm referring to your questionnaire of

16     yesterday that you filled out.  Do you recall filling that out?

17          PROSPECTIVE JUROR NUMBER 11:  Yes.

18          MR. WINTERS:  And, I have, maybe, four questions for

19     you.

20          PROSPECTIVE JUROR NUMBER 11:  Uh-huh. (affirmative

21     response)

22          MR. WINTERS:  The first question deals with the first

23     question on the questionnaire:  "It is proper for the

24     Government to conduct undercover operations to investigate

25     criminal activity."


                                        58

1          And, I'll tell you this case was an undercover

2     operation, okay.

3          "Do you have a problem with this procedure?"

4          Do you have a problem with the Government conducting

5     undercover operations?

6          PROSPECTIVE JUROR NUMBER 11:  It depends.

                         Page 51

         7          MR. WINTERS:  It depends on what, sir?

         8          PROSPECTIVE JUROR NUMBER 11:  Well, I just --

         9     sometimes I've seen and heard of things that were not exactly

        10     up-and-up, from what --

        11          MR. WINTERS:  What if it's the only way you can

        12     filtrate a criminal organization is to conduct an undercover

        13     investigation, do you have a problem with that procedure?

        14          PROSPECTIVE JUROR NUMBER 11:  Are you talking about a

        15     private individual or something like the organized crime,

        16     mafia, something like that?

        17          MR. WINTERS:  I'm talking about people involved in

        18     criminal activities, sir, whether it be a private individual,

        19     whether it be organized crime, mafia, whether it be corrupt

        20     politicians, whether it be corrupt law enforcement officers.

        21     Do you have a problem with the government conducting

        22     undercover operations?

        23          PROSPECTIVE JUROR NUMBER 11:  I guess -- it depends

        24     on the situation, I guess.

        25          MR. WINTERS:  Well, would you -- knowing that this is


                                                   59

         1     an undercover operation involving alleged corrupt law

         2     enforcement officers, could you give the Government a fair

         3     trial and render a fair verdict, if we prove the case beyond a

         4     reasonable doubt?

         5          PROSPECTIVE JUROR NUMBER 11:  I wouldn't toss that

         6     out completely, no.

         7          MR. WINTERS:  You wouldn't what, sir?

         8          PROSPECTIVE JUROR NUMBER 11:  I would not toss that

         9     out completely.

        10          MR. WINTERS:  What do you mean by "wouldn't toss it

11  out"?

12       PROSPECTIVE JUROR NUMBER 11:  I would not negate it.

13  I would not just discount --

14       MR. WINTERS:  So, you could give the Government a

15  fair trial?

16       PROSPECTIVE JUROR NUMBER 11:  Yeah.

17       MR. WINTERS:  Okay.  Now, Question 2:  "Often the

18  Government pays the expenses of individuals who give

19  information about criminal activity and who cooperate in

20  criminal investigations.  Sometimes these individuals are

21  given lump sum payments of money to help them restart their

22  lives after the investigations and prosecutions are over.  Do

23  you have a problem with this?"  You originally said "no," then

24  you crossed out "no," and checked "yes."

25       PROSPECTIVE JUROR NUMBER 11:  Well, at one time -- I


                                        60

1  was thinking about it and I thought the people were just being

2  paid off, possibly, buy witnesses.

3       MR. WINTERS:  Well, what if the evidence came out in

4  this trial that, after the fact, somebody who was giving

5  information to the Government and assisted the Government in

6  this undercover operation was paid a sum of money, after the

7  fact, okay, would that -- could you still render a fair

8  verdict for the Government?

9       PROSPECTIVE JUROR NUMBER 11:  I think he would be

10  benefiting from it.

11       MR. WINTERS:  Excuse me?

12       PROSPECTIVE JUROR NUMBER 11:  I think he would be

13  benefiting from it.

14          MR. WINTERS:  You think he'd be benefiting from it?

15          PROSPECTIVE JUROR NUMBER 11:  Yeah.

16          MR. WINTERS:  You think that's wrong for him to

17  benefit from it, if he gives information about criminal

18  activity?

19          PROSPECTIVE JUROR NUMBER 11:  Yes.

20          MR. WINTERS:  So, you would hold that against the

21  Government?

22          PROSPECTIVE JUROR NUMBER 11:  Uh-huh. (affirmative

23  response)

24          MR. WINTERS:  Thank you, sir.

25          THE COURT:  Mr. Riehlmann.

1          MR. WINTERS:  "During the investigation of illegal

2  activities, undercover agents often must give government money

3  to the people they're investigating and many times this money

4  is never recovered."  You have a problem with this, also, sir?

5          PROSPECTIVE JUROR NUMBER 11:  The money not being

6  recovered?

7          MR. WINTERS:  Yes.

8          PROSPECTIVE JUROR NUMBER 11:  No.

9          MR. WINTERS:  You checked "yes."  Was that a mistake?

10          PROSPECTIVE JUROR NUMBER 11:  Again, it was -- a lot

11  of the questions I felt were -- I could have answered it

12  either way.

13          MR. WINTERS:  Okay.  Well, what about that question?

14  Do you have problems -- I'm going to tell you, --

15          PROSPECTIVE JUROR NUMBER 11:  The only one I had a

16  problem with was the one we talked about prior to this one.

17          MR. WINTERS:  The one where you said you couldn't

18    render a fair verdict, right?

19          PROSPECTIVE JUROR NUMBER 11:  Yeah.

20          MR. WINTERS:  About paying --

21          PROSPECTIVE JUROR NUMBER 11:  Paying somebody --

22          MR. WINTERS:  Giving money for information.

23          PROSPECTIVE JUROR NUMBER 11:  Yeah.

24          MR. WINTERS:  All right.  One other question, sir.

25          PROSPECTIVE JUROR NUMBER 11:  The Judge clarified

                                        62

1    that one earlier with the -- there was one question where

2    there was a comma in there and it sounds like you were asking

3    two questions in one statement -- I can't --

4          MR. WINTERS:  No, no, that's not the question I was

5    going to ask you.  I was going to ask you with regards to your

6    answer to Question 4:  "Often the government secretly records

7    conversations, totally legally, during a criminal

8    investigation."  Do you have problems with this procedure?

9          PROSPECTIVE JUROR NUMBER 11:  No.

10          MR. WINTERS:  You checked "yes."  But, you don't have

11    problems?

12          PROSPECTIVE JUROR NUMBER 11:  No.

13          THE COURT:  Mr. Riehlmann.

14          MR. RIEHLMANN:  Thank you.

15          Hi, Mr. Armand.  Notwithstanding the problems that

16    Mr. Winters just discussed with you about money changing hands

17    and winding up, perhaps, in the wrong hands, if the agents,

18    the FBI agents that the Government calls to the witness stand,

19    the video and audio tapes that you hear, if all of those

20    things persuade you that these men are guilty beyond a

21    reasonable doubt, would you still be able to find them --

22        MR. WINTERS:  Objection, Your Honor.  It's starting

23    to get hypothetical.

24        MR. RIEHLMANN:  It's not hypothetical at all, Judge.

25    He's saying that he has problems.  I'm asking if he can get

                                         63

1    past those problems and still find him guilty, if he's

2    persuaded by all the evidence.

3        THE COURT:  Restate the question, please.

4        MR. RIEHLMANN:  If all the evidence that the

5    Government produces, tapes, video tapes and audio tapes, the

6    FBI agent with testimony and the testimony of the cooperating

7    witnesses, if all of that persuades you beyond a reasonable

8    doubt of the Defendant's guilt, can you find him guilty as

9    charged?

10        PROSPECTIVE JUROR NUMBER 11:  Yeah, I think so.

11        MR. RIEHLMANN:  All right.  Notwithstanding the fact

12    that the Government may have paid money to some of these agent

13    -- I mean some of these undercover people, is that correct?

14        PROSPECTIVE JUROR NUMBER 11:  Yeah.

15        MR. RIEHLMANN:  All right.  Thank you.

16        THE COURT:  Mr. Voight.

17        MR. VOIGHT:  Mr. Armand, on Question Number 7, that

18    question states:  "Would you give more weight to the testimony

19    of a law enforcement witness than that of any other witness?"

20    You checked the answer "yes."  There's going to be different

21    kinds of witnesses in this case.  Some of those witnesses are

22    going to be law enforcement agents.

23        Are you saying that you are more likely to believe

24    what they say than any other type of witness?

25          PROSPECTIVE JUROR NUMBER 11:  Yeah.


                                        64

1          MR. VOIGHT:  Would you be willing to -- are you
2     saying that you are not going to judge the witnesses based on
3     their demeanor, appearance, the impressions that you get, but
4     you're going to, rather, take into account the overriding
5     effect that their job would have on their testimony?
6          PROSPECTIVE JUROR NUMBER 11:  If it would come down
7     -- you know, if it came down to one thing.  To me, a police
8     officer is a person in authority, and I view their opinion as
9     being important.
10          MR. VOIGHT:  Thank you, sir.
11          THE COURT:  No further questions.  Thank you, sir.
12     You'll be excused for lunch, until 1:15.
13          (Prospective Juror Number 11 exits courtroom)
14          THE COURT:  And so will everybody else.  We'll recess
15     until 1:15, unless any Counsel has something they want to take
16     up with me now.
17          At 1:15.
18                    *    *    *    *    *
19          (Whereupon, a luncheon recess was held)
20
21
22
23
24
25

1              A F T E R N O O N   S E S S I O N

2          THE COURT:  Please be seated.  We continue on.  Was

3   our last number 11?

4          THE CLERK:  Eleven.

5          MR. WINTERS:  The Defense has a question for 12.

6          (Prospective Juror Number 12 enters)

7          MR. RIEHLMANN:  Mr. Medal.

8          PROSPECTIVE JUROR NUMBER 12:  Yes.

9          MR. RIEHLMANN:  Good afternoon, sir.  One of the

10  questions that was on the jury questionnaire was:  "Can you

11  accept the testimony of a convicted felon, or would you

12  automatically disregard it?"  You answered "yes," and I just

13  wanted you to elaborate, given the way that question was

14  phrased.

15         PROSPECTIVE JUROR NUMBER 12:  I answered the first

16  part of the question.

17         MR. RIEHLMANN:  So, you can believe the testimony of

18  a convicted felon, if supported by other evidence?

19         PROSPECTIVE JUROR NUMBER 12:  Yes.

20         MR. RIEHLMANN:  Okay, that's all I needed to find

21  out.

22         MR. WINTERS:  No questions.

23         THE COURT:  Mr. Voight, you don't have any?

24         MR. VOIGHT:  No questions.

25         MR. WINTERS:  No questions.

1          THE COURT:  Thank you, sir.  You'll remain out.

2          (Prospective Juror Number 12 exits courtroom)

3              (Prospective Juror Number 13 enters)

4          THE COURT:  This is Number 13, Ms. Roth.

5          PROSPECTIVE JUROR NUMBER 13:  Yes.

6          MR. MCMAHON:  Good afternoon, Ms. Roth.  How are you

7    doing?

8          PROSPECTIVE JUROR NUMBER 13:  Just fine.

9          MR. MCMAHON:  I have a couple of questions in

10   response to your questionnaire, okay.  Now, Number 1, you --

11   let me read the question to you, just to refresh your memory.

12   I'm sure you have a photographic memory, right?

13         PROSPECTIVE JUROR NUMBER 13:  Right.

14         MR. MCMAHON:  All right.  Number 1, the question was:

15   "It is proper for the Government to conduct undercover

16   operations to investigate criminal activity.  Do you have a

17   problem with this procedure?"  You ticked off "yes."  Do you

18   have a problem with that?

19         PROSPECTIVE JUROR NUMBER 13:  Do I have a problem

20   with them conducting undercover --

21         MR. MCMAHON:  Right.

22         PROSPECTIVE JUROR NUMBER 13:  No.

23         MR. MCMAHON:  Okay.  So, the "yes" was a mistake?

24         PROSPECTIVE JUROR NUMBER 13:  Oh, okay.

25         MR. MCMAHON:  Let me show it to you.

1          PROSPECTIVE JUROR NUMBER 13:  (Examines document)  I

2    answered --

3          MR. MCMAHON:  "It is proper....Do you have a

4    problem?"  And, you said "yes," you have a problem.

5          PROSPECTIVE JUROR NUMBER 13:  "It is proper for the

6    Government to conduct undercover operations to investigate

      7  criminal activities."

      8          MR. McMAHON:  Right.  And, then -- so you don't have

      9  a problem?

     10          PROSPECTIVE JUROR NUMBER 13:  Oh, no.

     11          MR. McMAHON:  Okay, got it.

     12          PROSPECTIVE JUROR NUMBER 13:  Okay.

     13          MR. McMAHON:  Probably -- let me just follow-up with

     14  one more, Number 3.  Probably the same thing happened.  Let me

     15  read it:  "During the investigation of illegal activities,

     16  undercover agents often must give government money to the

     17  people they're investigating and many times the money is never

     18  recovered."  Do you have a problem with that?

     19          PROSPECTIVE JUROR NUMBER 13:  No.

     20          MR. McMAHON:  That's it.  Thank you, sir. (sic)

     21          THE COURT:  Any questions, Mr. Riehlmann.

     22          MR. RIEHLMANN:  Ms. Roth, --

     23          PROSPECTIVE JUROR NUMBER 13:  Uh-huh. (affirmative

     24  response)

     25          MR. RIEHLMANN:  -- Question 10 was:  "Can you


                                                        68

      1  believe the testimony of a convicted felon, if supported by

      2  other evidence, or would you automatically disregard it?"

      3  That's essentially how it was phrased.  Your response to that

      4  was "yes."  And, because it was phrased in two different ways,

      5  I just want to know what you meant by your response to that.

      6          PROSPECTIVE JUROR NUMBER 13:  Can I accept evidence

      7  from --

      8          MR. RIEHLMANN:  Testimony from a convicted felon.

      9          THE COURT:  If supported --

     10          PROSPECTIVE JUROR NUMBER 13:  Can I accept testimony
                              Page 60

11    from them?  Yes.

12              THE CLERK:  "If supported by."

13              PROSPECTIVE JUROR NUMBER 13:  Yes.

14              MR. RIEHLMANN:  Okay, thank you, ma'am.

15              MR. VOIGHT:  I have no further questions.

16              THE COURT:  Thank you.  You can return to the room

17    and thank you very much.

18              MR. RIEHLMANN:  Thank you, ma'am.

19              MR. WINTERS:  Thank you.

20              (Prospective Juror Number 13 exits courtroom)

21                (Prospective Juror Number 15 enters)

22              MR. RIEHLMANN:  Ms. Averill?

23              PROSPECTIVE JUROR NUMBER 15:  That's me.

24              MR. RIEHLMANN:  Okay, Question 10 was phrased:  "Can

25    you accept the testimony of a convicted felon, if supported by


                                        69

1     other evidence, or would you automatically disregard it?"

2     And, you checked "yes," because the question was --

3              PROSPECTIVE JUROR NUMBER 15:  It was worded kind of

4     funny.

5              MR. RIEHLMANN:  Yeah.  So, what did "yes" mean to

6     you?

7              PROSPECTIVE JUROR NUMBER 15:  I guess I would have to

8     listen to -- what was the question, again?  You could either

9     -- believe the convicted felon or a police officer?

10             MR. RIEHLMANN:  No, it was:  "Can you accept the

11    testimony of a convicted felon, if supported by other

12    evidence, or would you automatically disregard it?"  That's

13    how the question was phrased.  I just want to know what your

14    answer is to that question.

15           PROSPECTIVE JUROR NUMBER 15:  I think I could believe

16    it, if it was supported by other evidence.

17           MR. RIEHLMANN:  All right.  Great; thank you.

18           THE COURT:  Mr. Voight?

19           MR. VOIGHT:  No questions, Your Honor.

20           THE COURT:  Does the Government?

21           MR. McMAHON:  No questions.

22           THE COURT:  Thank you, ma'am.  If you would return to

23    the other room.  Thank you.

24           (Prospective Juror Number 15 exits courtroom)

25               (Prospective Juror Number 16 enters)


                                                        70

1            THE COURT:  What are we on, now, Number --

2            THE CLERK:  Sixteen.

3            THE COURT:  -- 16.

4            MR. RIEHLMANN:  Hi, Mr. Bernard.  Question 10 was, on

5     the questionnaire:  "Can you consider the testimony of a

6     convicted felon, if supported by other evidence, or would you

7     automatically disregard it?"  Your answer was "yes," and I

8     just wanted to clarify what you meant by your answer.

9            PROSPECTIVE JUROR NUMBER 16:  Yeah.  Actually, I had

10    asked about that question, because to me it's two different

11    questions that require two different answers.

12           THE COURT:  Sort of a double question.   We realize

13    that.

14           PROSPECTIVE JUROR NUMBER 16:  Yeah.

15           THE COURT:  Yeah, it was a double question.

16           PROSPECTIVE JUROR NUMBER 16:  Yes to the first part,

17    if you could repeat that to me.

18          MR. RIEHLMANN:  "Can you accept the testimony of a

19    convicted felon, if supported by other evidence?"

20          PROSPECTIVE JUROR NUMBER 16:  Yes.

21          MR. RIEHLMANN:  Okay.

22          MR. RIEHLMANN:  And, Question 25 was, essentially, do

23    you know about the facts of the case?  And you said you

24    remembered some facts of the case.  Do you remember responding

25    that way?

1           PROSPECTIVE JUROR NUMBER 16:  Well, yeah.  I'm not

2     quite sure when it happened, chronologically.  I moved here to

3     Mandeville a little over a year ago from Monroe, Louisiana,

4     and what I think I recall is the part of the cocaine ring and

5     the part of murder and on tape, and things like that.  No

6     details, but -- this got to Monroe, I'm sure, so I think what

7     I was reading about was in the Monroe newspaper.

8           MR. RIEHLMANN:  Do you specifically remember anything

9     about these Defendants, I guess --

10          PROSPECTIVE JUROR NUMBER 16:  No, I don't.

11          MR. RIEHLMANN:  Okay.  So, you have no opinion as to

12    their innocence or guilt?

13          PROSPECTIVE JUROR NUMBER 16:  Correct.

14          MR. RIEHLMANN:  All right.  Thank you, sir.

15          THE COURT:  Mr. Voight?

16          MR. VOIGHT:  I have no questions.

17          THE COURT:  The Government?

18          MR. RIEHLMANN:  Mr. Bernard, just very briefly.  You

19    will hear evidence about a drug protection ring.  Now, would

20    that in any way resurrect any memories, which might cause you

21  to be unbiased in your view or do you think you pretty much --

22  what you remember is sketchy and you could view the

23  evidence --

24          PROSPECTIVE JUROR NUMBER 16:  Correct.  That's no

25  problem.  My memory is about the New Orleans Police Department

72

1  and some involvement in that, and that's the extent of it.

2          MR. RIEHLMANN:  Fine.  Thank you, sir.

3          THE COURT:  Thank you, sir.  If you'll return to the

4  room.

5          THE COURT:  What number do we have, now?

6          THE CLERK:  Seventeen.

7          THE COURT:  Seventeen.

8          (Prospective Juror Number 16 exits courtroom)

9              (Prospective Juror Number 17 enters)

10          MR. RIEHLMANN:  Ms. Ocker, --

11          PROSPECTIVE JUROR NUMBER 17:  It's Ocker.

12          MR. RIEHLMANN:  Ms. Ocker; I'm sorry.

13          -- you work for Mr. Paul Connick's office?

14          PROSPECTIVE JUROR NUMBER 17:  Yes, sir.

15          MR. RIEHLMANN:  Do you think being the fact that you

16  work for the office of a prosecutor is going to make you, in

17  any way, more sympathetic to the Prosecution than the Defense?

18          PROSPECTIVE JUROR NUMBER 17:  No, sir.

19          MR. RIEHLMANN:  All right.  Thank you, Ms. Ocker.

20          THE COURT:  Government?

21          MR. MCMAHON:  No, Your Honor.

22          THE COURT:  Nobody?

23          MR. VOIGHT:  No questions.  We have no questions.

24          THE COURT:  Okay, thank you, ma'am.  If you'll return

25   to the room.

1                (Prospective Juror Number 17 exits courtroom)

2                   (Prospective Juror Number 18 enters)

3            MR. WINTERS:  Ms. Williams, how are you doing?

4            PROSPECTIVE JUROR NUMBER 18:  Fine, thank you.

5            MR. WINTERS:  I just want to ask you one question,

6    and it pertains to your questionnaire that you filled out

7    yesterday.

8            PROSPECTIVE JUROR NUMBER 18:  Uh-huh. (affirmative

9    response)

10           MR. WINTERS:  Question 10, which is really a double

11   question, and I'm just trying to clarify your answer, read as

12   follows:  "Can you believe the testimony of a convicted felon,

13   if it is supported by other evidence, or would you

14   automatically disregard it?"  And you checked "no."  Let me

15   break it up for you:  Could you believe the testimony of a

16   convicted felon, if other evidence corroborated it?

17           PROSPECTIVE JUROR NUMBER 18:  Yes.

18           MR. WINTERS:  Nothing further, Your Honor.

19           THE COURT:  Any other questions?

20           MR. RIEHLMANN:  Not by me, Your Honor.

21           MR. VOIGHT:  Not by me, Your Honor.

22           THE COURT:  Thank you, ma'am, if you'll return to the

23   room.

24           MR. WINTERS:  Thank you, Ms. Williams.

25               (Prospective Juror Number 18 exits courtroom)

1          (Prospective Juror Number 21 enters)

2          MR. MCMAHON:  Mr. Davis?

3          PROSPECTIVE JUROR NUMBER 21:  Yes, sir.

4          MR. MCMAHON:  Good afternoon, how are you doing?

5          PROSPECTIVE JUROR NUMBER 21:  All right; and you?

6          MR. MCMAHON:  I have some inquiries about some of the

7   answers to your questionnaire you filled out yesterday.

8   Number 1, and let me just read the question to refresh your

9   memory:  "It is proper for the Government to conduct

10  undercover operations to investigate criminal activity.  Do

11  you have a problem with this procedure?"  You ticked off

12  "yes."  Could you elaborate on that?

13         PROSPECTIVE JUROR NUMBER 21:  I meant "no," I'm

14  sorry.

15         MR. MCMAHON:  Okay.  And, just a couple of other

16  concerns that we had.  You noted, on Number 22, that you have

17  a serious medical or physical condition.  You note it was a

18  bad back.  Now, this trial is going to last several days.

19         PROSPECTIVE JUROR NUMBER 21:  Right.  I got two

20  vertebrae in the lower part of my back that ain't growed, and

21  if I sit for a long time, I will catch a cramp in the back of

22  my back.

23         MR. MCMAHON:  You get spasms?

24         PROSPECTIVE JUROR NUMBER 21:  Yes, sir, and I can go

25  to Covington, to where I went to the doctor, and get an

1   excuse, if you need it, you know.

2          MR. MCMAHON:  That's why we're asking.

3          And, then the follow-up -- well, actually, the next

4    question it said, "Are there any members of your family who

5    have any kind of a medical problem, which might require your

6    attention while serving as a juror," and you --

7            PROSPECTIVE JUROR NUMBER 21:  Right.  My mother.  She

8    has seizures.  I just didn't know how to spell it, but that's

9    what she has seizures and stuff.

10           MR. McMAHON:  Right.  Okay.  Now, because of those

11   two facts, would that cause you a problem to sit as a juror

12   for several days?

13           PROSPECTIVE JUROR NUMBER 21:  Well, as far as sitting

14   like I am now, like I say, I will catch cramps in my back.

15   I'm not lying about that, because I do have a bad back.

16           MR. McMAHON:  Okay.  All right.  Thanks, Mr. Davis,

17   that's all I have.

18           MR. RIEHLMANN:  Mr. Davis, maybe I didn't understand.

19   Do you think it would affect your ability to pay attention to

20   the testimony, hours and hours of testimony?

21           PROSPECTIVE JUROR NUMBER 21:  My back will.  I ain't

22   going to lie to you; yes, sir.

23           MR. RIEHLMANN:  And, do you think that you'd be

24   distracted by your mother's condition, to the point --

25           PROSPECTIVE JUROR NUMBER 21:  Well, --



                                                    76

1            MR. RIEHLMANN:  -- where you couldn't pay attention?

2            PROSPECTIVE JUROR NUMBER 21:  -- like I say, my mom,

3    she has seizures.  She has fell and hit the bathtub and

4    everything else.  We've had to take her to the hospital two or

5    three times already, you know, and which I do worry about my

6    mom, you know.

7          MR. RIEHLMANN:  All right.  Thank you.

8          THE COURT:  Any other questions?

9          MR. VOIGHT:  Just briefly.

10          Mr. Davis, on Question Number 9, that question reads:

11     "Can you swear that you would not allow the ethnic origin or

12     race of any witness or Defendant to influence your verdict in

13     any way?"  You checked the answer "no," and I would ask you to

14     elaborate on your answer, if you could.  It's kind of a

15     confusing question.

16          PROSPECTIVE JUROR NUMBER 21:  Are you talking about

17     race, black/white -- it don't bother me.

18          MR. VOIGHT:  All right.

19          PROSPECTIVE JUROR NUMBER 21:  Chinese, it don't

20     matter, you know.

21          MR. VOIGHT:  Thank you.  Do you have to take pain

22     medication for your back?

23          PROSPECTIVE JUROR NUMBER 21:  Yes, sir.

24          MR. VOIGHT:  Are you on the medication now?

25          PROSPECTIVE JUROR NUMBER 21:  No, sir.


                                                            77

1          MR. VOIGHT:  If you had to take medication during the

2     course of the next couple of days, do you think that would

3     impair your ability --

4          PROSPECTIVE JUROR NUMBER 21:  Well, I do take

5     Percodans and Valium, sometimes, for my back, and it does kind

6     of make you a little woozy, you know; I'm not lying.

7          MR. VOIGHT:  Thank you.

8          THE COURT:  Thank you, sir.  If you'll return to the

9     room.  We'll be back in a little later.

10          (Prospective Juror Number 21 exits courtroom)

11          (Prospective Juror Number 24 enters)

12          MR. VOIGHT:  Good morning, Mr. Riley.

13          PROSPECTIVE JUROR NUMBER 24:  Good morning.

14          MR. VOIGHT:  I have just one brief question

15   concerning one of the answers you gave in the questionnaire.

16   It's Question Number 9, and I'm going to read it to you:  "Can

17   you swear that you would not allow the ethnic origin or race

18   of any witness or Defendant to influence your verdict in any

19   way?"  You checked the answer "no."  That's kind of a

20   confusing question and I was wondering if you could elaborate

21   on your answer for us.

22          PROSPECTIVE JUROR NUMBER 24:  I think I misunderstood

23   it as religious beliefs.

24          MR. VOIGHT:  So, what you're saying is that the race

25   of any witness or any Defendant or anybody is not going to --


                                            78

1    is that going to impact the way you'd vote --

2          PROSPECTIVE JUROR NUMBER 24:  No.

3          MR. VOIGHT:  -- in any way?

4          PROSPECTIVE JUROR NUMBER 24:  No.

5          MR. VOIGHT:  Thank you.

6          THE COURT:  No further questions?  Thank you, sir, if

7    you'll return to the room.

8          (Prospective Juror Number 24 exits courtroom)

9             (Prospective Juror Number 25 enters)

10          MR. WINTERS:  Hi, Ms. Turner, how are you?

11          PROSPECTIVE JUROR NUMBER 25:  Fine.

12          MR. WINTERS:  Ms. Turner, I want to ask you a couple

13   of questions and it basically concerns the questionnaire you

14    filled out yesterday.  I just want some clarification on two

15    of your answers, okay.

16          Particularly, Question Number 3 reads:  "During the

17    investigation of illegal activities, undercover agents often

18    must give money to the people they're investigating and many

19    times the money is never recovered.  Do you have any problem

20    with this?"

21          Before you answer, let me tell you that there will be

22    evidence brought out during this trial by the Government

23    Prosecutors that this was an undercover operation and, to

24    further the undercover operation, money was given to alleged

25    Defendants or to alleged criminals that they were

                                              79

1    investigating.

2          Now, do you have a problem with that type of activity

3    by the Government?

4          PROSPECTIVE JUROR NUMBER 25:  No.

5          MR. WINTERS:  No?  So, your answer was wrong.  Okay.

6          PROSPECTIVE JUROR NUMBER 25:  Uh-huh. (affirmative

7    response)

8          MR. WINTERS:  One other question with regards to

9    Number 10, and it's a confusing question:  "Can you believe

10    the testimony of a convicted felon, if it is supported by

11    other evidence, or would you automatically disregard it?"

12    And, you answered "yes."  Is your answer that you could

13    believe it, if it's supported by other evidence?

14          PROSPECTIVE JUROR NUMBER 25:  Read that again.

15          MR. WINTERS:  "Can you believe the testimony of a

16    convicted felon, if the testimony is supported by other

17    evidence, or would you automatically disregard it?"  Your

18  answer was "yes."  Is your answer that you could believe it,

19  if it's supported by other evidence?

20          PROSPECTIVE JUROR NUMBER 25:  Uh-huh. (affirmative

21  response)

22          MR. WINTERS:  Okay.  Nothing further.

23          MR. RIEHLMANN:  Nothing by me, Judge.

24          MR. VOIGHT:  I have nothing, Judge.

25          MR. WINTERS:  Thank you, ma'am.

80

1           THE COURT:  If you'll return to the room across the

2   hall; thank you.

3           (Prospective Juror Number 25 exits courtroom)

4             (Prospective Juror Number 26 enters)

5           MR. McMAHON:  Mr. Mickens.

6           PROSPECTIVE JUROR NUMBER 26:  Yes.

7           MR. McMAHON:  Good afternoon.

8           PROSPECTIVE JUROR NUMBER 26:  How are you doing?

9           MR. McMAHON:  I just had a couple of inquiries about

10  two of your answers from the questionnaire yesterday.  Number

11  2, let me read it to you, to refresh your memory:  "Often the

12  Government pays expenses of individuals who give information

13  about criminal activity and who cooperate in the criminal

14  investigations.  Sometimes these individuals are given lump

15  sum payments of money to help them restart their lives after

16  the investigations and prosecutions are over.  Do you have

17  problems with this?"  And, you ticked off "yes."  Do you have

18  a problem with that?

19          PROSPECTIVE JUROR NUMBER 26:  No, I misunderstood

20  that one.

21          MR. McMAHON:  So, you have no problem?

22          PROSPECTIVE JUROR NUMBER 26:  No.

23          MR. McMAHON:  All right.  The next question, Number

24  3, let me read that to you:  "During the investigation of

25  illegal activities, undercover agents often must give

                              81

1  government money to the people they're investigating and many

2  times the money is never recovered.  Do you have any problems

3  with this?"  And, you ticked off "yes," again.

4          PROSPECTIVE JUROR NUMBER 26:  Yes, I do.

5          MR. McMAHON:  Okay.  Now, in this case, you're going

6  to learn this was an undercover operation and you're also

7  going to learn that a substantial amount of money was given to

8  the targets of the investigation and we never got that money

9  back.

10          Now, knowing that up front, would you have any

11  problems in being able to judge this case?

12          PROSPECTIVE JUROR NUMBER 26:  I have a problem

13  knowing they're giving away money that people need.

14          MR. McMAHON:  Well, that's what -- okay, so you do

15  have a problem?

16          PROSPECTIVE JUROR NUMBER 26:  Yes.

17          MR. McMAHON:  Now, the question is going to be this:

18  Knowing that a lot of money was lost like that -- or, not

19  "lost," but never recovered, can you be fair to us

20  Prosecutors, in presenting our case, knowing that a

21  substantial sum of money was never recovered that was given

22  up, given to the targets during this undercover investigation?

23          PROSPECTIVE JUROR NUMBER 26:  I'd have a problem

24  understanding why people that's hungry that need food can't

25    get it, and you're giving away money.

1         MR. McMAHON:  So, you do have a problem?

2         PROSPECTIVE JUROR NUMBER 26:  Yes.

3         MR. McMAHON:  And, would that problem interfere with

4    your ability to judge this case fairly, as far as the

5    Government is goes?

6         PROSPECTIVE JUROR NUMBER 26:  That depend on the

7    circumstances.

8         MR. McMAHON:  Well, we need an answer.  Would that

9    cause you a problem to be fair to the Prosecution, to us in

10   this case, knowing -- and you're going to learn that.  I'm

11   telling you up front.

12        MR. RIEHLMANN:  Judge, I'm going to object.  I think

13   this is repetitious.  He's already answered that.

14        THE COURT:  It is somewhat repetitious, but just

15   restate the question one time.

16        MR. McMAHON:  Yes, sir.

17        Mr. Mickens, because that money was never recovered

18   -- and it was a substantial amount -- and you said that it

19   would cause a problem, that it causes you problems, would

20   that problem you feel interfere with your ability to judge

21   this case fairly for the Prosecution?  Yes or no.

22        PROSPECTIVE JUROR NUMBER 26:  I don't know.

23        THE COURT:  Mr. Riehlmann.

24        MR. RIEHLMANN:  Mr. Mickens, if the Government's

25   case, which in addition to the witnesses that Mr. McMahon has

1  talked about, the ones that got money, if it also had tapes,

2  audio and video tapes that convinced you that the Defendants

3  knew that they were doing something illegal and convinced you

4  beyond a reasonable doubt, could you set aside the problems

5  that you have with the money and still find these men guilty?

6  If you were convinced by the evidence beyond a reasonable

7  doubt, all the evidence?

8       PROSPECTIVE JUROR NUMBER 26:  Probably.

9       MR. RIEHLMANN:  All right.  Thank you.

10      THE COURT:  Any other questions?

11      MR. RIEHLMANN:  I have no further questions.

12      MR. MCMAHON:  One more.

13      You know, Mr. Mickens, you said "probably," but would

14  your problem that you feel about that money never being

15  recovered interfere with your ability to judge the evidence?

16      PROSPECTIVE JUROR NUMBER 26:  I don't think it will.

17  I still have a problem with it, but I don't think it would.

18      THE COURT:  Thank you.  You can return to the room

19  across the hall.

20      (Prospective Juror Number 26 exits courtroom)

21        (Prospective Juror Number 27 enters)

22      MR. VOIGHT:  Good afternoon, Ms. Jones.

23      PROSPECTIVE JUROR NUMBER 27:  Hi.

24      MR. VOIGHT:  I have one brief question regarding an

25  answer you gave on the questionnaire.  It's Question Number

1  14, and the question reads like this:  "If you learned that

2  one of the Defendants was a personal friend of Len Davis,

3  would that fact alone prejudice you against the Defendant?"

4    And, the answer you gave was "yes."  Could you elaborate on

5    that answer for us?

6              PROSPECTIVE JUROR NUMBER 27:  Well, repeat that

7    again.

8              MR. VOIGHT:  The question was:  "If you learned that

9    one of the Defendants was a personal friend of Len Davis,

10   would that fact alone prejudice you against the Defendant?"

11   And, you answered "yes."

12             PROSPECTIVE JUROR NUMBER 27:  Yeah, I feel that if

13   they knew each other or something that it wouldn't be a fair

14   trial.

15             MR. VOIGHT:  Are you saying that because they may

16   have known each other you wouldn't be able to set that -- you

17   wouldn't -- that would decide whether or not you thought that

18   person was guilty or not guilty?

19             PROSPECTIVE JUROR NUMBER 27:  Uh-huh. (affirmative

20   response)

21             MR. VOIGHT:  Thank you.

22             THE COURT:  Any other questions?  Mr. Riehlmann?

23             MR. RIEHLMANN:  No, sir.

24             THE COURT:  Government?

25             MR. McMAHON:  (Shakes head negatively)


                                        85

1              THE COURT:  Thank you, you may return to the room

2    across the hall.

3              (Prospective Juror Number 27 exits courtroom)

4                  (Prospective Juror Number 29 enters)

5              MR. RIEHLMANN:  Mr. Coste, on the jury questionnaire

6    you filled out yesterday, you were asked would you give more

7  weight to the testimony of a law enforcement witness than you

8  would a non-law enforcement witness, and you answered "yes,"

9  is that correct?

10          PROSPECTIVE JUROR NUMBER 29:  Yes, a police officer.

11          MR. RIEHLMANN:  Right.

12          PROSPECTIVE JUROR NUMBER 29:  Yeah, I would.

13          MR. RIEHLMANN:  You would?  You would -- I'm sorry.

14          PROSPECTIVE JUROR NUMBER 29:  I would give more

15  weight to a police officer.

16          MR. RIEHLMANN:  Okay, and would that feeling that you

17  have also extend to FBI agents?

18          PROSPECTIVE JUROR NUMBER 29:  Of course.

19          MR. RIEHLMANN:  Okay.  So, you would be more likely

20  to believe them than a civilian witness?

21          PROSPECTIVE JUROR NUMBER 29:  Yeah, because they're

22  working for the Government, you know, and -- how would I say

23  it?  I've been in the service myself, you know, and they're

24  credible, most of them.

25          MR. RIEHLMANN:  Okay.  Thank you, sir.


                                                              86

1          PROSPECTIVE JUROR NUMBER 29:  That's it?

2          MR. RIEHLMANN:  Yes, sir, that's all.

3          THE COURT:  No, no, -- does the Government have any

4  questions?

5          MR. WINTERS:  Yes.

6          Mr. Coste, you say no matter who testified, FBI

7  agents or New Orleans Policemen or civilians, you could listen

8  to all the evidence, including, maybe, tapes, videotapes, and

9  render a fair, impartial decision to either the Government or

10  the Defense?  Could you be fair and impartial?

11          PROSPECTIVE JUROR NUMBER 29:  Correct, yeah.

12          MR. WINTERS:  You could be?

13          PROSPECTIVE JUROR NUMBER 29:  I think so.

14          MR. WINTERS:  No matter who testifies?

15          PROSPECTIVE JUROR NUMBER 29:  No matter who

16     testifies.

17          MR. WINTERS:  Thank you, sir.

18          THE COURT:  Thank you.  You can return to the room

19     across the hall.  We'll be back.

20          (Prospective Juror Number 29 exits courtroom)

21            (Prospective Juror Number 30 enters)

22          MR. McMAHON:  Mr. Magee?

23          PROSPECTIVE JUROR NUMBER 30:  Yes, sir.

24          MR. McMAHON:  How are you doing?

25          PROSPECTIVE JUROR NUMBER 30:  Do you want me to stand


87

1     up?

2          MR. McMAHON:  Oh, no, no, no.  No, no.  I'm not that

3     important.  Only the Judge.

4          Look, I've got a couple of questions, Mr. Magee,

5     about your responses on the questionnaire yesterday.

6          PROSPECTIVE JUROR NUMBER 30:  Yes, sir.

7          MR. McMAHON:  Let me read the first one, it's Number

8     2:  "Often the Government pays expenses of individuals who

9     give information about criminal activity and who cooperate in

10     criminal investigations.  Sometimes these individuals are

11     given lump sums of money to help them restart their lives

12     after the investigations and prosecutions are over.  Do you

13     have any problems with this?"  And, you said you did.

14          PROSPECTIVE JUROR NUMBER 30:  Yes.  I don't think

15    that taxpayers money should be given to a witness or somebody.

16    You put enough money in front of him, you can get whatever you

17    want out of him.

18          MR. McMAHON:  Okay.  Now, the next question is

19    actually Number 3, which kind of follows onto that one:

20    "During the investigation of illegal activities, undercover

21    agents often must give government money to the people they're

22    investigating and many times the money is never recovered.  Do

23    you have any problem with this?"  And, you said you did.

24          PROSPECTIVE JUROR NUMBER 30:  Well, that almost goes

25    back -- like I say, I don't believe the taxpayers money should


88

1    be used for a witness program or to convict somebody, just --

2    like say, the taxpayer's money, you know.

3          MR. McMAHON:  Okay.

4          PROSPECTIVE JUROR NUMBER 30:  My money, your money,

5    whoever's.

6          MR. McMAHON:  Now, what you're going to learn in this

7    case, Mr. Magee, is both those things, and what I'll tell you

8    up front is that this was an undercover investigation and that

9    a very large sum of money was given by undercover agents

10    during the course -- and the money was never recovered, it was

11    given to the targets, a large sum of money.

12          Knowing that, would that prevent you from being fair

13    to the Government?  Because it's our case.

14          PROSPECTIVE JUROR NUMBER 30:  Well, I don't really

15    know, because you're entrapping people by giving them money.

16          MR. McMAHON:  That's how you feel?

17          PROSPECTIVE JUROR NUMBER 30:  Yes, sir.

18          THE COURT:  Any other questions?

19          MR. RIEHLMANN:  Yes.

20          Mr. Magee, the Defendants are charged with -- at

21    least Mr. Duncan is charged with acting as a police officer in

22    protecting a shipment of cocaine, and if the Government was to

23    present you with a tape recording of his own voice --

24          MR. MCMAHON:  Your Honor, I'm going to object to the

25    fact.  Judge, it's a hypothetical, it's too facts --


                                          89

1           MR. RIEHLMANN:  He's talking about substantial

2     amounts --

3           THE COURT:  No, no, complete your question.

4           MR. RIEHLMANN:  Thank you.

5           MR. RIEHLMANN:  If the Government was to present you,

6     as evidence in this case, a tape recording of Mr. Duncan

7     speaking, where, after you listen to the tape recording, you

8     were satisfied beyond a reasonable doubt that he knew he was

9     participating in some cocaine trafficking ring, could you find

10    Mr. Duncan guilty, even though the Government gave some of

11    these other witnesses money?

12          PROSPECTIVE JUROR NUMBER 30:  I don't really know.

13          MR. RIEHLMANN:  You'd have to hear the evidence, is

14    that what you're saying?

15          PROSPECTIVE JUROR NUMBER 30:  Well, I don't really

16    know.  Like I say, I'm not for the government trapping people

17    and using the taxpayers money.  But, if a man -- if a man has

18    done something and if he's trafficking cocaine or marijuana or

19    whatever, if he's guilty, I think he's guilty.

20          MR. RIEHLMANN:  And, you could find him guilty, if

21  the evidence persuaded you that he was guilty, all the

22  evidence?

23          PROSPECTIVE JUROR NUMBER 30:  I think I could.

24          MR. RIEHLMANN:  Okay.  Thank you.

25          THE COURT:  Any other questions?

1           Thank you, sir, you may --

2           MR. McMAHON:  Yes.

3           Mr. Magee, to follow up on that question:  If you

4   found out that the government, during this undercover, paid

5   Mr. Duncan money, would you have though he was entrapped?

6           MR. RIEHLMANN:  Judge, I'm going to object.  I don't

7   know that -- certainly that defense has not been raised.  I

8   don't know why that is a relevant question to be asked, and I

9   would have to --

10          THE COURT:  I think it falls into place with the

11  questions that have been addressed so far, so that will be

12  overruled.

13          MR. RIEHLMANN:  But, --

14          MR. McMAHON:  Do you want me to repeat it, Mr. Magee?

15          MR. RIEHLMANN:  -- define "entrap" so that this

16  gentleman understands what Mr. --

17          THE COURT:  Maybe you could restate the question.

18          PROSPECTIVE JUROR NUMBER 30:  You all are trying to

19  confuse me with one thing and the other.

20          MR. McMAHON:  No, I'm trying to get --

21          PROSPECTIVE JUROR NUMBER 30:  I don't feel like that

22  I would be a good juror on this case, on account of the

23  government's money had been used, this, that and the other.  I

24  just don't feel like I could make an honest opinion and give

25    you my own opinion.

1           MR. McMAHON:  Okay, and I'm going to tell you what
2    our evidence is going to show, that the Defendants got money,
3    so could you be fair or not?  Yes or no?  In the undercover
4    investigation.
5           PROSPECTIVE JUROR NUMBER 30:  I really don't know.
6           MR. McMAHON:  We have to have a more --
7           MR. RIEHLMANN:  Judge, --
8           MR. McMAHON:  If you could --
9           MR. RIEHLMANN:  -- I'm going to object.
10          MR. McMAHON:  He's interrupting me.  If you could
11   just --
12          THE COURT:  Finish your question.
13          MR. McMAHON:  Now, I'm telling you, up front,
14   Mr. Magee, and I'm basing this on what you told me earlier:
15   Our evidence is going to show that those Defendants got money
16   in an undercover operation.  Knowing that, can you be a fair
17   juror in this case?
18          PROSPECTIVE JUROR NUMBER 30:  I really can't answer
19   it, because I don't know.
20          MR. McMAHON:  Thank you.
21          THE COURT:  Thank you.   You can return to the room
22   and we'll call you back.
23          The next number.
24       (Prospective Juror Number 30 exits courtroom)
25          (Prospective Juror Number 31 enters)

1         MR. WINTERS:  Ms. Diettel?

2         PROSPECTIVE JUROR NUMBER 31:  That's fine.

3         MR. WINTERS:  Okay.  How are you?

4         I just have one question, based on your questionnaire

5 that you filled out yesterday that really is Question Number

6 23, and it concerned members of your family for whom you are

7 responsible, who have medical or physical problems, which

8 might require your attention while you serve as a juror, and

9 you checked "yes," and you said your mother has Alzheimer's

10 and lung disease and "I am an only child."  Okay, do you have

11 somebody to care for your mother right now?

12         PROSPECTIVE JUROR NUMBER 31:  Yeah.

13         MR. WINTERS:  Okay, so that wouldn't cause you --

14         PROSPECTIVE JUROR NUMBER 31:  Well, --

15         MR. WINTERS:  If the trial lasted four or five days,

16 that wouldn't detract from your listening to the evidence?

17         PROSPECTIVE JUROR NUMBER 31:  Unless something

18 happens, you know.

19         MR. WINTERS:  Unless something --

20         PROSPECTIVE JUROR NUMBER 31:  Like I say, I'm an only

21 child.  It's --

22         MR. WINTERS:  Right.  And, if something happened

23 terrible, you're saying.

24         PROSPECTIVE JUROR NUMBER 31:  Yeah.

25         MR. WINTERS:  But, ordinarily, it wouldn't affect

1 you?

2         PROSPECTIVE JUROR NUMBER 31:  No.

3         MR. WINTERS:  Okay.

 4          PROSPECTIVE JUROR NUMBER 31:  I mean, she's okay.

 5          THE COURT:  Any other questions?

 6          MR. WINTERS:  Yes, sir.  I'm sorry, I have one other

 7   question.

 8          THE COURT:  I thought you were finished.  I was going

 9   to the Defendant.

10          MR. WINTERS:  I have one other question.

11          Question 3:  "During the investigation of illegal

12   activities, undercover agents often must give government money

13   to the people they're investigating and many times the money

14   is not recovered."  Now, I'm going to tell you that you're

15   going to hear this was an undercover operation, and to further

16   the operation, money was given to targets.  It's a

17   considerable amount of money.  I mean, not millions of

18   dollars, but it's a considerable amount of money.

19          Do you have a problem with this?

20          PROSPECTIVE JUROR NUMBER 31:  It was a toss-up.  It

21   was sort of ambiguous, because the other one says if you

22   recover the money, you know, and this one --

23          MR. WINTERS:  Okay.

24          PROSPECTIVE JUROR NUMBER 31:  If you --

25          MR. WINTERS:  Would your feelings on that affect you


                                        94

 1   in any way, as to render a fair and impartial verdict after

 2   you heard the evidence?

 3          PROSPECTIVE JUROR NUMBER 31:  I guess I would be for

 4   it.

 5          MR. WINTERS:  You would be what, ma'am?

 6          PROSPECTIVE JUROR NUMBER 31:  For paying the money.

                            Page 83

```
 7            MR. WINTERS:  Okay.

 8            PROSPECTIVE JUROR NUMBER 31:  There was one other

 9   problem, though, that I didn't know quite how to put it down

10   or whatever.  There was something about the drugs, and I teach

11   eighth grade, and I've seen a lot of drugs, I've had kids

12   arrested for drugs and things, so I have -- not my immediate

13   family was involved in drugs, but, I mean, I see it daily.

14            MR. WINTERS:  You see it daily, you said?

15            PROSPECTIVE JUROR NUMBER 31:  Oh, yeah.  I've had

16   kids whose parents are in jail and -- you know, I teach eighth

17   grade.

18            MR. WINTERS:  Well, what are you saying, because this

19   is a drug case, you --

20            PROSPECTIVE JUROR NUMBER 31:  Yeah, it's --

21            MR. WINTERS:  -- would be prejudiced to the

22   Government?

23            PROSPECTIVE JUROR NUMBER 31:  No, I don't know what

24   I would be, but it's just -- I see so much that it causes.

25            MR. WINTERS:  Well, if the Court instructed you that
```

95

```
 1   you had to listen to the law and you had to, obviously, listen

 2   to the evidence, my question to you is:  Whether it's -- it is

 3   a drug trial, but would that affect your ability to give a

 4   fair, impartial verdict to whoever, whatever side?

 5            PROSPECTIVE JUROR NUMBER 31:  That's -- it probably

 6   would color my judgment.

 7            MR. WINTERS:  And, you could put that judgment aside?

 8            PROSPECTIVE JUROR NUMBER 31:  I mean, you know, I

 9   would probably try, but it does -- you know, I've just seen so

10   much.
```

11          MR. WINTERS:  Thank you, ma'am.

12          THE COURT:  Any other questions?

13          MR. RIEHLMANN:  Just a second.

14          Ma'am, you indicated in Question 10:  "Can you

15  consider the testimony of a convicted felon, if supported by

16  other evidence, or would you automatically disregard it?"  You

17  answered "yes."  Can you tell me what you were answering "yes"

18  to, which part of that question, since it was --

19          PROSPECTIVE JUROR NUMBER 31:  If there is evidence

20  showing that he did it, you know, I would believe the

21  evidence.

22          MR. RIEHLMANN:  Well, let me just clarify it for you.

23  If the Government were to call a witness to the witness stand

24  who has a felony conviction, if his testimony was

25  corroborated by other evidence, could you believe it or would

1  you automatically reject it, because of his felony conviction?

2          PROSPECTIVE JUROR NUMBER 31:  I would probably

3  believe it, I guess.  Like I say, that might have coloring to

4  it.  I don't know.

5          MR. RIEHLMANN:  Now, Question Number 14 was:  "If you

6  determine during the course of the trial that one of the

7  Defendants was a personal friend of Len Davis, would that

8  prejudice you against that Defendant?"  And, you said "yes."

9          PROSPECTIVE JUROR NUMBER 31:  Well, it was about the

10  -- I have read about that in the paper.

11          MR. RIEHLMANN:  Right.

12          PROSPECTIVE JUROR NUMBER 31:  And, that's kind of

13  what I meant.  I have read it and I remembered it from the

14  news.

15      MR. RIEHLMANN:  Okay, so do you stand by your answer,

16  that you would be prejudiced against a Defendant who was a

17  friend of Len Davis?

18      PROSPECTIVE JUROR NUMBER 31:  You see, I guess it

19  goes back to bias, you know.  That would sound -- I've never

20  been in these situations before.  I'm not sure exactly how I

21  would say.

22      MR. RIEHLMANN:  So, you think you may be biased by

23  that fact?

24      PROSPECTIVE JUROR NUMBER 31:  Maybe; maybe not.  It

25  depends on what they say and how they say it, I guess.


                                        97

1       MR. RIEHLMANN:  You also indicated that you had some

2   problems previously with the New Orleans Police Department.

3   Given that Mr. Duncan used to be a police officer for NOPD, do

4   you think that that might cause you problems?

5       PROSPECTIVE JUROR NUMBER 31:  No, because it's not

6   everybody.  It's just the problems we had at that point in

7   time.

8       MR. RIEHLMANN:  Okay.  Thank you, ma'am.

9       THE COURT:  Thank you.  You can return to the room.

10      You can bring in the next number and then we'll see

11  what happens after that.

12      (Prospective Juror Number 31 exits courtroom)

13          (Prospective Juror Number 9 enters)

14      THE COURT:  I received a note, which said you wanted

15  to talk to me.

16      PROSPECTIVE JUROR NUMBER 9:  Yes, I --

17      THE COURT:  You want to talk to me.
                      Page 86

18          PROSPECTIVE JUROR NUMBER 9:  I got a phone call at

19  12:00, when I called to check into my husband and let him know

20  I was still here.  He told me my daughter was sent to the

21  hospital.  She is six weeks pregnant.  Her uterus fell against

22  her rectum and she's on high risk, and I don't know if I can

23  be here.  I don't know how bad it is until I get home and

24  check on her.

25          MR. RIEHLMANN:  Judge, we'd consent to her.


98

1           MR. WINTERS:  The Government consents to excuse this

2   juror.

3           THE COURT:  The Defendants each consent?

4           MR. RIEHLMANN:  Yes.

5           MR. VOIGHT:  We'll consent.

6           THE COURT:  You will be, then, excused from this jury

7   panel.  You'll have to return to the jury room and advise them

8   and that will be taken care of.

9           PROSPECTIVE JUROR NUMBER 9:  Okay.  Sir, do I do that

10  now, --

11          THE COURT:  Yes.

12          PROSPECTIVE JUROR NUMBER 9:  -- or just wait?

13          THE COURT:  And, then you're excused.

14          PROSPECTIVE JUROR NUMBER 9:  Okay.  Thank you.

15          MR. RIEHLMANN:  Good luck.

16          MR. WINTERS:  Thank you, ma'am.  Good luck.

17          PROSPECTIVE JUROR NUMBER 9:  Thank you.

18          (Prospective Juror Number 9 exits courtroom)

19             (Prospective Juror Number 32 enters)

20          MR. RIEHLMANN:  Hi, Ms. Morris.

21      PROSPECTIVE JUROR NUMBER 32:  Hi.

22      MR. RIEHLMANN:  Question Number 7 in the juror

23  questionnaire was:  Would you give more weight to a law

24  enforcement witness as opposed to someone who wasn't in law

25  enforcement?  And, you answered "yes."  Do you agree with that

1   statement?

2       PROSPECTIVE JUROR NUMBER 32:  I would have to say yes.

3       MR. RIEHLMANN:  Okay.  Then in Question Number 10 you

4   were asked:  "Can you accept the testimony of a convicted

5   felon, if it's supported by other evidence, or would you

6   automatically disregard it?"  And, you answered "yes," but

7   because of the way the question is phrased --

8       PROSPECTIVE JUROR NUMBER 32:  I was confused.

9       MR. RIEHLMANN:  Right.  So, what is your response?

10      PROSPECTIVE JUROR NUMBER 32:  Could you repeat the

11  question?

12      MR. RIEHLMANN:  "Can you accept the testimony of a

13  convicted felon, if it's corroborated by other evidence, or

14  would you automatically disregard it," is how the question

15  reads.

16      PROSPECTIVE JUROR NUMBER 32:  If there was positive

17  evidence that what he was stating was true, I could accept.

18      MR. RIEHLMANN:  Okay.  Question Number 23, you said

19  something, you had some medical problems or someone in your

20  family has some medical problems.

21      PROSPECTIVE JUROR NUMBER 32:  Not medical -- well,

22  not necessarily medical.  I mentioned in there as long as I

23  was not sequestered, basically, as long as I could go home in

24  the evenings, it was fine.  I have young children and my

25    husband is out of town.

1         MR. RIEHLMANN:  Question Number 25 was that you did

2    have some recollection of the facts of this case.

3         PROSPECTIVE JUROR NUMBER 32:  Not necessarily facts.

4    I remember -- I'd have to say it was, maybe, two years ago,

5    maybe it wasn't that long ago, hearing something in the news

6    about it, but I don't remember the names of the people

7    involved or how many people were involved.

8         MR. RIEHLMANN:  Okay, so it wouldn't color your --

9         PROSPECTIVE JUROR NUMBER 32:  Oh, not at all.

10        MR. RIEHLMANN:  -- judgment in this case?

11        PROSPECTIVE JUROR NUMBER 32:  No.

12        MR. RIEHLMANN:  Thank you, ma'am.

13        PROSPECTIVE JUROR NUMBER 32:  I have to make a

14   statement.  I mentioned earlier, when asked if I have any

15   family member that works for the government, I mentioned that

16   my sister works for the U.S. District Court.  She does

17   actually work for the U.S. Attorney, and I didn't clarify

18   that.  Mary Castillian (phonetic) is my sister.

19        MR. McMAHON:  Oh, Mary.  Oh, okay.

20        MR. RIEHLMANN:  Ma'am, do you think that that might

21   pose a problem for you?

22        PROSPECTIVE JUROR NUMBER 32:  Oh, not at all for me.

23   In fact, I mean, I'd prefer not to be excused for that reason.

24        MR. RIEHLMANN:  Okay.

25        PROSPECTIVE JUROR NUMBER 32:  But, I felt you had to

1    know that.

2              MR. RIEHLMANN:  All right.  Thank you.

3              THE COURT:  Any other questions?

4              MR. McMAHON:  Yes, sir.  Mary gives us our travel

5    checks.  Did you ever speak to Mary about the work at all, at

6    the U.S. Attorney's Office?

7              PROSPECTIVE JUROR NUMBER 32:  No.

8              MR. McMAHON:  Okay.  She doesn't talk about cases or

9    anything like that to you?

10             PROSPECTIVE JUROR NUMBER 32:  Oh, absolutely not.

11             MR. McMAHON:  To follow up, Ms. Morris:  Would you

12   give more weight to the testimony of a law enforcement witness

13   than that of any other witness?  That may have been a loaded

14   question, but can you view the testimony -- and you will hear

15   from law enforcement agents.  Would you automatically accept

16   it or could you view it just like any other witness?

17             PROSPECTIVE JUROR NUMBER 32:  Well, like any other

18   witness.  I mean, I was raised to respect authority and I see

19   a law enforcement officer as an authority figure.

20             MR. McMAHON:  Well, that's why I said it was probably

21   loaded, but can you --

22             MR. RIEHLMANN:  Judge, I'm going to object to that

23   characterization.  The Court approved the question, when I

24   submitted it to the Court.  I don't think it's fair for

25   Mr. McMahon to --

1              THE COURT:  She's answered it, hasn't she?

2              MR. RIEHLMANN:  Huh?

3              THE COURT:  Hasn't she effectively answered it?

    4            Repeat it.

    5            MR. McMAHON:  Thank you, sir.

    6            I think the ultimate question is:  Could you be fair

    7    or -- for example, can you simply judge the credibility of a

    8    law enforcement agent and can you -- just for example, if, in

    9    your judgment, the law enforcement witness was not credible,

   10    can you say, "Well, I don't think that person was credible"?

   11    Can you do that?

   12            PROSPECTIVE JUROR NUMBER 32:  As an individual, I can

   13    say that.

   14            MR. McMAHON:  Thank you, ma'am.

   15            THE COURT:  Thank you.  You can return to the room

   16    and we'll be back.

   17            (Prospective Juror Number 32 exits courtroom)

   18               (Prospective Juror Number 33 enters)

   19            MR. RIEHLMANN:  Good afternoon, Ms. Hayes.  In

   20    response to Question Number 10, which read:  "Can you accept

   21    the testimony of a convicted felon, if supported by other

   22    evidence, or would you automatically disregard it?"  You

   23    answered "yes."  Are you answering yes to the first part of

   24    the question or the second part of the question?  Can you --

   25            PROSPECTIVE JUROR NUMBER 33:  The first part.


                                                         103

    1            MR. RIEHLMANN:  The first part?

    2            PROSPECTIVE JUROR NUMBER 33:  (Nods head

    3    affirmatively)

    4            MR. RIEHLMANN:  You can consider the testimony of a

    5    convicted felon, if supported by other evidence?

    6            PROSPECTIVE JUROR NUMBER 33:  Uh-huh. (affirmative

7   response)

8          MR. RIEHLMANN:  Okay.  You have some recollection of

9   the facts of the Len Davis case?

10         PROSPECTIVE JUROR NUMBER 33:  (Nods head

11  affirmatively)

12         MR. McMAHON:  You need to answer verbally.

13         PROSPECTIVE JUROR NUMBER 33:  Yes.

14         MR. RIEHLMANN:  Okay.  Ma'am, would your recollection

15  of the facts of the Len Davis case, whatever it is, does it in

16  any way affect your ability to give Mr. Duncan and Mr. Jones a

17  fair trial?

18         PROSPECTIVE JUROR NUMBER 33:  No.

19         MR. RIEHLMANN:  Okay.  Thank you, ma'am.;

20         MR. WINTERS:  No questions.

21         THE COURT:  Do you have questions?

22         MR. VOIGHT:  I don't have any questions.

23         THE COURT:  No further questions?

24         MR. WINTERS:  No questions.

25         THE COURT:  Thank you.  If you'll return to the room.


                                                      104

1          (Prospective Juror Number 33 exits courtroom)

2              (Prospective Juror Number 3 enters)

3          THE COURT:  You were questioned earlier and I

4   understand you may want to add something to what you were

5   questioned about?

6          PROSPECTIVE JUROR NUMBER 3:  No, it wasn't adding

7   anything about my little brother.  When I was telling you all

8   about the seizures and stuff and the person I had watching

9   him, they're supposed to be going to work at 3:00, and I just

10  have -- I didn't know I was going to be here all day long, all

11   the way to this evening.

12        THE COURT:  Questions from anyone?

13        MR. MCMAHON:  Ms. Williams, is that -- so, basically,

14   at 3:00 every day, the person who watches --

15        PROSPECTIVE JUROR NUMBER 3:  Yeah, see, because I

16   work from 5:00 in the morning until 1:00, and they be -- and

17   they leave and go to work at 3:00, until 11:00 at night.  But,

18   I didn't go to work today, because I came here.  But, they

19   going to stay there until 3:00, so I gotta be there for 3:00.

20        MR. MCMAHON:  Every day?

21        PROSPECTIVE JUROR NUMBER 3:  Every day.

22        MR. MCMAHON:  I'd move for consent, Your Honor.

23        MR. RIEHLMANN:  I would agree, Judge.

24        THE COURT:  No questions?

25        MR. VOIGHT:  No questions.


105

1        THE COURT:  All agree that the witness be excused?

2        MR. VOIGHT:  Yes, Your Honor.

3        THE COURT:  You'll be excused.  You'll have to return

4   to the jury room in the other building, and you're excused.

5        PROSPECTIVE JUROR NUMBER 3:  Yes, sir.

6        THE COURT:  You may leave.

7        PROSPECTIVE JUROR NUMBER 3:  Thank you.

8        (Prospective Juror Number 3 exits courtroom)

9           (Prospective Juror Number 36 enters)

10        MR. WINTERS:  How are you, sir?

11        PROSPECTIVE JUROR NUMBER 36:  Fine.

12        MR. WINTERS:  I just want to ask you a couple of

13   questions that involve your questionnaire, some of the answers

14    on your questionnaire from yesterday.

15            PROSPECTIVE JUROR NUMBER 36:  Okay.

16            MR. WINTERS:  Particularly, first of all, Question

17    Number 2:  "Often the Government pays expenses of individuals

18    who give information about criminal activity and who cooperate

19    in the criminal investigations.  Sometimes these individuals

20    are given lump sum payments of money to help them restart

21    their lives after the investigations and prosecutions are

22    over.  Do you have a problem with this?"

23            Let me first say you will hear evidence that after

24    the fact --

25            PROSPECTIVE JUROR NUMBER 36:  Well, let me say this:


                                                    106

1    You just read it again.  I read that thing yesterday three or

2    four times.

3            MR. WINTERS:  Yes, sir.

4            PROSPECTIVE JUROR NUMBER 36:  I don't understand it.

5            MR. WINTERS:  Well, let me see if I can explain it.

6    If a person gives information to the government about criminal

7    activity, okay, and assists the government in investigating --

8            PROSPECTIVE JUROR NUMBER 36:  In other words, the

9    government pays them to give them information?

10            MR. WINTERS:  No.  Pays them after the fact to

11    restart their lives, if the whole time they're working with

12    the government and can't work in a job, okay.  Do you have a

13    problem with the government giving -- after the fact -- these

14    people money, because they cooperated with the government?

15            PROSPECTIVE JUROR NUMBER 36:  I do.

16            MR. WINTERS:  You do.  And, would your opinion on

17    that or would your feelings on that affect your ability to

18  give the government a fair trial, if it came up that that
19  happened?
20       PROSPECTIVE JUROR NUMBER 36:  You've got to explain
21  it to me a little bit better.  I just don't really understand
22  the question.
23       MR. WINTERS:  All right.  If it came out at this
24  trial that there was an informant, a person that informed and
25  gave the government information about criminal activity, --

1        PROSPECTIVE JUROR NUMBER 36:  Uh-huh. (affirmative
2   response)
3        MR. WINTERS:  -- about individuals violating crimes,
4   violating drug crimes, okay, if this person gave this
5   information to the government and worked along with the
6   government undercover agents during a year investigation and,
7   at the conclusion of the investigation, because this person
8   has spent all this time and money and expenses working with
9   the government, we gave him a lump sum payment to allow him to
10  get back on his feet, go find a job and start working again,
11  do you have a problem with that type of --
12       PROSPECTIVE JUROR NUMBER 36:  Somewhat, because the
13  individual is being paid the whole time that this was going
14  on.
15       MR. WINTERS:  What if the individual couldn't work?
16  What if he couldn't hold a job?
17       PROSPECTIVE JUROR NUMBER 36:  Then I guess he would
18  get on the unemployment rolls like everybody else.
19       MR. WINTERS:  But, what if the government was using
20  this individual to infiltrate criminal organizations and we

21  had to pay his expenses, we had to pay for a telephone, we had

22  to pay for an apartment, would you have a problem with that?

23       PROSPECTIVE JUROR NUMBER 36:  I have a problem with a

24  lot of those things, yes.

25       MR. WINTERS:  So, my question is:  Would that, in any


108

1  way, affect your ability to give the Government, the

2  Prosecution, a fair trial, your feelings on that?

3       PROSPECTIVE JUROR NUMBER 36:  I would have to know

4  more detailed information to make that determination.  Maybe

5  yes, maybe no.

6       MR. WINTERS:  "Maybe yes, maybe no."

7       During the investigation --

8       This is Question Number 3:  During this

9  investigation, to further the investigation, the government

10  gave money to the targets, paid them off, okay, --

11       PROSPECTIVE JUROR NUMBER 36:  Uh-huh. (affirmative

12  response)

13       MR. WINTERS:  -- gave them money, and that money was

14  never recovered, because we couldn't recover it, because we

15  would bring up the investigation.  Do you have a problem with

16  that?

17       PROSPECTIVE JUROR NUMBER 36:  If the money were

18  stolen from that individual and it couldn't be recovered, I

19  have no problem with it.  But, if that individual pocketed the

20  money, yes, I have a problem.

21       MR. WINTERS:  You have a problem, not with the

22  government giving it to him, but with the individual being

23  able to pocket the money, --

24       PROSPECTIVE JUROR NUMBER 36:  Yes.

25          MR. WINTERS:  -- is that your answer?

1          PROSPECTIVE JUROR NUMBER 36:  Yes.

2          MR. WINTERS:  Okay, sir.  Thank you.

3          Question 10:  "Can you believe --"

4          Now, this is a very confusing question, okay.

5          "Can you believe the testimony of a convicted felon,

6   if it is supported by other evidence, or would you

7   automatically disregard it?"  Your answer was "no."  Is your

8   answer "no" to "Can you believe the testimony of a convicted

9   felon," or is it "no" to "or would you automatically disregard

10  it?"

11         PROSPECTIVE JUROR NUMBER 36:  In this particular

12  case, they were caught with drugs, I think they're guilty,

13  okay, so I can't really look at this very objectively, because

14  I feel that they're guilty, because they were caught with the

15  darn drugs.

16         MR. WINTERS:  But, that's not the question, sir.  The

17  question is:  --

18         PROSPECTIVE JUROR NUMBER 36:  Okay.

19         MR. WINTERS:  -- If the Government calls persons

20  convicted of a crime, could you believe them if they

21  testimony, not by itself, but if it was corroborated by other

22  evidence in the case, other witnesses, tape recordings, video

23  recordings?

24         PROSPECTIVE JUROR NUMBER 36:  That they were guilty?

25         MR. WINTERS:  Yeah.

1          PROSPECTIVE JUROR NUMBER 36:  If there were other

2    circumstances to prove their guilt?

3          MR. WINTERS:  Yes, could you believe that witness?

4          PROSPECTIVE JUROR NUMBER 36:  Yes.

5          MR. WINTERS:  Thank you, sir.

6          THE COURT:  Any other questions?

7          MR. RIEHLMANN:  Mr. Wagner, when you said they were

8    caught with the drugs, "the darn drugs, I believe they're

9    guilty," you're referring to the Defendants, aren't you?

10          PROSPECTIVE JUROR NUMBER 36:  The two individuals

11    that were caught with drugs.

12          MR. RIEHLMANN:  I'm talking about -- you're referring

13    to the -- you testified -- well, not "testified," but you

14    stated earlier that you feel these two men are guilty, didn't

15    you?

16          PROSPECTIVE JUROR NUMBER 36:  If they were caught

17    with drugs, in-hand, caught cold, they're guilty.

18          MR. RIEHLMANN:  All right.  You've prejudged this

19    case, would that be fair to say?

20          PROSPECTIVE JUROR NUMBER 36:  If they didn't have

21    drugs on them, there would be a shadow of a doubt.

22          MR. RIEHLMANN:  Do you think you can give these

23    Defendants a fair trial, knowing what you've been told so far?

24          PROSPECTIVE JUROR NUMBER 36:  No.

25          MR. RIEHLMANN:  All right.  Thank you, sir.

1          MR. McMAHON:  May we approach?

2          THE COURT:  All right.  Do you still need the Witness?

3          MR. McMAHON:  No, sir.

4          MR. WINTERS:  No, sir.

5          THE COURT:  You can return to the room across the

6     hall.

7          (Prospective Juror Number 36 exits courtroom)

8       (At side bar on the record)

9          MR. McMAHON:  Your Honor, I'm just wondering about

10    the timing as far as when we can make our challenges for

11    cause, when they're fresh or --

12         THE COURT:  When you're finished running through this

13    list, depending on what time of the day.

14         MR. WINTERS:  You want us to go through the whole

15    list?  That was our question, Judge.

16         MR. McMAHON:  Yeah, just --

17         THE COURT:  Well, we're moving along.  It's only --

18    you have to go pick up -- what time, I forgot what time.

19         MR. RIEHLMANN:  He told me 4:30, so I told him I'd

20    pick him up for quarter to 5:00.

21         THE COURT:  Yeah, that was my normal plan, to quit

22    around about 4:30.

23         MR. WINTERS:  So, you want us to challenge for cause

24    after we voir dire the whole panel?

25         THE COURT:  I'm open to -- we can, maybe, get rid of

112

1     some of them today.

2          MR. McMAHON:  Because I figure, like, up to this

3     point, I mean, -- maybe when the recollection is fresh and

4     the responses are --

5          THE COURT:  I'll tell you what, let's do a couple of

6     more witnesses (sic) and then we'll have a recess.

```
 7                MR. McMAHON:  Right.

 8                THE COURT:  It seems to me, I'm sure that as far as

 9    some of the challenges for cause, you all might have

10    agreement, and I can just pop them.

11                MR. McMAHON:  I think we have a joint --

12                MR. RIEHLMANN:  I think that last one was, yes, sir.

13                THE COURT:  I mean, there have been two or three of

14    them that I'm pretty sure, if you just use your common sense

15    you'd --

16                MR. RIEHLMANN:  Yeah.

17                MR. McMAHON:  We challenge --

18                MR. WINTERS:  We'd agree to challenge this last --

19    Mr. Wagner for cause, Your Honor, and --

20                THE COURT:  Yeah, we'll have a break in a few minutes

21    and make up a list and I can pop those.

22                MR. WINTERS:  All right.  Thank you, Judge.

23                MR. VOIGHT:  Good.

24      (End of discussion at side bar)

25                THE COURT:  So, we're now with Number --
```

113

```
 1                THE CLERK:  Thirty-seven.

 2                   (Prospective Juror Number 37 enters)

 3                MR. VOIGHT:  Juror 37, good afternoon, ma'am.  I have

 4    one brief question concerning an answer that you gave on a

 5    question on the questionnaire, and that was the trick

 6    question, Number 10.  The question reads:  "Can you believe

 7    the testimony of a convicted felon, if it is supported by

 8    other evidence, or would you automatically disregard it?"

 9                You answered "yes," with the understanding that

10    that's a two-part question, what were you answering "yes" to?
```

11          PROSPECTIVE JUROR NUMBER 37:  I was answering "yes"

12   to the first part.  If it was supported by evidence.

13          MR. VOIGHT:  Thank you.

14          PROSPECTIVE JUROR NUMBER 37:  Uh-huh. (affirmative

15   response)

16          THE COURT:  Any other questions?

17          MR. WINTERS:  The Government has nothing.

18          THE COURT:  Thank you.  You may return to the jury

19   room.

20          (Prospective Juror Number 37 exits courtroom)

21             (Prospective Juror Number 39 enters)

22          MR. McMAHON:  Mr. Durel, how are you?

23          PROSPECTIVE JUROR NUMBER 39:  All right.

24          MR. McMAHON:  Let me ask you, are you related to Mike

25   Durel, the IRS investigator?


                                          114

1           PROSPECTIVE JUROR NUMBER 39:  No.

2           MR. McMAHON:  Okay.  I want to ask you about your

3    answer to Number 3 on the questionnaire, and let me read it to

4    you:  "During the investigation of illegal activities,

5    undercover agents often must give government money to the

6    people they're investigating and many times the money is never

7    recovered."  And, you said you had a problem with that.  Could

8    you explain?

9           PROSPECTIVE JUROR NUMBER 39:  Like, when the police

10   have you in the car, they'll take your money sometimes.

11          MR. McMAHON:  What was that again?

12          PROSPECTIVE JUROR NUMBER 39:  Like, when the police

13   pull you over, --

14          MR. McMAHON:  Right.

15          PROSPECTIVE JUROR NUMBER 39:  -- and they search you

16   down, and you have a lot of money in your pocket, they'll take

17   it.

18          MR. McMAHON:  Okay, but this is a little different.

19   Now, this is in an undercover, when the -- a good cop, okay, a

20   good agent would, during an undercover, he pretends to be a

21   bad guy, and then he might give money to one of the targets of

22   the investigation, and the money walks, the person -- we never

23   get the money back.  Is that problem for you?

24          PROSPECTIVE JUROR NUMBER 39:  No.

25          MR. McMAHON:  Okay.  You also answered to Number 4,


                                          115

1    and this is the question:  "Often the government secretly

2    records conversations during a criminal investigation.  Do you

3    have a problem with this?"  And, you said you had a problem

4    with it.  Now, this case involves recorded conversations that

5    were recorded without the Defendant knowing they were being

6    recorded.  Is that going to cause you a problem?

7          PROSPECTIVE JUROR NUMBER 39:  No, not really.

8          MR. McMAHON:  Well, why did you answer "yes" to the

9    question?

10          PROSPECTIVE JUROR NUMBER 39:  I must have

11   misunderstood the question.

12          MR. McMAHON:  All right.  So, with that said, you're

13   not going to have a problem with the fact that recordings,

14   secret recordings were made during this case?

15          PROSPECTIVE JUROR NUMBER 39:  No.

16          MR. McMAHON:  Mr. Durel, you work at -- you're a

17   technician at the Carnival Club?

18        PROSPECTIVE JUROR NUMBER 39:  Yes, I am.

19        MR. McMAHON:  The Carnival Club is located a the

20   Mardi Gras Truck Stop, correct?

21        PROSPECTIVE JUROR NUMBER 39:  Yes.

22        MR. McMAHON:  This case came about at the Mardi Gras

23   Truck Stop.  Have you ever heard of this case?

24        PROSPECTIVE JUROR NUMBER 39:  No.

25        MR. McMAHON:  Would your knowledge of the Mardi Gras


116

1   Truck Stop in any way cause you to view the evidence either

2   for the Government or against the Government?

3        PROSPECTIVE JUROR NUMBER 39:  No.

4        MR. McMAHON:  How long have you been working at the

5   Carnival Club?

6        PROSPECTIVE JUROR NUMBER 39:  June will make two

7   years.

8        MR. McMAHON:  So, June of '96?

9        PROSPECTIVE JUROR NUMBER 39:  Ninety-six.

10        MR. McMAHON:  Okay.  Thank you, Mr. Durel.

11        THE COURT:  Any other questions?

12        MR. RIEHLMANN:  No questions.

13        THE COURT:  Thank you.  You can return to the room,

14   and we'll call back.

15        (Prospective Juror Number 39 exits courtroom)

16            (Prospective Juror Number 40 enters)

17        MR. RIEHLMANN:  Hello, Ms. Hebert.

18        PROSPECTIVE JUROR NUMBER 40:  Yes.

19        MR. RIEHLMANN:  Question Number 10 was:  "Can you

20   accept the testimony of a convicted felon, if supported by

21 other evidence, or would you automatically disregard it?"  And

22 you answered "yes."  Were you answering yes to the first part

23 of the question or to the second part of the question?

24          PROSPECTIVE JUROR NUMBER 40:  Well, I would not

25 automatically disregard it.


117

1          MR. RIEHLMANN:  Okay, thank you, Ms. Hebert.

2          THE COURT:  Any other questions?

3          MR. McMAHON:  (Shakes head negatively)

4          THE COURT:  Thank you, ma'am.  You may return to the

5 room across the hall.

6          PROSPECTIVE JUROR NUMBER 40:  Thank you.

7          (Prospective Juror Number 40 exits courtroom)

8             (Prospective Juror Number 41 enters)

9          MR. RIEHLMANN:  Hello, Mr. Conrad.

10          PROSPECTIVE JUROR NUMBER 41:  Hi.

11          MR. RIEHLMANN:  Question Number 10 on the jury

12 questionnaire asked you:  "Can you accept the testimony of a

13 convicted felon, if supported by other evidence, or would you

14 automatically disregard it?"  And, your answer was "yes," and

15 I was just wondering what part of that two-part question were

16 you answering "yes" to?

17          PROSPECTIVE JUROR NUMBER 41:  Okay, repeat it real

18 slow, and I'll tell you.

19          MR. RIEHLMANN:  Okay.  "Can you accept the testimony

20 of a convicted felon, if supported by other evidence, --"

21          PROSPECTIVE JUROR NUMBER 41:  Yeah, if it's right,

22 you know.

23          MR. RIEHLMANN:  Okay, so that was the part you were

24 answering --

Page 104

25          PROSPECTIVE JUROR NUMBER 41:  Uh-huh. (affirmative

1    response)

2          MR. RIEHLMANN:  -- "yes" to?

3          PROSPECTIVE JUROR NUMBER 41:  Yes.

4          MR. RIEHLMANN:  All right.  Thank you, Mr. Conrad.

5          MR. McMAHON:  No other questions?

6          MR. McMAHON:  No, sir.

7          THE COURT:  Thank you.  You may return to the room

8    across the hall.

9          Next number.

10         (Prospective Juror Number 41 exits courtroom)

11           (Prospective Juror Number 43 enters)

12         MR. WINTERS:  Mr. Daigle, how are you, sir?

13         PROSPECTIVE JUROR NUMBER 43:  Fine.

14         MR. WINTERS:  Mr. Daigle, I want to ask you several

15   questions concerning the questionnaire you filled out

16   yesterday, okay?

17         PROSPECTIVE JUROR NUMBER 43:  Okay.

18         MR. WINTERS:  First of all, with regards to Question

19   Number 2, and I'll read it to you, okay:  "Often the

20   Government pays the expenses of individuals who give

21   information about criminal activity and who cooperate in

22   criminal investigations.  Sometimes these individuals are

23   given lump sum payments of money to help them restart their

24   lives after the investigation and prosecutions are over.  Do

25   you have a problem with this?"  And, you said "yes."

1          PROSPECTIVE JUROR NUMBER 43:  Yes.

2          MR. WINTERS:  You have a problem with that, sir?

3          PROSPECTIVE JUROR NUMBER 43:  Yes, sir.

4          MR. WINTERS:  Okay, would you elaborate a little bit?

5     What is your problem?

6          PROSPECTIVE JUROR NUMBER 43:  Well, the entire

7     federal government spends too much money already.  And I think

8     this money is just thrown away.

9          MR. WINTERS:  Well, let me ask you this:  Would your

10    feelings about that, about giving money to individuals after

11    the fact they cooperate, would that in any way prejudice you

12    against the Government in our presentation of this case,

13    because --

14         PROSPECTIVE JUROR NUMBER 43:  Probably so, yes.

15         MR. WINTERS:  You think it would?

16         PROSPECTIVE JUROR NUMBER 43:  Yes.

17         MR. WINTERS:  Okay.  "During the investigation of

18    illegal activities, undercover agents often must give money to

19    the people they are investigating and many times the money is

20    never recovered."  To further the investigation.  That you're

21    going to hear, if you're on this jury, that happened in this

22    case.  And, you have a problem with that, also?

23         PROSPECTIVE JUROR NUMBER 43:  I really didn't

24    understand the question.

25         MR. WINTERS:  All right.

1          PROSPECTIVE JUROR NUMBER 43:  I'm sorry.  I'm tired.

2          MR. WINTERS:  You're tired?

3          PROSPECTIVE JUROR NUMBER 43:  Yes, sir.

4          MR. WINTERS:  Okay.  Are you tired --

5          PROSPECTIVE JUROR NUMBER 43:  Waiting around, --

6          MR. WINTERS:  -- just today?

7          PROSPECTIVE JUROR NUMBER 43:  Yes.

8          MR. WINTERS:  Okay.  Well, let me see if I can

9    explain it to you, sir.  All right.  During this case, --

10          This was an undercover investigation, okay?

11          PROSPECTIVE JUROR NUMBER 43:  Yeah, okay.

12          MR. WINTERS:  -- targets of this investigation were

13   given money by the undercover agents in this case for services

14   they rendered to the undercover agents.  Okay, are you with

15   me?

16          PROSPECTIVE JUROR NUMBER 43:  (Nods head

17   affirmatively)

18          MR. WINTERS:  To keep the investigation going that

19   money was never recovered, okay, and it's a considerable

20   amount of money.  I mean, it's not a million dollars, but it's

21   a considerable amount of money.  Do you have problems with

22   that?

23          PROSPECTIVE JUROR NUMBER 43:  The money never was

24   recovered?

25          MR. WINTERS:  Never was recovered by the government.


121

1    We never recovered it from the targets of the investigation,

2    after they were arrested.

3          PROSPECTIVE JUROR NUMBER 43:  Well, why was that?

4    Why wasn't it recovered?

5          MR. WINTERS:  Because they didn't have the money.  Do

6    you have a problem with that?

 7          PROSPECTIVE JUROR NUMBER 43:  (Pause)

 8          MR. WINTERS:  We're just trying, sir, to clarify --

 9          PROSPECTIVE JUROR NUMBER 43:  Yeah.

10          MR. WINTERS:  -- your answers.  I mean, do you have a

11 problem with that?

12          PROSPECTIVE JUROR NUMBER 43:  Yeah, I understand, but

13 -- do I have a problem with them recovering the money?

14          MR. WINTERS:  Not recovering the money.  The

15 government never recovered the money, because it wasn't

16 available, would you hold that against the government?

17          PROSPECTIVE JUROR NUMBER 43:  I guess so.

18          MR. WINTERS:  You would?

19          PROSPECTIVE JUROR NUMBER 43:  Yeah.

20          MR. WINTERS:  "Often the government secretly records

21 conversations during a criminal investigation."  Do you have a

22 problem with us recording conversations during a criminal

23 investigation?

24          PROSPECTIVE JUROR NUMBER 43:  Personally, I think the

25 government is too much into our lives anyway.

                                              122

 1          MR. WINTERS:  Okay.  So, you have a problem with the

 2 government investigating crime, recording conversations?

 3          PROSPECTIVE JUROR NUMBER 43:  Yes.

 4          MR. WINTERS:  Okay.  And, "Do you have any negative

 5 feelings about federal law enforcement agencies or the

 6 investigations conducted by them, such that you could not

 7 render a fair and impartial verdict?"  And, you said "yes."

 8          PROSPECTIVE JUROR NUMBER 43:  Yes.

 9          MR. WINTERS:  Do you feel strongly about federal law

10 enforcement agencies?

11          PROSPECTIVE JUROR NUMBER 43:  Yes, --

12          MR. WINTERS:  Okay.

13          PROSPECTIVE JUROR NUMBER 43:  -- because I'll tell

14     you what, to elaborate a little further --

15          MR. WINTERS:  Sure.

16          PROSPECTIVE JUROR NUMBER 43:  -- in drug busting, it

17     has happened where the drug busts happens at the wrong

18     household, like they target this place and the go to the wrong

19     address, and break in.  I have a big problem with that.

20          MR. WINTERS:  Okay.  So, you have a problem with

21     federal investigative agencies?

22          PROSPECTIVE JUROR NUMBER 43:  Yes.

23          MR. WINTERS:  The FBI?

24          PROSPECTIVE JUROR NUMBER 43:  Yes.

25          MR. WINTERS:  Okay.  Thank you.


123

1          MR. McMAHON:  Any questions?

2          MR. RIEHLMANN:  Yes, sir.

3          Mr. Daigle, --

4          PROSPECTIVE JUROR NUMBER 43:  Yes, sir.

5          MR. RIEHLMANN:  -- you understand that if you were

6     selected to this jury you would be called upon to determine

7     whether the Government presented enough evidence to you to

8     convince you of the Defendants' guilt, correct?

9          PROSPECTIVE JUROR NUMBER 43:  Yes.

10          MR. RIEHLMANN:  All right.  If all the evidence that

11     was presented to you, tape recordings, video tapes, the

12     testimony of cooperating witnesses and the testimony of FBI

13     agents, if all of that persuaded you that the Defendants were

14  guilty beyond a reasonable doubt, could you return a verdict

15  of guilty as charged, knowing what Mr. Winters has just told

16  you about the way government's investigation was operated?

17       PROSPECTIVE JUROR NUMBER 43:  Can you kind of

18  rephrase that?  I'm sorry, --

19       MR. RIEHLMANN:  That's all right.  I understand.

20       Taking what Mr. Winters has told you already about

21  how the government's investigation was conducted, --

22       PROSPECTIVE JUROR NUMBER 43:  Yes.

23       MR. RIEHLMANN:  -- if, after you viewed the --

24       PROSPECTIVE JUROR NUMBER 43:  After I've heard all

25  the evidence?


124

1        MR. RIEHLMANN:  Yeah, after you viewed the video

2   tapes, listened to the audio tapes of the Defendants' own

3   voices and listened to the testimony of all the witnesses,

4   after you did all that, you were convinced, beyond a

5   reasonable doubt, that they were guilty, could you find them

6   guilty?

7        PROSPECTIVE JUROR NUMBER 43:  Yes, I probably could.

8        MR. RIEHLMANN:  All right.  Even though money wasn't

9   recovered, as Mr. Winters has described to you, even though --

10       PROSPECTIVE JUROR NUMBER 43:  Yeah.

11       MR. RIEHLMANN:  Okay, thank you, sir.

12       THE COURT:  Any other questions?

13       MR. VOIGHT:  No questions, Judge.

14       THE COURT:  Thank you.  You may return to the room

15  across the hall.

16       MR. WINTERS:  Wait, I had a question, Your Honor.

17       THE COURT:  Go ahead.

18          MR. WINTERS:  Have a seat, sir.  I hate to keep you,
19   I know you're tired, --
20          PROSPECTIVE JUROR NUMBER 43:  Yeah.
21          MR. WINTERS:  -- but I really need some
22   clarification.  The four questions you've just answered that
23   you would hold it against the Government, okay.  Now, I need
24   to know, because I'm trying to make a decision and Mr. McMahon
25   is trying to make a decision:  Knowing that money wasn't


                                           125
1    recovered, okay, knowing that money was given to somebody
2    cooperating with the government, knowing that we recorded
3    conversations without the Defendants knowing we recorded and
4    knowing that the FBI, who you have negative feelings about,
5    investigated this case, could you put all that out of your
6    mind or would you hold that against the Government?
7           PROSPECTIVE JUROR NUMBER 43:  I think it would be in
8    the back of my mind, yes.
9           MR. WINTERS:  So, you would hold it against the
10   Government?
11          PROSPECTIVE JUROR NUMBER 43:  Probably.
12          MR. RIEHLMANN:  But, Judge, I object to the form of
13   the question.  I mean, you have to ask the potential juror
14   whether all the evidence, if he's convinced beyond a
15   reasonable doubt, could he put those problems aside and still
16   find --
17          MR. McMAHON:  He said he couldn't.
18          THE COURT:  You may go ahead and ask him that
19   question, Mr. Riehlmann.
20          MR. RIEHLMANN:  I understand, Mr. Daigle.
                              Page 111

21          PROSPECTIVE JUROR NUMBER 43:  Sir, --

22          MR. RIEHLMANN:  I'm just asking you:  If all the

23   evidence convinced you that this man over here, Leon Duncan,

24   in the white shirt, knew that he was doing something illegal,

25   could you find him guilty, even though the Government

                                                    126

1    conducted the operation in the way Mr. Winters has just

2    described?

3          PROSPECTIVE JUROR NUMBER 43:  I suppose so.  I --

4          MR. RIEHLMANN:  Thank you.

5          THE COURT:  Thank you, sir.  You may return --

6          PROSPECTIVE JUROR NUMBER 43:  I'm sorry, Your Honor.

7          THE COURT:  That's all right.  I understand.

8          PROSPECTIVE JUROR NUMBER 43:  It's been a long day

9    for me, the last couple of days.

10          THE COURT:  It's been a long day for all of us.  I'm

11   sorry it had to be this way, but that sometimes happens.

12          PROSPECTIVE JUROR NUMBER 43:  And I'm really tired,

13   you know.

14          THE COURT:  If you'll return to the room across the

15   hall, --

16          PROSPECTIVE JUROR NUMBER 43:  Thank you, sir.

17          THE COURT:  -- we'll be proceeding further.

18          But, at this point, we'll take a recess.  We'll take

19   a 10-minute recess.

20          (Prospective Juror Number 43 exits courtroom)

21   (Recess from 2:35 p.m. until 2:50 p.m.; all parties present)

22          THE COURT:  You can stay right there.  So, we have

23   Jurors Number 30, 31 and 36?

24          THE MARSHAL:  Yes, Your Honor.

25          THE COURT:  You all will be excused from the panel,

 1   now, and you may leave, but first I'd ask that you go to the

 2   jury room in the next building, and they'll give you your

 3   certificate.  And, thank you very much for your attendance.

 4                    (Excused jurors exit courtroom)

 5          THE COURT:  All Counsel are present and so are the

 6   Defendants.

 7          It is agreed that the Court's ruling on 30, 31 and

 8   36, based upon a joint stipulation, that those three jurors

 9   should be excused, isn't it?

10          MR. WINTERS:  That's correct, Your Honor.

11          MR. RIEHLMANN:  Yes, sir.

12          MR. VOIGHT:  Yes, sir.

13          THE COURT:  My next proposal is for Jurors Number 1

14   through 45 to be excused to return tomorrow at 9:30.  Any

15   objection to that procedure?

16          MR. VOIGHT:  No, sir.

17          MR. RIEHLMANN:  No objection, Your Honor.

18          MR. WINTERS:  No, sir.

19          THE COURT:  All right.  Jurors Number 1 through 45

20   can go home now and come back tomorrow at 9:30.

21          Now we pull our next number.

22          MR. WINTERS:  Forty-six.

23          MR. McMAHON:  Forty-six, Your Honor.

24          THE COURT:  Forty-six.

25          (Prospective Juror Number 46 enters courtroom)

1          MR. McMAHON:  Mr. Robinson, good afternoon.

2          PROSPECTIVE JUROR NUMBER 46:  Good afternoon.

3          MR. McMAHON:  I just had a couple of inquiries about

4     some of the answers on your jury questionnaire.  The first one

5     was:  "It is proper for the Government to conduct undercover

6     operations to investigate criminal activity."  You indicated

7     you have a problem with this.  Could you elaborate?

8          PROSPECTIVE JUROR NUMBER 46:  Well, I have a problem

9     with them spending a lot of money on it.

10          MR. McMAHON:  Okay.  Now, in this case, --

11          PROSPECTIVE JUROR NUMBER 46:  That question -- which

12     question is that again?

13          MR. McMAHON:  That was the first one.  Let me show it

14     to you.

15          PROSPECTIVE JUROR NUMBER 46:  Okay.

16          MR. McMAHON:  Just to refresh your memory.

17          PROSPECTIVE JUROR NUMBER 46:  (Examines document)  I

18     answered that question wrong.

19          MR. McMAHON:  Okay, now this case involved -- this is

20     an undercover operation.  The whole case is an undercover

21     operation.

22          PROSPECTIVE JUROR NUMBER 46:  Yeah.

23          MR. McMAHON:  So, do you have a problem with that?

24          PROSPECTIVE JUROR NUMBER 46:  I don't have a problem

25     with that, but I have a problem with, you know, with the money

1     being recovered.

2          MR. McMAHON:  Okay, let me follow up.

3          PROSPECTIVE JUROR NUMBER 46:  Okay.

4       MR. McMAHON:  That was my next one.  Number 3, okay,

5    the question, and let me read it:  "During the investigation

6    of illegal activities, undercover agents often must give

7    government money to the people they're investigating and many

8    times the money is never recovered."  Now, I'm going to tell

9    you up front, in this case, a large amount of money was

10   utilized during the undercover operation and it's gone, they

11   spent it, and you're going to learn that, I'm going to tell

12   you up front.   Do you have a problem with that?

13       PROSPECTIVE JUROR NUMBER 46:  That's it, I mean, all

14   that falls back on the taxpayers, and I'm a taxpayer.

15       MR. McMAHON:  Okay.  Would you be able to judge this

16   case fairly, especially our case, the Government's case,

17   knowing that a considerable sum of money -- I'm talking about

18   big money here -- was spent and it's gone.  We never got it

19   back.

20       PROSPECTIVE JUROR NUMBER 46:  I couldn't see where

21   that would happen, I mean, to determine -- or to make the

22   verdict go one way or another.  I don't think that would

23   interfere with that.

24       MR. McMAHON:  Okay, even knowing that, you could

25   still be --


                                        130

1       PROSPECTIVE JUROR NUMBER 46:  Even knowing that,

2   yeah, even knowing that.

3       MR. McMAHON:  Okay.  One of the questions, Number 10

4   -- now, this may have been -- admittedly, it was probably an

5   ambiguously worded question, it was:  "Can you believe the

6   testimony of a convicted felon, if it is supported by other

7    evidence, or would you automatically disregard it?"

8         And you ticked off "yes," so that could have been --

9    well, let me break it down.  Could you believe the

10   corroborated testimony of a convicted felon?

11        PROSPECTIVE JUROR NUMBER 46:  Yeah.

12        MR. MCMAHON:  You would not automatically disregard

13   it?

14        PROSPECTIVE JUROR NUMBER 46:  I wouldn't

15   automatically disregard it, no, I wouldn't.

16        MR. MCMAHON:  Thank you, sir, that's all I have.

17        THE COURT:  Any other questions?

18        MR. RIEHLMANN:  No, sir.

19        MR. VOIGHT:  No, Your Honor.

20        THE COURT:  Now, wait just one minute, please.  Since

21   we have excused 1 through 45, I propose to excuse this witness

22   (sic)  until tomorrow morning at 9:30.

23        MR. WINTERS:  No objection.

24        MR. RIEHLMANN:  No objection, Your Honor.

25        MR. VOIGHT:  No objection.


                                                            131
1         THE COURT:  No objection.

2         You're excused to return tomorrow morning at 9:30.

3         PROSPECTIVE JUROR NUMBER 46:  All right.

4         THE COURT:  But, you'll have to report back to the

5    jury room.

6         PROSPECTIVE JUROR NUMBER 46:  The jury room; right,

7    thanks.

8         THE COURT:  Thank you.

9         MR. MCMAHON:  Thank you, Mr. Robinson.

10        MR. WINTERS:  Thank you, sir.

 11          THE COURT:  Number 5 or the next number and then

 12     Number 5, either way.

 13          (Prospective Juror Number 46 exits courtroom)

 14            (Prospective Juror Number 5 enters)

 15          THE COURT:  Mr. Todaro, you asked that you be allowed

 16     to come back.  You have something you wanted to add to what

 17     was said earlier?

 18          PROSPECTIVE JUROR NUMBER 5:  I just -- my wife is

 19     getting operated on tomorrow morning and I need to bring her

 20     to the hospital.

 21          THE COURT:  Any questions?

 22          MR. McMAHON:  We consent, Your Honor.

 23          MR. WINTERS:  We consent --

 24          MR. RIEHLMANN:  I have a question.

 25          Mr. Todaro, what time do you have to have her to the


                                                  132

  1     hospital?

  2          PROSPECTIVE JUROR NUMBER 5:  At 7:30 in the morning.

  3          MR. RIEHLMANN:  And, is it an in-patient or out-

  4     patient --

  5          PROSPECTIVE JUROR NUMBER 5:  I'm not sure.  She's

  6     getting her arm operated on, because she can't close her hand

  7     anymore.

  8          MR. RIEHLMANN:  Okay.

  9          PROSPECTIVE JUROR NUMBER 5:  I'm not sure how is it

 10     going to be.

 11          MR. RIEHLMANN:  Is that going to affect your ability

 12     to sit and listen to the evidence?

 13          PROSPECTIVE JUROR NUMBER 5:  when?

                        Page 117

14          MR. RIEHLMANN:  I mean tomorrow, after you were to

15  finish --

16          PROSPECTIVE JUROR NUMBER 5:  Yeah.

17          MR. RIEHLMANN:  -- with that.

18          PROSPECTIVE JUROR NUMBER 5:  If I can get through in

19  time, I guess I can make it back here for 9:30 in the morning.

20          MR. RIEHLMANN:  Okay.  And, after that, would it

21  affect your ability to listen to the evidence, I mean, the

22  fact that she had this?

23          PROSPECTIVE JUROR NUMBER 5:  No, not unless something

24  happens, bad happens to her.

25          MR. RIEHLMANN:  All right.  Thank you, --


                                                        133

1          THE COURT:  This hospital is in Houma?

2          PROSPECTIVE JUROR NUMBER 5:  Raceland.

3          THE COURT:  Raceland.

4          Any other questions?

5          MR. McMAHON:  No, sir.

6          THE COURT:  Well, would normally be excusing you to

7  return at 9:30 tomorrow, but I don't know how I could say

8  that, because you don't know yourself how you're going to be.

9          PROSPECTIVE JUROR NUMBER 5:  Right.

10          THE COURT:  Does Counsel have suggestions?

11          MR. WINTERS:  Yes.

12          MR. McMAHON:  Your Honor, I don't think there's any

13  way that Mr. Todaro could make it down to Raceland for an

14  operation and back --

15          MR. RIEHLMANN:  Your Honor, can we approach the bench?

16          THE COURT:  Yes.

17      (At side bar on the record)

18          THE COURT:  Wasn't he one of the ones you suggested

19   you would challenge --

20          MR. RIEHLMANN:  Yes, sir.

21          THE COURT:  You said you would challenge --

22          MR. RIEHLMANN:  They would challenge for cause.  I'm

23   just going to put my reasons on the record, but --

24          THE COURT:  Let's do it right now.

25          MR. RIEHLMANN:  Okay.

1          THE COURT:  You're challenging him for cause --

2          MR. WINTERS:  We challenge him for cause, based on --

3          THE COURT:  -- and I've heard everything I've heard.

4          MR. WINTERS:  -- based on his militia leanings and --

5          THE COURT:  And Mr. Riehlmann.

6          MR. RIEHLMANN:  I just think that his other responses

7   that he could be fair and he could convict if the evidence was

8   beyond a reasonable doubt.

9          THE COURT:  Mr. Voight.

10          MR. VOIGHT:  Mr. Riehlmann spoke to what I think.  I

11   wouldn't have --

12          THE COURT:  Well, I'm going to accept the

13   Government's challenge for cause and overrule the Defendants'

14   objection.  Thank you.

15          MR. WINTERS:  Thank you.

16   (End of discussion at side bar)

17          THE COURT:  Mr. Todaro, you will be excused now from

18   the panel.  You may leave, but first go to the jury room and

19   it will not be necessary for you to come back.  Thank you.

20          PROSPECTIVE JUROR NUMBER 5:  Do what, now?  Go to --

21            THE COURT:  You're excused.

22            PROSPECTIVE JUROR NUMBER 5:  Oh, okay.

23            THE CLERK:  Go to the jury room.

24            PROSPECTIVE JUROR NUMBER 5:  Oh, to the jury room?

25            THE COURT:  So, you can leave, but go to the jury

1    room first to check out.

2            PROSPECTIVE JUROR NUMBER 5:  Okay.

3            THE COURT:  Thank you.

4            MR. WINTERS:  Good luck to you.

5        (Prospective Juror Number 56 exits courtroom)

6            (Prospective Juror Number 47 enters)

7            MR. WINTERS:  It's Keshk or Keshk.

8            PROSPECTIVE JUROR NUMBER 47:  Keshk.

9            MR. WINTERS:  Keshk?

10            PROSPECTIVE JUROR NUMBER 47:  Uh-huh. (affirmative

11   response)

12            MR. WINTERS:  Ma'am, Ms. Keshk, I have just a couple

13   of questions concerning the questionnaire you filled out

14   yesterday.

15            PROSPECTIVE JUROR NUMBER 47:  Yes, sir.

16            MR. WINTERS:  I just want some clarification.

17   Question 4 was on the questionnaire and it stated:  "Often the

18   government secretly records conversations during a criminal

19   investigation.  Do you have a problem with this?"  Now, I can

20   assure you in this case that you hear, if you're on this jury,

21   numerous tape recordings, okay.

22            PROSPECTIVE JUROR NUMBER 47:  Uh-huh. (affirmative

23   response)

24            MR. WINTERS:  Court authorized tape recordings and

25    legal tape recordings made by the government, but

1     surreptitiously, secretly.  Do you have a problem with that,

2     the government investigating criminal cases and recording

3     conversations?

4            PROSPECTIVE JUROR NUMBER 47:  No, I don't.

5            MR. WINTERS:  Okay, so when you checked "yes," that

6     was wrong?

7            PROSPECTIVE JUROR NUMBER 47:  No, it was just -- yes,

8     that was an error --

9            MR. WINTERS:  Okay.

10           PROSPECTIVE JUROR NUMBER 47:  -- on my part,

11    because --

12           MR. WINTERS:  One other question I'd have for you,

13    and this was a compound question, Question 10, and let me see

14    if I can break it down for you.  It read:  "Can you believe

15    the corroborated testimony of a convicted felon, if it is

16    supported by other evidence?"  In other words, if there are

17    other witnesses or other credible evidence supporting what a

18    convicted felon says, could you believe that witness?

19           PROSPECTIVE JUROR NUMBER 47:  Yes, --

20           MR. WINTERS:  Okay.

21           PROSPECTIVE JUROR NUMBER 47:  -- based on, you know,

22    the other evidence.

23           MR. WINTERS:  Based on the other evidence.

24           No further questions.

25           THE COURT:  Any other questions?

1      MR. VOIGHT:  I have one, Your Honor.

2      Ma'am, this concerns your answer to Question

3  Number 9.  That question reads:  "Can you swear that you would

4  not allow the ethnic origin or race of any witness or

5  Defendant to influence your verdict in any way?"  Your answer

6  to that was "no."  Could you elaborate on the answer to that

7  question?

8      PROSPECTIVE JUROR NUMBER 47:  I don't believe that --

9  I just don't believe that race or anything else, origin -- I'm

10  married to a foreigner.  I have -- do not believe that any --

11  that has a place in a judicial court.

12      MR. VOIGHT:  That's a confusing question, that's why

13  I asked.  Thank you, ma'am.

14      PROSPECTIVE JUROR NUMBER 47:  Thank you.

15      THE COURT:  No further questions?

16      MR. RIEHLMANN:  No, sir.

17      MR. WINTERS:  The Government has none.

18      THE COURT:  Thank you, ma'am.  You'll be excused to

19  leave, to come back tomorrow morning at 9:30.

20      PROSPECTIVE JUROR NUMBER 47:  Thank you, Your Honor.

21      THE COURT:  Thank you.

22  (Prospective Juror Number 47 exits courtroom)

23      (Prospective Juror Number 49 enters)

24      MR. RIEHLMANN:  Good afternoon, Mr. Kirk.

25      PROSPECTIVE JUROR NUMBER 49:   Good afternoon.

1      MR. RIEHLMANN:  One question that you responded to I

2  just wanted a little clarification on.  The question was:

3  "Can you accept the testimony of a convicted felon, if

 4  supported by other evidence, or would you automatically

 5  disregard it?"  Your answer was "yes," and I just wanted --

 6  because the question was phrased in the manner it was, "yes"

 7  doesn't really enlighten me as to how you feel about that.

 8  So, --

 9       PROSPECTIVE JUROR NUMBER 49:  Would you repeat the

10  question?

11       MR. RIEHLMANN:  "Can you accept the testimony of a

12  convicted felon, if supported by other evidence, or would you

13  automatically disregard it?"  So, I just need to know what

14  part of that question "yes" was --

15       PROSPECTIVE JUROR NUMBER 49:  Well, I can accept the

16  evidence of a convicted felon, if it's supported by other

17  evidence, sir.

18       MR. RIEHLMANN:  All right.  Thank you, sir.  That's

19  all I have for you.

20       THE COURT:  Any other questions?

21       MR. MCMAHON:  No, sir.

22       MR. WINTERS:  No, sir.

23       THE COURT:  Thank you, sir.  You'll be excused, to

24  return tomorrow morning at 9:30.

25       PROSPECTIVE JUROR NUMBER 49:  Yes, sir.


                                        139

 1       THE COURT:  Thank you.

 2       PROSPECTIVE JUROR NUMBER 49:  Here to the courtroom?

 3       THE COURT:  No, you can leave now.

 4       PROSPECTIVE JUROR NUMBER 49:  No.  Return to the

 5  courtroom?

 6       THE CLERK:  He wants to know where to report tomorrow

 7    morning.  Where should he report?

 8            THE COURT:  Where did you report this morning?

 9            PROSPECTIVE JUROR NUMBER 49:  The jury room.

10            THE MARSHAL:  Your Honor, I made the mistake of

11    telling them to report back up here tomorrow morning, so

12    everybody that has left is going to come back up here.

13            THE COURT:  I don't think it really matters.  It

14    doesn't really matter that much.  If he's here, fine.  If he's

15    in -- some might be in the jury room, we'll bring them up

16    here.

17            So, wherever you're comfortable.

18            PROSPECTIVE JUROR NUMBER 49:  Yes, sir.

19            (Prospective Juror Number 49 exits courtroom)

20            (Prospective Juror Number 50 enters)

21            MR. RIEHLMANN:  Hi, Ms. Lambert.

22            PROSPECTIVE JUROR NUMBER 50:  Hi.

23            MR. RIEHLMANN:  Let me see the jury questionnaire, so

24    I'll make sure I --

25            I just want a little clarification from the answer


                                                        140

 1    that you gave on one of the jury questions.  "Can you swear

 2    that you would not allow the ethnic origin or race of any

 3    witness or Defendant to influence your verdict in any way?"

 4    You answered "no."  Now, I can understand that you might have

 5    been confused by that.

 6            PROSPECTIVE JUROR NUMBER 50:  Oh, that was a

 7    confusing question, yeah.

 8            MR. RIEHLMANN:  Okay.  So, race wouldn't really

 9    affect --

10            PROSPECTIVE JUROR NUMBER 50:  No.

11          MR. RIEHLMANN:  -- your ability to judge a witness'
12  credibility, is that correct?
13          PROSPECTIVE JUROR NUMBER 50:  Uh-huh. (affirmative
14  response)
15          MR. RIEHLMANN:  All right.  Thank you.
16          THE COURT:  Any other questions?
17          MR. VOIGHT:  No questions, Your Honor.
18          MR. McMAHON:  Hi, Ms. Lambert.
19          PROSPECTIVE JUROR NUMBER 50:  Hi.
20          MR. McMAHON:  I just have one, in reference to Number
21  10 on the questionnaire -- and, again, this was a compound
22  question, so, admittedly, it was confusing, but the question
23  reads:  "Can you believe the testimony of a convicted felon,
24  if it is supported by other evidence, or would you
25  automatically disregard it?"  And, you ticked off "no."  So,


                                        141
1  could you believe it, if supported?
2          PROSPECTIVE JUROR NUMBER 50:  If I had supporting
3  evidence, yes.
4          MR. McMAHON:  So, you would not automatically
5  disregard it?
6          PROSPECTIVE JUROR NUMBER 50:  If the evidence was
7  there and all, yes, I would go with what the evidence was
8  showing.
9          MR. McMAHON:  But, you could -- you wouldn't -- the
10  question is:  You wouldn't automatically disregard, because
11  the person, the witness would be a convicted felon, would you?
12          PROSPECTIVE JUROR NUMBER 50:  No.
13          MR. McMAHON:  All right.  Thanks.
                        Page 125

14          PROSPECTIVE JUROR NUMBER 50:  Those questions are

15   confusing sometimes.

16          MR. McMAHON:  Yeah, it is, it is.

17          PROSPECTIVE JUROR NUMBER 50:  And, you're nervous,

18   so --

19          THE COURT:  But, I think you've answered

20   sufficiently.

21          MR. McMAHON:  Yes.

22          MR. WINTERS:  Yes.

23          THE COURT:  So, thank you.  You'll be excused to

24   return tomorrow morning at 9:30.  Thank you.

25          MR. McMAHON:  Thank you, ma'am.


142

1          (Prospective Juror Number 50 exits courtroom)

2             (Prospective Juror Number 54 enters)

3          MR. McMAHON:  Hi, Ms. Davis.

4          PROSPECTIVE JUROR NUMBER 54:  How you doing?

5          MR. McMAHON:  We just have -- I just have one

6    question.  It was in response to your questionnaire Item

7    Number 12.  Let me read it to you just to refresh your memory,

8    okay.

9          PROSPECTIVE JUROR NUMBER 54:  Uh-huh. (affirmative

10   response)

11         MR. McMAHON:  The question was:  "You will hear

12   evidence in this case about Len Davis, a former New Orleans

13   Police Officer, who is named, but is an unindicted co-

14   conspirator in this case."  You stated that you heard of

15   Davis, and let me read your response:  "Len Davis was employed

16   by National Canal Villere.  There he did a detail.  I was an

17   assistant manager there at the time.  I know that Len Davis

Page 126

18  was given the death penalty for assisting in a killing."

19      Len Davis, Ms. Davis, is going to be all over this

20  case.  Knowing what you know about him, would you be able to

21  be fair and impartial?

22      PROSPECTIVE JUROR NUMBER 54:  Yes.

23      MR. MCMAHON:  Okay, so you could disregard anything

24  you heard about Len Davis and be able to view the evidence --

25  you wouldn't hold it against the Defendants, because they knew

143

1   Davis, would you?

2       PROSPECTIVE JUROR NUMBER 54:  No.

3       MR. MCMAHON:  Thank you.

4       THE COURT:  Any other questions?

5       MR. VOIGHT:  No questions.

6       THE COURT:  Thank you.  You're excused, to return

7   tomorrow morning at 9:30, --

8       PROSPECTIVE JUROR NUMBER 54:  Thank you.

9       THE COURT:  -- and you can leave now.

10      (Prospective Juror Number 54 exits courtroom)

11          (Prospective Juror Number 57 enters)

12      MR. WINTERS:  How are you doing, ma'am?

13      PROSPECTIVE JUROR NUMBER 57:  All right.

14      MR. WINTERS:  Ms. Cyprian, is that correct?

15      PROSPECTIVE JUROR NUMBER 57:  Yes, that's right.

16      MR. WINTERS:  Okay.  Ms. Cyprian, I have a couple of

17  questions that I want to ask you concerning your questionnaire

18  that you filled out yesterday.  I'm sure you recall that,

19  right?

20      PROSPECTIVE JUROR NUMBER 57:  Right.

21          MR. WINTERS:  Okay.  The first question, I'd just
22    like some clarification.
23          PROSPECTIVE JUROR NUMBER 57:  Okay.
24          MR. WINTERS:  The first question that I want to ask
25    you about is Question Number 1, it said that -- the question


                                               144
 1    read as follows:  "It is proper for the Government to conduct
 2    undercover operations to investigate criminal activity.  Do
 3    you have a problem with this?"  And, you said "yes."  Do you
 4    have a problem with the government doing an undercover
 5    operation?
 6          PROSPECTIVE JUROR NUMBER 57:  No, I do not.
 7          MR. WINTERS:  So, when you said "yes," --
 8          PROSPECTIVE JUROR NUMBER 57:  When I said "yes," I
 9    was --
10          MR. WINTERS:  -- you were wrong?
11          PROSPECTIVE JUROR NUMBER 57:  Yeah.
12          MR. WINTERS:  Okay.  Now, the next question I want to
13    ask you is Question 3:  "During the investigation of illegal
14    activities, undercover agents often must give government money
15    to the people they're investigating --" to further the
16    undercover operation "-- and many times the money is never
17    recovered. Do you have a problem, any problem with this?"
18    And, you said "yes."
19          PROSPECTIVE JUROR NUMBER 57:  Yes.
20          MR. WINTERS:  Do you have a problem with that?
21          PROSPECTIVE JUROR NUMBER 57:  No.
22          MR. WINTERS:  No?
23          PROSPECTIVE JUROR NUMBER 57:  No.
24          MR. WINTERS:  Okay.  So, if the evidence came out at
                         Page 128

25   this trial that the government, the undercover agents gave

                                        145
1    money to the targets of this investigation and that money was
2    never recovered, because it was spent by them before they were
3    arrested, --
4               PROSPECTIVE JUROR NUMBER 57:  That's what I was
5    saying.
6               MR. WINTERS:  -- you wouldn't have any problems with
7    that?
8               PROSPECTIVE JUROR NUMBER 57:  Yes, I would.
9               MR. WINTERS:  You would?
10              PROSPECTIVE JUROR NUMBER 57:  Uh-huh. (affirmative
11   response)
12              MR. WINTERS:  Well, could you tell us why you would
13   have a problem with that?  Would you have a problem because
14   the government gave the money, or because the government never
15   recovered it from the criminal?
16              PROSPECTIVE JUROR NUMBER 57:  The government never
17   recovered it from the criminal, --
18              MR. WINTERS:  So, you would have a problem --
19              PROSPECTIVE JUROR NUMBER 57:  -- that's the one --
20              MR. WINTERS:  -- if the criminal got to keep it?
21              PROSPECTIVE JUROR NUMBER 57:  Right.
22              MR. WINTERS:  Would you hold that against the
23   Government in deciding on the verdict in this case?  I mean,
24   could you be fair and impartial and fair to the Government in
25   reaching a verdict?

1          PROSPECTIVE JUROR NUMBER 57:  I'll be fair about it.

2    That's what I had said.

3          MR. WINTERS:  You could, even though the money was

4    never recovered?

5          PROSPECTIVE JUROR NUMBER 57:  Yeah, that's the two

6    questions I really didn't understand on there.

7          MR. WINTERS:  All right.  One other question; now,

8    this was a confusing question, admittedly.

9          PROSPECTIVE JUROR NUMBER 57:  Uh-huh. (affirmative

10   response)

11         MR. WINTERS:  Question 10:  "Can you believe the

12   testimony --" and let me rephrase it -- the corroborated

13   testimony of a convicted felon, if it's supported by other

14   evidence?  Could you believe a convicted felon testifying if

15   there were other witnesses and other evidence to support what

16   that witness said?

17         PROSPECTIVE JUROR NUMBER 57:  Yes.

18         MR. WINTERS:  Yes?

19         PROSPECTIVE JUROR NUMBER 57:  Uh-huh. (affirmative

20   response)

21         MR. WINTERS:  Okay.  I mean, you wouldn't totally

22   disregard it, just because he's a convicted felon, if there

23   was other evidence supporting what that witness said?

24         PROSPECTIVE JUROR NUMBER 57:  Right.

25         MR. WINTERS:  Okay.  Thank you.

1          THE COURT:  Mr. Riehlmann?

2          MR. RIEHLMANN:  Nothing, Judge.

3          PROSPECTIVE JUROR NUMBER 57:  Could I talk to the

4    Judge --
5              THE COURT:  Mr. Voight?
6              PROSPECTIVE JUROR NUMBER 57:  -- about something?
7              MR. WINTERS:  Ma'am?
8              PROSPECTIVE JUROR NUMBER 57:  Could I talk to the
9    Judge?
10             MR. WINTERS:  I'm sorry?
11             THE COURT:  What?
12             THE CLERK:  She said she wants to speak to the Judge.
13             MR. McMAHON:  She wants to talk to the Judge.
14             MR. WINTERS:  Oh, she wants to speak to the Judge.
15   Okay.
16             THE COURT:  I'll be glad to speak with you.  What did
17   you want to say?
18             PROSPECTIVE JUROR NUMBER 57:  It's about my
19   transportation.  You see, I have to catch the Greyhound bus,
20   and they only have two schedules, so the bus leaves at 8:00 in
21   the morning and then in the evening it leaves at 6:30 at
22   night, and that's my only transportation.  I live in Luling.
23             THE COURT:  All right.  Right now, then, you'll be
24   excused to come back tomorrow morning at 9:30, like you did
25   this morning.


                                          148

1              PROSPECTIVE JUROR NUMBER 57:  Yes, sir.
2              THE COURT:  And, we'll be able to address the whole
3    thing then.  Thank you.
4              PROSPECTIVE JUROR NUMBER 57:  Thank you.
5              THE COURT:  So, you may leave now.
6              (Prospective Juror Number 57 exits courtroom)

7           THE COURT:  Before you bring anybody else in, we've

8    had a couple of gaps.  What's the next number to come in?

9           THE CLERK:  Fifty-eight is the next number.

10           THE COURT:  Fifty-eight?

11           THE CLERK:  Yes.

12           THE COURT:  So, then, there are a couple of earlier

13    numbers that I should let go home now.

14           THE CLERK:  Everybody before 58.

15           THE COURT:  Bring 58 and say that anybody in there

16    lower than 58 may leave to come back tomorrow at 9:30.

17           (Prospective Juror Number 58 enters courtroom)

18           MR. RIEHLMANN:  Hi, Mr. Jones.

19           PROSPECTIVE JUROR NUMBER 58:  Hi.

20           MR. RIEHLMANN:  Question Number 14, in the jury

21    questionnaire that you filled out yesterday said, essentially

22    said that if you were to find out during the trial that one of

23    the Defendants was a personal friend of Len Davis, would that

24    fact, alone, prejudice you against the Defendant, and you

25    answered "yes."


149

1           PROSPECTIVE JUROR NUMBER 58:  Yes, sir.

2           MR. RIEHLMANN:  Can you elaborate on that and tell me

3    what you meant by that?

4           PROSPECTIVE JUROR NUMBER 58:  Well, I would feel that

5    he may have some dealings with his indictment in the past that

6    wasn't brought up or wasn't discovered.

7           MR. RIEHLMANN:  All right.  So, just if you were to

8    learn that he was a friend of Len Davis, you think that would

9    prevent you from giving him a fair trial?

10           PROSPECTIVE JUROR NUMBER 58:  Yes.

11          MR. RIEHLMANN:  All right.  Thank you, sir.

12          PROSPECTIVE JUROR NUMBER 58:  Excuse me, one more

13   thing I wanted add.  On my way out, before lunch, I noticed

14   that somebody I think might have been in the family that was

15   sitting on that side, I recognized her from working with me at

16   the agency, also.  So, I think that might have something to do

17   with me giving a fair verdict, also.

18          THE COURT:  Any questions by Counsel?

19          MR. RIEHLMANN:  No, Your Honor.

20          MR. VOIGHT:  No, Your Honor.

21          MR. McMAHON:  No, Your Honor.

22          THE COURT:  You're excused to return tomorrow

23   morning at 9:30, and would you check in with the jury room on

24   your way out tonight.

25          PROSPECTIVE JUROR NUMBER 58:  Yes, sir.


                                                           150

1          THE COURT:  Thank you.

2          This is Number 59.

3       (Prospective Juror Number 58 exits courtroom)

4           (Prospective Juror Number 59 enters)

5          MR. WINTERS:  Ms. Givens?

6          PROSPECTIVE JUROR NUMBER 59:  Yes.

7          MR. WINTERS:  Hi.

8          PROSPECTIVE JUROR NUMBER 59:  Hi.

9          MR. WINTERS:  I just wanted to ask you a couple of

10   questions concerning your questionnaire that you filled out

11   yesterday.

12          PROSPECTIVE JUROR NUMBER 59:  Yes.

13          MR. WINTERS:  I just want some clarification to two

14  of your answers.  Question 3 on the questionnaire read:

15  "During the investigation of illegal activities, undercover

16  agents often must give government money to the people they're

17  investigating --" to further the investigation "-- and many

18  times that money is never recovered."

19      Now, I can tell you, in this case, if you're a juror,

20  you will hear that undercover agents -- undercover agent paid

21  government money to targets of this investigation, okay, and

22  that money was never recovered, because it had already been

23  spent before these people were arrested.

24      Now, do you have a problem with this, with the

25  government doing this?  You said "yes," --


                                    151

1       PROSPECTIVE JUROR NUMBER 59:  Yes.

2       MR. WINTERS:  -- on your answer, okay.  That's why I

3   want to ask you.  Do you have a problem?

4       PROSPECTIVE JUROR NUMBER 59:  Yes, I do.  It seems

5   like --

6       MR. WINTERS:  Well, could you explain it a little

7   bit?

8       PROSPECTIVE JUROR NUMBER 59:  It just seems like --

9   it seems like a waste of money.  It just seems like that it

10  comes to no -- there's nothing good coming out of it.

11      MR. WINTERS:  Well, do you consider it a waste of

12  money, because the government gave it to them, to continue

13  their investigation or because --

14      PROSPECTIVE JUROR NUMBER 59:  Well, I mean, I don't

15  understand how it's all -- who monitors -- you know, like, are

16  these people accountable for the money that they're spending

17  or they have a free limit of spending whatever money that's

                            Page 134

18   given to them?

19        MR. WINTERS:  Well, there are.  There are monitors on

20   it, but let me just ask you:  Are you concerned that the

21   government gives the money or that the criminal is allowed to

22   spend the money before its recovered?  What bothers you?

23        PROSPECTIVE JUROR NUMBER 59:  Both of them.

24        MR. WINTERS:  Both of them.  And, knowing this, would

25   you have problems giving the Government a fair trial?


                                                  152

1         I mean, if the Government proved these Defendants'

2    guilt beyond a reasonable doubt, would you hold the fact that

3    money was given and it was never recovered, would you hold

4    that against the Government?

5         PROSPECTIVE JUROR NUMBER 59:  (Pause)  Probably, yes.

6         MR. WINTERS:  You would?

7         PROSPECTIVE JUROR NUMBER 59:  Uh-huh. (affirmative

8    response)

9         MR. WINTERS:  You would hold it against the

10   Government.  Okay.

11        One other question:  "Can you believe the testimony

12   of a convicted felon, if it is supported by other evidence,"

13   and you wrote over it, and let me show you this, this is your

14   questionnaire.  You are Juror Number 59, Ms. Givens?

15        PROSPECTIVE JUROR NUMBER 59:  Yes.

16        MR. WINTERS:  And, you wrote over it "no."  Okay, is

17   that your handwriting?

18        PROSPECTIVE JUROR NUMBER 59:  Yes.

19        MR. WINTERS:  Okay.  So, you're saying that you

20   cannot believe the testimony of a convicted felon, is that

21   correct?

22         PROSPECTIVE JUROR NUMBER 59:  I would have a hard

23   time believing the testimony --

24         MR. WINTERS:  Okay.  Even if it's corroborated by

25   the evidence, you'd have a hard time?

1         PROSPECTIVE JUROR NUMBER 59:  I'd still have a hard

2   time.

3         MR. WINTERS: Thank you.

4         THE COURT:  Any other questions?

5         MR. RIEHLMANN:  None.

6         MR. VOIGHT:  No, Your Honor.

7         THE COURT:  Thank you.  You're excused to leave

8   today, to return tomorrow at 9:30.

9         PROSPECTIVE JUROR NUMBER 59:  Okay.

10         THE COURT:  Thank you.

11      (Prospective Juror Number 59 exits courtroom)

12        (Prospective Juror Number 60 enters)

13         MR. McMAHON:  Hi, Ms. Ashley.

14         PROSPECTIVE JUROR NUMBER 60:  Hi.

15         MR. McMAHON:  I had a couple of inquiries about some

16   of the responses on your questionnaire.

17         PROSPECTIVE JUROR NUMBER 60:  Yes, sir.

18         MR. McMAHON:  And, the first, let me just read the

19   question, just to refresh your memory.

20         PROSPECTIVE JUROR NUMBER 60:  Okay.

21         MR. McMAHON:  Number 2 reads:  "Often the Government

22   pays expenses of individuals who give information about

23   criminal activity and who cooperate in criminal the

24   investigations.  Sometimes these individuals are given lump

25    sum payments of money to help them restart their lives after

1     the investigations and prosecutions are over."

2           You indicated you had a problem with this.  Can you

3     elaborate?

4           PROSPECTIVE JUROR NUMBER 60:  I just think that it's

5     a person's public duty to do it without having to be paid to

6     do something.

7           MR. McMAHON:  But, you'll find in this case that

8     people were actually paid as part of their cooperative

9     efforts.  Would that taint your ability to be fair to the

10    Prosecution?

11          PROSPECTIVE JUROR NUMBER 60:  No, I don't think so.

12          MR. McMAHON:  The next question was -- and,

13    admittedly, it was a compound question and you actually noted

14    "very confusing."

15          PROSPECTIVE JUROR NUMBER 60:  Right.  One part, to

16    me, was "yes," the other part was "no."

17          MR. McMAHON:  Exactly.  Let's break it down.

18          PROSPECTIVE JUROR NUMBER 60:  Okay.

19          MR. McMAHON:  Number 10:  "Can you believe the

20    testimony of a convicted felon, if it is supported by other

21    evidence?"

22          PROSPECTIVE JUROR NUMBER 60:  Yes.

23          MR. McMAHON:  "Would you automatically disregard it?"

24          PROSPECTIVE JUROR NUMBER 60:  No.

25          MR. McMAHON:  And, again, just to be comfortable with

1  us, you won't have a problem -- like, you answered Number 3.
2  Question Number 3 read that "During an investigation --"
3        This was an undercover investigation --
4        MR. RIEHLMANN:  Judge, I'm going to object --
5        PROSPECTIVE JUROR NUMBER 60:  Okay.
6        MR. RIEHLMANN:  -- to this going back to Question 3.
7  I think it's repetitious.
8        THE COURT:  Overruled.
9        MR. McMAHON:  Actually, the question I referred to
10  earlier was Number 2, not 3.  I'm going to ask her about
11  Number 3, now.
12        Number 3 read that during an investigation, an
13  undercover investigation, money is spent during the
14  investigation and oftentimes it's never recovered.  That's
15  what happened here.  Would that cause you any type of problem?
16        PROSPECTIVE JUROR NUMBER 60:  No.
17        MR. McMAHON:  All right.  That's all I have.  Thank
18  you.
19        THE COURT:  Any other questions?
20        MR. RIEHLMANN:  None.
21        THE COURT:  Thank you, ma'am.  You'll be excused to
22  return tomorrow morning at 9:30, and --
23        PROSPECTIVE JUROR NUMBER 60:  Yes, sir.
24     (Prospective Juror Number 60 exits courtroom)
25           (Prospective Juror Number 63 enters)

1        MR. WINTERS:  Hi, Ms. Schexnaydre, how are you?
2        PROSPECTIVE JUROR NUMBER 63:  Hi; fine, thanks.
3        MR. WINTERS:  Have a seat.  I've just got a couple of

     4   questions I want to ask you concerning your answers on this
     5   questionnaire that you filled out yesterday.
     6            PROSPECTIVE JUROR NUMBER 63:  Right.
     7            MR. WINTERS:  Question Number 3 read as follows:
     8   "During the investigation of illegal activities, undercover
     9   agents -- "
    10            And, this is an undercover case that we'll be hearing
    11   about.
    12            PROSPECTIVE JUROR NUMBER 63:  Right.
    13            MR. WINTERS:  "-- often must give government money to
    14   the people they're investigating --"
    15            To continue the undercover operation, okay.
    16            "-- and many times the money is never recovered."
    17            Now, you're going to hear in this case, if you're on
    18   this jury, that a considerable amount of money -- not a
    19   million dollars -- was given to the targets of this
    20   investigation, and it was spent by them before they could be
    21   arrested, okay, --
    22            PROSPECTIVE JUROR NUMBER 63:  Uh-huh. (affirmative
    23   response)
    24            MR. WINTERS:  -- and when they were arrested, they
    25   didn't have the money, okay.


                                                157
     1            PROSPECTIVE JUROR NUMBER 63:  Yeah.
     2            MR. WINTERS:  Now, you first checked "no" you don't
     3   have a problem with this, and then you scratched it out and
     4   checked "yes."  Now, do you have a problem with this?
     5            PROSPECTIVE JUROR NUMBER 63:  No, I needed -- I just
     6   -- I thought at first, "Well, no, that's okay," and then I
                             Page 139

7   thought, "Well, hey, that's -- they shouldn't have to give

8   money to people they're investigating," and I was just totally

9   confused.  I mean, I guess it's a shame you have to, but then

10   if that's the way you reach justice, then you need to do it.

11        MR. WINTERS:  So, you don't have a problem?

12        PROSPECTIVE JUROR NUMBER 63:  Right.  I don't, no.

13        MR. WINTERS:  Okay.  One other question that was,

14   admittedly, a confusing question and it's Question 10, and let

15   me see if I can break it down for you.  The Government will

16   call in this case a couple of convicted felons, people

17   convicted, okay.

18        PROSPECTIVE JUROR NUMBER 63:  Right.

19        MR. WINTERS:  So, the question and let me read it to

20   you:  "Can you believe the testimony of a convicted felon, if

21   the testimony is supported by other evidence?"  Could you

22   believe a convicted felon, if there was other evidence --

23        PROSPECTIVE JUROR NUMBER 63:  Yeah, I could.

24        MR. WINTERS:  You could.

25        Nothing further.

158

1        Thank you, ma'am.

2        THE COURT:  Any other questions?

3        MR. VOIGHT:  One brief question.

4        Good afternoon, ma'am.  Question Number 9 was one of

5   the three or four confusing questions we decided to throw at

6   you all.  It reads:  "Can you swear that you would not allow

7   the ethnic origin or race of any witness or Defendant to

8   influence your verdict in any way?"  Your answer to that

9   question was "no."  Could you elaborate on that?

10        PROSPECTIVE JUROR NUMBER 63:  No, wait.  Say it

11     again.  I put "no"?

12             MR. VOIGHT:  You put "no."  The question reads:  "Can

13     you swear that you would not allow the ethnic origin or race

14     of any witness or Defendant to influence your verdict in any

15     way?"

16             PROSPECTIVE JUROR NUMBER 63:  Yes, I could swear that

17     I wouldn't.

18             MR. VOIGHT:  Right.  We threw you on that one, --

19             PROSPECTIVE JUROR NUMBER 63:  I didn't --

20             MR. VOIGHT:  -- didn't we?

21             PROSPECTIVE JUROR NUMBER 63:  The "I swear" --

22             MR. VOIGHT:  All right.

23             PROSPECTIVE JUROR NUMBER 63:  -- messed me up.

24             MR. VOIGHT:  Thank you, ma'am.

25             THE COURT:  Thank you, ma'am.  You're excused, to


                                                       159

1      return tomorrow morning at 9:30.  You may leave now.

2              MR. WINTERS:  Thank you, ma'am.

3              (Prospective Juror Number 63 exits courtroom)

4                  (Prospective Juror Number 64 enters)

5              MR. RIEHLMANN:  Hi, Ms. McConnell, how are you?

6              PROSPECTIVE JUROR NUMBER 64:  Fine.

7              MR. RIEHLMANN:  I had a couple of questions about a

8      couple of the questions that you answered in yesterday's

9      questionnaire.  One was:  "If you discovered during the

10     course of the trial that one of the Defendants was a friend of

11     Len Davis, would that fact, alone, prejudice you insofar as

12     that Defendant is concerned?"  And, you answered "yes."  Could

13     elaborate on that?

14          PROSPECTIVE JUROR NUMBER 64:  Well, I think it would

15   color my view.  I don't know whether that's -- I work with

16   teenagers.  I associate the idea of friends being in trouble

17   together or being in groups of doing things.

18          MR. RIEHLMANN:  Okay.

19          PROSPECTIVE JUROR NUMBER 64:  I think it would color

20   it.

21          MR. RIEHLMANN:  Did you have -- I have a note in here

22   that you had some trip plans?

23          PROSPECTIVE JUROR NUMBER 64:  I have a graduation

24   from the U.S. Coast Guard Academy that we've been planning for

25   four years.


                                                              160

1          MR. RIEHLMANN:  And, when is that scheduled?

2          PROSPECTIVE JUROR NUMBER 64:  The family festivities

3   start the 12th.  My mother of 88 is coming into town.

4          MR. RIEHLMANN:  May 12th?

5          PROSPECTIVE JUROR NUMBER 64:  May 12th.

6          MR. RIEHLMANN:  We'll be finished well before then.

7   Does that -- is there a problem --

8          PROSPECTIVE JUROR NUMBER 64:  If we're finished,

9   well, that's -- you know, but if it drags on and on, --

10          MR. RIEHLMANN:  Okay.

11          PROSPECTIVE JUROR NUMBER 64:  -- then it's a problem.

12          MR. RIEHLMANN:  Question 7 asks you would you be

13   likely to give more weight to a law enforcement witness than a

14   non-law enforcement witness, and you answered "yes."

15          If a law enforcement witness testified to a fact and

16   then a civilian contradicted him on that fact that he

17   testified to, by virtue of the fact that the first witness was

                            Page 142

18    law enforcement, you would be more likely to believe him?

19           PROSPECTIVE JUROR NUMBER 64:  Probably.

20           MR. RIEHLMANN:  Okay.

21           PROSPECTIVE JUROR NUMBER 64:  I mean, I think that

22    we're taught as kids to trust your policemen.

23           MR. RIEHLMANN:  Okay, thank you, ma'am.

24           THE COURT:  Mr. Voight?

25           MR. VOIGHT:  No questions.


           161

1           THE COURT:  The Government?

2           MR. McMAHON:  Yes.

3           Hi, Ms. McConnell.

4           PROSPECTIVE JUROR NUMBER 64:  Hi.

5           MR. McMAHON:  Let me ask you about that, you know,

6    would you give more weight to the testimony of a law

7    enforcement witness.  That was probably a somewhat loaded

8    question, but would you be able to view law enforcement

9    testimony or a law enforcement witness the same way you'd be

10    able to view any other witness?  Could you judge them and, if

11    you believed the witness, you'd believe it or, if there's

12    something about the witness that you don't believe, could you

13    say, "Well, I don't believe this"?

14           In other words, could you view such a witness

15    objectively or would you automatically accept law enforcement

16    testimony?

17           PROSPECTIVE JUROR NUMBER 64:  I think you would tend

18    to, automatically, agree with the law enforcement person,

19    because that's what we do.  Whether you could honestly put

20    that initial idea aside and be totally, totally even, I would

21    hope so, but I don't know.

22            MR. McMAHON:  Okay.  I think the question is:  Would

23    you -- could you conceive of the situation where you would not

24    believe a law enforcement witness?

25            PROSPECTIVE JUROR NUMBER 64:  Yes.


162

1            MR. McMAHON:  Okay, so you could judge a law

2    enforcement witness like any other witness?

3            PROSPECTIVE JUROR NUMBER 64:  I think you would tend

4    to believe them first and then, after, disbelieve them.

5            MR. McMAHON:  Well, put -- right, I mean, put that

6    aside.  You know, we are taught that way and --

7            PROSPECTIVE JUROR NUMBER 64:  Yeah.

8            MR. McMAHON:  -- I mean, that's why it was somewhat

9    "loaded," in the sense that we are taught to respect,

10    definitely, but could you just be fair and say, "Well, it's a

11    law enforcement, I'm going to have to automatically accept it

12    no matter what," or "I can view it objectively"?

13            MR. RIEHLMANN:  I would object.  I believe we've been

14    over this several times.

15            THE COURT:  Well, we haven't had the clear answer

16    yet.  Objection is overruled.

17            PROSPECTIVE JUROR NUMBER 64:  I would tend to believe

18    the law enforcement idea and -- I don't know, I'm just

19    repeating myself.  I would hope I would be objective, but --

20            MR. McMAHON:  Would you automatically view it,

21    automatically believe it, just because it's a law

22    enforcement witness?

23            PROSPECTIVE JUROR NUMBER 64:  Initially, yeah.

24            MR. McMAHON:  What about -- the Len Davis, you were

25    asked about Number 14, about:  If you learned one of the

1    Defendants was a personal friend of somebody named Len Davis,

2    would that fact, alone, prejudice you?

3            And, you indicated "yes," but then earlier on, Number

4    12 reads:  "You will hear evidence in this case about one Len

5    Davis, a former New Orleans Police Officer, who is a named,

6    but indicted, co-conspirator.  Have you heard of Len Davis?"

7    You said "no," you never heard of Len Davis.

8            Can I show it to you?

9            PROSPECTIVE JUROR NUMBER 64:  Yeah, maybe I read it

10   wrong.

11           MR. McMAHON:  Yeah, see, this is 14, where you

12   said --

13           PROSPECTIVE JUROR NUMBER 64:  Wait, you've got to get

14   it over here closer.

15           MR. McMAHON:  Right.

16           PROSPECTIVE JUROR NUMBER 64:  (Examines document)

17           MR. McMAHON:  All right?  Now, let's look at 12.

18           PROSPECTIVE JUROR NUMBER 64:  Okay, I didn't read it

19   right.  Okay, --

20           MR. McMAHON:  Now, let's look at 12.

21           PROSPECTIVE JUROR NUMBER 64:  Okay, I don't know.  I

22   don't know a Len Davis.

23           MR. McMAHON:  Right.  Because on 12 you indicate you

24   never heard of Len Davis.

25           PROSPECTIVE JUROR NUMBER 64:  Yeah.  Okay.

1      MR. McMAHON:  So, if you never heard of Len Davis,
2 how could that fact prejudice you --
3      PROSPECTIVE JUROR NUMBER 64:  No, that's wrong.
4 That's incorrect.
5      MR. McMAHON:  So, Number 14 should be "no"?
6      PROSPECTIVE JUROR NUMBER 64:  It should be "no."
7      MR. McMAHON:  You've never heard of Len Davis?
8      PROSPECTIVE JUROR NUMBER 64:  Well, we read -- no.
9      MR. McMAHON:  All right.  Good.
10     Do you think you can be fair in this case,
11 Ms. McConnell?
12     PROSPECTIVE JUROR NUMBER 64:  I would only try.
13     MR. McMAHON:  Thank you.
14     THE COURT:  Mr. Riehlmann.
15     MR. RIEHLMANN:  Ms. McConnell, --
16     Let me see the questionnaire.
17     -- when you answered Number 14, "yes," would it fair
18 to say that you had in your mind that Len Davis was a
19 nefarious criminal character or was some criminal?
20     PROSPECTIVE JUROR NUMBER 64:  I don't know who he is.
21     MR. RIEHLMANN:  I know, but I'm asking you, when you
22 read Question 14 and you answered it "yes," the fact that one
23 of the Defendants was a friend of Len Davis, did you have in
24 our mind that Len Davis had been convicted of some crimes or
25 was accused of some criminal activity?

1      PROSPECTIVE JUROR NUMBER 64:  Yeah.
2     MR. RIEHLMANN:  And, where did you get that
3 impression?

4          PROSPECTIVE JUROR NUMBER 64:  I don't know.

5          MR. RIEHLMANN:  Okay.

6          PROSPECTIVE JUROR NUMBER 64:  I guess I -- I don't

7    know, I think I had the names confused.

8          MR. RIEHLMANN:  All right.  Well, let me ask you

9    again:  Knowing now that Len Davis is an indicted co-

10   conspirator in this criminal enterprise, if one of the -- if

11   the evidence shows that one of the Defendants was a friend of

12   Len Davis, would you -- would that fact alone prejudice you

13   against that Defendant?

14         PROSPECTIVE JUROR NUMBER 64:  I think it comes back

15   to the very, very first question you asked, if friends like

16   friends tend to get into trouble together.  I think you would

17   have to think about that.

18         MR. RIEHLMANN:  All right.  Thank you.

19         THE COURT:  Any other questions?

20         MR. VOIGHT:  No questions, Your Honor.

21         THE COURT:  Thank you, ma'am.  You're excused to

22   return tomorrow morning at 9:30.

23         PROSPECTIVE JUROR NUMBER 64:  Thank you.

24         THE COURT:  Thank you.

25         (Prospective Juror Number 64 exits courtroom)


                                          166

1          (Prospective Juror Number 65 enters)

2          MR. RIEHLMANN:  Ms. Boudreaux, yesterday you were

3    confronted with Question Number 10 on your questionnaire, and

4    I think he gave you a little trouble.  I'm just going to show

5    it to you to refresh your memory.  Maybe you can read the

6    question over and explain to us what you intended to say in

7    your response.

8            PROSPECTIVE JUROR NUMBER 65:  Okay, "Can you believe

9    the testimony of a convicted felon, if it is supported by

10   other evidence, --" and then it said, "-- or would you

11   automatically disregard it?"  The question confused me,

12   because --

13           MR. RIEHLMANN:  Understandably.

14           PROSPECTIVE JUROR NUMBER 65:  -- it was two parts.

15           MR. RIEHLMANN:  Understandably.

16           PROSPECTIVE JUROR NUMBER 65:  One could be answered

17   one way and one could be answered the other way, so I didn't

18   really know, so I put a question mark on it.

19           MR. RIEHLMANN:  Well, just explain to us how you feel

20   about that whole notion of a convicted felon testifying.

21           PROSPECTIVE JUROR NUMBER 65:  Okay.  If they're a

22   convicted felon and they're giving testimony, I mean, I think

23   that would be okay, as long as, you know, there was some fact

24   to it that I could hear.

25           MR. RIEHLMANN:  Okay.  That's all I have.

1            PROSPECTIVE JUROR NUMBER 65:  Okay.

2            MR. RIEHLMANN:  I had to ask you.

3            THE COURT:  Any other questions?

4            MR. McMAHON:  (Shakes head negatively)

5            MR. VOIGHT:  (Shakes head negatively)

6            THE COURT:  Thank you, ma'am, you're excused, to

7    return tomorrow morning at 9:30.

8            PROSPECTIVE JUROR NUMBER 65:  Okay.

9        (Prospective Juror Number 65 exits courtroom)

10           (Prospective Juror Number 67 enters)

11          THE COURT:  Sixty-nine is not going to be called?

12          MR. VOIGHT:  No, sir.

13          MR. WINTERS:  No, Your Honor.

14          MR. RIEHLMANN:  No, Your Honor.

15          THE COURT:  You can tell 69 to return tomorrow

16    morning at 9:30.

17          MR. RIEHLMANN:  Hello, Mr. Hunter.

18          PROSPECTIVE JUROR NUMBER 67:  Hello.

19          MR. RIEHLMANN:  In your questionnaire responses

20    yesterday, you were asked would you be more likely -- would

21    you give more weight to a law enforcement witness than a non-

22    law enforcement witness, and you answered "yes."

23          If a law enforcement witness, an FBI agent, for

24    example, testified to a certain fact in the testimony and then

25    a civilian witness contradicted him on that fact, by virtue of


                                        168

1    his title as an FBI agent, would you be more likely to believe

2    the FBI agent than the civilian witness?

3          PROSPECTIVE JUROR NUMBER 67:  It's just on the word

4    of both people or no other evidence or anything?  Just on the

5    word?

6          MR. RIEHLMANN:  Right.

7          PROSPECTIVE JUROR NUMBER 67:  Probably the law

8    enforcement agency.

9          MR. RIEHLMANN:  Okay.  Are you familiar with Len

10    Davis, the Len Davis --

11          PROSPECTIVE JUROR NUMBER 67:  I heard it on the news

12    and all, you know, some of the stuff that went on.

13          MR. RIEHLMANN:  Okay.  Question 14 asked:  If during

14   the trial  you learned that one of the Defendant was a friend

15   of Len Davis, a personal friend, would that fact, alone,

16   prejudice you against that Defendant, and you answered "yes."

17   Could you elaborate on that?

18        PROSPECTIVE JUROR NUMBER 67:  Well, you know, what a

19   friend might do for a friend is different than a stranger

20   would do for somebody else, you know.  If you look at what --

21   you know, even in United States history, Richard Nixon just

22   lied for a few of his friends and so he got -- you know, but

23   that goes on all the time.

24        MR. RIEHLMANN:  Well, if you learn that one of the

25   Defendants was a friend of Len Davis, knowing now what you

169

1   know about Len Davis, do you think that would impair your

2   ability to give that Defendant a fair trial in this

3   proceeding?

4        PROSPECTIVE JUROR NUMBER 67:  It would probably

5   would.

6        MR. RIEHLMANN:  All right.  Thank you, sir, I have no

7   further questions.

8        THE COURT:  Any other questions?

9        MR. WINTERS:  No.

10        MR. VOIGHT:  (Shakes head negatively)

11        THE COURT:  Thank you, sir, you're excused, to return

12   tomorrow morning at 9:30.

13        PROSPECTIVE JUROR NUMBER 67:  Thank you.

14     (Prospective Juror Number 67 exits courtroom)

15       (Prospective Juror Number 68 enters)

16        MR. MCMAHON:  Ms. Walker, good afternoon.

17        PROSPECTIVE JUROR NUMBER 68:  Good afternoon.

18          MR. McMAHON:  We recognize each other.  I've spoken
19    to you on the elevator.  You work in the Boggs Building, right?
20          PROSPECTIVE JUROR NUMBER 68:  I work in the Boggs
21    Building, correct, seventh floor.
22          MR. McMAHON:  Right; bankruptcy?
23          PROSPECTIVE JUROR NUMBER 68:  Bankruptcy court.
24          MR. McMAHON:  We've spoken before, correct?
25          PROSPECTIVE JUROR NUMBER 68:  Yeah, we've spoken

                                                170

1     before.
2           MR. McMAHON:  All right.  Would that, in any way,
3     interfere with your ability to serve in this case?  Would you
4     slant things one way or the other?
5           PROSPECTIVE JUROR NUMBER 68:  Absolutely not.
6           MR. McMAHON:  All right.  On your questionnaire, just
7     to refresh your memory, Response Number 3, it was:  "During
8     the investigation of illegal activities, undercover agents
9     often must give government money to the people they're
10    investigating and many times the money is never recovered."
11    And, you indicated you have a problem with that.  Can you
12    elaborate?
13          PROSPECTIVE JUROR NUMBER 68:  With that question,
14    nothing particularly.  And, maybe when I thought about that
15    answer, monies never being recovered, I really don't -- didn't
16    have any concrete information on that.
17          MR. McMAHON:  All right.
18          PROSPECTIVE JUROR NUMBER 68:  It was just a
19    general --
20          MR. McMAHON:  Let me put it in context.

21          PROSPECTIVE JUROR NUMBER 68:  Okay.

22          MR. McMAHON:  This trial will involve testimony

23  involving an undercover operation.

24          PROSPECTIVE JUROR NUMBER 68:  Okay.

25          MR. McMAHON:  During that undercover operation, a

1  large sum of money was spent, given to the bad guys, and we

2  never got it back.  It was spent, it's gone.  Does that bother

3  you?

4          PROSPECTIVE JUROR NUMBER 68:  Yeah, to an extent.

5          MR. McMAHON:  We're talking about six figures.

6          PROSPECTIVE JUROR NUMBER 68:  Okay.

7          MR. RIEHLMANN:  Judge, I'm going to object.  That's

8  getting into the facts.

9          THE COURT:  Objection maintained.

10          MR. McMAHON:  Why does that bother you?

11          THE COURT:  Just try to determine whether she can be

12  fair and impartial.

13          MR. McMAHON:  Why does that bother you?

14          PROSPECTIVE JUROR NUMBER 68:  Well, for one reason,

15  -- I guess just the thought that it should be -- you should be

16  able to recover.  I mean, I know if it's gone, it's gone.

17          MR. McMAHON:  It's gone.

18          PROSPECTIVE JUROR NUMBER 68:  So, I really wouldn't,

19  one way or the other, have any serious problems with that.  If

20  it's gone, it's gone.

21          MR. McMAHON:  So, that wouldn't bother you?

22          PROSPECTIVE JUROR NUMBER 68:  It bothers me that's

23  it's gone and there's probably not much likelihood of

24  recovery, but not to the extent that I would be absolutely --

25    I'm absolutely upset about that.

1              MR. McMAHON:  Number 9, the question was:  "Can you
2     swear that you would not allow the ethnic origin or race of
3     any witness or Defendant to influence your verdict in any
4     way?"  And, you actually had a double check with "yes."  So,
5     in other words, you swore that that that would not bother you,
6     correct?
7              PROSPECTIVE JUROR NUMBER 68:  Would not bother me.
8              MR. McMAHON:  Now, the double check, that prompts
9     this question:  Does it bother you, the fact that these
10    Defendants are black?
11             PROSPECTIVE JUROR NUMBER 68:  No.  No, I think that
12    double check may be, too, -- did I not have another answer and
13    I scratched through?
14             MR. McMAHON:  Yes, you did.
15             PROSPECTIVE JUROR NUMBER 68:  That was a mistake, so
16    I guess a double check there just simply indicated I meant
17    that answer "yes."  No, it wasn't to --
18             MR. McMAHON:  Okay, it wasn't --
19             PROSPECTIVE JUROR NUMBER 68:  No, it was not to --
20             MR. McMAHON:  -- for added emphasis?
21             PROSPECTIVE JUROR NUMBER 68:  Right, it was not for
22    added emphasis, no.
23             MR. McMAHON:  Your husband is Richard Walker?
24             PROSPECTIVE JUROR NUMBER 68:  That is correct.
25             MR. McMAHON:  You realize I play tennis against

1  Richard Walker at UNO, in those tennis leagues?

2        PROSPECTIVE JUROR NUMBER 68:  I knew he played tennis

3  with -- now that you're telling me this, it's the same

4  McMahon.

5        MR. McMAHON:  Right.

6        PROSPECTIVE JUROR NUMBER 68:  Okay.

7        MR. McMAHON:  And, in fact, we've had some rather

8  acrimonious matches, are you aware of that?

9        PROSPECTIVE JUROR NUMBER 68:  What are you --

10  describe "acrimonious."

11        MR. McMAHON:  Well, I'll let you use your -- very

12  heated contests.

13        PROSPECTIVE JUROR NUMBER 68:  No, not anymore than he

14  plays with, you know, any other competitors.

15        MR. McMAHON:  Okay.  So, he's never said anything bad

16  about me to you, has he?

17        PROSPECTIVE JUROR NUMBER 68:  No.  No.

18        MR. McMAHON:  Because -- well, okay.  Thanks.

19        THE COURT:  Any other questions?

20        MR. VOIGHT:  No, sir.

21        MR. RIEHLMANN:  No, sir.

22        THE COURT:  Thank you.

23        MR. McMAHON:  Thank you.

24        THE COURT:  You're excused, to return tomorrow

25  morning at 9:30.

1        PROSPECTIVE JUROR NUMBER 68:  Okay.  Thank you.

2        (Prospective Juror Number 68 exits courtroom)

3        (Prospective Juror Number 70 enters)

4       MR. VOIGHT:  Good afternoon, sir.  I've got one brief

5  question for you.  It has to do with an answer from a question

6  on our questionnaire, and the question was Number 9, and it

7  reads:  "Can you swear that you would not allow the ethnic

8  origin or race of any witness or Defendant to influence your

9  verdict in any way?"  Your answer to that question was "no,"

10  and I was wondering if you could elaborate on that answer for

11  us.

12       PROSPECTIVE JUROR NUMBER 70:  Maybe I misunderstood

13  it, because --

14       THE COURT:  During my oral voir dire, you remember

15  that I asked this question:  "I'm going to ask you the

16  following question.  If there is anyone who would answer this

17  question yes, please raise your hand and state your name and

18  number."  The question was:  "Will the ethnic origin or race

19  of any witness or Defendant influence your verdict against

20  him?"

21       As I recall, the gentleman did not raise his hand.

22       PROSPECTIVE JUROR NUMBER 70:  Okay.  I just probably

23  read it wrong, then.

24       MR. VOIGHT:  Thank you.

25       THE COURT:  Any other questions?


       175

1       MR. WINTERS:  I have two, Your Honor, two brief ones.

2       How are you, Mr. Guillot.

3       PROSPECTIVE JUROR NUMBER 70:  I'm all right.

4       MR. WINTERS:  In your questionnaire yesterday that

5  you filled out yesterday morning, there was a question asked,

6  Question 3:  "During the investigation of illegal activities,

 7  undercover agents often must give government money to the
 8  people they're investigating and many times the money is never
 9  recovered."
10      I'm going to tell you right now, in this case, there
11  will be testimony, if you're on this jury, that undercover
12  agents, to further the investigation, gave to targets of this
13  investigation money, government money, okay, for services they
14  rendered, okay.
15      And, before that money could be recovered, before
16  these people were arrested, that money was spent.  Do you have
17  a problem with that?
18      PROSPECTIVE JUROR NUMBER 70:  No, it just goes to
19  say, you hear so much money getting lost and all and, as a
20  taxpayer, you get aggravated with that.
21      MR. WINTERS:  I understand.
22      PROSPECTIVE JUROR NUMBER 70:  I mean, that's just my
23  view on it right there.
24      MR. WINTERS:  All right.  But, in furtherance of this
25  investigation, to keep the investigation going and the money


                                    176
 1  was gone by the time these people were arrested, would you
 2  hold that against the Government?  Could you give the
 3  Government a fair and impartial verdict in this case, or would
 4  that fact --
 5      PROSPECTIVE JUROR NUMBER 70:  It would factor in,
 6  because, I mean, --
 7      MR. WINTERS:  I would factor in?
 8      PROSPECTIVE JUROR NUMBER 70:  Yes.  I mean, when you
 9  get your check, you see all this money gone.
10      MR. WINTERS:  So, you would have a problem with this

11    and you might hold it against the Government, am I correct?

12         PROSPECTIVE JUROR NUMBER 70:  Yes, that part I did

13    have a problem with.

14         MR. WINTERS:  Okay.  Secondly, I've got a question on

15    Number 10.  "Can you believe the testimony of a convicted

16    felon, if it is supported by other evidence, or would you

17    automatically disregard it?"  Now, you answered "no."  Was

18    that "no" to part one or "no" to part two?

19         PROSPECTIVE JUROR NUMBER 70:  Well, if it had

20    evidence to support what he said, I wouldn't have a problem

21    with it.

22         MR. WINTERS:  All right.

23         THE COURT:  Any other questions?

24         MR. RIEHLMANN:  Mr. Guillot, if all the evidence that

25    is presented at this trial by the Government, the videotapes,

                              177

1    the audio tapes, the testimony of FBI agents and the testimony

2    of the witnesses, who were given money, if all that evidence

3    persuaded you, beyond a reasonable doubt, that the Defendant

4    was guilty, could you find him guilty, setting aside the

5    business about the money that you and Mr. Winters just talked

6    about?

7         PROSPECTIVE JUROR NUMBER 70:  It's hard to say how I

8    would react to something, until it's there in front of me.  I

9    mean, on a judgment call, like I said, the money part really

10    aggravates me.

11         MR. RIEHLMANN:  It aggravates you as a taxpayer?

12         PROSPECTIVE JUROR NUMBER 70:  Yes, sir.

13         MR. RIEHLMANN:  Okay.  But, if your duty as a juror,

14  you watched all the tapes, you listened to all the tapes and
15  you were convinced by all the evidence that the Government had
16  presented to you that the Defendant was guilty, could you set
17  aside that money, aggravation and find the Defendant guilty?
18          PROSPECTIVE JUROR NUMBER 70:  It's hard to say.  I
19  mean, it's hard to say what I would do in any situation.  I
20  mean, I understand what you're asking.
21          MR. RIEHLMANN:  Does that money issue aggravate you
22  so much --
23          PROSPECTIVE JUROR NUMBER 70:  Yeah, that aggravates
24  me, because you always hear this is going -- "That money is
25  gone.  Give us more money."


                                        178
1           MR. RIEHLMANN:  Does it aggravate you so much,
2   though, that you would --
3           PROSPECTIVE JUROR NUMBER 70:  It would always be
4   sitting there, yes, sir.
5           MR. RIEHLMANN:  Does it aggravate you so much that it
6   would impair you in finding a guilty man guilty in a trial?
7           PROSPECTIVE JUROR NUMBER 70:  (Pause) Probably not.
8           MR. RIEHLMANN:  All right.
9           MR. WINTERS:  Did you say "probably not"?
10          PROSPECTIVE JUROR NUMBER 70:  Yes, sir.
11          MR. WINTERS:  Not "definitely."
12          PROSPECTIVE JUROR NUMBER 70:  I mean, no, not
13  definitely, because, like I said, who knows how you're going
14  to react in a situation, until you actually see everything.
15          MR. WINTERS:  Thank you.
16          PROSPECTIVE JUROR NUMBER 70:  "yes
17          THE COURT:  Any other questions?

18          MR. RIEHLMANN:  No questions.

19          MR. VOIGHT:  No questions.

20          THE COURT:  Thank you, sir, you will be excused, to

21     return tomorrow morning at 9:30.

22          PROSPECTIVE JUROR NUMBER 70:  "yes

23          (Prospective Juror Number 70 exits courtroom)

24                          *   *   *   *   *

25          THE COURT:  Do all Counsel agree that all questions

                                                    179

1      that need be asked to the jury panel have been asked?

2           MR. WINTERS:  Yes, sir.

3           MR. RIEHLMANN:  Yes, sir.

4           MR. VOIGHT:  Yes, Your Honor.

5           THE COURT:  No further questions, then, of the jury

6      panel.  Does the Government have any challenges for cause,

7      other than those that have been acted upon already?

8           MR. McMAHON:  Yes, sir.

9           THE COURT:  Do you all want a five- or ten-minute

10     break before I do this?

11          MR. RIEHLMANN:  That would be fine with me.

12          MR. WINTERS:  That's fine.

13          THE COURT:  Okay, we'll take -- let's cut it at 10

14     minutes, because maybe we can complete the thing.

15          We'll stand in recess.

16     (Recess from 3:45 p.m. until 4:00 p.m.; all parties present)

17          THE COURT:  We're back in session, now, and all are

18     present.

19          Does the Government have any additional challenges

20     for cause?  We've already excused some for cause by consent.

21          MR. MCMAHON:  We do, Your Honor.  We would challenge

22    for cause Juror Number 1, Evelyn Dorsey.  She indicated very,

23    very strongly that she would disregard, virtually without any

24    ambiguity, the testimony of a convicted felon and, since the

25    Government's case will comprise testimony from convicted

1     felons, we feel that she was -- and she wasn't very ambiguous

2     about it.  She was quite definite.  She could not accept such

3     testimony.

4          THE COURT:  Carol, do you have the notes from

5     Number 1?

6          THE CLERK:  Yes, I do.  She stated that she could

7     not believe a convicted felon.

8          THE COURT:  All right.  Now, what's the response to

9     that?

10         MR. RIEHLMANN:  Judge, on behalf of Mr. Duncan, my

11    response would be that, given that the centerpiece of the

12    Government's case is the tape recording of the Defendant, Leon

13    Duncan, wherein it's the Government's contention he, by his

14    own words, admits knowing participation in a cocaine

15    trafficking operation.

16         The testimony of Sammy Williams, even if rejected,

17    would -- Ms. Dorsey would still have ample basis with which to

18    return a guilty verdict.

19         THE COURT:  Mr. Voight?

20         MR. VOIGHT:  Your Honor, on behalf of Mr. Jones, I

21    believe that Ms. Dorsey also clearly stated, in response to

22    the questions of Mr. Riehlmann's concerning the testimony of

23    convicted felons, she did state that she could be fair,

24    ultimately, and I believe ultimately she could be fair and I

25    would object to any disqualification.

1         THE COURT:  Well, that's the problem the Court has in
2    determining whether, in fact, she, in view of questions asked
3    and answers given, whether, in fact, she could be totally fair
4    and impartial.
5         But, at any rate, the challenge is maintained.  The
6    objection to it is overruled.
7         Does the Government have any others?
8         MR. MCMAHON:  Yes, sir.  The Government would also
9    challenge, Your Honor, for cause, Juror Number 11, Mr. Gale
10   Armand.  He, again, was very strong in his -- the difficulty
11   he felt with the fact that money -- the money spent during
12   such undercover operations was lost and not recovered, and it
13   was not one of these, "Well, I could put aside."
14        Again, his views were quite emphatic along those
15   lines.  And, since this case will involve the actual spending
16   of in excess of $100,000, during the undercover operation, we
17   felt that he would not be able to put that aside.
18        And, again, we went back and forth with him quite a
19   bit, and his views were such that we feel justified for cause.
20        MR. RIEHLMANN:  On behalf of Mr. Duncan:  Judge, I
21   believe that on further questioning, when I asked him if he
22   was persuaded beyond a reasonable doubt of the Defendant's
23   guilt by the tape recordings and all the other evidence that
24   the Government presented, whether he could return a verdict of
25   guilty, he said yes.

1    I think what he voiced was a concern as a taxpayer
2  that money was spent and not recovered, and also he voiced a
3  concern that witnesses may being paid for their testimony and
4  I believe that those are legitimate concerns.
5    But, given his answer to my questions, I believe he
6  could, nevertheless, be fair.
7    MR. VOIGHT:  Your Honor, on behalf of Mr. Jones:  I
8  believe that the totality of what Mr. Armand stated was that
9  he could be fair.  He may have to "hold his nose" to certain
10 aspects of the State's (sic) case, but ultimately, when
11 presented with all of the Government's evidence, that he would
12 be a fair juror.
13   THE COURT:  That's was my impression.  A lot of
14 people expressed unhappiness over the fact that money is
15 spent.
16   Carol, what do my notes --
17   THE CLERK:  The note said that he would hold a
18 payment of money against the Government.  He would be more
19 likely to believe a law enforcement witness than another
20 witness, however, if the evidence persuaded him, he could find
21 the Defendants guilty and he would not toss the case out
22 completely.
23   THE COURT:  He's satisfied the Court's requirements
24 that he could be fair and impartial, thus the challenge is
25 denied --

1    MR. McMAHON:  Your Honor, the next --
2    THE COURT:  -- and the objection is maintained.
3    MR. McMAHON:  Your Honor, Juror Number 59 --

4          THE COURT:  Sixty-nine?

5          MR. McMAHON:  No, no, no.

6          THE COURT:  I beg your pardon.

7          THE CLERK:  Fifty-nine, he said.

8          MR. McMAHON:  I have others.  But, Juror Number 59,

9     Your Honor.

10          THE COURT:  Fifty-nine, let me get to that.

11          MR. McMAHON:  That was Kathryn Walla Givens.  She

12     was, again, extremely -- Mr. Winters -- she's more recent in

13     memory.  Mr. Winters questioned her.  She stated she could not

14     be fair, because of the fact that, again, money was spent and

15     never recovered; caused her real concern.  And, she also

16     expressed concomitantly that she could not believe the

17     testimony of a convicted felon.  That's Number 59, Kathryn

18     Givens.

19          THE COURT:  My recollection is she didn't ever come

20     out and really say "notwithstanding" she could be fair and

21     impartial.  But, let me hear from Counsel, first.

22          MR. VOIGHT:  Judge, I have no response.

23          MR. RIEHLMANN:  I have no objection here.

24          THE COURT:  That's Number 59, the challenge granted.

25          MR. McMAHON:  Also, Your Honor, Number 26, and that

184

1     is Juror Errol Mickens.  He -- again, on the question of the

2     fact that the money spend during the undercover investigation

3     was not recovered -- he never actually stated -- he said

4     "probably," and when we tried to pin him down to a definite

5     answer, that, "Yes, I could put that aside and be fair," the

6     best that we could get was "probably," which indicates a

7  refusal to.  So, that's Number 26.

8        MR. RIEHLMANN:  Judge, just to cut to the chase, I

9  think that Mr. Mickens' responses were much the same as

10  Mr. Armand's and I think that he said that --

11        THE COURT:  Many people were bothered by him.

12        MR. RIEHLMANN:  I think his concerns were, again,

13  voiced as a taxpayer having lost money, but he said that if

14  the evidence proved him guilty beyond a reasonable doubt, all

15  the evidence, he could set that aside and find the Defendants

16  guilty.

17        THE COURT:  Mr. Voight.

18        MR. VOIGHT:  Your Honor, on behalf of Mr. Jones, I

19  would concur with what Mr. Riehlmann just stated.

20        THE COURT:  What is that note we have, Carol?

21        THE CLERK:  I have that he doesn't like that they

22  paid money, but he could probably be fair.

23        THE COURT:  That was my recollection.  He never did

24  rule himself out.  Challenge to Number 26 is denied and the

25  objection is maintained.


                                        185

1        MR. McMAHON:  Your Honor, also Number 57, that is

2  Shequeta Cyprian.  She, too, was troubled by the fact of the

3  money, but, in addition, she was very, very unsure about the

4  testimony of a convicted felon, and in our view, -- and,

5  again, this was not an ambiguity, she simply could not give a

6  definite answer.  She exhibited extreme difficulty in her

7  willingness to accept such testimony, when pressed.  And,

8  that's Juror Number 57.

9        MR. RIEHLMANN:  Judge, I don't recall the

10  difficulties that Mr. McMahon is alluding to.  I do know that

11    she said, insofar as Questions 1 and 3 on the jury
12    questionnaire, that she could set aside the problems that she
13    had with the money not being recovered and, if persuaded
14    beyond a reasonable doubt.
15          And, the only thing that she said about the convicted
16    felon aspect of it, I don't think differs greatly from what
17    the Judge is going to charge the jury, insofar as a felony
18    conviction is something the juror can consider in determining
19    the credibility of a witness.
20          THE COURT:  Mr. Voight.
21          MR. VOIGHT:  Your Honor, I would concur with
22    Mr. Riehlmann in that regard.
23          THE COURT:  And what do my notes have on that?
24          THE CLERK:  The notes say that she has problems
25    with --

1          THE COURT:  I remember that.
2          THE CLERK:  -- giving money, the Government never
3    received the money back, because the target got to keep it and
4    she had problems with both aspects of it.  She said that she
5    could be fair, but she also said she had transportations,
6    because she has to take the bus --
7          THE COURT:  I don't recall her ever really saying
8    "notwithstanding" she could be fair and impartial.
9          MR. McMAHON:  In addition, Judge, the fact -- I mean,
10   if she has to take the Greyhound bus, this is going to be a
11   several day -- you know, and I've had experiences in the past
12   with trials where people, jurors have had to rely on such
13   forms of transportation and they don't show up and it really

14    has caused a jam during the trial.

15         THE COURT:  Disruptive of a trial.  Challenge is

16    maintained, objection overruled.

17         MR. MCMAHON:  And, finally, Your Honor, as far as the

18    United States goes, the last juror questioned, Juror Number

19    70, Robert Guillot, once again, the fact that money was

20    expended during the undercover operation and lost, and he used

21    the word he was "aggravated about that."  That was the

22    keystone here, so it wasn't -- it wasn't even a "probably."

23    It was -- I think the quote was "probably, not definitely,"

24    but later on he kept employing the term it "aggravated" him.

25    It "aggravated" him, and we just felt he couldn't be fair to


187

1     the Government because of this.

2          MR. RIEHLMANN:  I have no response insofar as

3     Mr. Guillot is concerned.

4          THE COURT:  Mr. Voight.

5          MR. VOIGHT:  Your Honor, just briefly, on behalf of

6     Mr. Jones, I would state that the aggravation Mr. Guillot felt

7     does not necessarily disqualify him from being a fair and

8     impartial juror in this matter.

9          THE COURT:  Perhaps he was trying to get off the

10    jury, but I don't recall that he ever said he could be fair

11    and impartial.

12         Do the notes say otherwise, Carol?

13         THE CLERK:  The notes say that he was aggravated.  He

14    had a problem.  He could probably be fair, but he wasn't

15    definitely sure he could be fair.

16         THE COURT:  Challenge maintained.  Objection

17    overruled.

                    Page 166

18          MR. McMAHON:  And, finally, Your Honor, the last one

19     who going to be challenged for cause by the Government is

20     going Number 43, Mr. Daigle.

21          Mr.  Daigle, as the Court will recall, was the person

22     who stated that he was very tired.  However, he exhibited --

23          THE COURT:  The elderly gentleman?

24          MR. McMAHON:  With the white hair.  He had problems

25     with the Government.  He had problems with undercover


                                                      188

1     investigations.  He had problems with wire taps.  He had

2     problems with the money, and I think that -- there was an

3     attempt to rehabilitate him, but the initial answers to such a

4     wide variety of crucial issues to this case, where he could

5     not accept -- he seemed to me to be anti-government, anti-

6     investigation, anti-FBI.  And, we feel that he just exhibited

7     a general bias against the Prosecution and the government.

8     Number 43, Mr. Daigle.

9          MR. RIEHLMANN:  Judge, it's my recollection that he

10     did answer the "notwithstanding."  He said that if he was

11     convinced by all the tapes and everything else, if he was

12     convinced beyond a reasonable doubt, that he could find the

13     Defendant guilty, notwithstanding the problems.

14          THE COURT:  Mr. Voight.

15          MR. VOIGHT:  I have nothing further to add to that,

16     Your Honor.

17          THE COURT:  Carol, our note on 43?

18          THE CLERK:  It says he would be prejudiced against

19     the Government, because they gave them money.  He said he

20     would hold it against the Government.  He said the Government

                        Page 167

21   is too much into our lives and he has problems with the FBI.

22          THE COURT:  That's -- yes, I remember it.

23          THE CLERK:  And, he said he could find the Defendants

24   guilty if the evidence --

25          THE COURT:  Challenge maintained; objection overruled.


189

1          MR. McMAHON:  Thank you, Your Honor.

2          THE COURT:  Does the Defendant Duncan have any

3   objections for cause?

4          MR. RIEHLMANN:  Yes, sir.  The first one I would go

5   to is Number 15, Ms. Margaret Averill, --

6          THE COURT:  Number 15?

7          MR. RIEHLMANN:  Yes.

8          THE COURT:  All right, sir.

9          MR. RIEHLMANN:  -- in that she responded that she

10  would give a law enforcement officer more weight than a non-

11  law enforcement officer, and I guess to borrow Mr. McMahon's

12  argument from the last juror, her initial responses were,

13  "Yes, I'd give more weight to a --" or actually it may have

14  just been her response on the jury questionnaire, but at any

15  rate she said that she'd give more weight to a law enforcement

16  officer than a non-law enforcement officer.

17         THE COURT:  Mr. Winters.

18         MR. WINTERS:  Your Honor, as I recall, that witness,

19  when questioned by the Government, said initially she gave

20  that answer, and said that she would -- could decide based on

21  the testimony of the law enforcement officer or a lay person,

22  and that she'd give it -- if they were not credible, she would

23  say so, whether they were law enforcement or lay witness.

24         THE COURT:  The notes were have, Carol?

25          THE CLERK:  I just have that she --

1          THE COURT:  I remember her testimony and being

2     unhappy about some aspects of it, but I would have noted here

3     that she would have said "no way can I be fair."  Thus, the

4     challenge is denied.  The objection is maintained.

5          MR. RIEHLMANN:  Okay.

6          THE COURT:  That's for Number 15.

7          Mr. Riehlmann, do you have additional ones?

8          MR. RIEHLMANN:  Randy Davis, Number 21.

9          THE COURT:  Twenty-one, Randy Davis.

10          MR. RIEHLMANN:  Mr. Davis indicated that --

11          THE COURT:  He was the young man with the back

12     problem?

13          MR. WINTERS:  Yes, sir.

14          MR. RIEHLMANN:  Medication.

15          THE COURT:  Well, he never did say he couldn't be

16     fair.

17          MR. RIEHLMANN:  He said that it would affect his

18     ability to listen to the evidence.

19          THE COURT:  Well, he said sitting in the chair as he

20     does --

21          MR. RIEHLMANN:  And, I think Mr. Voight asked him

22     about medication and he said that sometimes the medication

23     that he takes would make him woozy.

24          THE COURT:  Well, I don't remember him saying woozy.

25          MR. WINTERS:  No, I don't remember him saying woozy.

1    He gave some answer that "I take medication, but I'm not on
2    medication now."

3            THE COURT:  Yes.

4            MR. VOIGHT:  I think his answer was that if he was in
5    pain, he would take medication and that medication would --

6            THE COURT:  It might make him drowsy.

7            MR. RIEHLMANN:  He said -- I think he said Vicodin
8    and Valium.

9            THE CLERK:  That's right.  He said he has a bad back
10   and he gets back spasms, and if he has to sit all day it does
11   cause him problems.  He said his mother has seizures.  He's
12   worried about that, and he also says he takes pain medication
13   for his back.  He wasn't taking it now.  When he takes it, it
14   does affect him.

15           THE COURT:  Well, I get a backache myself from
16   sitting up here.

17           MR. WINTERS:  Me, too, Judge.

18           THE COURT:  I don't think it rises to the level to be
19   maintained, so that challenge to Number 21 is denied.  The
20   objection is maintained.

21           MR. RIEHLMANN:  Challenge Number 24, Gregory Riley.
22   On his jury questionnaire, he answered that he would be
23   prejudiced against the Defendant to learn that the Defendant
24   was a friend of Len Davis.

25           THE COURT:  What is on there?  Does he have that on

1    there, Carol?

2           THE CLERK:  No, I didn't have any notes --

3           MR. RIEHLMANN:  I didn't ask him the questions.  I'm

    4    just relying on his --

    5           THE CLERK:  I don't have any notes.

    6           MR. RIEHLMANN:  I'm just relying on his answer to the

    7    jury questionnaire.

    8           THE CLERK:  He wasn't asked that.

    9           THE COURT:  Let's see.

   10           THE CLERK:  I don't have a note that he was asked.

   11           MR. RIEHLMANN:  No, he wasn't.  That's what I'm

   12    saying.

   13           MR. WINTERS:  He wasn't.  He was not called, and I

   14    don't think he --

   15           MR. RIEHLMANN:  I was satisfied with his response on

   16    the jury questionnaire.

   17           MR. WINTERS:  Your Honor, he could have been

   18    questioned along those lines, but I think they waived it by

   19    not bringing him in here and questioning him.  He never said

   20    that he couldn't reach a fair and impartial verdict.

   21           THE COURT:  That's my -- otherwise, I would have

   22    noted.  So, that's Number 24?

   23           THE CLERK:  Yes, sir.

   24           THE COURT:  Denied.  Objection maintained.

   25           MR. RIEHLMANN:  Cynthia Jones, Number 27.


                                                        193

    1           THE COURT:  Twenty-seven?

    2           MR. RIEHLMANN:  Yes.

    3           THE COURT:  Cynthia Jones.

    4           MR. RIEHLMANN:  She said that she would have a

    5    problem being fair to the Defendants, knowing that they were

    6    friends with -- a friend of Len Davis.

 7          THE COURT:  But, she didn't say she couldn't be, in

 8  totality, fair and impartial, that I recall.

 9          MR. RIEHLMANN:  I thought that the totality of her

10  answers was that she would be unable to give them a fair

11  trial.

12          THE COURT:  Does the note have anything?  I didn't

13  have a note on it.

14          THE CLERK:  I have that she said that the fact that

15  the Defendant was a friend of Len Davis would affect whether

16  she thought they were guilty or not guilty.  But, I don't know

17  if the next question was asked.

18          THE COURT:  About being fair and impartial?

19          MR. WINTERS:  I don't think it was.

20          THE CLERK:  No.

21          MR. RIEHLMANN:  Well, I think that what Carol just

22  read is --

23          THE COURT:  That's Number -- what's her number, 27?

24          THE CLERK:  Twenty-seven.

25          THE COURT:  Maintained.  The challenge is maintained.


                                                    194

 1  The objection is overruled.

 2          MR. RIEHLMANN:  Judge, Margie (sic) Margot, Number

 3  28.  Again, I didn't question her about her responses to 7 and

 4  14, on the jury questionnaire, but I'm challenging her for

 5  cause, based on her responses to 7 and 14.

 6          THE COURT:  Mr. Winters.

 7          MR. WINTERS:  Judge, she was never asked the

 8  threshold question.

 9          THE COURT:  Challenge denied on Number 28.  Objection

10  maintained.

11          MR. RIEHLMANN:  Number 29, Mr. Coste.  I believe that
12    his testimony was that he would be more inclined to believe a
13    police officer than a lay witness, when asked -- when they
14    testified contrarily on a point of fact.
15          THE COURT:  Yeah, but -- he was the gentleman with
16    the white shirt on, wasn't he?
17          MR. WINTERS:  Yes, sir.
18          MR. RIEHLMANN:  Yes, sir.
19          THE COURT:  He never did convince me that he wouldn't
20    be impartial and fair.
21          What do you have, Carol?
22          THE CLERK:  He said that while he would tend to give
23    more weight to a police officer, FBI agent, because he thinks
24    most of them are credible, when asked the next question, he
25    said, "I could be fair and impartial."


                                              195
1          THE COURT:  That's my recollection.  So, 29, the
2    challenge is denied.
3          MR. RIEHLMANN:  Laura Morris, --
4          MR. WINTERS:  What number?
5          MR. RIEHLMANN:  -- Number 32.  I believe that she
6    also responded that she would give more weight to a law
7    enforcement officer's testimony than she would a non-law
8    enforcement officer.
9          THE COURT:  She didn't say she would be unfair or
10    anything?
11          MR. WINTERS:  No.  I thought she said she would be
12    fair and impartial, Your Honor.
13          THE COURT:  Thirty-two denied.

14          MR. RIEHLMANN:  Bear with me for a moment, Judge.

15          I would challenge for cause Number 58, Anthony Jones,

16   because of his --

17          THE COURT:  Fifty-eight?

18          MR. RIEHLMANN:  Yes, sir.

19          -- his responses as to the friend of -- he said that

20   he could not be fair to the Defendant, knowing that he was a

21   friend of Len Davis.

22          THE CLERK:  He did say he could not give a fair trial

23   and that he recognized a family member and that might cause

24   him to be prejudiced.

25          THE COURT:  But, did he say he couldn't be fair and

196

1    impartial --

2           THE CLERK:  I have it --

3           THE COURT:  -- considering --

4           THE CLERK:  I wrote down that he said he could not

5    give a fair trial.

6           THE COURT:  All right, 58 is granted; challenge

7    granted.

8           MR. RIEHLMANN:  Next would be 64, Ms. McConnell.

9    Again, borrowing Mr. McMahon's argument, I believe her initial

10   responses were that she would be more likely to believe a

11   police officer, when that police -- or law enforcement

12   officer, when he testified contrary to a civilian witness, and

13   she also said that the fact that he was -- that a Defendant

14   was friends with Len Davis would impair her ability to give

15   him a fair trial.

16          MR. WINTERS:  Your Honor, this is a witness -- I

17   mean, excuse me, a juror that said she didn't even know Len

18  Davis, okay, when questioned further by Mr. McMahon, and I
19  think she --
20          THE COURT:  She had a little conflict.
21          MR. WINTERS:  -- also equivocated on believing a law
22  enforcement.  She said that's what you're taught to do.
23          THE COURT:  Initial tendency is to do, but when --
24          MR. WINTERS:  That's your tendency, but --
25          THE COURT:  Didn't she said "notwithstanding" she

197

1   could take the testimony of --
2           MR. VOIGHT:  If I might briefly, Your Honor, on
3   behalf of Mr. Jones, I believe that her answers to the initial
4   questions were so over the top, and she never did actually
5   come back to her "could she be fundamentally fair."  I don't
6   believe she ever --
7           THE COURT:  I'm not so sure of that.
8           MR. VOIGHT:  -- rehabilitated herself.
9           THE COURT:  What we have?
10          THE CLERK:  I have that she said while she was taught
11  to believe law enforcement, she would tend to believe them
12  first, --
13          THE COURT:  But, --
14          THE CLERK:  -- if all the evidence convinced her that
15  they weren't telling the truth, she could believe that and
16  she would not believe them, then.  She said, "I would try to
17  be fair."
18          THE COURT:  So, to 64, the challenge is denied.
19  Objection is maintained.
20          MR. RIEHLMANN:  Number 67, Charles Hunter.

21          THE COURT:  Sixty-seven, Charles Hunter.

22          MR. RIEHLMANN:  And I got tired at this point and

23    stopped taking notes, but I have some indication that his

24    responses to Questions 7 and 14 on the jury questionnaire

25    warranted a challenge for cause, so I'll have to rely on


                                                    198

1    Carol's notes.

2          THE COURT:  Mr. Winters?

3          MR. WINTERS:  Your Honor, I don't recall.  I mean, I

4    was tired, too.

5          THE CLERK:  He was talking about the friend question

6    and he said he was worried about what a friend would do for a

7    friend, --

8          MR. RIEHLMANN:  Oh, now I picture him.

9          THE CLERK:  -- would do different things for a

10    stranger.  He said he would tend to believe law enforcement

11    and I have down that he would not -- he said he wouldn't have

12    a hard time being fair.

13          THE COURT:  So, 67 is denied.

14          MR. RIEHLMANN:  Denied?

15          THE COURT:  The challenge is denied.

16          MR. RIEHLMANN:  Oh, okay.

17          THE COURT:  The objection is maintained.

18          MR. RIEHLMANN:  Yes, sir.  That's all I have.

19          THE COURT:  Mr. Voight, do you have any?

20          MR. VOIGHT:  He covered mine, Your Honor.

21          THE COURT:  All of yours?

22          MR. VOIGHT:  Yes, he did.

23          THE COURT:  All right.  Anything else that Counsel

24    want to do on the record, at this time?

25          Then tomorrow, at 9:30, we'll have -- I think

1   mathematically we have a pool from which, if you exercise ten

2   and six and the Defendants can split their 10 or do whatever

3   you want, so --

4           THE CLERK:  We have enough, Judge.  We have enough.

5           THE COURT:  Well, then, you'd have to have two --

6   that's ten and six, that's 16; add two more for each side on

7   the alternate, that's --

8           MR. RIEHLMANN:  Two more per side or one per side?

9           MR. McMAHON:  One.

10          MR. RIEHLMANN:  I didn't know how we decided that.

11          THE COURT:  Well, the alternate comes up in the

12  numerical sequence.  You may or may not want to challenge, I

13  don't know.  I'm just thinking of having enough people here in

14  case you do, so that's --

15          MR. VOIGHT:  And, how many alternates are you

16  thinking of --

17          THE COURT:  Eighteen, plus 12 is 30, plus 32 -- we've

18  got 32, huh?

19          MR. McMAHON:  Yes, we've well over 32.

20          MR. WINTERS:  We've got well over 32.

21          THE COURT:  We're all right.  We're in good shape,

22  then.

23          MR. WINTERS:  Judge, can I ask you a question?

24          THE COURT:  Sure.

25          MR. WINTERS:  How do you select -- at the bench --

1  jurors?

2         THE COURT:  Yes, you come up here --

3         MR. WINTERS:  You come up here?  Okay.

4         THE COURT:  -- at the bench and, you know, --

5         MR. WINTERS:  Strike.

6         THE COURT:  I think the Government goes first with

7  three, then the Defendants two --

8         MR. McMAHON:  Is it, like, three/two, three/two,

9  three/two, one, right?

10        THE COURT:  Well, I have it here.  I'm willing to

11  change; it depends.

12        MR. McMAHON:  Yeah, three/two, three/two, --

13        THE CLERK:  Three Defendants, two Government, and

14  Defendants get the last --

15        THE COURT:  I go Defendants three, Government two,

16  Defendants three, Government two, Defendants three, Government

17  two, Defendants one.

18        MR. McMAHON:  And then one/one for the alternates.

19        THE COURT:  Yeah.

20        MR. WINTERS:  Okay.

21        THE COURT:  I'll change this procedure.  If you want

22  me to, I'll change it, whatever.

23        THE CLERK:  We have 50 people, Judge, so we have

24  plenty.

25        THE COURT:  Well, we think we have 50 people.  It

1  might be raining harder tomorrow morning, I don't know.

2         MR. WINTERS:  Judge, I would say ordinarily two, but

3  I think the last trial I had with Judge Berrigan we lost two

 4   jurors the first day, okay, so we only had two alternates and

 5   we were down to 12, so three is fine with me.

 6          THE COURT:  Everybody happy with three?

 7          MR. RIEHLMANN:  I'm happy.  Then we would each one

 8   challenge, right?

 9          THE CLERK:  Each side will get two challenges.

10          MR. WINTERS:  Two challenges.

11          MR. RIEHLMANN:  That's what I'm saying, each of us,

12   each Defendant.

13          THE CLERK:  Right, you all can do like that.

14          MR. WINTERS:  We've got enough?

15          THE CLERK:  We've got enough people.

16          MR. WINTERS:  Okay.  Three, Judge.

17          MR. McMAHON:  Can we just go down the list

18   informally, --

19          THE COURT:  And now three.

20          THE CLERK:  Yeah, why don't we go down the list and

21   say who's left, Judge.

22          MR. McMAHON:  Let's go down the list --

23          MR. RIEHLMANN:  Yeah, let's --

24          THE CLERK:  Can we go down the list and see who is

25   left?


                                           202

 1          MR. McMAHON:  Let's do that.

 2          MR. RIEHLMANN:  Let's see the ones that are excused,

 3   can we do that?

 4          MR. McMAHON:  No, no, let's go to the ones remaining.

 5          THE COURT:  They want to see who is left?

 6          THE CLERK:  Right.

```
 7              THE COURT:  Well, sure --

 8              THE CLERK:  Do you want me to call them or do you

 9    want to call them?

10              THE COURT:  Call who?

11              THE CLERK:  The jurors who are left in the pool.

12              MR. McMAHON:  Yeah, the ones who are left.

13              THE CLERK:  I have it on here, if you want --

14              THE COURT:  You can read out the numbers.

15              MR. McMAHON:  Two?

16              THE COURT:  I want to go and -- you read out the

17    numbers.  I'm going to call these people that we maintained

18    the challenges on and tell them they don't have to come

19    tomorrow.

20              MR. WINTERS:  Fine, Judge.

21              THE COURT:  You all don't need me anymore?

22              MR. WINTERS:  No, sir.

23              MR. McMAHON:  No, sir.

24              MR. WINTERS:  Thank you.

25              THE COURT:  Have a good evening.
```

                                              203
```
 1              MR. WINTERS:  You, too, Judge.

 2              MR. McMAHON:  You, too, Judge.

 3              THE COURT:  Court stands in recess.

 4                        *   *   *   *   *

 5         (Whereupon, the trial was adjourned for the day)

 6

 7

 8

 9

10
```

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

204

1                    C E R T I F I C A T E

2

3          I certify that the foregoing is a correct transcript

4    from the electronic sound recording of the proceedings in the

5    above-entitled matter.

6

7

8    /S/DOROTHY M. BOURGEOIS                        9-23-98
     _____          _____
9    Dorothy M. Bourgeois                        Date

10

11

12

13

14
15
16
17
18
19
20
21
22
23
24
25