1

1

2                      UNITED STATES DISTRICT COURT

3                      EASTERN DISTRICT OF LOUISIANA

4                                        *
5    UNITED STATES OF AMERICA,           *        Criminal Action
                                         *        No: 97-217
6         Plaintiff,                     *
                                         *        Section "E"
7         v.                             *
                                         *        New Orleans, Louisiana
     LEON R. DUNCAN,                     *        April 29, 1998
8    DARREL G. JONES,                    *
                                         *
9         Defendants.                    *
          * * * * * * * * * * * * * * *
10
                               VOLUME 3
11
                              JURY TRIAL
12            BEFORE THE HONORABLE MARCEL LIVAUDAIS, JR.,
                      UNITED STATES DISTRICT JUDGE
13
     APPEARANCES:
14
     For the Government,          United States Attorney's Office
15                                By:  MICHAEL E. MCMAHON, ESQ.
                                  By:  ALBERT J. WINTERS, JR., ESQ.
16                                501 Magazine Street, Rm. 210
                                  New Orleans, Louisiana 70130
17
     For the Defendant            Comarda & Associates
18   Leon R. Duncan,              By:  MICHAEL G. RIEHLMANN, ESQ.
                                  3316 Canal Street
19                                New Orleans, Louisiana 70119

20   For the Defendant            William Noland & Associates
     Darrel G. Jones,             By:  GREGORY K. VOIGHT, ESQ.
21                                2739 Tulane Avenue

                                  New Orleans, Louisiana 70119
22
     Court Audio Operator:        James Crull
23
     Transcriptionist:            Dorothy Bourgeois
24
     Proceedings recorded by electronic sound recording,
25
     transcript produced by transcription service.

```
 1                    I N D E X

 2                 Direct   Cross   Redirect   Recross
     WITNESSES:
 3
     Karen Jenkins      72       93      102        --
 4
 5   Juan Jackson      107      180       --        --

 6

 7   EXHIBITS:                          Marked   Received

 8   G-1         Affidavits (in globo)     71       71

 9   G-1a        PEN Register 6/16/94      78       79

10   G-1b        PEN Registers             78       80

11   Jenkins-1   List of Conversations     81       82

12   JJ-1        CD of Phone Conversations 91       92
     thru
13   JJ-4

14   SW-1        CD of Phone Conversations 91       92
     thru
15   SW-5

16   SW-8        CD of Phone Conversations 91       92
     thru
17   SW-14

18   LR-1        CD of Phone Conversations 91       92
     thru
19   LR-3

20   SW-6        CD of Phone Conversations 91       92
     and
21   SW-7

22   JJV-1       Video                    111      112

23   P-1         Photograph of Warehouse  125      126

24   SN-1        Fake Cocaine             170      170
     and
25   SN-2
```

```
 1
     EXHIBITS: (Cont'd)                 Marked   Received
 2
     Joint-1     Stipulations            102      103
 3   and
```

| | | | |
|---|---|---|---|
| Joint-3 | | | |
| 4 | | | |
| Joint-4 | Stipulation | 103 | 103 |

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                   P R O C E E D I N G S

2              (Tuesday, April 28, 1998)

3              (Call to Order of the Court)

4              (Prospective Jurors Present)

5    THE COURT:  Please be seated.

6         Ladies and gentlemen, at this stage of the

7 proceedings, we're down to the final pool from which the

8 attorneys might make peremptory challenges.

9     So, I'll ask Counsel to step up to the bench, please.

10     (At side bar on the record)

11     THE COURT:  According to the schedule we've all

12 agreed upon, Defendants will start with three.  Let me get

13 something to mark them with.

14     All right, shoot.

15     MR. VOIGHT:  I think we're start, Your Honor, with

16 Number 4, James Payne.

17     THE COURT:  James Payne.

18     MR. VOIGHT:  And, Number 6, Martin Solis.

19     MR. RIEHLMANN:  Number 8, Bruce Vallelungo.

20     THE COURT:  All right.  The Government, now, with two.

21     MR. WINTERS:  Judge, the Government is going to

22 strike Number 11, Mr. Gale Armand, and Number 12, Mr. Leonard

23 Medal.

24     THE COURT:  We're back to you Defendants with three.

25     MR. RIEHLMANN:  Number 14, Betty Adams.



5

1     THE COURT:  All right, Number 14.

2     MR. RIEHLMANN:  And, Number 15, Margaret Averill.

3     MR. VOIGHT:  Number 16, Gary Bernard.

4     THE COURT:  Gary Bernard.

5     THE COURT:  Back to the Government for two.

6     MR. WINTERS:  The Government is going to challenge,

7 Your Honor, Mr. Errol Mickens, --

8     MR. MCMAHON:  Number 26.

9     MR. WINTERS:  And, Mr. Anthony Durel, Number 39.

10     THE COURT:  That takes the Government out of that one.

11          Defendants three.

12          MR. VOIGHT:  Mr. Riley, Gregory Riley, Number 24.

13          THE COURT:  Twenty-four?

14          MR. VOIGHT:  Yes, sir.  And, Number 28, Marie Margot.

15          MR. RIEHLMANN:  And, Number 29, Mr. Herman Coste.

16          THE COURT:  Number 29?

17          MR. RIEHLMANN:  Yes, sir.

18          THE COURT:  The Government for two.

19          MR. WINTERS:  Twenty-one, Randy Davis.  We don't want

20     to use our last one, Your Honor.

21          THE COURT:  Waive it.

22          MR. WINTERS:  We waive it.

23          THE COURT:  The Defendants with one.

24          MR. VOIGHT:  Your Honor, Number 32, Laura Morris.

25          THE COURT:  All right.  Now, according to my papers,


                                              6

1     we have the first 12 people as:  Number 2, --

2          MR. McMAHON:  We have a motion.  We think that under

3     McCollum v Georgia, the Defendants exercised their strikes in

4     a peremptory racially -- their peremptory strikes in a

5     racially discriminatory manner.  The Defendants' first three

6     cuts, Number 4, James Payne, Number 6, Martin Solis, and

7     Number 8, Bruce Vallelungo; in addition, Number 16, Gary

8     Bernard, Number 24, Gregory Riley and three others directed to

9     all white males, all white males.

10          THE COURT:  All white males?

11          MR. McMAHON:  Yes.

12          THE CLERK:  The ones he just said so far.

13          MR. McMAHON:  Number 32, Laura Morris.

14          THE CLERK:  White female.

15          MR. McMAHON:  Number 28 Marie Margot.

16          THE CLERK:  White female.

17          MR. McMAHON:  And, Number 15, Margaret Averill were

18  all white females.  So, nine out of his ten cuts were directed

19  toward a white perspective jurors.  Number 29, Herman Coste

20  was a black male, and we feel that this is just a systematic

21  attempt to eliminate as many white prospective jurors as

22  possible, and we feel that we've made a prima facia case under

23  McCollum v Georgia, so we're moving a so-called reverse

24  Batson.  We think he ought to be able to justify his cuts.

25          THE COURT:  Your response?

1          MR. RIEHLMANN:  Okay, Judge.  First of all, let the

2  record reflect that the first juror selected is Jarrod

3  Bourgeois.  He's a white male.  The next -- okay, insofar as

4  James Payne, we cut James Payne, --

5          MR. VOIGHT:  I can explain that, since that's my cut.

6          MR. RIEHLMANN:  All right.

7          MR. VOIGHT:  Your Honor, my --

8          THE COURT:  Who are we talking about, Number 4?

9          MR. VOIGHT:  We're talking about James Payne.

10  Because of the --

11          THE COURT:  We're talking about Number 4?

12          MR. VOIGHT:  We're talking about Number 4.

13          THE COURT:  Yes.

14          MR. VOIGHT:  Because of the intense media coverage of

15  the previous proceedings, my goal has been to try, as best I

16  can, to make geographic cuts, rather than racial cuts, and to

17  try to select jurors as far away from the New Orleans metro

18    area as possible.

19          THE COURT:  Well, Number 4 is not.

20          MR. VOIGHT:  But, he is -- Marrero is a stone's

21    throw --

22          THE COURT:  Probably I could get to Marrero from here

23    faster than I can get to my home by Audubon Park.

24          MR. VOIGHT:  That's why I'm trying to stay away from

25    people close like that.  Frankly, his race has nothing to do

8

1    with it.  It really is a matter of geography.

2          MR. RIEHLMANN:  The Court has to take notice --

3          THE COURT:  Excuse me; go ahead.

4          MR. RIEHLMANN:  I'm sorry.  The Court has to take

5    notice of the manner in which the prospective jurors have been

6    dealt to us.  I mean, in the first --

7          THE COURT:  They kind of --

8          MR. RIEHLMANN:  The box contained 16 and in the first

9    16 there were only two blacks.

10          THE COURT:  I might make a note for the record that

11    this particular panel seemed -- I didn't count them, but they

12    seemed maybe two-thirds white and one-third black or

13    something.  I'm not thinking about the gender, purely on the

14    race.

15          The panel has more whites than blacks.  I believe I'm

16    correct in saying that.  So, that might be part of an

17    explanation of how your challenges.

18          MR. McMAHON:  It just seems, Your Honor, of -- nine

19    out of ten cuts are directed towards whites.  Six --

20          THE COURT:  Well, that's what I need an explanation

Page 7

21   for.  It's the overall, okay, not the specific ones.  So, what
22   the Government says under this -- is that you've loaded the
23   gun to get rid of white --
24        Males and females?
25        MR. MCMAHON:  Yes.  For example, Your Honor, Bruce

1   Vallelungo is from Mereaux.
2        MR. RIEHLMANN:  His brother is a sheriff's deputy.
3        MR. MCMAHON:  But, he was not voir dired on that
4   individually.  I mean, --
5        MR. RIEHLMANN:  He mentioned it to me.  That's all I
6   needed to hear, Mr. McMahon, was that his brother was a
7   sheriff's deputy, and presently is being very pro law
8   enforcement.  That's my racially neutral reason for cutting
9   Mr. Vallelungo.
10        MR. MCMAHON:  Well, that may be fine, but your Co-
11   Counsel just said that the cuts were directed specifically
12   toward geographic diversity.  This man is from Mereaux.
13        MR. VOIGHT:  Mike --
14        MR. RIEHLMANN:  He's not my Co-Counsel.  He
15   represents a Co-Defendant.
16        Judge, I might also point out that yesterday -- I'd
17   like the record to reflect that yesterday the Defense offered
18   challenge for causes for several blacks, so, I mean, our --
19        MR. VOIGHT:  The jury selection theory certainly is
20   not race-based.
21        THE COURT:  But, of course, challenges for cause, if
22   granted, don't fall into the gender, race --
23        MR. RIEHLMANN:  I just think the picture ought to be
24   accurate.  I think that that's -- I believe that
                            Page 8

25    Mr. Vallelungo has given a gender neutral reason for my

10

1    exercising the choice, that being that his brother is a
2    sheriff's deputy, and I believe the impression that I got from
3    him is that he would be more pro-law enforcement, he would be
4    more readily sympathetic to their case than not.
5            THE COURT:  And, did we talk about Mr. Solis?
6            MR. RIEHLMANN:  We have not yet, no.
7            MR. VOIGHT:  Not this morning, Your Honor.
8            MR. MCMAHON:  Here's an example:  Mr. Solis is from
9    Hammond.  He's is well outside the New Orleans area.  So,
10   therefore, he would not be infected by local --
11           THE COURT:  Proximity.
12           MR. MCMAHON:  -- local media, so the justification,
13   the geographical justification --
14           MR. RIEHLMANN:  Well, Judge, --
15           MR. MCMAHON:  -- fails on its face with Mr. Solis.
16           MR. RIEHLMANN:  Mike, --
17           MR. MCMAHON:  He's a white man, that's --
18           MR. RIEHLMANN:  I might also point out that his
19   daughter-in-law is a prosecutor.  His daughter-in-law is an
20   assistant D.A.  That, again, shows a gender neutral reason.
21   He has ties to law enforcement that may make him prejudiced in
22   this case.
23           THE COURT:  Well, I don't have any trouble with
24   Number 6.  I do have a little trouble with Number 4, just
25   because he lives in Marrero.  That's not a good -- if we're

1  going to consider it in the light of racial selection, I don't

2  think the fact that he lives somewhat close to the courthouse

3  is --

4         MR. VOIGHT:  He's one of the few jurors that actually

5  did give an answer to Question Number 25, and while I -- why I

6  didn't voir dire jurors as to their answers to Question 25, 25

7  does indicate a level of knowledge about perhaps the

8  peripheral facts of this case and, frankly, I would prefer my

9  jury to be fresh.

10        THE COURT:  Let's see, Number 25, let me look at the

11  -- is the Turner?

12        MR. VOIGHT:  It's Question Number 25.

13        THE COURT:  It's Juror Number --

14        THE CLERK:  Four.

15        MR. VOIGHT:  Four.

16        THE COURT:  Question Number --

17        MR. VOIGHT:  Twenty-five.  (Examines document)  I

18  apologize, Your Honor.

19        MR. WINTERS:  He didn't even answer 25.

20        MR. VOIGHT:  The reason why I have it in my notes is

21  because --

22        MR. McMAHON:  I guess there was a pretext.

23        MR. VOIGHT:  No.

24        -- because he didn't --

25        I would object to that characterization of my motive.

1         But, frankly, he didn't answer the second part of it

2  was the trigger of my note.

3         THE COURT:  The Court feels that the Defendants have

 4   exercised their peremptory challenges in a manner that is

 5   improper, in that --

 6           What is it, nine out of ten?

 7           MR. MCMAHON:  Yes, Your Honor.

 8           MR. WINTERS:  Yes, sir.

 9           THE COURT:  -- nine out of ten of the persons

10   selected by Defendants are white male or female and, thus, we

11   might have to make a change.

12           Number 4 is one of the persons challenged, which the

13   Court deems not to be a proper challenge, considering the

14   Batson aspects of it.

15           Number 6 is perfectly all right.  The Defendants have

16   chosen Number 6.

17           Number 8 --

18           MR. RIEHLMANN:  Is the --

19           THE COURT:  Yes, we've talked about him.

20           MR. RIEHLMANN:  -- sheriff's deputy, the brother of

21   the sheriff's deputy.

22           THE COURT:  Anything further on Number 8?

23           MR. MCMAHON:  Your Honor, Mr. Vallelungo was never

24   voir dired on that aspect.  He was never questioned about

25   this, in the sense that he never expressed any position on the


                                              13

 1   fact that his brother was a deputy sheriff.

 2           Now, if this were a cause of concern for the

 3   Defendant, they would have at least asked Mr. Vallelungo about

 4   that, but they did not.  We feel it's a pretext, because he is

 5   a white male.

 6           MR. RIEHLMANN:  Your Honor, this morning, when

7    Mr. Voight and I met, we were discussing how we were going to

8    exercise our peremptory challenges, and when we got to

9    Mr. Vallelungo, I said, "Mr. Voight, I'd like to cut him

10   because his brother is a police officer," because that, in and

11   of itself, is enough for me, if he has identified --

12            THE COURT:  The explanation given by the Defendants

13   is, at this time, acceptable.  We'll see what our proportion

14   turns out to be.

15            MR. MCMAHON:  Your Honor, we'd also -- Number 16.

16            THE COURT:  Wait, is that the next one?  Number 14.

17            MR. MCMAHON:  I'm jumping to the males, to the males

18   at this point.

19            THE COURT:  Number 16?

20            MR. MCMAHON:  Number 16, Gary Bernard, and Number 24,

21   Gregory Riley.

22            Mr. Bernard is from Mandeville.  He's a salesman for

23   Dr. Pepper.  He has no law enforcement relatives.

24            Mr. Riley is from Abita Springs.  He, to the best of

25   my notes, has no law enforcement relatives.



                                            14

1            And, again, these are two white males, who live well

2    outside the New Orleans metro area, the City of New Orleans.

3            MR. VOIGHT:  Your Honor, Bernard is my cut, so I'll

4    address that.  In individual voir dire, Mr. Bernard did inform

5    us all that he -- two things; one, that he just moved from

6    Monroe, and that he had remembered reading about the case and

7    the peripheral facts of this case in the paper.

8            It's his knowledge of these facts that has always

9    concerned me about Mr. Bernard, and that's what led to my

10   striking him.

11          THE COURT:  At this time, I'm not persuaded.  That's
12  Number 16.  Would you be saying the same thing for Mr. Riley?
13          MR. RIEHLMANN:  I have Mr. Riley.  I cut Mr. Riley
14  because his response to Question Number 14, that he would hold
15  it against the Defendant for being a friend of Len Davis.  I
16  urged a challenge for cause yesterday --
17          THE COURT:  We covered that -- we crossed that bridge
18  yesterday, didn't we?
19          MR. RIEHLMANN:  Well, Judge, we did and you said it
20  was an insufficient reason for challenge for cause, but I
21  think this is sufficiently racial reasons --
22          THE COURT:  That's Number 24?
23          MR. RIEHLMANN:  Yes.
24          It's a sufficiently racial --
25          THE COURT:  On the temporary list, I'll just put it


                                                15
1   there.
2           MR. RIEHLMANN:  Okay.
3           THE COURT:  Now, we skipped 14 and 15.  Nobody has
4   any problem with 14 and 15?
5           MR. MCMAHON:  I was doing the males first.
6           THE COURT:  Well, just so I can keep running, my
7   track running, 14 --
8           MR. MCMAHON:  Number 14, Your Honor, is Betty Adams.
9   She's from Raceland, which is well outside the area.
10          MR. RIEHLMANN:  That's my cut, and that's not so
11  geographically oriented, --
12          THE COURT:  Purely and simply?
13          MR. RIEHLMANN:  My explanation is that:  My notes

14  reflect that, going through the jury questionnaire yesterday

15  or day before yesterday, she responded to every question in a

16  manner in which I interpreted as being good for the

17  Government.  Every question she checked off was good for the

18  Government, and that's why I put --

19          THE COURT:  Well, that's 14.  Temporary list.

20          Number 15.

21          MR. RIEHLMANN:  She said, in Question 7, that she

22  would be more impressed by law enforcement testimony than --

23          THE COURT:  Okay.

24          MR. RIEHLMANN:  I'm not saying it's a challenge for

25  cause, but it is, I think, a racially neutral reason.  I mean,


                                                16

1  she --

2          THE COURT:  Well, perhaps it is, but when I see the

3  proportions, that's where I can say that there seems to be a

4  tendency in one direction.  And, that's number, what, 15?

5  Temporary list.

6          We've done 16.  We've done 24.

7          MR. McMAHON:  Twenty-eight, now, Your Honor.

8          THE COURT:  Twenty-eight.

9          MR. McMAHON:  Marie Margot.

10         MR. RIEHLMANN:  Twenty-eight was mine, I believe.

11  Two questions she answered on the questionnaire, Number 7, she

12  tends to believe law enforcement or a law enforcement witness,

13  rather than some other witness, and in Question Number 14, she

14  would hold it against the Defendants if they were found to be

15  friends of Len Davis.

16         THE COURT:  But, then, as we addressed the matter

17  yesterday, she clarified her position sufficiently.  So,

18    that's Number 28.  I'm going to just put 28 --

19          MR. RIEHLMANN:  Another thing I might point out on

20    this --

21          THE COURT:  Twenty-nine.

22          MR. RIEHLMANN:  Wait, Judge.  I pointed out to

23    Mr. Voight, when we were discussing our peremptories, that

24    Ms. Margot works for the Louisiana Workers' Comp Insurance

25    Corporation --

1          THE COURT:  Are we talking about this?

2          MR. McMAHON:  Uh-huh. (affirmative response)

3          MR. RIEHLMANN:  It's Number 28, --

4          THE COURT:  Yeah.

5          MR. RIEHLMANN:  -- and I thought that, in that she

6    works for the Louisiana Workers' Comp Insurance Corporation,

7    which is a company that whose purpose it is to seek out

8    Workmen's Comp, that I thought she would be more conservative

9    than --

10          THE COURT:  Number 29.

11          MR. McMAHON:  That's a pretext, Your Honor.

12          THE CLERK:  Twenty-nine is a black male.

13          THE COURT:  Okay, we needn't bother with that, unless

14    the Defendants are going to move against the Government for

15    executing.

16          MR. RIEHLMANN:  For whom?

17          THE COURT:  Number 29.

18          MR. WINTERS:  Twenty-nine --

19          MR. McMAHON:  Twenty-nine is the Defendants'.

20          MR. RIEHLMANN:  It's my cut, but he said -- he's

21  black.

22          MR. McMAHON:  He's the sole --

23          THE COURT:  Oh, he wasn't a Government cut, then.

24          MR. WINTERS:  He's the sole --

25          MR. McMAHON:  The sole --


18

1           THE COURT:  We're now at 32.

2           MR. McMAHON:  Ms. Morris.

3           MR. VOIGHT:  Thirty-two is mine.  Your Honor, again,

4   she indicated on her questionnaire that she was more likely to

5   favor a Government witness, more likely to believe them.

6           THE COURT:  Every person has a tendency to feel that

7   the Government starts off right, let's say.  It's just common

8   experience.  But, they all say, "But, if you show me

9   otherwise, the hell with the Government."

10          MR. VOIGHT:  But, a lot of the prospective jurors

11  answered the question "no," that they would not be more likely

12  to believe a law enforcement --

13          THE COURT:  Some people feel that way, some more

14  intelligent people can answer the question like you and I can.

15  Some less sophisticated people might not.

16          MR. VOIGHT:  But, --

17          THE COURT:  But, then, those less sophisticated

18  people come up and say, "Well, if the Government doesn't

19  have," there, again --

20          MR. VOIGHT:  Well, I certainly think that it's a

21  racially neutral reason.

22          THE COURT:  Well, that's what we're trying to

23  determine.  So, that's Number --

24          MR. McMAHON:  That's Number 32.

25          THE COURT:  -- 32.

1          MR. WINTERS:  Thirty-two.

2          THE COURT:  I think that's an improper selection.

3    Which brings us to --

4          THE CLERK:  That's it.

5          MR. RIEHLMANN:  That's it.

6          THE COURT:  All right.  You have Number 4 and Number

7    32 that I think you should substitute, because now you have

8    one, two, three, four, six, seven, eight in question -- all

9    right, eight and that's, what, 25 percent -- 75 percent the

10   other way.

11         MR. RIEHLMANN:  How many jurors did we go through?

12         THE COURT:  Eight.

13         MR. RIEHLMANN:  No, how many did we go through --

14   three, four, five, six that are in your temporary category.

15   Six out of 32 is one-fifth.  You've already observed, Judge,

16   that the panel is two-thirds white.  I mean, --

17         THE COURT:  No, you have 12 and here --

18         THE CLERK:  Up to Number 35 would be 12, if you --

19   these double strikes that they already used.  It would end at

20   35, not counting all -- and there are one, two, three --

21         THE COURT:  Well, --

22         THE CLERK:  -- four, five --

23         THE COURT:  -- as I said before, it appears that the

24   selections made by the Defendants are, in the totality of the

25   matter, improper, because they've concentrated 99 percent or

1    90 percent on white males and females.

2         However, the selection  -- the exercise of the

3    challenge on Numbers 4 and 32 are proper.  On the others, I

4    would say that the Defendants should get together and

5    reevaluate the thing on -- two, four, six -- proportionately,

6    I think maybe just one more could be substituted for.  And,

7    if that one other person is put here, the Defendants would

8    have three additional -- would have three peremptory

9    challenges.

10         So, I would ask that you all step aside or do

11    whatever you want to do or tell me right now, out of these

12    numbers on the temporary list --

13         MR. RIEHLMANN:  Judge, could we have -- I'm just

14    trying to figure out if we would add one more, might we

15    suggest that it be three.  As it stands now, who would be the

16    12th juror?

17         THE COURT:  Well, the column, down the line.

18         THE CLERK:  It would be 35.

19         MR. WINTERS:  Number 35.

20         THE CLERK:  Assuming those strikes are --

21         MR. VOIGHT:  (Inaudible; paper shuffling) and these

22    three?

23         THE CLERK:  No, I'm assuming that those are -- if he

24    puts some back in -- he's going to put one back in?

25         MR. VOIGHT:  He's going to put three back in.

1         THE CLERK:  Three back in?

2         THE COURT:  But, I need the final one.

3      (Pause in the bench conference; Defense Counsel confer)

4         MR. RIEHLMANN:  All right, Judge, we would reconsider

5    Number 14, Betty Adams.

6         THE COURT:  Number what?

7         MR. RIEHLMANN:  Fourteen, Betty Adams.  Any

8    explanations that we've already made on --

9         THE COURT:  I understand.  Those objections are noted

10   for the record and the Court has ruled on them, for whatever

11   purposes on appeal you might have.

12        MR. RIEHLMANN:  I didn't want the --

13        THE COURT:  And, let me just straighten this -- let's

14   see --

15        MR. McMAHON:  Judge, I don't think they can erase a

16   peremptory.  I think they have to --

17        MR. VOIGHT:  What are you asking us to do?

18        THE COURT:  This is done now.  You have three.

19        MR. RIEHLMANN:  So, you're satisfied --

20        THE COURT:  No, you only have one, now -- no, you

21   have three.

22        MR. RIEHLMANN:  We have 14 --

23        THE COURT:  So, you can substitute your earlier

24   challenges.  No, you'd have two more, wouldn't you?

25        MR. McMAHON:  No, three.


                                                          22

1         THE COURT:  Three?

2         MR. McMAHON:  Right.

3         THE COURT:  what are they?

4         MR. McMAHON:  Three.

5         THE COURT:  I took three out.

6         MR. RIEHLMANN:  You made us take back three

7  challenges, now he's saying --

8          THE COURT:  Fourteen is in.  Isn't that the one you

9  said --

10         MR. RIEHLMANN:  That's the one that we just put back

11  in.

12         THE COURT:  Yeah.

13         MR. RIEHLMANN:  We regained it.

14         THE COURT:  All right.  Well, then, you don't get

15  three challenges.

16         MR. McMAHON:  And, two of them were reversed; not

17  three, two.

18         THE COURT:  That's right.  Maybe you've only got one.

19         MR. RIEHLMANN:  No, he asked us to reconsider one of

20  our peremptory challenges --

21         THE COURT:  And, you did.

22         MR. RIEHLMANN:  -- which we did on 14, and so --

23         THE COURT:  Okay, so --

24         MR. RIEHLMANN:  -- why do we not get that back?

25         THE COURT:  Fourteen is in.  Who is substituting for


                                                        23

1  14?

2          MR. RIEHLMANN:  Well, now I get to see if there's

3  anybody I want to get rid of, because I may be satisfied with

4  whatever.

5          THE COURT:  All right.  And, then I guess you get a

6  substitute for 4 and 32.

7          MR. RIEHLMANN:  Yes, sir.

8          THE COURT:  Let me know what they are.

9     (Pause in the bench conference; Defense Counsel confer)

10         MR. RIEHLMANN:  As my final peremptory challenge, I

11    would excuse Eric Robinson.

12            THE COURT:  Number?

13            MR. McMAHON:  Forty-six.

14            MR. WINTERS:  Forty-six.

15            THE COURT:  Forty-six?  All right.

16            MR. VOIGHT:  Strike Carmella Hebert and Donald

17    Conrad, Number 40 and 41.

18            THE COURT:  Forty and 41.  Well, go ahead, then,

19    Number 40.  Let's read it.  Both of those, 40 and 41, those

20    are black males?

21            MR. WINTERS:  Yes.

22            THE COURT:  All right, Mr. Voight, we're back to

23    where we were with the first person from Marrero, I suppose.

24            MR. VOIGHT:  Frankly, Your Honor, both of these

25    people answered -- neither one of these people were voir


                                                    24

1    dired.  All these people's answers --

2            THE COURT:  They could have been voir dired.

3            MR. VOIGHT:  They could have been voir dired.

4    Frankly, because their answers were -- they were so anomalous

5    and fell so far off the radar that I'm concerned --

6            THE COURT:  Answer to the questionnaire, you mean?

7            MR. VOIGHT:  Answers to the questionnaire.

8            -- I'm concerned that they're not going to bring a

9    level of analysis to the facts of this case, and --

10            THE COURT:  That's 40 and 41, you say?

11            MR. VOIGHT:  (Nods head affirmatively)

12            THE COURT:  I'm looking at the questionnaire.

13            MR. McMAHON:  We disagree it's "so far off the

14    radar."

15         THE COURT:  I'm looking at the questionnaire of

16    Number 40 --

17         That was 40 and 41?

18         MR. RIEHLMANN:  Forty and 41, Your Honor.

19         THE COURT:  Well, 40 is a female, a white female.

20    I'm examining the questionnaire.

21         I've examined Ms. Hebert's questionnaire and I can

22    find nothing to support your argument, Mr. Voight, so I afford

23    you an opportunity to, again, address male, white.

24         MR. VOIGHT:  I'll submit on that.

25         THE COURT:  All right.  Then that gives you a

                                                25

1    substitute.  So, that's Number 40.

2         MR. RIEHLMANN:  Your Honor, once this is over, can we

3    have the jury -- would you give us a minute to get together

4    with our opponents and read into the record the exact racial

5    breakdown of this jury panel?  Because I do think that that is

6    probative as to whether or not it --

7         THE COURT:  I have no objection to your doing it, but

8    I'm not going to order that it be done and it can only be done

9    by unanimous consent.

10         MR. McMAHON:  We do not consent.  Under the law, the

11    essence is the use of the peremptories that the actual make-up

12    of the entire venire is irrelevant.  It is the exercise of the

13    peremptories that is at issue, and we do not consent.

14         THE COURT:  Okay, now Mr. Voight had Number 40 and

15    41.  What about Number 41?

16         MR. RIEHLMANN:  I think that's -- I'll submit it on

17    the exact same thing, Your Honor.

18          THE COURT:  Say what?

19          MR. RIEHLMANN:  That's going to be the exact same

20   result.  In other words, the argument was the same for both,

21   so I think your ruling is going to be the same for both.

22          THE COURT:  Number 41?  I've got it right in front of

23   me, that's why I can't find it.

24          What about this -- Mr. Voight, do you have something

25   with the questionnaire you don't like?


                                                26

1          MR. VOIGHT:  Your Honor, I will withdraw --

2          THE COURT:  Forty-one?

3          MR. VOIGHT:  I'll withdraw.

4          THE COURT:  So, now you have two.

5          MR. VOIGHT:  I will strike Number 48 and note for the

6   record that he is an African/American male.

7          MR. McMAHON:  No, he's not -- oh, he is.

8          MR. VOIGHT:  Yeah, he is.

9          THE COURT:  That he's what?

10          MR. VOIGHT:  He's an African/American male with ties

11   to the military.

12          THE COURT:  That's one of yours, and what would the

13   next one be?

14          MR. VOIGHT:  Number 54, Lola Davis.

15          THE COURT:  And, is that a white female or black?

16          MR. VOIGHT:  I have no idea.

17          MR. McMAHON:  Black female.

18          MR. VOIGHT:  Black female.

19          THE COURT:  All right.  That concludes the

20   challenges.  Does the Government have any further words to say

                         Page 23

21  on the Batson objection?

22          MR. McMAHON:  No, sir.

23          MR. WINTERS:  No, sir.

24          THE COURT:  Does the Defendant Duncan have any

25  objection as to the manner in which the Government exercised


                                          27

1  its peremptory challenges?

2          MR. RIEHLMANN:  No, sir.

3          THE COURT:  Does the Defendant Voight (sic) have any

4  objection as to the manner in which the Government exercised

5  its peremptory challenges?

6          MR. VOIGHT:  Defendant Jones does not.

7          THE COURT:  All right.  So, we're going to take the

8  first 12 as a juror and then we'll address for challenges, if

9  necessary, three alternates.

10          According to my papers, the jury is -- the first 12:

11  Number 2, Number 4, Number 7, Number --

12          That's all on that page.

13          -- Number 13 --

14          How many is that?

15          MR. RIEHLMANN:  Four.

16          THE CLERK:  Four.

17          THE COURT:  Okay.

18          -- Number 14, Number 17, Number 18, Number 19, Number

19  20, Number 23, Number 25, Number 32.

20          THE CLERK:  Twelve.

21          THE COURT:  That's 12?

22          THE CLERK:  That's 12, sir.

23          THE COURT:  Thirty-two ends at 12.  All right.  That

24  means the next three will be the alternate jurors.  Each side

25    will have one challenge.

1            MR. WINTERS:  The Government waives.

2            THE COURT:  Waives the challenge.

3            The Defendants?

4            MR. RIEHLMANN:  Each party has one.

5            THE COURT:  If there's some crises, I can always give

6    you two.

7            MR. RIEHLMANN:  Well, no, I'm just saying that when

8    we decided it was going to be three, I think --

9            THE COURT:  In other words, the Government is saying

10   33, 34 and 35 are okay with them.

11           MR. RIEHLMANN:  Number 34.

12           THE COURT:  You all want to strike 34?

13           MR. VOIGHT:  I think we've got one challenge.

14           THE COURT:  Well, it's an alternate, --

15           MR. VOIGHT:  I don't have any --

16           THE COURT:  You're happy with those three.

17           And, Mr. Riehlmann, you're not?  You're not happy

18   with these three.  Do you want --

19           MR. RIEHLMANN:  Just Mr. -- just 34.

20           THE COURT:  That would pull us to 37.  All right.

21   Thirty-four granted.

22           That does it, as far as I can see up here.  I'll now

23   get the jury and swear them in.

24           Someone asked me, as soon as we select the jury,

25   before we go on into any reading of the indictment and opening

1   statements, you'd like a break to do something?  Is that what
2   you asked me a moment ago, somebody asked me.
3           MR. RIEHLMANN:  I did, but you said I couldn't.  It
4   was about putting on the record the --
5           THE COURT:  Oh, that.  Okay, yeah, all right.
6           Well, what we'll do is I'll swear in the jury, excuse
7   the remainder, and I'll read the indictment to them, and I'll
8   have the Government's opening statement.
9           Maybe I should give them a break to go to the
10  bathroom.  Well, wait, they've never been in the jury room,
11  have they?
12          THE CLERK:  No.
13          THE COURT:  Maybe after they're selected and sworn,
14  they may want a cup of coffee.  That's what I'll do.  I'll
15  have a break and let the marshal show them the jury room and
16  how to come and go.
17          MR. WINTERS:  That's fine, Your Honor.
18          THE COURT:  Okay.  Thank you.
19      (End of discussion at side bar)
20          THE COURT:  Ladies and gentlemen, as I call your
21  name, would you kindly stand:
22          Number 2, Jarrod Bourgeois;
23          Number 4, James Payne;
24          Number 7, Kenneth Livaudais;
25          Number 13, Mrs. Zeffie Roth; --

1           THE CLERK:  Zeffie Roth.
2           MR. McMAHON:  Zeffie.
3           THE COURT:  Zeffie, I'm sorry.

```
4              -- Number 14, Betty Adams;

5              Number 17, Ann Ocker;

6              Number 18, Melva Williams;

7              Number 19, Johnny Vanderson;

8              Number 20, Bettie St. Romain;

9              Number 23, Lisa Landry;

10             Number 25, Annette Turner;

11             Number 33, Juanita Hayes; --

12             THE CLERK:  No, sir, it's 32.

13             MR. McMAHON:  Thirty-two is the next one.

14             THE COURT:  -- Number 32, Laura Bourgeois; --

15             MR. McMAHON:  Laura Morris.

16             THE COURT:  Do we have 12, now?

17             MR. McMAHON:  That's 12.

18             THE CLERK:  That's 12.

19             THE COURT:  You've been selected as the jurors in

20   this case, and now:

21             Number 33, Juanita Hayes;

22             Number 35, Tyree Young;

23             Number 37, Dianne Lagarde.

24             You've been selected as the three alternate jurors in

25   the case.
```

```
1              Will the clerk swear the jury and the alternate

2    jurors?

3         (Whereupon, the oath is administered to jurors)

4              THE COURT:  Thank you.  You may be seated for the

5    moment.

6              All of the other prospective jurors in this case will
```

7   be excused now to return to the jury room. Before you leave,

8   however, I want to thank you very much for your attendance and

9   service here in this process that we undertake in order to

10   enable the Defendant to have a fair and impartial jury.

11        Some people might think -- and it is cumbersome from

12   time to time; sometimes it works faster. It's a system that

13   is an important thread in the fabric of our society, I hope

14   you would believe, and by coming and serving as a juror or a

15   proposed juror, you're helping us preserve that, because, I

16   can tell you one thing, I know there are plenty of places in

17   the world that wished they had a system like this, where

18   jurors can protect the rights and freedom of an individual's

19   property and everything else.

20        You should be honored to have had an opportunity to

21   do your civic participation in it. On behalf of all the

22   parties to the suit, the attorneys, the counsel, the court,

23   and the United States, I thank you, and you're excused.

24            (Excused jury panel exits courtroom)

25            (Jury is seated in jury box)


32

1        THE COURT: Ladies and gentlemen, we're about to

2   start the trial, but before we do, there will be a brief

3   recess and the marshals will show you the jury room right

4   there. And, there is a corridor that leads out to the main

5   hall, so I would ask that, as you come and go, you use that

6   corridor to the jury room.

7        And, don't linger in the halls and certainly don't

8   talk to any of the parties to the suit or their attorneys or

9   anything else -- even to the extent of saying "Good morning,"

10   or "Good afternoon." Because, if one person sees you

11    speaking, even though it's just a "Good morning," and can't

12    hear what you're saying, they may come complain to me or to

13    the marshals that the juror is talking to somebody.  So, the

14    easiest thing to do, both for you and for me, is just ignore

15    everybody, just come and go on your own.

16         We'll have this recess and then we'll have the --

17    I'll give you a copy of the indictment and I'll read that, and

18    some preliminary instructions, and we'll start with the

19    Government making its opening statement, which I want to

20    remind you now and I'll remind you again, that is not

21    evidence.  It's an overview of what the Government expects to

22    be able to prove in the case.

23         So, if you would take your recess now.

24         I hope that, when you get in there, you'll find the

25    coffee hot and the soft drinks cold.  But, if it's the other


                                                        33

1     way around, tell the marshal and he'll tell me, because we do

2     try to accommodate you the best way we can.

3          We'll take a brief 10-minute recess.

4     (Jury exits courtroom in custody of marshal)

5     (Recess from 10:30 a.m. until 10:50 a.m.; all parties present)

6     (Jury enters courtroom in custody of marshal)

7          THE COURT:  Please be seated.  Ladies and gentlemen,

8     I'll start by reading to you the indictment that we're

9     presented with in this case, reminding, of course, that an

10    indictment is merely a charge.  It is not evidence.  Sooner

11    on, we'll be hearing the evidence in the case and seeing the

12    evidence.  The indictment is not evidence.  The evidence comes

13    from the witness stand and from the exhibits that are

14  introduced in the record.  So, bear in mind this is purely the

15  charge against the Defendants.

16      Count 1 recites that:  "At all material times herein:

17  "The Defendant, Leon R. Duncan was an officer of the

18  NewOrleans Police Department;

19      "B.  The Conspiracy:  From on or about December 1,

20  1993, and continuously thereafter, until on or about December

21  7, 1994, in the Eastern District of Louisiana, and elsewhere,

22  Leon R. Duncan and Darrel G. Jones, Defendants herein, did

23  knowingly and intentionally combine, conspire, confederate and

24  agree with divers other persons, known and unknown to the grand

25  jury, including Len E. Davis and Sammie L. Williams, Jr., co-

34

1  conspirators not named as defendants herein, to possess with

2  the intent to distribute in excess of five kilograms of

3  cocaine, a Schedule II narcotic drug controlled substance, in

4  violation of Title 21, United States Code, Section 841(a)(1);

5      "C.  Ways and Means:  It was part of the conspiracy,

6  among other things:

7      "One, that the Defendant, Leon R. Duncan, did use his

8  official position as an officer of the NewOrleans Police

9  Department to protect cocaine trafficking and;

10      "Two, that the Defendant, Darrel G. Jones, partially

11  disguised himself as a NewOrleans Police Officer to protect

12  cocaine trafficking;

13      "All in violation of Title 21, United States Code,

14  Section 846.

15      "Count 2 is that at all material times herein:  The

16  allegations of Count 1, Part A, are realleged and;

17      "B.  On or about November 18, 1994, in the Eastern

18  District of Louisiana, the Defendant Leon R. Duncan, did
19  knowingly use and carry a firearm during and in relation to a
20  drug trafficking crime for which he may be prosecuted in the
21  court of the United States, namely, conspiracy to possess,
22  with the intent to distribute, cocaine, as alleged in Count 1
23  of this indictment;
24        "All in violation of Title 18, United States Code,
25  Section 924(c)(1).


                                                    35
1        "Count 3, at all material times herein, the
2   allegations of Count 1, Part A are realleged and incorporated
3   by reference.
4        "B.  On or about November 18, 1994, in the Eastern
5   District of Louisiana, the Defendant, Darrel G. Jones, did
6   knowingly use and carry a firearm during and in relation to a
7   drug trafficking crime for which he may be prosecuted in the
8   courts of the United States, namely, conspiracy to possess,
9   with the intent to distribute, cocaine as alleged in Count 1
10  of this indictment;
11        "All in violation of Title 18, United States Code,
12  Section 924(c)(1)."
13        Now, I'll just give you some very preliminary
14  instructions.  You are now the jury in this case. I want to
15  take a few minutes tell you something about your duties as
16  jurors and to give you some instructions.  At the end of the
17  trial, I will give you more detailed instructions.  You must
18  follow all of my instructions in doing your job as jurors.
19        This criminal case has been brought by the United
20  States Government.  I may sometimes refer to the Government as

21    the "Prosecution."

22          The Defendants have been charged by the Government

23    with criminal violations of federal law, which is contained in

24    the indictment.  In a few minutes, -- I've already read the

25    indictment to you -- wait, my pages are stuck together.


                                              36

1          The indictment is simply the description of the

2     charge made by the Government against the Defendants.  It is

3     not evidence that the Defendants committed a crime.  The

4     Defendants have pleaded not guilty to the charge.

5          A defendant is presumed innocent and may not be found

6     guilty by you unless all twelve of you unanimously find during

7     your deliberations that the Government has proved Defendants'

8     guilt beyond a reasonable doubt.

9          In this case there are two Defendants.  The

10    Defendants are being tried together.  But you will have to

11    give separate consideration to the case against each

12    Defendant, so you should consider the case being presented

13    against each Defendant.

14          The first step in the trial will be the opening

15    statements.  The Government in its opening statement will tell

16    you about the evidence which it intends to put before you, so

17    that you will have an idea of what the Government's case is

18    going to be.  Just as the indictment is not evidence, neither

19    is the opening statement evidence.  Its purpose is only to

20    help you understand what the evidence will be and what the

21    Government will try to prove.

22          After the Government's opening statement, each

23    Defendant attorney may make an opening statement, or they may

24    defer their opening statement until the start of their case in

25    chief, or they may waive opening statement.  At this point in

1     the trial, no evidence has been offered by either side.

2          Next, in its case-in-chief, the Government will offer

3     evidence that it claims will support the charges against the

4     Defendants.  The Government's evidence may consist of the

5     testimony of witnesses as well as documents and exhibits.

6     Some of you have probably heard the terms "circumstantial

7     evidence" and "direct evidence."  Do not be concerned with

8     these terms.  You are to consider all the evidence given in

9     this trial.

10         After the Government's evidence, the Defendants'

11    lawyers may present evidence in the Defendants' behalf, but

12    the lawyer is not required to do so.  I remind you that the

13    Defendant is presumed innocent and that the Government must

14    prove the guilt of the Defendant beyond a reasonable doubt.

15    The Defendant does not have to prove his innocence.  If the

16    Defendant decides to present evidence, the Government may

17    introduce rebuttal evidence.

18         After you have heard all the evidence on both sides,

19    the Government and the Defense will each be given time for

20    their final statements.  I just told you that the opening

21    statements by the lawyers are not evidence.  The same applies

22    to the closing arguments.  They are not evidence either, but

23    you should pay close attention to them.

24         The final part of the trial occurs when I instruct

25    you about the rules of law which you are to use in reaching

1   your verdict.  After hearing my instructions, you will leave

2   the courtroom together to make your decision.  Your

3   deliberations will be secret.  You will never have to explain

4   your verdict to anyone.

5        Now that I have described the trial itself, let me

6   explain the jobs that you and I are to perform during the

7   trial.

8        I will decide which rules of law apply to this case,

9   in response to questions or objections raised by the attorneys

10   as we go along, and also in the final instructions given to

11   you after the evidence and arguments are completed.  You must

12   follow the law as I explain it to you whether you agree with

13   it or not.

14        You, and you alone, are the judges of the facts.

15   Therefore, you should give careful attention to the testimony

16   and exhibits, because based upon this evidence you will decide

17   whether the Government has proved, beyond a reasonable doubt,

18   that the Defendants have committed the crimes charged in the

19   indictment.  You must base that decision only on the evidence

20   in the case and my instructions about the law.  You will have

21   the exhibits with you in the jury room, when you deliberate.

22        It will be up to you to decide which witnesses to

23   believe, which witnesses not to believe, and how much of any

24   witness's testimony to accept or reject.  I will give you some

25   guidelines for determining the credibility of witnesses at the

1   end of the case.

2        During the course of the trial, do not talk with any

3   witnesses, or with the Defendants, or with any of the lawyers

4    in the case.  Please do not talk with them about any subject
5    at all.
6           You may be unaware of the identity of everyone
7    connected with the case.  Therefore, in order to avoid even
8    the appearance of impropriety, do not engage in any
9    conversation with anyone in or about the courtroom or
10   courthouse.  It is best that you remain in the jury room
11   during breaks in the trial and not linger in the halls.  In
12   addition, during the course of the trial do not talk about the
13   trial with anyone else, not your family, not your friends, not
14   the people with whom you work.
15          Also, do not discuss this case among yourselves until
16   I have instructed you on the law and you have gone to the jury
17   room to make your decision at the end of the trial.
18   Otherwise, without realizing it, you may start forming
19   opinions before the trial is over.
20          It is important that you wait until all the evidence
21   is received and you have heard my instructions on rules of law
22   before you deliberate among yourselves.
23          Let me add that during the course of the trial you
24   will receive all the evidence you properly may consider to
25   decide the case.  Because of this, do not attempt to gather


                                        40
1    any information on your own which you think might be helpful.
2    Do not engage in any outside reading on the case, and do not
3    attempt to visit any places mentioned in the case, and do not
4    in any other way try to learn about the case outside the
5    courtroom.
6           Now that the trial has begun, you must not read about

7   it in the newspapers or watch or listen to television or radio

8   reports of what is happening here.  The reason for these

9   rules, as I am certain you will understand, is that your

10  decision in this case must be made solely on the evidence

11  presented at the trial.

12          At times during the trial, a lawyer may make an

13  objection to a question asked by another lawyer, or to an

14  answer made by a witness.  This simply means that the lawyer

15  is requesting that I make a decision on a particular rule of

16  law.  Do not draw any conclusion from such objections or from

17  my rulings on the objections.  These relate only to the legal

18  questions that I must determine and should not influence your

19  thinking.

20          If I sustain an objection to a question, the witness

21  may not answer it.  Do not attempt to guess what answer might

22  have been given had I allowed the question to be answered.

23  Similarly, if I tell you not to consider a particular

24  statement, you should put that statement out of your mind, and

25  you may not refer to that statement in your later


                                            41

1   deliberations.  If an objection is overruled, treat the answer

2   like any other.

3           During the course of the trial I may ask a question

4   of a witness.  If I do, that does not indicate I have any

5   opinion about the facts in the case.  Nothing I say or do

6   should lead you to believe that I have any opinion about the

7   facts, nor be taken as indicating what your verdict should be.

8           And, finally, there are three basic rules about a

9   criminal case which you should keep in mind:

10          First, the Defendant is presumed innocent until

11    proven guilty.  The indictment against the Defendant brought
12    by the Government is only an accusation, nothing more.  It is
13    not proof of guilt or anything else.  The Defendant,
14    therefore, starts out with a clean slate.

15         Second, the burden of proof is on the Government
16    until the very end of this case.  The Defendant has no burden
17    to prove his innocence, or to present any evidence, or to
18    testify.  Since the Defendant has the right to remain silent,
19    the law prohibits you in arriving at your verdict from
20    considering that the Defendant may not have testified.

21         Third, the Government must prove the Defendant's
22    guilt beyond a reasonable doubt.  I will give you further
23    instructions on this point later, but bear in mind that in
24    this respect a criminal case is different from a civil case.

25         Thank you very much.


                                                    42
                    Government - Opening Statement

1          The Government will now present its opening
2    statement.

3                         *    *    *    *    *

4                         OPENING STATEMENT

5                         *    *    *    *    *

6          MR. MCMAHON:  Thank you, Your Honor.  Your Honor, we
7    would first move for a sequestration of any witnesses.

8          THE COURT:  Are there any witnesses, who will testify
9    here in the courtroom?  If so, you must remain outside until
10   called.

11         I cannot identify them myself, so I call upon all
12   Counsel to look and, if there are any witnesses, I'll repeat
13   the order.

14          MR. WINTERS:  The Government has none, Your Honor.

15          THE COURT:  No witnesses in the courtroom.   Thank

16  you.  And, that order remains in effect.  So, at any time you

17  see a witness come in, let me know, and I'll ask the witness

18  to stay outside.

19          MR. McMAHON:  May it please the Court.

20          Good morning, ladies and gentlemen.  My name is

21  Michael McMahon.  I was introduced to a couple of days ago.  I

22  know it's been a long process.

23          What I want to do now is give you an overview of the

24  evidence in this case that you're going to see and hear over

25  the next several days.  This case involves, as the Judge read

Government - Opening Statement

1   you the indictment, a conspiracy, and it was a conspiracy

2   among law enforcement officers here in NewOrleans to protect

3   large amounts of cocaine that they thought was being moved in

4   and out of this city by a major cocaine trafficker based out

5   of New York and Miami.

6           That cocaine trafficker was actually an FBI

7   undercover agent, and you're going to hear from him later

8   today.  But, let me take you back to how this all began.  It

9   really began on Christmas Eve of 1993, when a local crack

10  dealer, an admitted crack dealer here in NewOrleans was being

11  extorted, shaken down by the police, specifically a policeman

12  named Sammie Williams.

13          Sammie Williams approached this crack dealer, whose

14  name was Terry Adams.  He had a couple of nicknames.  They

15  called him "Scaboo" or "Scoo," and he operated out of the

16  Lower Ninth Ward, here in NewOrleans, across the Industrial

17  Canal.

18      Well, Mr. Adams got a little fed up with this, so
19  what he decided to do was, he went to the FBI.  There were no
20  charges pending over his head, but he admitted, "Look, I deal
21  dope, I'm a crack dealer, but I'm getting tired of this."  So,
22  he began to work with the FBI and he later met with Sammie
23  Williams.
24      Certain conversations between Sammie Williams and
25  Terry Adams were recorded during these meetings, and it was

1  proposed, by Terry, by Scaboo, to Sammie, he said, "Well,
2  look, you know, instead of you shaking me down, why don't you
3  provide protection for me, for my drug dealing activities?"
4      And, Sammie Williams said, "Yeah, that's a good idea.
5  Sure.  I'm going to bring in somebody you already know," and
6  this someone was Len Davis, who was another NewOrleans Police
7  Officer, along with Sammie Williams; both NewOrleans Police
8  Officers.
9      So, from January through April of 1994, Len Davis and
10  Sammie Williams protected Scaboo in moving cocaine around
11  NewOrleans, like they'd pick it up at one point and go
12  deliver it at another point, all the while being protected by
13  Len Davis and Sammie Williams.  Of course, it wasn't -- the
14  cocaine wasn't really being distributed in the community, this
15  was all part of an FBI undercover operation.
16      Well, it was decided around April that this operation
17  should identify the corrupt elements in the NewOrleans Police
18  Department at that time, the spring of 1994.  So, Scaboo
19  proposed to Len Davis, "Well, you know, you're doing such a
20  good job protecting me around NewOrleans, I got, you know, my

21  source, this big guy from New York and Miami, and he wants to

22  use your services, too.  He wants you to protect him."

23          And, the first time Len Davis and Sammie Williams saw

24  the FBI undercover agent, whose name is Juan Jackson -- they

25  call him JJ, was in the Sheraton Hotel, just a couple of

1   blocks down the street, when, on April 21st of 1994, Len Davis

2   and Sammie Williams escorted Terry Adams, Scaboo, from the

3   Clearview Shopping Plaza down to the Sheraton.  He was

4   carrying $100,000, supposedly in drug money, escorted by Len

5   Davis and Sammie Williams.

6           And, they saw JJ, Juan Jackson, in the hotel and that

7   was the first real encounter.  And, you'll hear that from

8   Special Agent Juan Jackson, an undercover FBI agent.

9           Well, they actually met a couple of weeks later, May

10  4th of 1994.  This is Len Davis, Sammie Williams, JJ, Juan

11  Jackson, and Terry Adams, Scaboo.  They met in a room in the

12  Hilton Riverside, right a couple of blocks down the street.

13  The room was equipped with a secret camera and recording

14  equipment, and you'll see Len Davis, Sammie Williams, JJ, Juan

15  Jackson, and Terry Adams.

16          And, the undercover agent proposes to Len Davis,

17  "Look, this is what I want to do," and you'll see that video

18  today, and the first thing they do when they come in the room

19  is they strip down to their briefs to show that they're not

20  wired up.  Of course, the microphone and the camera were not

21  on their person.  It was in the room.

22          And, JJ proposes to Len Davis, "Okay, what I want to

23  do is, I want to bring my cocaine, my stuff --" and you'll

24  hear them.  You'll see it on the videos.  "I want to bring it

25    into NewOrleans.  I want to have it sit for a few days, and

Government - Opening Statement

1    then it's going to be moved out by couriers."  You'll be able

2    to see that video.

3            And, of course, the aim of the operation being to

4    identify corrupt police officers.  Len Davis said, "You know,

5    --" or Juan Jackson, the undercover said, "You know, any

6    officers you bring in, I want to meet them.  I want to have a

7    sit-down, just like we're doing today."

8            And, Davis says, "Yeah, you know, if you're not that

9    careful, then I don't want to deal with you."

10           So, what happens is -- and you'll hear about this --

11   after that video, they met again on May 22nd.  Again,

12   different room, same hotel, at the Hilton, where they start

13   discussing the details of how the operation is actually

14   physically going to work here, and it was going to be based in

15   a warehouse at 420 Franklin Avenue, the corner of Franklin

16   Avenue and North Peters.

17           And, again, Juan Jackson says -- you know, he

18   identifies what he wants to do, and a lot of the ideas came

19   from Len Davis that the officers -- and what the deal, what

20   this deal, racket was going to be was to have cops,

21   NewOrleans cops sitting in front of that warehouse that they

22   thought was full of cocaine -- and it was.  When FBI

23   undercover couriers would drive in and out of the warehouse

24   and then take the cocaine away in vans, all the while being

25   guarded by these NewOrleans Policemen.

1    Well, Juan Jackson wasn't able to meet with other

2  cops, because after these videos, after these meetings in the

3  hotel, Len Davis backed off that idea, because he was being

4  advised by the Defendant, Leon Duncan -- and you'll hear that,

5  you'll hear testimony to that effect.

6    Defendant Leon Duncan over there was a former

7  narcotics detective, so he was aware of various techniques and

8  he told Davis, "Oh, no, don't meet in hotels anymore.  The

9  feds have -- they have ways of recording these kind of

10 meetings.  Oh, no, bad idea."

11    He also advised them on other things, and you'll hear

12 about that testimony.  But, what happens is, the operation

13 does actually begin.  It begins in June of 1994, and once a

14 month, from June through November -- June, July, August,

15 September, October, November of 1994, cocaine was placed in

16 that warehouse at 420 Franklin Avenue, and cops sat out there,

17 guarded that cocaine, and the cocaine was moved out of the

18 warehouse to points east and west, guarded by policemen.

19    Right before the June racket, the June protection,

20 Sammie Williams was given a cellular telephone.  He didn't

21 have a cell phone.  He was given a cellular telephone, on June

22 16th, of 1994.  That cellular telephone had a court authorized

23 wire tap on it.  The first two beeps, the first two pages --

24 and you'll hear Sammie Williams testify to this -- out of that

25 phone were made by Len Davis.  The first two calls pulsed out

1  of that phone were to Leon Duncan, the Defendant, and to

2  another cop named -- ex-cop; I shouldn't say "cop" -- named

3  Lemmie Rodgers, who will also testify in this trial for the

4    Government.

5            So, what happens is, the operation continues and Len

6    Davis was also given a cellular telephone, because he needed

7    one -- and you'll hear this in the hotel video.  Davis had

8    rigged up a phone where he was -- he was getting the services

9    illegally and he would be charged for any incoming calls.  So,

10   in order to make sure this operation was going, because Len

11   Davis was, you know, communicating with JJ, Juan Jackson.

12           Len Davis was organizing all this protection, and he

13   needed a phone to make sure that the operation ran well.  So,

14   on August 13th of '94, Davis got a phone and we put a wire tap

15   on that, in September.  And, you'll hear a number of calls,

16   through various witnesses, that were intercepted with court

17   authorization, over that phone.

18           So, what happens was -- and let me just tell you:

19   Typically, one of these events, one of the monthly protection

20   would last anywhere from two to four days.  And, what would

21   typically happen would be:  Len Davis, Sammie Williams, JJ the

22   undercover agent, and Terry Adams, Scaboo, the informant, the

23   crack dealer, would meet at the warehouse in an office -- and

24   the warehouse, again, 420 Franklin Avenue.

25           The office also was equipped, like the hotel room,

1    with cameras and equipment.  And, they would meet before every

2    protection deal went down, and they'd talk about, "Well, it's

3    going to last X number of days.  This is what we're going to

4    do."  And, they'd kind hammer out the details and "Davis,

5    well, you know, you got your people together?"

6            Davis would say, "Yeah, I got my cops all lined up."

7        And, you're going to hear portions of one of those

8    meetings from the July deal, July the 9th of '94, where JJ,

9    Juan Jackson, tells Davis, "You know, what kind of people,

10   what kind of cops are you getting to guard this warehouse?"

11       And, Davis says, "Look, everybody that I use is down.

12   They're in the game.  And, even though they might know

13   immediately all the details of how much cocaine was in the

14   warehouse," Davis says -- and you'll see this on the video "--

15   they out there.  They getting theirs, too."

16       They're dirty.  And, there's one portion of that

17   video you'll see, probably tomorrow, maybe later today, where

18   Len Davis, on tape, tells JJ, "None of the cops, none of the

19   cops that I'm going to use, they ain't no true blue policemen.

20   Oh, no, I would never use a real policeman."  Meaning a good

21   cop.  They were policemen at the time.  They're not policemen

22   anymore.  They were policemen at the time, and they were all

23   dirty.

24       So, what happens is, this operation continues

25   through November, but around that time, around November, it

                                                          50
                 Government - Opening Statement

1    was decided:  Let's expand the operation.  At that point,

2    approximately 11 dirty cops had been implicated and the

3    investigation wanted to continue to, again, try to identify

4    those corrupt elements in the Police Department.

5        So, it was decided to have more than one location,

6    where the dope dealer would bring in his large quantities of

7    cocaine, store it, and then move it out of NewOrleans, under

8    the protection of dirty cops.

9        And, on November the 18th, 1994, is the first deal

10   where both the warehouse was used and then a second location

11    -- and the second -- it was designed to:  Let's bring in,
12    let's identify more dirty cops, and it was presented to Len
13    Davis by JJ.  He's saying, "You know, I got somebody else,
14    another dope dealer, and he heard about what's going on here
15    and he heard how happy I was and how you're doing such a good
16    job protecting my dope, my cocaine, that he wants to use you,
17    too.  He wants to use NewOrleans as a trans-shipment point,
18    but he wants new people.  He doesn't want any of the warehouse
19    cops.  Those are my cops.  He wants new people to work for
20    him.
21         The intent being:  Let's see how many other dirty
22    cops come in.
23         So, this second location was at the Mardi Gras Truck
24    Stop, and for those of you not that familiar with NewOrleans,
25    the Mardi Gras Truck Stop is located, if you're going I-10

                                                  51
                   Government - Opening Statement
1    east, it's right off Elysian Fields, Elysian Fields Avenue.
2         So, this scenario would have been designed where an
3    18-wheeler would drive into the truck stop, offload cocaine --
4    in this case, 25 kilos, into two separate cars driven by drug
5    couriers, undercover agents.  One courier would drive east,
6    escorted by the police.  The other courier would drive west,
7    escorted by the police.  And, that's what happened on November
8    the 18th, 1994.
9         And, this case, ladies and gentlemen, is unique,
10    because in one of those cars escorting the cocaine east was
11    the Defendant Darrel Jones.  Darrel Jones, at the time, was a
12    reserve criminal deputy sheriff in NewOrleans.  He was also a
13    reserve deputy civil sheriff.  And, he had his little blue

14   civil sheriff's shirt, because he wasn't a cop, but he was law
15   enforcement, and he was in a car, along with Len Davis and
16   another individual named Sidney Dubuclet.

17        You will hear the conversation that went on in that
18   car, and it was maroon car -- sorry -- it was a blue car, blue
19   Chevy Caprice, following a blue Lincoln Continental, the
20   Continental being driven by an FBI undercover agent with
21   cocaine in it -- five kilos of real cocaine; 20 kilos of sham
22   cocaine.

23        You will be able to hear the conversation in that car
24   between Len Davis, Darrel Jones and the other party.

25        To back up a little bit; again, in the meeting

52
Government - Opening Statement

1    before, setting up that deal, that racket, on November the
2    16th, you'll also hear Len Davis tell JJ, and you'll hear
3    this, Davis says, "Tell your guy, JJ, the other big dope
4    dealer, who wanted to use NewOrleans, the NewOrleans Police
5    as protection, tell him to do his best," this is at the truck
6    stop, "Where our officers don't have plain view of what
7    they're unloading.  We don't want to see it.  We don't want to
8    know nothing.  As far as I know, this is a detail, bro,"
9    meaning it's a legitimate security detail -- but, of course,
10   it wasn't.

11        Davis says, "My people know what time of day it is."
12   And, you'll hear this.  "We don't never want to see it.  We
13   don't never want to be around it.  I don't want no parts of
14   it, ya dig?  We strictly security."

15        Now, let's go to November 18th, because what happens
16   is Darrel Jones and Sidney Dubuclet -- Jones is the Defendant
17   -- they get in that car and they go out to the Mardi Gras

18  Truck Stop.  They're in a car with Len Davis.  The courier
19  cars load up with the cocaine and one courier car goes east
20  and it's followed by the car driven by Len Davis with Darrel
21  Jones in it.
22          And, you'll be able to hear what they're talking
23  about.  For example, you hear that Darrel Jones is talking, he
24  wants to know if the courier cars, the car containing the
25  dope, quote -- and pardon the language; it's not mine, you'll

1   hear it later -- "They gonna have them tinted ass fucking
2   windows, though, huh?"  Talking about the courier cars, asking
3   Davis.
4           Davis says, "Yeah, well, ya dig, but anything we see
5   that looks suspicious, I'm going to run their plates."  Their
6   license plates.
7           They talk about discussions they would have over the
8   radio.  Davis, "You know, these cellulars, cellular phones,
9   you could pick up these conversations, pick up them f-ing two-
10  way walkie-talkies could be picked up."
11          And, then Darrel Jones says, "Well, you could pick up
12  anything now," with the technology, "You could pick it up off
13  walkie-talkies.  You could pick it up off cellulars."
14          Davis, "But, as far as with us, what we be
15  discussing, you just heard my conversation."
16          "Oh, it's not incriminating, right?"
17          Davis, "Yeah, you heard my conversation."  And, then
18  he says that --
19          In other words, you don't -- they don't say
20  "cocaine," like, "We are following a car with cocaine."

21  That's not how it happens in real life.

22          And, Davis says, "Well, that's all you gonna hear.

23  You ain't gonna hear nothing about what the fuck we doing,

24  right?"

25          Darrel Jones, "Well, it might be that we're going to


                                54
              Government - Opening Statement

1   go meet some bitches, anything."

2           Davis, "Even when we talk to them, --"

3           Meaning the dope dealers, who they thought were dope

4   dealers, really FBI agents.

5           "-- in the privacy of our own f-ing home or wherever,

6   we don't discuss words like that."

7           Darrel Jones, "Right."  Because it's already known,

8   so why is it necessary to say it?  Jones, "We know what's

9   happening."

10          "And if you know what we're talking about, --"

11          Darrel Jones, "Right."

12          "-- you don't need to go into detail about what the

13  fuck we doing.  We know what we're talking about."

14          In that same conversation a little later, Davis talks

15  about Lemmie Rodgers, the cop who is going to testify.  Lemmie

16  Rodgers was reluctant to get involved in this.  He smelled

17  something.  He didn't want to get involved.  Remember, he was

18  beeped way back in June.  Len Davis, "I'm laughing at that

19  Lemmie asshole, 'cause Leon --" and then he says -- and then

20  he picks up his thought, talks about Lemmie, "Lemmie was leery

21  from the first fucking time we went at it months ago, and

22  Dunc --"

23          Leon Duncan; you'll hear this with your own ears, you

24  judge.

25          "-- got him to come on, but I know Lemmie was saying

                    Government - Opening Statement

1    something about he has another question."  So, Leon Duncan,

2    you'll hear, convinced Lemmie Rodgers to involve himself.

3           And, we'll talk about Lemmie Rodgers, because they

4    were in the other car.  But, we're still in Len Davis' car

5    for the time being.

6           Darrel Jones, "If I didn't know Len --" further in

7    the conversation; Len Davis "-- all these years, I wouldn't

8    have handled this here.  I wouldn't have got involved.  But, I

9    know Len Davis."

10          Jones, "I brought radio, my gun, every motherfucking

11   thing."  Darrel Jones, now he's talking about his shirt, his

12   civil sheriff's shirt, because the officers had to be in

13   uniform, and you'll see this on the video.  The reason they

14   had to be in uniform is, if you see two civilians sitting out

15   watching something, it's going to raise suspicion.  So, who

16   you going to call?  Call the police.  But, you see two people

17   in a police uniform, that gives you a sense of security.

18   You're not going to call -- "Oh, it's the police.  Everything

19   is fine."

20          Well, his civil sheriff's uniform looked like an NOPD

21   uniform shirt.  Darrel Jones, -- you'll hear this -- "I took

22   my shit out the van, because I was gonna send -- I had brought

23   my shit to go to the cleaners.  I got to wear this

24   motherfucker dirty."  Meaning the shirt.

25          And, again, it's not my language.

1       "That why I never put my badge on, never put that

2   motherfucker on.  The motherfucker --"

3           Meaning the dope dealer.

4       "-- ain't looking for no badge.  They looking for the

5   gun."

6           And, then the other person, Sidney Dubuclet says,

7   "You ain't lying.  Anything blue," meaning the shirt is fine,

8   it's blue, it looks like an NOPD shirt.

9           As they're driving, this is the conversation they're

10  having.  They're keeping their eyes open for any kind of cars.

11  Len Davis, "Yeah, 'cause anybody who follows too f-ing

12  long, --"

13          And, then Darrel Jones says, "If you can't pick a

14  motherfucker up that's following you, something wrong."

15          And, they talk about one time that a person was able

16  to follow a car for a long time and get a whole lot of -- 44

17  kilos of cocaine.  You'll hear that talk.

18          They were there to make sure that those courier cars,

19  the cars that they were following, who they thought were dope

20  dealers, were not to be stopped by the police or not to be

21  stopped by anybody who would be trying to rob the cocaine.

22          You'll also hear Len Davis and Darrel Jones talk

23  about, well, what would happen -- what would happen if the

24  local police were to stop the car; the local police?  They'd

25  be able to handle that, because they're local, but if the feds

1   stopped them, that's a whole other story.

2           Len Davis, "They know what you got, so if they pulled

3   them over, just get in the middle lane and --"

```
 4              Meaning if the feds pull the car over.
 5              "-- get in the middle lane and keep the fuck going.
 6   Get on the phone, 'Jay, --'"
 7              That's JJ.
 8              "'-- they got them.'"
 9              Meaning the feds got your dope, the feds got your
10   dope.  That's all I can do.  I can influence the locals; I
11   can't influence the feds.
12              Darrel Jones, "Tell that nigger to go to running."
13              Meaning that car is gone.  JJ, you better get out of
14   town.
15              Len Davis, "I ain't shooting it out.  They ain't
16   paying me enough to shoot it out with the DEA."
17              Darrel Jones, "No, no, no."
18              And, then you're going to hear, as that courier car
19   containing 25 kilos of cocaine, real and sham, speeding across
20   the twin spans, because Davis in the car with Darrel Jones,
21   they didn't go across the twin spans, they cut right before
22   you get onto the twin spans going to Slidell, there's a little
23   cut where you can -- you don't have to go on the bridge, you
24   can cut back and go back I-10 coming back west.
25              You'll hear Darrel Jones laughing as that cocaine
```

```
 1   filled car continues across the twin spans.  "Later, my
 2   brother," and he laughs, because he's done his job.  He's
 3   escorted the cocaine.
 4              Now, the other car is driven by Sammie Williams.  In
 5   that car is Leon Duncan and Lemmie Rodgers; at the time, two
 6   NewOrleans Police Officers.  They're following a separate
```

7    car, a maroon car, a maroon Concord.  They're following it

8    west.  And, in fact, Sammie Williams is actually driving the

9    maroon car himself.  It's a rental car.

10         Now, inside those two rental cars, driven by the

11    cops, were microphones, and those microphones were authorized

12    by a judge, a federal judge, not Judge Livaudais, another

13    judge, to record the conversations in the cars.  So, we have

14    Sammie Williams following another car from the Mardi Gras

15    Truck Stop, thinking that that car was full of cocaine, which

16    it was, 25 kilos, real or sham.  This one is going west.

17         And, you'll hear Leon Duncan and Lemmie Rodgers

18    talking in that car, as they're following this car that they

19    think is owned by this big-time dope dealer that they're

20    providing an escort service for, security.

21         You'll hear Duncan, "If anything happen, I'm just

22    saying you just picked me up," to Sammie Williams.  Meaning,

23    if we're stopped or arrested, hey, I'm just -- you just picked

24    me up.  I'm just taking a ride with you.

25         Duncan, "I know you picked me up and asked me to

1    take a ride with you, Sam.  You my boy, I got no problem with

2    that.  I'm just hanging out with you."

3         Sammie Williams a little later says, "All them worst

4    scenarios going through your mind --"

5         Meaning, if we're stopped and arrested.

6         "In the worst case scenario, you just say you were

7    making a case on me."  This is Sammie Williams.

8         Lemmie Rodgers, "That ain't even funny, man."  You'll

9    hear this.

10         Now, a little later in the conversation, Duncan

11   asked, "Does he have --"

12           Meaning JJ, the dope dealer, the big-time dope

13   dealer.

14           "Does he have --"

15           Because he's aware of the warehouse, because all the

16   while Leon Duncan has been advising Len Davis about how to

17   approach JJ and how to run and organize the operation.  And,

18   by the way, Duncan and Rodgers being real policemen, were

19   armed and in full uniform.

20           Duncan asked, "Does he have different drivers each

21   time?"

22           Sammie says, "No, this is a little different from

23   something we usually do."

24           Meaning the warehouse.  It's a little different from

25   the warehouse.


                                              60
                       Government - Opening Statement

1            "These drivers are different, but the ones we put on

2    the other location --"

3            Meaning the warehouse.

4            "-- were always the same."

5            And, then he talks, Sammie Williams, "You know, I

6    would be suspicious of this car here."  And, they're talking

7    about their -- because that's their job, to watch out for

8    other cars, to make sure that the dope car is not stopped.  "I

9    would be suspicious of that car right away.  What them dudes

10   doing with commercial plates?"

11           Then Duncan comments on the driver of the car.

12   Duncan says, "They all clean-cut looking."  Well, they're FBI

13   agents.

14          Sammie Williams, "The kind, if you pull up on the

15   side of 'em, --"

16          Duncan, "You just look at them"

17          "You'd probably --" Sammie Williams, "You'd probably

18   just blow them off."  Because they look clean.  They don't

19   look like --

20          And, then Duncan says, "Yeah, 'cause they not all

21   racked up in the mouth."  Meaning they don't have all that

22   gold in their mouth.  This is Leon Duncan following the

23   cocaine car.

24          Then in a little while you hear -- now, this is what

25   they're talking about -- Sammie Williams, "Play the mirror,

1    Lemmie, make sure."

2          Lemmie Rodgers, they're talking about other cars

3    coming up.

4          Duncan, "See that white car, Lemmie, the white car?"

5    And, then Duncan says to Sammie Williams, facetiously, "Tell

6    him --"

7          Meaning the dope dealer, whose cocaine he thinks

8    they're protecting.

9          "-- I'm going to take my family to Disney World."

10   Duncan, "So, if he had a car to bring to Florida, let me do

11   it, all right?  I'm serious."  Duncan, "You know, like, I'm

12   going to bring my family to Disney World for a week."

13          Sammie, "What are you talking about, if we have one

14   of these cars?"

15          Duncan, "No, no, if he got a load to bring to

16   Florida."  A load of cocaine.  Duncan, "You know, me, my wife

17   and the kids go to Florida."

18          "I ain't comfortable, bro, but you --" Sammie

19    Williams, "You say you're going to Florida?"

20          Duncan, "Fucking right, that's how they do it, bro.

21    You know," Duncan, "Ten grand, drive a car there with your

22    kids, wife and kids."

23          Sammie Williams, "So, you're willing to do that?"

24          "Yeah, absolutely.  Sure."

25          Then Sammie later on jokes, "You probably wouldn't

1    come back to work."

2          Duncan, "Shit, probably --"

3          Meaning he'd steal -- not come back to work, he'd

4    take the dope, the load.

5          Duncan says, "Shit, probably put a contract out on

6    your family."  So, he's kind of like half seriously, half

7    joking, saying:  Well, I can make some extra money.  Tell the

8    guy I'll drive a load of his to Florida, to Disney World,

9    under the cover of bringing his family on a vacation.

10          You'll hear a little bit later in the conversation as

11    well:  Duncan, "Get ahead of that car.  Get that license

12    plate."

13          Then a little while it goes back, Duncan comments,

14    "Bitch might be DEA."  The Drug Enforcement Administration.

15    And, you'll hear other conversations, specifically later on

16    between Leon Duncan and Len Davis where Duncan advised Davis

17    that there are too many other dirty cops, who -- "there's too

18    much talk going on about the warehouse.  The warehouse is

19    getting too hot."  They're going to have to break off, stop

20    the warehouse and go to another location, but keep up on the

21  Mardi Gras Truck Stop.

22      And, what happened was, for reasons not relevant to

23  this case, the investigation had to be shut down in early

24  December of 1994.

25      Leon Duncan and Darrel Jones were paid $1,000 in cash

1  money for that approximate two and a half hours of work they

2  provided on November the 18th, 1994.  You will hear from their

3  own mouths what they said on that day, as they were following

4  that cocaine-filled car.

5      And, the United States is convinced that, once you

6  hear this evidence, you will find these Defendants guilty

7  beyond a reasonable doubt.

8      Thank you.

9      THE COURT:  Does the Defendant Duncan choose to make

10  an opening statement --

11      MR. RIEHLMANN:  Yes, sir.

12      THE COURT:  -- at this time?

13      MR. RIEHLMANN:  Yes, sir.  If you'd like me to do it

14  now, I'd be happy to.

15      THE COURT:  Well, it's 20 minutes to 12:00.  Are you

16  going to have a lengthy statement or do you want to do it

17  after the luncheon hour?

18      MR. RIEHLMANN:  Judge, I think I'd be completed

19  before then, --

20      THE COURT:  Very well.

21      MR. RIEHLMANN:  -- but it's up to you.

22      THE COURT:  You may proceed.

23      MR. RIEHLMANN:  Okay, thank you, Judge.

24

              Defendant Duncan - Opening Statement
  1                    *   *   *   *   *

  2                    OPENING STATEMENT

  3                    *   *   *   *   *

  4          MR. RIEHLMANN:  Good morning, ladies and gentlemen.

  5   As I was introduced to you yesterday, my name is Mike

  6   Riehlmann, and I am the attorney for Leon Duncan.

  7          You have not heard a word of evidence, yet, but you

  8   have heard a very powerful, persuasive opening statement by

  9   Mr. McMahon, and I can only imagine that some of you may have

 10   already started the decision making process that we call

 11   deliberation.

 12          Please, I beg of you, don't do that.  The Judge has

 13   instructed you not to deliberate this case, not to begin that

 14   decision making process until all the evidence is in, until he

 15   tells you:  Okay, now it's time.

 16          Please resist the very human tendency to start making

 17   up your mind early.  Wait until all the testimony is in.

 18   Because, although Mr. McMahon delivered a very persuasive

 19   opening statement, he left out quite a few things that I'm

 20   going to try to clue you into now, so that you'll be looking

 21   for them.

 22          Essentially, Mr. McMahon is correct, the type of case

 23   that you'll hear, the type of evidence that you'll hear will

 24   be of two types:  Tape, both video and audio, and testimony.

 25          Now, the tapes, the tape of November the 18th, 1994,

1  with Leon Duncan's voice in it, you will hear a few hours of
2  conversation, and I beg that you pay very, very close
3  attention to every word that everyone says, because I don't
4  believe that you'll be convinced beyond a reasonable doubt
5  that at the time that tape was made Leon Duncan knew that he
6  was doing something illegal.
7        Leon Duncan believed that he was working a legitimate
8  security detail, and the conversation that took place in that
9  car, which you will hear, will not convince you beyond a
10 reasonable doubt that he knew it was illegal and I believe
11 even the Government realizes that.  Because the Government has
12 brought a man to this court to tell you what Leon Duncan knew,
13 to tell you what Leon Duncan meant, when he said certain
14 things.
15       You may recall a few minutes ago Mr. McMahon would
16 read excerpts from this tape conversation and then he would
17 say "meaning."  Well, that "meaning" is going to be supplied
18 by a man named Sammie Williams.  And, you will know Sammie
19 Williams, you will get to know Sammie Williams over the next
20 couple of days.  You will know him by meeting him and you will
21 know him by his deeds.  Because Sammie Williams is very likely
22 the most evil man that you will ever share a room with.
23       You will learn that Sammie Williams has committed
24 more crimes than one can count.  He has done some of the most
25 despicable things you can imagine and, yes, that includes

1  murder.
2        You will hear, the testimony and evidence will show
3  to you, beyond any doubt, that on October the 13th, 1994, six

4    weeks before the detail that Leon Duncan worked with him,

5    that Sammie Williams assisted Len Davis and another man named

6    Paul Hardy in planning and hunting down and executing a woman

7    named Kim Groves.

8         And, what brought that tragic event to come forth was

9    that Sammie Williams has pistol whipped a nephew of Kim

10   Groves, and Kim Groves had the audacity to go to the Police

11   Department and complain to the Internal Affairs Division.

12   And, she mistakenly identified Len Davis as the attacker of

13   her nephew, who has pistol whipped him.  But, in reality, it

14   was Sammie Williams.

15        So, Len Davis and Paul Hardy, along with Sammie

16   Williams, rode the neighborhoods that they believed Kim Groves

17   could be found in, found her, hunted her down and found her,

18   and then unleashed Paul Hardy, their assassin to kill this

19   woman, who was making trouble for them.

20        Sammie Williams will tell you that he's never been

21   charged with that murder by the federal government.  He's

22   never been charged with that murder by Mr. Connick's Office,

23   the District Attorney for Orleans Parish.

24        Sammie Williams will tell you that that's not all

25   he's done on the wrong side of the law.  Sammie Williams will


                                                        67
              Defendant Duncan - Opening Statement

1    admit to you that he has confessed to many, many crimes, but

2    he's only been required to plead guilty to two.

3         Sammie Williams pled guilty to two crimes three years

4    ago, approximately.  Sammie Williams has not, yet, been

5    punished, not yet been sentenced.  And, you'll learn about how

6    the federal sentencing system works.  There will be a

7    prominently bandied about concept known as the 5K, where the

8    Government can ask for leniency for someone even as evil as

9    Sammie Williams, if he testifies to what they want him to

10   testify to.

11          And, he will do that, I can assure you.  He will tell

12   you that Leon Duncan knew there was dope in that car, but the

13   evidence will suggest otherwise.  The actual tape and all the

14   evidence will suggest otherwise.

15          Mr. McMahon would lead you to believe by his opening

16   statement that Leon Duncan was immediately involved in this

17   cocaine trafficking protection conspiracy, but that's what the

18   evidence will show.

19          The evidence will show that this cocaine trafficking

20   protection conspiracy began in December of 1993.  The one and

21   only time Leon Duncan was involved in any of this -- and I say

22   unwittingly involved -- was November the 18th, 1994, nearly a

23   year after the protection conspiracy began; never was at the

24   warehouse that made a fortune for Sammie Williams and Len

25   Davis;


                                                 68
                 Defendant Duncan - Opening Statement

1           Mr. McMahon would have you believe that Leon Duncan

2    was the source of information, the advisor to Len Davis and

3    Sammie Williams, but the only way he can prove that to you is

4    through the forked-tongue of Sammie Williams, because there's

5    absolutely no credible evidence to prove that.  As a matter of

6    fact, the evidence that you'll see in the Hilton Hotel

7    videotape suggests that the source of information is someone

8    entirely different than Leon Duncan.

9           The reason being that you'll see in that videotape

10   that Len Davis, in May of 1994, is talking about how he has a

11    source of information in Narcotics, someone who can alert him

12    to when his business partners are under investigation and then

13    he, Len Davis, can then tell them to cool it, that he has a

14    friend in Narcotics, who can give them this information.

15         Leon Duncan was not in Narcotics.  Leon Duncan had

16    long since been transferred out of Narcotics.

17         You may hear testimony from other criminals, who, in

18    an effort to save their skin, will accuse Leon Duncan of

19    criminal activity, but please consider the source -- convicted

20    felons.  A felony conviction, as the Judge will tell you, is a

21    consideration that you should use in determining the

22    credibility of a witness, but not only convicted felons,

23    convicted felons who are desperate to get out of jail.  That's

24    certainly a reason for them to lie.

25         Leon Duncan worked as a police officer for 13 years


                                                        69
                    Defendant Duncan - Opening Statement

1     for the NewOrleans Police Department.  In the end of 1994,

2     when all -- when, as Mr. McMahon said, in December of 1994,

3     when this what they called "Operation Shattered Shield" was

4     brought to its conclusion, Sammie Williams, Len Davis and a

5     great many other people were arrested, indicted and tried.

6          Leon Duncan was advised by the federal government at

7     that time that he may be a target of this investigation, way

8     back in December of 1994.  He was advised, but he continued to

9     work as a Police Officer for the NewOrleans Police Department

10    until October of 1996.  Continued, despite having been advised

11    that he was a potential target of this investigation.

12    Continued to live with his wife and children at their home in

13    NewOrleans East, where he resided.  He never attempted to

14  flee prosecution, but where he resided until August of last

15  year, when he was arrested and this prosecution began.

16         Tapes that they had since November of 1994, testimony

17  that they had from Sammie Williams since the middle of 1995,

18  and it's been -- and it was two years, yet, before they began

19  their prosecution.

20         In summary, I would just ask that, again, implore you

21  that you keep an open mind, that you listen to all the tapes

22  very, very closely, and you listen to the testimony of the

23  witnesses very, very closely.

24         All I'd ask is that you require Mr. McMahon and

25  Mr. Winters to prove to you that he knew he was doing

                                                      70
                  Defendant Duncan - Opening Statement

1   something illegal to the point where you're sure, and I

2   believe, at the conclusion of the evidence and the conclusion

3   of this trial, you will not be convinced beyond a reasonable

4   doubt of the truth of their charges.

5          Thank you.

6          THE COURT:  Mr. Voight, does your client choose to

7   make an opening statement at this time?

8          MR. VOIGHT:  Your Honor, we would defer at this time.

9          THE COURT:  Very well.

10         Then, ladies and gentlemen, the next thing that's

11  going to happen is the Government will call it's witnesses.

12  But, since it's five minutes to 12:00, they won't be calling

13  them until 1:00.

14         We'll recess now -- will that give everybody time?

15         We'll recess until 1:00, at this time.

16  (Jury exits courtroom in custody of marshal)

17                    *   *   *   *   *
                      Page 62

18          (Whereupon, a luncheon recess was held)

19

20

21

22

23

24

25

                                                    71

1                A F T E R N O O N   S E S S I O N

2     (Jury enters courtroom in custody of marshal; all parties

3     present)

4          THE COURT:  Please be seated.  Ladies and gentlemen,

5     as I told you just before the luncheon break, the thing we do

6     now is the Government starts presenting its evidence.  What

7     you've heard so far, let me again remind you -- I'm required

8     to do so; I told you ten times and I'll tell you the eleventh

9     time -- what you've heard in opening statements is not

10    evidence.

11         Now, you will hear the evidence.  The Government will

12    commence its case.

13         Mr. Winters.

14         MR. WINTERS:  Yes, Your Honor.  Before we start

15    calling witnesses, the Government would offer, introduce and

16    file into evidence as Government Exhibit 1 in globo certified

17    copies of the court authorized affidavits, applications and

18    orders for the wire taps, and certified copies of the orders

19    and application for the PEN registers.

20         THE COURT:  Well, is there any objection to that?

```
21          MR. RIEHLMANN:  Not on behalf of Mr. Duncan.

22          MR. VOIGHT:  No objection, Your Honor.

23          THE COURT:  That will be received.

24          MR. WINTERS:  Government Exhibit 1.

25          THE COURT:  I am not familiar with those, since
```

                        Jenkins - Direct

```
 1  they're not my orders.

 2          MR. WINTERS:  No, sir, they were authorized by

 3  another judge in this district.

 4          THE COURT:  That's fine.  Since there's no objection

 5  the exhibit is received.

 6          MR. MCMAHON:  Your Honor, the Government calls

 7  Special Agent Karen Jenkins.

 8          THE COURT:  Ms. Jenkins.

 9           KAREN JENKINS, GOVERNMENT'S WITNESS, SWORN

10                     *   *   *   *   *

11                     DIRECT EXAMINATION

12  BY MR. MCMAHON:

13  Q.  What is your occupation?

14  A.  I'm a Special Agent with the FBI.

15  Q.  How long have you been a Special Agent?

16  A.  I've been a Special Agent for 12 years.

17  Q.  Briefly, summarize your assignments with the FBI.

18  A.  My first assignment was in Portland, Oregon, where I

19  worked bank robberies and kidnappings.

20      I was then transferred to New York City, where I worked

21  organized crime.

22      And, for the last four years, I have been here in

23  NewOrleans where I work public corruption matters.

24  Q.  Have you worked on wire taps, either as a monitor or as a
```

25  supervisor, during your career?

                    Jenkins - Direct

 1  A.  Yes, I have.

 2  Q.  On how many wire taps have you worked?

 3  A.  I've worked a total of 11.

 4  Q.  Are you the -- one of the case agents of this matter?

 5  A.  I'm a co-case agent, yes.

 6  Q.  And, tell the jury, briefly, what that term means.

 7  A.  A case agent has the overall responsibility for an

 8  investigation.  They coordinate the investigation, they gather

 9  the evidence and then they assist the prosecutors in bringing

10  the case to trial.

11  Q.  What was your specific assignment?

12  A.  I was the shift supervisor of the wire room.

13  Q.  Whose responsibility was it to ensure that all of the

14  court-authorized recordings made during this investigation

15  were legally accounted for?

16  A.  It was my responsibility.

17  Q.  Are you familiar with the procedures that must be employed

18  to obtain a court-authorized interception of conversations?

19  A.  Yes, I am.

20  Q.  And, explain that to the jury, briefly.

21  A.  Well, first of all, the case agent will write an

22  affidavit, which sets forth all the probable cause that we

23  have to justify the intercept.  This is reviewed by

24  prosecutors here in NewOrleans and, once they review it and

25  approve it, we send it on to Washington, D.C., at our FBI

1  headquarters.

2      Once it gets there, it's reviewed by supervisory agents

3  and, when it's approved by them, it's sent over to the

4  Department of Justice, where it's reviewed and approved by

5  departmental attorneys.

6      Lastly, it's signed off by a deputy attorney general.

7      Then the very last step of all this process is that it's

8  sent back here to NewOrleans, where it's given to a federal

9  judge, who makes a final determination, then, as to whether or

10 not he will authorize the intercept.

11 Q. Were you actually the affiant, meaning were you the person

12 who actually wrote the affidavits regarding the court-

13 authorized interceptions in this case?

14 A. No, I was not.

15 Q. How long does a court order -- initially, what is the

16 period of interception, by law, initially?

17 A. It will last for 30 days.

18 Q. And, what happens at the end of that 30 days? Can it be

19 renewed?

20 A. Yes, but we have to go through the whole process again,

21 beginning with writing a new affidavit.

22 Q. And, does that process involving the affidavits and the

23 court orders apply both to interceptions over telephones and

24 to the interceptions by microphones or bugs placed in either a

25 car or a room, something like that?

1  A. Yes, it does.

2  Q. You mentioned you were a shift supervisor. What does a

3  shift supervisor do, Agent Jenkins?

4    A.   It was my responsibility to make sure that the wire room

5    ran properly.   I trained the agents, the monitors, and I

6    reviewed their work.   I also monitored calls myself.

7    Basically, I just had to handle whatever problems came up in

8    the wire room.

9         And, also, I had to make sure that the chain of custody

10   was properly maintained on all the original tapes.

11   Q.   Summarize what that term "chain of custody" means.

12   A.   Chain of custody refers to all the procedures that we go

13   through to make sure that possession of the original tape is

14   properly documented and accounted for at all times.

15   Q.   How many telephones relevant to this investigation were

16   actually tapped by court order during the investigation?

17   A.   We had two telephones.

18   Q.   What was the first one?

19   A.   The first one was Telephone Number 458-2922.

20   Q.   What kind of phone was that?

21   A.   That was a cell phone.

22   Q.   Who controlled that phone?

23   A.   Sammie Williams.

24   Q.   And, how did Sammie Williams get that phone?

25   A.   He asked for it.

Jenkins - Direct

1    Q.   What was the second telephone?

2    A.   The second telephone was 451-4971.

3    Q.   Who controlled that phone?

4    A.   Len Davis.

5    Q.   How did he get it?

6    A.   He, too, asked for it.

7  Q.  What was the period of interception on Len Davis' cellular

8  phone, 451-4971?

9  A.  That one began on September the 7th, 1994, and it ended on

10  December 5th, 1994.

11  Q.  And, in reference to this trial, were there any court-

12  authorized microphones, specifically placed in vehicles?

13  A.  Yes, there were.

14  Q.  How many?

15  A.  Two.

16  Q.  In what vehicles were the microphones placed?

17  A.  One was placed in a blue Chevy Caprice, and one was

18  placed in a maroon Buick LeSabre.

19  Q.  Where did these vehicles come from?  Who owned the

20  vehicles?

21  A.  They were rental vehicles.

22  Q.  And, who rode -- let's start with the blue Chevy Caprice.

23  Who rode in that vehicle?

24  A.  In the Caprice, we had Len Davis, Darrel Jones and Sidney

25  Dubuclet.

Jenkins - Direct

1  Q.  And, what about in the other car?

2  A.  In the LeSabre, we had Sammie Williams, Leon Duncan and

3  Lemmie Rodgers.

4  Q.  On what day were the court-authorized microphones utilized

5  in those two cars?

6  A.  On November 18th, 1994.

7  Q.  And, for how long was the interception period for those

8  mikes?

9  A.  It lasted for about a two-hour time frame.

10  Q.  So, what about the fact that the order originally said 30

11  days, these bugs are -- I'll call them "bugs" -- weren't

12  placed in those cars for a 30-day period?

13  A.  No, it was just for that one day.

14  Q.  Now, I'm going to refer, at this point, to the cellular

15  telephone conversations intercepted over 451-4971, the Len

16  Davis phone.  Could you identify the numbers being dialed out

17  of the phone?

18  A.  Yes, we could.

19  Q.  And, how is that done?

20  A.  We have PEN registers employed during that intercept.

21  Q.  And, for the reporter, define what is a PEN, P-E-N (sic)

22  register?  What does that mean?

23  A.  Okay, a pen register is a small printer-type box that sits

24  alongside the monitors in the monitoring room, as they're

25  listening to the calls, and this printer will produce a

78
Jenkins - Direct

1  printout that shows us the date, the time, the duration of all

2  calls, incoming and outgoing, and it will also show the

3  telephone number of the outgoing calls.

4  Q.  And, I'm going to show you, Agent Jenkins, what's already

5  been marked for identification as Government Exhibits 1A

6  and 1B.

7        MR. MCMAHON:  And, Counsel, has been provided, Your

8  Honor, with copies.  May I approach?

9        THE COURT:  Yes.

10  BY MR. MCMAHON:

11  Q.  I show you one original, and then a copy.  Are you

12  familiar with Government Exhibits 1A and 1B?

13  A.  Yes, I am.

14    Q.  What are they, respectively?  What's 1A?

15    A.  One-A is a PEN register for June 16th, 1994.

16    Q.  And, is that a computer readout?

17    A.  Yes, it is.

18    Q.  And, does that computer readout reflect every single

19    number pulsed -- actually, this is out of the cellular phone

20    controlled by Sammie Williams, correct?

21    A.  Yes, it is.

22    Q.  And, that number, again, was what?

23    A.  It's 458-2922.

24    Q.  And, does that reflect every single number pulsed out of

25    the Sammie Williams cellular phone, on June the 16th, 1994?

79

Jenkins - Direct

1    A.  Yes, it does.

2            MR. McMAHON:  Your Honor, I'd ask that Government

3    Exhibit 1A be introduced into evidence.

4            THE COURT:  It wasn't already filed with -- in globo

5    Government-1?

6            MR. McMAHON:  No, no.  That was the order, Your

7    Honor.

8            THE COURT:  All right.  Any objection?

9            MR. RIEHLMANN:  Judge, no, not to 1A.

10           MR. VOIGHT:  No objection, Your Honor.

11           THE COURT:  No objection; the exhibit is received.

12    BY MR. McMAHON:

13    Q.  What about 1B, what is that?

14    A.  One-B is the PEN register for November 18th, 1994, and the

15    PEN register for November 30th, 1994.

16    Q.  And, regarding what telephone?

17    A.  This is 451-4971.

18  Q.  And, again, does that exhibit or that computer readout

19  reflect every single number pulsed out of 451-4921 (sic), on

20  those two respective dates?

21  A.  Yes, it does.

22       MR. McMAHON:  Your Honor, I'd also offer, file and

23  introduce into evidence Government Exhibit 1B.

24       THE COURT:  Any objection?

25       MR. VOIGHT:  No, sir.


                                                            80
                        Jenkins - Direct

1       MR. RIEHLMANN:  No objection.

2       THE COURT:  No objection; received.

3       MR. McMAHON:  And, Your Honor, I do have the

4  original.  I'm going to actually, put the exact copy with

5  highlighted numbers as the exhibit.

6       THE COURT:  That's fine.

7  BY MR. McMAHON:

8  Q.  Agent Jenkins, were you able to identify the source of

9  phones that dial into those numbers during the interception

10  period?

11  A.  No, we could not.

12  Q.  So, there was no caller ID or trap or trace?

13  A.  No, we did not have those devices employed.

14  Q.  I'm going to refer these questions to 451-4971.  How many

15  persons actually monitored, at any one time, that telephone,

16  that cellular telephone?

17  A.  We had one monitor per shift.

18  Q.  And, how many days was the telephone monitored during the

19  interception period?

20  A.  It was monitored usually 16 hours a day, but when we had

21  the drug protection scenario going on at the warehouse, we

22  would keep the wire room open 24 hours a day.

23  Q.  Was a supervisor always present on shift during the

24  monitoring?

25  A.  Yes, the supervisor was always there physically or

1   immediately available by telephone or beeper.

2   Q.  And, were you often present in the listening room during

3   the interception periods?

4   A.  Yes, I was.

5   Q.  Were the monitors instructed on the machine operation?

6   A.  Yes, they were.

7   Q.  Were the machines checked before monitoring began?

8   A.  Yes, they were.

9        MR. McMAHON:  And, Your Honor, I'm going to refer,

10  for the sake of convenience to the Court, I have a list --

11  Defense has been provided with a copy of 20 conversations, 18

12  of which involve the phone 451-4971; the other two are

13  actually the conversations intercepted in the cars by the

14  court-authorized bugs.  Those are conversations listed at 10

15  and 11 here.  The rest are telephone.

16        And, rather than go down the list, to speed things

17  up, I will -- I'm going to refer to this sheet and I'd ask

18  that that go into the record, as well.

19        THE COURT:  Well, then you're offering it as an

20  exhibit of sorts.

21        MR. McMAHON:  Yes, I am, Your Honor.  I would simply

22  ask that this be labeled --

23        THE COURT:  It does simplify things.  Label it --

24        MR. McMAHON:  Jenkins-1.

25          THE COURT:  Very well.

                    Jenkins - Direct

1          Any objection?

2          MR. RIEHLMANN:  No, sir.

3          MR. VOIGHT:  No objection.

4          THE COURT:  It will be received.

5    BY MR. MCMAHON:

6    Q.  Agent Jenkins, were there any malfunctions of the

7    recording devices, either picking up the conversations from

8    the phone or the conversations in the two respective cars via

9    the bugs, during the interception period, especially

10   referencing the 20 calls on this sheet, which you have in

11   front of you?

12   A.  No, there were not.

13   Q.  Let's talk about how the interception of the telephone

14   conversations actually worked.  Was every single telephone

15   call recorded?

16   A.  Yes.

17   Q.  And, what about calls, for example, to an 800 number or a

18   restaurant?

19   A.  Yes, that would be recorded, as well.

20   Q.  Define the term "minimization."  What does that mean?

21   A.  Well, when Congress passed the wire tap law, they were

22   concerned about the fact that citizens' phone calls would be

23   recorded in their entirety, so they gave us certain

24   restrictions that we have to follow whenever we have a wire

25   tap.

1    These restrictions, which are referred to as "minimization
2  instructions," tell us that we cannot monitor or record
3  privilege-type conversations or private non-criminal-type
4  conversations.
5  Q.  Let me stop you there.  Tell the jury briefly what is a
6  "privileged" conversation?  What does that mean?
7  A.  That's a phone call between an attorney and a client, a
8  doctor and a patient, a husband and a wife, or a priest and a
9  penitent.
10  Q.  What does it mean to spot check a conversation?
11  A.  Well, if we have a call that is privileged or non-
12  criminal, we'll turn the machines off and we'll stop
13  recording.  In other words, we minimize the call.
14    Now, conversations can change at any given second, so even
15  though we minimize it, we are allowed to go back in and listen
16  again and do what we call spot check the call to see if the
17  conversation has changed or not.
18  Q.  But, if a conversation involves criminal talk, then
19  there's every right to listen to it, under the court order,
20  correct?
21  A.  Absolutely.
22  Q.  Were all of the monitors instructed on minimization before
23  451-4971 was intercepted?
24  A.  Yes, they were.
25  Q.  Who instructed the monitors?

84

1  A.  Assistant United States Attorney Al Winters.
2  Q.  Were there written minimization instructions?
3  A.  Yes, there were.

4   Q.  Were they posted in the listening room?

5   A.  Yes, they were.

6   Q.  Did every monitor have to acknowledge that he or she had

7   been so instructed?

8   A.  Yes.  Every monitor had to sign the instructions and date

9   it, to let us know that they had, in fact, read them.

10  Q.  And, did every monitor who intercepted any calls in this

11  case acknowledge that he or she had been so instructed?

12  A.  Yes.

13  Q.  Did any monitor ever listen to a telephone call, who had

14  not been minimized?

15  A.  No.

16  Q.  Were any other documents posted in the listening room?

17  A.  We also had copies of all the affidavits.  We had breaking

18  information concerning the case, up-dated information posted

19  throughout the wire room, and we also had the telephone

20  numbers of the prosecutors and our supervisors, in case they

21  needed to get hold of us and tell us there's something

22  happening over the wire.

23  Q.  Describe what a monitor does, when a conversation actually

24  comes in.  How is it actually intercepted?  What happens?

25  A.  Well, all calls are logged in sequence, as they're

                                                    85
                        Jenkins - Direct

1   received and, when a call comes in, the monitor starts to

2   listen.

3       At the same time, they begin writing on a log and that log

4   will include the time of the call, whether it's incoming or

5   outgoing.  It includes the identity of the people speaking, if

6   they know that identity at the time, and at the same time

7 they're writing out a summary, then, of what the conversation

8 is about.

9      They also include, then, if they minimized or spot checked

10 the call.

11 Q.  Was every call, no matter how long or short, reflected on

12 the contemporaneous log?

13 A.  Yes, it was.

14 Q.  And, they were numbered in sequence as they were received?

15 A.  Yes, they were.

16 Q.  What kind of tapes were used?  Let's talk about what kind

17 of tapes were actually used to record the telephone calls over

18 451-4971.

19 A.  The telephone calls were recorded on cassette tapes.

20 Q.  Just like the normal cassette you'd play in your car, your

21 car deck?

22 A.  Yes.

23 Q.  Describe the tapes used relative to the bugs in the two

24 vehicles on November 18, 1994, what did they look like?

25 A.  They were small, reel-type tapes, reel-to-reel type tape.


                                                    86
                         Jenkins - Direct

1 Q.  So, the actual tape recorder, then, was in the respective

2 cars?

3 A.  Yes, it was.

4 Q.  What's that called?  Is there a special name for that

5 tape?

6 A.  It's a Nagra recorder.

7 Q.  Is Nagra a brand name?

8 A.  Yes.

9          MR. McMAHON:  N-A-G-R-A, for the reporter.

10 BY MR. McMAHON:

11  Q.  How many original tapes -- I'm talking about the phone,

12  now -- how many original tapes were used to contemporaneously

13  record the calls?

14  A.  One.

15  Q.  And, who placed the tapes in the machines?

16  A.  The monitors did at the beginning of the monitoring day.

17  Q.  What happened when the tapes ran out?

18  A.  It was immediately replaced with a new one.

19  Q.  What happened if a monitoring period -- a monitoring shift

20  went on and you still had some room on a tape?  What happened

21  then?

22  A.  You still took it out.

23  Q.  And, whose ultimate responsibility was it to make sure

24  that the tapes were changed?

25  A.  The monitor on duty.

 1  Q.  What happened to the original tape, once it was taken out

 2  of the machine?

 3  A.  The monitor who took the tape out will immediately

 4  duplicate it and then they'll put the original tape in a chain

 5  of custody envelope.  They'll sign that envelope to show when

 6  they have possession of it, and then they put that envelope in

 7  a cabinet that was located behind three combination locked

 8  doors.  I, personally, then, would come up and pick up the

 9  envelope containing the original tape, I would sign the

10  envelope to show when I had possession of it, and then hand

11  carry it to our evidence custodians.

12  Q.  What did the evidence control officer or the evidence

13  custodian do with the original tapes?

14  A.  They place the original tapes in a locked room that only

15  they had access to that was confined in an FBI secure space.

16  Q.  Whose responsibility was it to ensure that chain of

17  custody was properly maintained on the two Nagras from the

18  cars on November 18, 1994?

19  A.  It was my responsibility.

20  Q.  And, what happened to those two tapes, once the event of

21  November 18, 1994 was concluded and the tape was taken out of

22  the recorder in the two cars?

23  A.  Special agents took possession of the original tapes.

24  They, too, placed the original tapes in a chain of custody

25  envelope, signed it to show when they had possession of it and

88

Jenkins - Direct

1  then they hand carried it to our evidence custodians, as well.

2  Q.  Were copies made of those two Nagra car tapes?

3  A.  Yes, they were.

4  Q.  Did you listen to every conversation from the original

5  tapes, both the Nagras in the cars and the original cassettes

6  that recorded the conversations contemporaneously that we

7  intend to offer as evidence today, listed on this sheet, which

8  has been marked as Jenkins-1?

9  A.  Yes, I did.

10  Q.  Did you listen to the duplicate of the -- the duplicate

11  originals, the copies from -- made from the original tape, as

12  well?

13  A.  Yes, I did.

14  Q.  Were the conversations listed on this sheet, the 20

15  conversations exact recordations of those conversations, as

16  they were contemporaneously recorded on the 20 instances

17  listed on the sheets?

18  A.  Yes, they were.

19  Q.  Were there any changes, deletions, additions, alterations

20  in any way?

21  A.  No.

22  Q.  Now, who supervised the digitization of the analogs, the

23  tapes, to produce the CDs that we intend to offer as evidence

24  today?

25  A.  I did that.

Jenkins - Direct

1  Q.  How is that process done?

2  A.  Well, the conversations on the cassette tapes are

3  digitized into a computer hard drive, and then from the

4  computer hard drive, they're burned onto CDs.

5  Q.  Did you actually supervise -- now, what happened -- what

6  kind of tape was used, the original or a duplicate original?

7  A.  It was a duplicate original.

8  Q.  And, when the tape is played, what happened once the

9  conversation was digitized?  In other words, was it --

10      MR. McMAHON:  Let me strike that and say that --

11  BY MR. McMAHON:

12  Q.  Were you actually physically present when the

13  conversations from the analog, the cassette tapes were played

14  to make the CDs?

15  A.  I was present during the entire process.

16  Q.  And, did you listen to the CD conversations, once the CDs

17  were actually made by this computer program?

18  A.  Yes, I did.

19  Q.  And, were those conversations reflected on the CDs, again,

20  exact recordations of the conversations as they were

21  contemporaneously recorded on the respective dates listed on

22  Jenkins-1?

23  A.  Yes.

24  Q.  Was there any editing done -- at least once, the computer

25  process, just for the sake of trial purposes?

1   A.  Yes.  For the sake of trial purposes and to save all your

2   time, we did take out some portions, the pauses, the dead

3   silence and some irrelevant information.

4   Q.  But, the original tapes and the copies, of course, were

5   providing to Defense Counsel months prior to trial, correct?

6   A.  Yes.

7           MR. RIEHLMANN:  Judge, I would object to that.  I

8   know that -- I'll withdraw that objection.

9           THE COURT:  Withdrawn; moot.

10  BY MR. McMAHON:

11  Q.  What happened to the original tapes, both the Nagras and

12  the cassettes from the telephone?

13      And, again, for purposes of this particular trial, we're

14  only talking about 451-4971, with the exception of 1A, the PEN

15  register from the Sammie Williams phone.

16      What happened to the original tapes at the end of the

17  interception period, when listening was no longer authorized

18  by the court, when it was shut down?

19  A.  We immediately hand carried them to a federal judge, and

20  we had them sealed in his presence.

21  Q.  What's the purpose of sealing it, --

22  A.  Well, --

23  Q.  -- the tapes?

24  A.  -- it's a legal requirement, first of all, and also we

25   wanted to be able to prove that no alterations or changes or

Jenkins - Direct

1   deletions had been made to the tapes.

2   Q.  And, finally, again, just to reiterate, Agent Jenkins,

3   were the 20 conversations, listed on Jenkins-1 here, altered

4   for the sake of, of course, the editing done to eliminate dead

5   spaces and pauses and irrelevant talk, were they in any way

6   altered, changed, added to, subtracted to in any way, or were

7   they accurate recordations of these 20 conversations as

8   contemporaneously recorded?

9   A.  They were not altered in any way, and they are accurate.

10          MR. MCMAHON:  Your Honor, at this time, I would

11  offer, file and introduce into evidence three compact disks,

12  listed as --

13          The Defense does have a copy.

14          -- Government exhibit, and it will go:

15          JJ, for Juan Jackson, 1 through 4;

16          SW, for Sam Williams, 1 through 5;

17          SW, for Sam Williams, 8 to 14 and;

18          LR, for Lemmie Rodgers, 1 through 3;

19          And, then, another compact disk labeled SW6, which is

20  a conversation from the Len Davis car, on November 18, 1994;

21          And, SW7, which is a third compact disk from the

22  Sammie Williams driven car on November 18, 1994.

23          We'd offer these into evidence.

24          THE COURT:  Any objection?

25          MR. RIEHLMANN:  Judge, just for clarification, I take

1  it that what Mr. McMahon is saying is that the 20

2  conversations listed on Jenkins-1 are those conversations and

3  no other ones?

4          THE COURT:  Is that what --

5          MR. McMAHON:  That is correct, Your Honor.  The 20

6  conversations listed on Jenkins-1 are actually variously on

7  the three D's, but it contains nothing else but those 20

8  conversations.

9          MR. RIEHLMANN:  All right.  Then, I have no

10  objection.

11          THE COURT:  No objection.

12          Do you have --

13          MR. VOIGHT:  No objection, Your Honor.

14          THE COURT:  No objection?

15          MR. VOIGHT:  No objection.

16          THE COURT:  Received.

17          MR. McMAHON:  Your Honor, at this point, we tender

18  Agent Jenkins for cross.  Thank you.

19          THE COURT:  Mr. Riehlmann.

20          MR. RIEHLMANN:  Thank you, Judge.

21                  *    *    *    *    *

22

23

24

25

                                                          93
                          Jenkins - Cross

1                      CROSS-EXAMINATION

2  BY MR. RIEHLMANN:

3  Q.  Good afternoon, ma'am.

4   A.   Good afternoon.

5   Q.   First of all, if I understood your testimony on direct

6   examination, it was that Sammie Williams was given the phone,

7   cell phone 458-2922, is that correct?

8   A.   That's correct.

9   Q.   On November the 18th, 1994, was he using that phone or the

10  phone 451-4971?

11  A.   Sammie Williams' phone lasted from July 6, '94 through

12  September 7th, '94, so it was already shut down on November

13  18th.

14  Q.   So, in answer to my question, he --

15  A.   It was 451-4971 that was used on November 18th.

16  Q.   And, it was used by Sammie Williams?

17  A.   No, on November 18th, the phone was at the warehouse being

18  used by the officers that were protecting the warehouse.

19  Q.   Okay.  Sammie Williams has a cell phone with him in the

20  car on November the 18th, did he not?

21  A.   Yes, he did.

22  Q.   But, it was not a cell phone --

23  A.   It was not one of ours.

24  Q.   Okay.

25  A.   It wasn't being intercepted.


                                                    94
                        Jenkins - Cross

1   Q.   Okay.  There were a great many more conversations

2   monitored and taped during the six-plus months that Operation

3   Shattered Shield lasted, isn't that true?

4   A.   Yes.

5   Q.   A great many more than just the 20 that are reflected on

6   Jenkins-1, correct?

7   A.  Correct.

8   Q.  All right.  What is the earliest date that you or one of

9   your crew monitored a cell phone conversation in which one of

10  your targets and Leon Duncan were the conversants?

11  A.  The first awareness I have of Leon Duncan was on June

12  16th, the very day that Sammie Williams got his cell phone.

13  As soon as he got out of the warehouse with our undercover

14  agent, where they're discussing the protection scenario that's

15  going to take place and told to get officers to work that

16  detail, the first call was to Leon Duncan, the first beep call

17  to Leon Duncan.

18  Q.  Was there a conversation?

19  A.  I know from Sammie Williams that they did, in fact, talk

20  about it.

21  Q.  And, that was by Sammie Williams indicating to you that

22  Leon Duncan returned his page?

23  A.  Yes.

24  Q.  Okay.  And, you say the first thing -- could you estimate

25  for me how many minutes passed between when Sammie Williams


                                                        95
                          Jenkins - Cross

1   left that warehouse and when he paged the pager that belonged

2   to Sammie Williams?

3   A.  I'm not aware of the exact time frame, but it was soon

4   thereafter.

5   Q.  Was it -- would two hours be --

6   A.  I don't know, sir.

7   Q.  -- accurate?

8   A.  I don't know.

9   Q.  All right.  The interception period for the Nagra

10  recorder, on November the 18th, 1994, in the LeSabre, I

11   believe you testified that that was two hours?

12   A.  A little over two hours, yes.

13   Q.  Okay.  So, from the moment Sammie Williams took that car

14   -- and this will be developed by further testimony -- from the

15   Avis Rent-A-Car place, to the moment that he returned it,

16   everything was recorded, is that correct?

17   A.  Yes.

18   Q.  All right.  Now, if I understand your testimony,

19   minimization is when you or another FBI agent decides that a

20   conversation is not pertinent, is that correct?

21   A.  We follow our regulations to decide if it's not pertinent

22   or not, yes.

23   Q.  But, ultimately it's in the discretion of an FBI agent,

24   whether a conversation is pertinent or not, correct?

25   A.  It's up to them to decide whether it's a privileged

                                                    96
                         Jenkins - Cross

 1   conversation or a non-criminal conversation.

 2   Q.  So, would the answer to my question be "yes"?

 3   A.  They'd follow the rules, yes.

 4   Q.  Okay.  In whose possession was 451-4971, on November the

 5   18th?  You said one of the -- or some of the people that

 6   worked the warehouse?  Do you know who it was?

 7   A.  It was Edward Williams was working it, and I think Michael

 8   Recasner during the daytime.

 9   Q.  Okay.  Now, you indicated that the CDs, that Mr. McMahon

10   has had you identify, were redacted or edited for trial

11   purposes, so that long pauses and irrelevant conversation was

12   edited out, is that correct?

13   A.  Correct.

14  Q.  All right.  The tapes that contained the entire

15  conversation are here in this courtroom, though, are they not?

16  A.  They're at the FBI office.

17  Q.  You don't have the six tapes, six cassette tapes that

18  contain the entire conversation?

19  A.  Not here with me today, but they're in our office, yes.

20  Q.  Okay.  The six cassette tapes that you delivered to me

21  some time ago, it's your testimony that those six tapes

22  contain the entire conversation that took place on November

23  the 18th, 1994, correct?

24  A.  Correct.

25  Q.  All right.  If, during an auto -- did you -- well, let me

Jenkins - Cross

1  back up.

2      Did you participate at all in the video taping that took

3  place several times during the Shattered Shield operation?

4  A.  No, I did not.

5  Q.  Well, if a word or a phrase or a sentence in a video or

6  audio tape is unclear, as you're listening to it, is there

7  some way that you can refine it or attempt to refine it, so

8  that the word or the phrase or the sentence is more clearly

9  understood?

10  A.  No.

11  Q.  All right.  And, when things were said, throughout this

12  operation, and recorded that you couldn't understand, the

13  transcripts will reflect that you couldn't understand it by

14  virtue of "UI," meaning "unintelligible," is that correct?

15  A.  Well, in this particular situation, sometimes we had music

16  playing in the background.  There was a police radio going in

17  the background, so there were a few phrases that we could not

18  pick up, a few words.  In those instances, we would put "UI,"

19  which stood for "unintelligible."

20  Q.  So, the answer to my question would be "yes"?

21  A.  Yes.

22  Q.  All right.  The conversation -- let me back up.

23      June 16th of 1994, you say that Sammie Williams paged Leon

24  Duncan, correct?

25  A.  Correct.

98

Jenkins - Cross

1  Q.  And, he used the cell phone that you had given him to

2  monitor his conversations, correct?

3  A.  I would like to restate that.  It was actually Len Davis

4  that paged him, but Sammie Williams was present.

5  Q.  Okay.

6  A.  Len Davis was using Sammie Williams' phone.

7  Q.  Okay.  Do you know what number was placed in Leon Duncan's

8  pager?

9  A.  If I could look at the PEN register, I could tell you.

10  Q.  Okay.  Well, I don't have the one for June 16th.

11          THE CLERK:  It's right there.

12          THE WITNESS:  (Examines document)

13  BY MR. RIEHLMANN:

14  Q.  Do you remember my question, Ms. Jenkins?

15  A.  Yes, the telephone number is 824-2842.

16  Q.  Do you know what that number is?

17  A.  It's Leon Duncan's beeper number.

18  Q.  No, I'm asking you, when -- that's the number that was

19  dialed on their cell phone.  I'm asking you:  Could you tell

20  what number they put in his pager, so that he could return a

21  call?

22  A.  Not on this printout, no.

23  Q.  Is there a record that would reflect that?

24  A.  No.

25  Q.  The monitoring equipment was in place at that time, I take

Jenkins - Cross

1  it, is that correct?

2  A.  No, it was not.

3  Q.  Oh, it was not; all right.  How soon thereafter --

4  A.  Sammie Williams' phone started on July 6, the monitoring

5  of it.

6  Q.  Okay.  So, for a two-week-plus period his telephone was

7  not monitored, is that correct?

8  A.  Correct.

9  Q.  All right.  Is it your testimony -- going back to what I

10  had asked you earlier, that the Federal Bureau of

11  Investigation does not have the means or the resources to take

12  a conversation that contains unintelligible words or phrases

13  and clean that up, so that, perhaps, they can be perceived?

14  A.  We do have technology were we could enhance tapes, but

15  that was not done to these particular tapes at our FBI

16  headquarters, no.

17  Q.  All right.

18          MR. RIEHLMANN:  Bear with me, please, Judge.  I'll be

19  finished in a moment.

20          THE COURT:  All right.

21  BY MR. RIEHLMANN:

22  Q.  Ma'am, were there ever occasions where you would be

23  nearing the end of a tape and you would have to switch tapes

24  and, in that process, you would miss parts of conversations?

25   A.  That would happen from time-to-time.  Not too often,

Jenkins - Cross

1   though.  I instructed my monitors to keep a close eye on those

2   tapes and, even if there is a large space left on one side, go

3   ahead and flip it over on down time, so not to miss any

4   conversations.  And, in reviewing all the conversations we're

5   entering into evidence today, that did not ever happen.

6   Q.  Okay.  Your subordinates that worked in the room, were

7   they FBI agents, as well?

8   A.  No.

9   Q.  Are they --

10  A.  Some of them were, some of them were our professional

11  people, career people there.

12          MR. RIEHLMANN:  One moment, Judge.

13          No further questions.

14          THE COURT:  Mr. Voight?

15          MR. RIEHLMANN:  No further questions.  Oh, I'm sorry,

16  I thought you didn't hear me.

17              *    *    *    *    *

18                  CROSS-EXAMINATION

19  BY MR. VOIGHT:

20  Q.  Good afternoon, Agent Jenkins.

21  A.  Good afternoon.

22  Q.  Concerning the Nagra recordings from the blue Caprice, --

23  A.  Yes.

24  Q.  -- the CDs that are going to be introduced or have been

25  introduced by the Government today, you testified that you

Jenkins - Cross

1    took out irrelevant conversation, is that correct?

2    A.  Yes.

3    Q.  Were you the person who determined which conversation on

4    those tapes was irrelevant?

5    A.  No.  It was a team effort between the prosecutors, the

6    case agent, and myself.

7    Q.  So, there were several people, who reviewed these tapes

8    and determined what was relevant and what was irrelevant for

9    their purposes?

10   A.  Yes.

11   Q.  And, some of the conversations removed from the CDs, or

12   rather that never made it to the CDs, included conversations

13   involving Darrel Jones, is that correct?

14   A.  Yes.

15   Q.  So, you removed things that Darrel Jones would have said

16   on those tapes?

17   A.  That were irrelevant.

18   Q.  That you determined to be irrelevant?

19   A.  Yes.

20           MR. VOIGHT:  Thank you.

21           THE COURT:  Mr. McMahon?

22                   *   *   *   *   *

23

24

25


                                                    102
                     Jenkins - Redirect

1                    REDIRECT EXAMINATION

2    BY MR. McMAHON:

3    Q.  Agent Jenkins, were Defense attorneys provided with the

4  copies of, exact copies of all of the intact conversations?

5  And, I'll specifically refer to those on Jenkins-1?

6  A.  Yes, they were.

7  Q.  When?

8  A.  Oh, that was probably about late last fall, I think it

9  was, we gave it to them; sometime in the fall time.

10  Q.  So, the original tapes were never edited out, were they?

11  A.  No.

12  Q.  And, the conversations on the CDs simply eliminate dead

13  time, music and talk that was irrelevant to the case, simply

14  to save time, correct?

15  A.  Correct.

16  Q.  Is the FBI the only entity in the country that has the

17  capability of enhancing tapes?

18  A.  No.

19  Q.  Are there commercial firms and ventures that can also

20  enhance tapes, if needed?

21  A.  Yes.

22        MR. MCMAHON:  Nothing further.

23        THE COURT:  Thank you, ma'am, you may step down.

24  (The witness is excused)

25        MR. WINTERS:  Your Honor, in conjunction with this


                                          103

1  Witness' testimony and the Government's -- the PEN register

2  tapes that were introduced, I'd like to read for the jury

3  right now, the Court and the jury, three stipulations that

4  have been entered into by all parties concerned with the case,

5  signed by the Defendants and their Counsel and the Government

6  attorneys.

                        Page 91

 7          THE COURT:  Very well.

 8          A stipulation, ladies and gentlemen, is an agreed

 9     upon fact or a series of facts.  All the lawyers agree that

10     what is recited in the stipulation is accurate, true,

11     correct.   So, what Mr. Winters is going to do is give the

12     record a document and read it to you.

13          Go right ahead, sir.

14          MR. WINTERS:  Thank you, Your Honor.

15          Stipulation:  "It is hereby stipulated and agreed

16     among the undersigned parties that the following is

17     uncontroverted, true and correct;

18          "That, if a representative of A-Plus Communications

19     would testify, that (504) 824-2842 was a digital beeper

20     subscribed to by Leon R. Duncan.

21          Stipulation Number 3: --

22          Number 2 will come at a later date.

23          Stipulation Number 3, same heading:  "It is hereby

24     stipulated and agreed among the undersigned parties that the

25     following is uncontroverted, true and correct;


                                                        104


 1          "That, if a representative of Bell South

 2     Telecommunications would testify, that the telephone number

 3     subscribed to by Leon R. Duncan was (504) 246-6518."

 4          And, Stipulation 4, same heading:  "It is hereby

 5     stipulated and agreed among the undersigned parties that the

 6     following is uncontroverted, true and correct;

 7          "That, on November 18th, 1994, Darrel G. Jones

 8     utilized digital beeper (504) 843-3746;"

 9          Signed by the Defendants, their attorneys and both

10     Government attorneys, and I would offer to introduce and file

11    into evidence Stipulations 1, 3 and 4, Your Honor.

12          THE COURT:  There being no objection, Stipulations 1,

13    3 and 4 will be received as Joint Exhibits 1, 3, 4.

14          Mr. McMahon.

15          MR. MCMAHON:  Yes, Your Honor.  Your Honor, the

16    United States would call Special Agent Juan Jackson.

17          THE COURT:  Juan Jackson.

18          MR. RIEHLMANN:  Judge, I realize that the Government

19    -- could we approach the bench?

20          THE COURT:  Surely.

21        (At side bar on the record)

22          MR. RIEHLMANN:  I realize that the Government is

23    entitled to a case agent, but I would ask that Ms. Jenkins be

24    sequestered for the rest of the proceedings, in the event that

25    I have to call her back.  I know Mr. Hadden is allowed to


105

1     stay, but I don't believe that both of them should be allowed

2     to stay.

3          THE COURT:  Well, he's the operator of the machine.

4     He's not going to testify.

5          MR. WINTERS:  No, she's going to assist the operator

6     of the machines and making sure that we don't waste any time,

7     because she's prepared all the evidence.

8          THE COURT:  So, she is sitting down at the trial

9     table, now?

10          MR. RIEHLMANN:  Yes.

11          THE COURT:  She hasn't been here before now?

12          MR. RIEHLMANN:  No, she was outside, sequestered.

13          THE COURT:  And, now, -- and she's sitting down.  The

14  Government, I presume, doesn't intend to call her back as a

15  witness?

16      MR. WINTERS:  No.

17      MR. RIEHLMANN:  We --

18      THE COURT:  So, I'll afford you --

19      MR. WINTERS:  She was dismissed.

20      THE COURT:  I can't --

21      MR. RIEHLMANN:  Can we have Mr. Hadden excluded from

22  the courtroom.

23      THE COURT:  And, the gentleman sitting there, is he

24  going --

25      MR. WINTERS:  He's going to help --


106

1       THE COURT:  -- to testify?

2       MR. WINTERS:  No, he's not going to testify.

3       THE COURT:  All right.

4       MR. RIEHLMANN:  Hadden is not going to testify?

5       MR. WINTERS:  No.

6       MR. RIEHLMANN:  Oh, okay.

7       THE COURT:  They've got the case agent --

8       MR. RIEHLMANN:  We don't have a problem.

9       MR. WINTERS:  All right.

10      THE COURT:  Fine.

11      MR. RIEHLMANN:  Well, actually, no, I guess I should

12  have him sequestered, because I may call him.

13      THE COURT:  Well, you can call her back.

14      MR. RIEHLMANN:  No, call him, Hadden, since he's

15  not --

16      MR. WINTERS:  Judge, he's the case agent.

17      THE COURT:  No, --

Page 94

18            MR. WINTERS:  There's exceptions for the case agent.

19            THE COURT:  -- your request is denied.  Thank you.

20        (End of discussion at side bar)

21            MR. McMAHON:  Your Honor, just a little housekeeping,

22   just to clarify for the record, the CD also includes any

23   consensual conversations which would not be subjected to court

24   order.  So, just for further -- just to clarify, the CDs

25   contain all of the conversations.  On Jenkins-1, for example,


                                              107
                        Jackson - Direct

 1   a meeting in the warehouse, which was not subjected to a court

 2   order.  It's strictly consensual.

 3            I just wanted to clarify that for the record.

 4            MR. RIEHLMANN:  Okay.

 5            THE COURT:  Well, I'm sure there's no problem,

 6   because to the commencement of this trial all of this has been

 7   explained and given to everybody.  Nobody is hiding any-

 8   thing --

 9            MR. McMAHON:  Oh, no.

10            THE COURT:  -- and popping it out at the last minute.

11            MR. McMAHON:  No, Your Honor.

12            THE COURT:  Any problem on the Defense side?

13            MR. VOIGHT:  No, Your Honor.

14            MR. RIEHLMANN:  Not insofar as what he said, no.

15            JUAN JACKSON, GOVERNMENT'S WITNESS, SWORN

16                    *    *    *    *    *

17                    DIRECT EXAMINATION

18   BY MR. McMAHON:

19   Q.  Mr. Jackson, what is your occupation?

20   A.  Special Agent with the FBI.

21  Q.  How long have you been with the FBI, sir?

22  A.  It will be 15 years in July of this year.

23  Q.  Do you have any prior law enforcement experience?

24  A.  Yes, sir.

25  Q.  Where?

Jackson - Direct

1  A.  New Jersey State Police.

2  Q.  Agent Jackson, briefly summarize your assignments during

3  your FBI career.

4  A.  Primarily, narcotics investigations throughout the, I

5  guess, 15 years, mainly undercover operations.

6  Q.  And, of that nearly 15-year period, what percentage of

7  your time has been devoted to undercover work?

8  A.  Ninety percent.

9  Q.  And, could you go over some of the cities in which you

10  have worked as an undercover agent?

11  A.  Okay, New York City, Philadelphia, NewOrleans, Boston,

12  L.A., Miami, Denver, St. Louis, Las Vegas, Waterbury,

13  Connecticut.  I'm sure I've missed several.

14  Q.  Tell the jury what is an undercover agent.  What do you do?

15  A.  You primarily assume the identity of someone else.  You're

16  totally involved in that identity, both through identification

17  and personality.

18  Q.  When did your undercover role begin here in the

19  NewOrleans area?

20  A.  April 1994.

21  Q.  When did it end?

22  A.  December of 1994.

23  Q.  What were the general goals of the undercover operation in

24  which you were involved?

25   A.   To identify the extent of corruption in the NewOrleans

Jackson - Direct

1   Police Department.

2   Q.   What was the name of your undercover persona, your

3   character?

4   A.   JJ.

5   Q.   Describe JJ.  Who was he?

6   A.   JJ was a high level drug dealer that had ties both in the

7   New York and Miami area.

8   Q.   Did you get to know Len Davis?

9   A.   Yes, sir.

10   Q.   Do you know Sammie Williams?

11   A.   Yes, sir.

12   Q.   When was the first time you saw Davis and Williams?

13   A.   It was April 21st, 1994.

14   Q.   Where?

15   A.   In the Hilton Hotel, in NewOrleans, Louisiana.

16   Q.   At the Hilton or the Sheraton?

17   A.   I'm sorry, it was the Sheraton.  I'm sorry.

18   Q.   And, on April 21 of '94, describe the circumstances where

19   you first saw Len Davis and Sammie Williams.

20   A.   We had decided we were going to use a simulation where a

21   delivery of $100,000 was going to be delivered to me by Terry

22   Adams.  That delivery was going to be guarded by Len Davis and

23   Sammie Williams.

24   Q.   Did they, in fact, guard that delivery?

25   A.   Yes.

1  Q.  Did you speak to them on that occasion?

2  A.  No.

3  Q.  How were they dressed?

4  A.  They were in their uniform and armed.

5  Q.  And, by the way, who was Terry Adams?

6  A.  Terry Adams was the informant on the case at the time.

7  Q.  Did he have any nicknames?

8  A.  Yes, he had several.  They called him "T" and they called

9  him Scaboo, as far as my understanding.

10  Q.  When was the next time you saw Davis?

11  A.  May 4th.

12  Q.  Of '94?

13  A.  Of '94.

14  Q.  Where?

15  A.  That time it was in the Hilton Hotel.

16  Q.  Where, in the Hilton was it, in the bar, in a restaurant,

17  in a room?  Where, exactly?

18  A.  It was in a room.

19  Q.  Was that room equipped with microphones and a camera?

20  A.  Yes, sir.

21  Q.  What was the purpose of your meeting Davis and Williams,

22  on May the 4th of 1994?

23  A.  That was my initial meeting with them.  We had decided

24  that we were going to explain to them exactly what I wanted

25  them to do and what I was trying to do in the City of

1  NewOrleans at the time.

2  Q.  Who else was present at the meeting, besides you, Davis

3  and Williams?

  4   A.  Terry Adams.

  5   Q.  What were you trying to do?  What was discussed?  What was

  6   proposed at that meeting?

  7   A.  I was a high level drug dealer.  I wanted to bring in

  8   shipments of cocaine into the NewOrleans area and store them

  9   somewhere in the city and have those shipments guarded.

 10        MR. McMAHON:  And, Your Honor, at this time, we

 11   would --

 12   BY MR. McMAHON:

 13   Q.  By the way, did you consent to having that meeting

 14   recorded?

 15   A.  Yes, sir.

 16   Q.  Have you seen the video marked as JJ, for Juan Jackson, V

 17   for Video-1?

 18   A.  Yes.

 19   Q.  And, is that video an accurate recordation of the meeting,

 20   as it occurred on May the 4th, 1994, in the Hilton Hotel?

 21   A.  Yes, it is.

 22   Q.  And, by the way, while we -- before we play the video,

 23   there's going to be a whirring sound.  Can you tell the jury

 24   in advance what that whirring sound is going to be?

 25   A.  During the video, as you'll see, they were looking around,


                                                        112
                          Jackson - Direct

  1   Sammie Williams and Len Davis.  They picked up -- the camera

  2   that we had was placed in a lamp, and once they picked the

  3   lamp up and sat it back down, what happened was you had to

  4   readjust the camera back to focus back on Len and Sammie.  So,

  5   you'll hear a noise.

  6   Q.  Were you able to hear that noise in the room, as the lens

7  is being refocused?

8  A.  No, no.

9  Q.  You imagined you did, though?

10  A.  Yes, I did.

11       MR. MCMAHON:  All right.  Your Honor, at this time, I

12  would like to offer JJV-1 into evidence and play it for the

13  jury.

14       THE COURT:  Any objection?

15       MR. VOIGHT:  No, sir.

16       MR. RIEHLMANN:  No objection.

17       THE COURT:  No objection; it will be received.

18       Do you wish us to dim part of the lights?

19       MR. MCMAHON:  I think so.

20       THE COURT:  Before we start, I see you've set the

21  monitors where they are, the TV by the jury, but was it your

22  intention to swing them out more in front of the jury or do

23  you want to leave them like that?

24       Well, let me ask the jury:  Would you prefer them to

25  be sort of in front, or do you want to glance sideways?

Jackson - Direct

1                    (TVs adjusted)

2                  (Video tape started)

3  (The video tape was unintelligible for transcription purposes)

4                  (Video tape stopped)

5  BY MR. MCMAHON:

6  Q.  Okay, who is that?

7  A.  That's myself.

8                  (Video tape restarted)

9  (The video tape was unintelligible for transcription purposes)

10                  (Video tape stopped)

~2784750.dat

11  BY MR. McMAHON:

12  Q.  Who is that, who just sat down with the briefcase?

13  A.  To the left, looking at the monitor, is Len Davis.  To the

14  right is Sammie Williams.

15  Q.  Sammie Williams is in the hat?

16  A.  Yes, sir.

17          MR. McMAHON:  Okay, go ahead.

18                    (Video tape restarted)

19  (The video tape was unintelligible for transcription purposes)

20                    (Video tape stopped)

21  BY MR. McMAHON:

22  Q.  Who is that person on the bed there, Agent Jackson?

23  A.  That was Terry Adams.

24                    (Video tape restarted)

25  (The video tape was unintelligible for transcription purposes)


                                                    114
                    Jackson - Direct

1                    (Video tape stopped)

2  BY MR. McMAHON:

3  Q.  When you say, "Ways of calling it by different names," to

4  what are you referring there?

5  A.  We're talking about the cocaine and calling it something

6  different than the word "cocaine."

7                    (Video tape restarted)

8  (The video tape was unintelligible for transcription purposes)

9                    (Video tape stopped)

10  BY MR. McMAHON:

11  Q.  What do you mean when you say, "Run the name"?

12  A.  I want them to check in their police computers, to check

13  for any -- any name I would give them, to identify the person

14  and let me know anything that I needed to know about them.

15                    (Video tape restarted)

16  (The video tape was unintelligible for transcription purposes)

17                    (Video tape stopped)

18  BY MR. McMAHON:

19  Q.  What did you mean a "spot to hold it"?  What are you

20  talking about right there?

21  A.  We're talking about a location where I was going to place

22  the drugs in and hold for, you know, two or three days.

23  Q.  And, when you said there should be no time where the name

24  is not called on the street, so to speak, what do you mean by

25  that?

                                                    115
                        Jackson - Direct

1  A.  I shouldn't be known by anybody on the street at all.  I

2  was just explaining to them how discreet this was going to be,

3  and no one in the NewOrleans area should know anything about

4  me.

5                    (Video tape restarted)

6  (The video tape was unintelligible for transcription purposes)

7                    (Video tape stopped)

8  BY MR. McMAHON:

9  Q.  What did you mean by that?

10  A.  I meant that any other police officer that he recruited to

11  bring into my operation we were going to talk to and explain

12  to them exactly what was going on with the operation.

13  Q.  And, what would have been the purpose for doing that?

14  A.  To make sure that everyone involved was on board.  No one

15  was going to actually do anything, other than work with me,

16  not against me and attempt to arrest me or blow my operation.

17                    (Video tape restarted)

18  (The video tape was unintelligible for transcription purposes)

19                      (Video tape stopped)

20  BY MR. McMAHON:

21  Q.  What do you mean by "bringing in the person who's down"?

22  What does the word "down" mean?

23  A.  What we were talking about there is somebody who was

24  agreeing to do exactly what I wanted him to do.  He was down

25  with the operation that I was going to do.  In other words, he

1  was going to be involved with it totally, and do exactly what

2  I needed him to do at all times.

3  Q.  When you said a little earlier that you don't want anybody

4  who was going to say no, what did you mean by that?

5  A.  Anyone -- what I was saying was:  Anyone that was

6  apprehensive, anyone that wasn't sure they wanted to be

7  involved in this operation don't bring in.  Don't bring in

8  anyone that might change up at all.

9      Today one might be on it and realize what really is going

10  on; tomorrow change up.  I wanted someone that was going to be

11  involved in it, stay with it, do exactly what I needed to do,

12  and not change from it at all.

13                      (Video tape restarted)

14  (The video tape was unintelligible for transcription purposes)

15                      (Video tape stopped)

16  BY MR. McMAHON:

17  Q.  What are you referring to?

18  A.  The first initial meeting at the Sheraton Hotel, when they

19  arrived, guarding the simulated $100,000 delivery.

20                      (Video tape restarted)

21  (The video tape was unintelligible for transcription purposes)

22                          (Video tape stopped)

23  BY MR. McMAHON:

24  Q.  What were you referring to when you said "follow my people

25  out of the warehouse"?  Who are your "people"?

Jackson - Direct

1  A.  I was referring to other agents that we were going to use

2  as couriers that would actually take the drugs outside the

3  warehouse and take them outside the city limits.

4                          (Video tape restarted)

5  (The video tape was unintelligible for transcription purposes)

6                          (Video tape stopped)

7  BY MR. McMAHON:

8  Q.  What did you understand Davis to mean, when he said, "If

9  it's DEA and they know what time of day it is"?

10  A.  In other words, if they were watching me and they decide

11  to come down and close down the operation and arrest me, they

12  couldn't interfere.  They had no power to stop them from

13  arresting me.

14                          (Video tape restarted)

15  (The video tape was unintelligible for transcription purposes)

16                          (Video tape stopped)

17  BY MR. McMAHON:

18  Q.  Who are "these people" who were "official"?

19  A.  Again, the DEA, the FBI, anybody that was more on the

20  federal level that he had no power to stop is what he meant.

21                          (Video tape restarted)

22  (The video tape was unintelligible for transcription purposes)

23                          (Video tape stopped)

24  BY MR. McMAHON:

25  Q.  Why did you ask him about banks?

1   A.  At that time, we were talking about concealing money,

2   large sums that I have, that I was alluding I had, rather, and

3   where I wanted to place that money at one time or another.

4   Q.  Did this money laundering aspect of the investigation ever

5   pan out?

6   A.  No.

7           MR. McMAHON:  Continue.

8                   (Video tape restarted)

9   (The video tape was unintelligible for transcription purposes)

10                   (Video tape stopped)

11  BY MR. McMAHON:

12  Q.  What's Davis talking about right there, Agent Jackson?

13          MR. RIEHLMANN:  Judge, I'd object to --

14  BY MR. McMAHON:

15  Q.  What did you --

16          MR. RIEHLMANN:  -- the form of the question.

17          THE COURT:  Wait, wait, don't answer the question

18  yet, please.

19          And, the basis of the objection?

20          MR. RIEHLMANN:  Well, I think Mr. McMahon is

21  rephrasing and I'm objecting to the form of the question:

22  What was Davis talking about?   I think that would be

23  presumptuous on this Witness' part to tell us what --

24          THE COURT:  Was he talking about -- what was Davis

25  thinking about or talking about?

1          MR. McMAHON:  I'm going to rephrase.

2     BY MR. McMAHON:

3     Q.  What did you understand Davis to be talking about right

4     there?

5     A.  He was talking about another individual he had been

6     dealing with on a lower level, a drug dealer on a lower level,

7     other than myself, and at that time something had gone wrong

8     with him now telling him about the moving of any drugs that he

9     was involved with.  He had gotten, actually, popped during

10    that time.

11    Q.  And, what do you mean by "popped"?

12    A.  Arrested.

13          MR. McMAHON:  Okay, go ahead.

14                    (Video tape restarted)

15    (The video tape was unintelligible for transcription purposes)

16                    (Video tape stopped)

17    BY MR. McMAHON:

18    Q.  What did you understand Davis to mean, when he said, "The

19    things that he --" referring to Terry Adams "-- used to do,"

20    they would be able to "sky right up"?  What things?

21    A.  Initially, before I arrived, there were several meetings

22    out by a mall, where they actually guarded or helped assist in

23    guarding a simulated drug drop out there where Terry Adams

24    delivered something and they guarded it and watched it go down.

25          MR. McMAHON:  Okay, go ahead.

1                    (Video tape restarted)

2     (The video tape was unintelligible for transcription purposes)

3                    (Video tape stopped)

BY MR. McMAHON:

Q.  Can you just elaborate, a little bit, on what you're speaking about there?

A.  We were talking, like, initially, about -- what he was saying was if I brought in anyone that he didn't know, any individuals from my organization, as it was so alluded to, he wanted to know about them and, if we wanted to talk and discuss business, as we're doing here, then he wanted to make sure that that person was stripped down and there was no microphones or anything, hidden records on him at all, and then we'd go ahead and discuss business.

He didn't want to be surprised, the bottom line.

MR. McMAHON:  Okay.

(Video tape restarted)

(The video tape was unintelligible for transcription purposes)

(Video tape stopped)

BY MR. McMAHON:

Q.  Can you explain what you meant by that, when you said, "Don't mess over the people you bring in"?

A.  What I was asking him to do is give them exactly what we agreed to pay each individual that was going to be involved in the operation.  Don't shortchange them, don't give them

anything short, and then keep the money for yourself.  I was going to pay him enough money that he didn't need to take anything else from any other person that was involved in this and, like I said, shortchange them.

(Video tape restarted)

(The video tape was unintelligible for transcription purposes)

```
 7                   (Video tape stopped)
```

 8  BY MR. McMAHON:

 9  Q.  What do you mean "loads and the numbers"?  To what are you

10  specifically referring?

11  A.  I'm talking about if we were going to store it in a

12  warehouse and then we were going to remove it from the

13  warehouse, he might see or they might see several different

14  cars with my couriers inside the vans or cars, removing the

15  cocaine from the warehouse and taking it outside the city.

```
16                   (Video tape restarted)
```

17  (The video tape was unintelligible for transcription purposes)

```
18                   (Video tape stopped)
```

19  BY MR. McMAHON:

20  Q.  What's a "ki"?

21  A.  It's a kilo of cocaine is what we're talking about.

22        MR. McMAHON:  Go ahead.

```
23                   (Video tape restarted)
```

24  (The video tape was unintelligible for transcription purposes)

```
25                   (Video tape stopped)
```

Jackson - Direct

 1  BY MR. McMAHON:

 2  Q.  What are you talking about there?

 3  A.  We were talking about the test.  He had asked me had I

 4  ever dealt with the police before, when he said, "5-O," and I

 5  told him that I had never dealt with them before and every

 6  time that "T" was dealing with it, it was a test to see just

 7  what was going to happen, whether he was going to be arrested

 8  or not.

 9        MR. McMAHON:  Go ahead.

```
10                   (Video tape restarted)
```

11    (The video tape was unintelligible for transcription purposes)

12                          (Video tape stopped)

13    BY MR. McMAHON:

14    Q.  Were you talking about the first time you saw them at the

15    Sheraton Hotel?

16    A.  Yes.

17                          (Video tape restarted)

18    (The video tape was unintelligible for transcription purposes)

19                          (Video tape stopped)

20    BY MR. McMAHON:

21    Q.  Were you actually -- during the investigation, did you

22    give phones to Davis and Williams?

23    A.  Yes, I did.

24              MR. McMAHON:  Go ahead.

25                          (Video tape restarted)


                                                        123
                        Jackson - Direct

1     (The video tape was unintelligible for transcription purposes)

2                          (Video tape stopped)

3     BY MR. McMAHON:

4     Q.  When you say "as it gets rolling, we'll be able to drop it

5     in two spots," what were you talking about?

6     A.  I was asking for another location besides the one we're

7     actually discussing now, and what I was trying to explain to

8     him is I wanted two locations, one on different -- in

9     different parts of the city to actually store the cocaine.

10              MR. McMAHON:  Go ahead.

11                          (Video tape restarted)

12    (The video tape was unintelligible for transcription purposes)

13                          (Video tape concluded)

14  BY MR. McMAHON:

15  Q.  What did you just give Davis and Williams there?

16  A.  I gave each one of them $100.

17       MR. McMAHON:  Your Honor, I think this would be a

18  good time to take a break.  I know I need one.

19       THE COURT:  And, we're finished the tape?

20       MR. McMAHON:  We're finished the tape.

21       THE COURT:  All right.  I was about to wonder when it

22  would end.

23       MR. McMAHON:  So was I.

24       THE COURT:  We'll take a 10-minute recess; a 15-

25  minute recess, and the plan of the Court this afternoon is to

Jackson - Direct

1  stop around about 4:30-ish, because we have jurors who travel.

2  So, for witness purposes and so forth.

3  (Jury exits courtroom in custody of marshal)

4  (Recess from 3:00 p.m. until 3:18 p.m.; all parties present)

5  (Jury enters courtroom in custody of marshal)

6       THE COURT:  Please be seated.

7       Mr. McMahon, you have further questions of the

8  Witness?

9       MR. McMAHON:  Yes, sir.

10       THE COURT:  Go right ahead.

11       MR. McMAHON:  Your Honor, just formally, I have the

12  actual physical tape, so I would offer JJV-1 into evidence.

13       MR. RIEHLMANN:  No objection.

14       THE COURT:  It will be received.

15  BY MR. McMAHON:

16  Q.  Agent Jackson, was there another meeting after the May 4,

17  1994 encounter?

18   A.  Yes, there was.

19   Q.  When?

20   A.  On May 22nd.

21   Q.  Where?

22   A.  At the Hilton Hotel, in New Orleans.

23   Q.  The same room?

24   A.  No.

25   Q.  Was that meeting also videotaped and audio recorded?

Jackson - Direct

1   A.  Yes.

2   Q.  Without playing the tape at this time, what happened on

3   May 22nd?

4   A.  We went into a little more detail about what the operation

5   was going to entail.  We discussed locations.  We discussed

6   carriers, types of vehicles, as well as input from Len Davis

7   and Sammie, using different phrases, types of uniforms, things

8   like that, how to be careful and what to look out for.

9   Q.  Did the protection scenario actually begin, --

10   A.  Yes.

11   Q.  -- in NewOrleans?

12   A.  Yes.

13   Q.  Was a warehouse rented?

14   A.  Yes.

15   Q.  What was the municipal address of the warehouse?

16   A.  It was 420 Franklin Avenue.

17   Q.  I'm going to show you P-, for photo, 1, and ask that you

18   -- do you recognize this?

19   A.  Yes.

20   Q.  What does P-1 depict?

21 A.  That is the warehouse, which we used on the drug scenario.

22 Q.  And, is this a photograph of the warehouse, as it occurred

23 in the summer and fall of 1994?

24 A.  Yes, sir, it is.

25          MR. McMAHON:  Your Honor, I would offer P-1 into

                        Jackson - Direct

1 evidence --

2          THE COURT:  Any objection?

3          MR. McMAHON:  -- and let the jury --

4          MR. RIEHLMANN:  No, sir.

5          MR. VOIGHT:  No objection.

6          THE COURT:  It will be received.  The large copy will

7 be received, but do you have a small one for the final record?

8          MR. McMAHON:  I'm sure we can get one, Your Honor.

9          THE COURT:  Because we can't -- that won't fit in a

10 drawer.

11    (Laughter)

12          THE COURT:  Substitute after the trial.

13          MR. McMAHON:  Yes, sir.

14          THE COURT:  The exhibit is received, it may be used.

15          MR. McMAHON:  We will.

16          THE COURT:  Substitute after the trial a small thing

17 that can be filed.

18 BY MR. McMAHON:

19 Q.  Agent Jackson, is that -- where the van is parked there,

20 is that the front of the warehouse?

21 A.  Yes.

22 Q.  Okay.  Now, was it your intention, following those initial

23 meetings, to meet the police officers recruited by Davis to

24 guard the warehouse?

25    A.  Yes, it was.

                          Jackson - Direct
 1    Q.  Did you actually meet any of those officers?
 2    A.  Only one.
 3    Q.  Did you meet Leon Duncan?
 4    A.  No, I did not.
 5    Q.  Did you meet or do you know Darrel Jones?
 6    A.  No, I don't.
 7    Q.  And, when did the protection that you described in the
 8    meeting with Davis, when did those protection events occur,
 9    and how many of them?
10    A.  There were six deals.  They started in June and ended in
11    November.  They were run once a month.
12    Q.  And, how long, typically, would they last, the monthly
13    deals?  How long did they last?
14    A.  Approximately two or three days at a time.
15    Q.  And, were you able to identify corrupt elements in the
16    NewOrleans Police Department, during that investigation?
17    A.  Yes.
18    Q.  Did there come a point in time when you decided or,
19    rather, the Bureau, the FBI decided to expand the operation
20    beyond the warehouse location at 420 Franklin Avenue?
21    A.  Yes.
22    Q.  What was the purpose of doing this?
23    A.  To, again, branch out throughout the city and try to
24    establish, if at all, if there were any other officers that
25    were going to be involved in this protection scenario.

1 Q. And, by the way, was there an office in the warehouse?

2 A. Yes.

3 Q. Was the office equipped with cameras and audio recording

4 equipment?

5 A. Yes, it was.

6 Q. Did you have meetings in that office with Davis and

7 Williams?

8 A. Yes.

9 Q. Did you consent to being recorded at those meetings?

10 A. Yes.

11 Q. Where would you typically meet Davis and Williams?

12 A. It would probably be either the day before or the day of

13 the meeting we would actually have a pre-deal meet, explaining

14 again what was going to go on.  We'd go upstairs and discuss

15 everything and kind of, like, finalize exactly how it was

16 going to go and for how long.

17 Q. Okay.  Do you recall meeting there July 9th of 1994?

18 A. Yes.

19 Q. Now, let's talk about the expansion.  What month was the

20 operation actually expanded beyond the warehouse?

21 A. In November.

22 Q. And, how was this presented to Davis?

23 A. I explained to him again -- what had happened was, we

24 wanted to run two protection scenarios at the same time.  We

25 wanted the original police officers that had been used

1 throughout the different deals in the warehouse and then we

2 wanted a new set of police officers to be used at the truck

3 stop.

4  Q.  And, who was supposed to be the person who wanted the

5  truck stop utilized as a protection site?

6  A.  We had told Len and Sammie that another drug dealer from

7  Miami was interested in trying to use the City of NewOrleans,

8  and we told him that he was going to bring his drugs in, and

9  they were going to be separate from the drugs I was going to

10  house in the warehouse, and it was an actual test to see just

11  what was going to go on.

12  Q.  Was there any stipulation or request made regarding what

13  officers were to work the new location?

14  A.  We wanted new officers.  We wanted separate from the ones

15  that actually had been used all along, and that's what we had

16  asked for.

17  Q.  Okay.  Do you recall a telephone conversation between you

18  and Davis, on November the 14th of 1994, at approximately

19  8:00 p.m.?

20  A.  Yes.

21  Q.  And, briefly, what happened in that call?  What was going

22  on?

23       MR. RIEHLMANN:  Judge, I object.  I think that the

24  best evidence is the tape, the transcript of the --

25       THE COURT:  Well, he just merely asked if he recalled


                                                        130
                        Jackson - Direct

1  the telephone conversation and, if so, what it was all about.

2  The objection is overruled.

3       MR. RIEHLMANN:  Note my objection.

4  BY MR. MCMAHON:

5  Q.  Go ahead.

6  A.  The conversation talked about the hours and the time that

                        Page 115

7   people would be needed for the actual detail.

8           MR. McMAHON:  Your Honor, at this point, I would ask

9   that Track 2 be played.  It's going to be identified as JJ-1,

10  and for the jury -- we've provided the jury with transcript

11  books, Your Honor, with the --

12          THE COURT:  This is telephone conversation you just

13  spoke about?

14          MR. McMAHON:  This is a telephone --

15          THE COURT:  How long does it take?

16          MR. McMAHON:  Not as long as that video, I'll tell

17  you --

18          THE COURT:  Well, no, I'm just wondering, because --

19          MR. McMAHON:  A couple of minutes, Your Honor.

20          THE COURT:  Okay.

21          MR. McMAHON:  This is JJ-1.  It's going to be

22  Track 2.

23          THE COURT:  The jurors have been provided with the

24  -- and so have I, I see.  I was wondering what this was.

25          Are you referring to JJ-1T, or whatever you call

                                              131
                    Jackson - Direct

1   them?

2           MR. McMAHON:  Your Honor, JJ-1 is the actual

3   conversation.  JJ-1T, standing for "transcript," so that's --

4           THE COURT:  Okay.

5           MR. McMAHON:  So, that's just to make it easy on the

6   record.

7           THE COURT:  That's fine.

8           MR. McMAHON:  All right.  Play it.

9       (whereupon, the following excerpt of the audio tape of

10  Government's Exhibit JJ-1, a conversation between JUAN JACKSON
                    Page 116

11    and LEN DAVIS, dated November 14, 1994, was then played for

12    the jury:)

13                          (Incoming Call)

14          "MR. DAVIS:  Hello.

15          "MR. JACKSON:  Lenny.

16          "MR. DAVIS:  Yeah, what you say, baby?

17          "MR. JACKSON:  Yeah, what's up, man?

18          "MR. DAVIS:  Who this, Jay?

19          "MR. JACKSON:  Yeah, yeah, nigger.

20          "MR. DAVIS:  I can't hear you.  I got a lot of static

21    in this house.  Hold on.

22          "MR. JACKSON:  All right.

23          "MR. DAVIS:  Hello?

24          "MR. JACKSON:  Yeah.

25          "MR. DAVIS:  Yeah, --


                                              132
                        Jackson - Direct

1           "MR. JACKSON:  What's up?

2           "MR. DAVIS:  What we wanted to know is we need at

3     least an idea of what hours we talking about Friday for that

4     separate thing.

5           "MR. JACKSON:  Uh-huh. (affirmative response)  Okay.

6           "MR. DAVIS:  'Cause, see, I got people that work the

7     morning watch, evening watch, night watch.

8           "MR. JACKSON:  Yeah, yeah, yeah, yeah, yeah, yeah.

9     Just try to make it -- see, I don't know, I hate to say this

10    to you right now.  It is a little fucked up.  I don't know for

11    sure.  You know, I guess that's why I said I'm going to meet

12    you on Wednesday and we gonna talk, but I don't know for sure,

13    I ain't gonna lie.  Can you have them ready by 10:00 --"

                        Page 117

14                  (Audio tape stopped)

15   BY MR. MCMAHON:

16   Q.  What was that "separate thing"?

17   A.  It was a separate deal from the warehouse.  Separate from

18   the warehouse.

19                  (Audio tape resumed)

20              "MR. JACKSON:  -- in the morning?

21              "MR. DAVIS:  Uh-huh. (affirmative response)

22              "MR. JACKSON:  And, just tell them it's gonna run

23   from 10:00, what'd I say, four, five hours, that's 10:00 to

24   what?

25              "MR. DAVIS:  Let's say about six hours, from about


                                                         133
                      Jackson - Direct

 1   10:00 to 4:00.

 2              "MR. JACKSON:  Right, yeah, 10:00 to 6:00, yeah.  You

 3   know what I'm saying, that way we might be safe.

 4              "MR. DAVIS:  All right.

 5              "MR. JACKSON:  It ain't gonna be that long of a time,

 6   but I -- if I told you 10:00, and it happened at 1:00 --

 7              "MR. DAVIS:  Yeah, I know what you saying.

 8              "MR. JACKSON:  -- then I done fucked it up.  You know

 9   what I'm saying.

10              "MR. DAVIS:  I know what you're saying.

11              "MR. JACKSON:  You know what I'm saying, and I don't

12   know for sure, you know what I mean?

13              "MR. DAVIS:  All right, let me ask you another

14   question.

15              "MR. JACKSON:  Huh?  Huh?

16              "MR. DAVIS:  It's gonna be stationary and then it's

17   gonna move --

18          "MR. JACKSON:  Yeah.

19          "MR. DAVIS:  -- or it's just gonna come in moving?

20          "MR. JACKSON:  No, it's gonna be stationary, then

21    gonna move, and what I'm gonna do is, is hash that out with

22    the guy.  We got a few things that I'm gonna run -- he gonna

23    run by me --"

24                    (Audio tape stopped)

25


                                                            134
                        Jackson - Direct

1    BY MR. McMAHON:

2    Q.  What do you mean in that exchange about it's "gonna be

3    stationary, and then gonna move"?  Explain those terms.

4    A.  What we were talking about is:  Once the delivery of the

5    drugs came in, would they be housed, would they be sitting

6    somewhere and then taken out, and that's what "stationary and

7    then move" meant.

8          MR. McMAHON:  All right.

9                    (Audio tape resumed)

10          "MR. DAVIS:  Uh-huh. (affirmative response)

11          "MR. JACKSON:  -- as far as what's coming in and how

12    I'm gonna grab it and whatever else is gonna happen and then

13    from there I'll let you all know how it is.  What he's trying

14    to do -- because, like I say, this is that test run thing,

15    he's trying to keep shit hush-hush.  I say fine, as long as I

16    know just when it's coming and when it's going, and how we

17    gonna get the fuck out, I don't give a fuck.

18          "MR. DAVIS:  Uh-huh. (affirmative response)

19          "MR. JACKSON:  You know what I'm saying?  So, what

20    he's trying to do is -- is, you know what I mean, handle his

                            Page 119

21  business a little bit about being on a little bit of hush-hush

22  shit.  You know what I'm saying?  But, I say if you have the

23  motherfuckers ready by 10:00, anytime within that time frame,

24  we should be good to go.  It will be, like, a six-hour deal,

25  you know.

1        "MR. DAVIS:  All right.  Well, I could have them

2  ready for 10:00.

3        "MR. JACKSON:  Yeah, yeah.

4        "MR. DAVIS:  I just needed to know.

5        "MR. JACKSON:  Yeah, just tell them -- I mean, but

6  you don't have to tell the nigger; nigger don't know.  You

7  know what I'm saying?  If it happened at 12:00, nigger said

8  10:00, but you're still gonna get paid, nigger.

9        "MR. DAVIS:  Yeah, true, and that's all I wanna know

10  is what hours to tell them be on standby.

11        "MR. JACKSON:  Yeah, yeah, yeah, yeah.

12        "MR. DAVIS:  This way, when I call, if I say 10:00, I

13  call at 11:30, I don't wanna hear nothin but 'I'm on my way.'

14        "MR. JACKSON:  Yeah, yeah.  Oh, yeah.  You right.

15  You right.  You right.  Yeah, you right.

16        "MR. DAVIS:  This is why I'm finding this out, 'cause

17  we want this shit to run smooth.

18        "MR. JACKSON:  Yeah, yeah, yeah, I know, and I might

19  still have to keep it a little bit shaky, even on wednesday,

20  as far as I might still not know exactly when, 'cause I'm sure

21  he's trying to decide how long it's gonna take a motherfucker

22  to get there.  You, you know what I mean."

23                    (Audio tape stopped)

24  BY MR. McMAHON:

25  Q.  Who is the "he" he's trying to decide "how long it's gonna

Jackson - Direct

1  take a motherfucker to get there"?  Who is "he"?

2  A.  Well, what we were saying was the other drug dealer that

3  was supposedly bringing his drugs into the city, that was the

4  other person.

5              (Audio tape resumed)

6          "MR. JACKSON:  So, even if I say, 'Lennie, it's gonna

7  happen at 11:00, then we gotta be flexible, 'cause if the

8  motherfucker don't get there until 12:00, we can't do nothin,

9  'cause -- you know what I'm saying.

10          "MR. DAVIS:  All right.

11          "MR. JACKSON:  So, but we gonna try and work it out

12  like that.

13          "MR. DAVIS:  All right.  And, them four people, the --

14          "MR. JACKSON:  Yeah.

15          "MR. DAVIS:  -- the ends gonna be right for them?"

16              (Audio tape stopped)

17  BY MR. McMAHON:

18  Q.  What is "ends," E-N-D-S?

19  A.  He's talking about the money.  Every time we talked, he

20  used the word "ends" and that meant the money I was going to

21  pay them for the actual protection they were going to provide

22  for me.

23  Q.  And, the "four people" are who?

24  A.  The four new people that he was going to get to be used in

25  the scenario at the truck stop.

1                    (Audio tape resumed)

2              "MR. JACKSON:  Oh, oh, oh, oh, oh, nigger, I'm

3    telling you it's gonna be right, motherfucker.

4              "MR. DAVIS:  All right.

5              "MR. JACKSON:  You blow this shit, motherfucker, I

6    told you before, bitch, -- you got something else going,

7    motherfucker.

8              "MR. DAVIS:  We ain't gonna blow it.

9              "MR. JACKSON:  That's right, nigger.  That's what I'm

10   saying, but you, nigger, I'm telling you, you blow all this

11   money, you really fucked up.

12             "MR. DAVIS:  Uh-uh. (negative response)

13             "MR. JACKSON:  You know what I mean?

14             "MR. DAVIS:  We ain't gonna blow a motherfucking

15   thing.

16             "MR. JACKSON:  But, I mean, we gonna get paid this

17   time, and from here on out, you watch.  But, I'm kicking

18   with you, we on the phone, --

19             "MR. DAVIS:  Right.

20             "MR. JACKSON:  -- you know what I mean.

21             "MR. DAVIS:  All right.

22             "MR. JACKSON:  You know, I like to talk.  You know --

23             "MR. DAVIS:  Well, holler at me when you get in.

24             "MR. JACKSON:  Yeah, we gonna sit down and kick it.

25             "MR. DAVIS:  All right.


                                                        138
                          Jackson - Direct

1              "MR. JACKSON:  When you gonna in that motherfucking

2    bar, boy?  You gonna -- what nights you working, bitch?

3              "MR. DAVIS:  I be -- I'm there seven days a week.
                          Page 122

4   I'm going there tonight, fuck --

5          "MR. JACKSON:  -- be there every night, huh, nigger?

6          "MR. DAVIS:  Yeah.

7          "MR. JACKSON:  All right, to what, midnight?

8          "MR. DAVIS:  At least till 1:00, 1:30, 2:00.

9          "MR. JACKSON:  That's every night?

10         "MR. DAVIS:  Yeah.

11         "MR. JACKSON:  All right, 'cause I might run by

12  there, maybe if I get in tomorrow or something.

13         "MR. DAVIS:  All right.

14         "MR. JACKSON:  All right.

15         "MR. DAVIS:  All right.

16         "MR. JACKSON:  (Unintelligible)"

17                (Audio tape concluded)

18  BY MR. McMAHON:

19  Q.  What's that bar you referred to on Line 13, Page 5?

20  A.  It was a bar where Len actually worked at.

21  Q.  Okay.  Did you speak to Davis the next day, November the

22  15th?

23  A.  Yes.

24  Q.  And, what was the purpose of that conversation?

25  A.  Again, we were discussing more of the details of what was

Jackson - Direct

1   going to happen, and a lot of things I was trying to keep him

2   in the dark about, and which he was more concerned that we

3   were keeping him in the dark, and they didn't know a lot about

4   what was going to go on.

5          MR. McMAHON:  Your Honor, at this time, I'd ask Track

6   5 be played, which is JJ-2, a call on November 15, '94 at

```
 7  7:34 p.m.

 8          THE COURT:  Go right ahead.

 9      (Whereupon, the following excerpt of the audio tape of

10  Government's Exhibit JJ-2, a conversation between JUAN JACKSON

11  and LEN DAVIS, dated November 15, 1994, was then played for

12  the jury:)

13                          (Income Call)

14          "MR. DAVIS:  Hello.

15          "MR. JACKSON:  What's up, man.

16          "MR. DAVIS:  What's happening, baby?

17          "MR. JACKSON:  What's going on, daddy?

18          "MR. DAVIS:  Not a damn thing.

19          "MR. JACKSON:  All right.  All right.  Check this

20  out, nigger, --

21          "MR. DAVIS:  I'm listening.

22          "MR. JACKSON:  Meet me tomorrow at the --

23          "MR. DAVIS:  Uh-huh. (affirmative response)

24          "MR. JACKSON:  -- at the warehouse, at 11:00.

25          "MR. DAVIS:  All right.
```

                          Jackson - Direct

```
 1          "MR. JACKSON:  Can you meet me there?

 2          "MR. DAVIS:  Yeah.

 3          "MR. JACKSON:  Eleven o'clock?

 4          "MR. DAVIS:  Yeah.

 5          "MR. JACKSON:  Oh, all right, I hurt my back again,

 6  man.  I'm fucked up again, man.

 7          "MR. DAVIS:  I ain't never -- you must be fucking

 8  taking too much steroids or something.

 9          "MR. JACKSON:  Oh, man, fuck you, man, I'm just

10  trying to get them project whores, they're starting to fuck
```

11    with me too bad.
12            "MR. DAVIS:  That's what it is, you're taking too
13    much steroids.
14            "MR. JACKSON:  (Laughing)
15            "MR. DAVIS:  But, now we're going to have location
16    and all that, right?  Tomorrow.
17            "MR. JACKSON:  Tomorrow?
18            "MR. DAVIS:  Or you don't know that yet?
19            "MR. JACKSON:  Yeah --"
20                      (Audio tape stopped)
21    BY MR. McMAHON:
22    Q.  When Davis asks if you're "going to have location," what
23    did you understand that to mean?
24    A.  He wanted to know the exact location of where the truck
25    stop, where it was going to be located, where the drugs were


                                          141
                          Jackson - Direct
 1    going to be actually brought in to.  At that time, I was
 2    trying to tell him I didn't know.
 3    Q.  And, when you say you're going to meet at the warehouse
 4    the next day, is that the warehouse depicted in P-1?
 5    A.  Yes.
 6            MR. McMAHON:  Go ahead.
 7                      (Audio tape resumed)
 8            "MR. JACKSON:  Yeah, I don't know that yet.  I'm --
 9    you know, that's the only problem.  But, I'm -- I know it's
10    Friday, like I say, but I think I should have it by 11:00.
11    I'm waiting for the motherfucker to call me back now.  They
12    should, they should know.
13            "MR. DAVIS:  Well, I tell you one fucking thing, Jay.

14          "MR. JACKSON:  What's that?

15          "MR. DAVIS:  This nigger better be handling his

16   business as far as them ends, 'cause right now he's doing a

17   lot of dictating.

18          "MR. JACKSON:  Yeah, yeah.

19          "MR. DAVIS:  And, we don't have too much say-so, and

20   we normally wouldn't even fuck with this like this, --

21          "MR. JACKSON:  Yeah.

22          "MR. DAVIS:  -- because he's dictating everything,

23   you dig?  We don't know what we're rolling in to, --

24          "MR. JACKSON:  I know, but --

25          "MR. DAVIS:  -- you dig.  So, he better be ready to

1    handle his business properly.

2           "MR. JACKSON:  Oh, yeah, I know.  And, you know I

3    told you before about the nigger being paranoid, you know what

4    I'm saying?

5           "MR. DAVIS:  Yeah, --"

6                       (Audio tape stopped)

7    BY MR. McMAHON:

8    Q.  What's that exchange all about, about -- who is the person

9    "dictating"?

10   A.  The individual we had told him that was going to bring the

11   drugs in to NewOrleans, along with my drugs, and what we were

12   talking about is that he was dictating exactly how much

13   information I was going to provide to them before the actual

14   scenario started.

15   Q.  And, was this a matter of -- did you understand this to be

16   a matter of concern to Davis?

17   A.  Yes, he was very concerned, because, like I said,

18    normally, as he says in here, he normally knows a little bit

19    more and that way he can provide his people with that

20    information.  At that time, we were not trying to do that.

21                    (Audio tape resumed)

22             "MR. DAVIS:  Yeah, I can understand that.  But, at

23    the same time, that's what you got to understand with us.

24             "MR. JACKSON:  Oh, yeah.

25             "MR. DAVIS:  He's doing all the dictating.

1             "MR. JACKSON:  I know, --

2             "MR. DAVIS:  And, we like puppets on a string, you

3    dig.

4             "MR. JACKSON:  You're right, and it's fucking

5    everything up.  You see, I agree with you, I hear you.  You

6    know, I agree with you 100 percent, it is fucking everything

7    up, you know what I'm saying.  But, yeah, at 11:00, hopefully,

8    I'll have everything at least to a point of what we're gonna

9    do.  You know what I'm saying?

10            "MR. DAVIS:  Uh-huh. (affirmative response)

11            "MR. JACKSON:  You know what, at 11:00, meet me at

12    the warehouse and we'll square it away.

13            "MR. DAVIS:  All right.

14            "MR. JACKSON:  You know what I'm saying, and we

15    gonna tighten things up.  I'm telling you, we're gonna tighten

16    things up, nigger.

17            "MR. DAVIS:  All right, man.  All right.

18            "MR. JACKSON:  All right, I'll talk to you.

19            "MR. DAVIS:  All right.

20            "MR. JACKSON:  Thanks.  Later."

```
21                    (Audio tape concluded)
22   BY MR. McMAHON:
23   Q.  I'm going to direct your attention to the next day,
24   Thursday, November the 16th, of '94, a little after noon.  Did
25   you meet at the warehouse?
```

Jackson - Direct

```
 1   A.  Yes.
 2   Q.  Who was there?
 3   A.  Myself, Terry Adams, Len Davis and Sammie Williams.
 4   Q.  And, was that meeting audio recorded?
 5   A.  Yes.
 6   Q.  And, did you consent to that?
 7   A.  Yes.
 8   Q.  Describe what happened -- was this one of the pre-deal
 9   meetings that you testified to earlier?
10   A.  Yes, it was.
11   Q.  And, in general terms, before we play the actual tape,
12   what was the topic of conversation?
13   A.  The scenarios were set up.  We were trying to explain to
14   them the locations, what we were going to do, the times we
15   were going to do it and how many people we were going to need
16   to do the two scenarios that we were going to set up to do.
17   Q.  How much money was Davis and Williams to receive for
18   protecting the cocaine at the truck stop, eventually?
19   A.  Fifteen thousand dollars.
20   Q.  And, how much were they to be paid for protecting the
21   cocaine that was going to be sitting at the warehouse?
22   A.  Fifteen thousand dollars.
23        MR. McMAHON:  Let's play Track 7, JJ-3.
24        (Whereupon, the following excerpt of the audio tape of
```

25    Government's Exhibit JJ-3, a conversation between JUAN

                          Jackson - Direct

 1    JACKSON, TERRY ADAMS, LEN DAVIS AND SAMMIE WILLIAMS, dated

 2    November 16, 1994, was then played for the jury:)

 3                        (Nagra Recorder)

 4            "MR. JACKSON:  So, what's up, daddy?

 5            "MR. DAVIS:  What the fuck, you up there talking to

 6    yourself?

 7            "MR. JACKSON:  Well, I always talk to my fucking --

 8    never mind, never mind.  Ain't no problem, ain't no problem.

 9    What's up, boss?

10            "MR. DAVIS:  We broke; --

11            "MR. JACKSON:  I know you are.  That ain't nothing

12    new, though.

13            "MR. DAVIS:  -- still driving Regals and Maximas.

14            "MR. JACKSON:  That, that ain't nothing.  I just ran

15    into nasty ass cobweb.  One second.  Shit, --

16            "You still driving what, Regals and what?

17            "MR. DAVIS:  Maximas.

18            "MR. JACKSON:  And Maximas.

19            "MR. DAVIS:  We should be in BMWs.

20            "MR. JACKSON:  You quit -- you quit spending so much

21    fucking money.

22            "MR. WILLIAMS:  Where my straw at?  You get my straw?

23            "I got one.

24            "MR. JACKSON:  Motherfucking shit.

25            "MR. DAVIS:  The money we been making won't pay the

1   financing on one of them motherfuckers.

2           "MR. JACKSON:  All right.  Well, well, we gonna sit

3   down and talk, nigger, 'cause we gonna make big money, you

4   know what I mean.  But, you all gonna blow it just as quick as

5   you all make it.

6           "All right, check this out.  All right.  We gonna

7   start this today, probably around a half an hour.

8           "MR. DAVIS:  Uh-huh. (affirmative response)

9           "MR. JACKSON:  With your boys coming, that's why we

10  got the van so quick, 'cause I wanted to go ahead and get it

11  and at least try to hook it up.  It's gonna, you know, last

12  till Friday.  Your boys gonna be here."

13                  (Audio tape stopped)

14  BY MR. McMAHON:

15  Q.  When you say, "We're gonna start this here today," what

16  was that specifically referring to?

17  A.  That was meaning protection of the drugs in the warehouse.

18          MR. McMAHON:  Okay.

19                  (Audio tape resumed)

20          "MR. JACKSON:  You know.  And, the other thing is

21  gonna happen on Friday.  It's gonna happen anywhere between

22  around -- have them ready between 11:00, and no later than

23  maybe 2:00 we'll be done.  All we're gonna do is this:  A

24  motherfucking tractor-trailer gonna pull up and we just gonna

25  have it unloaded.  You just gonna follow -- your boys just

1   gonna follow these motherfuckers in two different directions.

2   That's all the fuck you doing.

3           "MR. DAVIS:  You saying two --"

4                    (Audio tape stopped)

5    BY MR. McMAHON:

6    Q.  We just -- when you said that a tractor-trailer was going

7    to pull up and "we just going to have it unloaded," what is

8    "it"?

9    A.  The cocaine out of the tractor-trailer into.

10                   (Audio tape resumed)

11              "MR. DAVIS:  Okay.

12              "MR. JACKSON:  Well, east and west.

13              "MR. DAVIS:  In what type -- what type of vehicles?

14              "MR. JACKSON:  That -- what do you mean?

15              "MR. DAVIS:  A trailer gonna pull up?

16              "MR. JACKSON:  Yeah.

17              "MR. DAVIS:  And unload?

18              "MR. JACKSON:  Yeah.

19              "MR. DAVIS:  Into what?

20              "MR. JACKSON:  Into vans.

21              "MR. DAVIS:  Two vans?

22              "MR. JACKSON:  Yeah.

23              "MR. DAVIS:  With your logo?

24              "MR. JACKSON:  Yeah -- no, no, no, no, no, no.

25              "MR. DAVIS:  They're gonna be plain vans.

1              "MR. JACKSON:  No, no, no -- be plain vans, plain

2    vans.

3              "MR. DAVIS:  All right.  Two of them?

4              "MR. JACKSON:  Won't be no logo.

5              "MR. DAVIS:  So, what's the location?

6              "MR. JACKSON:  I don't know yet.  That's the only

7  problem.  I don't know.

8        "MR. DAVIS:  What the fuck is he waiting on to tell

9  you?"

10                    (Audio tape stopped)

11  BY MR. McMAHON:

12  Q.  What's the reference to "logos," when Davis asks if the

13  vans, the vehicles are going to have logos on them?  Does that

14  refer to anything in particular?

15  A.  Yes, we had logos placed on the vans in the prior

16  operations, showing the same logo that was on the warehouse,

17  and what we were saying here was those logos won't be placed

18  on any van.  It's going to be plain, so no one would know.

19                    (Audio tape resumed)

20        "MR. JACKSON:  He don't know.  He got three different

21  spots.  He don't know until the tractor-trailer guy figure out

22  which one it is he want to drop it off at.  I guess he got a

23  hook-up and which one he got the hook-up with is the one he's

24  gonna go with.

25        "MR. DAVIS:  Uh-huh. (affirmative response)

                                                              149
                    Jackson - Direct

1        "MR. JACKSON:  Right now he said here's two different

2  spots he's trying to get.  He don't know which one it is.

3        "MR. DAVIS:  But, --

4        "MR. JACKSON:  And that's why, bro.  I didn't ask --

5  I didn't really ask him, to be honest with you.  I didn't ask.

6        "MR. DAVIS:  You need to find out.

7        "MR. JACKSON:  I didn't ask.  I didn't ask, 'cause he

8  didn't know.  I mean, if he's telling me there's two or three

9  different --

10        "MR. DAVIS:  No.  Oh, he don't -- all right.  When

11  you're saying two different spots, I thought you know it's A

12  or B, is gonna be one of them.

13          "MR. JACKSON:  Well, A, B -- now it's A, it might be

14  A, B or C.

15          "MR. DAVIS:  Well, he got --

16          "MR. JACKSON:  In other words, it might be all the

17  way out by -- on the highway, and the other two will be here

18  in the city.

19          "MR. DAVIS:  Uh-huh. (affirmative response)

20          "MR. JACKSON:  But, he -- that's what he told me.

21  That's what he said.

22          "MR. WILLIAMS:  Look, the reason, the only reason --

23  let him know, the only reason we want to know is so we could

24  make it secure around there.

25          "MR. JACKSON:  Yeah, yeah, yeah, yeah.

1           "MR. DAVIS:  'Cause we want to know what's going down

2   in that area.  He might come and say, 'We want -- we doing it

3   at A Spot,' and that just happen to be where Narcotics at or

4   anything stupid.

5           "MR. JACKSON:  Right, right, right, --

6           "MR. DAVIS:  In other words, we want to know.

7           "MR. JACKSON:  Right, right, right, right.

8           "MR. DAVIS:  We're security.  We responsible for

9   this.  So, it's our job to know this.

10          "MR. JACKSON:  Okay.

11          "MR. DAVIS:  Don't wait and pop nothing on us.  'It's

12  11:00 -- it's 10:55; 11:00 it's gonna be at Broad and

13  Gravier,' by police headquarters.

```
14            "MR. JACKSON:  Right. (Laughing)  Right.

15            "MR. DAVIS:  See what I'm saying?

16            "MR. JACKSON:  Right, right, right.

17            "MR. DAVIS:  That's exaggerated, but that's the

18   point.

19            "MR. JACKSON:  All right.  Yeah.  I know what you're

20   saying.  All right.  Well, he, like I said, his whole problem

21   is with --

22            "MR. DAVIS:  Well, try to find out by Friday, before

23   Friday.

24            "MR. JACKSON:  All right.  Well, I'll try to find out

25   that morning, 'cause what he's saying to me is -- see, like I
```

```
 1   say, he leery.  He's saying, 'What do these niggers do?'

 2            "I said, 'Well, you know what they do.'

 3            "He said, 'Well, how do you know these mothers ain't

 4   fucking something up out there?  They jack them motherfuckers

 5   and you motherfuckers get knocked off on the day that we come

 6   in --'"

 7                         (Audio tape stopped)

 8   BY MR. McMAHON:

 9   Q.  What do you mean when you say "how do you know that these

10   motherfuckers ain't jacking and they get knocked off on the

11   day we come in"?  What was that?

12   A.  Well, what we're trying to do is avoid a rip-off, and

13   that's what we're trying to do is keep them in the dark, and

14   that's what I was meaning by that, is that we're trying to

15   keep them in the dark, or at least the other drug dealer is,

16   to make sure nothing like that happens.

17                         (Audio tape resumed)
```

18          "MR. JACKSON:  Say your boy jacks the motherfucker
19    and all of a sudden the police come down on you all that same
20    day we come in.  We all fucked.  We all fucked.
21          "MR. WILLIAMS:  Man, we ain't --
22          "MR. DAVIS:  But, why we ain't been jacking --
23          "MR. JACKSON:  No, I mean, -- that's what I'm saying.
24          "MR. WILLIAMS:  Well, he talking about if we jacking
25    somebody else out there --

                        Jackson - Direct
1          "MR. JACKSON:  Yeah, yeah, yeah.  That's what I'm
2    saying.  You boys been jacking all week, I don't know, 'cause
3    I don't hang with you all week long.
4          "MR. WILLIAMS:  Man, we ain't bringing no heat to
5    us."
6                    (Audio tape stopped)
7    BY MR. McMAHON:
8    Q.  And what is the term "jack" mean, what is that, to "jack"?
9    A.  It's just a term for rip-off, just -- in other words, to
10    take some money or take the drugs or money from them at one
11    time.
12                    (Audio tape resumed)
13          "MR. DAVIS:  So, in other words, you telling me his
14    concern is that we might have heat on us?
15          "MR. JACKSON:  Yeah.
16          "MR. DAVIS:  Oh, okay.
17          "MR. JACKSON:  Yeah.  And, all he saying is, if you
18    have heat on us, and one of them does -- not all you all; one
19    -- all of us go down.
20          "MR. DAVIS:  Now, you know what?  And, that was -- I

21 was thinking the same thing and that's why I say I don't want

22 him dictating too much.  We don't know who fucking over him.

23          "MR. JACKSON:  Right, right.

24          "MR. DAVIS:  We know you.

25          "MR. JACKSON:  Right, right.

                           Jackson - Direct

1          "MR. DAVIS:  And, I think, after all this time, I'm

2 pretty comfortable.

3          "MR. JACKSON:  Right.

4          "MR. DAVIS:  We're constantly checking up on Scaboo.

5          "MR. JACKSON:  Yeah, you better be.

6          "MR. DAVIS:  As far as to see if his name hot.

7          "MR. JACKSON:  All right.

8          "MR. DAVIS:  We'll step to him and tell him.

9          "MR. JACKSON:  Right.

10          "MR. DAVIS:  His name not even known.

11          "MR. JACKSON:  Right.

12          "MR. DAVIS:  And that's cool.  But, what we want to

13 do -- this motherfucker talking about us bringing heat.  Fuck.

14 They could have a whole motherfucking FBI unit assigned to

15 him.

16          "MR. JACKSON:  You're right, you're right.  You're

17 right.

18          "MR. DAVIS:  We don't know --

19          "MR. JACKSON:  And you're right.

20          "MR. DAVIS:  -- so we don't go rolling into something

21 without being able to play the area first and make sure it's

22 clean, just on his word.

23          "MR. JACKSON:  I know.

24          "MR. DAVIS:  He got to understand where we're coming

25    from.

                          Jackson - Direct
1         "The new people I got for the new detail, that's what
2    I wanted to talk to you about.
3         "MR. JACKSON:  Yeah, yeah.
4         "MR. DAVIS:  Two of them are detectives.
5         "MR. JACKSON:  All right.
6         "MR. DAVIS:  They drive a plain marked -- it's gonna
7    be a blue Ford.
8         "MR. JACKSON:  All right.  Well, just --
9         "MR. DAVIS:  Unmarked and --
10        "MR. JACKSON:  Don't worry about that.  Don't worry
11   about that.  That's the other thing we gotta talk about.  He
12   don't want -- I need you, on Friday, to be with me earlier
13   than 11:00.
14        "MR. DAVIS:  Uh-huh. (affirmative response)
15        "MR. JACKSON:  'Cause we're gonna go rent cars for
16   these guys, all right.  I want you to go with me.  We're gonna
17   go get these cars and you gonna drive them out, 'cause I can't
18   drive, the fucking car I got.
19        "MR. DAVIS:  Uh-huh. (affirmative response)
20        "MR. JACKSON:  And, so we're gonna go to a place,
21   rent them out.  Well, that's what I want to do.  That's what
22   he said.  He don't want nothing tied -- he don't want -- now,
23   his whole problem is being tied to anything.  Anything.
24   Motherfucker, if we get stopped, your police car -- his own
25   car -- your car -- his car is all linked to somebody."

1                    (Audio tape stopped)

2    BY MR. McMAHON:

3    Q.  When you say that "he" doesn't want anything "tied to

4    anything," what are you talking about?

5    A.  We were trying to make him understand that the other drug

6    dealer, the one that was bringing in the cocaine that was

7    going to be used in the truck stop, he didn't want anyone to

8    have anything that would identify him to anything else.  If we

9    were ever stopped by anyone, and it was someone's personal

10   car, they would be able to identify someone.  So, we wanted to

11   control that environment.

12   Q.  And, is that the purpose for renting the vehicles?

13   A.  Yes, it was.

14                   (Audio tape resumed)

15           "MR. DAVIS:  Uh-huh. (affirmative response)

16           "MR. JACKSON:  If we get a rent-a-car linked to one

17   credit card, only motherfucker we got to worry about is that

18   motherfucker right there.  If they come back, they come back

19   on him first.  That's where the name comes from.

20           "MR. ADAMS:  Well, it's just like -- I'm gonna still

21   get the cars --

22           "MR. JACKSON:  I'm not saying that's gonna happen.

23   I'm saying just be prepared --

24           "MR. DAVIS:  Well, I understand that logic, too.

25           "MR. JACKSON:  -- on Friday.

1           "MR. DAVIS:  So, what he's saying is, he wouldn't

2    want any cars that could be linked to police or us or nothing.

3           "MR. WOODS:  Yeah.

```
 4          "MR. JACKSON:  Nobody.

 5          "MR. DAVIS:  He want -- so --

 6          "MR. JACKSON:  And, that might happen.  I'm not

 7   saying that's totally.  He's --

 8          "MR. DAVIS:  All right.

 9          "MR. JACKSON:  That's what he threw down and he said,

10   'Tell your boy --' oh, and I need to have them a cell phone.

11   These -- can these two guys have cell phones?  Can these, you

12   know, --

13          "MR. ADAMS:  Can there be a cell phone in each car?

14          "MR. JACKSON:  -- can each guy have a cell phone in

15   his car?

16          "MR. WILLIAMS:  Yes.

17          "MR. DAVIS:  Is it necessary to have all four our

18   people there at the same time, or this is -- let me tell you

19   how I wanted to do it and you tell me if this is a problem.

20          "MR. JACKSON:  Okay.

21          "MR. DAVIS:  Let's say the thing pull up, --

22          "MR. JACKSON:  Right.

23          "MR. DAVIS:  -- we got two our people there.

24          "MR. JACKSON:  Right.

25          "MR. DAVIS:  It unloads.  The first van ready to
```

Jackson - Direct

```
 1   roll.

 2          "MR. JACKSON:  Right.

 3          "MR. DAVIS:  And, people pull off behind it.

 4          "MR. JACKSON:  Right.

 5          "MR. DAVIS:  Right simultaneous, after they pull

 6   off --
```

```
 7          "MR. JACKSON:  Right.

 8          "MR. DAVIS:  -- seconds later our other people pull

 9   up.

10          "MR. JACKSON:  Go ahead.

11          "MR. DAVIS:  The other thing come, then they follow

12   that one out -- or he's saying he want everybody --

13              (Multiple voices; unintelligible)

14          "MR. JACKSON:  Yeah, okay.  Let me -- I know what he

15   wanted to do, but I know what you're saying, too.  That way,

16   everybody ain't sitting around.  Let me -- 'cause all he was

17   doing is saying, 'If you all are sitting in a car that nobody

18   know about, --' and what happened is what he was trying to say

19   and that's what he was saying about the location, he was

20   trying to pick something where he could pull the truck -- in

21   other words, you wouldn't even see anything load and unload.

22   All I would do is say to you, 'Len, okay, it's a red car, it's

23   a red van.  It just left.'  You know, like, say -- just say --

24   say this is a wall.  Now, what, what we were -- me and him was

25   trying to hash things out.  He said, 'What I'd like to do --'
```

Jackson - Direct

```
 1   and he don't even want you all to see nothing, because --

 2          "MR. DAVIS:  Good.

 3          "MR. WILLIAMS:  Fine, we have no problem with --

 4          "MR. DAVIS:  We're perfect with that.

 5          "MR. JACKSON:  You know, you know, I mean,  you know

 6   what I'm saying.  So, what he's saying --

 7          "MR. DAVIS:  You don't have to --

 8          "MR. JACKSON:  Like, say, -- like, say, this is a

 9   wall, and you all are on this side of the wall and then they

10   over here loading, right.
```

```
11              "MR. WILLIAMS:  Uh-huh. (affirmative response)

12              "MR. JACKSON:  Then I'm out here somewhere.

13              "MR. DAVIS:  And then when they pull out, you say,

14   'That's it right there.'

15              "MR. JACKSON:  I say, 'The motherfucker's red.'

16              "MR. WILLIAMS:  Yeah.

17                  (Multiple voices; unintelligible)

18              "MR. JACKSON:  In other words, he say, 'All right,

19   man, it's the red car.  Get behind the motherfucker and handle

20   your business.'

21              "MR. WILLIAMS:  Yeah.

22              "MR. JACKSON:  Then another dude, same thing.  You

23   know what I'm saying?  So, you don't see nothing.  You know

24   what I'm saying, that way --

25              "MR. DAVIS:  That wouldn't be a problem.
```

                                                     159
                         Jackson - Direct

```
 1              "MR. JACKSON:  -- you know you don't -- ain't nobody

 2   see nothing.

 3              "MR. DAVIS:  What we'll do, I'll --

 4              "MR. WILLIAMS:  Basically, they gonna be moving at

 5   the same time?

 6              "MR. JACKSON:  Huh?

 7              "MR. WILLIAMS:  Rolling out at the same time, the two

 8   vans?

 9              "MR. JACKSON:  Yeah.

10              "MR. DAVIS:  Or it's gonna be one pull off, then

11   another one?

12              "MR. JACKSON:  No.  They just gonna put them -- put

13   them right in, you know, into and then get out of there.
```

14          "MR. WILLIAMS:  Okay.  They're going to be there at

15    the same time.

16          "MR. JACKSON:  Yeah, yeah, yeah, and just get out,

17    just get out.

18          "MR. DAVIS:  So, you don't want uniforms on this one.

19          "MR. JACKSON:  No.

20          "MR. DAVIS:  Okay.

21          "MR. WILLIAMS:  No uniforms?

22          "MR. JACKSON:  No, no, no.

23          "MR. WILLIAMS:  Okay.  That's fine.  That's fine.

24          "MR. JACKSON:  No.  I mean, in the car you can have

25    them.  Not marked; no, no, no marked units or nothing like

Jackson - Direct

1     that.

2               (Multiple voices; unintelligible)

3          "MR. JACKSON:  In the car, yeah, in the car you can

4     have uniforms on.  Yeah, yeah, but, but not anything marked.

5          "MR. WILLIAMS:  He do want them or don't want them?

6          "MR. DAVIS:  In other words, we talking about

7     uniforms.

8          "MR. JACKSON:  Oh, yeah, yeah, yeah, yeah, yeah,

9     yeah, yeah, yeah, yeah.  You mean your police uniforms?

10         "MR. DAVIS:  Yeah.

11         "MR. JACKSON:  Yeah, yeah, that's fine.  Yeah, That

12    he doesn't mind.  That he doesn't mind.

13         "MR. DAVIS:  Well, let me ask you this --"

14              (Audio tape stopped)

15    BY MR. McMAHON:

16    Q.  What does that talk about uniforms mean?

17    A.  The actual police uniforms that each police officer

18  would have, he wanted those officers to wear the uniforms.

19  Q.  And, when the officers guarded the cocaine in the months

20  prior to this, were they dressed in uniforms?

21  A.  Yes, sir.  Yes.

22  Q.  And, whose original idea was it for the officers to wear

23  the uniforms?

24  A.  Actually, it was Len's idea.

25                      (Audio tape resumed)


                                                        161
                        Jackson - Direct

1           "MR. DAVIS:  What I want to know is --

2           "MR. JACKSON:  What?

3           "MR. DAVIS:  -- I got two detectives who work plain

4   clothes.  It is a necessity or can they come plain?

5           "MR. JACKSON:  (Unintelligible)

6           "MR. DAVIS:  I'm asking you.  You know, normally you

7   want uniforms out there.

8           "MR. JACKSON:  Right.

9           "MR. ADAMS:  They come like they do their job.

10          "MR. DAVIS:  What we want to know is, do you want

11  them plain where --

12          "MR. JACKSON:  I know he would like to have them --

13          "MR. DAVIS:  -- they're more inconspicuous or what

14  would you like?

15              (Multiple voices; unintelligible)

16          "MR. JACKSON:  No.  Listen.  If somebody see a nigger

17  in uniform, and they say, 'That nigger's a detective.  Why he

18  got a uniform --'

19          "MR. WILLIAMS:  Detectives -- no, no, detectives --

20          "MR. DAVIS:  Oh, no.  They wear uniforms --

                        Page 143

21          "MR. WILLIAMS:  Let me tell you, detectives work

22  details --

23          "MR. JACKSON:  Oh, oh, they do?

24          "MR. DAVIS:  Yeah.

25          "MR. WILLIAMS:  They in uniform --

 1          "MR. JACKSON:  Oh, oh, okay.  I don't know.

 2          "MR. WILLIAMS:  When you work a detail, you got to

 3  put on a uniform.

 4          "MR. JACKSON:  Oh, okay, okay.  So, it, it ain't no

 5  problem.

 6          "MR. WILLIAMS:  No.

 7          "MR. JACKSON:  And, your boys ain't got no problem.

 8  That's just the normal the way they --

 9          "MR. DAVIS:  We already told them --

10          "MR. JACKSON:  Okay.  Okay.

11          "MR. DAVIS:  -- that it's a possibility, that they

12  might need to put on uniforms --

13          "MR. JACKSON:  Yeah, and it's a probability, okay.

14  Okay.

15          "MR. DAVIS:  Right.

16          "All right.  Get to where they going.

17          "MR. JACKSON:  Okay, one's gonna go east and one's

18  gonna go west.

19          "MR. DAVIS:  Okay.

20          "MR. JACKSON:  One's gonna go to the -- to that twin

21  thing again.

22          "MR. DAVIS:  To that drop-off.

23          "MR. JACKSON:  And, the other one's gonna go to I-55.

24          "MR. DAVIS:  To that drop-off.

25          "MR. JACKSON:  Right.  To that drop-off.  And that,

                                              163
                    Jackson - Direct

 1    and then they come on back.
 2          "MR. DAVIS:  Uh-huh. (affirmative response)
 3          "MR. JACKSON:  Okay.  I said it's around 11:00,
 4    right?  Gonna end around 2:00.  Okay.  These dudes here will
 5    be here from -- within another hour or two -- excuse me --
 6    until around 12:00.  Now, you got everybody for this, right?
 7          "MR. WILLIAMS:  Uh-huh. (affirmative response)
 8          "MR. DAVIS:  Yeah.   This is done, this is done.
 9          "MR. JACKSON:  Got somebody out there, right?
10          "MR. WILLIAMS:  Everybody's in.
11          "MR. JACKSON:  What am I missing here?  Fuck it.
12    Okay.  Yeah.  We gonna give you all for this, for here,
13    fifteen grand.  All right, $15,000 for here.
14          "MR. DAVIS:  Hum-m-m.
15          "MR. JACKSON:  All right."
16                     (Audio tape stopped)
17    BY MR. McMAHON:
18    Q.  What's "for here"?
19    A.  I was meaning the warehouse where we were meeting at.
20                     (Audio tape resumed)
21          "MR. JACKSON:  I don't know how many guys you usually
22    get, you know.  I figured it out in my head, but we all got
23    confused before.  So, you give the motherfucker -- whatever
24    you give them, you give them.  All right.  I get tired trying
25    to figure out $1,500.

                                              164

Jackson - Direct

1          "And, he was gonna -- and I was gonna give you 15 for
2    mine.  All right.  I talked to the nigger, now, and you do
3    what you want with the money, because I thought I was putting
4    -- running you into the ground.  I was gonna give you a
5    thousand dollars each for each guy, then three times, and
6    three times the amount for you all.  In other words, if you've
7    got four guys on the detail for the truck --
8          "MR. DAVIS:  Uh-huh. (affirmative response)
9          "MR. JACKSON:  -- at a thousand dollars apiece, that
10   was $4,000.  That left you all with --
11         "MR. DAVIS:  That's what our contract was.
12         "MR. JACKSON:  That left you all with,  you know,
13   three apiece, six.  You know, three times as much as what your
14   boys get.
15         "MR. DAVIS:  Uh-huh. (affirmative response)
16         "MR. WILLIAMS:  This is gonna be leaving about that
17   time?
18         "MR. JACKSON:  About noontime on Friday.
19         "MR. DAVIS:  Noon, Friday.
20         "Look, try his best to do it where our officers don't
21   have plain view with what they unloading.  We don't want to
22   see it.
23         "MR. JACKSON:  Okay.
24         "MR. DAVIS:  We don't want to know nothing.
25         "MR. JACKSON:  Okay.


                                                        165
                        Jackson - Direct
1          "MR. DAVIS:  As far as I know, this is a detail
2    place, bro.
3          "MR. JACKSON:  Right.

4          "MR. DAVIS:  And, you all selling car accessories.

5          "MR. JACKSON:  Car accessories.  Yeah.

6          "MR. DAVIS:  And, that's where the fuck it's at, you

7     dig?

8          "MR. JACKSON:  Exactly.

9          "MR. DAVIS:  My people know what time of day it is."

10                    (Audio tape stopped)

11    BY MR. McMAHON:

12    Q.  When Davis tells you "we don't want to see it," to what is

13    he referring?

14    A.  The cocaine.

15    Q.  What did you understand the term, when he tells you "my

16    people know what time of day it is," to mean?

17    A.  The agreement we had was everyone would know exactly what

18    they were going to be involved with, and that they were going

19    to be used in protection of a drug scenario.

20         MR. McMAHON:  Continue.

21                    (Audio tape resumed)

22         "MR. JACKSON:  Yeah, yeah, but, no --

23         "MR. DAVIS:  But, as far as we know --

24         "MR. JACKSON:  Right, right.  You're damn right.

25    You're damn right.


                                                        166
                         Jackson - Direct

1          "MR. DAVIS:  We don't never want to see it.  We don't

2     never want to be around it.  I don't want to parts of it.

3          "MR. JACKSON:  Uh-huh. (affirmative response)

4          "MR. DAVIS:  You dig.  We're strictly security.

5     That's you all's job.

6          "MR. JACKSON:  Yeah.  That's no problem.  That's what

7  I said about him trying to, you know, get it behind the --

8  you know, some wall over there.

9        "MR. DAVIS:  You can finagle all that.  We don't have

10  a problem with that.

11       "MR. JACKSON:  So, all you're gonna do is see a

12  motherfucker come pulling out and I'll say, 'Len --'

13       "MR. DAVIS:  That's perfect.

14       "MR. JACKSON:  '-- here's the car, the van --'

15       "MR. DAVIS:  That's cool

16       "MR. JACKSON:  -- whatever it is.  It's either gonna

17  be a car or a van.  I say a van.  It might be a car.  I don't

18  know, you know, I gotta see what I'm gonna rent.

19       "MR. DAVIS:  Don't matter.  That's perfect.

20       "MR. JACKSON:  But, all you all see is it come out

21  and I'll say, 'It's a red car.  Tell your boy it's a red,

22  blue --' whatever.  You know what I'm saying.

23       "MR. DAVIS:  Well, --

24       "MR. JACKSON:  But, I'm gonna need you all on that

25  Friday, if he says go ahead and get --

1        "MR. DAVIS:  Go get the rentals?

2        "MR. JACKSON:  -- the rental car for your boys and,

3  you know, whatever you're gonna put your boys' car --

4        "MR. DAVIS:  I thought four rentals was coming in.

5        "MR. JACKSON:  No, two, two, two, two.

6        "MR. DAVIS:  Okay, okay.

7        "The only thing we want to know is we want to have at

8  least a little time where he can give us a location and we can

9  feel comfortable with it.

10       "MR. JACKSON:  Right.

11          "MR. DAVIS:  In other words, 'Len, it's gonna be "A"
12  location.'
13          "MR. JACKSON:  Right.
14          "MR. DAVIS:  'All right.'
15          "'Is "A" cool?'
16          "'Yeah, it's cool.'
17          "'Fine.'
18          "MR. JACKSON:  Right.
19          "MR. DAVIS:  And, that's what we want to do.
20          "MR. JACKSON:  Okay.
21          "MR. DAVIS:  We don't want no five minutes -- 'All
22  right, go to this spot.'
23          "MR. JACKSON:  All right.
24          "MR. DAVIS:  Uh-uh. (negative response)
25          "MR. JACKSON:  Okay.  All right.


                                            168
                        Jackson - Direct
1           "MR. DAVIS:  That's the only compromise you got to
2   deal with, with us.  Everything else you saying is cool.
3           "MR. JACKSON:  Okay.  All right.
4           "MR. DAVIS:  We don't want to see a fucking thing.
5           "MR. JACKSON:  Okay. All right.  All right.  So,
6   it's -- like I say, it should be all -- and I said 2:00 for
7   them motherfuckers driving out there.  I don't know how long
8   that'll take them to get out and get back.
9           "MR. DAVIS:  Well, I already told my people between
10  -- as far as that thing there, I told them, they gonna be on
11  standby from 10:00 in the morning till 4:00 in the evening.
12          "MR. JACKSON:  Okay.
13          "MR. DAVIS:  So, that's ample enough time --
                        Page 149

14          "MR. JACKSON:  Then that's covered.

15          "MR. DAVIS:  -- in case anything happen.

16          "MR. JACKSON:  Right."

17                    (Audio tape concluded)

18   BY MR. McMAHON:

19   Q.  Agent Jackson, were cars actually rented for the second

20   deal?

21   A.  Yeah.

22   Q.  Where did that deal occur?

23   A.  At the Mardi Gras Truck Stop on Elysian Fields.

24   Q.  And, how many vehicles were actually rented during the

25   operation for these purposes?

Jackson - Direct

1    A.  We rented four.

2    Q.  And, what were two of them -- well, break them down.

3    Describe the vehicles.

4    A.  Two cars were -- there was a blue Chevy Caprice and a

5    maroon Buick LeSabre.  They were going to be used for the

6    police officers to be sitting in, and a blue Lincoln and a red

7    Concord were going to be used for the couriers.

8    Q.  Okay.  Were any recording devices put, by court order, in

9    the blue Chevy Caprice and the maroon LeSabre, to be utilized,

10   those cars to be utilized by the cops?

11   A.  Yes.

12   Q.  What?

13   A.  Recording devices were placed in each vehicle, yes, it

14   was.

15   Q.  Okay, good.  And, on what date was the -- well, were the

16   vehicles secured, actually, before November 18th?

17   A.  We picked them up on November 18th, yes, we did.

18 Q. And, who, ostensibly, -- who was the person who supposedly
19 actually rented them?
20 A. Terry Adams was actually the one who actually rented them.
21 Q. Okay. Did you see Davis and Williams at the -- what was
22 the agency from which you got the vehicles?
23 A. It was Avis Rental Agency on Canal Street.
24 Q. Did you see Davis and Williams at the Avis?
25 A. Yes, I did.

Jackson - Direct

1 Q. And, where did you go from there?
2 A. To the truck stop.
3 Q. The Mardi Gras Truck Stop?
4 A. Yes, the Mardi Gras Truck Stop.
5 Q. About what time did you get there?
6 A. About noon.
7 Q. What happened, once you arrived at the Mardi Gras Truck
8 Stop, on November the 18th of '94?
9 A. What actually happened was a tractor and trailer driven by
10 an FBI undercover agent pulled into the truck stop. The way
11 the truck stop was situated, there was a large, like,
12 warehouse building with a parking lot area right in the front.
13      I got out, greeted the undercover, advised him to go
14 around the warehouse. As he pulled around the warehouse to
15 the other side, out of the sight of where the parking lot area
16 is, the two couriers and myself and Terry pulled around to the
17 other side.
18      And, what we did was unload 20 kilos of fake cocaine
19 into each car, and then I advised Len, when the car would exit
20 from around the side of the warehouse out onto the highway.

21  Q.  Okay.  I'm going to show you what we're marking as

22  Government Exhibits SN-1 and SN-2.  Agent Jackson, do these

23  two look familiar to you?

24  A.  Yes, they do.

25  Q.  What are they?

Jackson - Direct

1   A.  They're the sham cocaine that was used in the protected

2   sale.

3   Q.  Okay, you say you placed 20 of these in each of the rental

4   cars?

5   A.  Yes.

6           MR. MCMAHON:  Your Honor, I'd offer SN-1 and SN-2

7   into evidence.

8           THE COURT:  There being no objection, they'll be

9   received.

10          MR. RIEHLMANN:  No objection, Judge.

11  BY MR. MCMAHON:

12  Q.  Was real cocaine, in your presence, also placed in either

13  or both of those vehicles?

14  A.  No, not in my presence, no.

15  Q.  Are you aware that -- was any real cocaine placed in the

16  vehicles?

17  A.  I understand there was a kilo of cocaine in each vehicle,

18  a real kilo.

19  Q.  You did not -- you were not the agent who actually put

20  them in?

21  A.  No, I did not.

22  Q.  All right.  Why was the tractor-trailer pulled around, you

23  said, around the warehouse at the Mardi Gras Truck Stop?

24  A.  That was the agreement I had with Len.  We decided that

25  how we were going to offload the cocaine from the tractor-

Jackson - Direct

1   trailer into the cars was that no one would actually see it.

2   The police officers that were in the two cars waiting for the

3   transportation of the cocaine would not see the actual

4   offloading.

5   Q.  And, what happened, once the two courier cars, the blue

6   Lincoln and the Concord, the Chrysler Concord was loaded up?

7   What happened then?

8   A.  Then I would advise Len exactly when each car would be

9   exiting from around the warehouse and for him to follow or

10  Sammie to follow the actual vehicles out.

11  Q.  Did that occur?

12  A.  Yes, it did.

13  Q.  Where did one of them -- well, let's say where did the

14  blue Lincoln, where did that go?

15  A.  That headed east, and the Concord headed west.

16  Q.  Who followed the blue Lincoln, which officer?

17  A.  I think Len had the Lincoln and Sam had the Concord.

18  Q.  Did you know who else was in the car with Len Davis in the

19  blue Chevy Caprice following the blue Lincoln?

20  A.  No, I did not.

21  Q.  Did you know who else was in the car with Sammie Williams,

22  who was in the blue LeSabre following -- rather, the maroon

23  LeSabre following the maroon Concord?  Did you know who else

24  was in the car with Sammie Williams?

25  A.  No, I did not.

Jackson - Direct

1  Q.  Okay.  Did you pay Davis and Williams for their protection

2  work for both the warehouse and the Mardi Gras Truck Stop, on

3  November the 18th of '94?

4  A.  Yes, I did.

5  Q.  And, how much did you pay them, total?

6  A.  Thirty thousand dollars.

7  Q.  Do you remember where you were, when you paid them?

8  A.  It was in a parking lot, an Eckerd Drugstore parking lot

9  off of Elysian Fields.

10  Q.  What was the form of the payment, check?  Cash?  Money

11  Order?

12  A.  Cash, cash.

13  Q.  Was another Mardi Gras Truck Stop scenario planned for

14  after November the 18th?

15  A.  Yes, there was.

16  Q.  What about the warehouse, was the intention to try to

17  continue the operation at 420 Franklin Avenue, as well?

18  A.  Yeah, we were going to actually try to move again to

19  another location throughout the city.

20  Q.  Any particular reason why move away from 420 Franklin

21  Avenue and not utilize the warehouse anymore?

22  A.  Len had felt that the actual location was starting to get

23  heated up, a lot of police officers, a lot of people were

24  starting to know about the location and it was time to move

25  on.

174

Jackson - Direct

1  Q.  And, do you recall the conversation on November the 30th,

2  1994, with Len Davis, which has been marked as JJ-4?

3  A.  Yes.

4   Q.  And, what did you talk about on November the 30th with

5   him?

6   A.  And, again, we talked about moving the location away from

7   the warehouse to other parts of the city.

8           MR. McMAHON:  And, Your Honor, at this time, I would

9   please play JJ-4, which is Track 17, a call which occurred

10  November the 30th, '94, at 7:26 p.m.

11      (Whereupon, the following excerpt of the audio tape of

12  Government's Exhibit JJ-4, a conversation between LEN DAVIS

13  and TERRY ADAMS, dated November 30, 1994, was then played for

14  the jury:)

15                          (Incoming Call)

16          "MR. DAVIS:  Hello.

17          "MR. ADAMS:  Hello.

18          "MR. DAVIS:  Yeah.

19          "MR. ADAMS:  Yeah, what's happening?

20          "MR. DAVIS:  What's up, baby?

21          "MR. ADAMS:  Look, I talked with JJ."

22          "MR. DAVIS:  Uh-huh. (affirmative response)"

23                          (Audio tape stopped)

24  BY MR. McMAHON:

25  Q.  Actually, -- who is actually -- "JJ" is referring to whom?

                                              175
                        Jackson - Direct

1   A.  Myself.

2   Q.  Who is on the phone with Davis there?  I misspoke earlier.

3   A.  It's Terry Adams.

4   Q.  Scaboo?

5   A.  Scaboo.

6           MR. McMAHON:  Okay, continue.

 7                    (Audio tape resumed)

 8          "MR. ADAMS:  And he said on the warehouse thing, --

 9          "MR. DAVIS:  Uh-huh. (affirmative response)

10          "MR. ADAMS:  -- he said he'd get with you all on

11     that, 'cause he think that's, that's, like, over, too.

12          "MR. DAVIS:  Yeah, that's what I'm talking about,

13     bro.

14          "MR. ADAMS:  But, he said he was -- he was trying to

15     get something together for Saturday.

16          "MR. DAVIS:  Yeah.

17          "MR. ADAMS:  With the --

18          "MR. DAVIS:  With the truck?

19          "MR. ADAMS:  Yeah, with the little new people.

20          "MR. DAVIS:  Yeah.

21          "MR. ADAMS:  And he said, you know, he was gonna try

22     to work on something for Saturday.  So, if you can, try to get

23     them together.

24          "MR. DAVIS:  Uh-huh. (affirmative response)

25          "MR. ADAMS:  Now, I ain't saying it's nothing for


                                                        176
                        Jackson - Direct

 1     sure, now.

 2          "MR. DAVIS:  All right.  But, if it is, we need four

 3     again, now.

 4          "MR. ADAMS:  Yeah, but he trying to put it together.

 5     He say he working hard at it, you know.

 6          "MR. DAVIS:  Okay, okay.  Well, I'll just have them

 7     on standby.

 8          "MR. ADAMS:  All right.  And, he said stay on the

 9     warehouse thing, another one.

10          "MR. DAVIS:  Huh?

11          "MR. ADAMS:  He said stay on the new warehouse.

12          "MR. DAVIS:  Stay on the new one?

13          "MR. ADAMS:  Yeah, you know what I mean, finding."

14                    (Audio tape stopped)

15   BY MR. MCMAHON:

16   Q.  Do you know what that reference was about, finding a new

17   warehouse?  What's Terry talking about?  Are you aware?

18   A.  We had told him before that we were looking for another

19   new location, a new warehouse, and we wanted him to go out and

20   try to search throughout the city to find one, and Terry was

21   telling him, then, as I told him to tell him, to again look

22   for another location for me.

23                    (Audio tape resumed)

24          "MR. DAVIS:  Oh, you talking about trying to find

25   something, you talking about?


                                                      177
                    Jackson - Direct

1          "MR. ADAMS:  Yeah.  I know --

2          "MR. DAVIS:  Yeah, because I'm completely dead with

3   that other one, bro.

4          "MR. ADAMS:  Oh, yeah?

5          "MR. DAVIS:  Yeah, bro.  I don't like that.

6          "Kevin Hudson, 9/29/61.

7          "Yeah, I don't like that no more, bro, 'cause too

8   many motherfuckers been passing.

9          "MR. ADAMS:  Oh, okay.

10          "MR. DAVIS:  Ya dig, and it got too familiar --

11          "MR. ADAMS:  Uh-huh. (affirmative response)

12          "MR. DAVIS:  -- and that was my reason for saying I

13   just want -- we ain't heard nothing, ya dig, but you know how

14    you just get a feeling --

15         "MR. ADAMS:  Yeah.  I understand --

16         "MR. DAVIS:  -- and you -- yeah, you just ready to

17    leave that same shit alone, bro.

18         "MR. ADAMS:  Yeah.

19         "MR. DAVIS:  But, yeah.  Well, all right, then.  I'll

20    have --

21         "MR. ADAMS:  He said, you know, work on those two

22    things and, you know, he gonna get -- we can probably get back

23    with you Friday.

24         "MR. DAVIS:  All right, then.

25         "MR. ADAMS:  All right.


Jackson - Direct

1          "MR. DAVIS:  All right.

2          "MR. ADAMS:  Later."

3                    (Audio tape concluded)

4          MR. McMAHON:  Your Honor, consistent with the

5     stipulation entered into earlier, the last two items were the

6     actual beeps to Lemmie Rodgers' beeper number, Area Code 504,

7     826-4978, and the second was an outgoing page to Leon Duncan's

8     beeper, number (504) 824-2842.

9     BY MR. McMAHON:

10    Q.  Agent Jackson, was the operation -- and what was the title

11    of the operation?

12    A.  Shattered Shield.

13    Q.  Was Shattered Shield, anything proactive accomplished

14    after November the 30th of 1994?

15    A.  No, it wasn't.

16    Q.  The operation was shut down?

17    A.  Yes, it was.

18  Q.  Why was it shut down?

19  A.  Due to the murder, we came to the decision that we had to

20  shut down the operation.

21  Q.  Murder of whom?

22  A.  Kim Groves.

23        MR. McMAHON:  Your Honor, I tender the Witness for

24  Cross.

25        THE COURT:  Mr. Riehlmann.

                      Jackson - Direct

1        MR. WINTERS:  Your Honor, before cross, can we

2  approach the bench?

3        THE COURT:  Surely.

4     (At side bar on the record)

5        MR. WINTERS:  I don't know how long they're going

6  to be on cross, but the next witness is Sammie Williams.  Do I

7  have any need to get him down here?  Because he's a protected

8  witness.  I can, I'm just trying to -- do you think we're

9  going to get into --

10        THE COURT:  Well, once you start him, he's going to

11  be somewhat long.

12        MR. WINTERS:  Well, he's going to be here -- he'll

13  probably be on the stand a day.

14        THE COURT:  It makes sense not to bring him today,

15  but unless you're just going to be two seconds --

16        MR. RIEHLMANN:  No, I'm going to be a little while.

17   MR. WINTERS:  Okay.

18        THE COURT:  All right.

19        MR. WINTERS:  So, I can --

20        THE COURT:  Sammie Williams will be tomorrow morning.

21          MR. WINTERS:  Okay, thank you.

22          THE COURT:  Okay?  Good.

23     (End of discussion at side bar)

24

25


                                        180
                    Jackson - Cross
1                    CROSS-EXAMINATION

2  BY MR. RIEHLMANN:

3  Q.  Mr. Jackson, did you prepare any FD302s in connection with

4  this operation?

5  A.  Maybe one or two, sir.

6  Q.  And, did you testify before the grand jury, at any time?

7  A.  No, sir.

8          MR. RIEHLMANN:  Judge, could I approach the bench at

9  this time?

10         THE COURT:  Sure.

11     (At side bar on the record)

12         MR. RIEHLMANN:  I was never given 302 by this

13 Witness.  I'm contending that I'm entitled to it under Jencks.

14         THE COURT:  The same for you?

15         MR. RIEHLMANN:  Would you all agree that I never got

16 a 302 --

17         MR. WINTERS:  I've never seen any 302.  I don't think

18 he's done a 302.

19         MR. RIEHLMANN:  Well, he said he has.

20         MR. WINTERS:  If he does, it was turned over to you.

21         MR. RIEHLMANN:  It was not turned over.

22         MR. MCMAHON:  We turned over, in discovery, every 302

23 that pertains to this case that was in the discovery packets.

24         MR. RIEHLMANN:  Right, I got one.

25          MR. McMAHON:  Well, and --

Jackson - Cross

1          MR. RIEHLMANN:  Well, I'm just saying I got one

2  authored by Stan Hadden, and that's it.

3          MR. McMAHON:  Well, then, he did not -- if you

4  didn't --

5          MR. WINTERS:  If you didn't get it --

6          MR. McMAHON:  -- then he didn't author it.

7          MR. WINTERS:  Right.  Okay?

8          MR. RIEHLMANN:  He just said that he did.  He just

9  said that he --

10          MR. WINTERS:  He said maybe one or two.

11          MR. RIEHLMANN:  Well, --

12          MR. WINTERS:  If you don't have it, he didn't do it.

13          THE COURT:  Ask him again, if that needs to be

14  clarified.

15     (End of discussion at side bar)

16  BY MR. RIEHLMANN:

17  Q.  Mr. Jackson, did you take notes in connection with your

18  participation in Shatter Shield?

19  A.  No, sir.

20  Q.  But, you do believe you prepared one or two 302s, is that

21  correct?

22  A.  With the whole operation, sir?

23  Q.  Yes, sir.

24  A.  Yes, probably the whole operation, yes.

25          MR. RIEHLMANN:  Okay, then I would renew my request,

1    Judge.

2         THE COURT:  Well, the explanation given -- why don't

3    you ask whether -- he gave an answer "the whole operation."

4         MR. RIEHLMANN:  Well, Judge, he's testified as to the

5    whole operation.

6         THE COURT:  Which -- do you all want to step back up

7    again.

8    (At side bar on the record)

9         THE COURT:  Well, he answered.  He gave one or two

10   for the whole operation, and the Government earlier told me

11   that they had given you those that were -- any that might

12   pertain to this particular case.  I'm a little lost with "this

13   particular case," which is a part of, I suppose, the whole

14   operation -- or was it not?  I'm --

15        MR. RIEHLMANN:  Well, I mean, he testified on direct

16   about the entire operation, beginning with April of 1994.  I

17   mean, I think that I'm entitled to a 302 that he prepared --

18        MR. McMAHON:  He --

19        MR. RIEHLMANN:  Wait, let me finish.

20        -- that touches upon his testimony on direct.  I

21   think that that's what Jencks is for.

22        MR. McMAHON:  Your Honor, we want to make it clear

23   for the record that we were scrupulous in turning over to the

24   Defendants months ago, as part of the discovery packet, every

25   relevant Jencks and statement, report, whatever.  What was

1    turned over to the Defendants would have included 302s and

2    other reports.

3         Now, this vague allusion to "maybe I did a 302," the

 4     bottom line is -- and we'll check -- we'll recheck the file

 5     now, but Mr. Winters and I were scrupulous in making sure,

 6     just to obviate this type of problem --

 7          MR. RIEHLMANN:  Well, let me tell you how scrupulous

 8     they were, Judge, because I learned, in reviewing a transcript

 9     last night in preparation for today, that Special Agent Hadden

10     took notes in debriefing Sammie Williams.  I've certainly

11     never gotten those and since --

12          MR. McMAHON:  That's --

13          MR. RIEHLMANN:  Wait.

14          -- since the Government tells us that they're going

15     to call Sammie Williams, I think under Jencks I'm entitled to

16     those --

17          MR. McMAHON:  No, you're not.

18          MR. RIEHLMANN:  Well, in my reading of it, I am.

19          MR. WINTERS:  That is not Jencks material.  You

20     better read the Fifth Circuit case law.

21          MR. RIEHLMANN:  Well, --

22          MR. WINTERS:  Unless it's adopted by the witness,

23     it's not Jencks --

24          MR. McMAHON:  Exactly.

25          MR. WINTERS:  -- material.  It's --

 1          MR. McMAHON:  Read Flores.

 2          MR. RIEHLMANN:  Or that it substantially --

 3          MR. WINTERS:  No.

 4          MR. McMAHON:  No.

 5          MR. RIEHLMANN:  Well, --

 6          MR. McMAHON:  Read Flores.

 7          MR. RIEHLMANN:  Well, --

 8          MR. MCMAHON:  I'll get you the cite.

 9          MR. RIEHLMANN:  -- at any rate, at any rate, I did

10   not get a 302 --

11          MR. WINTERS:  Judge, --

12          MR. RIEHLMANN:  -- concerning Sammie Williams'

13   debriefing, and I think I'd be entitled to that, in

14   preparation for Sammie Williams' testimony.

15          But, at the very least, they've allusioned, your

16   witness -- your witness has twice testified, when I asked him,

17   "Did you prepare a 302?" -- he said, "Yes."  And, then he

18   said, "Insofar as the entire operation is concerned."

19          You're the one who had him go through the entire

20   operation.  You didn't begin him with November 18th.  You

21   began him with April 21st.  I think that in all fairness I

22   should have a copy of the 302 that he prepared in connection

23   with the entire operation.

24          MR. MCMAHON:  Let me --

25          MR. RIEHLMANN:  Wait just a minute, let me just

 1   finish.

 2          I think in all fairness I should have a copy of

 3   Mr. Jackson's 302 that he prepared and from which he testified

 4   to today, --

 5          MR. MCMAHON:  We --

 6          MR. RIEHLMANN:  -- about the entire operation.

 7          MR. MCMAHON:  -- agree with everything you said.  The

 8   problem is I have not seen a 302, and we'll go back and we'll

 9   look at those files.  But, whatever he --

10          MR. WINTERS:  If he did any 302s, they were not

11    relevant to his testimony.  It might have been a particular
12    thing in the warehouse deal that we never covered.
13          THE COURT:  Well, we can't determine whether they
14    were relevant or not unless we see them.  Do you have them in
15    your possession?
16          MR. McMAHON:  No, sir.
17          THE COURT:  All right.
18          MR. McMAHON:  We reviewed --
19          MR. WINTERS:  The discovery that we turned over six
20    months ago, me and Mr. McMahon sat down and reviewed
21    everything, okay.  We even gave them testimony we weren't
22    required to give them, because that's public material.
23          THE COURT:  All right.
24          MR. RIEHLMANN:  Well, it might be --
25          THE COURT:  Where are the 302s, if, in fact, they

                                                              186
                          Jackson - Cross
 1    exist?  Here, somewhere in the FBI office?
 2          MR. WINTERS:  That would be up here, yes.
 3          THE COURT:  Let's proceed.  But, get them by tomorrow
 4    morning.
 5          MR. WINTERS:  Sure.
 6          MR. McMAHON:  Exactly.
 7          MR. WINTERS:  We'll get them by tomorrow morning.
 8          THE COURT:  Yes.
 9          MR. RIEHLMANN:  So, I will not have to conclude my
10    cross-examination of this witness --
11          THE COURT:  You'll be able to, if necessary -- we'll
12    see what the outcome of the whole thing is.
13          MR. RIEHLMANN:  Okay.

14    THE COURT:  And, if you need to call him back, we'll
15 call him back.
16    MR. RIEHLMANN:  Okay.
17    MR. MCMAHON:  And, one other point:  Mr. Riehlmann
18 misstated the law.  There's a recent -- I'll get the cite --
19 United States v Flores specifically discusses agents' notes
20 taken during interviews as not falling under the Jencks Act,
21 unless they are adopted, signed or otherwise adopted by the
22 witness.  It is not Jencks.  I'll get the Fifth Circuit cite
23 first thing in the morning.  It's Flores.  It came down about
24 five -- four or five months ago, and it was a capital case out
25 of Texas.  It's a Fifth Circuit case.

                                        187
                    Jackson - Cross
1     What you alluded to is not Jencks.  Hadden's notes
2 are not Jencks.
3     MR. WINTERS:  There has never been any 302 adopted
4 by Sammie Williams, okay, and it's not Jencks under the case
5 law.
6     MR. RIEHLMANN:  Okay.
7    (End of discussion at side bar)
8 BY MR. RIEHLMANN:
9 Q.  Mr. Jackson, do you recall, in particular, what the 302s
10 that you prepared dealt with, what proportion of the
11 operation?
12 A.  I don't recall at this time, sir, no, I don't.
13 Q.  Do you recall about when you prepared them?
14 A.  No, sir.
15 Q.  All right.  Have you reviewed them in preparation for your
16 testimony?
17 A.  No, sir.
                    Page 166

18  Q.  On JJ-T3, there was a reference to -- and I don't have the

19  exact page, maybe you could get to it -- but, about "jacking,"

20  I'm sure you recall Mr. McMahon talking to you about

21  "jacking."

22  A.  Yes, sir.

23  Q.  Could you explain to me what you meant by -- or what you

24  understood they were talking -- or you all were talking about

25  when he was talking about "jacking up people"?

Jackson - Cross

1  A.  I understood that to mean -- I'm trying to find it, sir,

2  if you don't --

3  Q.  Well, let me ask you, then, Mr. Jackson:  Was what they

4  were talking about or you all were talking about is that you

5  did not want them to bring police officers into the operation

6  who had been jacking up drug dealers or whatever, for fear

7  they would bring the heat on, is that correct?

8  A.  Yes, who were actually ripping drug dealers off, yes.

9  Q.  So, that's what you meant, when you said, "I don't want

10  you bringing in police officers, who have been ripping off

11  drug dealers, because that might bring the heat on us,"

12  meaning the police might be watching them giving -- their

13  illegal activities, is that what you were referring to?

14  A.  Yeah, I was alluding to the other drug dealer did not want

15  that to be done.

16  Q.  Okay.

17  A.  Not myself.

18  Q.  I understand.  Okay, insofar as the "jacking" part,

19  though, it was -- you were referring to the police officers

20  that they were going to bring in to the operation, the new

21  deal, correct?

22  A.  Yes, the other drug dealer was concerned about that, not

23  myself.

24  Q.  On November the 16th of 1994, -- I don't believe you have

25  this transcript before you, but there was another conversation

1  at 9:29 a.m. that was recorded by Nagra, isn't that correct?

2  A.  On November 16th?

3  Q.  Yes.

4  A.  Yes, sir.

5       MR. RIEHLMANN:  Do you have a transcript of it that I

6  could give to the Witness?

7       MR. McMAHON:  What are you referring to?

8       MR. WINTERS:  Which one are you referring to?

9       MR. RIEHLMANN:  November 16th, 1994, Nagra recording

10  beginning at 9:29 a.m.

11  BY MR. RIEHLMANN:

12  Q.  I'll give you -- share mine with you, then.

13       MR. RIEHLMANN:  Is it all right, Judge, if I stand

14  here and question the Witness?

15       THE COURT:  Yes.

16       MR. RIEHLMANN:  Thank you, Judge.

17  BY MR. RIEHLMANN:

18  Q.  Okay, first of all, why don't you just look at it and

19  identify it as a transcript of a conversation.

20  A.  (Examines document)  This is a conversation.

21  Q.  Who are the participants in this conversation, sir?

22  A.  I'm sorry, I'd have to look back over it.  I'd have to go

23  back and refer to each thing as you ask it.  I'm sorry.

24       Since I don't have the tape, I'm just going to read from

25   what the transcript says.  Myself --

Jackson - Cross

1    Q.  First of all, yeah, just tell us who the participants in

2    the conversation were.

3    A.  Yeah, and as I was trying to explain to you, since I don't

4    have the tape and don't really recall this, I'd have to refer

5    to what you're giving to me, and written here it says "Juan

6    Jackson, cooperating witness, Len Davis and Sammie Williams."

7    Q.  And, the "cooperating witness" would have been Terry

8    Adams?

9    A.  Yes, sir.

10   Q.  Okay.  This is a transcript -- I mean, this isn't the

11   first time you've seen this transcript, as I gave it to you

12   just now, is it?

13   A.  No, it's not.

14   Q.  All right.  Thank you.  Has this been played already today

15   to this jury?

16   A.  I don't have any knowledge of that, sir.

17   Q.  Do you recall earlier when you testified, when they were

18   asking you about the vans and whether or not there would be

19   logos on it, and you said, "No, no, no," you recall that

20   testimony a little while ago, correct?

21   A.  Yes, sir.

22   Q.  And that's at Page 7 of this transcript?

23   A.  Of that one, yes.

24   Q.  Page 8, where you and Len Davis are talking about it might

25   be Location "A," Location "B" or Location "C," you recall

1  that, correct?

2  A.  Yes.

3  Q.  Do you recall the part of the conversation where you're

4  saying -- and, again, you're referring to this second big drug

5  dealer, and you said, "He said, 'Well, how do you know these

6  motherfuckers ain't fucking something up out there?'"  Do you

7  recall that?

8  A.  Yes, sir.

9  Q.  And, who were you referring to, when you said "these

10  motherfuckers"?

11  A.  The other police officers.

12  Q.  The police officers that were going to be brought in to

13  the new detail?

14  A.  To the truck stop detail.

15  Q.  And, then you said, "Say your boys jack a motherfucker and

16  all of a sudden the police come down on you all," again,

17  you're referring to the new police officers they're bringing

18  in, correct?

19  A.  Yes, sir.

20  Q.  All right.  You go on to say, "Yeah, yeah, yeah, that's

21  what I'm saying.  You boys been jacking all week," now you're

22  referring to the other police officers or just Len and Sammie?

23  That's at Line 10, 11 and 12.

24  A.  I'm still talking about whether the other police officers

25  are or not.

1  Q.  Okay.  And, then, again, at Line 14, you say, "And, then

2  you bring a nigger that just jacked up some nigger for

3  whatever -- you know, I'm just making up shit -- now he's just

4   making up stories -- you know what I'm saying.  In other

5   words, he's making up the worst scenario possible."  You said

6   that, correct?

7   A.  Yes, sir.

8   Q.  And, again, you're still talking about the other police

9   officers, correct?

10  A.  Yes, and the concern of the other drug dealer.

11  Q.  And, this is at Page 10, right?

12  A.  That's what it says there, sir.

13  Q.  All right.  Then you say, "That's why he kept saying

14  before about don't let the motherfuckers know what's going on.

15  Let them niggers that you all been dealing with, just don't

16  tell them niggers."  You said that, correct?

17  A.  Yes, that's what I said.

18  Q.  Okay.  Still referring to those same police officers,

19  correct?

20  A.  Yes, sir.

21  Q.  The April 21st, 1994 meeting in the Sheraton, where

22  $100,000 -- was it a simulated delivery of $100,000?

23  A.  Yes, sir.

24  Q.  And, that was by Terry Adams to you?

25  A.  Yes, sir.


                                                    193
                         Jackson - Cross

1   Q.  Being guarded by Len Davis and Sammie Williams, correct?

2   A.  Yes, sir.

3   Q.  Were they told that this was going to be a cash delivery

4   or were they there thinking that you were delivering -- that

5   Terry Adams was delivering cocaine?

6   A.  It was money they were told, sir.

7  Q.  Okay.  So, they knew that they were guarding a shipment of

8  money?

9  A.  Yes, sir.

10  Q.  All right.  And "they" I mean Len Davis and Sammie

11  Williams knew they were guarding a shipment of money?

12  A.  Yes, sir.

13  Q.  All right.  I believe in your first meeting, April 21st,

14  '94, the one that we saw the rather lengthy videotape about,

15  you said to Sammie Williams and Len Davis that you didn't want

16  to be talking apples and oranges, you felt like to talk in

17  code was a sign that they didn't trust you, correct?

18  A.  Yes, that's what I said.

19  Q.  All right.  So, you wanted them to implicate themselves on

20  the video tape by talking in terms of cocaine or kilograms or

21  ki's or stuff like that, correct?

22  A.  I wanted them to understand what I was talking about,

23  yes, sir.

24  Q.  All right.  But, Len Davis expressed to you that he was

25  concerned about using the terms "cocaine," "kilos," anything

194

Jackson - Cross

1  readily understood to mean drugs?  He was concerned about

2  using those words around people that he couldn't trust,

3  correct?

4  A.  He was concerned about using the word "cocaine," yes,

5  that's what he said.

6  Q.  Around people that he couldn't trust, correct?

7  A.  I don't recall the "trust," but I do remember he was

8  concerned about using the word --

9  Q.  What I'm saying --

10  A.  -- "cocaine."

11  Q.  Okay, but you've said -- you have told us what you
12  understood Mr. Davis to mean, when he said certain things to
13  you during this conversation.  Isn't it true that what you
14  understood him to mean was that he did not want to use the
15  words "cocaine" or anything like that around people that he
16  couldn't trust?
17  A.  No, I understood it to mean that he didn't want to use
18  the word "cocaine."  We were going to use the word "loads"
19  from here on out.
20  Q.  All right.  Now, you asked him if he had any sources to
21  run names, so that you could check them out for security
22  purposes, right?
23  A.  Did he have "sources"?
24  Q.  Well, police clerks or whatever.  Didn't you refer to
25  some clerks that you could give him the name --

                                                      195
                        Jackson - Cross

1  A.  I asked him could he run the names, yes, sir.
2  Q.  But, didn't you mention some clerks?  And, that's what I
3  was concerned about.
4  A.  "Clerks"?  No, I never used the word "clerks."
5  Q.  You didn't use that word?
6  A.  No, sir.
7  Q.  Now, initially, when you first met with him, you were
8  talking about how you were going to need him around the clock.
9  It was apparent from what they were saying to you that Sammie
10  Williams and Len Davis were hoping to do this by themselves,
11  correct?
12  A.  They said they thought they were going to be doing by
13  themselves, --

14  Q.  Right.

15  A.  -- yes, they did.

16  Q.  They even went so far as to say that they would go to take

17  furlough, if necessary, to work the number of hours that you

18  required of them, correct?

19  A.  Yes, sir.

20  Q.  All right.  Now, it was your intention, in that meeting

21  when you told them that you had to meet with the other police

22  officers, sit down and have a face-to-face, take all your

23  clothes off, if necessary, it was your intention that that

24  plan should be carried out, correct?

25  A.  Yes, sir.


                                                    196
                          Jackson - Cross

 1  Q.  And, the reason you wanted to do that is you wanted it to

 2  be plain to anybody who might later look at the tapes or

 3  listen to the testimony that these guys, the new guys coming

 4  in, knew that they were guarding cocaine or that they were

 5  going to be part of a cocaine protection racket, correct?

 6  A.  I wanted ever officer to know exactly what he was

 7  guarding, yes, sir.

 8  Q.  Okay.  Was I incorrect in concluding from your testimony

 9  that you told Len Davis that you would not be telling your

10  couriers that the police were involved in the protection

11  racket?

12  A.  I said unless needed, I would not be telling them.

13  Q.  Unless needed, okay.  Now, do you recall that part of the

14  conversation where you were talking to Len Davis about

15  treating his police officers, the police officers that were

16  going to be working the detail for him, treating them fairly,

17  so that they didn't, I think you said to him and I quote, "You

                          Page 174

18  don't fuck them."  Do you remember what I'm saying?

19  A.  Do I recall that conversation --

20  Q.  Yeah.

21  A.  -- is that what you're asking me?

22  Q.  Yeah.

23  A.  Yes.

24  Q.  You were saying that they should not short the police

25  officers who were going to be working the detail on what they

Jackson - Cross

1  were going to be paid, because you were afraid that that might

2  create animosity and they'd come back on you, is that correct?

3  A.  I didn't want them to shortchange them.  I wanted to pay

4  them for what they supposedly deserved.

5  Q.  And, Len Davis said something to the effect about "I

6  wouldn't deal with anyone that I wasn't tight with."  Do you

7  recall him saying that?

8  A.  If that was a response, you're asking me that?

9  Q.  Yeah.

10  A.  I don't recall, but he told me that he would not

11  shortchange them, if that's what you're asking me.

12  Q.  Okay.  Now, at some point, Len Davis did, during the

13  conversation that you had in that hotel room, he did mention

14  "ki" or "ki's" and you understood that to mean "kilo,"

15  correct?

16  A.  Yes, sir.

17  Q.  And, that is common vernacular in the drug trade for a

18  kilo.  When people who deal in the drug trade say "ki's,"

19  everybody knows they're talking kilos, correct?

20  A.  Most of the time, if they're talking about a "ki," they're

21 talking about a kilo of cocaine, yes.

22 Q. At some point during your conversation with him, you were

23 asking Len Davis and Sammie Williams if it would be all right

24 if you met them in public places, correct?

25 A. Yes, sir.

Jackson - Cross

1 Q. All right. And, they seemed to have no objection to that,

2 correct?

3 A. Yes, sir.

4 Q. All right. At some point during your conversation with

5 the, you also said that insofar as the other officers that

6 they would bring in to help, that you wanted them to tell you

7 about these new officers, tell you how long they had known

8 these new officers, et cetera, correct?

9 A. I wanted to -- yes, them to tell me about the officers,

10 yes, sir.

11 Q. All right. You recall a meeting on June 16th of 1994,

12 where you gave Sammie Williams a cell phone?

13 A. Yes, sir.

14 Q. All right. Do you know what time that meeting concluded

15 and they left the warehouse?

16 A. No, sir.

17 Q. Would you have that recorded on any document that might

18 refresh your recollection?

19 A. Yes, it probably --

20 Q. Would that document --

21 A. -- should be recorded.

22 Q. -- be in the courtroom?

23 A. Would I know if the document is in the courtroom?

24 Q. Yeah.

25   A.  You'd have to ask one of the other individuals there.

                        Jackson - Cross
 1          MR. RIEHLMANN:  Do we have any documents in the
 2   courtroom that this witness could use to refresh his
 3   recollection?
 4          MR. WINTERS:  There's not a document authored by this
 5   witness.  I mean, we might have another document.
 6          MR. RIEHLMANN:  Well, let me just ask Mr. Jackson.
 7   BY MR. RIEHLMANN:
 8   Q.  Would you have prepared a document or made notes
 9   reflecting what time the meeting concluded?
10   A.  No, sir, I did not.
11   Q.  All right.
12   A.  Is that what you're asking me?
13   Q.  All right.
14          MR. WINTERS:  The best I could give you is the -- I
15   don't have the document -- it was an hour later the call was
16   made, but I don't have the document here.  It's back at the
17   FBI.
18          MR. RIEHLMANN:  Would it be the surveillance logs?
19   Is that what you're looking for?  Because I believe I might
20   have that.
21          MR. WINTERS:  I don't think they would have had
22   surveillance logs for November the 16th.
23          MR. RIEHLMANN:  June 16th.
24          MR. McMAHON:  No, June 16.
25          MR. WINTERS:  June 16th; I'm sorry.

1        MR. McMAHON:  There should be a surveillance log for

2   June 16th that would indicate that.

3        MR. RIEHLMANN:  All right.

4        MR. McMAHON:  We didn't bring it with us.

5        MR. RIEHLMANN:  Well, I'll come back to that.

6   BY MR. RIEHLMANN:

7   Q.  You spoke in your conversation with Mr. Williams and

8   Mr. Davis about testing them.  Do you know what I'm referring

9   to?  Because I was a little --

10  A.  What conversation are you talking about, sir?

11  Q.  When you were talking about -- in that conversation, in

12  the hotel room, at some point you mentioned that you would be

13  testing them.  You don't know what I'm referring to?

14  A.  In the first meeting?

15  Q.  Yes.

16  A.  In April?

17  Q.  Yes.

18  A.  I would be testing them?

19  Q.  Yes.

20  A.  Or did I say I had been testing them?

21  Q.  Well, either way, --

22  A.  Okay.

23  Q.  -- do you recall saying it in either tense?

24  A.  That they were being -- had been tested, yes, sir.

25  Q.  Yes.  And, I'm sorry I didn't understand or I don't know

1   if you even explained what that meant, what you meant by that.

2   A.  Yes, I did explain it.

3   Q.  Well, could you --

 4   A.  But, I will explain it again.

 5   Q.  -- explain it again for me?

 6   A.  There were several meetings without myself being present

 7   that were conducted with Terry Adams and Len Davis, meaning

 8   transactions where Terry Adams and Len Davis and Sammie

 9   Williams were involved in some other narcotics transactions,

10   bringing simulated transactions to a mall, and I was saying

11   that I, even though I wasn't there, was looking at that as a

12   test to make sure that nothing happened.

13   Q.  Okay.  Thank you.  And, in that conversation, you, at some

14   point, offered to get Sammie Williams a cell phone?

15   A.  In that --

16   Q.  Well, in the same conversation that happened in the hotel

17   room --

18   A.  Yes, sir.

19   Q.  -- maybe not right around the testing time, but I'm

20   talking about in that conversation in the hotel room, you

21   offered to get Sammie Williams a cell phone?

22   A.  Yes, sir.

23   Q.  And, you did get him a cell phone?

24   A.  Yes, sir.

25   Q.  Okay.  Was that the cell phone that Sammie Williams had

                        Jackson - Cross

 1   with him in the car that he was driving on November the 18th?

 2   A.  I don't recall, sir.

 3   Q.  All right.  In the very conclusion of that tape, Sammie

 4   Williams -- I believe it's Sammie Williams, but you correct me

 5   if I'm wrong -- he shakes hands with Scaboo, is that correct?

 6   A.  In the conclusion of the first tape --

 7  Q.  Yeah.

 8  A.  -- in the hotel room?

 9  Q.  Yeah.

10  A.  I don't know one way or another, sir.

11  Q.  Okay.  I believe you testified that of all the 11 officers

12  that worked the warehouse detail you only met one?

13  A.  Yes, sir.

14  Q.  Who was that?

15  A.  Larry Smith.

16  Q.  All right.  And, that was during the operation?

17  A.  Yes, sir.

18  Q.  Okay.  The meetings at the warehouse, these monthly

19  meetings, pre -- what was it, pre-something meeting, the pre-

20  shipment meeting, whatever you would -- however you

21  characterized it, those meetings were audio taped and video

22  taped, is that correct?

23  A.  Most of them were, yes, sir.

24  Q.  All right.  The warehouse was equipped with quite a bit of

25  surveillance equipment, isn't that true?

 1  A.  I couldn't really say one way or another, because I didn't

 2  place it in there, but I'm sure there were recording devices

 3  in there.  I don't know where they were, if that's what you're

 4  asking.

 5  Q.  There were cameras there, correct?

 6  A.  To my understanding, yes, there were.

 7  Q.  All right.  There were -- and from time to time there were

 8  agents secreted inside the warehouse that were using the video

 9  cameras and still cameras, isn't that true?

10  A.  Are we still talking about during the meetings, when Len

11   Davis are there?

12   Q.  Well, no, actually we're not.  We're just talking about

13   the entire six-month period that the sting operation went on

14   at the warehouse, wasn't it common to have FBI agents hidden

15   in the warehouse using video cameras and still photograph

16   cameras?

17   A.  I think there was one time when they were placed in there

18   once, is my understanding, but since that wasn't my particular

19   assignment, you'd have to ask somebody else.

20   Q.  You weren't the case agent?  Mr. Hadden and Ms. Jenkins

21   were, correct?

22   A.  Yes.

23   Q.  You were working under their supervision, correct?

24   A.  I was the undercover agent.

25   Q.  All right.  Now, in JJ-T1, if you could turn to that.

204

Jackson - Cross

1   A.  Okay.

2   Q.  And, I'm sorry I was scribbling so fast I didn't get a

3   chance to put the page citation, but, again, you talk about a

4   "test run thing."  Do you recall that part and do you think

5   you might be able to find it for me?

6   A.  "A test run thing," is that what --

7   Q.  Well, you may not have said "thing," but you said "test

8   run," I believe.  Page 3, I'm told, by clerk.

9   A.  I see it, sir, yes, sir.

10  Q.  And, what was that in reference to?  I didn't understand

11  your explanation.

12  A.  I was alluding to the other drug dealer, who was bringing

13  the shipments of cocaine in.  This was the first time he was

14  actually going to allow the drugs to come in to NewOrleans

15  and so this was going to be the test run.

16  Q.  Oh, I understand.  Okay.  Now, at Page 8 of JJ-T3, Lines

17  12 through 14, Len Davis speaks of "playing the area."  Do you

18  see that?

19  A.  I'm sorry, hold on one second.  Page 8?

20  Q.  Lines 12 through 14, if I scribbled that down right.  Do

21  you -- is that where it says something about "playing the

22  area"?

23  A.  "Playing the area"?

24  Q.  Yeah.

25  A.  (Examines document)  Yes, I see --

205

Jackson - Cross

1  Q.  Okay.  And, what you understood that to mean was that,

2  when Len Davis arrived or when Len Davis and Sammie Williams

3  arrived, they would "play the area," in that they would drive

4  around the area to make sure that there were no surveillance

5  agents, is that correct?

6  A.  I took it to mean that he just wanted to look around to

7  make sure there was nothing wrong in the area, nothing that he

8  did not know was going to go on in the area.

9  Q.  All right.  Over the six-month period that the warehouse

10  detail went on, Leon Duncan never worked at that warehouse,

11  did he?

12  A.  To my knowledge, no, sir.

13  Q.  All right.  And, over that six-month period that that

14  warehouse detail went on, can you tell us how many kilos of

15  cocaine were actually stored there?

16  A.  Not at this time, I can't.

17  Q.  All right.  Can you tell us an approximate dollar amount

18  of how much cocaine was stored there?

19  A.  Dollar amount of the cocaine stored there?

20  Q.  Yes.

21  A.  No, I can't, sir.

22  Q.  All right.  We talked earlier about your intentions, your

23  plans that each and every police officer that were to be

24  brought into the operation would have to meet with you and

25  undergo, in essence, an interview with you, so that you could

206

Jackson - Cross

1  satisfy yourself that this police officer was a corrupt police

2  officer, correct?

3  A.  I wanted him to understand what was going on, yes, sir.

4  Q.  And, what you mean by that is you were going to explain to

5  them that what they were beginning -- or what they were about

6  to embark upon was a cocaine protection ring, correct?

7  A.  I wanted them to agree to protect the cocaine, yes, sir.

8  Q.  All right.  All right.  All right, but you never did meet,

9  with the exception of Mr. Larry Smith, you never did meet with

10  any of those police officers, did you?

11  A.  No, sir.

12  Q.  Okay.  In part, I guess, your motivation was that, in

13  suggesting that plan, your motivation was that you didn't want

14  to hoodwink or you didn't want to have police officers who

15  may have been hoodwinked by Len Davis into believing that they

16  were going to be working a legitimate detail?  You wanted to

17  make sure that that did not happen, correct?

18  A.  I wanted them to have knowledge of what the actual

19  operation was going to entail.

20  Q.  All right.  The meetings at the warehouse that were taped

2784750.dat

21  and monitored, was Leon Duncan's name ever bandied about?

22  A.  No, sir.

23  Q.  All right.  Did you, as part of your participation in this

24  operation, did you listen to all the taped conversations over

25  that entire period?  Are you familiar with all of them?

Jackson - Cross

1   A.  No, sir.

2   Q.  All right.  Now, in the November detail, you and Scaboo

3   meet with Len Davis and Sammie Williams, and you specifically

4   instruct them to bring new faces into the operation, correct?

5   A.  Yes, I asked could he provide.  Yes, sir.

6   Q.  But, it had to be new people, it couldn't be the same

7   people that had already been used, correct?

8   A.  Correct.

9   Q.  All right.  And, they had to be police officers, correct?

10  A.  Correct.

11  Q.  All right.  Because you had learned that Len Davis had

12  used a civilian during the warehouse security detail, isn't

13  that true?

14  A.  That's true, sir.

15  Q.  And, that was a man by the name of Gregory Boldan, isn't

16  that true?

17  A.  I don't recall his name, sir.

18  Q.  All right.  Do you recall, then, that, when Gregory Boldan

19  was brought to work at that warehouse detail, that it was

20  learned that he had not been clued in that he would be

21  guarding cocaine, did you know that?

22  A.  No, sir, I did not.

23  Q.  All right.  Despite the fact that you told Len Davis and

24  Sammie Williams that it had to be police officers, new police

Page 184

25   officers, he used two people, who weren't police officers on

Jackson - Cross

1   that November 18th detail, isn't that true?

2   A.   To my knowledge, I don't know what actual people he

3   actually used, sir.

4   Q.   Okay.  The cocaine that was loaded into the cars on

5   November the 18th, was loaded into the cars in an area that

6   could not be seen by the people -- by the people in the two

7   cars, Len Davis, Sidney Dubuclet, Darrel Jones, Sammie

8   Williams, Leon Duncan and Lemmie Rodgers, isn't that true?

9   A.   The cocaine was out of sight of both Len Davis and Sammie

10  Williams and anybody else in that car, yes, sir.

11  Q.   All right.  Thank you.  Did you take part in Sammie

12  Williams' debriefing?

13  A.   No, sir.

14  Q.   All right.  Do you recall a conversation with Len Davis

15  and Sammie Williams, wherein Len Davis tells you that one or

16  two of the police officers that he had used to guard the

17  warehouse did not know that there was cocaine in the

18  warehouse?

19  A.   I don't recall, sir.

20  Q.   Do you recall a meeting on July 9th, 1994, that as

21  videotaped, in which you met with Mr. Davis and Mr. Williams?

22  A.   I wouldn't know specific dates at this time, but, yes,

23  there were meetings.

24  Q.   All right.  It was about a 30-minute meeting, from about

25  1:30 to 2:00?  You don't recall that meeting?

Jackson - Cross

1   A.  Nothing right now I don't.

2   Q.  All right.  Well, let me ask you:  Do you recall, then,

3   Davis using the phrase "wracking his brains" in the context

4   that he said insofar as trying to find police officers who

5   were corrupt, he was "wracking his brains," you don't recall

6   that phrase?

7   A.  And you're still referring to July?

8   Q.  Yes.

9   A.  I don't recall at this time, sir, no.

10  Q.  All right.  Do you recall the May 22nd, 1994 meeting at

11  the Hilton, where Len Davis tells you that he has a source in

12  the Narcotics Department?

13  A.  I don't recall specifically, but I do remember the

14  meeting.

15          MR. RIEHLMANN:  Just one moment, please, Judge.

16          THE COURT:  All right.

17  BY MR. RIEHLMANN:

18  Q.  Mr. Jackson, at Page 11 of JJ-T3, -- are you with me, sir?

19  A.  Yes, sir.

20  Q.  Okay.  Lines 22, 23, you say, "He don't even want you all

21  to see noting, because --"  Now, the "he" is this fictitious

22  other drug dealer, is that correct?

23  A.  Yes, sir.

24  Q.  All right.  And the "you all" is all the police officers

25  involved, correct?


                                                    210
                         Jackson - Cross

1   A.  In that scenario, yes, sir.

2          THE COURT:  Any further questions, Mr. Riehlmann?

3          MR. RIEHLMANN:  With the --

        4           THE COURT:  No further questions at this time?

        5           MR. RIEHLMANN:  No, sir, that's what I was trying to

        6    say.

        7           THE COURT:  We'll recess until 9:30 tomorrow morning.

        8                          *   *   *   *   *

        9       (Whereupon, the trial was adjourned for the day)

       10

       11

       12

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25


                                                211

        1                  C E R T I F I C A T E

        2

        3          I certify that the foregoing is a correct transcript

        4    from the electronic sound recording of the proceedings in the

        5    above-entitled matter.

        6

7

8  /S/DOROTHY M. BOURGEOIS                          9-23-98

   ———————————————————————              —————————
   Dorothy M. Bourgeois                             Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25