1

1
2          UNITED STATES DISTRICT COURT

3          EASTERN DISTRICT OF LOUISIANA

4                                    *
                                     *
5    UNITED STATES OF AMERICA,       *        Criminal Action
                                     *        No: 97-217
6         Plaintiff,                 *
                                     *        Section "E"
7         v.                         *
                                     *        New Orleans, Louisiana
     LEON R. DUNCAN,                 *        May 1, 1998
8    DARREL G. JONES,                *
                                     *
9         Defendants.                *
     * * * * * * * * * * * * * * *

10
                          VOLUME 5
11
                        JURY TRIAL
12       BEFORE THE HONORABLE MARCEL LIVAUDAIS, JR.,
                 UNITED STATES DISTRICT JUDGE
13
     APPEARANCES:
14
     For the Government,        United States Attorney's Office
15                              By:  MICHAEL E. McMAHON, ESQ.
                                By:  ALBERT J. WINTERS, JR., ESQ.
16                              501 Magazine Street, Room 210
                                New Orleans, Louisiana 70130
17
     For the Defendant          Comarda & Associates
18   Leon R. Duncan,            By:  MICHAEL G. RIEHLMANN, ESQ.
                                3316 Canal Street
19                              New Orleans, Louisiana 70119

20   For the Defendant          William Noland & Associates
     Darrel G. Jones,           By:  WILLIAM NOLAND, ESQ.
21                              By:  GREGORY K. VOIGHT, ESQ.
                                2739 Tulane Avenue

22                              New Orleans, Louisiana 70119

23   Court Audio Operator:      James Crull

24   Transcriptionist:          Dorothy Bourgeois

25   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.

I N D E X

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Juan Jackson | -- | 3 | -- | -- |
| Sammie Williams | 11 | 92, 169 | 199 | -- |
| Lemmie Rodgers | 209 | 247 | 261 | -- |
| John Fleming | 262 | 266 | -- | -- |

| EXHIBITS: | | Marked | Received |
|---|---|---|---|
| N-1 | One Kilogram of Cocaine | 265 | 265 |
| N-2 | One Kilogram of Cocaine | 265 | 265 |
| N-3 | One Kilogram of Cocaine | 265 | 265 |
| N-4 | One Kilogram of Cocaine | 265 | 265 |
| N-5 | One Kilogram of Cocaine | 265 | 265 |
| N-6 | One Kilogram of Cocaine | 265 | 265 |
| N-7 | One Kilogram of Cocaine | 265 | 265 |
| N-8 | One Kilogram of Cocaine | 265 | 265 |
| N-9 | One Kilogram of Cocaine | 265 | 265 |
| N-10 | One Kilogram of Cocaine | 265 | 265 |
| P-3 | Photograph | 209 | 209 |
| P-6 | Photograph | 209 | 209 |
| Stip No. 2 | Written Stipulation | 52 | 52 |
| Duncan-3 | Detail Sheet | 147 | 147 |
| Jones No. 2 | Compact Disc of Tape | 208 | 208 |
| Jones No. 3 | Transcript of Tape (Jones 2) | 208 | 208 |
| SW 15 | Transcript | 208 | 208 |
| LR 4 | Plea Agreement of Lemmie Rodgers | 215 | 215 |

3

Jackson - Cross

1              P R O C E E D I N G S

2              (Friday, May 1, 1998)

3              (Call to Order of the Court)

4          (The Jury is present)

5          THE COURT:  Please be seated.

6                  *   *   *   *   *

7     JUAN JACKSON, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

8          THE COURT:  Well, ladies and gentlemen, as you will

9  recall, this Witness was on the stand yesterday or perhaps it

10  was the day before.  The cross-examination by Defendant's

11  Counsel hasn't been completed, so it will be completed now.

12          And I remind you, sir, you're still under oath.

13          THE WITNESS:  Yes, sir.

14          MR. RIEHLMANN:  Thank you, Judge.

15                  *   *   *   *   *

16              CONTINUED CROSS-EXAMINATION

17  BY MR. RIEHLMANN:

18  Q.  Good morning, Mr.Jackson.

19  A.  Good morning, sir.

20  Q.  Mr.Jackson, do you recall, I believe it was yesterday

21  morning, it might have been the day before, I asked you if you

22  prepared any 302s, which are FBI reports, in connection with

23  your role in this operation, isn't that true?

24  A.  You did ask me that, sir.  Yes, you did.

25  Q.  Yes.  And you, I believe your response was maybe one or

                                              4
                    Jackson - Cross

1  two, isn't that true?

2  A.  Yes, sir.

3  Q.  Do you have the 302s that you prepared in front of you?  I

4  notice you had a folder.  Is that --

5  A.  Yes, sir.

6  Q.  Okay.  In reality, instead of one or two, you prepared 15

7    of them, isn't that correct?

8    A.  I didn't count the amount but there are several more than

9    one or two, yes, sir.

10   Q.  Well, would you count them now and just tell me how many

11   you prepared, real quickly?

12   A.  (Witness complies)  Yes, sir.  Fifteen, sir.

13   Q.  Okay.  I don't know what order you have them in, but the

14   first one I'd like to direct your attention to has the date of

15   transcription as 10/27/94, but the date dictated 8/17/94, and

16   it refers to a meeting that you had on 8/17/94; if you could

17   turn to that one, please.

18   A.  (Witness complies)  Okay.

19   Q.  And I'm sorry, when you said, "Yes, sir" a moment ago, you

20   were agreeing with me that in reality you prepared fifteen

21   302s?

22   A.  Yes, in 1994, yes, I prepared fifteen 302s.

23   Q.  Okay.  On August 17th, 1994, you met with Sammie Williams

24   and Len Davis at the warehouse, is that correct?

25   A.  Yes, sir.

                                                    5
                        Jackson - Cross

1    Q.  And this 302 reflects that you told them that the cocaine

2    shipment for that month would be coming in, in about an hour,

3    correct?

4    A.  I'd have to read --

5    Q.  And I direct your attention to the first line of Paragraph

6    2.

7    A.  (Witness examines document)  Yes, sir.  That's what it

8    says, sir.

9    Q.  And a couple of lines down in that paragraph you indicated

10   to him that that cocaine was going to be staying in the

11  warehouse from Wednesday to Friday, correct?

12  A.  Yes, sir.

13  Q.  All right.  And that took place on August 17th, 1994,

14  correct?

15  A.  August 17th, yes, sir.

16  Q.  All right.  Next, I'd ask that you turn to the 302 that

17  you authored, dictated 8/19/94, transcribed 10/26/94.

18  A.  (Witness complies)  Yes, sir.

19  Q.  You, again, met with Sammie Williams and Len Davis on that

20  date, correct?

21  A.  Yes, sir.

22  Q.  And that, the text of that report reflects that, I believe

23  in the second -- pardon me -- in the second paragraph, you all

24  discussed a police officer that -- or one of the people that

25  they had out there guarding the warehouse was wearing a

6

Jackson - Cross

1  different uniform than the rest of the NewOrleans police

2  officers, correct?

3  A.  Yes, sir.  That's what it says here.

4  Q.  And Mr. Davis explained to you that that was an auxiliary

5  officer?

6  A.  (Witness examines document)

7  Q.  That's in the third paragraph.

8  A.  Yes, sir.  That's what it says.

9  Q.  Okay.  Mr. Williams was present for that conversation,

10  correct?

11  A.  Sammie Williams?

12  Q.  Yes.

13  A.  Yes, sir.

14 Q. Okay. I'd ask that you now turn to the 302 that was

15 transcribed 10/24/94 and the date that you dictated it was

16 9/9/94.

17 A. (Witness complies) Okay.

18 Q. Now, on that date, you met with Sammie Williams and Len

19 Davis again, correct?

20 A. Yes, sir.

21 Q. And you -- the point of that meeting was that you were

22 discussing with them, that couriers would be coming soon and

23 then they would pick up something at the warehouse and then go

24 to the Lakefront Airport, correct?

25 A. Yes, sir.


7

Jackson - Cross

1 Q. All right. The next one I'd ask that you turn to is

2 6/18/94 is the date of dictation, 6/22/94 is the date of

3 transcription.

4 A. Six eighteen, you said?

5 Q. Yes, sir. It's the date that you dictated it, 6/22/94 is

6 the date that it was transcribed.

7 A. (Witness complies) Okay.

8 Q. Okay. On that 302, what you've reported is that you and

9 Mr. Adams drove by in your car so as to observe and perhaps

10 identify or at least describe one of the police officers who

11 was working the detail, correct?

12 A. I think I grabbed the wrong one.

13 Q. Okay.

14 A. Sorry about that.

15 Q. It's just one paragraph.

16 A. Yes, I see it.

17 Q. Okay.

18    A.  (Witness examines document)  Yes, sir.

19    Q.  All right.  And you all drove by there so as to find out

20    who was the police officer working out there, correct?

21    A.  We attempted to identify the person.

22    Q.  All right.

23    A.  Yes, sir.

24    Q.  That was done pretty routinely by the agents involved in

25    this operation, to go out there to see who was working the

8

Jackson - Cross

1    details, who was out at the warehouse, correct?

2    A.  Was it done by me; is that what you're asking me?

3    Q.  No, I'm just saying by you and other agents.

4    A.  I can't speak for anybody else, sir.  I can only speak for

5    myself.

6    Q.  You don't know whether other agents went by there

7    routinely to observe and copy down information to see who --

8    what police officers were out at the warehouse?

9    A.  I never observed such a thing, no.

10    Q.  Do you know of such a thing, through your participation in

11    the operation?

12    A.  That's been like four years.  I really couldn't say one

13    way or another, whether they did it or not.  But like I said,

14    I can't say I observed it myself, no.

15    Q.  All right.  There was one occasion, and I believe we

16    referred to this earlier, where you met Larry Smith, correct?

17    A.  Yes, sir.

18    Q.  And that was when he was out there holding -- having --

19    detaining somebody who had their hands raised over their head;

20    do you recall this incident?

Page 7

21  A.  I don't remember the date, but, yes, I do remember meeting

22  him.

23  Q.  Okay.  He was outside of the warehouse, correct?

24  A.  Yes, sir.

25  Q.  If I showed you what has been previously marked and

9

Jackson - Cross

 1  introduced as --

 2          MR. RIEHLMANN:  Can you give me an exhibit number,

 3  please?

 4          THE CLERK:  It's up in the left corner.

 5          MR. VOIGHT:  Top left.

 6          MR. WINTERS:  P-1.

 7          MR. RIEHLMANN:  P-1.  Oh, I'm sorry, I see it.

 8  BY MR. RIEHLMANN:

 9  Q.  Can you tell me where that occurred, in this photograph?

10  A.  Where I met him; is that what you're saying?

11  Q.  Yes, where you saw him.

12  A.  It's not in the photo.

13  Q.  Oh, it's not?

14  A.  No, it's not.

15  Q.  All right.  It was on another side of the warehouse?

16  A.  What happens is, as you -- he's like on the -- when I

17  talked to him, he was like on the corner here (indicating),

18  when I -- when I was trying to talk to him.

19  Q.  All right.

20  A.  You know, I mean, it's like -- and this was -- and I'm

21  trying to, you know, this doesn't make too much sense to you.

22  If there's like a corner right here, they kind of set like --

23  like this (indicating), and they kind of jetted out to where

24  they could see here, and then the street, like, right here.

Page 8

25   Q.  All right.

                        Jackson - Cross

 1   A.  Do you know what I mean?

 2   Q.  Yes, I do.

 3   A.  And then, and I kind of like walked right towards him

 4   right in there (indicating).

 5   Q.  Is the place on -- the warehouse where the video

 6   surveillance camera was posted, is that depicted in this

 7   photograph?

 8   A.  Say it again?

 9   Q.  Is the place on the warehouse where the video surveillance

10   camera was posted or installed; is that depicted in this

11   photograph?

12   A.  Where the camera was?

13   Q.  Yes.

14   A.  I don't know where it was.

15   Q.  Okay.

16   A.  No.

17   Q.  All right.

18              MR. RIEHLMANN:  That's all I have.

19              Thank you, sir.

20              THE COURT:  Mr. Voight, do you have anything?

21              MR. VOIGHT:  Nothing else, Your Honor.

22              THE COURT:  Mr. McMahon?

23              MR. McMAHON:  No redirect, Your Honor.

24              THE COURT:  All right, thank you, sir.

25              MR. McMAHON:  May this Witness finally be excused?

Williams - Direct

1       THE COURT:  Counsel?

2       MR. RIEHLMANN:  I certainly have no more questions

3  for him.

4       THE COURT:  You what?

5       MR. RIEHLMANN:  I have no more questions for him.

6       MR. VOIGHT:  I have no further either.

7       THE COURT:  Then the Witness will be excused.

8       MR. McMAHON:  Thank you, Judge.

9       THE COURT:  Thank you, sir.

10      THE WITNESS:  Thank you, sir.

11      THE COURT:  You may step down.

12      THE WITNESS:  Have a good day.

13              (The Witness is excused)

14      MR. WINTERS:  The Government recalls Sammie Williams.

15              *   *   *   *   *

16   SAMMIE WILLIAMS, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

17              CONTINUED DIRECT EXAMINATION

18  BY MR. WINTERS:

19  Q.  Mr.Williams, you're still under oath.

20  A.  Yes.

21      MR. WINTERS:  I'd ask now, ladies and gentlemen, to

22  turn to SW 7, Tape 2.  I think we left off at Tape 1

23  yesterday.

24  BY MR. WINTERS:

25  Q.  Mr.Williams, do you have your book in front of you?


                                        12
                    Williams - Direct

1  A.  Yes.

2  Q.  Okay.

3      (Whereupon, the following excerpt of the audio tape of

     4    Defendant's Exhibit SW 7T, Tape 2, a continuing conversation

     5    between SAMMIE WILLIAMS, LEON DUNCAN, LEMMIE RODGERS, LEN

     6    DAVIS and JUAN JACKSON, inside a maroon Buick LeSabre, dated

     7    November 18, 1994, was then played for the jury:)

     8        (Cellular telephone ringing)

     9        (Music playing in background)

    10        (Mr. Williams is talking on the cellular telephone:)

    11            "MR. WILLIAMS:  Yeah.  All right.  All right.  Look,

    12    call back and let us know which one's going first.  All right.

    13        (Mr. Williams gets off the cellular telephone)

    14            "MR. DUNCAN:  What's up?

    15            "MR. WILLIAMS:  Huh?

    16            "MR. DUNCAN:  What's up?

    17            "MR. WILLIAMS:  Yeah.  It's about to happen."

    18                            (Tape stopped)

    19    BY MR. WINTERS:

    20    Q.  What was about to happen, Mr.Williams?

    21    A.  The couriers are about to leave, carrying the drugs, and

    22    we're going to be following them pretty shortly.

    23                            (Tape restarted)

    24            "MR. DUNCAN:  (Inaudible)

    25            "MR. WILLIAMS:  Oh, yeah, that's him.


                                                            13
                            Williams - Direct

     1            "MR. RODGERS:  Where the gray car at?

     2            "MR. WILLIAMS:  Huh?

     3            "MR. RODGERS:  Where the gray car at?

     4            "MR. WILLIAMS:  The other two?  Behind the two dudes?

     5            "MR. RODGERS:  Yeah, behind Len.  I mean, behind the

     6    other two dudes.

7          "MR. WILLIAMS:  Another dude.

8     (Static)

9     (Mr. Davis enters the vehicle)

10        "MR. WILLIAMS:  Hey.

11    (Pause)

12       "MR. WILLIAMS:  What you hurry, bro?  You want me to

13  move over there?

14       "MR. DAVIS:  Yeah, that's what I was telling you on

15  the phone."

16                   (Tape stopped)

17  BY MR. WINTERS:

18  Q.  Who gets in your car now?

19  A.  That's Len Davis.  We're -- they at the Mardi Gras Truck

20  Stop with us and he just came over to our vehicle and got in

21  the car.

22  Q.  Is Mr. Duncan and Mr. Rodgers still in your automobile?

23  A.  Yes.

24                 (Tape restarted)

25       "MR. DAVIS:  Them some raggedy fucking phones.

 

                                          14
               Williams - Direct

1        "MR. DUNCAN:  Say, don't be doing that shit, bro.

2    (Pause)

3    (Whistling)

4        "MR. DUNCAN:  So, what's been happening, bro?

5        "MR. DAVIS:  Not a fucking thing, man.  I was

6  supposed to be at the Academy.  Fuck them bitches.  I ain't

7  thinking about that.  I told them I had court.

8        "MR. DUNCAN:  Academy for what?"

9    (Pause)

10     (Music playing in background)

11          "MR. DAVIS:  Bitch, this business.  We need to hear

12    the phone ring.

13          "MR. DUNCAN:  I love that jam boy.  I like that jam.

14          "MR. RODGERS:  You can hear the phone ring.

15          "MR. DUNCAN:  Deaf mother fucker.  (Singing)

16      (Music playing in background)

17          "MR. DAVIS:  I'm gonna take the east route.  Ya'll

18    take the west route to I-51.

19          "MR. WILLIAMS:  He gonna call and let me know which

20    one going out first?

21          "MR. DAVIS:  Yeah, he gonna call and tell us.  I told

22    him to give me the east and give you the west.

23          "MR. RODGERS:  Why you taking the east?

24          "MR. DAVIS:  So I can get these one twelve.  Because

25    I want -- I got one twelves in the fucking car.  The east is


                                        15
                        Williams - Direct

1    gonna --"

2                          (Tape stopped)

3    BY MR. WINTERS:

4    Q.  What's "one twelves"?

5    A.  That's the police code for impersonating a police officer.

6    He's referring to Sidney Dubuclet and Darrel Jones, because

7    they're impersonating police officers.

8                          (Tape restarted)

9          "MR. DAVIS:  The east is gonna be the quicker route.

10    I want to get them bitches out of the car as quick as

11    possible.

12          "MR. DUNCAN:  They out in the east too?

13          "MR. DAVIS:  Well, --

14                "MR. DUNCAN:  They --

15                "MR. DAVIS:  Well, no, I got to come back and get my

16 car by Canal Street.  That's what I want to tell them, I can

17 -- we can leave them fucking rentals up there --

18                "MR. WILLIAMS:  Uh-huh. (affirmative response)

19                "MR. DAVIS:  -- and put the keys under the seat or

20 something, and get in our personal cars and leave.  I'm gonna

21 have to ask him how he want to do that.

22                "MR. WILLIAMS:  Uh-huh. (affirmative response)

23                "MR. DAVIS:  Or, unless they gonna meet us there.

24 But the reason I want to take the east route is because it's

25 quicker.  And then I can come back and drop these niggers off.


                                        16
                Williams - Direct

1 You dig?

2                "MR. DUNCAN:  Where you got to drop them off at?

3                "MR. WILLIAMS:  Look, you see what --

4                "MR. DAVIS:  One on Gentilly by the Texaco and one up

5 on Cleveland Street.

6                "MR. DUNCAN:  Oh, you shoulda' took the west route.

7                "MR. DAVIS:  No.  East is quicker though, Dunc.

8                "MR. RODGERS:  Yeah, you can go right there.

9                "MR. DUNCAN:  (Inaudible)

10                "MR. DAVIS:  I'm going right to the twin span.

11                "MR. WILLIAMS:  I'm going -- we're going to go I-55.

12                "MR. DUNCAN:  Oh, okay.  Oh.

13                "MR. DAVIS:  Ya'll got to go out past Kenner.

14                "MR. DUNCAN:  All right.

15                "MR. WILLIAMS:  It ain't gonna be really that much

16 longer, but when you get to that, that six mile bridge, I

17 think it is before the next exit.

18          "MR. DUNCAN:  Yeah.

19          "MR. WILLIAMS:  Six miles before you get to the next

20     exit.

21          "MR. DAVIS:  That, plus, I don't know what fucking

22     exit to take going that way, and that asshole passed it up

23     last time too.  I hope ya'll don't wind up in Mississippi.

24          "MR. DUNCAN:  (Inaudible) I-55.

25          "MR. RODGERS:  (Inaudible)

                          Williams - Direct

1          "MR. WILLIAMS:  No, this is what happened.  We

2     ain't --

3          "MR. DUNCAN:  Laplace exit.

4          "MR. WILLIAMS:  We know the exit.

5          "MR. RODGERS:  (Inaudible)

6          "MR. WILLIAMS:  But we didn't get down at 55.  We was

7     going straight to take the next exit, which was a couple of

8     miles further.

9          "MR. DUNCAN:  Yeah.  It is.

10          "MR. RODGERS:  Ya'll didn't make the curve there?

11          "MR. WILLIAMS:  Yeah.

12     (Pause)

13     (Mr. Davis exits the vehicle)

14          "MR. DUNCAN:  I asked him to get (inaudible).

15          "MR. RODGERS:  Hey, brother.  Who that nigger is in

16     that back seat?

17          "MR. WILLIAMS:  One twelve.

18          "MR. RODGERS:  He be up by the courthouse?

19          "MR. WILLIAMS:  I think he a deputy sheriff.

20          "MR. RODGERS:  Yeah, okay, then."

```
21                        (Tape stopped)

22    BY MR. WINTERS:

23    Q.  What does it mean to you when he's -- what did you mean

24    when you said, "I think he a deputy sheriff;" who were you

25    talking about?
```

```
 1    A.  Darrel Jones.

 2                         (Tape restarted)

 3            "MR. RODGERS:  Yeah, okay, then.

 4        (Pause)

 5        (Mr. Davis gets back into the vehicle)

 6            "MR. DUNCAN:  Oh, you brought your gun this time,

 7    huh?

 8            "MR. DAVIS:  The gun been on me.  I brought the

 9    phone.

10        (Pause)

11            "MR. WILLIAMS:  I see one of them.

12            "MR. DAVIS:  What the fuck up?

13            "MR. WILLIAMS:  I see one van in front them.

14        (Mr. Davis exits the vehicle)

15        (Door closes)

16            "MR. WILLIAMS:  One van behind them, I mean.

17            "MR. DUNCAN:  Huh?

18            "MR. WILLIAMS:  What they got a tow in the back of

19    that bitch for?  Oh, that's somebody else.

20            "MR. RODGERS:  He look like he pointing out shit.

21            "MR. WILLIAMS:  Oh, they trying -- trying to tell the

22    dude how to get out.

23            "MR. DUNCAN:  Where the dude at?"

24                         (Tape stopped)
```

25    BY MR. WINTERS:

                    Williams - Direct

 1   Q.  What "dude" are you talking about there, Mr.Williams?

 2   A.  The couriers.  But I mean JJ.  He's instructing the

 3   couriers how -- how to get out to the Interstates and stuff.

 4                          (Tape restarted)

 5          "MR. WILLIAMS:  Well, the driver must be telling the

 6   passenger, because the driver know the route.

 7          "MR. DUNCAN:  That's the van?

 8          "MR. WILLIAMS:  No.

 9   (Pause)

10          "MR. RODGERS:  Where did they go?

11          "MR. WILLIAMS:  Back in the back.

12          "MR. RODGERS:  They came down the exit?

13   (Music playing in background)

14          "MR. WILLIAMS:  See, the driver came out to show the

15   passenger how to get back on the Interstate, so he could go

16   over there and tell the dude, or call him on the phone or

17   something.

18          "MR. RODGERS:  I saw him on the phone.

19   (Pause)

20   (Cellular telephone ringing)

21   (Music playing in background)

22   (Mr. Williams is talking on the cellular telephone:)

23          "MR. WILLIAMS:  Yo.  Yeah.  Uh-huh. (affirmative

24   response)

25          "MR. DUNCAN:  (Inaudible)

1    (Static)

2    (Music is turned off)

3         "MR. WILLIAMS:  Uh-huh. (affirmative response)  I'm

4    about to -- I'm about to start that way to catch him.  No, I'm

5    backing out though.  But are you -- just tell me what kind.

6    Oh, how he know where to go?  And this is me, right?  Well,

7    what the fuck you're telling me for?  Is he out already?  I'm

8    gonna let him know.  No, I'm gonna let Len know.  Blue four

9    door Lincoln."

10                                (Tape stopped)

11   BY MR. WINTERS:

12   Q.  Who are you talking to there?

13   A.  I'm talking to JJ.  He's telling me that the couriers are

14   about to leave, but he's telling me the one going east is

15   about to leave.  And I'm asking him why is he calling me,

16   because Len is supposed to be following the courier containing

17   the drugs going east.  So, I'm telling him I'm going to let

18   Len know that's his vehicle.

19   Q.  And the blue four door Lincoln was the courier?

20   A.  Yes.

21                                (Tape restarted)

22        "MR. RODGERS:  That van came out already.

23        "MR. WILLIAMS:  Yeah.  Call me back for mine.

24        "MR. JACKSON:  (Talking from telephone)  I'll call

25   you right back.  Give me Len's number too.

1         "MR. WILLIAMS:  Four, five -- four, five, two, nine,

2    one, six, one.

3         "MR. JACKSON:  (Talking from telephone)  Okay.

4          "MR. WILLIAMS:  All right.

5      (Mr. Williams gets off the cellular telephone)

6          "MR. RODGERS:  Didn't the blue van come out already?

7          "MR. DUNCAN:  Blue van?

8          "MR. WILLIAMS:  No, it's a Lincoln.

9          "MR. RODGERS:  Oh, I see the Lincoln behind him.

10     (Horn honking)

11         "MR. DUNCAN:  Pull up on side of him, bro."

12                    (Tape stopped)

13  BY MR. WINTERS:

14  Q.  Who were you pulling up on side of there?

15  A.  Len Davis, his vehicle.

16                    (Tape restarted)

17     (Mr. Williams pulls his vehicle beside Len Davis' vehicle)

18         "MR. WILLIAMS:  It's coming out now.  Four blue -- a

19  four door blue Lincoln.

20         "MR. DAVIS:  A what?

21         "MR. WILLIAMS:  Four door blue Lincoln.

22         "MR. DUNCAN:  Four door blue Lincoln.

23         "MR. WILLIAMS:  That's you.

24         "MR. DAVIS:  For me?

25         "MR. WILLIAMS:  Yeah, he about to call you on the


                                          22
                    Williams - Direct

1   phone.

2          "MR. DAVIS:  All right.

3      (Len Davis' cellular telephone ringing)

4          "MR. RODGERS:  Turn the radio back on, man.

5          "MR. WILLIAMS:  Ya'll saw a four door blue Lincoln?

6          "MR. RODGERS:  I seen a blue four door van.

```
 7           "MR. DUNCAN:  (Inaudible)

 8           "MR. WILLIAMS:  Lincoln.

 9           "MR. RODGERS:  No -- yeah, I seen a Lincoln, blue or

10    either gray or something.

11           "MR. DUNCAN:  Light blue.

12           "MR. WILLIAMS:  That must be it.  Right down there,

13    about to turn down Florida.  I mean, go down.  No, that's not

14    a blue Lincoln.

15       (Music playing in background)

16           "MR. WILLIAMS:  Oh, you see it?

17           "MR. DUNCAN:  I don't know.

18           "MR. WILLIAMS:  Look, there it is over there.

19           "MR. DUNCAN:  Oh, okay.  Yeah, yeah, yeah, yeah,

20    yeah, yeah, yeah, yeah.

21           "MR. WILLIAMS:  All right, bitch.  Don't be looking

22    at us.

23       (Pause)

24       (Music playing in background)

25           "MR. RODGERS:  What, Sid, he got a fucking police
```

Williams - Direct

```
 1    shirt on?

 2           "MR. WILLIAMS:  Yeah, Sid the fucking police, boy.

 3           "MR. RODGERS:  Yeah, the mother fucker.

 4           "MR. DUNCAN:  (Inaudible)

 5           "MR. WILLIAMS:  They going over the bridge?

 6           "MR. RODGERS:  Yeah, they going over the bridge right

 7    now.  Boy, I be curious as a mother fucker.

 8       (Static)

 9           "MR. WILLIAMS:  How much, huh?

10           "MR. RODGERS:  I'll have to go look in the mother
```

11  fucking trunk."

12                              (Tape stopped)

13  BY MR. WINTERS:

14  Q.  What does it mean to you when Lemmie Rodgers said, "Boy, I

15  be curious as an MF?"

16  A.  He be curious as to how much drugs is inside the vehicle,

17  the couriers that Len was following.

18                              (Tape restarted)

19          "MR. WILLIAMS:  They parked right there, Lemmie?

20  Where they come from?

21          "MR. DUNCAN:  Well, they didn't come out.

22          "MR. RODGERS:  I don't know.  I think they just

23  backed up and went back in.

24          "MR. DUNCAN:  No, they didn't go back in.

25          "MR. RODGERS:  Huh?


                                                        24
                          Williams - Direct

1          "MR. WILLIAMS:  They must have just backed up and

2  parked."

3      (Pause)

4          "MR. WILLIAMS:  It's about to happen.

5      (Pause)

6      (Music playing in background)

7          "MR. DUNCAN:  Why you put -- I wonder why they put

8  two niggers in a Lincoln?  They shouldn't --

9      (Mr. Williams is talking on the cellular telephone:)

10          "MR. WILLIAMS:  Just hang tight. It -- it will be

11  finished in a little bit.

12          "MR. DUNCAN:  You know?  Two niggers in a Lincoln,

13  you right off the bat like, oh, yeah --

14          "MR. WILLIAMS:  (talking on cellular telephone)  They

15     just passed."

16                              (Tape stopped)

17     BY MR. WINTERS:

18     Q.  What does it mean to you when Leon Duncan says, "why they

19     put two niggers in a Lincoln?  Two niggers in a Lincoln, you

20     right off the bat like, oh, yeah"?

21          MR. RIEHLMANN:  Judge, I'm going to object, for

22     purposes that, as Mr. Voight stated yesterday, I believe that

23     the only time that a witness can interpret another

24     individual's language is when they're speaking in code, and I

25     don't believe that this is --


                                                        25
                              Williams - Direct

1          THE COURT:  Well, again, Counsel, you'll have the

2     opportunity to cross-examine.  The objection is overruled.

3          MR. RIEHLMANN:  Yes, sir.

4          THE WITNESS:  Okay, Duncan is saying that the

5     couriers, the guys driving the couriers containing the drugs

6     are two young guys, they're black, and they're driving a

7     lavish car, like a -- a Lincoln.  And he's wondering why did

8     they get a Lincoln and put these guys in it, because that

9     would draw attention to the average police officer.

10                             (Tape restarted)

11         (Music playing in background)

12         "MR. WILLIAMS:  (Talking on cellular telephone) No,

13    they -- they ain't none of our people because they all out

14    here.  So, don't let nobody fuck with nothing.  All right.

15         (Mr. Williams gets off the cellular telephone)

16         "MR. DUNCAN:  You talk to them?

17         "MR. WILLIAMS:  (Inaudible)

18    (Static)

19    (Pause)

20         "MR. DUNCAN:  Sam, what you going, city two?  I'm

21    gonna run up in there to the bathroom, bro.  And you call me

22    if they call you, all right?"

23                              (Tape stopped)

24    BY MR. WINTERS:

25    Q.  What is city two?

                                        26
                    Williams - Direct

1    A.  That's a police channel on our police portable handheld

2    radios, and he's telling me to go on that channel, because

3    he's about to go to the bathroom, and so I can call him if I

4    need him.

5                         (Tape restarted)

6    (Music playing in background)

7         "MR. WILLIAMS:  All right.

8         "MR. DUNCAN:  All right.

9         "MR. WILLIAMS:  Make sure I have a city two.

10   Everybody got a city two?

11        "MR. DUNCAN:  Yeah, everybody got a city two.

12        "MR. WILLIAMS:  Uh-huh. (affirmative response)

13   (Mr. Duncan exits the vehicle)

14   (Door slams)"

15                    (End of taped conversation)

16   BY MR. WINTERS:

17   Q.  All right.

18        MR. WINTERS:  I would ask the ladies and gentlemen of

19   the jury to go to SW 7, Tape 3.

20        (whereupon, the following excerpt of the audio tape of

21  Defendant's Exhibit SW 7T, Tape 3, a continuing conversation

22  between SAMMIE WILLIAMS, LEON DUNCAN and LEMMIE RODGERS,

23  inside a maroon Buick LeSabre, dated November 18, 1994, was

24  then played for the jury:)

25      (Mr. Duncan enters the vehicle)


                                        27
                        Williams - Direct

1       (Music playing in background)

2               "MR. DUNCAN:  What's up?

3               "MR. WILLIAMS:  He -- he used to be like real loud,

4   you know?

5       (Police radio in background)

6               "MR. RODGERS:  Who?

7               "MR. WILLIAMS:  The dude from the Ninth Ward.  You

8   mean the one over here?"

9                           (Tape stopped)

10  BY MR. WINTERS:

11  Q.  Who is the dude from the Ninth Ward?

12  A.  That's Terry Adams.

13  Q.  And did Leon Duncan get back in the car now?

14  A.  Yes.

15                          (Tape restarted)

16              "MR. RODGERS:  Uh-huh. (affirmative response)

17              "MR. WILLIAMS:  (Inaudible)  When -- when we seen

18  that cold Porsche, well, fuck, we knew about him then.  I done

19  jacked the nigger myself.

20      (Pause)

21              "MR. WILLIAMS:  That car must have came from the

22  other side of that building.

23              "MR. RODGERS:  What car?

24              "MR. WILLIAMS:  The -- the one that Len and them's
                        Page 24

25    behind.

                        Williams - Direct
 1              "MR. DUNCAN:  Yeah.
 2              "MR. WILLIAMS:  Because they didn't come out this
 3     way.  Yeah, he was asking did I see it on the side of the road
 4     too.
 5              "MR. RODGERS:  Who that?  Len saying to ask you?
 6              "MR. WILLIAMS:  No, the -- the dude.  The dude was
 7     calling to let me know it coming out.  He was asking do I see
 8     it and I was like --
 9          (Cellular telephone ringing)
10              "MR. WILLIAMS:  -- I was looking this way.  Be
11     looking that way for him.  (Inaudible)
12          (Mr. Williams is talking on the cellular telephone:)
13          (Static)
14              "MR. WILLIAMS:  Yeah.  Yeah.  Uh-huh. (affirmative
15     response)  Oh, I see it right there, yeah.  That is ours --
16              "MR. RODGERS:  (Inaudible)
17              "MR. WILLIAMS:  Oh, that's ours?  That's it?  Don't
18     go all the way.  Loyola, yeah.  All right.  Cool.  All right.
19          (Mr. Williams gets off the cellular telephone)
20              "MR. WILLIAMS:  We don't have to go as far as we
21     thought.  Just to the Loyola exit.  You heard me?
22              "MR. DUNCAN:  Yeah."
23                              (Tape stopped)
24     BY MR. WINTERS:
25     Q.  Mr.Williams, what do you mean by "the Loyola exit?"

1   A.  Well, JJ has just called me and told me that the couriers
2   containing the drugs that we're going to be following is about
3   to leave, and for us not to go as far as we went the last time
4   we followed them, which was to the I-55 exit, off of I-10.
5   He's saying we only have to go to the Loyola exit, which is --
6   which is a lot shorter now.
7   Q.  Step down here;
8         MR. WINTERS:  With the Court's permission, sir.
9         THE WITNESS:  (Complying)
10  BY MR. WINTERS:
11  Q.  And I'm going to show you what is already in evidence as
12  P-2, and I'd ask you if you can pick out the Loyola exit that
13  you drove to with Leon Duncan and Lemmie Rodgers following
14  that car?
15  A.  (Witness examines photograph)  Yes, this is the Interstate
16  going west, and the Loyola exit should be about right here
17  (indicating).
18  Q.  Thank you, sir.
19                      (Tape restarted)
20        "MR. RODGERS:  Has he been careful, bro?
21        "MR. WILLIAMS:  Uh-huh. (affirmative response)
22        "MR. DUNCAN:  Does he have different drivers each
23  time?"
24                      (Tape stopped)
25  BY MR. WINTERS:


                                                    30
1   Q.  What does it mean to you when Lemmie Rodgers says, "Has he
2   been careful, bro"?
3   A.  Oh, he's asking me has the -- JJ, the guy we're dealing

4   with, has he been careful as to not having police are

5   investigating him and stuff like that.

6   Q.  What does it mean to you when Leon Duncan says, "Does he

7   have different drivers each time"?

8   A.  He's asking me are the -- are these the same guys that

9   always drive the couriers as we were protecting the drugs at

10  the warehouse.  And I'm going to explain to him that what

11  we're doing, we're protecting these drugs for JJ's drug

12  dealing buddy, so he has different guys.  And then, the guys

13  that used to drive the couriers as they protected the drugs --

14  as we protected the drugs at the warehouse, were the same guys

15  all the time, because they were for JJ.

16                              (Tape restarted)

17          "MR. WILLIAMS:  No.  See, this is -- this is

18  something different from what we usually do, right?  And these

19  -- these drivers are different.

20      (Pause)

21          "MR. WILLIAMS:  But, the ones we -- we put on the

22  other location, always be the same dudes.  Now, I would be

23  suspicious of this car right away.

24          "MR. RODGERS:  I ain't hear you.

25          "MR. WILLIAMS:  I would be suspicious of this car

1   right away.  What them dudes doing with a commercial plate on?

2       (Music playing in background)

3          "MR. DUNCAN:  It's a rental car.

4          "MR. RODGERS:  Yeah, it's a rental.

5          "MR. WILLIAMS:  Well, I would stop it.

6          "MR. DUNCAN:  Well, I would too.  Two niggers in a

7   rental car.

8           "MR. RODGERS:  They got that A on the plates."

9                           (Tape stopped)

10  BY MR. WINTERS:

11  Q.  What does it mean to you -- excuse me, what did you mean

12  when you said, "I'd be suspicious of this car right away;"

13  suspicious in what regard?

14  A.  Well, it's a -- it's a big car and two guys are driving

15  the vehicle.  However, it's a rental vehicle, but it has a

16  commercial license plate on it, and most business vehicles

17  usually have commercial plates.  So, I'm saying this would

18  draw, as a police officer, it would make me suspicious right

19  away.

20  Q.  That's what you mean when you say, "I would stop it," and

21  Mr. Duncan agrees with you?

22  A.  Yes.  If we were like thinking they were probably drug

23  traffickers or something like that, we would pull them over.

24                          (Tape restarted)

25          "MR. DUNCAN:  Uh-huh. (affirmative response)

                        Williams - Direct

1           "MR. RODGERS:  Commercial.

2   (Pause)

3   (Music playing in background)

4   (Cellular telephone ringing)

5           "MR. WILLIAMS:  That nigger listens to what we say

6   though, bro.

7   (Mr. Williams is talking on the cellular telephone:)

8           "MR. WILLIAMS:  Yeah.  It's what?  Who is this?

9   Yeah.  Yeah, yeah, we on the road.  We -- we just now about to

10  roll.  All right.

11          (Mr. Williams gets off the cellular telephone)

12               "MR. WILLIAMS:  (Inaudible)

13               "MR. DUNCAN:  But you know they look clean cut guys.

14     You know what I'm saying?

15               "MR. WILLIAMS:  Uh-huh. (affirmative response)  Yeah.

16               "MR. DUNCAN:  They all clean cut looking.

17               "MR. WILLIAMS:  The kind if you pull up on the side

18     of them and look at them, --

19               "MR. DUNCAN:  They look clean.

20               "MR. WILLIAMS:  -- you'll probably just blow them

21     off.

22               "MR. DUNCAN:  Yeah.  Because they not all racked up

23     in the mouth."

24                         (Tape stopped)

25     BY MR. WINTERS:

                         Williams - Direct

1     Q.  What does it mean to you when Mr. Duncan says, "They --

2     but they clean cut guys; you know what I'm saying"?

3          And then you say, "You'll probably just blow them off"?

4     A.  We're saying that even though the vehicle would make us

5     suspicious, as police officers, and it would draw our

6     attention, as we took a -- like, if we were behind them or

7     pulled on the side of them and took a better look at them, we

8     see that they're actually clean cut guys, not looking like the

9     average drug dealing kind of guy.  So, we say we probably

10    wouldn't stop them, because we really don't have any

11    justification for doing so.

12    Q.  What does Duncan mean to you when he says, "Because they

13    not all racked up in the mouth"?

14  A.  Some of the drug dealers usually have gold teeth in their

15  mouth, and that's what he means when he says, "racked up in

16  the mouth."  These guys don't.

17                    (Tape restarted)

18       "MR. WILLIAMS:  And watch how these mother fuckers do

19  the speed limit, bro.  I know the police gonna lock it in.  At

20  least, well, I don't know about these guys.

21       "MR. DUNCAN:  So we -- you don't know where this car

22  is going?

23       "MR. WILLIAMS:  Uh-uh. (negative response)  What you

24  mean?  At its final destination?

25       "MR. DUNCAN:  Yeah.


                                                        34
                        Williams - Direct

1        "MR. WILLIAMS:  Fuck no.  Don't care to know.  I need

2   to know?

3        "MR. RODGERS:  So the dude gonna jet too"

4                     (Tape stopped)

5   BY MR. WINTERS:

6   Q.  What car -- what does it mean to you when Mr. Duncan says,

7   "Do you know where this car is going;" what car?

8   A.  The car that we're following.  He's asking me do I know

9   the final destination where it's going to continue going, once

10  we break off the protection.  And I'm telling him, "No, I

11  don't know where it's going after that."  It doesn't even

12  matter to us, we just have to protect it for so far.

13  Q.  And the dude, Rodgers says, "So the dude gonna jet;" who

14  is the dude he's talking about?

15  A.  Oh, he's talking about JJ.

16                    (Tape restarted)

17       "MR. WILLIAMS:  Who?

18          "MR. RODGERS:  You know the dude.

19      (Static)

20          "MR. WILLIAMS:  Is he gonna jet?  No, he gonna still

21      be there.  We got to, you know, we got that other deal.

22      (Pause)

23          "MR. WILLIAMS:  Play the mirror, Lemmie.  Make sure.

24          "MR. RODGERS:  Yeah.

25      (Pause)

 1          "MR. RODGERS:  Only thing came up when we came up was

 2      this BMW, but he look like he trying to go past us.

 3          "MR. WILLIAMS:  Uh-huh. (affirmative response)

 4      (Pause)

 5          "MR. DUNCAN:  See that white car, Lemmie?

 6          "MR. RODGERS:  Huh?

 7          "MR. DUNCAN:  See that white car?

 8          "MR. RODGERS:  That white car didn't come from

 9      behind.  The black car got over.

10          "MR. DUNCAN:  Tell him I'm gonna take my family to

11      Disneyworld.

12          "MR. WILLIAMS:  (Inaudible)

13          "MR. DUNCAN:  So, if he had a car to bring to

14      Florida, let me know, all right?  I'm serious.

15          "MR. WILLIAMS:  (Inaudible)

16          "MR. DUNCAN:  You know, like I'm going to bring my

17      family to Disneyworld for a week.

18          "MR. WILLIAMS:  What you talking about, if we have

19      one of these cars?

20          "MR. DUNCAN:  No.  He got a load to bring to Florida?

21          "MR. WILLIAMS:  Oh.

22          "MR. DUNCAN:  You know, --"

23                    (Tape stopped)

24    BY MR. WINTERS:

25    Q.  Let's go back a little bit.  Earlier in this tape, when


                                        36
                    Williams - Direct

1     you tell Lemmie Rodgers to "play the mirror," what are you

2     talking about?

3     A.  I'm telling him to look in the rearview mirror, because

4     even though we are following this vehicle, protecting the

5     drugs, we're still worried that there might be law enforcement

6     looking at us, so Lemmie -- Leon Duncan and Lemmie Rodgers are

7     looking in the rearview mirrors and looking behind them and

8     watching to make sure that no vehicle is like behind us.

9     Q.  What does it mean when Duncan says, "Tell them I'm going

10    to take my family to Disneyworld, so if he had a car to bring

11    to Florida, let me do it, all right?  I'm serious"?

12    A.  Well, he -- he kind of throws me off here at this time,

13    because he catches me off guard.  He's telling me that if JJ

14    has another load of drugs he wants to bring to Florida, let

15    him know so he can drive the vehicle himself with his family,

16    as if he's going to Disneyworld or something, and he can

17    deliver the drugs himself.  And I'm kind of surprised at this,

18    because shortly -- well, just a while before this, Leon was

19    kind of leery about everything, but it seemed as though he's

20    gotten kind of comfortable now.

21    Q.  And on the top of Page 5 in the transcript when he says,

22    "No.  He got a load to bring to Florida;" load of what?

23    A.  A load of drugs.

24                    (Tape restarted)

25          "MR. DUNCAN:  You know, me, my wife and the kids go

                    Williams - Direct

1   to Florida, shit.

2          "MR. WILLIAMS:  Now you're comfortable, huh, bitch?

3          "MR. DUNCAN:  I ain't, no.  I ain't comfortable, bro.

4   But --

5          "MR. WILLIAMS:  And you say you're gonna go to

6   Florida.

7          "MR. DUNCAN:  Fucking right.  That's how they do it,

8   bro.

9          "MR. WILLIAMS:  Yeah, I know."

10                         (Tape stopped)

11  BY MR. WINTERS:

12  Q.  What does Mr. Duncan mean when he says -- mean to you when

13  he says, "Fucking right.  That's how they do it, bro"?

14  A.  That's how the drug dealers do it and they -- it could be

15  -- when they're trafficking drugs, like, to Florida, they'll

16  bring their family down with them as a disguise, so the police

17  won't pull them over.  If they see a family in a car, they

18  don't think anything of it.

19                         (Tape restarted)

20     (Static)

21          "MR. DUNCAN:  (Inaudible)

22          "MR. RODGERS:  (Inaudible)

23          "MR. WILLIAMS:  (Inaudible) for the fucking people.

24     (Pause)

25          "MR. DUNCAN:  Man, you know, ten grand, drive a car

1  there with your kids, wife and kids, make the reservations for

2  them.

3      "MR. WILLIAMS:  You're willing to do that?

4      "MR. DUNCAN:  Yeah, absolutely.  Sure.

5      "MR. WILLIAMS:  Well, you sure went from there to

6  there.  We don't even -- we don't even be in the same place.

7      "MR. DUNCAN:  Sam, I'm just bullshitting you, Sam"

8                        (Tape stopped)

9  BY MR. WINTERS:

10 Q.  What does this reference to you, of Mr. Duncan, "Man, you

11 know, ten grand, drive a car there with your kids, wife and

12 kids, and make the reservations for them"?

13 A.  He's saying for ten thousand dollars, he'll -- or, if JJ

14 was to pay him ten thousand dollars, he would drive his wife

15 and kids down to Florida and make the reservations as if they

16 just going to Disneyworld, and at the same time, he could have

17 the drugs delivered.

18                        (Tape restarted)

19     "MR. DUNCAN:  I'm just bullshitting you, Sam.  I'm

20 just fucking joking.

21     "MR. WILLIAMS:  That's why I said I'm not

22 understanding that shit.

23     "MR. DUNCAN:  I'm just joking.

24     "MR. WILLIAMS:  We don't even get paid that.

25   (Pause)


                                                    39

1     "MR. DUNCAN:  I'm just joking, brother.

2     "MR. WILLIAMS:  You probably would never come back to

3  work.

"MR. DUNCAN:  Huh?

"MR. WILLIAMS:  You probably would never come back anyway.

"MR. DUNCAN:  Why you say that?

"MR. WILLIAMS:  (Inaudible)

"MR. DUNCAN:  Who would?

"MR. WILLIAMS:  (Inaudible)

"MR. DUNCAN:  Shit, he'd probably put a contract out on your family.  Fuck that, you know what I'm saying?  It ain't worth it, man."

(Tape stopped)

BY MR. WINTERS:

Q.  What do you mean when you tell Mr. Duncan, "You probably would never come back to work"?

A.  He's saying -- I'm saying once he gets that much money and stuff, he'll probably stay away, in Florida, and not come back to work.

Q.  And what do you mean -- what does he mean to you when he says, "Probably put a contract out on your family, you know what I'm saying?  It ain't worth it"?

A.  He's saying now that he's just joking about the whole thing, even though he knows there are drugs in the car, he

wouldn't take his family down to Florida, because it's not worth it.  They'd probably kill his family if he didn't come back or something like that.

Q.  Who would kill his family?

A.  The drug dealer.

Q.  If he didn't come back?

```
 7   A.  Yes.

 8                        (Tape restarted)

 9        "MR. WILLIAMS:  You know at one time, before we even

10   started doing this many different things, they used to try to

11   test us to see if we would gank move them, and they told us

12   what they had, --

13      (Static)

14        "MR. DUNCAN:  Yeah.

15        "MR. WILLIAMS:  -- so it was enough to set us, you

16   know, --

17        "MR. DUNCAN:  Right, right."

18                        (Tape stopped)

19   BY MR. WINTERS:

20   Q.  What's a "gank move"?

21   A.  That's another term for jacking or taking the drugs, or

22   something, or your money.

23                        (Tape restarted)

24        "MR. WILLIAMS:  -- for a long time.

25        "MR. DUNCAN:  Make your mind go, yeah.
```

```
 1        "MR. WILLIAMS:  Yeah.  They just wanted to see how we

 2   was gonna deal with that, because they were gonna have

 3   something bigger now, them niggers probably got -- I can't

 4   even imagine.

 5      (Pause)

 6        "MR. DUNCAN:  Get ahead of that car --"

 7                        (Tape stopped)

 8   BY MR. WINTERS:

 9   Q.  What do you mean when you say, "Because they were gonna

10   have something bigger now, and them niggers probably got -- I
```

11    can't even imagine;" what are you referring to?

12    A.  Well, I was telling Duncan about the time when me and Len

13    was protecting the drugs on one of the earlier deals, and they

14    told us how much cocaine was inside, which was about six kilos

15    at the time.  And we figured it to be a test to see -- because

16    he tried to figure out if we were going to jack him then, and

17    that way, that will -- he would knew not -- well, he would

18    have known -- the six kilos didn't mean that much because now

19    he probably have a bigger quantity of cocaine in the vehicles

20    we're following now.

21                            (Tape restarted)

22            "MR. DUNCAN:  Get ahead of that car and get that

23    license plate number.  I'm gonna have to call her.

24            "MR. RODGERS:  (Inaudible)

25      (Pause)


                                                              42
                          Williams - Direct

1            "MR. DUNCAN:  Bitch might be DEA.

2      (Pause)

3            "MR. DUNCAN:  How often ya'll do this?

4            "MR. WILLIAMS:  Oh, about once a month.

5      (Cellular telephone rings)"

6                            (Tape stopped)

7    BY MR. WINTERS:

8    Q.  Are Mr. Duncan and Mr. Rodgers still looking out for cars

9    that are coming past you all?

10            MR. RIEHLMANN:  Judge, I'm going to object to

11    Mr.Winters leading his witness.  I don't think that's

12    appropriate.

13    BY MR. WINTERS:

14   Q.  What does Mr. Duncan --

15         THE COURT:  Try to avoid the leading.

16   BY MR. WINTERS:

17   Q.  -- mean when he says, "Bitch might be DEA;" what does that

18   mean to you?

19   A.  Well, Duncan just saw a vehicle pass by and he say a

20   female inside of the vehicle.  He told me to pull up so he can

21   get the license plate, so he can get in contact with her at a

22   later date.  Then he says, "She might be DEA."

23                (Tape restarted)

24   (Cellular telephone rings)

25      "MR. WILLIAMS:  I think one month it was twice.


                                      43
                 Williams - Direct

1     (Static)

2     (Mr. Williams is talking on the cellular telephone:)

3      "MR. WILLIAMS:  Yeah.  I'm about to get at my exit

4   now.  Well, we ain't going as far as we thought we had to go.

5   We gonna be late.  What about the car?  Hold on to both of

6   them because they probably want to use them.  Yeah, all right.

7   I'll be there soon.  That's what I'm gonna do too.  All right.

8     (Mr. Williams gets off the cellular telephone)

9      "MR. WILLIAMS:  Did we pass Loyola?

10      "MR. DUNCAN:  No.

11     (Pause)

12     (Music playing in background)

13      "MR. DUNCAN:  Ya'll don't work 'til 2:25, huh?

14      "MR. WILLIAMS:  Yeah, we already taken care of that.

15      "MR. DUNCAN:  Yeah, shit, ya'll gonna make it on

16   time.

17      "MR. WILLIAMS:  Well, we got something else to do.

18          "MR. DUNCAN:  What else ya'll got to do?

19          "MR. WILLIAMS:  Handle something else at the other

20   location.  But we ain't got to drive though.  Well, I don't

21   think we got to drive there."

22                          (Tape stopped)

23   BY MR. WINTERS:

24   Q.  What are you telling Mr. Duncan there when you say,

25   "Handle something at the other location"?


                                                      44
                       Williams - Direct

1    A.  We still have to protect the drugs that -- at the

2    warehouse, with the van that's inside there.

3    Q.  And what do you mean when you say, "We ain't got to drive

4    though"?

5    A.  We don't -- we don't have to follow it, but the van is

6    still in the warehouse, so we have to relieve the guys over

7    there.

8                          (Tape restarted)

9       (Music playing in background)

10          "MR. WILLIAMS:  But we ain't got to drive nowhere.

11   We just got to go to the other location and handle that.  We

12   just told them we gonna be a little late.

13          "MR. DUNCAN:  Uh-huh. (affirmative response)

14          "MR. WILLIAMS:  (Inaudible)

15          "MR. DUNCAN:  We -- we finished, right?

16          "MR. WILLIAMS:  Yeah.  Want me to drop ya'll off

17   home?  Ya'll going back to (inaudible)?

18          "MR. DUNCAN:  (Inaudible)

19          "MR. WILLIAMS:  And I guess Len gonna hook up with

20   ya'll later.

21                "MR. DUNCAN:  Yeah.

22                "MR. RODGERS:  Look, don't make the left.  Go ahead

23     straight and then come back up, hear?  Make a left right here.

24                "MR. WILLIAMS:  Uh-huh. (affirmative response)

25                "MR. RODGERS:  And go up -- what's that, Airline

1      Highway, whatever that is?

2                 "MR. WILLIAMS:  Yeah.

3                 "MR. RODGERS:  And then come on back, and then come

4      around.  See where this -- this green car going?  He got over

5      right -- right before we got over.  He already up and jumped

6      in the left lane.

7                  "MR. WILLIAMS:  This one right here?  On the right?

8                  "MR. RODGERS:  Yeah.

9                  "MR. WILLIAMS:  Yeah.

10                 "MR. RODGERS:  He still behind us?

11                 "MR. DUNCAN:  He in the right lane.

12                 "MR. WILLIAMS:  No, in the right, he in the right.

13                 "MR. RODGERS:  He in the right lane now?

14                 "MR. WILLIAMS:  Yeah.

15                 "MR. DUNCAN:  Yeah.

16                 "MR. WILLIAMS:  This is a U-turn?

17                 "MR. RODGERS:  Yeah.

18          (Pause)

19          (Cellular telephone rings)

20          (Mr. Williams is talking on the cellular telephone:)

21                 "MR. WILLIAMS:  Yo.  Yeah.  Yeah, what's up?  Hello?

22     Yeah, what's up?  Yeah, we on the way back now.  All right.

23     Hello?  Hello?  Hello?  It's cutting out.

24          (Mr. Williams gets off the cellular telephone)

25          "MR. WILLIAMS:  Bitch, I know what he wanted to say

                        Williams - Direct

1    though.

2          "MR. DUNCAN:  What?

3      (Static)

4          "MR. WILLIAMS:  Len was calling about that other dude

5    calling to meet him at the -- I'm gonna drop you off and we

6    just gonna meet at the other place, the rental place.

7    (Inaudible)  So, ya'll might want to hang a -- oh no --

8    (Inaudible)

9      (Pause)

10     (Cellular telephone rings)

11     (Mr. williams is talking on the cellular telephone:)

12         "MR. WILLIAMS:  Yeah.  He just called me and told me.

13   All right.  It ain't mine, it's their -- all their phones

14   fucked up.

15     (Pause)

16         "MR. DUNCAN:  Lemmie, you got to go to work too, huh?

17         "MR. RODGERS:  Yeah.

18     (Pause)

19         "MR. DUNCAN:  You want me just get yours?"

20                        (Tape stopped)

21   BY MR. WINTERS:

22   Q.  What does it mean to you when Duncan says, "You want me to

23   get yours"?

24   A.  He's asking Lemmie Rodgers, do you want -- does he want

25   him to pick up his portion of the money, once we finish

1  protecting the drugs.

2                              (Tape restarted)

3       "MR. RODGERS:  Yeah.  That's about the only reason I

4  might get off tonight.  Leon, you off today, right?

5       "MR. DUNCAN:  Yeah.

6       "MR. RODGERS:  Huh?

7       "MR. DUNCAN:  Yeah.

8    (Pause)

9       "MR. RODGERS:  It's like, I don't know what to do

10  right now.

11    (Pause)

12    (Music playing in background)

13       "MR. WILLIAMS:  All right fellas.

14       "MR. RODGERS:  All right, brother.

15       "MR. WILLIAMS:  Be cool.

16       "MR. DUNCAN:  Later.

17    (Sounds of door shutting)"

18                      (End of taped conversation)

19  BY MR. WINTERS:

20  Q.  Did you drop Duncan and Rodgers back at their car?

21  A.  Yes.

22  Q.  Where you had picked them up?

23  A.  Yes.

24  Q.  Did you go back to the rental place and bring the car?

25  A.  Yes.

1  Q.  And after that, did you and Davis meet JJ?

2  A.  Yes, we did.

3  Q.  And did he give you any money?

     4   A.  Yes.

     5   Q.  Do you remember how much he gave you?

     6   A.  Yes, he gave me thirty thousand dollars for protecting

     7   drugs at both places.

     8   Q.  Fifteen thousand for the warehouse?

     9   A.  Yes.

    10   Q.  And fifteen thousand for the Mardi Gras Truck Stop?

    11   A.  Yes.

    12   Q.  You hadn't paid off anybody by this time, am I correct?

    13   A.  That's correct, not yet.

    14   Q.  Okay.

    15       MR. WINTERS:  I ask now for the jury to look at SW 8

    16   in the transcript book.

    17   BY MR. WINTERS:

    18   Q.  And Mr.Williams, please get to SW 8.

    19   A.  (Complying)

    20   (whereupon, the following excerpt of the audio tape of

    21   Defendant's Exhibit SW 8T, a conversation between LEN DAVIS,

    22   LEON DUNCAN and an UNKNOWN FEMALE, dated November 18, 1994,

    23   was then played for the jury:)

    24   (Outgoing call)

    25   (Phone ringing)

                          Williams - Direct

     1       "MR. DAVIS:  (Inaudible)

     2       "UNKNOWN FEMALE:  Hello?

     3       "MR. DAVIS:  Fuck.  Yeah, what's up sweetheart?  You

     4   ready for a new man yet?

     5       "UNKNOWN FEMALE:  Excuse me?

     6       "MR. DUNCAN:  Put the phone up Kian (phonetic).

```
 7              "MR. DAVIS:  Where Dunc at?

 8              "MR. DUNCAN:  What's up?

 9              "MR. DAVIS:  Yeah, what's up, nigger?

10              "MR. DUNCAN:  Yo, what's happening?

11              "MR. DAVIS:  I thought that was Tonnice, boy.

12              "MR. DUNCAN:  Yeah, right."

13                          (Tape stopped)

14  BY MR. WINTERS:

15  Q.  Who is "Tonnice"?

16  A.  Leon Duncan's wife.

17                          (Tape restarted)

18              "MR. DUNCAN:  Yeah, right.

19              "MR. DAVIS:  Yeah, well fuck you.  It ain't no secret

20  I'm trying to get with Tonnice.  Say, bro.

21              "MR. DUNCAN:  What?

22              "MR. DAVIS:  You have any twenties and tens and shit?

23              "MR. DUNCAN:  Do I have --

24              "MR. DAVIS:  Huh?

25              "MR. DUNCAN:  Do I have any?
```

Williams - Direct

```
 1              "MR. DAVIS:  Yeah, do you have any like change for a

 2  hundred?

 3              "MR. DUNCAN:  Yeah, I got some.

 4              "MR. DAVIS:  All right.  I guess I'm gonna have to

 5  stop -- talk -- deal with you first, because I'm gonna need

 6  change like a mother fucker.

 7              "MR. DUNCAN:  All right.

 8              "MR. DAVIS:  You think you got change for a couple a

 9  hundred?

10              "MR. DUNCAN:  Yeah.
```

11          "MR. DAVIS:  I figured you --"

12                         (Tape stopped)

13     BY MR. WINTERS:

14     Q.  What does that mean to you when Davis says, "You think you

15     got change for a couple a hundred;" what's he doing?

16          MR. RIEHLMANN:  Judge, it's going to be the same

17     objection I made earlier.  And also, I'd object that

18     Mr.Williams is being asked to interpret a phone call that he

19     was not a party to.

20          THE COURT:  But this, again, he is being asked what

21     does that mean to him, and he will answer it one way or the

22     other and you can cross-examine him.  So, the objection is

23     overruled.

24          THE WITNESS:  He -- he means does he have change for

25     what we just got paid, and we got paid in all hundreds and Len


                                              51
                         Williams - Direct

1      is about to come over to pay him, and at the same time, he

2      going to get some change from Duncan, to break some of them

3      hundred dollar bills.

4                         (Tape restarted)

5          "MR. DAVIS:  I figured you would have money, bitch.

6      All them people you robbing in the Sixth.  All right.  Let me

7      see.  What I'm gonna do, I'm gonna swing through there.  I'm

8      gonna leave you Lemmie's too, hear?

9          "MR. DUNCAN:  All right.

10         "MR. DAVIS:  So call him and tell him he can come by

11     the house and get it now.  We be out there in a few.

12         "MR. DUNCAN:  All right.

13         "MR. DAVIS:  All right."

14          (End of taped conversation)

15     BY MR. WINTERS:

16     Q.  Did you all go meet Mr. Duncan?

17     A.  Yes.

18     Q.  And where did you meet him?

19     A.  At his house.

20          MR. WINTERS:  And again, with the Court's permission.

21     BY MR. WINTERS:

22     Q.  Would you please step down here and I want you to

23     identify, if you can, P-6.  Can you identify this?

24     A.  Yes, Leon's house is the two story house right here

25     (indicating).

1     Q.  That was on Aberdeen Street?

2     A.  Yes.

3          MR. WINTERS:  Your Honor, I guess it's appropriate at

4     this time, in conjunction with this Witness' testimony, to

5     read a stipulation into the record that has been signed by all

6     parties, including both Defendants and both Government

7     attorneys.

8          It's marked as Stipulation Number 2 and with the

9     Court's permission, I'll read it:

10          "It is hereby stipulated and agreed among the

11     undersigned parties the following is uncontroverted, true and

12     correct, that a representative of Entergy Corporation would

13     testify that from April 24th, 1990 through December 31st,

14     1994, Leon R. Duncan resided at 8220 Aberdeen Street,

15     NewOrleans, Louisiana."

16          I offer to introduce and file it into the record.

17          MR. RIEHLMANN:  Yes, sir.

18          THE COURT:  All agree that that is the stipulation?
19          MR. RIEHLMANN:  Yes, sir.
20          MR. VOIGHT:  Yes, Your Honor.
21          THE COURT:  The stipulation will be received.
22   BY MR. WINTERS:
23   Q.  How much money did you give Mr.Duncan?
24   A.  I gave him two thousand dollars; a thousand for himself
25   and a thousand to give to Lemmie.


                                                          53
                          Williams - Direct
1    Q.  For who?
2    A.  Lemmie Rodgers.
3    Q.  And who was present when you gave it to him?
4    A.  It was myself, Len and Leon.
5    Q.  And you were present?
6    A.  Yes.
7          MR. WINTERS:  I would ask the jury now to turn to SW
8    9 in the transcript book.  It's another telephone conversation
9    on November 18th, at 2254, which is -- well, 2254, off of 451-
10   4971.
11          MR. McMAHON:  Hold on, Al.  That's the wrong one.
12          MR. WINTERS:  I'm sorry.
13          MR. McMAHON:  That's the one.
14          MR. WINTERS:  Your Honor, I misspoke.  It's -- it's
15   SW 9, and it's a telephone conversation off of 451-4971, and
16   the time is 1732, or 5:32 p.m., SW 9.
17   (whereupon, the following excerpt of the audio tape of
18   Defendant's Exhibit SW 9T, a conversation between LEN DAVIS,
19   SAMMIE WILLIAMS and DARREL JONES, dated November 18, 1994, was
20   then played for the jury:)
                          Page 47

21     (Incoming call)

22     (Phone ringing)

23          "MR. WILLIAMS:  Hello?

24          "MR. JONES:  Yeah.  Len?

25          "MR. WILLIAMS:  Yeah.  This -- this Sam on here.


                                                    54
                         Williams - Direct

1          "MR. JONES:  Sam?

2          "MR. WILLIAMS:  Yeah, hold on.  He gonna talk to you

3     in a minute.

4          "MR. JONES:  All right.

5      (Mr. Davis and Mr. Williams are talking in background)

6          "MR. DAVIS:  Where you at?

7          "MR. JONES:  Up on Tulane and White.  What you got?

8     Where you want me to meet you?

9          "MR. DAVIS:  Well, fuck, you right where -- you right

10    around us then.  Let me see.  I'm at Canal and Robertson right

11    now.  So, --

12          "MR. JONES:  Where you want me to meet you, by the

13    McDonalds?

14          "MR. DAVIS:  By what McDonalds?

15          "MR. JONES:  On Canal, or further than that?

16          "MR. DAVIS:  All right.  You at Tulane and what?  Oh,

17    okay, you up the street by the bank.

18          "MR. JONES:  Yeah.

19          "MR. DAVIS:  You in a car?

20          "MR. JONES:  Yeah.

21          "MR. DAVIS:  All right.  Well, come on down and meet

22    me at -- meet me at Galvez and Tulane.

23          "MR. JONES:  Galvez and Tulane?

24          "MR. DAVIS:  Come right now.
                         Page 48

25          "MR. JONES:  All right."

                    Williams - Direct
 1              (End of taped conversation)
 2    BY MR. WINTERS:
 3    Q.  Who is Mr. Davis talking to there?  Do you recognize the
 4    voice?
 5    A.  Darrel Jones.
 6    Q.  And what was the purpose of that call?
 7    A.  We were back in our police vehicle and we at work, but
 8    we're paying the guys that protected the drugs.  And Darrel
 9    Jones being one of them, we about to meet with him and pay
10    him.
11    Q.  Did you all meet -- were you in the car with Davis?
12    A.  Yes.
13    Q.  And did you all meet at Galvez and Tulane?
14    A.  Yes.
15    Q.  And did Mr. Jones come to Galvez and Tulane?
16    A.  Yes.
17    Q.  And did you observe what happened?
18    A.  Yes.  Len was driving our vehicle so he parked the vehicle
19    right behind Darrel Jones' vehicle.  He got out of the vehicle
20    and went to Darrel Jones' vehicle and paid him his money.
21          MR. WINTERS:  All right.  I'd ask now that the jury
22    turn to SW 10 in the transcript book, which is a telephone
23    conversation over telephone 451-4971.
24          (Whereupon, the following excerpt of the audio tape of
25    Defendant's Exhibit SW 10T, a conversation between LEN DAVIS

1    and SHANTRICE, dated November 18, 1994, was then played for the

2    jury:)

3         (Incoming call)

4         (Phone ringing)

5              "MR. DAVIS:  Hold on.

6         (Irrelevant conversation)

7              "MS. SHANTRICE:  You on your way to Flynn's?

8              "MR. DAVIS:  Fuck Flynn's.  I'm about to go to --

9                             (Tape stopped)

10   BY MR. WINTERS:

11   Q.  Who is Davis talking to there?

12   A.  His girlfriend, Shantrice.

13   Q.  What is "Flynn's"?

14   A.  That's a -- a bar that Len used to go to all the time.

15   Q.  Where is Flynn's Bar located?

16   A.  The actual name of it is Flynn's Den, located on Chef

17   Menteur Highway.

18   Q.  And what type of clientele frequents Flynn's Den?

19   A.  A lot of police officers used to go there.

20                           (Tape restarted)

21              "MR. DAVIS:  I'm about to go to my fucking house and

22   probably change and come back out.  All them niggers we paid

23   off wanna hookup.  (Laughter)"

24                             (Tape stopped)

25   BY MR. WINTERS:

1    Q.  What does it mean to you when he says, "All them niggers

2    we paid off;" who's he referring to?

3    A.  The guys that protected the drugs with us.

4          (Tape restarted)

5          "MR. DAVIS:  Them bitches, all the new people like

6    Dunc and Lemmie and Mike.  Mike called me back, 'Say, bro,

7    don't forget about me next time, bro.  Nigger, you on the map,

8    Nigger.  Nigger, you on the map.  Say, bro, you niggers

9    righteous, bro.  You niggers righteous.  I wanna take you out

10   for a drink.'

11         "I say that bitch is gonna drink up his little

12   fucking change before he even take care any fucking business

13   with it.  Them niggers couldn't believe how easy it was to get

14   them little ends.  Easy as a mother fucker.  And I got Sid --

15   I gotta get -- meet with Sid tonight and give Sid his shit.

16   But I need to get my fucking blood pressure checked."

17         (End of taped conversation)

18         MR. WINTERS:  I'm going to ask the jury now to turn

19   to SW 11, which is a telephone conversation over 451-4971,

20   which occurred on November the 29th at 12:44 p.m.

21         (Whereupon, the following excerpt of the audio tape of

22   Defendant's Exhibit SW 11T, a conversation between LEN DAVIS

23   and LEON DUNCAN, dated November 29, 1994, was then played for

24   the jury:)

25         (Incoming call)

1    (Phone ringing)

2          "MR. DAVIS:  Yeah, what up nigger?

3          "MR. DUNCAN:  Yeah, what's up.

4          "MR. DAVIS:  Where you at?

5          "MR. DUNCAN:  At home.

6    (Irrelevant conversation)

```
 7          "MR. DAVIS:  While you was working I was gonna -- we
 8     was gonna meet up.  But I just thought about that just when I
 9     called you, but -- but what I wanted you to do was talk to
10     your people.
11          "MR. DUNCAN:  Yeah.
12          "MR. DAVIS:  And just see if you hearing anything.
13     We ain't hearing nothing.
14                         (Tape stopped)
15     BY MR. WINTERS:
16     Q.  Who is Rodgers talking to there -- I mean, excuse me.  Who
17     is Mr. Davis talking to there?
18     A.  Leon Duncan.
19     Q.  And what does it mean to you when Len Davis says, "What I
20     wanted you to do was talk to your people"?
21     A.  Talk to his connections in Narcotics and stuff like that.
22     Q.  And what does it mean to you when he says, "Just see if
23     you hearing anything"?
24     A.  Is he hearing anything about us protecting the drugs.
25                         (Tape restarted)
```

                         Williams - Direct

```
 1          "MR. DAVIS:  But, you know, just to --
 2          "MR. DUNCAN:  You know what I wanted to talk you
 3     about?
 4          "MR. DAVIS:  What?
 5          "MR. DUNCAN:  Where you -- where you at right now?
 6     You working?
 7          "MR. DAVIS:  On the Interstate.
 8          "MR. DUNCAN:  On Interstate; where you going?
 9          "MR. DAVIS:  Toward the house.
10          "MR. DUNCAN:  Where you at right now?
```

```
11          "MR. DAVIS:  By Dow -- passing up -- well,
12    approaching the high rise.
13          "MR. DUNCAN:  Well, I -- I just wanted to get -- I
14    didn't -- I didn't hear nothing from them, but I heard other
15    people talking about something that was similar to what you
16    had.
17          "MR. DAVIS:  Uh-huh. (affirmative response)
18          "MR. DUNCAN:  You know.  And you know -- David
19    Singleton never did -- never did nothing for you, huh?
20          "MR. DAVIS:  Huh?
21          "MR. DUNCAN:  David Singleton?
22          "MR. DAVIS:  No, but they -- they familiar.
23          "MR. DUNCAN:  They familiar?"
24                         (Tape stopped)
25    BY MR. WINTERS:
```

Williams - Direct

```
 1    Q.  What does it mean to you -- who is David Singleton?
 2    A.  He was a police officer.
 3    Q.  Where is Singleton?
 4    A.  He's in prison.
 5    Q.  And when Duncan says, "David Singleton never did nothing
 6    for you;" what does that mean to you?
 7    A.  Did David Singleton work for you, protecting the drugs.
 8    Q.  And what does it mean to you when Davis says, "They
 9    familiar"?
10    A.  Len is telling him, no, they didn't work for him but he
11    did try to recruit him.  So, he knows about the drugs,
12    protecting the drugs at the warehouse.
13                         (Tape restarted)
```

Page 53

14          "MR. DUNCAN:  They familiar?

15          "MR. DAVIS:  Yeah, that's who you heard talking?

16          "MR. DUNCAN:  No.  Somebody else that was on that

17  same side, you know what I'm saying?

18          "MR. DAVIS:  Uh-huh. (affirmative response)"

19                    (Tape stopped)

20  BY MR. WINTERS:

21  Q.  What does it mean to you when Duncan says, "Somebody else

22  that was on the same side"?

23  A.  Somebody that's connected with Dave and them, with David

24  Singleton, friends with him.

25                    (Tape restarted)


                                   61
                    Williams - Direct

1          "MR. DUNCAN:  (Inaudible) came and talked to me and

2  told me he heard something about this, and this is what was

3  going on, you know, and this is who was watching, you know.  I

4  said, 'well, how you heard this?'  He said, 'Man, them niggers

5  talking, bro.'  I say, (inaudible), 'I better talk to --'

6          "MR. DAVIS:  Hold on, hold on.  Who told you this?

7          "MR. DUNCAN:  You know Henry?  Remember Henry?

8          "MR. DAVIS:  Henry?

9          "MR. DUNCAN:  Why don't you stop by the house?"

10                    (Tape stopped)

11  BY MR. WINTERS:

12  Q.  What does it mean to you when Duncan says, "Why don't you

13  stop by the house"?

14  A.  Just that.  Why don't you come to the -- Duncan is telling

15  Len, "Why don't you come to the house" and talk to him because

16  he's -- he doesn't really want to talk on the phone,

17  especially a cellular phone.

18                    (Tape restarted)
19          "MR. DAVIS:  I got Dees and fucking what you call him
20   waiting --
21          "MR. DUNCAN:  All right.
22          "MR. DAVIS:  -- for me."
23                    (Tape stopped)
24   BY MR. WINTERS:
25   Q.  Who is "Dees"?


                                                    62
                        Williams - Direct
1    A.  Adam Dees.  He was another police officer.
2    Q.  Did he work with you all?
3    A.  Yes, he protected the drugs at the warehouse.
4    Q.  Where is he?
5    A.  He's in prison.
6                    (Tape restarted)
7          "MR. DAVIS:  -- for me.  But --
8          "MR. DUNCAN:  You remember Henry, the dude we did?
9          "MR. DAVIS:  Yeah.  Okay, yeah, yeah.
10         "MR. DUNCAN:  Well, he told me that somebody came
11   told him about it, you know, and --
12         "MR. DAVIS:  Fuck.  It couldn't be nobody but Lemmie.
13         "MR. DUNCAN:  No, Lemmie didn't tell him, okay?
14         "MR. DAVIS:  Uh-huh. (affirmative response)
15         "MR. DUNCAN:  'Cause this -- this was like right -- I
16   mean, like the next day, he was sitting down and we was
17   talking.  He was telling me, you know, about David.  He said
18   -- he told me David Singleton was telling one of his podners
19   about it.  And the dude was telling him about it.  All right?
20         "MR. DAVIS:  Uh-huh. (affirmative response)

21          "MR. DUNCAN:  And I said no, you bull -- I said, I
22     don't -- I never heard, you know, nothing about it.  He say,
23     'Yeah, man, it's -- it's like everybody and they mama know
24     about this, you know --'"
25                          (Tape stopped)

                          Williams - Direct
1     BY MR. WINTERS:
2     Q.  What does it mean to you when Duncan tells Davis,
3     "Everybody and his mama know about this"?
4     A.  He's saying somebody is talking about us protecting the
5     drugs at the warehouse and it's getting around so much that
6     everybody is finding out about it.
7                          (Tape restarted)
8          "MR. DUNCAN:  -- about this, you know what I'm
9     saying?  That this is what they doing for -- 'Say, bro, watch
10    yourself, you know.'  I say, 'Well, yeah, all right.  Well,
11    I'm glad you told me, you know.'  And that's what, I wanted to
12    talk to -- remember you was supposed to pass by for
13    Thanksgiving --
14         "MR. DAVIS:  Yeah.
15         "MR. DUNCAN:  -- and to tell you about that, you
16    know.  And ask if they ever did anything for you, you know?"
17                          (Tape stopped)
18    BY MR. WINTERS:
19    Q.  What does it mean to you when Duncan says, "And ask you if
20    they ever did anything for you"?
21    A.  Well, he's, again, telling -- asking Len did David ever
22    work for him protecting the drugs.
23                          (Tape restarted)
24         "MR. DAVIS:  So now David then told some fucking body
                          Page 56

25    he know?

Williams - Direct

1          "MR. DUNCAN:  Right.

2          "MR. DAVIS:  That done told him.

3          "MR. DUNCAN:  That right.  And evidently he went and

4    told Henry about it, and Henry was asking me.  But I said I

5    didn't hear anything about this and, you know, 'cause

6    everybody, you know?  And I said, 'Well, no, bro --'

7          "MR. DAVIS:  David told them names?

8          "MR. DUNCAN:  Yeah.  Well, no, he didn't tell them no

9    names.  No, he didn't.

10          "MR. DAVIS:  He just said something was being worked

11    like that, --

12          "MR. DUNCAN:  Right.

13          "MR. DAVIS:  -- but he didn't say who was working it.

14          "MR. DUNCAN:  And -- well, I'm gonna tell you how he

15    told me.  He said something about the way they sit in the van.

16    They was sitting inside of a van.  They had a TV in the van.

17    They had coffee, and all kinda bull -- anything they -- you

18    know, some shit like this.

19          "MR. DAVIS:  I know you lying.

20          "MR. DUNCAN:  No.  Yeah, and he said it --"

21                    (Tape stopped)

22    BY MR. WINTERS:

23    Q.  Do you know who Henry is?

24    A.  No, I don't know who Henry is.

25    Q.  Okay.  What does this mean to you when Duncan says, "They

Williams - Direct

1  had a TV in the van. They had coffee, anyway, you know, some
2  shit like that"?
3  A. Well, he's describing the set up we had at the warehouse.
4  The police officers had a van out there and they were sitting
5  there to guard the drugs inside the warehouse. And they had a
6  television inside, coffee and stuff like that.
7                    (Tape restarted)
8           "MR. DUNCAN: He said it was a white van, that they
9  was sitting inside of. I mean, he was telling me bits and
10 pieces, how the guy gave it to him and I'm sitting there and
11 I'm saying to myself -- and I didn't know exactly, I said I
12 don't know -- I don't know nothing about that one.
13          "MR. DAVIS: Uh-huh. (affirmative response)
14          "MR. DUNCAN: You know what I'm saying. But I
15 remember you told me this -- this, it was different this time,
16 you know. But, I just wanted to tell you.
17          "MR. DAVIS: Yeah, you fucking right, 'cause, see --
18          "MR. DUNCAN: You watch who you -- you watch who you
19 fucking with."
20                    (Tape stopped)
21 BY MR. WINTERS:
22 Q. This van you referred to; who requested that van?
23 A. We did.
24 Q. You and who?
25 A. Len Davis


                                              66
                    Williams - Direct
1  Q. Now was it -- who supplied it?
2  A. JJ.
3  Q. You later found out there were recording devices in that

    4   van?

    5   A.  Yes.

    6   Q.  Court authorized?

    7   A.  Yes.

    8                       (Tape restarted)

    9           "MR. DUNCAN:  You watch you who fucking with, because

   10   by the same token, you know what I'm saying?  Niggers -- them

   11   niggers talk too much for me, bro.

   12           "MR. DAVIS:  And that's what kill a mother fucker.

   13   Yep, and look, and it's stupid.

   14           "MR. DUNCAN:  You see, and this is what he told me.

   15   He told me, he said something about, you know, it was supposed

   16   to be paying like $35 an hour, but instead of that, they gave

   17   them -- at the end they gave them like a grand for a couple

   18   minutes, you know, some shit like this.  That's when I said,

   19   'Are you serious, man?'  He told me, he say, 'Yeah.'

   20           "MR. DAVIS:  All the details."

   21                       (Tape stopped)

   22   BY MR. WINTERS:

   23   Q.  What does it mean to you when Duncan says, "But instead

   24   they gave them, at the end, they gave them like a grand,"

   25   okay?


                                                          67
                        Williams - Direct

    1   A.  He's saying that instead of giving them what they -- or a

    2   little more than you would get on the normal detail, we would

    3   -- they would -- they guys out there were getting a lot more,

    4   and this was being discussed.  And a grand means a thousand

    5   dollars.

    6                       (Tape restarted)

7          "MR. DUNCAN:  Yeah.  I mean, I'm sitting here like I

8     never heard nothing about it, but nobody approached me.  But

9     no, hey, if they do, you know what I'm saying?  I'll, you

10    know, I'll -- I'll watch myself.  You know, like, he said,

11    yeah, bro.  I just wanted to tell you, bro.  You know, but

12    see, the thing about it, you see, them niggers is talking, you

13    know, about this.  I said to myself, 'Man, that's

14    unbelievable,' you know.  I mean, I -- and I wanted to tell

15    you, you got to watch who you fuck with, with this, man."

16                         (Tape stopped)

17    BY MR. WINTERS:

18    Q.  What does it mean to you when Duncan says, "I wanted to

19    tell you, you got to watch who you fuck with, with this, man"?

20    A.  Well, Duncan doesn't, you know, he's telling him, "You

21    told David about this and here, David is talking to other guys

22    there, then who was talking to another guy, and it got back to

23    him.  He's saying you got to be careful who you're talking to.

24    And Len is going to tell him, well, it wasn't his idea to

25    recruit David in the first place, but being that they wanted


                                            68
                      Williams - Direct

1     new guys, or new -- for -- to protect the drugs at the Mardi

2     Gras Truck Stop, that's why he had to bring them in, or tell

3     them about it

4                         (Tape restarted)

5          "MR. DAVIS:  Hey, bro.  And I know.  But you know

6     what it was?  We wouldn't have never went and told David and

7     them any fucking thing.

8          "MR. DUNCAN:  Yeah.

9          "MR. DAVIS:  But this nigger wanted to expand.  His

10    -- his boy wanted somebody new.  And I told his fucking ass I

11   didn't really want to do it like that, but the nigger called

12   his self testing us.

13         "MR. DUNCAN:  Yeah."

14                 (Tape stopped)

15   BY MR. WINTERS:

16   Q.  Did you all approach David Singleton to work at the Mardi

17   Gras Truck Stop?

18   A.  Yes.  When JJ told us that the guys that -- the guy, his

19   partner, wanted new guys to work the Mardi Gras Truck Stop.

20   We were leery about talking to David because of this -- this

21   reason right here, that he would tell a lot of people, and so

22   -- but Len did try to recruit him; however, he declined.  And

23   -- but he didn't know the facts about it.

24                (Tape restarted)

25         "MR. DAVIS:  So, we had to tell other people, ya dig?

<div align="right">69</div>

<center>Williams - Direct</center>

1         "MR. DUNCAN:  Right.

2         "MR. DAVIS:  To get them to -- to get them to do this

3   here.

4         "MR. DUNCAN:  Right.

5         "MR. DAVIS:  But that's all right.  I'm about to

6   throw all that shit in the cross.

7         "MR. DUNCAN:  But all I'm saying is, you know, like I

8   say, but that's too sweet, bro.

9         "MR. DAVIS:  I know.  I know.

10        "MR. DUNCAN:  You know what I'm saying?"

11              (Tape stopped)

12   BY MR. WINTERS:

13   Q.  What does it mean to you when Davis says, "I'm about to

<center>Page 61</center>

14   throw all that in the cross"?

15   A.  He's saying that we're not going to be working at the

16   Mr.Duncan any more.  We're going to -- since it seems as

17   though other people know about it, we're not going to be

18   protecting drugs there any more.

19   Q.  And what does it mean when Duncan says, "I say, that's too

20   sweet, bro"?

21   A.  We're making a lot of money off protecting these drugs and

22   he's saying that it's a -- it's a good deal.  So, it's -- if

23   we mess it up by telling people, it would be a bad deal.

24                        (Tape restarted)

25              "MR. DAVIS:  I know.  I know.

1              "MR DUNCAN:  You know what I'm saying?

2              "MR. DAVIS:  Well, --

3              "MR. DUNCAN:  Somebody stupid to go to talking.

4              "MR. DAVIS:  Uh-huh. (affirmative response)

5              "MR. DUNCAN:  And, you know, you know what I'm

6    saying, you can't be telling no fucking body about this, you

7    know what I'm saying?

8              "MR. DAVIS:  Man, niggers is stupid, hear.

9              "MR. DUNCAN:  'Cause you know what I'm saying?

10             "MR. DAVIS:  So, but all -- but all that -- but how

11   the fuck -- all that shit came from when Ronald, and fucking

12   David.

13             "MR. DUNCAN:  Well, all right.  But they --

14             "MR. DAVIS:  It had to."

15                        (Tape stopped)

16   BY MR. WINTERS:

17   Q.  Who is Ronald?

18  A.  I believe Ronald Singleton is David Singleton's brother,

19  and he's also -- he was a police officer also.

20  Q.  Where is he?

21  A.  He's in prison now.

22                         (Tape restarted)

23         "MR. DAVIS:  It had to, because if he said David told

24  him --

25         "MR. DUNCAN:  He told me David, David Singleton.

                    Williams - Direct

1          "MR. DAVIS:  Told his boy?

2          "MR. DUNCAN:  Told his boy.  And his boy was telling

3   him about it.  You see what I'm saying?

4          "MR. DAVIS:  (Inaudible)

5          "MR. DUNCAN:  And the main thing, I'm gonna tell you,

6   the main thing he was telling me was the fact that, man, ain't

7   no way in the world I would be paying no nigger no thousand

8   dollars to watch this.  I mean, maybe five hundred, but not no

9   thousand, you know what I'm saying?

10         "MR. DAVIS:  Uh-huh. (affirmative response)

11         "MR. DUNCAN:  But I'm not gonna sit there and tell

12  him, 'Well, yeah, but that's legit because this is, I know,'

13  you know what I'm saying?

14         "MR. DAVIS:  Uh-huh. (affirmative response)

15         "MR. DUNCAN:  I'm sitting there, well, yeah, but --

16  but I'm gonna have to watch my fucking self if anybody

17  approach me, you know?

18         "MR. DAVIS:  Uh-huh. (affirmative response)

19         "MR. DUNCAN:  And shit like this, you know.  But I

20  said to myself, 'Now, wait, I wanted to tell you, but

21  don't --"

22                          (Tape stopped)

23  BY MR. WINTERS:

24  Q.  What does it mean to you when Duncan says a little

25  earlier, "Yeah, but that's legit because this, you know, this,

1   I know -- you, what I'm saying"?

2   A.  The guy that's telling Duncan about this is saying there

3   ain't no way he was gonna be paying nobody five hundred to a

4   thousand dollars just to sit out there and guard anything.

5   And -- and Leon is saying, well, he doesn't want to tell the

6   guy, but he's saying to himself that it's legitimate because

7   of what we're actually guarding is, you know, cocaine.  But

8   he's not going to say that.  So, he's just playing along like

9   he doesn't know about it and telling the guy that he's just

10  going to watch himself.

11                          (Tape restarted)

12          "MR. DUNCAN:  -- but don't fuck with them niggers,

13  man, or you know what I'm saying?  Don't, man.

14          "MR. DAVIS:  Well, --

15          "MR. DUNCAN:  Don't tell nobody jack shit about that,

16  bro.  That's -- you know what I'm saying?

17          "MR. DAVIS:  Well, that -- that whole little thing

18  with the van and all that shit there about to get 10-22'ed

19  like a mother fucker --

20          "MR. DUNCAN:  Hey, bro.  I'm telling you."

21                          (Tape stopped)

22  BY MR. WINTERS:

23  Q.  What does "10-22'ed" mean to you?

24  A.  That's the police code for disregard.

25    Q.  End?

Williams - Direct

1    A.  Yes.  Yes, to terminate.

2                        (Tape restarted)

3          "MR. DAVIS:  -- for something else.  So, I ain't

4    sweating that.

5          "MR. DUNCAN:  You know what I'm saying?  Yeah, and

6    well -- well, like I say, the main thing, but you got to

7    watch, just like I told you before --"

8                        (Tape stopped)

9    BY MR. WINTERS:

10   Q.  What does it mean to you when Duncan says, "But you got to

11   watch, just like I told you before"?

12   A.  Len gave him advice on things, to be careful about who

13   you're dealing with and how you're dealing with these, so he's

14   telling him again.  Watch yourself.

15                       (Tape restarted)

16         "MR. DAVIS:  I didn't want to go outside the little

17   fucking group I had, bro.

18         "MR. DUNCAN:  Right, bro.  Right.

19         "MR. DAVIS:  But this mother fucker wanted to do

20   that.

21         "MR. DUNCAN:  Right.

22         "MR. DAVIS:  Ya' dig?  And we did it, and now it's --

23   and that's when the fucking rumor started.

24         "MR. DUNCAN:  Right.

25         "MR. DAVIS:  Ya' dig?  And I'm about to 10-22 that

1   shit right now.

2           "MR. DUNCAN:  Yeah, yeah.  'Cause them -- I don't

3   know why them niggers got to talk so much.  I don't understand

4   that.

5           "MR. DAVIS:  Run they fucking head, bro.

6           "MR. DUNCAN:  You know, if I'm gonna sit here and

7   talk about something, it is gonna be between me and you, you

8   know what I'm saying?  With niggers I know that's down, you

9   know?

10          "MR. DAVIS:  Uh-huh. (affirmative response)

11          "MR. DUNCAN:  But I ain't gonna go outside and tell

12  some fucking, you know --

13          "MR. DAVIS:  I'm about to -- I'm about to make a

14  couple of calls.  Bro, you work today?

15          "MR. DUNCAN:  Yeah, I go to work -- go to work for

16  6:00.  But that's what I wanted to tell you.  I'm so glad --

17          "MR. DAVIS:  Uh-huh. (affirmative response)

18          "MR. DUNCAN:  -- you called me boy.

19          "MR. DAVIS:  All right.  Well, I'm gonna holler back

20  at you.

21          "MR. DUNCAN:  All right then.

22          "MR. DAVIS:  All right.

23          "MR. DUNCAN:  Later."

24              (End of taped conversation)

25          MR. WINTERS:  Excuse me, Your Honor.

1       (There is a pause in the proceedings)

2           MR. WINTERS:  I'd ask the jury now to turn to SW 12,

3   which is a telephone call of November 29th, 1994, over 451-

4    4971.  It occurred at 12:53 p.m.

5         (Whereupon, the following excerpt of the audio tape of

6    Defendant's Exhibit SW 12T, a conversation between LEN DAVIS

7    and SAMMIE WILLIAMS, dated November 29, 1994, was then played

8    for the jury:)

9         (Outgoing call)

10        (Phone ringing)

11             "MR. WILLIAMS:  Hello.

12             "MR. DAVIS:  Yeah.  Who you on the phone with?

13             "MR. WILLIAMS:  Reva.

14             "MR. DAVIS:  That shit gonna have to be the -- the --

15    man, that shit got to get 10-22'ed like a mother fucker, bro."

16                          (Tape stopped)

17    BY MR. WINTERS:

18    Q.  Who's talking there?

19    A.  Len Davis and myself.

20    Q.  And who is "Reva"?

21    A.  That's a friend of mine's -- it's Peanut's, Edward

22    williams' girlfriend.

23                          (Tape restarted)

24             "MR. WILLIAMS:  What?

25             "MR. DAVIS:  The fucking -- with the fucking set, the


                                                    76
                         Williams - Direct

1    set detail.  Man, you know that mother fucking boy, DS, RS's

2    brother went and laid there and told the mother fuckers about

3    it.  Another nigger in the game."

4                          (Tape stopped)

5    BY MR. WINTERS:

6    Q.  What is the "set detail"?  What does it mean to you?

7   A.  What you said, the sentence?

8   Q.  No.  What does the "set detail" mean to you?

9   A.  Oh, the -- the protecting the drugs at the warehouse.

10  Q.  And who's "DS" and "RS"?

11  A.  David Singleton and Ronald Singleton.

12  Q.  And what does it mean to you when he says, "Another nigger

13  in the game"?

14  A.  Another drug dealer.

15                      (Tape restarted)

16          "MR. WILLIAMS:  Wait.

17          "MR. DAVIS:  And he go tell another mother fucker who

18  in turn just happen to know Dunc, and come and tell him all

19  the fucking details.

20          "MR. WILLIAMS:  Oh, you lying.

21          "MR. DAVIS:  About how much, where they sitting.

22          "MR. WILLIAMS:  Who -- who -- who -- who did this?

23          "MR. DAVIS:  DS, RS's brother from the Fifth.

24          "MR. WILLIAMS:  Oh, no.  Huh?

25          "MR. DAVIS:  Say bro.  Went and told the niggers

1   about the fucking operation.  Ya' dig?  The strictly legit

2   detail and the fucking people be sweating us now for doing an

3   unauthorized detail, bro.  Ya' dig?  And this nigger stupid.

4   Niggers is stupid.  The amount that's being paid and

5   everything.

6          "MR. WILLIAMS:  You know what, --"

7                      (Tape stopped)

8   BY MR. WINTERS:

9   Q.  What does he mean when he says a "legit detail"?

10  A.  He's just disguising what he's talking about, because

11   we're talking about protecting the drugs at the warehouse, but

12   he's being coy and just saying that "legit detail" and now we

13   -- it's just like a alibi kind of thing.

14                              (Tape restarted)

15          "MR. WILLIAMS:  You know what, we should have went

16   with our first mind.

17          "MR. DAVIS:  Say bro, but you know what?  That was

18   them niggers wanting to bring in that -- that new mother

19   fucker wanting to bring in new people.  If he wouldn't of --

20   if he would have let us work like we wanted to, and let us be

21   responsible --

22          "MR. WILLIAMS:  Yeah.

23          "MR. DAVIS:  -- for the fucking security, none of

24   this would have never happened.

25          "MR. WILLIAMS:  We knew who not to let work.


                                        78
                        Williams - Direct

1          "MR. DAVIS:  Huh?

2          "MR. WILLIAMS:  We knew who not to let work.

3          "MR. DAVIS:  Yeah, and when we was forced to go

4    there --

5          "MR. WILLIAMS:  Uh-huh. (affirmative response)

6          "MR. DAVIS:  -- look what happened.  But --

7          "MR. WILLIAMS:  (Inaudible)

8          "MR. DAVIS:  I just talked -- I just talked to Scoo.

9          "MR. WILLIAMS:  Uh-huh. (affirmative response)

10         "MR. DAVIS:  And I'm meeting him today.

11         "MR. WILLIAMS:  Yeah.

12         "MR. DAVIS:  And there's no doubt about it, when it

13   come again, it's definitely got to be at a new spot.

```
14   Definitely.  I don't even want to fuck with that.  I'm telling

15   you now.  That, accompanied with fucking Mike ass, you dig?

16   Uh-uh. (negative response)  I -- it don't take no brick

17   building to fall on me, bro."

18                          (Tape stopped)

19   BY MR. WINTERS:

20   Q.  What does he mean when he said, "That, accompanied with

21   Mike's ass;" who is Mike?

22   A.  Michael Kasner.  He was one of the guys that was

23   protecting the drugs for us at the warehouse.

24   Q.  What does that mean to you?

25   A.  It -- well, something happened at the warehouse where --
```

                                                79
                          Williams - Direct

```
 1   where a ranking officer had passed by and saw Michael Kasner

 2   vehicle parked near the area, and Michael Kasner thought

 3   somebody was on to him protecting the drugs at the warehouse,

 4   so he kind of panicked.

 5   Q.  Was anybody on to him?

 6   A.  No.

 7                          (Tape restarted)

 8           "MR. DAVIS:  -- fall on me, bro.

 9           "MR. WILLIAMS:  I know.

10           "MR. DAVIS:  It don't take one, so.

11           "MR. WILLIAMS:  You right.

12           "MR. DAVIS:  All right.  I'm gonna talk to them today

13   and I'll get back with you later on.

14           "MR. WILLIAMS:  Well, we'll have select individuals

15   for sure, regardless of what they say.

16           "MR. DAVIS:  Oh, most definitely, most definitely.

17   Because you know what it's gonna wind up being?  If we got to
```

18    do some of the shit ourself.

19              "MR. WILLIAMS:  Yeah.

20              "MR. DAVIS:  That's what it's gonna be.

21              "MR. WILLIAMS:  Yeah.

22              "MR. DAVIS:  Because I'm fucking this pussy all this

23    time, I'm not letting the nigger take my pussy.

24              "MR. WILLIAMS:  I mean, bro.

25              "MR. DAVIS:  You see what I'm saying, bro?  That's

1    just how it is, and we learning, and we gonna know now before

2    the fucking building fall, and do what we got to do.

3              "MR. WILLIAMS:  This bitch is -- ain't that a bitch?

4              "MR. DAVIS:  Shit done pissed me off, bro.  Dunc

5    said, 'Man, I been wanting to tell you that,' because I just

6    called Dunc.  And all the details:  Television, coffee in the

7    van, three five an hour, all that, hear.  And what -- and I

8    don't even -- I guess I must have talked to Ronald about that.

9    I don't even remember, but I'm glad I did, because now I know

10   it had to be a mother fucker talking who knew 'cause they went

11   into detail.

12             "MR. WILLIAMS:  Uh-huh. (affirmative response)

13             "MR. DAVIS:  Ya' dig?  So, I'll get back with you

14   after I talk to Scoo.

15             "MR. WILLIAMS:  All right.

16             "MR. DAVIS:  All right."

17                        (End of taped conversation)

18             MR. WINTERS:  I'm going to ask the jury now to turn

19   to SW 13, which is a telephone call over 451-4971, that

20   occurred at one minute after midnight.

21      (Whereupon, the following excerpt of the audio tape of

22   Defendant's Exhibit SW 13T, a conversation between LEN DAVIS

23   and SAMMIE WILLIAMS, dated November 30, 1994, was then played

24   for the jury:)

25      (Outgoing call)

1      (Phone ringing)

2      (Music playing in background)

3         "MR. WILLIAMS:  Hello.

4         "MR. DAVIS:  You ain't get my beep earlier?

5         "MR. WILLIAMS:  Fuck no, you ain't beeped me.

6         "MR. DAVIS:  I beeped you.  It must didn't come

7    across.  Bitch, you got my ticket book, huh?  It's in your

8    fucking bag, I guarantee.

9         "MR. WILLIAMS:  I doubt it, but it might be.

10        "MR. DAVIS:  Yeah.  Uh-huh. (affirmative response)  I

11   -- I know it 'cause I just got a fresh ticket book and I

12   fucking went to write tickets on a 20 today and got two books

13   with one ticket -- no, one book with one ticket in it.  Had to

14   call for a ticket book and I know I just got a fresh one and

15   we ain't --"

16                         (Tape stopped)

17   BY MR. WINTERS:

18   Q.  What is all this talk -- what does it mean to you, talking

19   about a ticket book?

20   A.  We are issued ticket books to write tickets for traffic

21   accidents and like that, and he's talking -- he -- well, he's

22   saying that I took his ticket book and got it mixed up with

23   mine.  That's all.

24   Q.  Well, what's a "twenty"?

25    A.  That's a police code for auto accident.

                        Williams - Direct
 1                        (Tape restarted)
 2              "MR. DAVIS:  -- we ain't wrote that many.
 3              "MR. WILLIAMS:  You had a ticket book with one ticket
 4     in it?
 5              "MR. DAVIS:  One ticket.
 6              "MR. WILLIAMS:  Well, bitch, you ain't gonna get a
 7     new ticket book unless you turn the old one in, so I must not
 8     have your ticket book.
 9              "MR. DAVIS:  First of all, Sam, I had a couple of
10     ticket books here.  I always turn in one, get another one.  I
11     always kept --
12              "MR. WILLIAMS:  I know this ain't why you called me
13     though.
14              "MR. DAVIS:  No, I always kept two ticket books.
15              "MR. WILLIAMS:  Well, let's get to the reason you
16     called me.
17              "MR. DAVIS:  What it was, I just talked to the
18     subjects.
19              "MR. WILLIAMS:  Uh-huh. (affirmative response)
20              "MR. DAVIS:  That DS talked to.  All right.  It's a
21     nigger that Lem and Dunc been down with.  Now, I've been down.
22     I know the nigger too, ya' dig?  He talks to me.  He tells
23     me --"
24                        (Tape stopped)
25     BY MR. WINTERS:

1   Q.  What does it mean to you when he said, "And Lem and Dunc
2   been down with"?
3   A.  Lemmie Rodgers and Leon Duncan; they know him to be
4   involved in criminal activity and they -- they are cool with
5   him.
6                         (Tape restarted)
7           "MR. DAVIS:  -- tells me a lot of shit.  They -- DS
8   is cool with this nigger 'cause he deal with the nigger just
9   like me and you would deal with P."
10                        (Tape stopped)
11  BY MR. WINTERS:
12  Q.  What does it mean to you when he says, "Me and you deal
13  with P"?
14  A.  He's saying that Leon and Ronald and Lemmie deal with this
15  guy like we would deal with "P" who is Paul Hardy, as a drug
16  dealer that me and Len knows.
17                        (Tape restarted)
18          "MR. DAVIS:  And DS told the nigger, he ain't give
19  him no name but he straight up told him everything about it.
20  He said they was just conversating.  DS was handling some
21  other business with him and DS just straight up told him,
22  'Say, yeah, bro, ya' know they got this going on.'
23          "MR. WILLIAMS:  This nigger Five-O?
24          "MR. DAVIS:  Uh-uh. (negative response)  No.  Uh-uh.
25  No.  Uh-uh.  This nigger in the -- he in the game."

1           "MR. WILLIAMS:  Uh-huh. (affirmative response)
2           "MR. DAVIS:  And DS straight up told him, 'Say, yeah,
3   bro, this going on.  Nigger came at me with this, ya' dig?'

4   And blah blah this and blah blah that.  And it was strictly a
5   conversation between DS and him, and he happened to mention it
6   to Dunc, who in turn mentioned it to me.
7           "MR. WILLIAMS:  Yeah, all right.
8           "MR. DAVIS:  And that's how the shit went down.  I
9   said, 'So, you didn't hear this from another person?'  He
10  said, 'No.'  Uh-uh. (negative response)  Uh-uh.  He was just
11  talking to me because we been dealing business for awhile.
12          "MR. WILLIAMS:  Who -- what's his name?
13          "MR. DAVIS:  The nigger Henry.
14          "MR. WILLIAMS:  What?
15          "MR. DAVIS:  I couldn't even tell you.  He from out
16  here in the Seventh District and he -- yeah, he -- he -- he--
17  he pretty heavy.  And Lem, Dunc, all of them, they -- they
18  been -- ya' know, they -- they know what's happening, you
19  know."
20                          (Tape stopped)
21  BY MR. WINTERS:
22  Q.  What does it mean when, to you, when Davis said he,
23  meaning Henry, "He pretty heavy"?
24  A.  He's a big time drug dealer.
25  Q.  And what does it mean to you when he said, "And Lem and

1   Dunc, all of them, they know what's happening"?
2   A.  They know he's a big time drug dealer and they associate
3   with him.
4                          (Tape restarted)
5           "MR. WILLIAMS:  You call -- you talk to the people?
6           "MR. DAVIS:  No, man.  I left this fucking phone on

7   all day and I talked -- oh, and the nigger did mention Scoo

8   name too, 'cause DS definitely mentioned Scoo name.  And I

9   think that's why DS and them didn't want to fuck with it,

10  because of Scoo."

11                          (Tape stopped)

12  BY MR. WINTERS:

13  Q.  What does it mean to you when he says, "I think that's why

14  DS and them didn't want to fuck with it, because of Scoo"?

15  A.  Well, like I said, we tried to recruit David Singleton

16  when we had the new thing at the Mardi Gras Truck Stop, but

17  they didn't want to get involved because they knew Terry

18  Adams, Scaboo, was involved in it.

19                          (Tape restarted)

20      "MR. DAVIS:  But that's what they play was.  But,

21  anyway --

22      "MR. WILLIAMS:  I didn't know you had told them all

23  that.

24      "MR. DAVIS:  You know what?  You know what?

25      "MR. WILLIAMS:  You had to.

                        Williams - Direct

1       "MR. DAVIS:  No.  Uh-uh. (negative response)  That's

2   bullshit.  That's bullshit.  I don't think I told RS that.

3       "MR. WILLIAMS:  You had to.

4       "MR. DAVIS:  No, that's bullshit.  See, what you

5   forgot, Reynard and all them talk.  I think I --

6       "MR. WILLIAMS:  Well, you -- I didn't think you -- I

7   didn't think you told any, 'cause when I stepped to you, I

8   told you don't tell Noonie.

9       "MR. DAVIS:  Well, I must -- I didn't then.  Oh no, I

10  definitely -- you right.  You absolutely right.  I didn't tell

11  him that.  Say, bro.  Say, bro, I fuck -- I ain't crazy.  I
12  know for a fact I didn't mention no names.  I know for a fact
13  that I did not --"
14                          (Tape stopped)
15  BY MR. WINTERS:
16  Q.  Who is Reynard and Noonie?
17  A.  Reynard is Reynard Smith.  Noonie is a nickname for Sidney
18  Robinson.  Both --
19  Q.  Who is Sidney Robinson?
20  A.  Both of them are police officers.
21                          (Tape restarted)
22          "MR. DAVIS:  -- did not mention any mother fucking
23  names.
24          "MR. WILLIAMS:  Well, --
25          "MR. DAVIS:  I -- you know what happened?


                                                 87
                         Williams - Direct
1           "MR. WILLIAMS:  I know Dunc might have mentioned --
2           "MR. DAVIS:  Dunc.  There we go.
3           "MR. WILLIAMS:  Yeah.
4           "MR. DAVIS:  Once -- once Henry told Dunc what he
5  knew.
6           "MR. WILLIAMS:  Yeah, Dunc told him.
7           "MR. DAVIS:  That's how that went, 'cause I ain't
8  losing my fucking mind.  I know I didn't tell none of the new
9  people no names.
10          "MR. WILLIAMS:  Look, let me get you back.
11          "MR. DAVIS:  All right."
12                      (End of taped conversation)
13          MR. WINTERS:  I would ask now for the jury to turn to

14  the final taped transcript, SW 14, a conversation dated

15  November 30th, 1994, over 451-4971, between Len Davis and Leon

16  Duncan.

17      (Whereupon, the following excerpt of the audio tape of

18  Defendant's Exhibit SW 14T, a conversation between LEN DAVIS

19  and LEON DUNCAN, dated November 30, 1994, was then played for

20  the jury:)

21      (Incoming call)

22      (Phone ringing)

23          "MR. DAVIS:  Hello.  Hello.

24          "MR. DUNCAN:  Yeah, what's up?

25          "MR. DAVIS:  What up, nigger?


                                                    88
                        Williams - Direct

1           "MR. DUNCAN:  You.  What's happening?

2           "MR. DAVIS:  I just got off the phone with Lemmie's

3   fucking ass.

4           "MR. DUNCAN:  Yeah.

5           "MR. DAVIS:  What's your working hours Saturday?

6           "MR. DUNCAN:  Saturday?  I'm off Saturday.

7           "MR. DAVIS:  All right.  We might be doing it again.

8   It ain't a definite thing.

9           "MR. DUNCAN:  Uh-huh. (affirmative response)

10          "MR. DAVIS:  But we might do another little quickie.

11          "MR. DUNCAN:  What time?

12          "MR. DAVIS:  Saturday.  What hours it was last time?

13          "MR. DUNCAN:  I think --"

14                  (Tape stopped)

15  BY MR. WINTERS:

16  Q.  What's he talking about, what does it mean to you when he

17  says, "We might be doing it again"?

18    A.  We might be protecting the drugs again.

19                        (Tape restarted)

20              "MR. DUNCAN:  I think it was around 1:00.

21              "MR. DAVIS:  All right.  Well, it'll probably be a

22    little before that.

23              "MR. DUNCAN:  All right.

24              "MR. DAVIS:  Because it will be the only thing.

25              "MR. DUNCAN:  All right.  So, when are you gonna know


                                              89
                        Williams - Direct

1    for sure?

2              "MR. DAVIS:  Friday.

3              "MR. DUNCAN:  All right, good.  Because I work.

4              "MR. DAVIS:  I won't --

5              "MR. DUNCAN:  I work a detail Saturday, so if I got

6    to get out of it, I'll know.

7              "MR. DAVIS:  What time you working?

8              "MR. DUNCAN:  Seven, 7:00 a.m. to 3:00 p.m.

9              "MR. DAVIS:  Oh, okay.  Yeah, well, I'll know -- I'll

10    know for sure Friday, to give you a chance to get somebody for

11    your detail.

12              "MR. DUNCAN:  All right.  That's cool.

13        (Irrelevant conversation)

14              "MR. DAVIS:  All right, 518.

15              "MR. DUNCAN:  All right.

16              "MR. DAVIS:  All right.

17              "MR. DUNCAN:  Later."

18                        (End of taped conversation)

19    BY MR. WINTERS:

20    Q.  What does "518" mean to you?

21   A.  That was our police call number.

22   Q.  Mr.Williams, let me bring back -- bring you back to

23   November 18th, when you paid $2,000 to Leon Duncan, a thousand

24   for himself and a thousand for Lemmie Rodgers.  How long would

25   you estimate this entire, from the time you picked up

1   Mr.Duncan and Mr. Rodgers, to the time you dropped them off,

2   including following the courier; how long did all of that

3   take?

4   A.  Oh, about -- about an hour and a half to two hours.

5   Q.  Do normal details pay $500 an hour?

6   A.  No.

7   Q.  Have you ever heard of a detail paying $500, a legitimate

8   detail?

9   A.  No.

10  Q.  You mentioned earlier in your testimony, --

11        THE COURT:  Mr. Winters, if this --

12  BY MR. WINTERS:

13  Q.  -- an individual by the name of Charles Boutin.

14        THE COURT:  Mr. Winters, if we have an appropriate

15  time for break, is this it?

16        MR. WINTERS:  I have maybe two, three more questions.

17        THE COURT:  Go ahead.

18        MR. WINTERS:  Then I'm going to tender the witness,

19  Your Honor.

20        THE COURT:  Go ahead.

21        MR. WINTERS:  Unless my Co-Counsel reminds me of

22  something else.

23  BY MR. WINTERS:

24  Q.  But you mentioned earlier in your testimony, an individual

25    named Charles Boutin?

                          Williams - Direct

1    A.  Yes.

2    Q.  Is Boutin related to Leon Duncan?

3    A.  No.

4    Q.  Well, is he related to Len Davis?

5    A.  No.

6    Q.  Is he related to Larry Smith?

7    A.  No.

8    Q.  You also testified earlier that myself and Mr. McMahon

9    probably spent a hundred hours talking to you about this case

10   and numerous other cases, and other testimony and other

11   trials.  Did we ever tell you to do anything but tell the

12   truth?

13   A.  No.

14   Q.  When were you arrested?

15   A.  In December of 1994.

16   Q.  December 7th, to be exact?

17   A.  Yes.

18   Q.  And you've been in jail since that date?

19   A.  Yes.

20        MR. WINTERS:  Excuse me, Your Honor.

21   (There is a pause in the proceedings)

22        MR. WINTERS:  Tender.

23        THE COURT:  Very well.  We'll take a brief recess, a

24   ten to fifteen minute recess, and then pick up with the cross-

25   examination.

1    (Jury out at 10:47 a.m.)

2                    *   *   *   *   *

3    (Recess at 10:47 a.m., until 11:00 a.m.)

4                    *   *   *   *   *

5    (Jury in at 11:00 a.m.)

6         THE COURT:  Please be seated.

7         THE CLERK:  Court is back in session.

8         THE COURT:  Mr. Riehlmann.

9         MR. RIEHLMANN:  Thank you, Judge.

10        THE COURT:  Go right ahead.

11                   *   *   *   *   *

12                   CROSS-EXAMINATION

13   BY MR. RIEHLMANN:

14   Q.  Mr.Williams, you have a very clear recollection of all of

15   the events that occurred between December of 1993 and December

16   of 1994, isn't that true?

17   A.  Yes.  The tapes seen to help me along with my

18   recollection.

19   Q.  Okay.  And in addition to the tapes, would it be fair to

20   say that you have been helped along by the many, many meetings

21   that you've had with Mr. Winters and Mr. McMahon?

22   A.  Yes, in the meetings and what I've reviewed in the tapes,

23   my recollection seems to come clearer all the time.

24   Q.  Okay.  So, meeting with Mr. Winters and meeting with

25   Mr.McMahon over the last couple of years, and reviewing the

1    tapes, has refreshed a lot of recollections, is that fair to

2    say?

3    A.  Yes.

4   Q.  All right.  You've also met with an Assistant U.S.
5   Attorney by the name of Constantine Georges.  Do you recall
6   ever meeting with him?
7   A.  I think -- yes, I think that's the guy's name.
8   Q.  All right.  And Nelson Maher; do you remember meeting with
9   him?
10  A.  Yes.
11  Q.  So, you've met with more than just Mr. Winters and
12  Mr.McMahon, correct?
13  A.  Yes.
14  Q.  And you've met with Mr. Hadden, I would take it?
15  A.  Yes.
16  Q.  Okay.  A little while ago, Mr. Jackson testified, Juan
17  Jackson testified to a meeting that occurred on August 17th,
18  1994, a meeting with you, Sammie Williams -- I mean, Len Davis
19  and Terry Adams.  Can you tell us what happened at that
20  meeting?
21  A.  Are you talking about at the warehouse?
22  Q.  Yes.
23  A.  Probably the same thing that normally happens.  We meet at
24  the warehouse before we do a -- protect the drugs and we kind
25  of go over that the drugs are going to be coming on a certain

1   day and we need these people.
2   Q.  On that day, when did he tell you the drugs would be
3   coming?
4   A.  On that day when did he tell me?
5   Q.  Yes.
6   A.  What time you mean?

7    Q.  Yes.

8    A.  I don't know exact time.

9    Q.  On that day, August 17th, 1994, when did he tell you what

10   days the drugs would be stored in the warehouse?

11   A.  I'm not sure.  Now, you're telling me it was August 17th

12   when we met and I'm taking for granted that that's so.  So, if

13   we did meet that day, I'm not -- the drugs, we probably get

14   the protection scenario the next day.

15   Q.  Okay.  And what days of the week did he tell you the drugs

16   would be stored in the warehouse?

17   A.  I don't remember the days of the week, sir.

18   Q.  Okay.  On August 19th, when you met with Mr. Jackson at

19   the warehouse, he had a discussion with you all, you and

20   Mr.Davis; do you recall what the details of that discussion

21   was?

22   A.  If we did in fact meet that day, and it being two days

23   after the initial meeting, it probably was when we got paid

24   for protecting the drugs.

25   Q.  But do you recall discussing other things on August the

                                                        95
                          Williams - Cross

1    19th of 1994?

2    A.  We discussed a lot of things on a lot of different days in

3    August.

4    Q.  Specifically, do you recall what else you talked about?

5    A.  No.

6    Q.  All right.  September the 9th, 1994, you met with

7    Mr.Jackson, JJ, and Terry Adams and Len Davis.  Do you

8    remember the details of that conversation, that meeting?

9    A.  No, but if you play the tapes, they would help me remember

10   it.

11    Q.  Okay.  And -- okay.  If I understand your testimony on

12    direct examination over the last day or so, Leon Duncan rode

13    in a car with you on November the 18th, 1994, for

14    approximately two hours, correct?

15    A.  Yes.

16    Q.  And during that time, you all spoke about the drug

17    protection scenario, correct?

18    A.  Yes.

19    Q.  All right.  Leon Duncan got out of the car one time to go

20    to the bathroom?

21    A.  Yes.

22    Q.  Other than that, according to your testimony, all that he

23    did was ride in that car and you all conversed as we have

24    heard over the last two days, those tape recorded

25    conversations, correct?

1     A.  Yeah.  We conversed about protecting the drugs and we

2     basically protected them as we followed behind.

3     Q.  All right.  And it's your contention that he is a -- he

4     was a knowing co-conspirator in this drug protection

5     conspiracy -- drug trafficking protection scenario, correct?

6     A.  Yes, but not just mine alone.  The tapes say the same

7     thing.

8     Q.  All right.  And by the same token, Mr.Williams, you would

9     agree that on October the 13th, 1994, you were a knowing co-

10    conspirator with Len Davis and Paul Hardy, in planning and

11    carrying out the murder of Kim Groves; isn't that true?

12    A.  No, that's not true.  I was in the vehicle with Len Davis,

13    however, I did not plot or plan with him, the killing of Kim

14   Groves.  We were at work that day and I happened to be his
15   partner, so I couldn't help but to be present.  However,
16   during his conversations with Paul Hardy, the guy he hired to
17   kill Kim Groves, I wasn't a participant in these
18   conversations.
19   Q.  You didn't say a word the entire day of October the 13th,
20   as you, Len Davis and at times, Paul Hardy drove around
21   looking for Kim Groves?  You didn't say a word?
22   A.  No, I -- I talked, but I didn't talk about the murder.  I
23   didn't say anything about killing Kim Groves.  I wasn't a
24   participant in none of those conversations.
25   Q.  You, just like conversations that took place on November

Williams - Cross

1    the 18th, 1994, that you say were about drugs; you were riding
2    in a car on October the 13th, 1994, when the conversation was
3    about finding Kim Groves and killing her, isn't that true,
4    Mr.Williams?
5    A.  I was in the vehicle when Len talked to Paul Hardy about
6    doing something --
7    Q.  Would you answer my question yes or no?
8    A.  Yes.
9    Q.  And then, feel free to explain it.  And I'll repeat the
10   question to you.
11   A.  Okay.  No.  And --
12   Q.  Wait.  Let me repeat the question.  Just as Leon Duncan
13   and Lemmie Rodgers rode in the car with you on November the
14   18th, 1994, and discussed what you say was a drug protection
15   scenario; on October the 13th, 1994, you rode in a car with
16   Paul Hardy and Len Davis when the conversation was about
17   finding and killing Kim Groves?

18          Answer that question yes or no, and then explain to
19     your satisfaction.
20     A.  Okay.  No.
21     Q.  All right.
22     A.  And now, the difference is that when Leon was in the car
23     with us, he was a participant and protecting the drugs with
24     me, and the conversation was about such.  When I was in the
25     car with Len Davis, as he was talking to Paul Hardy about

1      killing Kim Groves, I wasn't a participant in any of that, and
2      I did not talk to him or discuss any of those conversations.
3      Q.  All right.  The sequence of events that ended with the
4      execution of Kim Groves started with your pistol whipping a
5      young man who was her nephew, isn't that correct?
6      A.  No, it isn't.
7      Q.  All right.  What part of that is incorrect?
8      A.  Well, he wasn't her nephew and I didn't pistol whip him.
9      Q.  Okay.  Well, she referred to him as her nephew, let's
10     correct that part, correct?
11     A.  Yes.
12     Q.  It may not have been a blood relationship, correct?
13     A.  It wasn't.
14     Q.  All right.  Now, you say you didn't pistol whip him, but
15     it is true, is it not, Mr.Williams, that you chased him with
16     your gun drawn and then when you caught up to him, you pulled
17     him towards you and hit him in the head with your pistol?
18     A.  No.
19     Q.  That's not true, okay.
20     A.  I did catch up with him, and I was chasing him with my gun

21  drawn, and as I caught up with him, I pushed him.  And when I
22  pushed him, I hit -- I pushed him with my gun hand, with --
23  and my hand -- my gun was in my hand, so I pushed him on the
24  back of his head and he was next to a porch railing, which
25  caused him to hit the front of his head on the porch railing,

 1  causing a minor cut.
 2  Q.  Okay.
 3      (There is a pause in the proceedings)
 4          MR. RIEHLMANN:  Bear with me please, sir, I'm trying
 5  to find the right transcript I have for you.
 6      (There is a pause in the proceedings)
 7  BY MR. RIEHLMANN:
 8  Q.  I'll come back to that, Mr.Williams.  But, in other
 9  words, what you're telling this jury is that you accidentally
10  hit him with your gun?
11  A.  Yes, I didn't mean or intend to hit him with my gun.  I
12  was --
13  Q.  And you --
14  A.  It was -- I was chasing behind him and I was eager to
15  catch up with him.  My gun was drawn, as it should be, because
16  I didn't know if he had one or not.  When I caught up with
17  him, I hit him -- pushing him against the rail, trying to stop
18  him, I hit him with the gun.
19  Q.  Would you agree that you previously testified that you hit
20  him with your gun in the back of the head, making no reference
21  to "accidentally;" would you agree with that?
22  A.  Yes.
23  Q.  All right.  And you previously testified that when you hit
24  him in the back of the head with your gun, he, meaning Nathan

25    -- what's his last name?

                        Williams - Cross

 1    A.  Norwood.

 2    Q.  -- Norwood, then jerked his head forward into the railing;

 3    that's what your previous testimony was, correct?

 4    A.  What I'm saying, my -- my -- by me hitting him, it caused

 5    him to jerk his head forward.

 6    Q.  All right.  Now, Kim Groves, did she -- was she a witness

 7    to this?

 8    A.  No.

 9    Q.  All right.  She learned about it though, correct?

10    A.  Yeah, she came on the scene.

11    Q.  All right.  And she was concerned about this young man,

12    correct?

13    A.  Yes.

14    Q.  And you told her, "Get up the street," correct?

15    A.  Yes.

16    Q.  All right.

17    A.  Because -- yes.

18    Q.  All right.  Now, she later went to the Police Department

19    and made a complaint of police brutality, correct?

20    A.  Yes.

21    Q.  She erroneously identified Len Davis as the person who had

22    hit her nephew in the head with a pistol, isn't that true?

23    A.  I don't know if it's erroneous, because I think her

24    reasons for it was because a couple of days before that, we

25    stopped Norwood and his twin brother, Nathaniel, on a -- it

1    was just a regular stop.  And at the time, Kim Groves, again,
2    came on that scene.  Now, this is a couple of days prior to
3    this happening.  At this time, Kim Groves came on the scene,
4    you know, asking us, Len Davis in particular, "Well, why you
5    all stopping my -- my nephews like that?  Why you all messing
6    with them?"
7         So, her and Len Davis got into an argument.  And because
8    of this argument, Len ran her from the scene, and I think she
9    was still upset about that.  And so, when this happened again,
10   me and Len, being on the scene, I think she was still kind of
11   angry and Len and that's what made her say Len beat him up,
12   because Nathan knew exactly who hit him.  He knew it was me.
13   Q.  All right.  At this previous stop that you've just
14   described for us, did you stop Nathan and his brother?
15   A.  Yes.
16   Q.  All right.  And you, what, like a field interview stop?
17   A.  Yes.
18   Q.  All right.  You took their names, do you think?
19   A.  I don't recall everything we did at the stop, --
20   Q.  All right.
21   A.  -- but I --
22   Q.  But you're familiarizing --
23   A.  We didn't arrest them.  Yeah, we familiarized ourselves
24   with them, yes.
25   Q.  All right.  And I believe you testified yesterday that on

1    the date where Nathan was struck in the head with your pistol,
2    on that date when you saw him initially, you thought he was
3    somebody who was wanted for murder?

4    A.  Yes.  We were looking for someone wanted for murder, and
5    as we happened upon this corner, Nathan took off.  However, we
6    weren't at a close enough distance to see exactly who it is.
7    So, we saw the subject run and it wasn't until I caught up
8    with Nathan that I realized it's the same guy we stopped a
9    couple of days ago.
10   Q.  And what was that date?
11   A.  I don't recall the date, sir.
12   Q.  Well, Kim Groves was murdered on October the 13th, 1994,
13   isn't that true?
14   A.  Yes.
15   Q.  How many days proceeding Kim Groves' murder did this
16   incident with Nathan Norwood getting hit in the head with the
17   pistol; how many days before that did it occur?
18   A.  A couple, I think.  Maybe one, maybe.
19   Q.  All right.  So, somewhere between --
20   A.  I think it was -- it may have been the 12th.
21   Q.  Somewhere between, let's say, the 11th and 13th, is when
22   you hit him in the head with your pistol?
23   A.  Yes.
24   Q.  All right.  Do you remember, just coincidentally, that the
25   day that Kim Groves was killed was the same day that

                         Williams - Cross
1    Superintendent Pennington became the chief of police?
2    A.  I don't remember that.
3    Q.  All right.  Now, on October the 13th, you and Len Davis
4    were in your car when, I think, stopped at a traffic light,
5    when you looked to your right or to your left and you saw Kim
6    Groves in a car next to you all, isn't that true?

 7   A.  Yes.

 8   Q.  And she began screaming to the people she was in the car

 9   with, that the two of you were the ones who had abused her

10   nephew, isn't that true?

11   A.  I couldn't hear exactly what she was saying, but I know --

12   we were stopped at the light and this is our vehicle

13   (indicating) in this parking lane and she's in the parking

14   lane beside us, stopped right here (indicating).  And she was

15   in the rear seat, someone else was driving the vehicle and she

16   was pointing over to our vehicle.  Her window was up, so I

17   couldn't tell exactly what she was saying.

18   Q.  All right.

19   A.  But it was -- she was kind of motioning to us like,

20   "That's them.  That's them."

21   Q.  All right.  And let me stop for a second.  Yesterday, when

22   Mr. Winters asked you have you reviewed any documents in

23   preparation for your testimony, you initially said no,

24   correct?

25   A.  Yes.

                          Williams - Cross

 1   Q.  Then you corrected yourself and said that you had read

 2   your trial transcripts from the previous trials, correct?

 3   A.  Yes.  I didn't understand what he mean by "transcripts".

 4   Q.  All right.  Now, right after you saw Ms. Groves in the car

 5   next to you all, that was when Len Davis told you, "We could

 6   get P to 30 that whore," or something like that, correct?

 7   A.  Yes.  He said it -- he said it out loud, yes, but he was

 8   talking to me.

 9   Q.  And to the -- for the benefit of these ladies and

10   gentlemen, "30" is police code for murder, isn't that true?

11   A.  Yes.

12   Q.  And by "that whore," you knew Len Davis was referring to

13   Kim Groves, isn't that true?

14   A.  Yes.

15   Q.  All right.  You did nothing to talk him out of that idea,

16   did you?

17   A.  No.

18   Q.  And you knew he was serious about it, didn't you?

19   A.  Yes, but I didn't think he was going to carry -- I knew he

20   was seriously upset, but I didn't think he was going to carry

21   through a murder.

22   Q.  You knew he was serious about saying, "We could get P,"

23   meaning Paul Hardy, "to murder that whore;" yes or no?

24   A.  Yes.  I knew he was seriously upset.  I didn't -- I didn't

25   actually think he was going to carry it through.


105

                         Williams - Cross

1    Q.  Well, let me ask you the question again.  You knew he was

2    serious when he said to you, "We could get Paul Hardy to

3    murder Kim Groves;" yes or no?

4    A.  Yes, sir.

5    Q.  At some point that day, you and Len Davis met with Paul

6    Hardy and other members of his gang at the -- what is it the

7    Fifth District Police Station, correct?

8    A.  No, you're incorrect.  Len met with Paul Hardy and his

9    crew.

10   Q.  Where were you?

11   A.  In my police vehicle.

12   Q.  Where was your police vehicle?

13   A.  At the Fifth District Station.

14   Q.  Where did Len meet with Paul Hardy and his crew?

15   A.  At the Fifth District, but he exited the vehicle and

16   walked over to the station where they were standing and talked

17   with them.

18   Q.  All right.  Now, Paul Hardy was somebody that you were on

19   friendly terms with, correct?

20   A.  Only because Len was his friend.  I didn't really had a --

21   have a relationship with him.  I learned of him through Len

22   Davis.

23   Q.  Were you on friendly terms with him?

24   A.  Yes.

25   Q.  Did you address him a friend?  Did you call him P?

Williams - Cross

1   A.  I didn't address him as a friend, but I did call him P.

2   Q.  All right.  Did you ever meet with him when you all --

3   when you weren't working?

4   A.  No.

5   Q.  When Len Davis met with Paul Hardy at the Fifth District

6   Police Station, he gave Paul Hardy his cell phone, so that he

7   could keep in touch with Paul Hardy, concerning Kim Groves,

8   isn't that true?

9   A.  Yes.

10   Q.  And you all were going to use your cell phone to call him,

11   to keep in contact about Kim Groves, isn't that true?

12   A.  No.

13   Q.  Well, in what manner were you all going to reach him on

14   the cell phone, but for you --

15   A.  We want --

16   Q.  Wait, let me finish the question.

17   A.  Okay.

18    Q.  How were you going to contact him on his cell phone -- let
19    me start over.
20        He had Len Davis' cell phone, right?
21    A.  That's correct.
22    Q.  Did you and Len Davis, as you were in your car, have a
23    cell phone?
24    A.  I -- I had my cellular phone.
25    Q.  All right.  Was your cellular phone used to contact Paul

1     Hardy concerning Kim Groves?
2     A.  Yes.  Len used my phone to call Paul Hardy.
3     Q.  Okay.  In your presence?
4     A.  Yes.
5     Q.  All right.  Now, at some point, the two of you all, in
6     your police car, on October the 13th, drove around the
7     neighborhood that you believed Kim Groves to live in, in an
8     effort to locate Kim Groves, isn't that true?
9     A.  I didn't.  I happened to be in the police car as Len drove
10    Paul Hardy around to look for her.
11    Q.  All right.
12    A.  And I can tell you how that happened, if you care for me
13    to explain it to you.
14    Q.  Well, was it known to you that the purpose of this trip
15    into Kim Groves' neighborhood was to look for her?
16    A.  Not initially.  You see, I wasn't in the vehicle when Paul
17    Hardy and Len met.  I was in -- they -- we drove to -- we were
18    in the Fifth District and we drove to Paul Hardy's area, which
19    happened to be the same area whereby I knew another female,
20    which was in the project area.  As I got out of the vehicle to

21  visit with this female, Len visited with Paul Hardy.

22      So, when I came back to the vehicle, Paul Hardy was

23  already in the police vehicle and I got in the passenger side,

24  Len was driving the vehicle.  Paul Hardy was seated in the

25  rear.  As I got in the vehicle, we started driving and

1   suddenly Len just started driving across the canal saying that

2   he going to take P to look for Kim Groves.

3   Q.  Okay.  And P, seated in the back seat, then displayed to

4   you that he had a nine millimeter handgun with him, isn't that

5   true?

6   A.  Not to me, but he did display it and I saw it.  He -- he

7   wasn't trying to show it to me.  He just was saying that he

8   has his gun with him.

9   Q.  All right.

10  A.  And this is -- I don't realize that this is going to

11  happen, because me and Len are partners and we're riding in

12  the car together, but when I come back to the vehicle, this is

13  all -- has -- all this have been discussed and it's about to

14  take place, him looking for Kim Groves.

15  Q.  Are you saying that you didn't realize that Paul Hardy was

16  riding in the car with a nine millimeter, looking for Kim

17  Groves, to carry out the plan that Len Davis had announced to

18  you earlier; is that what your testimony is?

19  A.  Yes, sir.  And he didn't -- Len Davis didn't announce he

20  was -- to me that he was picking up Paul Hardy to do this.  As

21  I was meeting with my female friend, they have discussed this

22  already.  Then when I got into the vehicle, it was already in

23  the -- in the workings.

24  Q.  But that's my question.  At the point that you're in the

25    vehicle with Len Davis and Paul Hardy, you know what's going

                        Williams - Cross

1    on?

2    A.  Yes.  At this point is when I realized what he's going to

3    do.

4    Q.  Okay.

5    A.  He's going to look for Kim Groves.

6    Q.  And then later that night you all drop Paul Hardy off,

7    right?

8    A.  Paul -- well, yeah, because Len and Paul don't find Kim

9    Groves, so he bring Paul back to wherever he picked him up at.

10   Q.  Now, again, you say Len and Paul don't find Kim Groves,

11   you were seated in the front seat with Len Davis, Paul Hardy

12   is in the back seat while the car is driving around looking

13   for Kim Groves, correct?

14   A.  Yes, but I'm not looking for her.  I'm in this car and I

15   have to be in the car.

16   Q.  Okay.  Now, later still, a little before 10:00, you and

17   Len get in the police car, go back over the canal, in an

18   effort to find Kim Groves, correct?

19   A.  No, that's not correct.  You see, this -- we are on duty

20   as police officers, so me and Len ride together.  We're doing

21   normal routine patrol.  If we are clear, meaning that we're

22   not answering a call or responding to anything, Len takes the

23   opportunity to go across the canal and look for Kim Groves.

24   Now, he doesn't --

25   Q.  And you know that?

1   A.  Yes, but he doesn't tell me this.  He just does it.  He's

2   driving, I'm in the passenger seat.  Now, once we do go across

3   the canal, I realizing what he's doing.

4   Q.  All right.  Do you ever say, "Let me out of this car"?

5   A.  No.

6   Q.  All right.  At some point you and Len see Kim Groves,

7   don't you?

8   A.  Yes, we do.

9   Q.  All right.  Len calls Paul Hardy and describes to him, how

10  she's dressed and where she is, correct?

11  A.  Yes.

12  Q.  All right.  Now, at this point, surely you must think Len

13  Davis is serious and Paul Hardy is serious about doing this,

14  correct?

15  A.  Yes, but this wasn't the first time he called Paul Hardy

16  throughout the day since -- since we first got on shift, was

17  at 3:00.  And like I say, now, it's 10:00.  He has been

18  calling Paul Hardy and he even met with him, and the entire

19  time, he's talking about Kim Groves, as we working.  So, --

20  Q.  Yes, but it's not until ten minutes to ten that he

21  actually finds Kim Groves and informs Paul Hardy of where she

22  is, correct?

23  A.  Yes, this is the first time he actually seen her and

24  informed Paul Hardy.  But even though he called Paul Hardy and

25  told him, Paul Hardy didn't just fly over there and start

1   looking for her.

2   Q.  No, but I -- my question to you, Mr.Williams, was that

3   when Len Davis is on the phone with Paul Hardy saying, "Kim

4    Groves is dressed in such a such a manner and she's located on

5    such and such a street," now you knew he was serious about

6    having her killed, isn't that true?

7    A.  Yes.

8    Q.  You didn't do anything to stop it, isn't that true?

9    A.  That's true.

10   Q.  And you know that you could have, isn't that true?

11   A.  Yes.

12   Q.  Now, 10:45 that night you learned that Kim Groves has been

13   killed, isn't that true?

14   A.  I'm not sure it was 10:45.  I mean, I think it was after

15   11:00, or something like that.

16   Q.  Okay.  And the phone call by which you learned that Kim

17   Groves had been killed was recorded by the FBI, isn't that

18   true?

19   A.  Yes.

20   Q.  You've heard that tape before, isn't that true?

21   A.  Yes.

22   Q.  Mr. McMahon has played that tape in the courtroom before,

23   while you commented on it, isn't that true?

24   A.  Yes.

25   Q.  All right.  And you would agree that you were pretty

Williams - Cross

1    happy, isn't that true?

2    A.  No, I wasn't happy about Kim Groves' murder.

3    Q.  Okay.  Did Mr. McMahon ask you in that previous trial,

4    "You sound pretty happy there;" did he ask you that?

5    A.  No, he's not talking about Kim Groves' murder.

6    Q.  Oh, that question that he asked, it was not in response to

7   your having learned about Kim Groves' murder?

8   A.  No.  I had learned about Kim Groves' murder by phone.  He

9   -- when he asked me was I happy, that was during another

10  conversation, another taped conversation.

11  Q.  We'll get to that then.  After you learned that Kim Groves

12  had been murdered by Paul Hardy, you left to go get something

13  to eat, isn't that true?

14  A.  No.

15  Q.  You didn't?

16  A.  No.

17  Q.  Okay.  It was not while you were on your way to go get

18  something to eat that you changed your mind and decided to go

19  meet Len Davis at Flynn's; that's not correct?

20  A.  You -- would you like me to explain to you what happened?

21  Q.  Yes.

22  A.  My shift had ended and Kim Groves hadn't been murdered.

23  And by the end of the shift, I was relieved at that, for

24  itself.  And I said, "Well, Len is going to get over this.

25  He's going to blow it over and not worry about it by

1   tomorrow," because it didn't happen.  So, I went on with

2   whatever I was going to do for the rest of the night, and I

3   happened to pick up a girlfriend of mine and we were in my

4   vehicle, going get something to eat, when Len called me on the

5   phone.

6       Now, I had already was going get something to eat with my

7   girlfriend.  Len called me on the phone and said, "Signal 30,

8   NAT."

9       And I said, "Signal what?"

10      "Signal 30, NAT."  He repeated it.

11      And I was saying, "You lying."  And I was shocked because
12   here I am thinking it's all over with, he's forgotten about
13   it, and then suddenly he's calling me to tell me that she's
14   dead.  So, then I said -- I asked him where he is and he tells
15   me and then I meet up with him at Flynn's, because I'm
16   surprised that this actually happened.
17   Q.  You're surprised.  You're shocked.  Wouldn't you agree,
18   sir, that on the tape your voice sounds happy?
19   A.  No.
20   Q.  You wouldn't?
21   A.  No.
22   Q.  Okay.  You do meet up with Len Davis at Flynn's, shortly
23   after learning that Kim Groves is dead, correct?
24   A.  Yes.
25   Q.  And your voice is, again, captured on tape as you're on

                            Williams - Cross
1    the phone, talking to Paul Hardy, I believe, is that correct?
2    A.  No.
3    Q.  Who were you talking to?  Or, wait, at Flynn's, were you
4    caught on tape at all, talking to anybody on the phone?
5    A.  Oh, at Flynn's Den?
6    Q.  Yes.
7    A.  Yes.
8    Q.  Who --
9    A.  It was Paul Hardy.
10   Q.  It was Paul Hardy.  And you were laughing, weren't you?
11   A.  Yes, but not about Kim Groves' murder.
12   Q.  No, you were laughing, instead, about the way Len Davis
13   was dancing, in joy, over the murder of Kim Groves, is that

14    correct?

15    A.  He was rejubilating about it.  He was dancing and he

16    looked very funny, and I was laughing at that, but I wasn't

17    putting the two together, that he's -- I'm laughing at Kim

18    Groves' murder, that --

19    Q.  You knew why he was dancing?

20    A.  Yes.

21    Q.  He was dancing because he was happy Kim Groves was dead,

22    right?

23    A.  Yes.

24    Q.  Okay.

25    A.  But I'm not connecting the two.  I'm just -- I'm laughing.


                                                    115
                        Williams - Cross

1    If you're asking me why am I laughing, I'm laughing because

2    how he's looking as he's dancing.  He's a big old guy and he's

3    acting a fool, and he look pretty silly.

4    Q.  Oh.

5    A.  And that's the only reason I was laughing.

6    Q.  And this was within just a few minutes of your having

7    learned that Kim Groves had been murdered, correct?

8    A.  Yes, Mr. Riehlmann, but I am a police officer.  I dealt

9    with murders every day.

10    Q.  Okay.

11    A.  That -- that wasn't something that I was going to carry

12    with me for a very long time.

13    Q.  Do you remember talking -- do you remember having a

14    conversation with Len Davis that night, trying to determine

15    whether Kim Groves had been actually killed, you spoke on the

16    phone and you asked Len Davis whether Ms. Groves was, quote,

17    "10-7'ed," unquote; do you remember saying that?

18    A.  Did I ask him what?

19    Q.  Was Kim Groves "10-7'ed"?  Do you remember asking Len

20    Davis that?

21    A.  No.

22    Q.  Okay.  You never asked anyone, "Was Kim Groves 10-7'ed"?

23    A.  I don't remember asking anyone that.  I know I used that,

24    the code 10-7 before, but I don't remember asking Len was Kim

25    Groves --

                                                    116
                        Williams - Cross

1    Q.  Did you use the code 10-7 as it related to Kim Groves?

2    A.  I don't remember.

3    Q.  All right.

4              MR. RIEHLMANN:  Just a second.

5        (There is a pause in the proceedings)

6    BY MR. RIEHLMANN:

7    Q.  Now, Mr.Williams, you've never been charged with any

8    offense concerning the murder of Kim Groves, isn't that true?

9    A.  That's correct.

10   Q.  Have you ever been charged with any offense, period, by

11   Harry Connick's office, the Orleans Parish District Attorney's

12   Office?

13   A.  No.

14   Q.  All right.  You were never charged with the drug

15   trafficking conspiracy that occurred within Orleans Parish;

16   you were never charged by Mr. Connick's office with that,

17   correct?

18   A.  No.

19   Q.  And you're certainly aware that the state officials can

20   charge you just as, at the same time that federal officials

21  are charging you, aren't you?

22  A.  Yes.

23  Q.  Okay.  Now, you have confessed, in meetings with

24  Mr.Winters and in open court, to having committed other

25  crimes, other than the drug trafficking conspiracy and

1  carrying a gun during the drug trafficking conspiracy, isn't

2  that true?

3  A.  Yes, I confessed to insurance fraud.

4  Q.  Okay.

5  A.  Taking money from drug dealers.

6  Q.  Okay.  Well, let's start with taking money with drug

7  dealers, from drug dealers.  In 1993, that's when you became a

8  crooked police officer, according to you, is that correct?

9  A.  Yes.

10  Q.  All right.  You approached Terry Adams and demanded money

11  from him, isn't that true?

12  A.  Yes.

13  Q.  And if he didn't pay you money, you would fabricate a

14  charge against him and arrest him, is that correct?

15  A.  No.  I was just taking my chances.  I figured he gave --

16  well, he had gave -- other guys took money from him, I figured

17  I could get some money from him too.  If I couldn't, if he was

18  going to say no, I just wouldn't have been able to get it.

19  Q.  Well, you went up to Mr. Adams and you said, "Give me

20  money;" is that what you said?

21  A.  No.

22  Q.  What did you say?

23  A.  I said --

24  Q.  I mean, how was it --

25    A.  I said --

                    Williams - Cross
 1    Q.  How was it that you -- wait.  How was it that you demanded
 2    money from him?  Where was the demand?  Where was the force?
 3    Where was the threat?
 4    A.  I took his money.
 5    Q.  Oh.
 6    A.  He had money on him that day, about two hundred something
 7    dollars, and I took it.
 8    Q.  All right.
 9    A.  When we stopped him.
10    Q.  All right.
11    A.  And other than that, we discussed protecting him from
12    other officers doing just what I did, taking their money.
13    Q.  We're going to get to that, sir, but talking about the
14    money that you took from him; did he resist in any way?
15    A.  No.
16    Q.  All right.  You had a gun on your hip, isn't that true?
17    A.  Yes.
18    Q.  And when you take money from people, when you have a gun
19    on your hip, and you use force or intimidation to do it, you
20    know as a police officer that that's a crime called armed
21    robbery, isn't that true?
22    A.  Yes.
23    Q.  And armed robbery in the State of Louisiana, as a police
24    officer, you know that that carries a sentence of five to 99
25    years in Angola, without benefit of parole, isn't that true?

1  A.  Something like that.

2  Q.  And you've never been charged with armed robbery by

3  Mr.Connick's office for what you did to Scaboo, isn't that

4  true?

5  A.  Yes.

6  Q.  How many times did you do that to Scaboo?

7  A.  Once.

8  Q.  Just one time?  It is your testimony, though, that you did

9  not threaten Scaboo with saying, "If you don't give me your

10  money, I'm going to arrest you on some fabricated charges," or

11  some words to that affect?

12  A.  I --

13  Q.  Do you understand my question?

14  A.  You're saying that if -- when I I took his money, I didn't

15  -- did I tell him that if you don't give me your money, I'm

16  going to take you to jail.

17  Q.  On fabricated charges, or some -- right.

18  A.  No, I didn't tell him that.

19  Q.  All right.  I believe in the insurance fraud thing you

20  were telling us about, you were saying that you wrote phony

21  police reports?

22  A.  Yes.

23  Q.  Is that --

24  A.  Yes.

25  Q.  Okay.

1  A.  Yes, sir.

2  Q.  So, you -- and that wasn't the only time that you

3  falsified police records, you did that pretty frequently,

4   didn't you?

5   A.  Uh-uh. (negative response)  No.

6   Q.  Didn't you tell -- haven't you previously testified that

7   you would falsify entries on your trip sheet?

8   A.  Oh, yeah.

9   Q.  Your daily log, as to where you had gone and what you had

10  done?

11  A.  Uh-huh. (affirmative response)

12  Q.  So, you falsified police records on a pretty regular

13  basis, isn't that true?

14  A.  Well, I don't know, I wouldn't say a regular basis, but

15  sometimes, yes, like on our trip sheet we supposed to fill out

16  exactly what we doing throughout the shift, but I didn't

17  always do that.

18  Q.  Over the career, you -- over the span of your career, you

19  did it dozens of times, would that be fair to say?

20  A.  I guess you can say that.

21  Q.  You've never been charged with malfeasance or falsifying

22  public records, have you?

23  A.  No, sir.

24  Q.  Now, you witnessed criminal activity on many occasions and

25  did absolutely nothing about it, correct?

1   A.  Yes.

2   Q.  You'd agree that that's malfeasance for a police

3   officer, --

4   A.  Yes.

5   Q.  -- wouldn't you?

6   A.  Yes.

7   Q. You'd agree, sir, that if you were charged and convicted

8   of all the many crimes you've committed during the course of

9   your career as a police officer, you'd probably spend the rest

10   of your life in jail, isn't that true?

11   A. Yes, and with the charge I am convicted on, I could spend

12   the rest of my life in jail.

13   Q. We're going to get to that. Yesterday, when we were

14   listening to Sammie Williams 7T, Tape 1;

15         MR. RIEHLMANN: And I'd ask that the jury turn to

16   that, please.

17   BY MR. RIEHLMANN:

18   Q. Do you have that transcript in front of you, sir?

19   A. Yes, sir.

20   Q. Okay.

21   A. It's SW 7T, Tape 1.

22   Q. Okay. Just so that I understand, Line 8, where you say,

23   "What's up, gentlemen"? That's the moment that Leon Duncan

24   and Lemmie Rodgers get in the car, correct?

25   A. Yes.

1   Q. All right. What line was that Mr.Williams, eight?

2   A. Yes.

3   Q. Where did that occur, sir?

4   A. I don't recall the exact street.

5   Q. Not from the Avis Rental Car?

6   A. Yes.

7   Q. Now, if the FBI Surveillance Logs reflect that that

8   occurred at 11:57, would you quarrel with that time?

9   A. (No response)

10   Q. 11:57 a.m., on November the 18th; would you quarrel with

11    that time?

12    A.  No.

13    Q.  All right.

14         MR. RIEHLMANN:  Would the Government stipulate that

15    that's what time the surveillance log reflects?

16         MR. WINTERS:  Show me the -- you'll have to show me

17    the surveillance logs.

18         MR. RIEHLMANN:  I -- well, I think I have it here.

19      (There is a pause in the proceedings)

20         MR. RIEHLMANN:  Mr. Voight, if you could look for it,

21    maybe we could --

22      (There is a pause in the proceedings)

23         MR. RIEHLMANN:  Oh, I've got it.  I have it on Page 2

24    of 9.

25         MR. McMAHON:  No.


                                                        123
                        Williams - Cross

1          MR. WINTERS:  I can't stipulate to that.

2          MR. RIEHLMANN:  Can you tell me where --

3          MR. McMAHON:  No, that's not right.  They -- they did

4    not surveil.

5          MR. WINTERS:  They didn't surveil him.

6          MR. RIEHLMANN:  Oh.

7          MR. McMAHON:  He was in a maroon car, not a blue car.

8          MR. WINTERS:  He was in a maroon car, not a blue car.

9    BY MR. RIEHLMANN:

10   Q.  If the surveillance logs indicate that you left the area

11   at 11:59, would you agree with that?

12   A.  I wouldn't argue against it.

13   Q.  All right.

14           MR. McMAHON:  That's what area?

15           MR. RIEHLMANN:  Well, I think that's what he

16  testified to.

17  BY MR. RIEHLMANN:

18  Q.  And if the surveillance logs reflect that you arrived at

19  the Mardi Gras Truck Stop at 12:14, would you dispute that?

20  A.  No.

21  Q.  Now, in SW 7, Tape 1, would you turn to Page 10?

22  A.  You said SW 7, Tape 1?

23  Q.  Yes, sir.  Tape 1, Page 10.

24  A.  (Witness complies)

25  Q.  Line 22.  "That's them in the car over there.  That's --"

Williams - Cross

1  You're saying that.

2    And then Mr. Rodgers says, "That's a rental."

3    That's the point at which you see who in a rental car?

4  A.  Well, I'm referring to JJ and Terry Adams.

5  Q.  Okay.  And where are they when you see them there?

6  A.  At the Mardi Gras Truck Stop.

7  Q.  Okay.  So, at that point, Page 10, that Line 22 -- what

8  line was it that you say that?

9  A.  Line 22.

10  Q.  Okay.  That's when you arrive, approximately arrive, at

11  the Mardi Gras Truck Stop?

12  A.  No, I think I got there shortly before that.

13  Q.  How much before that?

14  A.  Shortly before that, I think.

15  Q.  Well, can you find where in your conversation, something

16  in your conversation --

17  A.  Well, I mean, there's a -- there's a pause so I don't know

18  how long that pause was.  It shouldn't have been much -- it

19  was around there.  Not much far -- not much sooner than that.

20  Q.  A minute or two, would that be fair to say?

21  A.  Perhaps, yes.

22  Q.  Okay.  During the six months that you and Len Davis ran

23  the warehouse trafficking protection scenario, it is true, is

24  it not, that you guarded over 135 kilograms of cocaine?

25  A.  I'm not sure how much it was.

Williams - Cross

1  Q.  In all of the hundred hours that you've spent with the

2  federal government, you've never talked about how much cocaine

3  was in that warehouse over that period of time?

4  A.  We may have, but I don't recall how much it was.

5  Q.  All right.  Now, if I understand your testimony on direct,

6  as you sit here today, you have absolutely no idea what your

7  sentence is going to be in this case?

8  A.  No, that's up to the judge.

9  Q.  You've met with Constantine Georges, Al Winters, Peter

10  McCloskey, Nelson Thayer, Mike McMahon, five different

11  Assistant U.S. Attorneys, over the last three and a half

12  years, and never once did the subject of how much time you

13  were going to have to do come up?

14  A.  None of those guys are sentencing me, the judge is, so.

15  Q.  That's not my question, sir.

16  A.  Okay.  The answer to your question is no.

17  Q.  All right.

18  A.  I've asked how -- how much time am I going to have to --

19  how long I'm going to be in prison, and they say that's up to

20  the judge.

21  Q.  Uh-huh. (affirmative response)  You hope, your hope is to

22  get probation, isn't that true?

23  A.  Yes.

24  Q.  All right.

25  A.  I hope to get time served or I hope to get out of prison.

Williams - Cross

1  I hope to not do life in prison.

2  Q.  You hope, I believe you just said, you hope to get time

3  served.  Tell these ladies and gentlemen what "time served"

4  means?

5  A.  Whatever time you've done already, will be the time you'll

6  do, but --

7  Q.  Right.  So, on the date that the judge sentences you, if

8  he says, "Mr.Williams, I sentence you to time served," you

9  walk out the front doors of the courthouse, isn't that true?

10  A.  Not exactly, but --

11  Q.  You hit the streets of NewOrleans that same day, isn't

12  that true?

13  A.  No, well, not exactly, so --

14  Q.  Well, explain to me the difference.  What --

15  A.  You'd have to go back and be released from the place you

16  are.

17  Q.  Okay.

18  A.  It's what --

19  Q.  So, you'd have to go back to where you are and be

20  released?

21  A.  Yes.  But as you said, I do hope to get time served.  I

22  mean, of course, I don't want to stay in jail one day more

23  than I have to.

24  Q.  All right.

25    A.  But I don't know whether that's the case or not.

Williams - Cross

1    Q.  I would imagine, sir, that on December the 7th, 1994, when
2    you were arrested and put behind bars for the first time in
3    your life, the first thing you thought about was, "How long am
4    I going to be behind these bars;" would that be fair to say?
5    A.  No.
6    Q.  Oh, it was not?  Well, was it the second thing you thought
7    about?
8    A.  I don't think so.
9    Q.  Well, the day that you were arrested, did you start
10   thinking about, "God, how long am I going to be behind these
11   bars"?
12   A.  Sure, I did.
13   Q.  And I'll bet your heart was pounding, would that be fair
14   to say?
15   A.  Yes, I was afraid.  I was scared.  I was -- well, the
16   first thing I thought about was my children and who's going to
17   take care of them.  And I was upset.  And then I remember
18   being embarrassed because I was on the camera.  The first
19   thing that popped in my head was not how long I was going to
20   be in prison, I had other things that I was thinking about.
21   Q.  You --
22   A.  But eventually, I did wonder how long am I going to be in
23   prison.
24   Q.  You were afraid, would it be fair to say, sir, that you
25   were desperate?

1    A.  No, it wouldn't be fair to say that.

2    Q.  Okay.  Have you ever received any lump sum payments from

3    the Government with which you can restart your life after all

4    of this is over?

5    A.  No.

6    Q.  Now, you did receive the lion's share or the bulk or

7    whatever it was, however it was you referred to it, of

8    $98,000, or what figure was it?

9    A.  $98,500.

10   Q.  How much of that went to you?

11   A.  Me and -- me and Len split the majority of it.

12   Q.  So, approximately $50,000?

13   A.  Well, I don't -- I don't know if it was that much.  I

14   mean, when I say the majority of it, we -- well, if you divide

15   all the money between all the individuals, since there were

16   eleven of us that participated in protecting the drugs, me and

17   Len got more than the rest of them did.

18   Q.  And you spent it, you just spent it?

19   A.  Yes.

20   Q.  All right.  Since you've been cooperating with the

21   Government, have you all entered into any kind of arrangement

22   whereby you promise to repay them all that money?

23   A.  No.

24   Q.  No.  Did you declare that money as income in your 1994

25   Income Tax Returns?

1    A.  No.  I didn't fill out a 1994.

2    Q.  You didn't feel it was income?

3    A.  I didn't fill out a income tax return.

2940703.dat

4    Q.  Oh, okay.

5    A.  I was in prison.

6    Q.  All right.  Because, clearly, it was income.

7    A.  I'm not disputing that, sir.

8    Q.  All right.  Scaboo wasn't the first drug dealer you ever

9    shook down, was he?

10   A.  No.

11   Q.  You had done the same thing that you've described earlier

12   to these ladies and gentlemen, by taking money from drug

13   dealers with a gun on your hip, you'd done that plenty times

14   before, hadn't you?

15   A.  A few times before, yes.

16   Q.  All right.  Do you remember a man by the name of Carlos

17   Adams?

18   A.  Carlos Adams?

19   Q.  Do you remember a Mr. Carlos Adams, who was murdered on

20   September --

21   A.  Okay.

22   Q.  -- the 30th, 1994?

23   A.  Yes.

24   Q.  All right.  He was murdered by members of the Paul Hardy's

25   gang, isn't that true?

                                                      130
                        Williams - Cross

1    A.  I think so.

2    Q.  All right.  And just to refresh your recollection, sir,

3    what happened was you were driving around -- were you in your

4    police car?

5    A.  No.

6    Q.  You were in your personal car?

                          Page 115

```
 7    A.  Yes.

 8    Q.  You were off duty?

 9    A.  I had just gotten off duty and I was leaving the Fifth

10    District Station, going home.

11    Q.  What time was that?

12    A.  Well, I had got off earlier than my normal shift, so I

13    can't recall the time.

14    Q.  All right.  You heard gunshots ring out?

15    A.  Yes.

16    Q.  And as you drove, you unholstered your weapon, correct?

17    A.  (No response)

18    Q.  Or you had your weapon drawn, correct?

19    A.  Yes.

20    Q.  All right.  And you saw people running from the area from

21    which you'd heard those gunshots ring out, isn't that true?

22    A.  Yes.

23    Q.  And some of those people had guns, isn't that true?

24    A.  Yes.

25    Q.  All right.  And --
```

Williams - Cross

```
 1    A.  Well, not the guys that were running, not the people that

 2    were running from the gunshots.

 3    Q.  You saw people leaving the area with guns, correct?

 4    A.  I don't -- yeah.  They weren't leaving the area.  When I

 5    saw these guys, they weren't running with the rest of the

 6    people.  What happened was, I was driving my vehicle, then I

 7    heard some gunshots.  So, I started then driving into the

 8    direction where the gunshots were coming from.

 9    Q.  You did that as a police officer?

10    A.  Yes.
```

11    Q.  All right.

12    A.  And then, the people were -- I saw people running from

13    that direction, and I heard some of them talking, "They

14    shooting.  They shooting," like that.  Now, no one knows I'm a

15    police officer because I'm in my personal vehicle, so I got my

16    gun out because, you know, I don't know if I'm going to happen

17    upon these guys.

18         So, suddenly I do see some guys go to -- wait.  Before I

19    saw that, I think I saw -- no, I saw some guys go to a vehicle

20    with some guns.

21    Q.  Okay.  Now, --

22    A.  But they weren't running from that direction.

23    Q.  Okay.  But surely, being a police officer, you connected

24    the guys you saw with the guns with the gunshots you just

25    heard ring out?


                                                        132
                           Williams - Cross

1     A.  Yes, I'm thinking, "These might be the guys."

2     Q.  All right.  But what happened, rather than apprehend them

3     as possible suspects in the murder of Carlos Adams, you saw

4     them and realized that they were gang members of Paul Hardy's,

5     isn't that true?

6     A.  Well, I can't apprehend them in the murder of Carlos Adams

7     because I don't even realize someone is dead at this point, or

8     even that someone has been shot.  However, as a police

9     officer, I am ready to draw down on these guys and stop them,

10    until I see them go to Paul Hardy's vehicle.  And he's -- him,

11    being a friend of Len Davis, I don't.  And when they go to

12    Paul Hardy's vehicle, they go -- they put the guns inside the

13    vehicle, it appears, and then one of the guys goes back and he

14    takes the guns out and give it to another guy, who brings it
15    up to a house.  We're in the project area, so he brings it up
16    to one of the houses in there.
17    Q.  Getting rid of what could be the murder weapon, is what
18    you're describing?
19    A.  Yes.  Well, I'm not sure right now if they involved in the
20    shooting or if they were going to go after the guys who's
21    doing that shooting, or whatever they doing.  But at the time,
22    they a suspect to me.
23    Q.  And you do nothing?
24    A.  So, but until I -- well, once they reaches Paul Hardy
25    vehicle, I realize they may be a crew of Paul Hardy's and my

                     Williams - Cross
1     partner, Len Davis, being a good friend of Paul Hardy's, I
2     don't stop them or do anything about it, but I call Len Davis
3     and tell him what just happened.  And find -- and I tell him
4     to find out if that's Paul Hardy's crew.
5     Q.  Now, are you unable to admit that you were friends with
6     Paul Hardy?  You keep saying --
7     A.  Well, I wasn't.
8     Q.  No, wait.  Let me finish the question.
9         You keep saying Len Davis was a friend of Paul Hardy's.
10    A.  And I'm saying that because that's exactly true.  I didn't
11    even meet Paul Hardy until he -- until it was through Len
12    Davis, and I wasn't a friend of his.  I wouldn't call Paul
13    Hardy on the phone.  I wouldn't meet him off duty.  The only
14    time I came in contact with Paul Hardy was through Len Davis,
15    so.
16    Q.  You weren't a friend to him, but you felt allegiance to
17    him to the extent that you let members of his gang escape what
                     Page 118

18   turned out to be a murder, isn't that true?

19   A.  Because of his relationship with my friend, Len Davis.

20   Q.  All right.

21   A.  My partner.

22   Q.  And then, after you saw these guys hiding the guns and you

23   didn't do anything, you just drove from the area and didn't --

24   A.  I called Len to find out if, in fact, they were involved

25   in the shooting.  And I went around to -- I continued through


134

Williams - Cross

1    to the -- to the murder scene where other police officers was

2    already in route to.

3    Q.  You didn't feel any guilt about letting those people

4    escape, did you?

5    A.  No.

6    Q.  All right.  And it was just two weeks later that you were

7    in the car with Len Davis, looking for Kim Groves, isn't that

8    true?

9    A.  I wasn't looking for her, but I was in the car with him,

10   yes.

11   Q.  All right.  Would you agree that your take of the yield

12   for the Operation Shatter Shield had to be in the neighborhood

13   of $40,000?

14   A.  I'm not sure how much I -- I had, but.

15   Q.  Well, give me the lowest figure you think it might be?

16   A.  Well, I know one day we made, individually, I made

17   $11,000, and on another occasion I might have made two or

18   three thousand dollars, so it -- it had to be at least

19   $20,000, for myself.

20   Q.  And you made exactly what Len Davis made?

21  A.  Yes.

22  Q.  So, of the $98,000, you all just -- of the $98,000 that

23  you said yesterday you all split the bulk of, you're saying

24  you really only got $40,000?

25  A.  No.  What I'm saying is that if there were eleven or

1  twelve officers, me and Len got the majority of the $98,500,

2  and the rest was divided between the rest of the officers.

3  However, they, individually, themselves, did not receive as

4  much as me and Len.  They might have gotten $5,000.  Depending

5  on how much they worked.  If they worked -- if they didn't

6  work -- me and Len was at everything, at every drug protection

7  scenario, not every other officer was.

8  Q.  Would you estimate that over the year long period that you

9  were involved with Scaboo and then JJ, that you worked

10  hundreds of hours, in connection with protecting them?

11  A.  No.

12  Q.  All right.  Dozens of hours?  I mean, how many hours would

13  you estimate your work?

14  A.  Well, whenever I protected them, it was probably only for

15  a couple of hours at a time with prior to the warehouse

16  things.  I mean, or probably to the -- yeah, the warehouse,

17  protecting the drugs at the warehouse.  So, maybe about 50

18  hours.

19  Q.  All right.  And Leon Duncan was in the car for two hours

20  with you, correct?

21  A.  Yes.

22  Q.  Would you -- you said 50 hours.  Would you then estimate

23  for me how many different times you worked gun -- drug

24  protection details?

25    A.  At the warehouse?

Williams - Cross

1    Q.  At the warehouse or escorting cars out of town, anytime
2    you did anything where you knew you were protecting drugs?
3    A.  Well, maybe twelve.
4    Q.  Twelve, all right.  Every time that you did it, you had a
5    gun, correct?
6    A.  Yes.
7    Q.  All right.  Have you been charged with twelve gun counts
8    or one gun count?
9    A.  One gun count.
10   Q.  And there was one time that you were out at the warehouse,
11   guarding drugs with a shotgun, isn't that true?
12   A.  No.  The shotgun was for police work.  It just happens
13   that I had it in my police vehicle when we went to the
14   warehouse.
15   Q.  Okay.  But that would qualify as carrying a gun, so that
16   you could be charged with a gun count, isn't that true?
17   A.  Yes, if you were committing a crime and you had a gun, you
18   can be charged for every one.
19   Q.  And you know, from acquainting yourself with the federal
20   criminal law, that carrying a shotgun is an even more enhanced
21   penalty than carrying a handgun, isn't that true?
22   A.  No, I -- I don't know about that.
23   Q.  You didn't know that it doubled it from five years
24   consecutive to ten years consecutive?
25   A.  No.

1   Q.  All right.  Now, since you've been arrested, though,

2   you've come to learn what a gun count is, right?

3   A.  Yes.

4   Q.  Okay.  It means five years on top of whatever number of

5   years you get sentenced for the drugs, correct?

6   A.  Yes.

7   Q.  All right.

8       (There is a pause in the proceedings)

9           THE COURT:  Mr. Riehlmann, and maybe at this time,

10  it's noontime --

11          MR. RIEHLMANN:  Oh, it snuck up on me.

12          THE COURT:  Are you about to finish or whatever?

13          MR. RIEHLMANN:  No, sir.

14          THE COURT:  All right.  Well, then this would be the

15  time to take a break until 1:15.

16          MR. RIEHLMANN:  Okay.

17          THE COURT:  Thank you

18      (Jury out at 12:00 p.m.)

19                      *   *   *   *   *

20      (Recess at 12:00 p.m., until 1:15 p.m.)

21                      *   *   *   *   *

22

23

24

25

1           A F T E R N O O N   S E S S I O N

2       (Jury in at 1:15 p.m.)

3                       *   *   *   *   *

    4              THE CLERK:  Court is in session.
    5              THE COURT:  Please be seated.
    6              Go right ahead, Mr. Riehlmann.
    7              MR. RIEHLMANN:  Thank you, Judge.
    8                      *    *    *    *    *
    9       SAMMIE WILLIAMS, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN
   10                   CONTINUED CROSS-EXAMINATION
   11   BY MR. RIEHLMANN:
   12   Q.  Mr.Williams, you have met with Mr. McMahon and
   13   Mr.Winters very recently, within the last month or so, so as
   14   to prepare your testimony for this case, isn't that true?
   15   A.  Yes.
   16   Q.  Okay.  In all of the hundred hours or so that you've met
   17   with the Prosecution to prepare for testimony and whatnot,
   18   have you ever listened to the unedited version of the November
   19   18th, 1994 car tape that you were in?
   20   A.  I don't know if there is an unedited version.
   21   Q.  Okay.
   22   A.  Too, I don't know if the version I heard was edited or
   23   unedited.  I don't think it was edited though.
   24   Q.  Well, the version that Mr. Winters played yesterday was
   25   edited, wouldn't you agree to that?  I mean --


                                                            139
                          Williams - Cross

    1   A.  Not to my knowledge.
    2   Q.  Oh.  So, what you commented on yesterday that was played
    3   for this jury is the entirety of the conversation that took
    4   place in that car on November the 18th, 1994?
    5   A.  Yes.
    6   Q.  Okay.  Earlier, I asked you about 10-7.  10-7, that's
                          Page 123

7   police code, isn't it?

8   A.  Yes.

9   Q.  And it's police code for what?

10   A.  Out of service.

11   Q.  Out of service.  Now, on the night that Kim Groves was

12   murdered, when you talked to Len Davis and determined -- and

13   he told you that she had been murdered, you asked Len Davis,

14   "How do you know it's a 10-7 thing;" didn't you?

15   A.  Yes.

16   Q.  All right.  And you were referring to Kim Groves, correct?

17   A.  Yes.

18   Q.  All right.  So, you were referring to this woman who had

19   just been killed as, "How do you know she's out of service;"

20   is that essentially what you were asking Mr. Davis?

21   A.  Yes, because we don't -- I didn't want to say "murder"

22   just like we don't want to say drugs when we're talking.

23   Q.  Okay.  Now, Gregory Boldan was a person that was used to

24   work the warehouse detail, correct?

25   A.  Yes.

1   Q.  He was not a police officer though, was he?

2   A.  No.  He drove a tow truck for the N.O.P.D.

3   Q.  All right.  And Len Davis, in an effort to find people to

4   work the warehouse guarding detail, had to resort to Gregory

5   Boldan to fill a slot, isn't that true?

6   A.  Well, he -- he -- I think he picked Gregory Boldan because

7   it was someone he knew and trusted that wouldn't say anything,

8   and he --

9   Q.  But to answer my question -- I'm sorry, go ahead.

10   A.  He knew he was already involved in criminal activity.

11    Q.  All right.  But to answer my question:  Len Davis chose

12    Gregory Boldan, who was not a police officer, because he had

13    to fill a slot in the warehouse guarding detail, correct?

14    A.  Yes.

15    Q.  And at the time that he got Gregory Boldan to do that,

16    Gregory Boldan had not been told that there was cocaine in

17    that warehouse, isn't that true?

18    A.  I don't know.

19    Q.  Okay.

20        (There is a pause in the proceedings)

21    BY MR. RIEHLMANN:

22    Q.  Gregory Boldan worked it one time?

23    A.  Yes.

24    Q.  The July 9th, 1994 meeting that took place, it took place

25    at the Hilton, I believe you testified, is that correct?

Williams - Cross

1    A.  July when?

2    Q.  July 9th, 1994 meeting.

3    A.  I think that's the day, yes.

4    Q.  We played the video tape yesterday.

5    A.  Yes.

6    Q.  All right.  Len Davis was heard to say that he was

7    wracking his brains, do you remember that particular phrase?

8    A.  In the July meeting?

9    Q.  That's right.  July 9th, 1994.  When Len Davis is sitting

10   on the couch with his arms outstretched.

11   A.  Okay, that's not at the Hilton.

12   Q.  Oh, well that's what I asked you.  Where was that?

13   A.  Well, that's at the warehouse.

14    Q.  Okay.  I'm sorry, then.

15    A.  Okay.

16    Q.  That -- but Len Davis was heard to use the phrase

17    "wracking his brains," correct?

18    A.  Oh, yes.

19    Q.  And what he meant by that is he was wracking his brains

20    trying to think of police officers that he could get to fill

21    additional time slots, isn't that true?

22    A.  He was wracking his brains to select or keep it as a

23    select few individuals that he knew he can trust and knew they

24    were already in the game, as he said, or down, involved in

25    criminal activity.


                                                    142
                        Williams - Cross

1    Q.  And at the same time, he mentioned that there was one or

2    two out there who didn't know that there was cocaine in the

3    warehouse, correct?

4    A.  Yes.

5    Q.  Now, you've already told us that one of those two was a

6    fictitious person, correct?

7    A.  Yes.

8    Q.  The other person was Chris Evans, correct?

9    A.  Yes.

10    Q.  Now, Chris Evans was a police officer, correct?

11    A.  That's correct.

12    Q.  And the very first time that he worked that detail, he did

13    not know that there was cocaine in that warehouse, isn't that

14    true?

15    A.  That's true.  He didn't know there was cocaine in there.

16    However, he did know that it was of criminal aspects.  He knew

17    we were -- he was getting involved in something criminal, but
                        Page 126

18   we didn't tell him that it was cocaine inside the warehouse.

19   However, later on, the next time he worked, he knew about the

20   cocaine and everything and continued to work.

21   Q.  So, what did Len Davis say to him that imparted to him

22   that this was a criminal enterprise, without telling him what

23   the criminal aspect of it was?

24   A.  Well, as you can see in the tapes, the way we talk, we

25   don't say things like, "Listen, I'm about to do something

1   criminal."  So, he would say something like, "We about to do a

2   little something -- something on the DL."

3        And that means, you know, this is not something for you to

4   talk about because "DL" is short for down low, and it's not

5   something legal because, you know, or why wouldn't he be able

6   to talk about it.  You know, he would come to him like that.

7   I'm not saying he used those exact words, but this is the way

8   he would approach him, to let him know that it's illegal, it's

9   involving illegal stuff.

10  Q.  Well, you weren't present for the conversation that he had

11  with Chris Evans?

12  A.  No.

13  Q.  Well, then, how do you know that he said --

14  A.  Len told me he told him.

15  Q.  Okay.  In September of 1994, Len Davis had a conversation

16  with Carlos Rodriguez, where he was quite angry at Carlos

17  Rodriguez for having told Chris Evans that there was cocaine

18  in that warehouse, isn't that true?

19  A.  Yes.

20  Q.  Okay.  Yet, you maintain that Chris Evans knew shortly

21  after the July meeting, isn't that true?

22  A.  Yes, he did.

23  Q.  Okay.

24  A.  I don't know if it was in September when --

25  Q.  September the 7th, 1994, 2:49 p.m., Len Davis was taped in

1   a phone conversation with Carlos Rodriguez.  You've heard that

2   tape, haven't you?

3   A.  Yes.  Well, okay.

4   Q.  Chris Evans was initially paid a lower rate because he

5   didn't know there was cocaine in the warehouse, and then once

6   you told him, or Carlos Rodriguez told him, then you all gave

7   him a raise, isn't that true?

8   A.  Yeah, he wanted more money.

9   Q.  Okay.  In September or on September the 18th, 1994, didn't

10  you and Len Davis speak of plans to arm rob JJ and Scaboo and

11  steal from them, the money that was -- or the drugs that was

12  -- that they were trafficking in?

13  A.  No.

14  Q.  All right.

15      (There is a pause in the proceedings)

16  BY MR. RIEHLMANN:

17  Q.  I'm going to show you what I've marked for identification

18  as Duncan Exhibit 3, I believe.

19          MR. RIEHLMANN:  Is that correct?

20          THE CLERK:  Yes.

21          MR. RIEHLMANN:  All right.

22  BY MR. RIEHLMANN:

23  Q.  Review that for me, please, Mr.Williams.

24  A.  (Witness examines document)

25    Q.  Have you reviewed it?

                      Williams - Cross

 1    A.  Yes, sir.

 2    Q.  That's a NewOrleans Police Department Detail

 3    Authorization Form?

 4    A.  Yes.

 5    Q.  All right.  And it was filled out by Len Davis, correct?

 6    A.  Yes.

 7    Q.  And Len Davis filled that out in June of 1994?

 8    A.  Not June.  I think it's July of 1994.  No, it -- okay.

 9    It's June, yes.

10    Q.  Okay.  And Len Davis was filling that detail form out to

11    apprise his supervisors that he was working a detail, guarding

12    Good Wood Auto Supply Warehouse, is that correct?

13    A.  No.  He --

14    Q.  What is it that he's

15    A.  He filled this out to use this in addition to his alibi,

16    he can have his self covered to, say, if we ever stopped,

17    like, if say we're on the scene protecting the drugs and rank

18    come out there and asking us what are we doing sitting out

19    here, and we tell them, "We're working a detail."  Well, he

20    filled this out to cover himself, to make sure that this phony

21    slip here would have been approved by rank and stuff, because

22    we wasn't really working a detail.

23    Q.  Well, I thought that's what I asked you.  Len Davis filled

24    that out to get --

25    A.  Yeah, but that wasn't his purpose.  His purpose --

1  Q.  I'm not -- that -- I wasn't asking you what his purpose

2  was.

3  A.  I think you did.

4  Q.  Well, then, let me rephrase the question.  Len Davis

5  filled that out to notify his rank, his supervisor, of that

6  detail; am I incorrect?

7  A.  You're asking me is that his purpose for filling this out?

8  Q.  Well, did he submit it to his supervisor?

9  A.  Yes.

10  Q.  All right.  And he submitted to his supervisor to inform

11  them, whatever reasons he had, but to inform them that he was

12  working a detail guarding that warehouse, isn't that true?

13  A.  Let me explain this to you.

14  Q.  Well, you can answer my question.

15  A.  Okay.

16  Q.  Then you can explain it.

17  A.  Okay.  Not quite true.  Let's say if we were working a

18  real detail, Len wouldn't have had to bother filling this out.

19  Even though this is the form that the police officer used to

20  work the detail, but nobody bothers you about working a

21  detail.  This was just a precautionary thing so we can -- it

22  can add on to our so called alibi.

23  Q.  Okay.

24  A.  In case we were caught.

25  Q.  Okay.

1  A.  Because, you know, the rank didn't mind.  I worked plenty

2  of details at places like K&B and stuff, I didn't notify the

3  rank.  I didn't fill one of these out.

4   Q.  Okay.

5   A.  I just worked it.

6   Q.  Okay.  So, it was -- you'd say it was a common practice to

7   work details and not fill out the authorization form like the

8   one you have before you?

9   A.  Yes, and --

10  Q.  Okay.

11  A.  -- so Len's reason wasn't for to inform the rank.

12       MR. RIEHLMANN:  I'd offer, file and introduce

13  Defendant's Exhibit, I mean Duncan 3.

14       THE COURT:  Any objection?

15       MR. WINTERS:  No objection.

16       THE COURT:  No objection?

17       MR. VOIGHT:  No objection.

18       THE COURT:  Received.

19       MR. RIEHLMANN:  Thank you, Judge.

20  BY MR. RIEHLMANN:

21  Q.  Mr.Williams, you had a code word system so that in those

22  instances when you wanted to conceal from someone that you

23  were involved in protecting cocaine shipments, you'd speak of

24  stereos, isn't that true?

25  A.  Yeah, it started out that way.

Williams - Cross

1   Q.  Okay.  Now, you did get comfortable around certain people

2   that you trusted like JJ and Terry, and you were comfortable

3   to such an extent that you would use the word "drugs;" would

4   you agree with that?

5   A.  Yes.

6   Q.  All right.  Because those were people you trusted,

7   correct?

8   A.  (No response)

9   Q.  JJ and Scaboo?  I mean, it turned out you were wrong, but

10  you trusted them at that time, correct?

11  A.  Yes.

12  Q.  Okay.  Did I understand you to testify on direct

13  examination that you have no plea agreement with the

14  Government?

15  A.  That's correct.

16  Q.  Okay.  Did I understand you to testify yesterday that on

17  October the 13th, 1994, when you finished your shift, as it

18  concerns the plans to kill Kim Groves, you had, quote, "I had

19  forgot about it;" did you say that yesterday?

20  A.  When I finished my shift as a police officer on duty, you

21  mean?

22  Q.  Let me rephrase the question.  Let me start over.

23  A.  Okay.

24  Q.  Did you testify yesterday concerning the end of your tour

25  of duty on October the 13th, 1994, concerning the plans that

149

Williams - Cross

1   had been discussed about the murder of Kim Groves, when you

2   finished your tour of duty, you had forgot about it; did you

3   say that yesterday?

4   A.  I believe I testified that Len -- I thought Len Davis

5   would forget about it.

6   Q.  You did not say that you had forgotten about it?

7   A.  Yeah, well, it wasn't on my mind to begin with.

8   Q.  You testified yesterday that you talked Len Davis out of

9   killing the twin, Nathan Norwood, correct?

10  A.  Yes.

11    Q.  You did that because you told Len Davis that to kill the
12    twin right after Kim Groves had been killed would be, quote,
13    "too suspicious," isn't that true?
14    A.  That's -- that's the words I used to talk him out of it,
15    however, he didn't think it was -- I didn't think it was too
16    suspicious, I just didn't want him to do it.  And I would have
17    said anything if it would have stopped him.
18    Q.  You testified yesterday about the Government had provided
19    your girlfriend with airfare to fly to visit you, is that
20    true?
21    A.  Yes.
22    Q.  All right.  Did that come about by means of your
23    contacting the prosecuting attorneys and telling them that you
24    were lovesick or missing your girlfriend so much that you
25    needed to visit with her?

                                              150
                        Williams - Cross

1     A.  Yes.
2     Q.  And you told the Government that if you had an opportunity
3     to visit with her, it would make you happy, I take it?
4     A.  No.
5     Q.  Oh.  Well, was it a happy reunion that you had with your
6     girlfriend?
7     A.  I'm always happy to see her.
8     Q.  Okay.  Over the four years, have you gotten to be on
9     pretty friendly terms with Mr. McMahon and Mr. Winters?
10    A.  Well, I don't consider them friends of mine.
11    Q.  How do you address them?
12    A.  Al Winters, Mike McMahon.
13    Q.  All right.  And they call you Sammie?

14    A.  Yes.

15    Q.  All right.  Throughout the tapes that we heard yesterday

16    and today, you refer to "raggedy ass phones" or "raggedy

17    phones" and Len Davis does too.  What are you referring to?

18    I'm -- could you explain that to me?

19    A.  I don't recall calling them that, but Len does call them

20    that.  He's talking about the cellular phones.

21    Q.  What cellular phones?

22    A.  The ones we were talking on.

23    Q.  Okay.  Were those the ones that the Government provided

24    you or were those your own?

25    A.  Well, I had one of my own and the Government had gave us

1     one.

2     Q.  On November the 18th, which phone were you using?

3     A.  I was using both of them.

4     Q.  Okay.  As you rode with Leon Duncan and Sammie Williams --

5     I mean, excuse me, sir.  I get these names confused.

6         As you rode with Leon Duncan and Lemmie Rodgers, which one

7     were you using?

8     A.  Both of them.

9     Q.  Okay.  Insofar as that trip on November the 18th, 1994,

10    you -- did you know beforehand that you would be guarding a

11    car in which there were a total of 25 or 26 both real and sham

12    kilos of cocaine?

13    A.  I knew we would be guarding cocaine.  I didn't know how

14    much it was.

15    Q.  You later learned that it was either 25 or 26?

16    A.  I still don't know, to this day, unless you're telling me.

17    Q.  Oh, you don't -- no one ever told you that it was 51 kilos

18    in those two cars that day?

19    A.  No.

20    Q.  All right.

21         MR. RIEHLMANN:  Could we play the August -- I'm

22    sorry, the -- the trip that we -- I mean, the meeting that we

23    discussed a little while ago where Len said, "wracking my

24    brains"

25         MR. VOIGHT:  The video.

                    Williams - Cross

1         MR. WINTERS:  July 9th.

2         MR. RIEHLMANN:  July 9th.  That's what I'm looking

3    for.

4         Could we play that?  And I believe your timer would

5    reflect it was around 28 minutes?

6         MR. WINTERS:  No.

7         MR. RIEHLMANN:  No?

8         MR. WINTERS:  It's about eight minutes.

9         MR. RIEHLMANN:  Do you know --

10        MR. WINTERS:  About eight minutes.

11        MR. RIEHLMANN:  Oh, it's eight minutes long?

12        MR. WINTERS:  Right.

13        MR. RIEHLMANN:  Oh, okay.

14        MR. WINTERS:  Approximately.  Because we removed

15    irrelevant things.

16        MR. RIEHLMANN:  Well, we may not be necessary.  Let

17    me just --

18    BY MR. RIEHLMANN:

19    Q.  Do you remember during that conversation, Len Davis using

20    the phrase "keeping them off" as it referred to Charles

21   Boutin?  "Keeping them off."

22   A.  On that particular tape?

23   Q.  Yes.

24   A.  I don't think he said that.

25   Q.  Oh, it was May 22nd?

1    A.  Yeah, that was a different tape.

2    Q.  Wait -- okay.  On the May 22nd, '94 conversation, do you

3    recall him using that phrase, "keeping them off"?

4    A.  Yes.

5    Q.  And he was talking about keeping them off Charles Boutin?

6    A.  Yes.

7    Q.  Okay.  And you told these ladies and gentlemen yesterday

8    that when he used that phrase, keeping them off Charles

9    Boutin, that he was referring to Leon Duncan having been a

10   source of information for him in keeping people -- keeping the

11   authorities off of Charles Boutin; is that what you testified

12   to yesterday?

13   A.  Yes.  He was keeping the police from arresting him and

14   other guys from taking his drugs and money.

15   Q.  Have you previously testified that, in response to the

16   question, "who is he talking about, keeping them off what,"

17   your answer was, "Charles Boutin."  And then the question,

18   "What, wasn't it your testimony that when Lemmie was in

19   Narcotics he used to call Len and tell him what was going on

20   with Charles Boutin."

21        Did you previously testify to that?

22   A.  Yes.

23   Q.  And that's, you were referring to Lemmie Rodgers there,

24   correct?

25   A.  Yes.  Both of them used to give Len information, but at

Williams - Cross

1   the time, I think Lemmie was working with Narcotics.  However,

2   he was assigned to Special Assignment, and that's a division

3   that works with other different divisions.

4   Q.  You told us about a meeting that you -- well, let me back

5   up a little bit.  When was it, Mr.Williams, that you decided

6   that you were going to cooperate with the Government?  When,

7   after December the 7th, 1994, as best as you can approximate,

8   did you decide that you were going to cooperate with the

9   Government?

10  A.  A couple of months after that.

11  Q.  So, we put ourselves into February or March of 1995; would

12  that be fair to say?

13  A.  Yes.

14  Q.  And you pled guilty in April of '95?

15  A.  Yes.

16  Q.  And you still haven't been sentenced, obviously, correct?

17  A.  That's correct.

18  Q.  All right.  So, in February or March when you started

19  meeting with the Government, you started telling them what you

20  knew about the operation and what you knew about corrupt

21  police officers, in general?

22  A.  Yes.

23  Q.  Had you kept like a diary or written reports or kept

24  documents that recorded all the many observations and

25  information that you knew about the things you later revealed

1  to the Government?

2  A.  No.

3  Q.  All right.  Did you -- when you began meeting with the

4  Government, they call that a debriefing, right?

5  A.  Yes.

6  Q.  And was Mr. Hadden present?

7  A.  Yes.

8  Q.  He was taking notes, correct?

9  A.  I think so.

10  Q.  All right.

11  A.  I'm not sure.

12  Q.  All right.  Did you ever see him taking notes?

13  A.  He was writing on occasions.  I'm not sure if he was

14  taking notes.

15  Q.  All right.  In that meeting or in later meetings, would

16  they go back to those notes to ask you about certain things?

17  A.  They would ask me questions throughout the meetings.  I

18  don't -- I don't know if he's referring to his notes when he

19  asked the questions though.

20  Q.  All right.  Have you ever testified before a grand jury?

21  A.  No.

22  Q.  All right.  Have you, from the very first time that you

23  met with the Government to start telling them what you knew,

24  did you tell them the whole truth and nothing but the truth?

25  A.  Yes.

1  Q.  You've never deceived them or withheld information from

2  them in any way?

3  A.  No.

4  Q.  So, in February or March of '95, you decide you're going

5  to cooperate with the Government.  It's then that you start

6  recalling or trying to recollect the events of the last year

7  or two, is that correct?

8  A.  Yes.

9  Q.  All right.  And you, obviously, as we've already testified

10 to, you have no materials in front of you to refresh your

11 recollection, it was entirely your memory, correct?

12 A.  Yes.

13 Q.  All right.  You have described for -- you described for us

14 yesterday that you recall meeting with Leon Duncan and Lemmie

15 Rodgers in the First District, where you remained in the

16 vehicle and Leon Duncan and Len Davis talked outside the car.

17 Do you remember telling us about that?

18 A.  Yes.

19 Q.  What month did that happen in?

20 A.  I can't recall the exact month.

21 Q.  Well, --

22 A.  But it was shortly after we started meeting with JJ and

23 Terry Adams.

24 Q.  All right.  And you told the Government about that the

25 first time you met with them?

Williams - Cross

1  A.  Well, I don't know if that came up the first time, but

2  somewhere along the line, I told them.

3  Q.  All right.  You related to us yesterday that you met with

4  Leon Duncan at the warehouse?

5  A.  Yes.

6  Q.  When was that?

7    A.  Well, I didn't meet with him but he came down to talk to

8    Len and I was there.

9    Q.  And when was that?

10   A.  That was -- I don't know the exact date on that one

11   either, but it was during one of the scenarios at the

12   warehouse.

13   Q.  What time of day was it?

14   A.  Daytime.

15   Q.  Have you ever seen any photographs of Leon Duncan at that

16   warehouse from the surveillance cameras that they had at the

17   warehouse?

18   A.  No, I haven't received -- I haven't seen photos of anyone

19   at the warehouse, outside of it.

20   Q.  Len Davis was there?

21   A.  Yes.

22   Q.  Who else was there?

23   A.  Me.

24   Q.  Who else?

25   A.  I can't remember which guys were working.

1    Q.  You're talking about the police officers there?

2    A.  Yes.

3    Q.  All right.  And you specifically recalled, as much as

4    maybe a year later, that he had told you about some airplane

5    that could -- that had these high tech -- high tech equipment

6    on it?

7    A.  Yes, it was -- it wasn't hard to remember that.  It was

8    something exciting, so, yeah.

9    Q.  Okay.  It was something what?

10   A.  Exciting.  Something, you know, that -- well, being in my

11    field, I was interested in it.

12    Q.  Oh, okay.  In the May 22nd meeting, I believe, Len Davis

13    tells JJ and Terry Adams that he, quote, "Has some people

14    going to Narcotics;" remember him saying that?

15    A.  Yeah.

16    Q.  And by "some people," those two words, you're saying --

17    A.  That's --

18    Q.  Wait, let me finish.

19    A.  Okay.

20    Q.  By those two words, "some people," you're telling this

21    jury he was referring to Leon Duncan?

22    A.  Yes.  Quite often Len would talk in either plural terms

23    when talking about one person or in past tense when just

24    talking about the present time.  So, that's just the way he

25    talked.

Williams - Cross

1     Q.  And --

2     A.  But he was talking about Leon Duncan.

3     Q.  And he talked about Leon Duncan being transferred to

4     Narcotics in a week or two, in that sentence, didn't he?

5     A.  I believe he did.  At the time, we thought the chief was

6     coming in fairly soon and that he would be going to Narcotics.

7     Q.  All right.  And you knew that, you say, because of some

8     meeting that you -- or your just happening to run into Leon

9     Duncan at Central Lockup?

10    A.  Well, first Len had told me that Leon was going back to

11    Narcotics and then, like I said, when we were going to Central

12    Lockup, that's where we go to bring prisoners, Leon Duncan

13    happened to be there.  And again, he was confirming with Len

14  that he feels strongly about he's going to Narcotics.

15  Q.  All right.  And when was that meeting at Central Lockup?

16  A.  I don't know the date.

17  Q.  All right.  To the best of your recollection, when did

18  Chief Pennington become the chief of police?

19  A.  I don't remember.

20  Q.  At all?

21  A.  (Negative response)

22  Q.  Were you still on the Force?

23  A.  Yes.

24  Q.  Okay.  Was it within one or two weeks of Leon Duncan -- of

25  Len Davis saying this on May 22nd, 1994?

1  A.  I don't think so, no.

2  Q.  All right.  As a matter of fact it was several months

3  later, it wasn't until October of '94, that Chief Pennington

4  became the superintendent, isn't that true?

5  A.  I don't remember the exact date that he became

6  superintendent, but I know it didn't happen when we all

7  thought it would happen.  He came a little while later.

8  Q.  Okay.  Because you do recall that in May of 1994, Marc

9  Morial had just been elected mayor and then they had a search

10  for a police chief that lasted many, many months.

11  A.  Yeah, that's probably what it was.

12  Q.  Pardon me?

13  A.  That's probably what it -- what delayed him coming,

14  because they were looking for someone.

15  Q.  Have you ever seen any kind of paperwork indicating that

16  Leon Duncan had applied for a transfer back to Narcotics?

17  A.  No.

18    Q.  In the police department, you just don't call somebody up
19    and say, "I want to come back."  You have to fill out transfer
20    paperwork, isn't that true?
21    A.  Well, actually, it is more like who you know than filling
22    out the paperwork.
23    Q.  Is there paperwork involved?
24    A.  Oh, yes, of course.
25    Q.  All right.  It was your testimony, I believe that any time

1    they used -- somebody refers to somebody, someone else as
2    being "down," that means that that person is corrupt?
3    A.  No, not any time.  In the context of our conversations,
4    that's what it meant most of the time.
5    Q.  Well, yesterday when JJ referred to the man he had been --
6    he had obtained or rented the warehouse from, when JJ said,
7    "He's got my money.  He's down."  What did JJ mean by that?
8    A.  If JJ said that, I'm -- he would mean that the guy got his
9    money and that he's going to cooperate with -- allow him to
10   have the warehouse.
11   Q.  But JJ had been saying that he wanted to make sure that
12   that warehouse owner never found out that there was cocaine
13   there, obviously, correct?
14   A.  Yes.  That's why --
15   Q.  So, that man wasn't down in the sense that you would like
16   that -- that you said that word was commonly used, correct?
17   A.  Yes.  That's why I said it depends on the context of the
18   conversation.
19   Q.  Okay.  You testified yesterday that you got advice from
20   Leon Duncan, Carlos Rodriguez and Larry Smith, is that

21  correct?

22  A.  Yes.

23  Q.  You previously testified that you got advice from Carlos

24  Rodriguez, Larry Smith and some other officers, isn't that

25  true?

Williams - Cross

1   A.  Yes.

2   Q.  Okay.  And you previously testified that you got advice

3   from Lemmie Rodgers, isn't that true?

4   A.  Yes.

5   Q.  Do you recall when you went to Biloxi with JJ and --

6   A.  Terry Adams.

7   Q.  -- Terry Adams?

8   A.  I don't recall the date, but I know we did go.

9   Q.  How long did you go for?

10  A.  A few hours that day.

11  Q.  Okay.  And you went to Atlanta too, with Terry Adams and

12  JJ?

13  A.  Yes.

14  Q.  And when was that?

15  A.  I think it was in August.

16  Q.  And how --

17  A.  I'm not sure though.

18  Q.  For how long?

19  A.  Oh, for a couple of days, I think.

20  Q.  And what did you all do while you were on these trips?

21  A.  When we went to Biloxi, we went to the casino and gambled.

22  When we went to Atlanta, we went shopping, hung out at a strip

23  club, and a number of other things.

24  Q.  I believe it was your testimony yesterday that Len Davis

25    hired Leon?

                    Williams - Cross

 1    A.  Yes.

 2    Q.  All right.  Do you know when that was?

 3    A.  In November.

 4    Q.  Okay, specifically what date?

 5    A.  What day he asked him to work?

 6    Q.  Yes.

 7    A.  I don't know, it was in one of the tapes though.  I think

 8    it was a couple of days or maybe the day before it actually

 9    happened.

10    Q.  And do you know where Len was when he asked Leon if he'd

11    work?

12    A.  Do I know where -- no, I don't.

13    Q.  Where Len was?

14    A.  No.

15    Q.  All right.  Do you know where you were?

16    A.  No.

17    Q.  All right.  It was your testimony yesterday that when Len

18    Davis was talking to Leon Duncan and he said, "I'm gonna kick

19    something at you," that that meant --

20    A.  Now, I remember that's where he was.  He was at the house,

21    at Leon's house.

22    Q.  when he said, "I'm gonna kick something at you"?

23    A.  No.  When he asked him to work.  The phone call was to

24    tell him that I want to kick something at you, and we were

25    like at work at that time, then we went to Leon's house.

1 Q. Okay. And gonna kick something at you meant, to you, that

2 it was going to be a drug conspiracy -- drug protection

3 racket?

4 A. He wanted to talk to him about protecting the drugs that

5 were over at the new location, which was the Mardi Gras Truck

6 Stop.

7 Q. And you gleaned all of that from the words, "I'm gonna

8 kick something at you"?

9 A. Well, I'm in the car with him and I know what we're

10 talking about. So, prior to that, prior to him getting on the

11 phone, Len might have talked to me about, "I'm gonna call Leon

12 and see -- and Duncan and Lemmie and see if they want to

13 work."

14 Q. "I'm gonna kick something at you," is in slang for I'm

15 going to get you involved in a drug protection scenario?

16 A. No. No. It depends on the context of the conversation.

17 This is what we're talking about at the time.

18 Q. All right.

19 A. Protecting the drugs.

20 Q. And we have to rely upon you to give us the context of the

21 conversation, the many different conversations, correct?

22 A. Well, no. You have the tapes there. The tapes really

23 tell themselves. But, I can --

24 Q. The tapes what?

25 A. Speak for themselves.

1 Q. Then why do we need you?

2 A. Because I was there, present. I can explain to you what

3 is going on. I mean, you can just listen to the tapes,

4   however, I'm there to explain what may not be clear.  Like

5   when you just asked me, "What does kicking it to the -- kick

6   something at you mean"?  You may not know what that means, but

7   I'm there and I know what we're talking about, so I can

8   explain that to you.

9   Q.  Well, I return to the other question:  So, we have to rely

10  on you to explain?

11  A.  Yes.  Well, yes, if you don't understand, I can explain it

12  to you.

13  Q.  The "big boys" were the eleven police officers that you

14  had used previously in the warehouse scenario?

15  A.  No.

16  Q.  When you were talking about not using the big boys?

17  A.  Yes, but not all eleven of them.  We're talking about --

18  Q.  Who?

19  A.  Carlos Rodriguez and Larry Smith.

20  Q.  And why were they the big boys?

21  A.  Because they were getting paid a little more than some of

22  the other guys.

23  Q.  And why were they getting paid a little more than some of

24  the other guys?

25  A.  Because they were able to advise us on things, kind of

Williams - Cross

1   like Leon and Lemmie Rodgers.

2   Q.  All right.  And Larry Smith worked a lot of those details,

3   isn't that true?

4   A.  Yes.

5   Q.  Okay.  At some point yesterday, Mr.Williams -- I mean

6   Mr. --

7   A.  Williams is correct.

8   Q.  No, I'm talking about Mr. Winters.

9   A.  Oh.

10   Q.  Asked you how long you were at the Mardi Gras Truck Stop,

11  and you said 45 minutes.  Is your memory that good, or do you

12  have some independent reason or --

13   A.  I said approximately 45 minutes.

14   Q.  All right.

15   A.  So, --

16   Q.  And you can remember four years ago or three and a half

17  years ago, that it was just 45 minutes or approximately 45

18  minutes?

19   A.  (No response)

20   Q.  Or are you relying on the tapes?

21   A.  Well, if the tapes help me remember then, yeah, I would

22  rely on them.  But I kind of remember that we weren't out

23  there for that long too.

24   Q.  Okay.  Yesterday you testified that Darrel Jones had his

25  gun.  Did you see Darrel Jones' gun?

Williams - Cross

1   A.  No.

2   Q.  You said Darrel Jones had his gun because the tape said

3  Darrel Jones had his gun?

4   A.  And Len told me that he's going to make sure the -- the

5  guys, Sidney Dubuclet and Darrel Jones have their guns.

6   Q.  All right.  You didn't know Darrel Jones before that, did

7  you?

8   A.  No.

9   Q.  Yet, you've identified his voice?

10   A.  I've --

11  Q.  You say that's Darrel Jones' voice, but it was no one --
12  it was not someone that you knew beforehand?
13  A.  No.
14  Q.  So, to say it was his voice, it's because they've told you
15  that this is Darrel Jones speaking at this point, isn't that
16  true?
17  A.  Yes.  The tapes say that it's Darrel Jones, so I -- I
18  mean, and not only that, but what's happening, because I'm at
19  the Mardi Gras Truck Stop with them, so I -- I pretty much
20  know what's happening at the truck stop, so I would know
21  that's not Len talking.
22  Q.  You said yesterday that at two different points during
23  your trip with Leon Duncan on November the 18th, 1994, three
24  and a half years ago, he had a funny look on his face; you
25  remember a look that another person had on their face three

                                                    168
                         Williams - Cross

 1  and a half years ago, is that what your testimony is?
 2  A.  No.  When you were playing the tapes and I was explaining
 3  to you what I was saying.  And the question was, or what was
 4  said was, "why -- why you looking at me," or I might have said
 5  to Len, I'm looking at you like -- I mean, to Leon, "I'm
 6  looking at you like this," for this reason or whatever.  The
 7  tapes allow me to remember what was going on then.  Like, I
 8  might not remember what happened to me yesterday, however, if
 9  somebody played a video tape, I can easily remember, "Yeah,
10  that's it.  I did do that."
11  Q.  Okay.  At that point where you, I think it was Sammie
12  Williams 7, Tape 1, Page 11, Line 7, where you referred to
13  this look on his face.  I believe following that there is

14  "Duncan:  Unintelligible conversation."  Do you remember what

15  it was Mr. Duncan said?

16  A.  On Tape 1, what is that?

17  Q.  I think it's Page 11, Line 7.

18  A.  What -- SW what?  What was it?

19  Q.  Are you there?

20  A.  No, what is it?  SW 7, something?

21  Q.  Oh, it's SW 7, Tape 1.

22  A.  (Witness searching for document)

23  Q.  Is there a portion of that conversation -- oh, you're not

24  there yet.  Are you there?

25  A.  Wait.  SW 7, Tape what?

Williams - Cross

1  Q.  I think it's Tape 1.

2  A.  Tape 1.

3  Q.  Page 11.

4  A.  Page 11, right there.

5  Q.  At Line 8, "Duncan:  Unintelligible."  Can you tell us

6  what Mr. Duncan said there?

7  A.  No.

8  Q.  Okay.

9      (There is a pause in the proceedings)

10      MR. RIEHLMANN:  One second, Judge.  I think I'm

11  finished.

12      (There is a pause in the proceedings.

13      MR. RIEHLMANN:  Judge, I have no further questions.

14      THE COURT:  Mr. Voight.

15      MR. VOIGHT:  Yes, Your Honor.

16                  *   *   *   *   *

17                  CROSS-EXAMINATION

18    BY MR. VOIGHT:

19    Q.  Good afternoon.

20    A.  Hi.

21    Q.  Now, Mr.Williams, tell the jury, if you could, what a 5K

22    is.

23    A.  That's a letter from the Prosecution to the judge,

24    recommending a lower sentence.

25    Q.  And the Prosecution are the only people that can issue


                                                        170
                        Williams - Cross

1     such a document, a 5K, is that correct?

2     A.  Yes.

3     Q.  And the only way to obtain something like that from the

4     Government is to cooperate, is that correct?

5     A.  I think so, yes.

6     Q.  To the best of your knowledge?

7     A.  Yes.

8     Q.  Now, also, to the best of your knowledge, the only way

9     that a judge can deviate below a minimum mandatory sentence

10    would be with such a 5K, is that correct?

11    A.  Yes, I think so.  Yes.

12    Q.  All right.  Do you hope, at the conclusion of your

13    cooperation with the Government, that they will issue you such

14    a 5K?

15    A.  Oh, certainly I do hope so.  However, they haven't

16    promised me that they will do so.

17    Q.  All right.  Now, yesterday you discussed, and you

18    discussed a little bit further today, insurance scams that you

19    committed while you were a police officer?

20    A.  Yes.

21    Q.  Did you receive money as a result of those scams?

22    A.  Yes.

23    Q.  Did you spend the money?

24    A.  Yes.

25    Q.  In the three years or so that you've been incarcerated,

Williams - Cross

1    has anyone discussed with you repayment of those monies from

2    whence they came?

3    A.  (No response)

4    Q.  Has anybody asked you to pay the money back that you got

5    as a result of those insurance scams?

6    A.  Pay it back to whom?

7    Q.  Where would you have received the money?

8    A.  From a co-conspirator.

9    Q.  As a result of insurance payoffs, from insurance

10   companies?

11   A.  Yes.  Well, not exactly.  I don't know how far it went,

12   but the money I received supposedly came from them.  So, I

13   don't know where they got their money from.

14   Q.  And as a result of the scams, you filed police reports

15   that were false, is that correct?

16   A.  Yes.

17   Q.  And you know that that is a crime, is that correct?

18   A.  Yes.

19   Q.  And you knew that at the time, --

20   A.  Yes.

21   Q.  -- is that correct?

22   A.  Yes.

23   Q.  Now, also in conjunction with these insurance scams, did

24   you ever issue any tickets, to the best of your knowledge?

25    A.   No.

                        Williams - Cross

1    Q.   All right.  Now, if you would, refer to what the

2    Government has marked SW 2, the transcript.

3    A.   (Witness complies)

4    Q.   I believe Line 16, and this is Len Davis talking, on the

5    bottom of Page 1.

6    A.   Line 16?

7    Q.   Line 16.

8    A.   "So this shit ain't rolled as smooth as I thought, but --"

9    Q.   That's the line.  "I'm halfway there.  The new part of the

10   detail is done.  That shit completed as far as my people

11   concerned."  What is Len Davis referring to there?

12   A.   Protecting the drugs at the Mardi Gras Truck Stop and the

13   warehouse.

14   Q.   Now, specifically, though, when he says, "The new part of

15   the detail is done," what does he mean by that?

16   A.   He's hired the guys to work at the Mardi Gras Truck Stop.

17   Q.   And who are those guys?

18   A.   Leon Duncan, Darrel Jones, Sidney Dubuclet and -- and

19   Lemmie Rodgers.

20   Q.   And --

21   A.   I mean -- yeah, Lemmie Rodgers.

22   Q.   And when does Len Davis say this?  What date, if you

23   recall?

24   A.   (Witness examines document)  November 15th.

25   Q.   And that would be three days before the actual Mardi Gras

1    Truck Stop scenario, is that correct?

2    A.  Yes.

3    Q.  Now, refer to the next transcript if you would, on Page 2

4    of that transcript.

5    A.  (Witness complies)

6    Q.  Line 19.  And that, in that line Len Davis refers to the

7    "four horsemen," is that correct?

8    A.  Yes.

9    Q.  And what did you understand him -- who are the four

10   horsemen, to your understanding?

11   A.  Leon Duncan, Lemmie Rodgers, Darrel Jones and Sidney

12   Dubuclet.

13   Q.  All right.  And when did Len Davis make that statement?

14   A.  November 16 -- November 16th.

15   Q.  All right.  And that would be two days before the Mardi

16   Gras Truck Stop incident, is that correct?

17   A.  Yes.

18   Q.  If you would refer to SW 6, Tape 2.

19   A.  (Witness complies)

20   Q.  Page 3, at Line 15.  "SD," what does SD stand for on that

21   transcript?

22   A.  S what?

23   Q.  SD.  When it says SD there, who is SD?

24   A.  Sidney Dubuclet.

25   Q.  Okay.  And he says there, after Darrel Jones at Line 14

1    states, "This is your first time rolling on it?"

2        Sidney Dubuclet says, "Yeah, he just called me this

3    morning."

4    A.  Wait.  I'm sorry, sir.  Where are we at?

5    Q.  We're on Page 3 of Tape 2 of SW 6.

6    A.  Oh, Tape 2.

7    Q.  Tape 2, Page 3, Line -- Lines 14 and 15.

8    A.  Okay.

9    Q.  And at Line 14 Darrel Jones says, "This is your first time

10   rolling on it?"

11       At Line 15 Sidney Dubuclet says, "Yeah, he just called me

12   this morning," and the rest is unintelligible.

13       Who is -- who do you understand "he" to be in that

14   sentence, in that statement?

15   A.  Len Davis

16   Q.  Refer, if you would, Mr.Williams, to SW 6, Tape 3, Page

17   8, Line 24.

18   A.  (Witness complies)

19   Q.  Halfway through that line Darrel Jones states, "I'm gonna

20   holler at -- I might have a little thing going on too."  What

21   do you understand Darrel Jones to be saying in that statement?

22   A.  That he might have something illegal happening that he

23   might -- that he want Len to do with him.

24   Q.  And what about that statement, what in that statement

25   leads you to believe that what Darrel Jones is talking about

1    is something illegal?

2    A.  Because we just -- they just -- it's not just a statement,

3    it's just what they finished doing was something illegal that

4    makes me think that.

5    Q.  All right.  Now, if I could have --

6         MR. VOIGHT:  If I could have your technician play the

 7   first part of that (indicating).

 8              MR. WINTERS:  Sure.  Sure.

 9              MR. VOIGHT:  What I'm going to -- I've marked for

10   identification purposes at this time, Your Honor, is Jones

11   Exhibit 2.  This is --

12              MR. WINTERS:  Just tell him where you want it.

13              MR. RIEHLMANN:  This is the tape?

14              MR. VOIGHT:  Can you play that from the beginning,

15   please.

16              And Your Honor, also what I've marked as Jones

17   Exhibit 3, which is a transcript, which I'm going to provide

18   to the Witness, of Tape 1.

19              It's the one you gave me.

20              May I approach the Witness, Your Honor?

21              THE COURT:  Yes.

22   BY MR. VOIGHT:

23   Q.  Could you review that, Mr.Williams, just to familiarize

24   yourself with it.

25   A.  (Witness examines document)  Okay.

                     Williams - Cross

 1   Q.  What is that, Mr.Williams?

 2   A.  It looks like a transcript of one of the tapes.

 3   Q.  All right.

 4              MR. VOIGHT:  Now, I would ask you to just begin that

 5   from the beginning.

 6              (Whereupon, the following excerpt of the audio tape of

 7   Defendant's Exhibit Jones 2, a conversation between LEN DAVIS

 8   DARREL JONES, SIDNEY DUBUCLET and an UNKNOWN MALE, inside a

 9   blue Chevrolet Caprice, dated November 18, 1994, was then

10   played for the jury:)

11      (Mr. Davis is talking on the cellular telephone:)

12          "MR. DAVIS:  Yeah, Sid, there's been a change in

13      plans.  I'm going to be in the car with ya'll.  I got the car

14      right now.  So, you ain't going to need your phone.  I got

15      mine.  Just come.  You got it?  Well, come on downstairs.  All

16      right.  Huh?  Yeah, be dressed.  We ready.  All right.

17      (Mr. Davis answers call waiting:)

18          "MR. DAVIS:  Hello.  Say bro, what -- what the fuck

19      kind of number Darrel gave me, man.  543-3746.

20      (Police radio in background)

21      (Pause)

22          "MR. DAVIS:  What it is, yeah.  Uh-huh. (affirmative

23      response)  4846, all right.

24      (Pause)

25          "MR. DAVIS:  Yeah, Darrel.  Man, what kind of beeper

Williams - Cross

1       number you gave me, bro?  No, man.  I got 543-3746.  Boy, it's

2       a good fucking thing I got in touch with Reynard.  Yeah,

3       nigger, you gave me the wrong fucking thing.  Yeah, well, fuck

4       I know now.  Well, anyway, things gonna be even smoother

5       'cause I am going to be in the car with ya'll now.  I'm in the

6       car right now.  I'm -- I'm -- all right.  I'm about to tell

7       you now.  You ain't got to come way up here.  Meet me at --

8       let me see, I'm on Elysian Fields.  Why don't you meet me at

9       Elysian Fields and Gentilly, by the McDonalds.  You could park

10      your car at McDonalds.  You know where I'm talking about?

11      (Pause)

12          "MR. DAVIS:  On Gentilly?  All right.  Well, meet me

13      there.  Well, leave right now.  All right.

14      (Mr. Davis speaking to an Unidentified Male:)

15          "MR. DAVIS:  You didn't know that was me blowing at

16  you in that white car when I passed with them tinted windows?

17  It's dirty, man.  I ain't washed it in a week.  (Laughter)

18          "UNIDENTIFIED MALE:  (Inaudible)

19          "MR. DAVIS:  What's happening, baby?

20          "UNIDENTIFIED MALE:  (Inaudible)

21          "MR. DAVIS:  It's as dirty as a fuck.

22          "UNIDENTIFIED MALE:  (Inaudible)

23          "MR. DAVIS:  (Laughter)

24      (Pause)

25      (Police radio and music in background)

178

Williams - Cross

1       (Mr. Davis is talking on the cellular telephone:)

2           "MR. DAVIS:  Hello.  You got 'em?  All right.  I'm

3   picking up one of mine now, and going to pick up the other one

4   right down there on Gentilly.  I'll call you when I got both

5   of them.  All right.

6       (Mr. Davis gets off the cellular telephone)"

7                           (Tape stopped)

8   BY MR. VOIGHT:

9   Q.  Who is that speaking?

10  A.  Len Davis.

11  Q.  And who is he speaking to?

12  A.  Me.

13  Q.  Okay.

14                          (Tape restarted)

15      (Police radio and music in background)

16      (Whistling)

17      (Mr. Dubuclet enters the vehicle)

18        "MR. DAVIS:  Now push -- put that fucking seat back.

19  I know you squenched up like a mother fucker.  Let's see if

20  you can fit this one, 'cause if not, you sitting in the car

21  with me and we ain't going to even sweat it.  You ain't got to

22  button this bitch up.  Put this bitch on.

23        "Yeah, what it is, there originally was gonna be

24  ya'll two and my other two people, but --

25        "MR. DUBUCLET:  This yours?

1        "MR. DAVIS:  -- my boy -- huh?

2        "MR. DUBUCLET:  This is yours?

3        "MR. DAVIS:  That's from Sam.  He's the same size as

4  you.  But my boy --

5        "MR. DUBUCLET:  Yeah, that'll fit me.

6        "MR. DAVIS:  My boy want us in the car too, just to

7  insure things.  (Inaudible)

8        "MR. DUBUCLET:  (Inaudible)  What them niggers doing

9  riding around (inaudible).

10        "MR. DAVIS:  What you say?  About the shirt?

11        "MR. DUBUCLET:  I said it fits.  It fits.

12        (Police radio in background)

13        "MR. DAVIS:  Big fucking luxury cars.  I'm thinking

14  these niggers going to get the little fucking --

15        "MR. DUBUCLET:  That's not no bullshit man.

16        "MR. DAVIS:  That's the kind of cars they get when

17  they fucking be renting 'em for themselves.  Bitch can ride

18  the highway good.

19        "MR. DUBUCLET:  So we going to pick up the nigger

20  now?

21       "MR. DAVIS:  All right.  What we going to do, we
22  going to meet Darrel right now.  Put that shit on your side or
23  something, or hold it in your lap or something.  We -- I just
24  want to hear what's going on in the Fifth.  We going to --
25  yeah, Darrel going to meet us by the Texaco in Gentilly where

Williams - Cross

1  his old lady works.  He going to leave his car there.  And he
2  going to just get in the back of this mother fucker.  All they
3  want to do is see three uniforms and then --
4       "MR. DUBUCLET:  And them niggers paying a nigger like
5  that, man?
6       "MR. DAVIS:  Hey, bro, let me tell you something.
7  They paying for a peace of fucking mind, and them niggers
8  gonna get paid.  This ain't no small time shit.  We hooked on
9  to some great shit, ya' dig?  All, we just got to keep playing
10  it smooth.
11       "MR. DUBUCLET:  Yeah.
12       "MR. DAVIS:  And what it is right now, see, this is
13  the other dude coming in with our people.
14       "MR. DUBUCLET:  Uh-huh. (affirmative response)
15       "MR. DAVIS:  This is his thing we going do now, the
16  other dude's shit, all right.  Our shit is in a stationary
17  spot.  After we finish this, then we got to go back to the
18  stationary spot, and follow that out, ya' dig?  But, man,
19  nigger pay righteous, bro.  I'm telling ya'."
20                 (Tape stopped)
21  BY MR. VOIGHT:
22  Q.  Who is Len Davis talking to there?
23  A.  Sidney Dubuclet.
24  Q.  What is he saying to Sidney Dubuclet?

25   A.  He's telling him how the guys, JJ, pay good and he's

Williams - Cross

1   telling him that this deal that we're doing at the Mardi Gras
2   Truck Stop is for his drug dealing partner.
3   Q.  And what does he mean when he says that, "Our shit is in a
4   stationary spot;" what does he mean by that?
5   A.  It's in a --
6   Q.  At Line 16 on Page 3.
7   A.  He's talking about the Mardi Gras -- I mean the warehouse,
8   where it says -- just, yeah.
9   Q.  Okay.  So, he has just explained to Sidney Dubuclet, who
10   has just gotten in the car, your testimony is that he's
11   explaining, he has just explained to Sidney Dubuclet,
12   concerning JJ, the new drug dealer and the old thing, which is
13   the warehouse protection scenario?
14   A.  Yes.
15   Q.  And he has explained that since Sidney's gotten in the
16   car, is that correct?
17   A.  Yes.
18   Q.  Okay.
19                          (Tape restarted)
20          "MR. DUBUCLET:  But that's how you got to do if you
21   want to take care of your (inaudible).
22          "MR. DAVIS:  You fucking right.  See --
23          "MR. DUBUCLET:  That's how them white folks been
24   doing it for years.
25          (Police radio in background)

1      "MR. DAVIS:  -- you got peace of mind, you got the
2   police 'round, you dig?  So, they know they got that peace of
3   mind.  Nobody ain't gonna pull a jack move or nothing 'cause
4   that's what we there for, you dig?  If the people come down,
5   then the people can -- if the people know that that's them,
6   then there ain't nothing we could do anyway, but fucking keep
7   on riding.  But ain't no nigger going to jack 'em.
8      (Pause)
9      "MR. DAVIS:  But, long as it go smooth with you and
10   they see you and everything cool and shit, and they see you in
11   the car and everything, fuck, if I ever need you again, I'm
12   gonna go ahead on and give you a grand."
13                        (Tape stopped)
14   BY MR. VOIGHT:
15   Q.  When Len says to Sidney, "If I ever need you again, I'll
16   go on and give you a grand;" what does he mean by that?
17   A.  If I need you to work it again, I'm going to give you a
18   thousand dollars.
19   Q.  Okay.  What did you all wind up paying Sidney for this, if
20   you know?
21   A.  To my knowledge, a thousand dollars.
22   Q.  All right.
23                        (Tape restarted)
24      "MR. DAVIS:  Ya' dig?  This is a temp thing right
25   now.  Just seeing how it gonna work.  Everything go smooth,

                                              183

1   the pay gonna get better.
2      (Police radio in background)
3         "MR. DUBUCLET:  Niggers say I look like a big fucking

4    policeman anyhow.

5        "MR. DAVIS:  Uh-huh. (affirmative response)  Niggers

6    already -- a lot of the mother fuckers already thought you was

7    the fucking police, and seeing you at Flynn's all the time.

8    So, what the fuck.  Now, you gonna be the police.  I wanted to

9    tell you, you should have brought you some Reeboks.  You don't

10    have no fucking shades, huh?

11        "MR. DUBUCLET:  Uh-uh. (negative response)

12        "MR. DAVIS:  Throw ya' some shades on where a mother

13    fucker can't see your face anyway.

14        "MR. DUBUCLET:  Yeah.  You ain't got no police hat,

15    huh?

16        "MR. DAVIS:  Uh-uh. (negative response)  But I'll

17    tell you what, you see that Texaco where we going?

18        "MR. DUBUCLET:  Uh-huh. (affirmative response)

19        "MR. DAVIS:  They sell shades up in there.  You can

20    go get you a $3 pair --

21        "MR. DUBUCLET:  Yeah.

22        "MR. DAVIS:  -- of shades to put on.  Man, what the

23    fuck.  You can tell white folks been in this mother fucker.

24    That's nothing but white folks.

25        (Changes channel on car radio)

                         Williams - Cross

1        "MR. DUBUCLET:  Nice fucking car though.

2        "MR. DAVIS:  That is for sure.

3        "MR. DUBUCLET:  This looks like a police car too.

4        "MR. DAVIS:  That man go in there and he say, 'Don't

5    give me no small fucking car.'  The nigger say, 'Give me two

6    cars.  I don't give a fuck what you got, give me two.'  Sam

```
 7   and them in a burgundy four door.  Sam gots a Lumina or
 8   something.  I don't know what you call it.
 9          "MR. DUBUCLET:  So, you over the detail, boy?
10          "MR. DAVIS:  Well, the way this shit started, Scaboo,
11   across the canal, Sam stepped to the nigger one day, told the
12   nigger, 'Look, I got information.  People trying to get you,'
13   blah blah blah, 'Take care of me and I'm gonna look out for
14   you.'"
15                          (Tape stopped)
16   BY MR. VOIGHT:
17   Q.  What's Len Davis saying to Sidney Dubuclet there?
18   A.  He's telling him how me and Scaboo first encountered each
19   other and how I agreed to protect him as he delivered his
20   drugs.
21   Q.  So, basically, Len is describing to Sidney the beginning
22   of this whole drug protection conspiracy that you and Len
23   began, is that correct?
24   A.  Yes.
25   Q.  All right.
```

```
 1                          (Tape restarted)
 2          "MR. DAVIS:  So Scaboo start taking care of the
 3   mother fucker.
 4          "MR. DUBUCLET:  All right.
 5          "MR. DAVIS:  So then, --
 6      (Horn honking)
 7          "MR. DAVIS:  Man, what the fuck is you waiting on?
 8   Fuck.
 9          "So the mother fucker start taking care of him.  So,
10   anyway, Scoo said, 'Well, look, I'll pay ya'll a grand for
```

11    every fucking thing I got to drop off, ya'll just follow me.'

12    So, if the nigger got to drop off two of them things, we got

13    two grand.  Drop off five, we got five grand.  Our job was

14    simply to follow 'em.  Look at that nigger right there.  Our

15    job was simply to follow 'em -- follow 'em, and he drops the

16    shit off and, boom, we got our money.  Simple as cake.

17         "MR. DUBUCLET:  And this shit work that simple.  Do

18    ya'll do that?  Nigger, come and give ya'll ya'll money and

19    ya'll roll out, just like that?

20         "MR. DAVIS:  Just like that.  He drop it off, pull

21    back around, give us the fucking money and we go.  So, that's

22    how it started off.  So now, with this thing here, we been

23    dealing with this for about six months.  We have somebody

24    twenty-four, seven, two, three days sitting, watching a

25    location.  Two police just sitting there twenty-four, seven.

1    I got 'em on twelve hour shifts.  They just sit there, all

2    right.  And after the shit is done, and they leave out, we

3    follow it for so far.  We used to have two to follow -- follow

4    one east, follow one west, come back.  It's over.  Just like

5    that.  And we've been doing this for months.  Just that

6    fucking simple.  Just that simple.  And I'll tell you what, as

7    long as they never get a mother fucker, an inside CI with

8    us, -- "

9                        (Tape stopped)

10   BY MR. VOIGHT:

11   Q.  What does Len mean by "inside CI"?

12   A.  A confidential informant.

13   Q.  And why is he concerned about that?

14    A.  Because we'll get busted.  We'll go to jail.

15                          (Tape restarted)

16           "MR. DAVIS:  -- CI with us, --

17           "MR. DUBUCLET:  Uh-huh. (affirmative response)

18           "MR. DAVIS:  -- we could never get in trouble, 'cause

19    we not doing nothing.  All we doing is sitting there.  We not

20    in the building with it.  We not nothing.  We just sitting

21    there.

22           "MR. DUBUCLET:  Right.  Ya'll don't even know what's

23    in there.

24           "MR. DAVIS:  We looking at Tastee Donuts, like this

25    is the car, we just looking at Tastee Donuts.  That's it.


                                              187
                          Williams - Cross

1            "MR. DUBUCLET:  You don't even know what's in there.

2            "MR. DAVIS:  Fuck no.  We don't know and I ain't

3     trying to know.

4            "MR. DUBUCLET:  Ya'lls job is to watch the building.

5     Not the, you know, the contents.

6            "MR. DAVIS:  That's it.  And guess what?  The

7     business is a hundred percent legit.  It's in the yellow pages

8     and everything.  Everything is legit.  The nigger got a

9     million dollars insurance on it though.  White man made him

10    put up a million to show he was legit.

11    (Police radio in background)

12           "MR. DUBUCLET:  This a NewOrleans nigger that

13    strong, boy?

14           "MR. DAVIS:  Uh-uh. (negative response)  New York.

15           "MR. DUBUCLET:  The nigger just live in NewOrleans?

16           "MR. DAVIS:  No, the nigger just know Scoobie and he

17    come through NewOrleans.  See, NewOrleans is nothing but a
                          Page 166

18  fucking stop.  And what it is, they move from one location to
19  another.  Now, why it has to sit here two, three days before
20  it go again, I guess -- I don't even know why.  I don't even
21  go into them questions.
22          "MR. DUBUCLET:  Uh-huh. (affirmative response)
23          "MR. DAVIS:  But I'm assuming it's because they
24  dealing with the same drivers and they got to wait 'til they
25  finish making a run wherever and then come back to get this.

188
Williams - Cross

1   The niggers got the shit -- we helped the niggers tighten up
2   the shit even smoother, with putting the fucking logos on side
3   of the trucks.  Everything legit.
4           "MR. DUBUCLET:  Uh-huh. (affirmative response)
5       (Pause)
6       (Police radio and music in background)
7           "MR. DAVIS:  Basically, what we do is keep our eyes
8   peeled for anything that might look suspicious, like a mother
9   fucking white boy sitting off over there parked in a car, or a
10  nigger sitting, just sitting there, tinted windows, you
11  dig?"
12                          (Tape stopped)
13  BY MR. VOIGHT:
14  Q.  What is Len telling Sidney Dubuclet there, where he says,
15  "Basically, what we do is keep our eyes peeled for anything
16  that;" what's he --
17  A.  Now he's telling him about the protection for ourselves,
18  that we look out for police officers that might be working
19  undercover, a sting, trying to get us.
20                          (Tape restarted)

Page 167

21          "MR. DAVIS:  Just keep your eyes looking for that

22    kind of shit there.  And that's all we do.  When you start

23    slipping and relaxing, thinking, 'Oh, man, this is a piece of

24    cake, every trip we got is going smooth,' fuck, that's when

25    the shit fall around.


189

Williams - Cross

1          "MR. DUBUCLET:  Yeah.  It what generally happen any

2    mother fucking time with that much dope.

3          "MR. DAVIS:  We keep our fucking eyes peeled.  Fuck,

4    we know this shit ain't going to last forever.  Sooner or

5    later, something gonna happen.  Either it's going to happen

6    where they going to get them somewhere else, or whatever.  Or

7    -- or we just going to say, 'Fuck it, bro,' and just, this

8    shit done went long enough.  You cold?

9          "MR. DUBUCLET:  (Inaudible)

10          "MR. DAVIS:  (Inaudible)  So, that's it.

11          "MR. DUBUCLET:  Uh-huh. (affirmative response)

12       (Police radio and music in background)

13          "MR. DAVIS:  Look at Troy.

14          "MR. DUBUCLET:  Who's Troy?

15          "MR. DAVIS:  Dude I went to school with.  I think

16    that's him behind them glasses.  I can't really tell.  Nigger

17    I went to Lawless with, across the canal.  Bro, you want to go

18    get, when we stop, get you a little pair of shades like that,

19    throw them bitches on.  That way a mother fucker don't get to

20    see your facial features.  Scoo live down here.  well, you

21    might bump heads with Scoo in a restaurant or any fucking

22    place where you be hanging, 'cause we don't want the nigger to

23    get a good look at you and know you're not Five-O.

24          "One time we caught ourselves using Greg, and we let

25    Greg go out there in his fucking -- with his fucking tow wagon

                        Williams - Cross
 1    driver uniform.  And the nigger said, 'Man, that wasn't no
 2    police out there.'"
 3                         (Tape stopped)
 4    BY MR. VOIGHT:
 5    Q.  Who is the "Greg" Len is referring to there?
 6    A.  Gregory Boldan.
 7    Q.  And he was the tow truck operator?
 8    A.  Yes.
 9    Q.  All right.
10                         (Tape restarted)
11            "MR. DUBUCLET:  Oh, so all the niggers be around?
12            "MR. DAVIS:  Who?
13            "MR. DUBUCLET:  All the niggers that --
14            "MR. DAVIS:  No, they don't stop and talk to nobody.
15    They pass through and when they pass, they look at the vehicle
16    parked at that location.  They look in there and see the
17    uniforms.
18            "MR. DUBUCLET:  Uh-huh. (affirmative response)
19            "MR. DAVIS:  Oh, them niggers be checking.  They
20    ain't no fools, bro.  They not going to be paying for two
21    people and they got one sitting outside.  Ya' dig?  They pay
22    for each separate police we have.
23            "MR. DUBUCLET:  Uh-huh. (affirmative response)
24        (Police radio and music in background)
25            "MR. DAVIS:  Go get you a pair of shades in there.

1        "MR. DUBUCLET:  I ain't have no money on me, bro.

2        "MR. DAVIS:  You ain't have no money?

3        "MR. DUBUCLET:  No.  This where your boy supposed to

4    meet us at too?

5        "MR. DAVIS:  Uh-huh. (affirmative response)

6    (Mr. Dubuclet exits the car)

7    (Car door closes)

8    (Music playing in background)

9    (Pause)

10   (Car door opens)

11   (Mr. Dubuclet gets back into the car)

12       "MR. DAVIS:  That's it, yeah.  Go ahead and shirt up.

13       "MR. DUBUCLET:  Where's Darrel?  I don't see any

14   mother fuckers here though.

15       "MR. DAVIS:  That's probably his old lady that waited

16   on you.

17       "MR. DUBUCLET:  Damn Sam."

18                        (Tape stopped)

19   BY MR. VOIGHT:

20   Q.  What is Sidney Dubuclet doing there?

21   A.  Putting on a police shirt.

22   Q.  Now, --

23   A.  Trying to put it on him.  Trying to put on a police shirt.

24   Q.  And that's your shirt, correct?

25   A.  Yes.

1    Q.  All right.  Did Sidney have a gun on him at the time?

2    A.  I don't know.

3    Q.  Okay.

4                    (Tape restarted)

5           (Police radio in background)

6              "MR. DAVIS:  Damn, man.  You a big ole' nigger.  You

7     ain't got to worry about if the bitch gonna be too tight to

8     button.

9              "MR. DUBUCLET:  (Inaudible)

10             "MR. DAVIS:  Put that bitch on and let it hang like

11    that.  Let it out.  Oh, fuck.

12             "MR. DUBUCLET:  What's the matter?

13             "MR. DAVIS:  I forgot the -- well, you ain't gonna

14    need it.  I forgot the fucking badge in my car.  We ain't

15    gonna need it though.  The nigger ain't gonna be spotting all

16    that.  Nigger gonna be looking for that shirt color and these

17    patches.  Let all them mother fuckers see you now.  Uniform,

18    shirt and the shades.  They don't know a fucking thing else.

19         (Pause)

20         (Police radio in background)

21         (Irrelevant conversation)

22             "MR. DAVIS:  I wish this dude would come on.  Fuck.

23    He should have been here.  He's coming from right around

24    Crowder.  I ain't going to be fucking with Reynard and these

25    niggers no more, bro.  They don't have their shit together."


                                        193
                       Williams - Cross

1                    (Tape stopped)

2     BY MR. VOIGHT:

3     Q.  What did Len mean when he said, "It was supposed to be,

4     yeah, it was supposed to be Reynard"?

5     A.  The four horsemen were originally supposed to be all

6     police officers; Lemmie Rodgers, Leon Duncan, Reynard Smith

7    and I believe the other one was Noonie.  But they didn't give

8    Len a answer right then, they kept putting him off and stuff

9    like that, so Len changed his mind about hiring Reynard Smith

10   and Noonie, for whatever reasons, or they declined it,

11   something like that.  They didn't get it straight.  So, Len

12   decided he wasn't going to deal with that.  And that's how

13   Sidney Dubuclet and Darrel Jones became the horsemen.

14   Q.  On November 16, when Len is referring to the four

15   horsemen, who is he referring to?

16   A.  He was referring to the guys that was going to work the

17   Mardi Gras Truck Stop.

18   Q.  And was that --

19   A.  In particular, --

20   Q.  Does that include Reynard Smith?

21   A.  Well, it depends on at what point.  It may have been

22   Reynard Smith at that time, but when -- Reynard Smith and

23   Sidney Robinson at that time, but it later became Darrel Jones

24   and Sidney Dubuclet.

25   Q.  So, when you testified earlier that the four horsemen

                        Williams - Cross

1    referred to Lemmie Rodgers, Leon Duncan, Sidney Dubuclet and

2    Darrel Jones, would you like to qualify that?

3    A.  (No response)

4    Q.  Or do you still stand by that?

5    A.  No, I still stand.  They are the four horsemen that worked

6    at the Mardi Gras Truck Stop.  They just happened to have

7    changed.

8    Q.  And you don't know when Len Davis contacted Darrel Jones,

9    do you?

10   A.  No.

11    Q.  You didn't contact Darrel Jones, did you?

12    A.  No.

13    Q.  You didn't know Darrel Jones, did you?

14    A.  No.

15    Q.  Now, this isn't the first time you've heard this tape, is

16    it?

17    A.  No, I believe I heard -- heard this before.

18    Q.  And where were you when you heard this the first time?

19    A.  Probably where I am now, I mean, in prison.

20    Q.  All right.  And were you alone or were there people with

21    you?

22    A.  Al Winters and Mike McMahon and Stan Hadden were there.

23    Q.  All right.  Were you provided a transcript of this

24    recording, as well, to review at that time?

25    A.  I don't think so.  I'm not sure.


                                                        195
                        Williams - Cross

1    Q.  All right.

2                        (Tape restarted)

3            "MR. DUBUCLET:  (Inaudible) beyond the issue on this

4    mother fucker.

5            "MR. DAVIS:  And it was supposed to be -- yeah.  It

6    was supposed to be Reynard and the other nigger, ya' dig?  And

7    these mother fuckers with all them.  Fuck, and I'm beeping

8    this nigger all yesterday.  He don't call back.  Talking about

9    he got the beeper off, knowing I'm gonna be calling him for

10   business.  'Man, you don't do no business like that, bro,' I

11   told him.

12       (Police radio in background)

13       (Cellular telephone ringing)

14          "MR. DAVIS:  That's probably them asking me where the

15  fuck I'm at.

16      (Mr. Davis is talking on the cellular telephone:)

17          "MR. DAVIS:  Hello.  Yeah.  I'm on -- I'm on -- I'm

18  right here fucking by Elysian Fields and Gentilly.

19          "MR. DUBUCLET:  Tell him by the Texaco.

20          "MR. DAVIS:  (talking on cellular telephone)  Yeah.

21  We about to head -- yeah.  We coming down that way now.  All

22  right.

23      (Mr. Davis gets off the cellular telephone)

24          "MR. DAVIS:  That was Jay.  That wasn't even your

25  fucking boy, man.  I thought that was Sam.  That's Jay asking


                                            196
                    Williams - Cross

 1  where the fuck I'm at.

 2          "MR. DUBUCLET:  The dude you working for?

 3          "MR. DAVIS:  Uh-huh. (affirmative response)  I'm

 4  about to leave Darrel.  That's all there is to it.  He's --

 5  he's about to get left like a mother fucker.

 6          "MR. DUBUCLET:  (Unintelligible)

 7          "MR. DAVIS:  That's exactly what I'm talking about,

 8  bro.  These dudes want shit to run smooth, man.  They ain't

 9  got time for that bullshit.  It's gonna be me and you on this.

10  Look at the nigger there.

11          "Darrel, hurry up, bro.  We gotta go.

12      (The car door opens, Darrel Jones enters the car)

13          "MR. DAVIS:  I was just talking about your ass.

14  Throw that shirt on."

15                          (Tape stopped)

16  BY MR. VOIGHT:

17  Q.  Now, you testified yesterday that you recognized that
                        Page 174

18    voice as Darrel Jones, is that correct?

19    A.  I said that was Darrel Jones.

20    Q.  And how did you know that was Darrel Jones?

21    A.  Because it says "Darrel Jones" right here.

22    Q.  So, you're relying on the transcript to know if that was

23    Darrel Jones?

24    A.  Well, no.  Len is calling him.  I'm relying on the tapes.

25    Q.  All right.  You don't know what Darrel Jones' voice sounds

1    like though, do you?

2    A.  No.  The only time -- well, prior to this happening, I

3    never met Darrel Jones.

4    Q.  All right.

5    A.  So, if you just played his voice independently, I probably

6    wouldn't recognize it.

7    Q.  You, prior to this, you had never met Darrel Jones --

8         MR. VOIGHT:  I'm done with that.  You can turn that

9    off if you'd like.

10         THE TECHNICIAN:  You're done?

11         MR. VOIGHT:  Yes.

12    BY MR. VOIGHT:

13    Q.  You had never met Darrel Jones but yet you can tell this

14    jury what the meaning of what Darrel Jones said was, is that

15    correct?

16    A.  Yes.  I am a co-conspirator in this whole thing so I know

17    what we're talking about and I know the type slang these --

18    that's used in criminal activity among police officer and drug

19    dealers.

20    Q.  Now, during this entire Mardi Gras Truck Stop scenario,

21  you never talked to Darrel Jones during that time, did you?

22  A.  No.

23  Q.  You were never present when Darrel Jones said anything

24  that's contained on these tapes or transcripts, is that

25  correct?

Williams - Cross

1  A.  That's correct.

2  Q.  As a matter of fact, you testified earlier that there came

3  a time later on that day, on, I'm saying November 18th, --

4  A.  Uh-huh. (affirmative response)

5  Q.  -- where Len and Darrel met, is that correct?

6  A.  Yes.

7  Q.  You didn't get out of the car, did you?

8  A.  No, I didn't.

9  Q.  You didn't talk to Darrel Jones at that time, did you?

10  A.  No.

11  Q.  You don't know what, if anything, Darrel may have said to

12  Len, do you?

13  A.  No.

14  Q.  And you don't know what, if anything, Len said to Darrel,

15  do you?

16  A.  No.

17  Q.  What did you see when you were out there?

18  A.  I saw Len hand Darrel Jones some money.

19  Q.  And how much money was that?

20  A.  I couldn't tell exactly how much it was.

21  Q.  And where were you when you saw this?

22  A.  Inside the police vehicle.

23  Q.  And where was Darrel Jones?

24  A.  Inside his car.

25    Q.  And how far away were you from Darrel at the time?

1    A.  I was almost right behind him.

2    Q.  But he was in his car and you were in your car?

3    A.  Yes.

4    Q.  And this is in November, on the 18th.  What time of day

5    was it, do you recall?

6    A.  Daytime.

7    Q.  Daytime is a fairly broad period of time.  Was it morning,

8    evening, noon, night?

9    A.  Evening.

10   Q.  All right.

11           MR. VOIGHT:  One moment, Your Honor.

12           THE COURT:  All right.

13       (There is a pause in the proceedings)

14           MR. VOIGHT:  I have nothing further of this witness,

15   Your Honor.

16           THE COURT:  Mr. Winters.

17           MR. WINTERS:  It will be about ten or twelve

18   questions, Your Honor.

19           THE COURT:  Okay.

20                       *   *   *   *   *

21                       REDIRECT EXAMINATION

22   BY MR. WINTERS:

23   Q.  Mr.Davis, do you remember earlier --

24   A.  It's Williams.

25   Q.  -- in your cross-examination by Mr. Riehlmann, he was

1  talking about a situation or an event that occurred with Kim

2  -- with the lady, Kim Groves, and you and Len Davis in a

3  police car?

4  A.  Yes.

5  Q.  And you remember he referenced a conversation, something

6  about, I think he said, "We could get P to do that ho now and

7  handle the 30;" do you remember that?

8  A.  Yes, I remember him saying that.

9    (There is a pause in the proceedings)

10  BY MR. WINTERS:

11  Q.  I'm going to show you now what I've marked as SW 15, which

12  is a transcript of that conversation that was introduced at

13  the murder trial of Kim Groves.  And I ask for you to read

14  what Len Davis said at that time.

15  A.  "Len Davis said, I could get P to come do that ho now, and

16  then we could handle the 30."

17  Q.  He didn't say "we" he said "I", meaning Len Davis?

18      MR. RIEHLMANN:  Judge, I'm going to object to

19  Mr.Winters testifying here.  And I don't know that

20  Mr.Williams is talking about the same conversation, so I --

21      THE COURT:  Well, you just saw the document.  He's

22  questioning him on the document.

23      MR. RIEHLMANN:  But he's leading.

24      THE COURT:  All right.  Please avoid the leading

25  questions.

1  BY MR. WINTERS:

2  Q.  All right, Mr.Williams, have you ever heard, or are there

3  in existence, to your knowledge, any tapes with you planning

4    or giving advice to Len Davis, Paul Hardy, or anyone else on

5    the murder of Kim Groves?

6    A.  No, I haven't heard any tapes like that and there is a

7    reason for that, and the reason is because there are any tapes

8    -- aren't any tapes like that.  I didn't participate in

9    planning Kim Groves' murder.

10   Q.  How many trials have you testified in?

11   A.  Two others.  This will be the third one.

12   Q.  All right.  What was the first trial you testified in?

13   A.  In Kim Groves' murder trial.

14   Q.  And then you testified in the drug trial?

15   A.  Yes.

16   Q.  And then this trial?

17   A.  That's correct.

18   Q.  And before every trial were you prepared to testify?

19   A.  Yes.

20   Q.  By Government prosecutors?

21   A.  Yes.

22   Q.  Now, before the murder trial, were you played tapes?

23   A.  Yes.

24   Q.  And what tapes were you played?

25   A.  Tapes concerning the murder.

                                                          202
                    Williams - Redirect

1    Q.  You weren't played tapes concerning the Mardi Gras Truck

2    Stop, were you?

3              MR. RIEHLMANN:  Judge, again, I'm going to object.

4    He's leading his Witness.

5    BY MR. WINTERS:

6    Q.  Were you played --

```
 7              THE COURT:  No, no.  It's overruled.
 8    BY MR. WINTERS:
 9    Q.  -- tapes concerning the Mardi Gras Truck Stop?
10    A.  No.
11    Q.  Were you played tapes concerning the warehouse?
12    A.  No.
13    Q.  When you were prepared, about a month ago, when me and
14    Mr.McMahon traveled away to see you, what tapes did we play
15    for you?
16    A.  Tapes concerning this case.
17    Q.  Not concerning the warehouse?
18    A.  No.
19    Q.  Not concerning the murder?
20    A.  No.
21    Q.  Now, you testified both in direct and cross about this
22    individual named Charles Boutin?
23    A.  Yes.
24    Q.  Len Davis was protecting him?
25    A.  Yes.
```

                    Williams - Redirect

```
 1    Q.  And who was giving Len Davis information to protect
 2    Boutin's drug trafficking?
 3    A.  Leon Duncan.
 4    Q.  And how do you know that?
 5    A.  Len Davis told me and Leon said it in front of me,
 6    himself.
 7    Q.  Now, Lemmie Rodgers; was he giving him information -- was
 8    he giving information to protect Boutin?
 9    A.  According to Len, yes, he was.
10    Q.  Did you ever talk directly to Lemmie Rodgers?
```

11    A.  No.

12    Q.  Do you know Sidney Dubuclet?

13    A.  Yes.

14    Q.  And you know his voice?

15    A.  Yes, I have talked to Sidney a couple of times.

16    Q.  And the only other person in the car with Sidney Dubuclet

17    was Len Davis and who?

18    A.  Darrel Jones.

19    Q.  And that's how you ID'd the voices?

20    A.  Yes.

21    Q.  Do you get paid in prison?

22    A.  No.

23    Q.  You don't get any salary at all?  Do you work in prison?

24    A.  Oh, yeah.  We work and we get some, whatever salary,

25    enough for us to buy over commissary.


                                                            204
                        Williams - Redirect

1     Q.  How much is that an hour?

2     A.  I believe it's twelve cent an hour, something like that.

3     Q.  Twelve cents an hour, that's what you get?

4     A.  Well, it varies.  It goes up to like to twelve to maybe

5     twenty cent, you know.

6     Q.  Now, not to belabor these tapes any further, but I just

7     have to refer you to two.  I'd ask you and the jury to turn to

8     -- and I'm not going to play it, Sammie Williams 6, Tape 3,

9     Page 24.  Excuse me, Page 8, Line 24.

10    A.  (Witness complies)

11    Q.  Are you there, Mr.Williams?

12    A.  Tape 3?

13    Q.  Yes, Tape 3.  SW 6, Tape 3, Page 8, Line 24.

14    A.  Okay, I got it.

15    Q.  Are you there?

16    A.  Yes.

17    Q.  Do you recall Mr. Voight asked you a question concerning

18    this particular phrase and what Darrel Jones said, "I'm gonna

19    holler at -- I might have a little thing going on too," all

20    right.  He left out the first sentence, am I correct, when he

21    questioned you?

22    A.  Yes.

23    Q.  Now, what did you say you believed "have a little thing

24    going on, too" meant?

25    A.  It meant that Darrel Jones wanted Len Davis to come in on

                    Williams - Redirect

1    some illegal activity that Darrel was going to be doing.

2    Q.  And did you also, in giving your answer, think about the

3    first part, what he left out, "I'm gonna get Zoo to holler at

4    you"?

5    A.  Yes.

6    Q.  Who is Zoo?

7    A.  Reynard Smith.

8    Q.  And was Zoo corrupt?

9    A.  Yes.

10    Q.  Is Zoo in jail?

11    A.  Yes.

12    Q.  Was Zoo involved in drug activity?

13    A.  Yes.

14    Q.  I'm going to ask you now to take a look at SW 6, Tape 2,

15    Page 4, excuse me, and Line 18, which is what Darrel Jones was

16    saying.  And would you read, starting with "D" what Mr. Jones

17    said.

18    A.  (Reading)  "The mother fucker ain't looking for no badge,
19    they --"
20          MR. VOIGHT:  I would object, Your Honor.  At this
21    time I believe that's beyond the scope of cross-examination.
22          THE COURT:  I'm not so sure of that.
23          What's your response, Mr. Winters, to the objection?
24          MR. WINTERS:  Yes, sir, Your Honor.  He was asking
25    how did he know he carried a gun, and that's all I'm trying to

                        Williams - Redirect
1    redirect him on.
2          THE COURT:  Objection overruled.
3          MR. VOIGHT:  Thank you, Your Honor.
4    BY MR. WINTERS:
5    Q.  Go ahead.
6    A.  It reads, (Reading)  "The mother fucker ain't looking for
7    no badge, they looking for the gun."
8    Q.  But who is saying that?
9    A.  Darrel Jones.
10    Q.  Did that indicate Darrel Jones had a gun to you?
11    A.  Yes.
12    Q.  Also, look at, on the same page, Line 11 what Darrel Jones
13    said and read that.
14    A.  Line 11 reads:  (Reading)  "I brought radio, gun, every
15    mother fucking thing.  What's happening with you?"
16    Q.  Thank you.  Did Darrel Jones know he was guarding cocaine?
17    A.  Yes.
18    Q.  Did Gregory Boldan, in your vernacular, was he down also,
19    when you all used him at that warehouse?
20    A.  Yes, he was involved in criminal activities.
                        Page 183

21  Q. Would you all have used anybody to guard cocaine that

22  wasn't down?

23  A. No way.

24  Q. Let me just ask you two more questions.  Who is going to

25  sentence you when you get sentenced?

Williams - Redirect

1   A. Judge Feldman.

2   Q. And the maximum sentence is what?

3   A. Life in prison.

4   Q. And do you have any agreement with Judge Feldman or with

5   the Government as to what your sentence is going to be?

6   A. None at all.

7   Q. He can give you life?

8   A. Yes, he can.

9   Q. Life plus five years?

10  A. Yes.

11  Q. Now, this 5K that Mr. Voight talked about, the Government

12  can file a 5K, right?

13  A. Yes.

14  Q. Who's got to grant the 5K?

15  A. The judge.

16  Q. The Government doesn't grant it, do they?

17  A. No.

18  Q. The judge can tell the Government, "I'm not granting it"?

19  A. That's correct.

20          MR. WINTERS:  Nothing further.

21          THE COURT:  Thank you.  You may step down.

22                  (The Witness is excused)

23          THE COURT:  And we'll take a brief recess and pick up

24  again.

25          (Jury out at 2:45 p.m.)

                    Williams - Redirect
 1                      *    *    *    *    *

 2          (Recess at 2:45 p.m., until 3:00 p.m.)

 3                      *    *    *    *    *

 4          (Jury in at 3:00 p.m.)

 5               THE CLERK:  Court is back in session.

 6               THE COURT:  Please be seated.

 7               MR. VOIGHT:  Your Honor, briefly, some housekeeping.

 8     At this time I would offer, file and introduce Jones 2, the

 9     compact disc containing the tape recording that we played

10     during Mr.Williams' cross-examination and Jones 3, a

11     transcript of that tape.

12               THE COURT:  And there being no objection, I take it.

13               MR. WINTERS:  No objection.

14               THE COURT:  They will be received.

15               THE CLERK:  SW 15 was never admitted.

16               MR. MCMAHON:  It's going to -- I'm going to do that

17     right now.

18               THE COURT:  Go ahead, Mr. McMahon.

19               MR. MCMAHON:  Your Honor, in connection with the

20     testimony of Sammie Williams, the Government would offer, file

21     and introduce into evidence SW 15, a copy of the transcript

22     from the murder trial of Len --

23               THE COURT:  Again, no objection, it's received.

24               MR. MCMAHON:  And additionally, Your Honor,

25     photographs referred to during that testimony, specifically

Rodgers - Direct

```
 1   "P" for Photo 3, a photograph of the Avis Rental Car place on
 2   Canal Street, and P-6, which is a photograph of Leon Duncan's
 3   home.
 4            THE COURT:  And no objection; received.
 5            MR. McMAHON:  We call Lemmie Rodgers.
 6                    *   *   *   *   *
 7            LEMMIE RODGERS, GOVERNMENT'S WITNESS, SWORN
 8                     DIRECT EXAMINATION
 9   BY MR. McMAHON:
10   Q.  Mr.Rodgers, how old are you, sir?
11   A.  Thirty-six.
12   Q.  Are you from NewOrleans, born and raised?
13   A.  Yes.
14   Q.  Do you have a job now?
15   A.  Yes.
16   Q.  For whom do you work?
17   A.  James Kinney, contractor.
18   Q.  What kind of work does James Kinney do?
19   A.  It's a contracting company.
20   Q.  And how long have you been working for that company?
21   A.  Five months.
22   Q.  What do you do there?
23   A.  I'm a driver.
24   Q.  Did you have a job before James Kinney?
25   A.  Yes.
```

Rodgers - Direct

```
 1   Q.  Doing what?
 2   A.  I was a over the road truck driver.
 3   Q.  Eighteen wheelers?
```

4     A.  Yes.

5     Q.  And how long were you a truck driver?

6     A.  Two and a half years.

7     Q.  Have you ever worked for the NewOrleans Police

8     Department?

9     A.  Yes.

10    Q.  How long have you been -- how long had you been a

11    NewOrleans police officer?

12    A.  A little over seven years.

13    Q.  Summarize briefly for the jury the assignments you had

14    during your police career?

15    A.  I was a patrolman.  I worked in Headquarters, General

16    Assignment.  I worked Robbery, some Burglary, some Vice,

17    Narcotics.

18    Q.  Were those Robbery, Burglary, Vice and Narcotics; were you

19    assigned to those divisions separately or was that part of

20    another assignment?

21    A.  That was part of another assignment, General Assignment

22    was where I was assigned to.

23    Q.  And just very briefly for the jury, that's kind of a term

24    of art; what does "General Assignment" mean?

25    A.  We basically, we're assigned different -- different cases

                                                        211
                          Rodgers - Direct

1     by the Bureau Chief.

2     Q.  This was detective work?

3     A.  Yes.

4     Q.  Where were you stationed at your last police assignment?

5     A.  The Sixth District.

6     Q.  Tell the jury where the Sixth Police District is in

 7    NewOrleans.

 8    A.  It's on Felicity Street.  It's uptown.

 9    Q.  Were you a detective there or a patrolman?

10    A.  Patrolman.

11    Q.  Why did you leave the Police Department?

12    A.  Because of my involvement in the drug conspiracy.

13    Q.  Did you quit or were you fired?

14    A.  I quit.

15    Q.  Were you a corrupt cop?

16    A.  Yes.

17    Q.  Did you ever accept money, illegal money?

18    A.  Yes.

19    Q.  How much money, total, about, have you accepted?

20    A.  A couple thousand.

21    Q.  Who gave it to you?

22    A.  Leon Duncan.

23    Q.  How many times did he give it to you?

24    A.  At least twice.

25    Q.  Where did the money come from, do you know?

Rodgers - Direct

 1    A.  I believe it came from Narcotics cases.

 2    Q.  Explain that.  Elaborate on that.

 3    A.  Upon executing a warrant, at times, all monies wasn't

 4    turned in.

 5    Q.  Now, you --

 6    A.  And placed on the property books.

 7    Q.  Okay, that was my next question.

 8    A.  Yeah.

 9    Q.  By "turned in" you mean what?

10    A.  Placed on the -- on property books at Police Headquarters.

11    Q.   What happened to it?

12    A.   It had been taken.

13    Q.   For what?

14    A.   Just -- it was theft, just taken, kept.  It had not been

15    turned in, or partially been turned in.

16    Q.   Have you been indicted, Mr.Rodgers, for any federal

17    crime?

18    A.   No -- yes.

19    Q.   For what were you indicted?

20    A.   Conspiracy to possess an excess of five kilos of cocaine.

21    Q.   What were the statutory penalties, what penalties did you

22    face under the law for that conspiracy?

23    A.   A minimum ten years, maximum life.

24    Q.   Did you plead guilty to that charge?

25    A.   No.

213

Rodgers - Direct

1    Q.   Have you pleaded guilty to any federal criminal charges?

2    A.   Yes.

3    Q.   How many?

4    A.   Two.

5    Q.   What were those two charges?

6    A.   Misprision of a felony and one phone count.

7    Q.   Tell the jury what misprision of a felony means.

8    A.   Having knowledge of a felony and not reporting it.

9    Q.   And tell the jury what "phone count" means.

10    A.   Using the phone, doing these -- in the occurrence of this

11    crime.

12    Q.   What is the penalty for the misprision?

13    A.   Three years.

14   Q.  What's the penalty for using the phone during the drug

15   crime?

16   A.  Four years.

17   Q.  So, what's the maximum total time you face for pleading

18   guilty to those two offenses?

19   A.  Seven years.

20   Q.  Did you plead guilty to those two crimes, Mr. Rodgers, as

21   a result of an agreement between you and the United States,

22   represented by me and Mr. Winters?

23   A.  Yes.

24   Q.  Were you represented by an attorney in connection with

25   your guilty plea?

Rodgers - Direct

1   A.  Yes.

2   Q.  And did he counsel with you and advise you in entering the

3   guilty plea to those two charges?

4   A.  Yes.

5   Q.  Were the terms of that agreement reduced to writing?

6   A.  Yes.

7   Q.  Did you read it and go over it with your lawyer?

8   A.  Yes.

9   Q.  Did you sign it?

10   A.  Yes.

11   Q.  Did he sign it?

12   A.  Yes.

13        MR. MCMAHON:  I'm going to show you what has been

14   marked, Your Honor, as LR-4.

15        MR. RIEHLMANN:  Judge, I've never seen this document.

16        THE COURT:  You haven't seen it?  Well, it's in the

17   record.

18        MR. WINTERS:  We sent them to him.  They're in the

19    record anyway.  Public record.

20        (There is a pause in the proceedings)

21    BY MR. McMAHON:

22    Q.  Here (indicating).

23    A.  (Witness examines document)

24    Q.  Mr.Rodgers, what is LR-4?

25    A.  Lemmie Rodgers.

Rodgers - Direct

1    Q.  What is that document?

2    A.  It's my plea agreement.

3    Q.  Have you reviewed that before?

4    A.  Yes.

5    Q.  And is that a certified copy of the same original letter

6    that you signed and we filed into the record before Judge

7    Livaudais?

8    A.  Yes.

9        MR. McMAHON:  Your Honor, at this time I would offer

10    into evidence LR-4.

11        THE COURT:  With there being no objection, it's

12    received.

13        MR. McMAHON:  And it's actually part of the record

14    anyway, so.

15        THE COURT:  I know.

16        MR. McMAHON:  All right.

17    BY MR. McMAHON:

18    Q.  Mr.Rodgers, as far as your end of the bargain, your end

19    of the agreement, what did you agree to do?  What did you

20    understand your part of the agreement to be?

21  A.  Testify to my involvement in this conspiracy truthfully,

22  and also to agree to testify in any further investigations

23  that I was involved in or that I had knowledge of.

24  Q.  What did you understand the Government's obligation under

25  this agreement?

Rodgers - Direct

1  A.  It was to consider asking the judge to dismiss the

2  original indictment, conspiracy indictment, against me.

3  Q.  And when would that occur?

4  A.  At the time of sentencing.

5  Q.  Okay.

6  A.  And also --

7  Q.  Anything else?

8  A.  Yes.  And also, allow me to plead guilty to the misprision

9  and the phone count.  And also, at the time of sentencing,

10  consider asking for a reduction in my sentencing.

11  Q.  Mr.Rodgers, have you been promised anything in regard to

12  the sentence that you may receive from Judge Livaudais?

13  A.  No.

14  Q.  Have you been sentenced yet?

15  A.  No.

16  Q.  Do you know anybody named Len Davis?

17  A.  Yes.

18  Q.  How do you know him?

19  A.  Well, from the Police Department.

20  Q.  And how long have you known Davis?

21  A.  Well, probably about seven years.

22  Q.  Was he a friend of yours?

23  A.  Yes.

24  Q.  Do you know Leon Duncan?

25    A.  Yes.

Rodgers - Direct

1    Q.  How long have you known Leon Duncan?

2    A.  About the same amount of time, seven years, maybe eight

3    years.

4    Q.  You met him on the job?

5    A.  Yes.

6    Q.  Could you point him out for the record?

7    A.  He's seated to my right, a light colored shirt

8    (indicating).

9         MR. McMAHON:  Your Honor, let the record reflect that

10    he has identified Leon Duncan.

11        THE COURT:  Let the record so reflect.

12    BY MR. McMAHON:

13    Q.  Was Leon Duncan a friend of yours?

14    A.  Yes.

15    Q.  Did you socialize with him?

16    A.  Yes.

17    Q.  You've been to his house?

18    A.  Yes.

19    Q.  Has he been to yours?

20    A.  Yes.

21    Q.  Did you work with him when you were in General Assignment?

22    A.  On occasions, yes.

23    Q.  Explain that.

24    A.  We worked some Narcotics in General Assignment when he was

25    assigned to Narcotics.

1  Q.  Okay.  I think you have to get your voice up a little bit.

2  A.  Okay.

3  Q.  I think maybe it may be a little bit difficult for some

4  people to hear.

5      Was Leon Duncan in General Assignment?

6  A.  No, he was in Narcotics.

7  Q.  Did you work together on cases?

8  A.  Yes.

9  Q.  During your last assignment in the Sixth District, did you

10  ever run into Leon Duncan on the job?

11  A.  Yes.

12  Q.  How?

13  A.  He worked the shift before I -- before my shift.

14  Q.  In the Sixth District?

15  A.  Yes.

16  Q.  Were you partners?

17  A.  No, we weren't partners.

18  Q.  How did you become involved in that conspiracy to

19  distribute cocaine for which you were originally indicted?

20  A.  Len Davis asked me on several occasions if I would be

21  interested in working a detail.

22  Q.  When did he first approach you about this?

23  A.  Summer of '94.

24  Q.  In person or over the phone?

25  A.  Both.

1  Q.  What did he tell you?

2  A.  Basically, he just would tell me that he had a detail.  I

3  wouldn't have do anything but sit there, and just sit there

4    and watch a building.

5    Q.  A building?

6    A.  Yes.

7    Q.  Did he tell you where the building was?

8    A.  No, I don't think we got that far into the conversation,

9    as to the whereabouts.

10   Q.  Did you continue to discuss this with him?

11   A.  Whenever he seen me, he would ask me again, to work it.

12   Q.  Did you have any other discussions about this arrangement

13   with anybody else?

14   A.  Yes.

15   Q.  Who?

16   A.  With Leon Duncan.

17   Q.  When did he approach you about this?

18        MR. RIEHLMANN:  Judge, I'd object.  That's not what

19   the witness testified to.

20        THE COURT:  "when did he approach you about this?"

21        MR. RIEHLMANN:  Yes.

22        THE COURT:  I don't understand your objection.

23        MR. RIEHLMANN:  Well, I don't believe that's what the

24   witness testified to.  He said he had discussions with him,

25   with Mr. Duncan.

                                                    220
                        Rodgers - Direct

1         THE COURT:  And I thought the question was when did

2    you have them?

3         MR. McMAHON:  When.

4    BY MR. McMAHON:

5    Q.  When did you have these discussions?

6         MR. RIEHLMANN:  Your Honor, --

```
 7          THE COURT:  The objection is overruled.
 8   BY MR. MCMAHON:
 9   Q.  When did the discussions begin?
10   A.  Around about the same time, the Summer of '94.
11   Q.  In person or over the phone?
12   A.  In both.  Both.
13   Q.  What did Leon Duncan tell you, Mr.Rodgers?
14   A.  That, basically, he needed someone to work with him
15   because it was a partner type of deal, it wasn't a solo where
16   you work it alone.  And basically, originally, I told him I
17   didn't want to work it.
18   Q.  Did he tell you what you would be doing?
19   A.  Yeah.  He told me that there would be, at the warehouse,
20   which is what we were talking about was the warehouse, he was
21   told that there was drugs or money at the warehouse.
22   Q.  Did you ever work this warehouse arrangement with Leon
23   Duncan?
24   A.  No, we never worked it.
25   Q.  Why not?
```

Rodgers - Direct

```
 1   A.  I didn't want to work it, so he didn't work it either.  We
 2   just never worked it.
 3   Q.  Did Davis continue following the summer to discuss or
 4   request that you work with him or for him?
 5   A.  Yes.
 6   Q.  Have you heard a telephone conversation between you and
 7   Len Davis of October 13, 1994?
 8   A.  Yes.
 9          MR. MCMAHON:  Your Honor, I would ask the jury to
10   turn to the transcripts marked "LR" for Lemmie Rodgers 1.
```

11          And I would ask at this time that that conversation

12    be played.  October 13, 1994 at 2139, which -- that military

13    time always gets me.  I think that's 9:39.

14          (Whereupon, the following excerpt of the audio tape of

15    Defendant's Exhibit LR 1T, a conversation between LEN DAVIS

16    and LEMMIE RODGERS, dated October 13, 1994, was then played

17    for the jury:)

18          (Incoming call)

19          (Phone ringing)

20          "MR. DAVIS:  You missed the money again.

21          "MR. RODGERS:  I know.

22          "MR. DAVIS:  How you know?

23          "MR. RODGERS:  Because I -- I didn't hear from you

24    the next day.  I think --

25          "MR. DAVIS:  I was calling -- I call you on the

Rodgers - Direct

1    fucking phone -- on the radio.

2          "MR. RODGERS:  The day -- the day -- the day you was

3    calling me, bro --

4          "MR. DAVIS:  I was -- I was -- what your beeper

5    number, Lemmie?

6          "MR. RODGERS:  Eight, two, six, four, nine, seven,

7    six.

8          "MR. DAVIS:  You just say fuck calling me back, huh?

9          "MR. RODGERS:  No.  Uh-uh. (negative response)  I

10    told you the day you was calling me?

11          "MR. DAVIS:  Uh-huh. (affirmative response)

12          "MR. RODGERS:  And I told you I was gonna call you

13    back?  You remember?  I told you --

14         "MR. DAVIS:  Uh-huh. (affirmative response)  I

15  remember.

16    (Pause)

17    (Irrelevant conversation)

18         "MR. DAVIS:  Yeah, dude, we finishing it up tomorrow.

19  It be finished tomorrow for about 2:00.  I say, now the nigger

20  done missed their ends again.  Everybody done got their 'lil

21  ends and shit, and they get it tomorrow.  And we -- it was

22  Wednesday.  Today.  And then it gonna be over tomorrow about

23  2:00, and everybody get paid and shit.  Say, bro?

24         "MR. RODGERS:  Yeah.

25         "MR. DAVIS:  Did Keisha and her friend come in there

                                                        223

Rodgers - Direct

1  looking for me?

2         "MR. RODGERS:  Huh?

3         "MR. DAVIS:  At Flynn's?"

4             (End of taped conversation)

5  BY MR. McMAHON:

6  Q.  All right.  Now, Mr.Rodgers, what does the term, when Len

7  Davis says, "You missed them little ends," E-N-D-S.  What is

8  an end, or what are ends?

9  A.  He's referring to money.

10  Q.  And do you know what he was talking about there when he

11  said you missed something?

12  A.  Yes.

13  Q.  What did you miss?

14  A.  I missed working the warehouse.

15  Q.  Were you trying to avoid him at that point?

16  A.  Yes.

17  Q.  Now, did there come a time when you ultimately decided to

18    work for Davis?

19    A.  Yes.

20    Q.  And did you have telephone conversations where he asked

21    you about this?

22    A.  Yes.

23    Q.  And I'm going to direct your attention to what's marked LR

24    2, LR 2T, the transcript.  November 15th, 1994.

25    A.  (Witness examines document)

Rodgers - Direct

1    Q.  And the time is approximately 1:56 p.m.  And have you

2    heard this before?

3    A.  Yes.

4    Q.  Now, what day of the week was November 15, can you recall?

5    A.  I believe it was a Wednesday.

6    Q.  Well, if Friday was the 18th, I guess it would have to be

7    Tuesday, right?

8    A.  Tuesday, okay.

9    Q.  And what was this phone call?  Just give the jury just a

10    little bit of an idea before we play it; what's it all about?

11    A.  He was trying to, you know, confirmation on whether or not

12    I was gonna work it that weekend.

13    Q.  And work what?

14    A.  Work that -- the drug protection deal that upcoming

15    weekend.

16    Q.  All right.

17          MR. McMAHON:  Let's play the call.

18          (Whereupon, the following excerpt of the audio tape of

19    Defendant's Exhibit LR 2T, a conversation between LEN DAVIS

20    and LEMMIE RODGERS, dated November 16, 1994, was then played

21   for the jury:)

22        (Incoming call)

23        (Phone ringing)

24   BY MR. McMAHON:

25   Q.  Mr.Rodgers, do you recognize the number at the top of the

                        Rodgers - Direct

1    page of the transcript LR 2T, 826-4976?

2    A.  Yes.

3    Q.  What was that?

4    A.  My beeper number.

5    Q.  Okay.

6              MR. McMAHON:  Go ahead.

7                            (Tape restarted)

8              "MR. DAVIS:  Yo.

9              "MR. RODGERS:  Yeah, what's up?

10             "MR. DAVIS:  Oh, bitch, you decided to call the

11   beeper back this time, huh?

12             "MR. RODGERS:  No, I just got up.  I'm about to leave

13   out for work.  I just turned the beeper on.  You just -- you

14   been calling me earlier?

15             "MR. DAVIS:  No.  Uh-uh. (negative response)  I just

16   called you.  But any other time I beep your monkey ass, you

17   never call back.

18             "MR. RODGERS:  Man, look you -- you -- you must be

19   calling me when I'm fucking asleep or something like that, or

20   the beeper off or something.

21             "MR. DAVIS:  I don't know what it be, nigger.  But --

22             "MR. RODGERS:  I mean, every time I get a beep, I

23   call.

24             "MR. DAVIS:  Shee, I can't --

25          "MR. RODGERS:  And only -- only a couple of people I

                    Rodgers - Direct

1    know got a -- a phone.  And that's Jay and you, and probably

2    Mitch.

3          "MR. DAVIS:  Shee.  Well, anyway, I got a little

4    thing, something simpler, for Friday with the detail.  I need

5    to kick at you so you can let me know today, --

6          "MR. RODGERS:  Okay.

7          "MR. DAVIS:  -- if you interested.  You got anything

8    planned for Saturday?  It's gonna be like between the hours of

9    ten in the morning --

10          "MR. RODGERS:  Uh-huh. (affirmative response)

11          "MR. DAVIS:  -- and maybe like ten 'til about four in

12    the evening.  Now, the only reason we say those hours --

13          "MR. RODGERS:  Uh-huh. (affirmative response)

14          "MR. DAVIS:  -- is just so you don't make plans

15    between those hours.  But it's a good chance that it's gonna

16    be a two hour thing, where you sit at a location for a certain

17    amount of time, maybe a hour at the most.

18          "MR. RODGERS:  Uh-huh. (affirmative response)

19          "MR. DAVIS:  And then you stay in your car and one of

20    the company vans pull off, with the logos and stuff, and they

21    been getting sixty-foured and shit.  So, they just like

22    somebody to, like, hang back two, three car lengths.  They

23    jump on the Interstate and they head out east or they head out

24    west, whichever way they gonna head.  You go to a certain

25    point and then you turn around and that's it.  That's the job.

1       "MR. RODGERS:  All right.

2       "MR. DAVIS:  And the job pays one.

3       "MR. RODGERS:  Okay.

4       "MR. DAVIS:  And so, what you need to do is -- you go

5  to work today?

6       "MR. RODGERS:  Yeah.  I'm about to head out right

7  now.

8       "MR. DAVIS:  All right.  I'll tell you what, once you

9  get to work, won't you hit me on the air, five eighteen.

10      "MR. RODGERS:  All right.

11      "MR. DAVIS:  And we'll come meet ya'll.

12      "MR. RODGERS:  Okay.  I'll do that.

13      "MR. DAVIS:  Come meet you.  And you let me know if

14  you interested.

15      "MR. RODGERS:  All right.

16      "MR. DAVIS:  All right.

17      "MR. RODGERS:  All right, 518."

18             (End of taped conversation)

19  BY MR. MCMAHON:

20  Q.  Mr.Rodgers, on Page 2, Line 28, when Mr. Davis says, "The

21  job pays one;" what did that mean to you?

22  A.  One thousand.

23  Q.  One thousand what?

24  A.  Dollars.

25  Q.  And what did you think you were going to be doing for this

1  two hour period?

2  A.  Sitting by a warehouse, because that's what it originally

3  -- it was supposed to be.

4    Q.  What did you think was going to be in the warehouse?

5    A.  Drugs.  Drug money.

6    Q.  And what is, when Davis says, on Page 2, Line 21, "They

7    been getting sixty-foured;" what does sixty-foured -- what

8    does that mean?

9    A.  Armed robbery.

10   Q.  Is that the NewOrleans Police code for armed robbery?

11   A.  Yes, it is.

12   Q.  Did you think you were going to be doing, on that day for

13   Len Davis, a legitimate security detail?

14   A.  No.

15   Q.  And did you ultimately follow up on that call and agree to

16   work for Davis?

17   A.  I agreed to work, but I never followed up on that call.

18   But I did ultimately agree to work it.

19   Q.  You say you didn't follow up in the call.  How did you

20   come to agree to work?

21   A.  Just talking with Leon Duncan on Thursday night, --

22   Q.  And what did --

23   A.  -- that Thursday night.

24   Q.  And what did he tell you?

25   A.  He asked me to work it with him.  He needed a partner and

                        Rodgers - Direct

1    I was at work at the time and I needed to work it with him.

2    Q.  What day did you actually -- did this occur, did this job,

3    this little --

4    A.  Friday.

5    Q.  November 18th?

6    A.  Yes.

7   Q.  Did you see Leon Duncan that day?

8   A.  Yes.

9   Q.  About what time in the morning did you see him?

10  A.  Maybe 11:00.

11  Q.  Did you see Sammie Williams?  Do you know Sammie Williams,

12  by the way?

13  A.  Yes.

14  Q.  Did you see him that morning?

15  A.  Yes.

16  Q.  And how did you come to see Sammie Williams?

17  A.  He picked myself and Duncan up that morning.

18  Q.  What kind of car did Sammie Williams have?

19  A.  He was driving a Buick LeSabre, I believe.

20  Q.  Was it a police car?

21  A.  No.

22  Q.  And where were you sitting in that vehicle?

23  A.  The rear, driver's seat, in the rear.

24  Q.  Where was Duncan?

25  A.  The front passenger.


                                                              230
                    Rodgers - Direct

1   Q.  Were you the only three people in the car?

2   A.  Yes.

3   Q.  Can you remember the exact location where you got picked

4   up?

5   A.  It's on Galvez, not far from the Lafitte Project, maybe

6   Bienville and Galvez, St. Louis and Galvez.  It was on Galvez

7   though.

8   Q.  And how far, let's just -- let's just say St. Louis and

9   Galvez; how far is that from the Avis Rental Car?  Are you

10  familiar with the Avis Rental Car Agency on Canal?

11    A.  Yes.

12    Q.  About how far away, in minutes, is --

13    A.  Two minutes.

14    Q.  Okay.  Where did you three go after Williams picked you

15    up?

16    A.  To the Mardi Gras Truck Stop on Elysian Fields Avenue.

17    Q.  When you got there, who did you see?

18    A.  (No response)

19    Q.  Did you see anybody you knew or recognized?

20    A.  Yeah.  Len Davis --

21    Q.  Okay.

22    A.  -- came out to the truck stop.

23    Q.  Did you see anybody else?  Do you see anybody else in the

24    courtroom here that you saw that day, that you recognize?

25    A.  Yes, sir.  Jones was in the vehicle with Len Davis.


                                                          231
                          Rodgers - Direct

1    Q.  And you say, "Jones."  Why don't you, for the record,

2    point out exactly to whom you're referring?

3    A.  He's seated to my right (indicating), with the dark

4    colored suit on.

5    Q.  And what's he -- is he this gentleman at the end of the

6    table?

7    A.  He's seated in the middle.

8    Q.  All right.

9         MR. McMAHON:  Let the record reflect the Witness has

10    identified Darrel Jones.

11         THE COURT:  Let it so reflect.

12    BY MR. McMAHON:

13    Q.  Had you ever seen Darrel Jones before November the 18th,

14    1994, Mr.Rodgers?

15    A.  Yes.

16    Q.  Where?

17    A.  Around the courthouse.

18    Q.  This courthouse?

19    A.  No.  Tulane and Broad, Criminal District Court.

20    Q.  How did you recognize him?

21    A.  Just from seeing him, face.

22    Q.  Was there anybody else in that car with Len Davis and

23    Darrel Jones?

24    A.  Yes.  A guy by the name of Sidney.

25    Q.  Do you know Sidney's last name?

Rodgers - Direct

1    A.  No, not offhand.

2    Q.  How did you know Sidney?

3    A.  Seeing him in the nightclub.

4    Q.  Which nightclub?

5    A.  Flynn's Den.

6          MR. MCMAHON:  I think the jury knows where Flynn's

7    Den is.

8    BY MR. MCMAHON:

9    Q.  What kind of clientele -- well, did Flynn's Den have a

10   particular clientele?

11   A.  Yes.

12   Q.  Who?

13   A.  Policemen.

14   Q.  What were you wearing on November the 18th, 1994?

15   A.  My police uniform.

16   Q.  Did you have your gun?

17   A.  Yes.

18  Q.  What was Leon Duncan wearing?

19  A.  He was in uniform also.

20  Q.  Did he have his gun?

21  A.  Yes.

22  Q.  About how long did you stay at the Mardi Gras Truck Stop?

23  A.  Maybe an hour and a half, hour and forty-five minutes,

24  maybe.

25  Q.  Did you come to leave from there?


233

Rodgers - Direct

1  A.  Yes.

2  Q.  Why did you leave?

3  A.  Sammie had got a call on the cell phone.  Someone told him

4  to follow a vehicle out of the truck stop.

5  Q.  What vehicle did you follow out of the truck stop?

6  A.  Another Buick.  I believe it was a Buick also.

7  Q.  And where did this car go?

8  A.  It got up on Interstate 10 west and we followed it to

9  Loyola Avenue in Kenner.

10  Q.  Did you three have conversation on the way to the truck

11  stop, while you were at the truck stop, and when you were on

12  the I-10?

13  A.  Yes.

14  Q.  And the jury has already heard, and I wanted to refer --

15  and you've heard this conversation, the tape, --

16  A.  Yes.

17  Q.  -- haven't you?

18  A.  Yes.

19  Q.  You weren't aware, of course, that there was a bug, there

20  was a microphone in the car that day, were you?

21    A.   No.

22         MR. McMAHON:  And Your Honor, without taking up too

23    much of the jury's time with this, I do want to refer to the

24    transcript and I want to go to SW 7T.

25    BY MR. McMAHON:

 1    Q.  And let's first turn -- do you have your transcript,

 2    Mr.Rodgers?

 3    A.  Yeah.

 4    Q.  Turn to SW 7, and turn to Page 3.

 5         THE CLERK:  Which tape?

 6         MR. McMAHON:  Pardon me?

 7         THE CLERK:  What's the tape number?

 8         MR. McMAHON:  Oh, I'm sorry.  It's Tape 1.  I

 9    apologize.  It's Tape 1.

10    BY MR. McMAHON:

11    Q.  SW 7T, Tape 1, Page 3, I think.  All right.  Line 5,

12    Mr.Rodgers.

13    A.  (Witness examines document)

14    Q.  Now, you've heard this discussion on tape.  You ask, "How

15    solid you think this is, Sam?"

16         Do you have the right page?

17    A.  Here it is.

18    Q.  Who is the Sam?

19    A.  Sammie Williams.

20    Q.  What did you mean by that question?

21    A.  What I meant was how solid was it, pertaining to who --

22    who the peoples -- who the guys were that we were working for,

23    who were they, did he know them, would it be any problem with

24    this here, because I didn't -- I didn't know anybody out

25    there.

Rodgers - Direct

1    Q.  What do you mean by "problem"?

2    A.  The vehicles that we were following, they were heading out

3    west and I was concerned about if the vehicles didn't make it

4    to their destination, would we have a problem with that.  If

5    everything wasn't accounted for, the drugs or money or

6    whatever, if it had a problem, would we be -- have a problem

7    with it if something happened, and I was concerned about that.

8    Q.  What were you concerned about, something -- what would

9    happen that would give you concern?

10    A.  If some of this money or some of these drugs was missing.

11    Q.  Okay.  Turn to Page 5 of that same transcript.

12    A.  (Witness complies)

13    Q.  Lines 9 and 10.  You state, "I know a couple of times I

14    told him I didn't want to fuck with it, you know;" what do you

15    mean there?

16    A.  I didn't want to work it.  I had --

17    Q.  Who is the "him" you told?

18    A.  I told Len, originally.

19    Q.  Now, let's jump -- Len Davis?

20    A.  Originally, yes.

21    Q.  Let's jump down the lines, that same page, Lines 16, 17

22    and 18.

23    A.  (Witness complies)

24    Q.  "But then when Duncan called me and he want to go with him

25    I said, you know, I say fuck, because I'm broke as a mother

1  fucker right now."  Explain that to the jury.

2  A.  When he called and asked me to go with him, basically, I

3  told him that okay, I would.  I didn't have any money or I

4  don't know if that was the expression that I used, I don't

5  know.  But I said that and I agreed to go with him.

6  Q.  And the "Duncan" is who?

7  A.  Leon Duncan.

8  Q.  Let's jump to the top of Page 7, that first line.

9  A.  (Witness complies)

10  Q.  You asked, same transcript.  You asked, "The one -- the

11  one Len's fucking with, he the man, huh?"  To whom were you

12  referring?

13  A.  They had always referred to a guy as a Ninth Ward guy and

14  I was wondering if, if that's who all this belonged to, the

15  guy in the Ninth Ward.

16  Q.  All what belonged to?

17  A.  All the money, all the drugs, or whatever we were -- were

18  doing.  I was wondering, well, did it belong to him.  They

19  always referred to him as the guy from the Ninth Ward.

20  Q.  Let's go to Page 9, same transcript.

21  A.  (Witness complies)

22  Q.  SW 7T, Tape 1.  Lines 13 and 14, and I'm going to read

23  this in sequence.  "Ya'll been -- ya'll been -- ya'll been

24  doing anything at the truck stop often?"

25      And let's jump to Lines 17 and 18, the second half of Line

1  17, "what you call them be setting up on the truck stop,"

2  Sammie Williams asked you, "Traffic police?"

3      Then you come in, Lines 20 to 22, "No, Narcotics.  Because

4    the -- the dudes be making little deals.  They meet them at

5    the truck stop and stuff, you know, you get lucky, you know."

6         Explain that exchange there.

7    A.  Well, we be sitting in the parking lot at the truck stop

8    and I know from experience that Narcotics frequent the truck

9    stop because a lot of times deals be -- small deals be take

10   place in that parking lot.  It's a pretty big parking lot.

11   And -- and, that's what I meant by -- by that I was concerned

12   about sitting there.

13   Q.  Why were you concerned?

14   A.  Because the police may come there.  Narcotics may be

15   working the parking lot.

16   Q.  And let's go right to the top of the next page, Line 10.

17   A.  (Witness complies)

18   Q.  After the pause.  You say, "How big is this fucking dude,

19   bro?  He's got to be fucking really big coming off all that

20   money."

21        And then Sammie Williams, the next line, "He don't let us

22   know everything that's happening with him, you know, but the

23   nigger is some large."  What were you asking there?  What did

24   you mean?

25   A.  I thought he was paying a lot of money for us to follow a

                          Rodgers - Direct

1    car, and I was just thinking out loud.

2    Q.  And what does "some large" -- what does "large" mean?

3    Overweight?

4    A.  No.  Large, that he has a lot of money.  He's -- has a lot

5    of money.

6    Q.  Turn to Page 11 of that same transcript, Lines 25 and 26.

```
 7    A.  (Witness complies)

 8    Q.  You ask, "They ain't fucking with the warehouse no more;"

 9    well, what warehouse are you talking about?

10    A.  The warehouse I was originally asked to work.

11    Q.  And let's turn to Page 12.

12    A.  (Witness complies)

13    Q.  Lines 21 and following.  Sammie Williams says, "All them

14    worst scenarios going through your head.  In the worst case

15    scenario, just say you were making a case on me."

16        And then you say, "That ain't even funny, man."  And then

17    you repeat it on Line 26.  "I said that wasn't even funny."

18        Why wasn't that funny?

19    A.  Sammie thought it was funny.  He said the worst case

20    scenario, just say ya'll working a case against me.  And he

21    was laughing and laughing, and I didn't think it was funny.

22    Q.  Why not?  That's the question.

23    A.  Well, we out there in a car, following cars with drugs or

24    money, and saying that we're making a case on him, I just

25    didn't think that that was funny.
```

Rodgers - Direct

```
 1    Q.  Turn to the next transcript, which is going to be Tape 2,

 2    SW 7T, Tape 2.

 3    A.  (Witness complies)

 4    Q.  Pages 4 and 5.  Let's start at the very bottom of Page 4.

 5    You ask, "who that nigger is in that back seat?"

 6        Sammie Williams replies, "One twelve."

 7        What's a one twelve?

 8    A.  A police impersonator.

 9    Q.  And then you ask, "He be up by the courthouse?"

10        Sammie Williams replies, "I think he a deputy sheriff."
```

11    To whom are you referring?

12    A.  Jones.

13    Q.  The same person right here (indicating)?

14    A.  Yes.

15    Q.  Page 8, same transcript.

16    A.  (Witness complies)

17    Q.  Lines 15 and 16.  You say, "Yeah, they going over the

18    bridge right now.  Boy, I be curious as a mother fucker;" what

19    did you mean by that?  Why were you curious?

20    A.  I was curious to know exactly what and how much drugs or

21    money that was actually in the vehicle.

22    Q.  And turn to the next transcript, Tape 3, SW 7, Tape 3.

23    A.  (Witness complies)

24    Q.  Page 2.  Lines 13, 14 and 15, this small exchange.  You

25    ask, "Has he been careful, bro?"


                                                    240
                       Rodgers - Direct

1    Sammie Williams, "Uh-huh. (affirmative response)"

2    Duncan, "Does he have different drivers each time?"

3    Why did you ask -- careful about what?

4    A.  Careful about how they were -- how they were working this

5    thing.  How they were moving on the Interstate.  How they were

6    moving drugs from here to there.

7    Q.  And who is the "they"?  Let's define our pronouns.

8    A.  The -- the guy from the Ninth Ward and the other guy, the

9    guys who all this belonged to, who set this up.

10   Q.  Turn to Page 4.

11   A.  (Witness complies)

12   Q.  Line 6, Sammie Williams requests, "Play the mirror,

13   Lemmie, make sure."

14    You say, "Yeah." There's a pause. "Only thing came up

15    when we came up was this BMW, but he looked like he trying to

16    go past us."

17        Explain that.

18    A.  He asked me to play the mirror, so, check the mirror to

19    see if we were being followed.

20    Q.  And who were you concerned with following you?

21    A.  Police, any police.

22    Q.  Did you know you were doing something illegal out there?

23    A.  Yeah.

24    Q.  By the way, do you know somebody named Charles Boutin?

25    A.  Yes.


241

Rodgers - Direct

1    Q.  To your knowledge, was he related to Leon Duncan?

2    A.  No.  I didn't know of him to be related to him.

3    Q.  Did you ever give Len Davis information about Charles --

4    that you had heard that maybe the police were going to move

5    against Charles Boutin?

6    A.  No.

7    Q.  Now, what happened after you got off the Loyola Drive exit

8    in Kenner?

9    A.  Someone had told him that was far enough, so --

10   Q.  Told who?

11   A.  Told Sammie Williams.  So, at that time we exited the

12   Interstate at Loyola, made a U-turn and got back on 10 going

13   east.

14   Q.  Where did you go?

15   A.  Back to the truck stop -- no, back to our vehicles.

16   Q.  Where Sammie Williams had picked you up?

17   A.  Yes.

18    Q.  Did you see Williams and Duncan later that day on November
19    18th?
20    A.  No.
21    Q.  Did you get paid, Mr.Rodgers, for taking that little ride
22    out there?
23    A.  Yes.
24    Q.  How much were you paid?
25    A.  One thousand dollars.

242

Rodgers - Direct

1    Q.  What was the form of the money?
2    A.  One hundred dollar bills.
3    Q.  Cash, check, money order?
4    A.  Cash.
5    Q.  Well, I guess so if it was one hundred dollar bills.
6         Who paid you?
7    A.  Leon Duncan.
8    Q.  Did you speak again to Len Davis about working this truck
9    stop thing in the future?
10   A.  Yes.
11        MR. McMAHON:  And I'm going to direct your attention,
12   jury.  It's LR 3T, which is the last transcript in the book.
13        And we would ask that that --
14   BY MR. McMAHON:
15   Q.  By the way, just let's preface that.  Do you have it,
16   Mr.Rodgers?
17   A.  No.
18   Q.  LR 3.
19   A.  (Witness examines document)
20   Q.  Do you recall that conversation?

Page 215

21    A.  Yes.

22    Q.  Have you listened to it before today?

23    A.  Yes.

24    Q.  And what's that, or who are you speaking to there?

25    A.  (No response)

Rodgers - Direct

1    Q.  Do you have LR 3?

2    A.  Yeah.  What page?

3    Q.  Just the first page.

4    A.  First page.

5    Q.  Who were the parties to the conversation?

6    A.  It was myself and Len Davis.

7    Q.  And what is the conversation about; do you remember that?

8    A.  Yes.  He was trying to get a confirmation on whether or

9  not I would be available to work it again that following

10  weekend.

11    Q.  Okay.

12        MR. McMAHON:  Well, let's play that.

13    (Whereupon, the following excerpt of the audio tape of

14  Defendant's Exhibit LR 3T, a conversation between LEN DAVIS

15  and LEMMIE RODGERS, dated November 30, 1994, was then played

16  for the jury:)

17    (Incoming call)

18    (Phone ringing)

19       "MR. DAVIS:  Yo.

20       "MR. RODGERS:  Hey.

21       "MR. DAVIS:  What up, nigger?

22       "MR. RODGERS:  Nothing.  What's happening?

23       "MR. DAVIS:  Where you at?

24       "MR. RODGERS:  I'm uptown by Keisha.

25          "MR. DAVIS:  What's -- when you off?

                        Rodgers - Direct
 1          "MR. RODGERS:  I just come off.  My off days are --
 2          "MR. DAVIS:  All right.  What --
 3          "MR. RODGERS:  -- Monday and Tuesday.
 4          "MR. DAVIS:  And your hours are second watch hours
 5    Saturday, huh?
 6          "MR. RODGERS:  Right.
 7          "MR. DAVIS:  Two twenty-five.
 8          "MR. RODGERS:  Right.
 9          "MR. DAVIS:  All right.  Ain't nothing definite yet
10    but we might do another little quickie Saturday.  I won't know
11    'til Friday, but it's a good chance it'll be before your
12    working hours.  But even if it's not, you might want to get a
13    hour furlough or whatever.
14          "MR. RODGERS:  Same arrangements?
15          "MR. DAVIS:  Huh?
16          "MR. RODGERS:  Same arrangements?
17          "MR. DAVIS:  Yeah.  From what I know.
18      (Static)
19          "MR. DAVIS:  I'll know more Saturday.
20          "MR. RODGERS:  Same issue?
21          "MR. DAVIS:  Huh?
22          "MR. RODGERS:  The paper.
23          "MR. DAVIS:  I can't hear you.
24          "MR. RODGERS:  I mean the same -- same paper?
25          "MR. DAVIS:  Do you need the same -- yeah, yeah,

1  yeah.  The same, yeah.  All that, yeah.

2       "MR. RODGERS:  All right.

3       "MR. DAVIS:  Yeah, and all that gonna be the -- the

4  same.

5       "MR. RODGERS:  Good, 'cause I need some ends.  I'm

6  going to Atlanta next week.

7       "MR. DAVIS:  All right.  Well, but that's Dunc on the

8  other end, so just be keeping your mind open for Saturday.

9       "MR. RODGERS:  All right.  Look?

10      "MR. DAVIS:  What?

11      "MR. RODGERS:  You -- you say you didn't want to go

12  to that -- to that Atlanta thing, huh?

13      "MR. DAVIS:  I don't think I'm doing Atlanta.

14      "MR. RODGERS:  Okay, 'cause I got a couple of

15  tickets.

16      "MR. DAVIS:  Uh-uh. (negative response)

17      "MR. RODGERS:  All right.

18      "MR. DAVIS:  All right.

19      "MR. RODGERS:  Later."

20              (End of taped conversation)

21  BY MR. McMAHON:

22  Q.  Mr.Rodgers, let's start from the back first.  What was

23  that Atlanta thing?

24  A.  Football game.

25  Q.  Did you ever go to Atlanta with anybody named JJ, Terry

1  Adams and Sammie, Sammie Williams and Len Davis?

2  A.  No.

3  Q.  This is a separate thing?

4   A.  Yeah, I always go to Atlanta Saints games.

5   Q.  When the Saints played the Falcons?

6   A.  Yes.

7   Q.  When you asked Davis, "Same issue?  The paper.  I mean the

8   same paper," Page 2.  What's the issue and the paper?  To what

9   are you referring?

10  A.  The money, it's the same amount of money.

11  Q.  Meaning what?

12  A.  Was it going to be the exact same amount of money for, you

13  know, for the next detail.  Was it going to pay the same.

14  Q.  Did you work another detail following that November 30th,

15  1994 phone call?

16  A.  No.

17  Q.  Any reason why not?

18  A.  Len and a bunch of the other guys that had worked it were

19  indicted the following week.

20  Q.  Is there any doubt in your mind, Mr.Rodgers, that you and

21  Leon Duncan knew that you were guarding dope or dope money

22  when you followed that car out to the Loyola exit on November

23  the 18th, 1994?

24  A.  No.

25          MR. McMAHON:  Tender for cross.


                                                        247
                        Rodgers - Cross

1           THE COURT:  Mr. Riehlmann.

2           MR. RIEHLMANN:  Thank you, Judge.

3                   *   *   *   *   *

4                   CROSS-EXAMINATION

5   BY MR. RIEHLMANN:

6   Q.  Mr.Rodgers, we've met before, haven't we?

 7  A.  Yes.

 8  Q.  In October 1996, Leon Duncan was terminated from the

 9  N.O.P.D., correct?

10  A.  Yes.

11  Q.  You had left quite some time before that, correct?

12  A.  Yes.

13  Q.  Specifically, when did you leave?

14  A.  The Summer of '95.

15  Q.  Were you under the care of an Arnold Devezin (phonetic) at

16  that time?  Do you know who that is?

17  A.  Yes.

18  Q.  Who is that?

19  A.  It's a police -- it's a police doctor.

20  Q.  He's a psychologist or a psychiatrist?

21          MR. McMAHON:  May we approach?

22          THE COURT:  Yes.

23                  *   *   *   *   *

24  (At side bar on the record)

25          THE COURT:  Why would a person be under the care of


                                                        248
                        Rodgers - Cross

 1  a --

 2          MR. RIEHLMANN:  Arnold Devezin.

 3          MR. McMAHON:  And we --

 4          MR. RIEHLMANN:  A psychiatrist or a psychologist, or

 5  something.

 6          MR. McMAHON:  And we file a long, long time ago a

 7  motion for reciprocal discovery, which we have received

 8  nothing.

 9          MR. RIEHLMANN:  Well, let me tell you --

10          MR. McMAHON:  No.

11        MR. RIEHLMANN:  Can I respond?  It was in the

12    materials you gave me.  It's in the disciplinary records that

13    you gave me.  There's a -- there's a letter.  There's no --

14    there's a letter from him, referring to the fact that he has

15    been relieved from the care of Arnold Devezin.  And then,

16    another letter to Pennington where he -- he resigns.  That was

17    in the records you gave me.  I can assure you I didn't get

18    that from anywhere else.

19        MR. McMAHON:  Are you alleging some kind of

20    psychiatric condition?

21        MR. RIEHLMANN:  At this point, I don't know.  I'm

22    just now --

23        THE COURT:  Well, your objection is to him pursuing

24    this line of questioning.  And I have to be liberal with

25    cross-examination.


                                                          249
                         Rodgers - Cross

1         MR. McMAHON:  I understand.

2         THE COURT:  So, at this point -- you can jump again

3     and make another objection.  At this point, the objection is

4     overruled.

5         MR. McMAHON:  Yes, sir.

6         MR. RIEHLMANN:  Okay.

7        (End of discussion at side bar)

8                    *    *    *    *    *

9         THE COURT:  All right.

10    BY MR. RIEHLMANN:

11    Q.  And when we previously met, we met in my office, correct?

12    A.  Yes.

13    Q.  And at that time I introduced you as Mr. Duncan's attorney

14  and I was prosecuting his appeal with the Civil Service Board

15  to try to get him his job back, correct?

16  A.  Yes.

17  Q.  And I interviewed you to ask if you would testify for

18  Mr.Duncan in the Civil Service matter, testify to the affect

19  that you and Mr. Duncan did not know that there were drugs in

20  that car, isn't that true?

21  A.  Yes.

22  Q.  And you agreed that you and Mr. Duncan did not know that

23  there were drugs in that car, isn't that true?

24  A.  Yes, that's what I told you.

25  Q.  Okay.  You, I take it by virtue of the fact that you

                                                    250
                        Rodgers - Cross

1   walked in that door (indicating), you're not in jail, correct?

2   A.  I'm out on bond.

3   Q.  You're out on bond.  And you have been since when?

4   A.  October.

5   Q.  October of 1997?

6   A.  Yes.

7   Q.  And that was with the -- well, wait.  You, after you were

8   released on bond, were permitted to leave the Eastern District

9   of Louisiana and drive trucks across country, isn't that true?

10  A.  Yes.

11  Q.  And that was with the agreement of the Government, isn't

12  that true?

13  A.  My lawyer filed the paperwork with Judge Africk.

14  Q.  And the Government didn't object, did they?

15  A.  No.

16  Q.  All right.  Insofar as your testimony that Leon Duncan

17  gave you thousands of dollars at these search warrant raids,

18   when did this happen?

19   A.  In '93.

20   Q.  When in '93?

21   A.  I don't know the exact date.

22   Q.  And who was the first person to whom you have revealed

23   this?

24   A.  The first person I revealed it to?

25   Q.  Yeah.

251

Rodgers - Cross

1    A.  Today.

2    Q.  All right.  You've been debriefed by the U.S. Attorneys

3    and the FBI, is that correct?

4    A.  Yes.

5    Q.  Did you testify before a grand jury?

6    A.  No.

7    Q.  When you were debriefed, did they take notes of your --

8    the details of which you had been telling them?

9    A.  I don't -- I don't recall if -- I know I spoke with them.

10   Q.  All right.  And the information you revealed to them in

11   debriefing is the same that you've testified to today?

12   A.  Yes.

13   Q.  And without any deviation, is that correct?

14   A.  Well, I'm pretty sure.

15   Q.  All right.  Now, the source of your knowledge about what

16   was in that car on November the 18th, 1994 was Len Davis or,

17   and/or Sammie Williams?

18   A.  Yes.

19   Q.  All right.  Would you agree that you were called first by

20   Len Davis, to work the detail at the warehouse, even before

Page 223

21  Mr. Duncan was called?

22  A.  I don't know when he was called.

23  Q.  All right.  Were you -- would you agree that you were

24  called first by Len Davis to work the Mardi Gras Truck Stop

25  detail, even before he called Leon Duncan?

1  A.  I don't know if he called anyone else prior to me.

2  Q.  All right.  Did you and Leon Duncan meet Len Davis and

3  Sammie Williams in the First District one time to discuss the

4  warehouse detail?

5  A.  I don't remember where we actually met.  I don't remember.

6  Q.  Did Len Davis or Sammie Williams tell you that there was

7  going to be either drugs or money in that car?

8  A.  No.

9  Q.  You keep saying that it was either drugs, money or

10  whatever.  You had indicated to me that there's some -- you

11  had some uncertainty and you still have some uncertainty about

12  what was in that car, is that true?

13  A.  Well, Duncan told me that someone in another district had

14  told him something pertaining to that, and that's where that

15  came from.

16  Q.  All right.  Now, when Len Davis and Sammie Williams talked

17  to you, did they clearly tell you what was going to be in that

18  car?

19  A.  I never had that conversation in detail with Len Davis,

20  you know.  Whenever he would try to talk to me about working

21  it, he wanted to talk in person, he wanted to talk later, and

22  I always put him off.

23  Q.  All right.  You were indicted for possession with, or

24  conspiracy to possess with the intent to distribute in excess

Page 224

25    of five kilograms, correct?

                        Rodgers - Cross

 1    A.  Yes.
 2    Q.  And you told this jury that that exposed you to a sentence
 3    of ten years at a minimum, and as much as a life sentence,
 4    correct?
 5    A.  Yes.
 6    Q.  You were charged in that indictment with having conspired
 7    to possess with the intent to distribute in excess of fifty
 8    kilograms of cocaine on November the 18th, 1994, is that
 9    correct?
10    A.  Well, I'm not sure of the exact amount.
11    Q.  Well, suffice it to --
12    A.  I know it was in the excess five.  I know that.
13    Q.  Okay.  Suffice it to say that once you were arrested and
14    indicted, you learned that for that charge, under the Federal
15    Sentencing Guidelines, you were exposed to a sentence of
16    between 20 and 25 years, isn't that true?
17    A.  Yes.
18    Q.  All right.  And you learned that if you were charged with
19    a gun count, like Mr. Duncan is, that that five years would go
20    on top of that 25 years, to be 30 years, isn't that true?
21    A.  I didn't know anything about a gun charge until after Leon
22    was additionally charged.
23    Q.  Okay.  But you now know that that --
24    A.  Yeah, now.
25    Q.  Let me finish my question.

Rodgers - Cross

1    A.  Uh-huh. (affirmative response)

2    Q.  But you now know that that gun count adds five years to

3    the guidelines range that we're talking about, making it a

4    total of 30 years, isn't that true?

5    A.  Well, I didn't know that, no.

6    Q.  All right.  Now, you have pled guilty to misprision, which

7    means that you knew of a felony but didn't report it, is that

8    correct?

9    A.  Yes.

10   Q.  You have not pled guilty to knowingly possessing or

11   conspiring to possess in excess of five kilograms, isn't that

12   true?

13   A.  Yes.

14   Q.  And you've never even been charged with having a gun on

15   November the 18th, isn't that true?

16   A.  No.

17   Q.  And that saves you five years, isn't that true?

18   A.  Yes.

19   Q.  The other count, the phone count you said, exposes you to

20   four years, correct?

21   A.  Yes.

22   Q.  The three years that you got -- that you could get for the

23   misprision and that's the most you could get for the

24   misprision, isn't that right?

25   A.  (No response)

Rodgers - Cross

1    Q.  Three years?

2    A.  Yeah.

3    Q.  Those two sentences could be run concurrent, isn't that

4    true?

5    A.  Seven years maximum.

6    Q.  But it could be run, those two sentences could be run

7    concurrent, which would mean four instead of seven, isn't

8    that --

9    A.  I don't know.  No one told me that.

10   Q.  All right.  But at any rate, you have entered into an

11   agreement with the Government that in exchange for your

12   testimony, you max -- you're capped at seven years, isn't that

13   true?

14   A.  Yes.

15   Q.  All right.  And in addition to that, you hope that the

16   Government will file a motion under Chapter 5K asking the

17   judge to reduce your sentence even more, isn't that true?

18   A.  Yes.

19   Q.  Okay.  Have you testified in anything else other than

20   this?

21   A.  No.

22   Q.  This is the only thing the Government is going to require

23   you to testify in, correct?

24   A.  I don't know.

25   Q.  As I understand, when you first discussed with Len Davis

                                                            256
                         Rodgers - Cross

1    the possibility of working this warehouse detail, you and Leon

2    Duncan decided not to work it, is that correct?

3    A.  Yes.

4    Q.  And what was your explanation for why you all decided not

5    to work it?

6    A.  Duncan told me that someone in the Second District had

2940703.dat

7   told him -- he had heard things from someone in the Second

8   District pertaining to the warehouse.

9   Q.  That there might be drugs involved, correct?

10  A.  That there was drugs involved.

11  Q.  Okay.  One of the conversations that we played where

12  Mr.Davis tells you that you missed, what, you missed some

13  money or you missed the ends, or whatever it was; do you

14  remember that conversation?  I think it was the first one?

15  A.  Yes.

16  Q.  He meant that he had had you scheduled to work that

17  warehouse detail but that, for whatever reason, you didn't

18  work it, is that what he meant by that?

19  A.  He never had me scheduled to work it.

20  Q.  But there was --

21  A.  But I never told him I would work it.

22  Q.  Was what he was implying by that, was that you and he had

23  discussed working it, but you just didn't show up to work it?

24  A.  No.  He was implying that every time he called me to try

25  to get a confirmation on me working it, that I never called

Rodgers - Cross

1   him back.

2   Q.  Okay.  On November the 18th, you said you were picked up

3   at Galvez and Bienville.  You were picked up near Clarence

4   Mitchell's house, correct?

5   A.  Now, I don't -- I don't remember.  I thought it was around

6   Galvez.

7   Q.  Okay.  As you sit there today, under oath, you

8   specifically deny ever having supplied Len Davis with

9   information about Charles Boutin, is that your testimony?

10  A.  Yes.

Page 228

11   Q.  All right.  What is a rig, in police jargon?

12   A.  A what?

13   Q.  A rig?

14   A.  A rig?

15   Q.  When police officers refer to their rig, what are they

16   talking about?

17   A.  I don't know.

18   Q.  Isn't that not a slang term --

19          MR. MCMAHON:  Objection.  He said he didn't know.

20          MR. RIEHLMANN:  Well, let me ask him this question.

21          THE COURT:  Okay, ask the next question.

22          MR. RIEHLMANN:  Sure.  Thank you.

23   BY MR. RIEHLMANN:

24   Q.  Is that not a slang term for your equipment belt that

25   would carry your radio and your gun?

                        Rodgers - Cross

1    A.  I've never referred to it as a rig.

2    Q.  Have you ever heard it referred to it as that?

3    A.  No, I never heard that either.

4    Q.  All right.  Do you know whether Leon Duncan took his

5    police holster with his radio and left it in your car, before

6    he left to go on that Mardi Gras Truck Stop?

7    A.  I don't -- I don't remember.

8    Q.  All right.

9    A.  I didn't have my holster on either.  I had just the

10   holster itself, the gun belt.

11   Q.  You didn't have the whole belt?

12   A.  No.

13   Q.  You had a clip on gun?

14   A.  Yes.  I had a holster.

15   Q.  All right.

16        MR. RIEHLMANN:  Bear with me for a moment, sir.

17   (There is a pause in the proceedings)

18  BY MR. RIEHLMANN:

19   Q.  Were you and Mr. Duncan ever partners in the Sixth

20  District?

21   A.  No.

22   Q.  Did you ever ride together?

23   A.  We may have rode together.  I don't remember.

24   Q.  All right.  You mentioned before that you were friends

25  with Mr. Duncan for seven years.  Isn't it true that you and

                                                    259
                           Rodgers - Cross

1  Mr. Duncan didn't meet until he came to Narcotics in 1993?

2   A.  That's possible.  I knew him.  Right off the top of my

3  head, I figured that's about -- about that time.  It could be

4  less.

5   Q.  He had been a police officer for a long time before you

6  came on the job, isn't that true?

7   A.  Yes.

8   Q.  All right.  Now, you said you were assigned to General

9  Assignment and occasionally you'd be rotated over to

10  Narcotics, is that what you're saying?

11   A.  Originally, I was assigned to General Assignment, when I

12  first went into the Detective Bureau.

13   Q.  And General Assignment was disbanded, isn't that true?

14   A.  Yes.

15   Q.  And then you were assigned to Narcotics?

16   A.  Yes.

17   Q.  Okay.  Who was your partner in Narcotics?

18   A.   Clarence Mitchell.

19   Q.   And did Mr. Duncan have a partner in Narcotics?

20   A.   I believe he had several partners up there.

21   Q.   Most of the time, wasn't it the case that he worked alone?

22   A.   I believe he worked alone too.

23   Q.   You worked, when you were working in Narcotics, you worked

24   under the supervision of Sergeant Eddie Selby (phonetic),

25   isn't that true?

Rodgers - Cross

1    A.   Yes.

2    Q.   During the period of time that you worked in Narcotics,

3    that would have been in 1993 when Mr. Duncan was there, is

4    that correct?

5    A.   I'm not sure of the year.  Probably about that time.

6    Q.   All right.  And while you were working in Sergeant Selby's

7    squad, were you all ever provided with information that

8    Charles Boutin was a drug dealer?

9    A.   I don't remember.

10   Q.   All right.  Do you remember ever working any cases on him?

11   A.   I never worked a case on him.

12   Q.   All right.  Do you remember Sergeant Selby ever discussing

13   Charles Boutin with you?

14   A.   I don't remember discussing Charles Boutin --

15   Q.   All right.

16   A.   -- with Eddie Shelby.

17   Q.   All right.  Thank you.

18        MR. RIEHLMANN:  Just a second, Judge.

19   (There is a pause in the proceedings)

20        MR. RIEHLMANN:  Thank you.  I have no further

Page 231

21    questions, Judge.

22           THE COURT:  Mr. Voight.

23           MR. VOIGHT:  I have no questions of this witness,

24    Judge.

25           THE COURT:  Does the Government have any redirect?

Rodgers - Redirect

1                    *   *   *   *   *

2                    REDIRECT EXAMINATION

3     BY MR. McMAHON:

4     Q.  Mr.Rodgers, --

5           MR. McMAHON:  Very briefly.

6     BY MR. McMAHON:

7     Q.  Mr.Rodgers, when you went down to Mr. Riehlmann's office,

8     that incident he referred to earlier, had you agreed to

9     cooperate at that point?

10    A.  Yes.

11    Q.  Did you want to talk to Mr. Riehlmann that day?

12    A.  No.

13    Q.  Why did you tell him what you told him?

14    A.  They told me it was for a Civil Service Hearing and -- and

15    I didn't want to go to Civil Service.  I didn't want to be

16    involved in a Civil Service hearing.

17    Q.  But when Mr. Riehlmann asked you earlier about when you

18    told him that well, you didn't know that you were going to be

19    guarding, or that you guarded dope on November 18th; why did

20    you tell him that?

21    A.  I basically just did it to put him off and to get out of

22    the -- to get from up there.  I was in town and whenever I

23    would come in town, Duncan would tell me his lawyer wanted to

24    talk to me.  His lawyer wanted to talk to me.  So, I was in

25    town and I went up there.  I didn't have any intentions on

               Rodgers - Redirect/Fleming - Direct

 1    being involved in a Civil Service hearing and being questioned

 2    by anybody in Civil Service.

 3              MR. McMAHON:  Thank you.

 4              THE COURT:  Thank you.  You may step down.

 5              THE WITNESS:  Thank you.

 6                    (The Witness is excused)

 7              MR. WINTERS:  Your Honor, the Government would call

 8    John Fleming.

 9              THE COURT:  Will this be a lengthy witness or a short

10    witness?

11              MR. McMAHON:  Short.

12              THE COURT:  All right.

13              MR. WINTERS:  Short, Your Honor.

14              THE COURT:  Go ahead.

15                    *   *   *   *   *

16              JOHN M. FLEMING, GOVERNMENT'S WITNESS, SWORN

17              THE CLERK:  Have a seat and state your name and

18    address for the record.

19              THE WITNESS:  My name is John M. Fleming.

20                    *   *   *   *   *

21                    DIRECT EXAMINATION

22    BY MR. WINTERS:

23    Q.  How are you employed?

24    A.  I'm an FBI agent here in NewOrleans.

25    Q.  How long have you been with the FBI?

1    A.  I've been with the Bureau 26 years.

2    Q.  And what squad are you presently assigned to?

3    A.  The Public Corruption Squad.

4    Q.  Now, were you involved in the investigation of Len Davis,

5    Leon Duncan, Darrel Jones and numerous other policemen?

6    A.  Yes, sir.

7    Q.  And I'm going to direct your attention now to November the

8    18th, 1994 and ask what were your duties on that date?

9    A.  On November the 18th I was assigned to coordinate the

10   efforts of four undercover agents, take custody of ten kilos

11   of cocaine and conceal those kilos in two vehicles, make sure

12   that they got safely to the area of the Mardi Gras Truck Stop,

13   and thereafter, get the cocaine safely back into our evidence

14   room.

15   Q.  Now, what vehicles in particular do you recall whether you

16   put cocaine -- that you put cocaine in?

17   A.  I put five kilos of cocaine concealed in the passenger

18   compartment of a burgundy Chrysler Concorde and five kilos

19   concealed in the passenger compartment of a blue Lincoln

20   Continental.

21   Q.  And was this real cocaine?

22   A.  Yes, sir, it was.

23   Q.  Okay.  And previously in the investigation, were you also

24   to put cocaine in a warehouse and in various different

25   vehicles?

1    A.  Right.  Through the efforts of undercover agents.

2    Q.  Now, did any of this real cocaine used in the Len Davis

3    investigation and the Mardi Gras Truck Stop part of it and the

4    warehouse part of it, ever get into commerce?

5    A.  No, it did not.

6    Q.  And what would happen after these vehicles would take

7    cocaine to a certain area, what would happen?

8    A.  Well, the surveillance and the escort of these vehicles

9    would be taken up by special agents of the Special Operations

10   Group, and other, other undercover agents.  And following the

11   deal, they would return to a predesignated location at which

12   time I would escort them back.  We would take custody of the

13   cocaine and make sure it got safely back to the office.

14   Q.  Special Agent Fleming, I'm going to show you what has

15   previously been marked as Government Exhibits N1 through N10.

16   Would you take one of those out and stand up so the jury can

17   see you?

18   A.  (Witness complies)

19   Q.  Is that one of the kilos of the real cocaine?

20   A.  Yes, sir, it is.

21   Q.  And you put five of those in one vehicle, a burgundy

22   Concorde, and five in a blue Lincoln?

23   A.  Yes, sir.

24   Q.  Okay.

25        MR. WINTERS:  Your Honor, before I tender the

Fleming - Direct

1    Witness, I would offer to introduce and file into evidence

2    Government Exhibits N-1 through N-10, and ask that we be

3    allowed to withdraw it for safekeeping, because I know the

4    Clerk's Office doesn't like to keep narcotics down there.

5        And I'd also like to read a stipulation entered into

6    by all parties to this matter:

7       "It is hereby stipulated and agreed among the

8   undersigned parties the following is uncontroverted true and

9   correct:  That Leo A. Poulty (phonetic), forensic chemist for

10  the Drug Enforcement Administration would testify that

11  Government Exhibits N-1 through N-10 contained in that box are

12  cocaine."

13          And it's signed by all parties.

14          THE COURT:  That is the stipulation?

15          MR. RIEHLMANN:  Yes, sir.

16          MR. VOIGHT:  Yes, sir.

17          THE COURT:  And the offer of the ten items, the

18  exhibits, with there being no objection, they will be

19  received.

20          And you will be permitted to, in fact ordered to,

21  take them back and lock them up after today's proceedings.

22          MR. WINTERS:  All right, Your Honor.  Thank you.

23          Your Honor, I tender.

24          THE COURT:  Mr. Riehlmann.

25          MR. RIEHLMANN:  Yes, sir.


                                                    266
                        Fleming - Cross

1               *    *    *    *    *

2                   CROSS-EXAMINATION

3   BY MR. RIEHLMANN:

4   Q.  Hello, Mr.Fleming.

5   A.  Good afternoon.

6   Q.  Was your only role in this investigation to be the

7   custodian of N-1 through N-10?

8   A.  No, sir.

9   Q.  All right.  Were you the person who was over the entire

10  course of the operation responsible for the security aspect of

11    the actual cocaine that was used?

12    A.  Partially.

13    Q.  All right.

14    A.  There were other agents that were involved with checking

15    it out and making sure that it was checked back in, verifying

16    numbers and so on.

17    Q.  All right.  But you were involved from beginning to end,

18    is that correct?

19    A.  I was involved in the case for, in one form or the other,

20    for quite a few months.

21    Q.  A total of 135 kilograms were actually used in Operation

22    Shattered Shield, isn't that true?

23    A.  I'm not sure how many.

24    Q.  Well, can you tell me how many you are sure were involved?

25    A.  In this case, I'm sure that we used ten.


                                                    267
                        Fleming - Cross

1    Q.  On the November 18th incident.  I'm talking about

2    throughout the period of June -- well, actually, from January

3    1 through December 31st of 1994; how much cocaine are you

4    aware of that was used?

5    A.  Well, we would check out several kilos at a time,

6    depending on which deal was going to take place.  Certainly

7    there wasn't 135 kilos all in one truckload.

8    Q.  But over the period of the year, can you give me an

9    estimate as to how many on different -- what was the sum total

10    of all the kilos that were used?

11    A.  Well, I would say the average that we would handle would

12    be ten, maybe for a deal, five.  On one occasion there was

13    one.  I was associated with maybe five or six of these

14    transactions.  And so, if you would want an estimate, a rough

15    estimate?

16    Q.  Yes, sir.

17    A.  Maybe 65.

18    Q.  Were you involved in the surveillance end of it at all?

19    A.  Yes, sir.

20    Q.  All right.  Were you involved in the -- are you familiar

21    with the surveillance mechanisms that were in place at the

22    warehouse?

23    A.  I was aware that there were video cameras.

24    Q.  Do you know where they were?

25    A.  No, sir.


                                                              268
                        Fleming - Cross

1     Q.  Were they both interior and exterior?

2     A.  I don't know.

3     Q.  All right.

4              MR. RIEHLMANN:  Thank you, Mr.Fleming.

5              THE WITNESS:  You're welcome.

6              THE COURT:  Mr. Voight?

7              MR. VOIGHT:  I have no questions of this Witness,

8     Judge.

9              THE COURT:  Any redirect?

10             MR. WINTERS:  No redirect, Your Honor.

11             THE COURT:  Thank you, sir.  You may step down.

12             THE WITNESS:  Thank you, Your Honor.

13                  (The Witness is excused)

14             MR. WINTERS:  May we approach?

15             THE COURT:  Yes.

16                      *    *    *    *    *

17        (At side bar on the record)
                        Page 238

18          THE COURT:  All right.

19          MR. WINTERS:  Judge, we might have -- we might have a

20   couple of more witnesses, okay.  But we can't finish them

21   today.

22          THE COURT:  You won't know whether you'll have them

23   or not until when?

24          MR. WINTERS:  There is -- we still have some

25   discussions to do.  There's the possibility we will call at


269

1    least two more witnesses, okay, Monday morning.  And there's

2    the possibility we won't, okay.  But, I mean, I'll be happy to

3    leave a message on the Court's recorder, if that's what you

4    want us to do.

5           THE COURT:  No.

6           MR. WINTERS:  But regardless, we can't finish today.

7           THE COURT:  Yes.

8           MR. WINTERS:  It might be that we're saving the

9    witnesses for rebuttal.  I have to discuss it with

10   Mr.McMahon.

11          THE COURT:  Well, then, there's little -- it's ten

12   after 4:00, we might as well go ahead and --

13          MR. RIEHLMANN:  You'll get no arguments from me,

14   Judge.

15          THE COURT:  Okay.  Thank you.

16          MR. RIEHLMANN:  Thank you, Judge.

17     (End of discussion at side bar)

18                        *    *    *    *    *

19          THE COURT:  It's possible that the Government may

20   call another witness or so, but it's uncertain.  They have to

21    determine that.

22            And so, we'll recess until 9:30 Monday morning.

23                    *   *   *   *   *

24            (Whereupon, this concludes Day 5 of the trial.)

25


                                                270

1                    C E R T I F I C A T E

2

3            I certify that the foregoing is a correct transcript

4    from the electronic sound recording of the proceedings in the

5    above-entitled matter.

6

7

    /S/DOROTHY M. BOURGEOIS                        9-23-98
8    _____              _____

    Dorothy M. Bourgeois                           Date
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25