~8923937.dat

.pl

1                    UNITED STATES DISTRICT COURT

 2                    EASTERN DISTRICT OF LOUISIANA

 3

 4                                    *
    UNITED STATES OF AMERICA,         *        Criminal Action
 5                                    *        No: 97-217
         Plaintiff,                   *
 6                                    *        Section "E"
         v.                           *
 7                                    *        New Orleans, Louisiana
    LEON R. DUNCAN,                    *        May 4, 1998
 8  DARREL G. JONES,                   *
                                      *
 9       Defendants.                  *
         * * * * * * * * * * * * * * *

10                          VOLUME 6

11
                            JURY TRIAL
12         BEFORE THE HONORABLE MARCEL LIVAUDAIS, JR.,
                   UNITED STATES DISTRICT JUDGE
13
    APPEARANCES:
14
    For the Government,        United States Attorney's Office
15                             By:  MICHAEL E. MCMAHON, ESQ.
                               By:  ALBERT J. WINTERS, JR., ESQ.
16                             501 Magazine Street, Room 210
                               New Orleans, Louisiana 70130
17
    For the Defendant          Comarda & Associates
18  Leon R. Duncan,            By:  MICHAEL G. RIEHLMANN, ESQ.
                               3316 Canal Street
19                             New Orleans, Louisiana 70119

20  For the Defendant          William Noland & Associates
    Darrel G. Jones,           By:  WILLIAM NOLAND, ESQ.
21                             By:  GREGORY K. VOIGHT, ESQ.
                               2739 Tulane Avenue

22                             New Orleans, Louisiana 70119

23  Court Audio Operator:      James Crull

24  Transcriptionist:          Dorothy Bourgeois

25  Proceedings recorded by electronic sound recording,
    transcript produced by transcription service.

1                    I N D E X

2                 Direct    Cross    Redirect    Recross
   WITNESSES:

3  Karen Jenkins      4        --         --          --

4  Stanley Hadden     6        26         --          --

5  Darrel G. Jones   35        61         --          --

6  Earl Newell      123       128         --          --

7

8  EXHIBITS:                            Marked    Received

9  Duncan 4  Unedited Cassette Tapes       6         6

10 Duncan 5  Unspecified                  14        16

11 EN 1      FBI Report of Interview     126       130

12 EN 2      E. Newell Notes of Interview 126      130
13           with Darrel Jones

14

15

16

17

18

19

20

21

22

23

24

25

3

1                P R O C E E D I N G S

2               (Monday, May 4, 1998)

3            (Call to Order of the Court)

4      (Jury is present)

5           THE COURT:  Please be seated.  Mr. Winters, you may

6  proceed.

7           MR. WINTERS:  Your Honor, the Government rests,

8  subject to rebuttal.

9           THE COURT:  Very well.  Well, the Government

10  has concluded its case, subject to a rebuttal, if

11  necessary.

12           Would Counsel step up to the bench, please?

13      (Discussion at side bar on the record)

14           THE COURT:  Rather than shuffle the jury again, I'll

15  just ask here now, Mr. Riehlmann, do you have any motions or

16  anything to state on the record at this time?

17           MR. RIEHLMANN:  Yes, at this time I'm going to move

18  for an involuntary dismissal.  The Government has not proven

19  guilt beyond a reasonable doubt in the best light -- accepting

20  the Government's case in the best light.

21           THE COURT:  Well, of course that's for the jury to

22  assess as to whether he's been found guilty beyond a

23  reasonable doubt.  But from the point of view of ruling on

24  this motion, I can only say there's sufficient evidence, in my

25  opinion, to allow the jury to perform its function.  So, the


                                              4
                        Jenkins - Direct

1  motion would be denied.

2           Mr. Voight?

3           MR. VOIGHT:  I would make a similar motion, Your

4  Honor.

5           THE COURT:  And then the similar ruling.

6           MR. VOIGHT:  Thank you.

7        THE COURT:  Thank you very much.  Now, I understand

8  somebody's going to call a witness, you or you?

9        MR. VOIGHT:  Both of us.

10   (End of discussion at side bar)

11       THE COURT:  Well, ladies and gentlemen, the

12  Government has now rested its case in chief.  The Court finds

13  that the Government's evidence has --

14       THE CLERK:  Judge, not in front of the jury.  I don't

15  think this goes on the record in front of the jury.

16       THE COURT:  All right.  Mr. Riehlmann, you may

17  proceed with your defense.

18       MR. RIEHLMANN:  Thank you, Judge.  At this time I

19  call Special Agent Jenkins.

20   KAREN JENKINS, DEFENDANT DUNCAN'S WITNESS, PREVIOUSLY SWORN

21                   DIRECT EXAMINATION

22  BY MR. RIEHLMANN:

23  Q.  Ms. Jenkins, I believe in October of last year I met with

24  you for purposes of getting the materials to which I was

25  entitled, is that correct?

                                                       5
                     Jenkins - Direct

1  A.  Correct.

2  Q.  And you provided me with a large box materials, isn't that

3  true?

4  A.  Yes, I did.

5  Q.  And I'll show you what I'll mark for identification as

6  Duncan 4.  I ask that you look at those six cassettes,

7  Ms.Jenkins.

8  A.  Okay.

9  Q.  You've reviewed them.  Is that your handwriting on those

10  labels?

11  A.  Yes, it is.

12  Q.  All right, and what I've given you is six cassette tapes

13  that you provided to me, is that correct?

14  A.  Correct.

15  Q.  All right.  And those tapes contain the unedited version

16  of the conversation that took place in the car in which Sammie

17  Williams, Leon Duncan and Lemmie Rodgers were riding on

18  November the 18th, 1994, is that correct?

19  A.  Correct.

20  Q.  What we've heard so far in court, I believe, and you

21  correct me if I'm wrong, is the edited version where you took

22  out irrelevant conversation and long pauses of dead air, is

23  that correct?

24  A.  Correct.

25  Q.  All right.


                                                    6
                Jenkins - Direct/Hadden - Direct

1           MR. RIEHLMANN:  Judge, at this time I'd offer, file,

2  and introduce into evidence the -- what I marked as Duncan 4.

3           THE COURT:  Well, aren't they already in evidence?

4           MR. RIEHLMANN:  No, sir, the edited version is in

5  evidence.

6           THE COURT:  Edited version.

7           MR. MCMAHON:  No objection.

8           THE COURT:  No objection, it will be received.

9           MR. RIEHLMANN:  Thank you, Ms. Jenkins, I have no

10  further questions.

11           THE COURT:  Mr. Voight, do you have any questions of

12  this witness?

13           MR. VOIGHT:  No further questions of this witness.

14    THE COURT:  Mr. McMahon?

15    MR. McMAHON:  No questions, Your Honor.

16    THE COURT:  Thank you, ma'am.  You may step down.

17    MR. RIEHLMANN:  At this time I call Special Agent

18  Hadden.

19    STANLEY HADDEN, DEFENDANT DUNCAN'S WITNESS, SWORN

20                    DIRECT EXAMINATION

21  BY MR. RIEHLMANN:

22  Q.  Sir, you are an FBI Agent, correct?

23  A.  Correct.

24  Q.  And you have been for how many years?

25  A.  For almost 20 years.

7

Hadden - Direct

1   Q.  Excuse me for a second.  And in connection with your

2   employment as an FBI Agent, you were the case agent along with

3   Ms. Jenkins in what came to be known as Operation Shattered

4   Shield, correct?

5   A.  That's correct.

6   Q.  All right, it would be better to say that the FBI used

7   every investigative resource that they have to call upon in

8   the manner in which they conducted Operation Shattered Shield

9   over a period of a year, correct?

10  A.  Well, we used a certain extensive amount of resources.  We

11  didn't use every resource that we have, however.

12  Q.  You used video cameras that were secreted within the

13  warehouse, correct?

14  A.  Correct.

15  Q.  You used a video camera that was placed on the exterior of

16  the building, is that correct?

17  A.  Correct.

18  Q.  All right.  I'm going to show you what has previously been
19  marked as P-1.  Can you point out to the jury if it is in this
20  picture where that surveillance camera was posted?
21  A.  Right there (indicating).
22  Q.  Okay, and could you tell us what you were pointing to?  I
23  mean what was it actually connected to on the building?
24  A.  Well, it was on top of what appears to be a walk-in
25  freezer.  That's a small building just to the other side of

Hadden - Direct

1  that van and it was right up against the corner of the
2  building even with the floor level of the second floor.
3  Q.  Okay, and that was put there for the purpose of taking
4  video pictures of the police officers who participated in the
5  warehouse guarding scenario, is that correct?
6  A.  Yes, sir.
7  Q.  Did that run pretty continuously whenever any of the
8  police officers were out there?
9  A.  Most of the time it did, yes, sir.
10  Q.  And by looking that the pictures that were taken by that
11  video camera, you were able to identify many of the police
12  officers who actually worked that scenario, correct?
13  A.  Not always, but most of the time.
14  Q.  Okay.  In addition to that, didn't you have some FBI
15  Agents inserted inside the building taking photographs with
16  just a regular camera for that purposes?
17  A.  On two occasions we did, yes.
18  Q.  And it was their aim to take pictures of the police
19  officers who were in and around the warehouse?
20  A.  Yes.

21  Q.  All right, and they did so.

22  A.  Yes.

23  Q.  All right.  In debriefing Sammie Williams, did you take

24  notes?

25  A.  Yes.

1  Q.  And was Mr. -- did you go over those notes with Mr.

2  Williams?

3  A.  Well, I didn't go over them, discuss them with him, or

4  show him anything, no.

5  Q.  All right.  Now, initially your aim in this operation was

6  to take every precaution possible to make sure that Len Davis

7  and Sammie Williams didn't hoodwink any police officers into

8  working what those police officers would have considered to be

9  a legitimate detail, isn't that true?

10 A.  That's true.

11 Q.  And in order to make sure that that didn't happen, that is

12 to say honest police officers were hoodwinked into working a

13 legitimate detail, your initial plan was to have JJ meet with

14 the officers and explain to them the legal purpose of this

15 whole scenario, isn't that true?

16 A.  That was part of the reason that we wanted JJ to have a

17 face to face meeting.  The other part of the reason was we

18 wanted to make sure that the officers did come in understood

19 exactly what was going on, that they were going to be

20 protecting cocaine so there would be no doubt in a subsequent

21 trial that they knew exactly what was happening.

22 Q.  But Len Davis and Sammie Williams later refused to that

23 proposal, isn't that true?

24 A.  That's true.

25   Q.  Okay.  And that created problems in that you were unable

Hadden - Direct

 1   to readily identify who the officers were that were coming
 2   aboard, correct?
 3   A.  That is true.
 4   Q.  And you really -- it created the potential problem that
 5   you couldn't ascertain whether the detail officers knew of the
 6   illegal purposes, isn't that true?
 7   A.  That is true.
 8   Q.  Okay.  From June of '94 to November of '94, Len Davis and
 9   Sammie Williams met with JJ and the other undercover agents
10   and discussed the protection plan, isn't that true?
11   A.  Yes.
12   Q.  At the warehouse, correct?  And other places for that
13   matter.
14   A.  Wait, say your question again, please?
15   Q.  Well, from June to November of '94, Sammie Williams and
16   Len Davis met with JJ and the other undercover agents and
17   Terry Adams, a cooperating witness, for the purpose of
18   discussing the protection scenario, correct?
19   A.  No, Sammie Williams and Len Davis never met with any of
20   the other undercover agents.
21   Q.  Well, but they did meet with JJ and Terry Adams for that
22   purpose.
23   A.  Yes.  The only contact with any FBI Agents by Sammie
24   Williams or Len Davis was with our undercover agent, Juan
25   Jackson, and with the informant, Terry Adams.

Hadden - Direct

1 Q. Okay, and those -- all those meeting, and correct me if
2 I'm wrong, were video taped or audio taped, correct?
3 A. Yes.
4 Q. In all those monitored and taped conversations, was Leon
5 Duncan's name ever mentioned?
6 A. No.
7 Q. Now, there was an individual who worked the warehouse
8 protection scenario named Gregory Boldan, correct?
9 A. Yes.
10 Q. And he turned out not to be a police officer, but rather
11 an NOPD truck driver, isn't that true?
12 A. Yes.
13 Q. In monitoring the conversations, didn't you learn at some
14 point that when Gregory Boldan worked that detail initially,
15 he had not been apprised that there was cocaine in that
16 warehouse?
17 A. Well, we were never able to determine whether Greg Boldan
18 knew cocaine was in the warehouse or not. And it was our
19 intent to try and find out whether he knew, just as it was our
20 intent to find out with every officer that worked whether they
21 knew what was going on at the warehouse.
22    What happened with Gregory Boldan was that we were
23 attempting to stimulate conversation between the undercover
24 agent and some of the other officers, and between Len Davis
25 and Sammie Williams in an effort to again see what kind of

12
Hadden - Direct
1 information we could glean from these conversations. And when
2 we observed that Gregory Boldan was not an actual police
3 officer, we seized on that opportunity to have JJ complain to
Page 10

4  Sammie Williams and Len Davis about the fact that this man was
5  not a police officer.  But out intent was simply to try and
6  generate conversation.  And much to our surprise, Len Davis
7  and Sammie Williams fired him and didn't let him work the
8  detail again.  So, he was only out there one time.  And so we
9  never were able to determine whether he knew or did not know
10 what he was doing.
11 Q.  But there was some suggestion that he did not know, isn't
12 that true?
13 A.  Well, we were never able to determine from any of the
14 evidence we had that he knew.
15 Q.  All right.  And the same thing insofar as the first time
16 Chris Evans worked.  You -- well, wait, let me start over.
17     In September of 1994, you monitored a telephone
18 conversation between Len Davis and Carlos Rodriguez, isn't
19 that true?
20 A.  Well, I don't remember the dates, there were so many
21 conversations.
22 Q.  September 9th of 1994, Len Davis was on the telephone with
23 Carlos Rodriguez reaming him out or indicating that he was
24 very angry with Carlos Rodriguez for having told Chris Evans,
25 "what the time of day was," isn't that true?

Hadden - Direct
1  A.  Yes.  I don't remember the date.
2  Q.  All right.
3  A.  But there was a conversation where Len Davis was
4  complaining that Carlos Rodriguez had told Chris Evans about
5  what was going on at the warehouse in detail.
6  Q.  And Carlos Rodriguez was a sergeant with the NOPD,

7   correct?

8   A.  That is true.

9   Q.  All right, and Len Davis was very angry because Chris

10  Evans had confronted him with the knowledge that there was

11  cocaine in the warehouse and Davis was unprepared to respond

12  to his questions, isn't that true?

13  A.  Well, I don't know if that's true or not.  I only know

14  what I heard on the tape, and it's clear from the tape that

15  Len Davis was angry that Carlos Rodriguez had told Chris Evans

16  what was going on.  And that's all I can tell you.

17  Q.  Okay.

18  A.  And that's based strictly on what I heard on the tape.

19  Q.  Yes, sir.  Over the course of the six months that the

20  warehouse scenario was run, Sammie Williams, and Len Davis,

21  and the other police officers guarded a combined sum or a

22  combined total of 135 kilograms of cocaine, is that correct?

23  A.  That's a pretty close approximation, yes.

24  Q.  All right.  Haven't you previously testified that it was

25  your understanding Sammie Williams had a plea agreement with


                                                            14
                        Hadden - Direct

1   the Government?

2   A.  I don't recall if I testified that way or not.

3   Q.  All right.  Agent Hadden, at some point during your

4   investigation did you submit to the New Orleans Police

5   Department Central Evidence and Property personnel, a list of

6   names of police officers requesting that they research the

7   Central Evidence and Property records?

8   A.  No, I don't think I did.

9   Q.  Okay, well let me -- let me -- I'm going to show you what

10  I've marked for identification as -- I'm going to show you

11    what I've marked for identification purposes as Duncan Number

12    5 and ask that you take a look at this and see if this

13    refreshes your recollection.

14    A.  Okay.  Yes.

15    Q.  Okay.  You submitted a list of names to the -- I believe

16    his name is Ellis Williams --

17    A.  Yes.

18    Q.  -- of NOPD?

19    A.  Yes.

20    Q.  For what purpose did you submit those names?

21    A.  We were wanting to know if any of the officers that had

22    participated in the protection of the warehouse or at the

23    Mardi Gras Truck Stop had submitted any of the money that they

24    had received from our undercover agent and then from Len Davis

25    and or Sammie Williams into evidence at the NOPD.

<br>

                                                              15
                              Hadden - Direct

1    Q.  But you'd agree that there are several names on that list

2    of officers who never worked either of those scenarios,

3    wouldn't you?  You can look at it and review.

4    A.  Yes.

5    Q.  Okay.  But do you still stand by your earlier response?  I

6    mean if those officers had not worked either of the scenarios,

7    then why would you have submitted their names to Mr. Williams

8    and ask to do a record search?

9    A.  Well, I'd have to see the original document where I

10    requested the information.  I may have even requested it

11    orally; however, the sergeant in question, I guess he was a

12    sergeant, who was in charge of evidence and property did a

13    more thorough search than I had even asked him to do and he

14 submitted information back to me that was more thorough than
15 what I had originally requested.  But there are names on this
16 list that we had no interest in.
17 Q.  Okay, he gave you a list of -- I mean a packet of dockets
18 hundreds of pages long, isn't that true?
19 A.  Well, we received photographic copies of the evidence and
20 property logs where they log in any evidence that's introduced
21 into the evidence custodians' custody at the NOPD.  Yes, we
22 received those photocopies of those original logs.
23 Q.  Can you estimate for me when it was you requested that
24 those records be searched?
25 A.  I really don't know.  It was after -- it was sometime

Hadden - Direct

1 after all the arrests were made in this case, which was in
2 December of 1994.
3 Q.  All right.  And all the names that you submitted were the
4 people that you had suspects -- that you had as suspects in
5 this scenario, correct?
6 A.  Yes, those are the names we were interested in, anyone who
7 was a suspect or a subject in this case, those were the ones
8 we were interested in finding out information about.
9 Q.  Is Leon Duncan's name on that document that you have in
10 front of you?
11 A.  No.
12 Q.  All right.
13        MR. RIEHLMANN:  Judge, at this time I'd offer, file,
14 and introduce into evidence Duncan 5.
15        THE COURT:  Any objection?
16        THE COURT:  Hearing none, the exhibit is received.
17 BY MR. RIEHLMANN:

18  Q.  Leon Duncan was, to your knowledge, never seen at that
19  warehouse, isn't that true?
20  A.  Other than what I know from Sammie Williams, we did not
21  independently corroborate that he was at the warehouse, no.
22  Q.  You had the corroboration of the New Orleans Police
23  Department through the person of Sergeant Willie Davis with
24  Public Integrity Division throughout your investigation,
25  correct?

Hadden - Direct

1  A.  After about three or four weeks into the investigation,
2  yes.
3  Q.  All right.  And I take it that from time to time when
4  necessary you would request that Sergeant Davis obtain NOPD
5  records for you?
6  A.  True.
7  Q.  All right.  Did you ever request him to obtain records for
8  you concerning Leon Duncan applying for a transfer back to
9  narcotics after he had left in September of '93?
10  A.  I know that Sergeant Davis and I discussed that and he was
11  not able to come up with any records.  I don't specifically
12  recall asking him for that information, because if I remember
13  correctly, we had concluded from everything we knew that
14  Duncan did not go back to narcotics.

15      We also knew that the New Orleans Police Department was
16  notoriously bad about keeping any sort of records.  And we
17  knew that it would be a futile search to try and go in search
18  of any sort of official documents that would corroborate
19  whether he was going back to narcotics or not, so rather than
20  -- rather than waste our time on a futile search, we just let

21  it go, because we knew he had never gone back there.

22  Q.  So you didn't even try is what you're saying.

23  A.  Well, we didn't -- we didn't try to find something we felt

24  very confident was not there.

25  Q.  Okay.

1  A.  And not because he might not have submitted it, because

2  the NOPD is just awful.  When it comes to records, they are

3  just completely prehistoric in their record keeping.

4  Q.  You had previously testified, I believe, that Leon Duncan

5  and Lemmie Rodgers were two of the three officers who advised

6  Len Davis and Sammie Williams on how to deal with Scaboo and

7  JJ, is that correct?

8  A.  Well, I didn't know I was going to be testifying and it is

9  common procedure to review prior testimony prior to appearing

10  in court.  It's a routine procedure.  Now not knowing that I

11  was going to testify, I have not reviewed any prior testimony

12  that I may have given, so I don't recall specifically what

13  you're talking about or what the occasion was.

14  Q.  You do recall that you testified at Leon Duncan's Civil

15  Service Hearing a couple of years ago, correct?

16  A.  Yes, I did.

17  Q.  All right.  You prepared, was it six or seven affidavits

18  in support of your request for wiretap authorization?

19  A.  Again, I don't remember how many, but it was quite a few.

20  Q.  All right.  And the affidavits contained factual

21  allegations that supported your contention that these police

22  officers knew these was cocaine in that warehouse, correct?

23  A.  Yes.

24  Q.  And you'd agree with me that in none of these affidavits

25    is there any factual information suggesting Leon Duncan knew

Hadden - Direct

1    there was cocaine in that warehouse, is there?

2    A.  Well, I would not agree with that, no.

3    Q.  Are there factual allegations in your affidavits that

4    would support that Leon Duncan knew there was cocaine in that

5    warehouse?

6    A.  Well, I believe that when I wrote the first affidavit for

7    this case, which concerned the cell phone that we gave to

8    Sammie Williams on June 16th of 1994, one of the facts that I

9    relied on was that we believed that Leon Duncan and Lemmie

10   Rodgers would be two of the officers that would be called by

11   Len Davis and Sammie Williams to work at the warehouse.  And

12   once we gave the cell phone to them, within one hour after the

13   initial meeting with JJ where he said, you're going to start

14   guarding the warehouse, get your people together, the first

15   two calls that were made by Len Davis and or Sammie Williams

16   from that cell phone were to the beeper numbers of Leon Duncan

17   and Lemmie Rodgers.

18        And so based on information that I had at my disposal at

19   that time whether I actually included it in the affidavit or

20   not, I believed that those two officers knew what was going on

21   at the warehouse, were privy to certain intelligence that Len

22   Davis and or Sammie Williams had given them about what we were

23   going to do at the warehouse and I believe that they were

24   going to be there working at the warehouse fully knowing what

25   was going on.

1 Q. You concluded all that from the fact that he paged Leon
2 Duncan an hour after that meeting, is that correct?
3 A. No, there was other information that had come to our --
4 our attention. I started gathering intelligence against the
5 NOPD back in 1992. And, in fact, the Shattered Shield case
6 was like the third attempt at the Shattered Shield case. We
7 had two cases that failed previously. And during this
8 extensive effort to gather intelligence, we believe that Leon
9 Duncan and Lemmie Rodgers were dirty officers. And they had a
10 close relationship with Len Davis. And we believe that they
11 would be two that would come work at the warehouse.
12     And not only that, an affidavit does not have to include
13 every fact that you know about a situation. It only has to
14 include a sufficient number of facts to convince a Federal
15 Judge that the wiretap is authorized. And so I included in
16 that affidavit what I thought was appropriate to get the Judge
17 to agree to do a wiretap.
18 Q. Now, the beeper, the fact that Sammie Williams called Leon
19 Duncan's beeper an hour after he'd gotten the cell phone,
20 Sammie Williams told you that Leon Duncan returned that call,
21 correct?
22 A. Without reviewing my 302's of my debriefings with Sammie
23 Williams, I couldn't say yes or no.
24 Q. Well, Ms. Jenkins testified the other day that Sammie
25 Williams in his debriefing said that Leon Duncan returned that

1 call. Do you recall her testimony on that point?
2 A. No, I don't.
3 Q. All right.

 4    A.   If she said it, I'm sure it's true.

 5    Q.   And surely you don't recall Sammie Williams testifying

 6    about any conversation that he had with Leon Duncan about --

 7    after he had called Leon Duncan on that pager, do you?

 8    A.   No, I don't recall any such testimony.

 9    Q.   Your investigation -- never mind.

10         In December 1993, Sammie Williams was threatening to

11    fabricate charges, that is to say arrest Scaboo and attempt to

12    prosecute him on fabricated charges if Scaboo didn't pay him a

13    sum of money, isn't that correct?

14    A.   True.

15    Q.   And that sum of money, was that like $300?

16    A.   Not it was originally $10,000, and Scaboo told me that he

17    had negotiated that $10,000 amount down to an amount of

18    $6,000.

19    Q.   You heard me pose that question to Sammie Williams the

20    other day where I asked him:  Isn't it true that you were

21    going to fabricate charges, bring Scaboo to court with

22    fabricated charges if he didn't pay you that money, and he

23    denied that; isn't that true?

24    A.   That's true, but my information came from the informant

25    Terry Adams.  And Terry Adams said that Sammie Williams was

                          Hadden - Direct

 1    extorting him and was going to bring him to jail on trumped

 2    up charges.

 3    Q.   It's true that Sammie Williams, on September the 18th,

 4    1994, and Len Davis spoke of plans to arm rob JJ and his

 5    colleagues of their money and drugs, isn't that true?

 6    A.   Sammie Williams and Len Davis did?

7   Q.  Yeah.

8   A.  Well, there were two conversations.  I don't remember the

9   exact date again.  They were talking about, if you could tell

10  me what conversation we're talking about and who the

11  participants were, I might be able to give you more detailed

12  information.

13  Q.  A conversation of September the 18th, 1994, the

14  participants were Len Davis and Sammie Williams, and they

15  discussed plans to arm rob JJ and his colleagues of their

16  money and drugs.

17  A.  Was it a telephone conversation?

18  Q.  I don't know, let's see, it's in you affidavit.

19          THE WITNESS:  Your Honor, I also recollect something

20  else about a prior question.  Would it be appropriate for me

21  to expand on that?

22          MR. RIEHLMANN:  I'm going to object --

23          THE COURT:  You can always -- if after being asked a

24  question you can answer it and you always have a right to

25  explain your answer.

Hadden - Direct

1          THE WITNESS:  Okay.  May I do so?

2          MR. RIEHLMANN:  Judge, I'd object.

3          THE COURT:  No, there hasn't been a question yet.

4   We'll wait to the question comes up.

5   BY MR. RIEHLMANN:

6   Q.  Mr. Hadden, maybe you can help me here.  You'd know where

7   to look better than I would.  I'm looking for your affidavit

8   of November the 17th, 1994, I believe that's the date.  Yeah,

9   November the 17th of 1994.

10  A.  Is that the date it was signed, the order was signed?

11  Q.  I believe it was the date that -- I used the dates that
12  you would have put when you were filling out the affidavit as
13  the date that you submitted it.  The date that would appear
14  right above your signature.
15  A.  Okay, the -- I'll have to look through these extensively.
16  It may take some time.
17  Q.  Well, maybe I'll help -- maybe I can help you.
18  A.  Okay.  I haven't looked at these in a long time.
19  Q.  I apologize, I can't find it.
20       It is your testimony, Agent Hadden, that you cannot recall
21  Sammie Williams ever participating in a conversation, whether
22  telephone or otherwise obtained, wherein he did discuss plans
23  to rob JJ and his colleagues?
24  A.  No.
25  Q.  You don't recall such a conversation.


                                                              24
                        Hadden - Direct

 1  A.  That's not my testimony.
 2  Q.  Oh, I'm sorry, then the question was phrased poorly.  Did
 3  he ever plan or discuss plans to rob JJ and his colleagues?
 4  A.  Well, again, there were three situations were plans were
 5  discussed by various participants to rob our undercover
 6  agents, including killing our undercover agents.  And one of
 7  those conversations involved a number of officers that were at
 8  the warehouse.  And they were actively talking about killing
 9  our undercover agents and stealing the cocaine.
10       Another conversation occurred between a man by the name of
11  Sidney Robinson, whose alias is Noonie, who is a police
12  officer with the New Orleans Police Department now, and
13  another man by the name of Reynard Smith, who is a police

14    officer.  And they apparently were talking about ripping off

15    our cocaine as well, and that conversation was relayed to

16    Sammie Williams by Len Davis and Sammie Williams told me about

17    that conversation.

18        And then there was another conversation, a telephone

19    conversation the date of which I cannot recall, but it was a

20    conversation between Len Davis and Sammie Williams where they

21    talked about the fact that Noonie wanted to rip off our

22    cocaine, but that they weren't going to do that, that it might

23    come to that at a later date, but that right now they were

24    just going to milk this good deal as long as they could.  And

25    if it ever came to that, then maybe they would get with Noonie

Hadden - Direct

1    and other people to rip off our dope.  But at the present time,

2    the present date of that conversation, Len and Sammie decided

3    that they weren't going to rip off the dope.  They were going

4    to continue with the operation as it was going along.

5    Q.  On September the 18th, 1994, during an intercepted

6    telephone conversation between Sammie L. Williams, Jr., and

7    Len E. Davis, Williams clearly hinted that he and Davis might

8    attempt to steal either cocaine or money from UCA Jackson and

9    the CW in the near future.  Do you deny that you put that in

10    an affidavit, yes or no?

11    A.  Absolutely not.  If it's in the affidavit, I wrote it, but

12    again, my belief is just as I expressed it, Len Davis and

13    Sammie Williams thought about it, as I believe all the

14    officers at the warehouse thought about stealing it.  I mean

15    we had a quarter of a million dollars or more in cocaine in

16    the warehouse at any one time.  And there was a lot of

17    temptation and they talked about the possibility of stealing

18  it, but they didn't do it because they thought it was too good

19  a deal, and they could milk this deal for as long as possible

20  and get as much money as possible.

21  Q.  And when asked the other day whether or not he actually

22  had discussed plans to rob JJ, Sammie Williams denied that,

23  isn't that true?

24  A.  I don't recall what he said.

25          MR. RIEHLMANN:  Thank you, Mr. Hadden.

                        Hadden - Cross

1           THE COURT:  Mr. Voight, do you have any questions?

2           MR. VOIGHT:  No questions, Your Honor.

3           THE COURT:  Mr. Winters?

4           MR. WINTERS:  Yes, sir.

5                       CROSS-EXAMINATION

6  BY MR. WINTERS:

7  Q.  Mr.Hadden, step down here with the Court's permission.

8  A.  (Witness steps down)

9  Q.  I'd like you to point out for the jury where that fixed

10  camera was located at the warehouse.

11  A.  Okay, it was on top of the roof right at the junction of

12  this walk in freezer where it meets the building, right in

13  that corner right there (indicating).

14  Q.  And where was it directed?

15  A.  It was a fixed lens camera, unlike the camera that was in

16  the hotel room where they took off all their clothes, that

17  camera we actually had the capability of panning the lens

18  around and viewing the whole room or a large part of the room.

19          But this particular camera was a fixed lens and a fixed

20  focus camera and it would only take a picture of what it was

21  aimed at and we didn't have the capability of moving it.  And
22  that camera was aimed basically at an area that was right
23  about right here, right in here (indicating), which is where
24  the officers usually sat when they came to guard the
25  warehouse.  And so if, you know, we couldn't see anything

1   outside of that one little area, which was about the width of
2   a car and a half, you know, that was all we could see.
3   Q.  Did you have any night capability?  What happened at
4   night?
5   A.  Well, that was one of the things that I was very unhappy
6   about because even though the FBI has a lot of resources, we
7   didn't have the high quality cameras that I would like to have
8   had.  And so, therefore, at night our video cameras became
9   almost useless because you couldn't identify anybody.  The
10  cameras just wouldn't take a good enough picture to be able to
11  identify anybody at night.
12  Q.  You can have a seat, sir.
13  A.  (Witness sits down)
14  Q.  Now there was some discussion or some questions on cross-
15  examination about putting agents in the warehouse, okay.  And
16  how many times did that occur?
17  A.  On two occasions.
18  Q.  And why did it occur only on two occasions?
19  A.  The video camera, which we -- we were just discussing
20  there, we refer to as the Peter Street video.  And the Peter
21  Street video malfunctioned on two separate occasions and for
22  that reason we tried to put agents in the warehouse, smuggle
23  them in so they could provide the eyes for us that we no
24  longer had because the Peter Street video malfunctioned.

25  Q.  Were there people that showed up at the warehouse that you

Hadden - Cross

1   all could never identify?

2   A.  Yes.

3   Q.  A number of people?

4   A.  Yes.

5   Q.  And what happened if somebody showed up and got out of the

6   view of the camera, could you all identify him?

7   A.  No.

8   Q.  Are there people today that appeared at that warehouse

9   that we still don't know who they are?

10  A.  Yes.

11        MR. RIEHLMANN:  Judge, I object to that.  I mean --

12  I'll withdraw my objection.

13        THE COURT:  Well --

14        MR. RIEHLMANN:  I'll withdraw it, Judge, I'm sorry.

15  BY MR. WINTERS:

16  Q.  To your knowledge does Sammie Williams have a plea

17  agreement in this case?

18  A.  No.

19  Q.  Now there was some discussion by Mr. Riehlmann and some

20  questions about a conversation that happened in September

21  between Len Davis and Carlos Rodriguez about Chris Evans.  Do

22  you recall that on cross?

23  A.  Yes.

24  Q.  And I think the questions were only centered around

25  whether Len Davis was upset because Rodriguez had told Evans

1  that there was cocaine in the warehouse --

2  A.  Yes.

3  Q.  -- do you recall that?  Didn't the conversation go a

4  little further and didn't --

5          MR. RIEHLMANN:  Judge, I don't believe that

6  Mr.Winters can lead his witness.  I mean even though I called

7  him, I still think it's his witness and I object to leading.

8          THE COURT:  Overruled.

9  BY MR. WINTERS:

10  Q.  Didn't the conversation go a little further and didn't

11  Rodriguez say that Evans had figured out what was in the

12  warehouse long before?

13  A.  Yes, he did.

14  Q.  Now, there was some -- are you familiar with the grand

15  jury subpoenas issued in this case?

16  A.  Yes.

17  Q.  You served a lot of them, is that correct?

18  A.  Yes.

19  Q.  And do you recall serving a subpoena to NOPD Central

20  Evidence and Property?

21  A.  Yes.

22  Q.  And we asked for them to bring the evidence book, am I

23  correct?

24  A.  Correct.  We asked them to bring all of the evidence logs

25  that would indicate whether or not -- well, it's a record of

                                                        30

1  all evidence that is entered into the custody of the Evidence

2  Custodian at the NOPD by any officer.

3  Q.  Do you know the purpose of that subpoena?

4    A.  Yes.

5    Q.  Explain.

6    A.  Well, again, we were interested in only prosecuting people

7    that we felt were guilty.  And in order to do that, we had to

8    prove whether or not the officers had knowledge that they were

9    protecting cocaine.  So one of the ways we tried to determine

10   whether an officer knew or did not know he was protecting

11   cocaine was to subpoena the property records.  If an officer

12   had put any of the money that he had received in payment from

13   Len Davis on the property record book, that would be an

14   indication that that officer might be working in an undercover

15   capacity for his NOPD trying to work a case against Len Davis

16   and Sammie Williams, and it's evidence of a crime.

17   Q.  Did Leon Duncan put that $1,000 on the evidence book to

18   your knowledge?

19   A.  No.

20   Q.  Did anybody that we indicted and convicted in this case

21   put the money they received on the evidence book?

22   A.  No.

23   Q.  Now, did we have Chris Evans on tape?

24   A.  Yes.

25   Q.  Do we have him on tape when he sat in that van?

31

Hadden - Cross

1    A.  Yes.

2    Q.  Did we have Gregory Boldan on tape at any time, either on

3    the telephone or when he sat at that warehouse on one

4    occasion?

5    A.  We did have him on the telephone when he was complaining

6    to Len Davis about not being allowed to work the warehouse

7   again, but that's the only occasion that I know of.

8   Q.  Do we have him when he was at the warehouse?

9   A.  No.

10  Q.  Now, in June and July and August, the first three

11  warehouse protection scenarios, did we have any recording

12  devices in any of the vehicles that these policemen were

13  sitting in?

14  A.  No.

15  Q.  Beginning in September and October, did we have recorded

16  conversations of the people sitting at the warehouse guarding

17  the warehouse?

18  A.  Yes, we had microphones placed in the vehicles they were

19  sitting in.

20  Q.  And tell us how it came about that we were able to supply

21  vehicles.

22  A.  Len Davis and Sammie Williams asked JJ to supply vehicles

23  for the officers to sit in because they, in some cases they

24  didn't want to run their own vehicles and put wear and tear on

25  their private vehicles.  They didn't want to put wear and tear

32

Hadden - Cross

1   on their own air conditioning systems, because it was the

2   summertime and it was very hot, and in other cases they had

3   NOPD vehicles that the air conditioners were not functioning

4   properly in and they wanted something cool to sit in.

5       So, they requested the vehicles from Len Davis and Sammie

6   Williams.  And thereafter -- correction, Sammie Williams and

7   Len Davis requested the vehicles from Len Davis -- I'll get it

8   right here in a second -- from JJ.  And so, JJ, the FBI,

9   provided them with vehicles to sit in and that gave us the

10  opportunity to put microphones in those vehicles and record

11  conversations.

12  Q.  The people that sat in June and July that were indicted,

13  did they also sit in September and October and were recorded

14  in those vehicles?

15  A.  Yes.

16  Q.  Are the 15 people that we indicted, 13 convicted --

17         MR. RIEHLMANN:  Judge, I'm going to object to that.

18         THE COURT:  Objection maintained to the form of the

19  question.

20  BY MR. WINTERS:

21  Q.  Of the 15 people we indicted, do we have incriminating

22  conversations on all of them?

23  A.  Yes.

24         MR. RIEHLMANN:  I'm going to object to that, Judge.

25         THE COURT:  Overruled.

                                                    33
                        Hadden - Cross

1  BY MR. WINTERS:

2  Q.  Do you recall hearing those conversations about stealing

3  the cocaine and killing the undercover agent?

4  A.  Yes.

5  Q.  They were of concern to the FBI?

6  A.  Definitely.

7  Q.  Isn't it a fact that the people that were discussing that

8  were Sheldon Polk and Briant Brown, two other police officers?

9  A.  And others, yes.

10  Q.  Did you ever hear Sammie Williams discuss that?

11  A.  No.

12  Q.  In fact, they were concerned that Sammie Williams would

13  find out what they were doing, am I correct?

14    A.   Absolutely.

15            MR. WINTERS:   Excuse me one second, Judge.

16            Nothing further.

17            THE COURT:   Any redirect?

18            MR. RIEHLMANN:   No, sir.

19            THE COURT:   Thank you, sir, you may step down.

20            MR. RIEHLMANN:   Judge, at this time on behalf of

21    Mr.Duncan I rest.

22            THE COURT:   Very well.   Mr. Voight?

23            MR. RIEHLMANN:   Oh, Judge, he told me that he had --

24    can we approach the bench?

25            THE COURT:   Sure.

1        (Discussion at side bar on the record)

2            THE COURT:   Where did Voight go?

3            MR. RIEHLMANN:   He said he had to run to the

4    bathroom.

5            MR. WINTERS:   Excuse me?

6            MR. RIEHLMANN:   Greg had to run to the bathroom.

7            MR. WINTERS:   Has he got a defense?

8            MR. RIEHLMANN:   I can't speak for him.

9            MR. WINTERS:   Oh, you don't know.

10            MR. RIEHLMANN:   No.  But I know he had a --

11            THE COURT:   So, you're finished and --

12            MR. RIEHLMANN:   Yeah.

13            THE COURT:   Well, how long ago did he go?

14            MR. RIEHLMANN:   While Mr. winters was doing his --

15            MR. WINTERS:   Redirect?

16            MR. RIEHLMANN:   -- cross.

17            MR. WINTERS:   Redirect, cross, re-cross direct.

18          THE COURT:  Well, I'm --

19          MR. WINTERS:  Do you want to take a recess?

20          THE COURT:  -- inclined to feel that he's not going

21  to do anything.

22          MR. RIEHLMANN:  No, I don't think that's the case.

23          THE COURT:  Okay.  Well, we'll wait just a few

24  minutes and then have a recess if necessary.  And that means

25  if we finish your thing and it's not appropriate to have

                          Jones - Direct

1  another recess, you can go into your thing, right, the closing

2  argument.

3          MR. WINTERS:  Do you want to recess now?

4          THE COURT:  Well, if he doesn't come in in a minute

5  or so, I'm mean -- here he comes.

6     (End of discussion at side bar)

7          THE COURT:  Mr. Voight, you may proceed with your

8  defense.

9          MR. VOIGHT:  Thank you, Your Honor.

10         Your Honor, at this time Defendant Jones would waive

11  his opening statement and I would call Darrel Jones to the

12  stand.

13         THE COURT:  Very well.

14             DARREL G. JONES, DEFENDANT, SWORN

15                    DIRECT EXAMINATION

16  BY MR. VOIGHT:

17  Q.  Darrel, how old are you?

18  A.  Thirty-nine.

19  Q.  Where were you born?

20  A.  New Orleans, Louisiana.

21  Q.  Where do you reside now?  Where do you reside now?  What

22  city?

23  A.  New Orleans.

24  Q.  Have you always lived in New Orleans?

25  A.  Yes, I did.

Jones - Direct

1  Q.  Did you go to school in New Orleans?

2  A.  Yes, I have.

3  Q.  Where did you graduate from?

4  A.  Walter L. Cohen Senior High.

5  Q.  What did you do after you graduated from high school?

6  A.  I worked with a state program tutoring kids after school.

7  Q.  Now, in 1994 how were you employed?

8  A.  I worked with A&A Bail Bond.

9  Q.  And what did you do for them?

10  A.  I went through the courts picking up subjects that's

11  wanted and I had a parking lot that I ran also.

12  Q.  When you say, "picking up subjects that are wanted," what

13  is that job?  What do they call that?

14  A.  Okay, it consists of a bounty hunter and subjects that's

15  wanted by the court system, and I check it through the court

16  system and I pick the guys up for the courts.

17  Q.  Okay.  During the course of your work as a bounty hunter,

18  did you encounter police officers?

19  A.  Yes, I did.

20  Q.  Was one of those police officers Len Davis?

21  A.  Yes, I have used Len Davis.

22  Q.  Tell us how you met Len Davis.

23  A.  I met Len Davis through the second -- when he was in the

24  Second District, someone broke into my wife's car and he came

25    out on the call and that's how I met Len Davis.

                        Jones - Direct

 1    Q.  Were you friendly with Len Davis?

 2    A.  No, I wasn't.

 3    Q.  Did you go to Flynn's and hang out with Len Davis?

 4    A.  No, I didn't.

 5    Q.  Now, let me direct your attention to November of 1994.

 6    A.  Okay.

 7    Q.  Prior to November 18th, 1994, did Len Davis approach you

 8    about working a detail?

 9    A.  Yes, he did.

10    Q.  And when did he do that?

11    A.  It was approximately 9:00 that morning or 9:30 I saw Len

12    in the Criminal Court building.

13    Q.  When you say, "that morning," what morning are you

14    referring to?

15    A.  That would be November the 18th.

16    Q.  Now had he talked to you a couple of days earlier about

17    working the detail?

18    A.  No, he didn't.

19    Q.  Now, when you say you met Len in the Criminal Court

20    building, where in the Criminal Court building did you meet

21    Len?

22    A.  I met Len on the 2nd Floor in the hallway of the Criminal

23    Court Building on Tulane and South Broad.

24    Q.  And what were you doing over there?

25    A.  Looking for someone to help me on some bond forfeitures I

1  had, that's guys wanted by the court system, and someone --
2  one of the police officers to help me to see about picking
3  them up in the Fifth District.
4  Q.  Now, when you say "bond forfeitures," what do you mean by
5  that?
6  A.  Okay, it's a bond forfeiture means if the bondsman, if I
7  don't pick the guy up within six months, that means the
8  bondsman lose out on the money.  But if I get him before the
9  system pick him up, they doesn't lose out on the money.
10  Q.  And when you say you were looking for somebody, what do
11  you mean by that?
12  A.  That's a subject that's wanted.
13  Q.  When you -- now, you say that Len Davis approached you
14  that morning about a detail.  What did he tell you the detail
15  was going to consist of?
16  A.  He didn't tell me, just said he needed someone to work a
17  detail.
18  Q.  Now, you had -- were you -- when we talk about details,
19  we've heard a lot about details.  Would you describe what you
20  know a detail to be?
21  A.  A detail is consist of security work.  If you have a
22  business from 8:00 to 4:00, and you need someone out there,
23  there maybe have problems around there breaking into cars, you
24  may have me out there for that reason from 8:00 to 4:00.
25  That's what a detail consists of, security work.

1  Q.  Now you had worked details before, right?
2  A.  Yes, I have.
3  Q.  Approximately how many details had you worked?

  4   A.   I work hundreds of them.
  5   Q.   Now, at the time in November 1994, were you a reserve
  6   deputy sheriff -- a criminal deputy sheriff?
  7   A.   In 1994?
  8   Q.   In 1994.
  9   A.   No, I wasn't a criminal sheriff at the time.
 10   Q.   Were you a reserve deputy civil sheriff in 1994?
 11   A.   Yes, I was.
 12   Q.   And how long have you been a reserved deputy civil
 13   sheriff?
 14   A.   Five or six years.
 15   Q.   And what did your duties consist of as a reserve deputy
 16   civil sheriff?
 17   A.   Okay, they may have some guys that they're short of.  They
 18   may have a function or something going on.  They may need 25
 19   people.  They may have 20 regular guys that's working and
 20   they'll get five of the reserve.
 21   Q.   Now, during the course of -- strike that.
 22        Did you ever work details in your civil sheriff's uniform?
 23   A.   Yes, I have.
 24   Q.   When you worked a detail in your civil sheriff's uniform,
 25   what did you bring to that detail?

                                                              40
                            Jones - Direct
  1   A.   I had my navy blue pants, blue shirt, and my gun belt and
  2   gun.
  3   Q.   And did you have a name for your gun?
  4   A.   Yeah, Roscoe.
  5   Q.   Did you ever work a detail where you didn't bring your
  6   gun?

7   A.  No, I brought it at all times.

8   Q.  Now, tell us -- tell the jury about the conversation you

9   had with Len Davis the morning of the 18th in the Criminal

10  Court Building.

11  A.  Okay, I met with Len Davis that morning.  I have a parking

12  lot that I have, and I run it.  And I went over the court

13  building and I saw Len in the hall and he asked me could I

14  work a detail for him.  I told him if I'm clear with my

15  parking lot, I'll get back with him on the detail.  And

16  evidently I gave him my pager number to get in contact with

17  me, but he -- I told him I would be across the street in my

18  lot.  He came over there and asked me could I take it.  I told

19  him if I'm clear, I'll take it.

20  Q.  All right, now you were clear, is that correct?

21  A.  I didn't hear you.

22  Q.  Were you clear?

23  A.  Yeah, I was clear.

24  Q.  And did you later meet Len Davis?

25  A.  Yes, I met Len Davis later on that day.

1   Q.  And where did you meet him?

2   A.  I met Len in Gentilly by the Texaco gas station.

3   Q.  Why don't you open your book, Darrel, to SW 6 Tape 1.

4   A.  (Witness complies)

5   Q.  Do you recognize that, Darrel?

6   A.  You said Tape 1?

7   Q.  Tape 1.

8   A.  Okay.

9   Q.  Now, Darrel, you and I have listened to audio tapes and

10  CD's that contain this conversation, is that true?

11  A.  Yes, I have.

12  Q.  And down there at Line 10 on Page 1, where it days, "DJ,

13  what's happening?"  You've listened to that tape, haven't you?

14  A.  Yes, I have.

15  Q.  Is that your voice?

16  A.  Yes, it is.

17  Q.  Now, before you got in that car, Darrel, had you ever met

18  Sidney Dubuclet?

19  A.  No, I haven't.

20  Q.  Had you ever met Sammie Williams?

21  A.  No, I didn't.

22  Q.  Had you ever met Leon Duncan?

23  A.  No, I didn't.

24  Q.  Had you ever met Lemmie Rodgers?

25  A.  No, I didn't.

Jones - Direct

1  Q.  Had you ever met Juan Jackson?

2  A.  No, I didn't.

3  Q.  Had you ever met Terry Adams, Scoo, Scaboo?

4  A.  No, I didn't.

5  Q.  Darrel, these transcripts, which are marked as SW 6 Tape

6  1, 2 and 3, do they contain all the conversations that you

7  would have had in the automobile while you were in there?

8  A.  No.

9  Q.  What -- were there other conversations that are not

10  included in these transcripts?

11  A.  Yes, it is.

12  Q.  On these conversations -- no, strike that.

13      Darrel, flip over to Page 2.  I'm going to direct your

14  attention to Lines 1 through 4.  What do you mean on Line 4

15  when you say, "They going to have them tinted ass fucking

16  windows though?"

17  A.  All that just was -- was just stuff someone having tinted

18  windows.

19  Q.  What were you -- what -- what were you responding to

20  there?

21  A.  Just another car with tinted windows on it, that's all.

22  Q.  Now, skip on down to Line 12 where you speak, "When me and

23  Zoo be together," now who is Zoo?

24  A.  Reynard Smith.

25  Q.  "We handle it."  What did you mean by that?

Jones - Direct

1  A.  Okay, sometime we be talking about police work and we be

2  in a car and if you see guys that look suspicious or whatever,

3  he runs, you know, he just runs the license plate on the car.

4  Q.  And what -- to your knowledge, why would he do that?

5  A.  Maybe the car may be stolen or something like that if the

6  guys look suspicious.

7  Q.  Skip over to Page 3, Darrel.

8  A.  (Witness complies)

9  Q.  At Line 7, and this is Len Davis speaking down at the

10  bottom of that paragraph.  "See that gray car and that other

11  car over there?"  Do you recall what he was talking about

12  there?

13  A.  No, I didn't.

14  Q.  Now, where were you in this car?  Where were you seated?

15  A.  I was sitting in the backseat on the passenger side.

16  Q.  And who was driving the car?

17  A.  Len Davis.

18  Q.  And who was in the front seat on the passenger side?

19  A.  I guess that the guy, Sidney Dubuclet.

20  Q.  Darrel, skip on over to Page 5.

21  A.  (Witness complies)

22  Q.  Line 14 through 16, are you with me?

23  A.  Yeah.

24  Q.  Now this is Len Davis talking.  Do you know where the car

25  was located at this time, at this point in the conversation?

                                                        44
                        Jones - Direct

1  A.  Where the car was located?

2  Q.  Where you all were in the car.

3  A.  No.

4  Q.  All right.  Now, this is Len Davis talking.  "They got a

5  whole stack of something here.  Come and lose our dope man

6  money."  And then a cell phone rings.  To the best of your

7  knowledge, Darrel, what was Len Davis talking about there?

8  A.  I didn't even hear what Len Davis said at the time.

9  Q.  You were in the car though.

10  A.  I was in the car.

11  Q.  But you didn't hear Len Davis say that.

12  A.  No.

13  Q.  Skip on over to -- now, Darrel, tell us what you all did

14  while -- there came a time when you all traveled in the car to

15  the Mardi Gras Truck Stop.

16  A.  Yes, I did.

17  Q.  Tell us what, to the best of your recollection, you all

18  discussed while you were in the car while sitting at the Mardi

19  Gras Truck Stop?

20  A.  Well, it wasn't much that was discussed.  We talked about

21 basketball, did we play basketball somewhere before.

22 Q. Now who would have had that discussion with you?

23 A. I had that discussion with Sidney Dubuclet.

24 Q. And that's not contained on these transcripts, is it?

25 A. No, it isn't.

Jones - Direct

1 Q. During that conversation you didn't discuss guarding

2 cocaine, did you?

3 A. No, I didn't.

4 Q. Now, when you were at the Mardi Gras Truck Stop, did you

5 know that you were guarding cocaine?

6 A. No, I didn't.

7 Q. Had Len Davis told you that you were going to be guarding

8 cocaine?

9 A. No, he didn't.

10 Q. Did -- while Len Davis was out of the car, did Sidney

11 Dubuclet indicate to you that you were going to be guarding

12 cocaine?

13 A. No, he didn't.

14 Q. Skip on down to Page 13.

15 A. (Witness complies)

16 Q. Line 18, this is Len Davis talking now. "No, I ain't

17 laughing at that. I'm laughing at Lemmie, asshole, because

18 Leon, he was leery from the first fucking time we went at it

19 months ago and Dunc got him to come on." Do you recall

20 hearing that when Len Davis spoke it?

21 A. I don't recall that conversation.

22 Q. On November 18th, 1994, did you know who Lemmie was?

23 A. No, I didn't.

24 Q. Did you know who Leon was?

25   A.   No, I didn't.

                        Jones - Direct
 1   Q.   Did you know who Dunc was?

 2   A.   No.

 3   Q.   Skip on over to SW 6 Tape 2.

 4   A.   (Witness complies)

 5   Q.   On Page 1, Line 1, Darrel, you say, "I've got a fucking

 6   detail tonight and I don't feel like going."  What was that

 7   detail, Darrel?

 8   A.   It was a church at the -- that I works during the week and

 9   it's a church detail.

10   Q.   Is that one of your regular details?

11   A.   Yes, it is.

12   Q.   Approximately how many times a week do you work that

13   detail?

14   A.   Four times, sometimes five out of the week.

15   Q.   Did you wear -- typically when you went to that detail,

16   would you wear your uniform?

17   A.   Yes.

18   Q.   Would you bring your gun?

19   A.   Yes.

20   Q.   Now, go to line -- Page 2, Line 25.  And this is you

21   speaking now.  "About four of them niggers up there, 966

22   boys."  What are you talking about there?

23   A.   Okay, well that's the stuff -- that's guys where I work

24   the detail at, the church is in the middle of the block and

25   its guys that stand on the corner by the grocery store and

1 sell drugs.

2 Q. And what were you telling Len Davis about that?

3 A. Okay, I was asking him could he come around there and

4 clear that corner up for me sometime when he's working,

5 because they be out there everyday.

6 Q. Have you ever called the district concerning those drug

7 dealers?

8 A. Several times.

9 Q. And what was the New Orleans Police Office's response to

10 your calls?

11 A. They would come out.  I'd give the description of what the

12 guys have on and they'll come out and pick them up.  Sometime

13 they get them, sometime they don't.

14 Q. Now, why don't you go on over to Page 3, Line 18.

15 A. (Witness complies)

16 Q. You said, "All right now, the two niggers in the other

17 car, where they -- where they going to be?"  Do you recall who

18 you were talking about there?

19 A. No, I don't.

20 Q. Were you talking about JJ and Terry Adams?

21 A. No, I don't even know them.

22 Q. Go to line -- Page 4, Line 3.

23 A. (Witness complies)

24 Q. That's your -- you speaking.  You say, "That's their

25 business, right?"  What did you mean by that?

1 A. Okay, that had to be the other guys that I was talking

2 about consist of the detail that, you know, were they going to

3 be working the detail also.

4   Q.  Now, at that time was the car still at the Mardi Gras
5   Truck Stop?
6   A.  Yes, it was.
7   Q.  To the best of your knowledge, was there anybody else
8   working that detail at the Mardi Gras Truck Stop at the time?
9   A.  I don't know.  I just saw other policemens in the car.  I
10  don't know who they were.
11  Q.  When you say you saw other policemen in a car, where was
12  that located?
13  A.  It was -- it should have been on the left-hand -- on my
14  left.
15  Q.  And to the best of your knowledge, who was in that car?
16  A.  I don't know who it was.  I couldn't see.
17  Q.  Now, you saw -- sitting through this trial you've learned
18  who was in that car, is that correct?
19  A.  Yes.
20  Q.  And that was?
21  A.  Leon Duncan, Lemmie Rodgers and Sammie Williams.
22  Q.  On November 18th, 1994, did you know those individuals?
23  A.  Did I know them?
24  Q.  Yes.
25  A.  No, I didn't.

                                                    49
                        Jones - Direct
1   Q.  Now, Darrel, on Page 4, Line 11, you state, "I brought
2   radio, gun, every mother fucking thing, what's happening with
3   you?"  On November 1994, -- I'm sorry, November 18th, 1994,
4   had you brought your radio with you?
5   A.  I can't remember if I had a radio.  I probably, but I know
6   I had my gun and everything with me.

                        Page 43

7    Q.  So your testifying that you brought your gun with you.

8    A.  Yes, I did.

9    Q.  Now, go down to Line 18 on that same page.  "The mother

10   fucker ain't looking for no badge.  They looking for a gun."

11   who is "they"?

12   A.  Okay, talking in reference of a criminal that's out here

13   doing something wrong.  They're not looking for the badge.  If

14   you have a uniform on and your gun, they're not even paying

15   attention to whether you have a badge on your shirt or not.

16   Q.  Were you talking about JJ?

17   A.  No.

18   Q.  Go over to line -- Page 5, Darrel.

19   A.  (Witness complies)

20   Q.  Line 19, this is you speaking.  "I know that's right

21   ya'll.  You see, you like me, I'm going with you and that's

22   all I need to mother fucking know."  What did you mean by

23   that?

24   A.  Okay, he asked me about a detail.  I didn't need to know

25   any details about the detail.  He just asked me to work a

                                                           50
                            Jones - Direct
1    detail and I was going with him.  Evidently, he knew what we

2    was going to work, he just needed some people to work the

3    detail and I was going with him on the detail.

4    Q.  Was it your practice to ask questions when you were hired

5    for a detail?

6    A.  No.

7    Q.  At this time during this conversation did you know that

8    you were guarding a shipment of cocaine?

9    A.  No, I didn't.

10   Q.  On Page 6, on Line 18, this is your talking again, Darrel.

11  "As long as that mother fucker stayed where he at, all these
12  mother fucking blue shirts, all them niggers with all them
13  mother fucking gold."  Do you recall what you were talking
14  about there?
15  A.  No, well, they had some guys in a car that had pulled up
16  and they had a bunch of gold in their mouth.  All of them had
17  golds in their mouth.  And I said as long as they don't bother
18  me, I don't think they're going to bother us.
19  Q.  And why did you think that they weren't going to bother
20  you?
21  A.  Well, because they had all policemens in the car with
22  uniform shirts on.
23  Q.  On Page 7, Darrel, at Line 20, this is you speaking.
24  "Right here behind the truck I was just telling you."  Do you
25  recall what you were talking about there?

                                                        51
                        Jones - Direct
1   A.  No, not offhand.
2   Q.  And when did this conversation take place, Darrel, that
3   this is a transcript of?
4   A.  When we was in the car.
5   Q.  And when was that?
6   A.  At the -- when I was in the car with Len Davis at the
7   Mardi Gras Truck Stop.
8   Q.  Now, on Page 8 at Line 3, you say, "Because I noticed they
9   looked over here."
10  A.  Okay.
11  Q.  What are you talking about there?
12  A.  Okay, he said he was supposed to meet somebody, and
13  evidently that's -- I was telling him that was his people that

14  he was looking for, because they was looking at him.

15  Q.  Had you seen the people before who were looking at him?

16  A.  No, I haven't.

17  Q.  Did you recognize who they were?

18  A.  No.

19  Q.  Did you know that they were in a car containing cocaine?

20  A.  No, I didn't.

21  Q.  At Line 15 on that page, Darrel, Len Davis says, "Um, keep

22  our eyes open for any kind of cars."  And you say, "Oh, yeah."

23  Do you know what Len Davis was talking about there?

24  A.  No, I didn't.

25  Q.  And then at Line 18 you say, "Yeah, because the mother

Jones - Direct

1  fucker ain't going to follow you too far."  What are you

2  talking about there?

3  A.  Okay, we was in reference -- we was talking about police

4  work, guys following one another and that's what we was

5  talking about, a car following you so long, you wouldn't know

6  if a car following you to a certain point or whatever.

7  Q.  Now, at Line 21 you say, "If you can't pick a mother

8  fucker up that's following you, something's wrong.  I mean

9  like the time the mother fucker Sam got with the 44 kilos."

10  What were you talking about there?

11  A.  All right, I was talking about a guy, a sergeant in the

12  Sixth District by the name of Sam Pool.  They made a bust

13  following some guys out of town and they made a bust of 44

14  kilos and that's what I was talking about, how these guys can

15  pick up them following them way out of town.

16  Q.  Now, on Page 9 at Line 2, when you say, "Sam fooled them,"

17  is that what you're saying there?

18  A.  No, I said, "Sam Pool."

19  Q.  All right.  Darrel, on Page 10 at Line 12, this is you

20  again.  You say, "Exactly.  When they -- when the first time

21  they relax, I had a little thing going on -- going in the

22  district so long we had to --" what are you talking about

23  there?

24  A.  Okay, when I was talking about the guys, I had another

25  detail in the district, but when the guys was out on the

Jones - Direct

1  corner, I used to call the police and have them picked up at

2  all times, in the district at all times.

3  Q.  Were you talking about you committing illegal activity at

4  that point?

5  A.  No, I'm talking about cleaning up the guys that was out

6  there selling drugs.

7  Q.  All right, now on the top of Page 12, Darrel, Len Davis

8  says, "We've been dealing with the other people."  This is

9  some people that he brought in with him.  And you say, "All

10  right."

11      And then Len Davis says, "All right, and they want

12  our protection, so what it is these people never had this with

13  us before."  And you say, "Right, right, because they don't

14  know where we coming from."  Do you know what Len Davis was

15  talking about there?

16  A.  No, I didn't.

17  Q.  And what were you talking about there?

18  A.  They had me, but I don't even think that was really me.  I

19  just was agreeing, I guess agreeing on what him talking of

20  police work.  That's all I can see.  I don't know exactly what

Page 47

21  it was.

22  Q.  Now, on Line 19 of that same page Len Davis says, "I

23  wouldn't be surprised if this car empty and everything in that

24  other, the nigger might just play us just like that."  And you

25  say, "I hear you.  Yeah, you right, you right."  What do you

Jones - Direct

1  mean by that?

2  A.  I'm just agreeing with Len.  I don't recall what that was.

3  Q.  Do you -- did you know at that time what Len Davis was

4  talking about?

5  A.  No, I didn't.

6  Q.  Page 13, on Line 5, where you say, "I don't even want to

7  know what's in the mother fucker."  What did you mean by that?

8  A.  Where we at?

9  Q.  Page 13 on Line 5, your voice.

10  A.  Okay.

11  Q.  "I don't even want to know what's in the mother fucker."

12  What did you mean by that?

13  A.  Okay, I didn't think nothing would have been in the car.

14  I just figured Len had a detail that he was operating and I

15  went along with him with the detail.

16  Q.  Now, where were you when you were having this

17  conversation?  Where was the automobile that you were in?

18  A.  Where was the automobile?

19  Q.  Uh-huh (Affirmative response)

20  A.  I don't know how far we out -- might of was on the

21  Interstate or something like that.  I can't recall.

22  Q.  Okay.  When Len hired you to do a detail, did you know

23  that you were going to be following a car?

24  A.  No, I didn't.

25   Q.  When did you realize that Len wasn't going to drop you off

Jones - Direct

1   at a detail?

2   A.  Okay, we had got on the Interstate and we had got past

3   maybe Crowder or Bullard maybe, and I realized it then.

4   Q.  And what did you think Len was having you do?

5   A.  Well, I think Len was doing an escort detail without

6   reporting it to his work and his sergeant, or his captain, or

7   lieutenant, whoever he have to report the detail to, and I

8   just figured he was doing an escort detail without reporting

9   it.

10   Q.  Did you think that you were escorting cocaine at that

11   time?

12   A.  No, I didn't.

13   Q.  Page 13 on Line 20, you say, "Right, and they can't hold

14   you for that shit if there is to come down."  What did you

15   mean by that?

16   A.  All right, what I meant by that by his -- him doing an

17   escort detail, the rank couldn't do him anything at the time,

18   you know, only they probably could do was suspend him for

19   doing the escort detail without reporting it.

20   Q.  Page 14, Darrel, Line 4, you say, "They just got over

21   behind us."  What are you referring to there?

22   A.  I don't know exactly what that was.

23   Q.  At Line 20 when Len Davis says, "That idea is gone."  And

24   you say at Line 21, "It's gone."  What are you referring to

25   there?

1   A.  I don't know.

2   Q.  Skip on over to Tape Number 3, Darrel, Line 1.

3   A.  (Witness complies)

4   Q.  This is your voice.  "But told him I saw the Lincoln

5   looking -- yeah, and I told them, I said, is that a blue

6   Lincoln over there."  What are you referring to there?

7   A.  Well, the time he said he was looking for someone that he

8   was supposed to meet, and that's what, I was telling him maybe

9   that was the guy that he was looking for.

10  Q.  Now, on Page 2 of that transcript at Line 2, this is your

11  voice again, Darrel.  You say, "But like you were saying,

12  that's the point, yeah.  They might not have a mother fucking

13  thing in there.  The nigger want to see where we --" on Line

14  6, "-- coming from."  Line 8, "And the other shit going the

15  opposite way."  What are you talking about there?

16  A.  I don't have no idea on that.

17  Q.  Are you -- at that time were you talking about cocaine

18  there?

19  A.  No, I wasn't.

20  Q.  Do you the word "shit" to be street slang for narcotics?

21  A.  No.

22  Q.  Now, on Page 3, on Line 6, you say, "How far they going?"

23  Do you know what you were referring to there?

24  A.  No.  All I can say unless he was talking about the car

25  that he was escorting and that's what I could have been

1   assuming that he was talking about the car that he was

2   escorting.

3   Q.  On Line 13 Len Davis says, "I don't even ask them no

4    questions.  I don't even want to know."  And you say, "I hear
5    you.  All I want is like you say."  What did you mean by that?
6    A.  I just was responding with Len.  I didn't really know.
7    Q.  On November 18th, 1994, did you know that Len Davis had
8    been protecting cocaine?
9    A.  No, I didn't.
10   Q.  Did you know that Len Davis had been involved in illegal
11   activity?
12   A.  No, I didn't.
13   Q.  Did you know that Len Davis was a -- had -- was implicated
14   in a murder?
15   A.  No, I didn't.
16   Q.  On November 18th, 1994, did you respect Len Davis?
17   A.  Yes, I did.
18   Q.  Did you think he was a -- strike that.
19       On Page 5 of that transcript, Line 15, you say, "Later my
20   brother, later."  Do you remember what you were referring to
21   then?
22   A.  No, I just was saying later.
23   Q.  At that time did you realize, or at that time did you know
24   that you had escorted cocaine?
25   A.  No, I didn't know.

                                                          58
                            Jones - Direct
1    Q.  Now on Page 6, at Line 3, you say, "I ain't on the other
2    -- I'm talking about on the other time."  What's the other
3    time?
4    A.  I don't even know what that is.
5    Q.  Now, on Page 8, Darrel, at Line 24, you say, "I'm going to
6    get Zoo to holler at you -- I'm holler at -- I might have a

7   little thing going on too."  What are you referring to there?

8   A.  Okay, I had another detail in the Fifth District and I was

9   trying to get somebody else to work it, because I had the

10  church detail I had, I had it like four or five days out of

11  the week and I couldn't take it at all.

12  Q.  Now, tell us, Darrel, what you recall you did while you

13  were in that automobile on November 18th, 1994.  What

14  happened?

15  A.  Well, Len, when he picked me up, all I remember we getting

16  into the car.  He went by the Mardi Gras Truck Stop.  We sat

17  there for a few minutes and when he found out, he said he had

18  to meet his people, that when we -- he pulled off and we just

19  started driving and we got on the Interstate.

20  Q.  Did there come a time when you turned around?

21  A.  Yes, we did turn around.

22  Q.  Now, do you recall what time Len Davis dropped you off?

23  A.  No, I don't recall.  It had to be before -- it was before

24  maybe 2:30, I know that.

25  Q.  Do you recall how long you were in that car from the time

Jones - Direct

1   you got in until the time you got out?

2   A.  Approximately an hour.

3   Q.  Now, you've heard the tapes the Government has played and

4   you've heard the testimony of Sammie Williams.  Do you recall

5   meeting up with Len Davis later that afternoon?

6   A.  I think I did.  I might have meet Len something during

7   that day.  I don't know when I met Len, but I probably did.

8   Q.  Did Len Davis pay you $1,000?

9   A.  No, he didn't.

10  Q.  What's the most money you've ever been paid to work a

11  detail?

12  A.  Maybe $700 or $800.

13  Q.  Did Len Davis pay you any money?

14  A.  No, he didn't.

15  Q.  Do you recall what you would have discussed with Len later

16  that afternoon?

17  A.  Yeah, I talked to Len about helping me out about picking

18  some of the guys up in the Fifth District that was wanted by

19  the court that I had for the bail bonds office that I was

20  working for.

21  Q.  Now, after all this happened, did there come a time when

22  you met with the FBI concerning this incident?

23  A.  Yes, I did.

24  Q.  And do you recall telling the FBI about this second

25  meeting with Len Davis?

Jones - Direct

1  A.  I didn't hear the question.

2  Q.  Did you recall -- do you recall what you told the FBI

3  concerning the second meeting?

4  A.  No, I don't.

5  Q.  Did you tell the FBI what you remembered about that

6  meeting?

7  A.  I probably remember some of it.  I didn't remember all of

8  it.  I can't recall offhand.  I did meet with them though.  To

9  the best of my knowledge, I gave them what I know.

10  Q.  When you got into the car, Darrel, were you dressed in

11  your civil sheriff's deputy uniform?

12  A.  With Len Davis?

13  Q.  When you first got in the car.

14  A.  Yes, I did -- no, not when I first got in the car.  I just

15  had on my shoes, my blue pants and I guess a some kind of pull

16  over sweatshirt or shirt.

17  Q.  And you later put on your reserve -- your civil sheriff

18  shirt.

19  A.  Yes, I did.

20  Q.  And what does that shirt look like?

21  A.  It's light blue, consist of like the New Orleans Police

22  shirt, the same color.

23  Q.  On November 18th, 1994, were you trying to be a -- trying

24  to dress like a New Orleans police officer?

25  A.  No, I wasn't.


                                                    61
                            Jones - Cross

1  Q.  Were you permitted by the civil sheriff's office to wear

2  that uniform on details?

3  A.  Yes.

4           MR. VOIGHT:  I'll tender, Your Honor.

5           Please answer their questions, Darrel.

6           THE COURT:  This maybe the appropriate time to have a

7  recess, so we'll take a brief ten minute recess.

8     (Recess)

9     (Jury is present in the courtroom)

10          THE COURT:  Please be seated.  First, let me ask,

11  Mr.Riehlmann, are you going to have any questions of this

12  witness?

13          MR. RIEHLMANN:  No, sir, I'm not.

14          THE COURT:  Thank you.  Then, Mr. Winters, you may

15  proceed.

16          MR. WINTERS:  Thank you, Judge.

17                            CROSS-EXAMINATION
                            Page 54

18   BY MR. WINTERS:

19   Q.  Good morning, Mr. Jones.

20   A.  How you doing?

21   Q.  How are you, sir?

22   A.  Okay.

23   Q.  Mr.Jones, at one time you were a reserve criminal

24   sheriff, am I correct, a criminal sheriff's deputy?

25   A.  Yes, I was.

Jones - Cross

1   Q.  Okay.  Now, so the jury's not confused, you work for AA

2   Bonding or AAA Bonding?

3   A.  I work for A&A Bail Bonds.

4   Q.  A&A Bail Bonds.

5   A.  Uh-huh (Affirmative response)

6   Q.  And you basically wrote bonds for people who were charged

7   in criminal court, am I correct?

8   A.  Criminal court, traffic court, municipal court, all of

9   them.

10   Q.  Not Federal Court.

11   A.  No Federal.

12   Q.  Okay, and when you say you were a bounty hunter, if you

13   wrote a bond for somebody and guaranteed their appearance, if

14   they didn't appear, that's when you'd go try to find them, am

15   I correct?

16   A.  Yes.

17   Q.  And you would go look for people that you wrote bonds for,

18   am I correct, or your company?

19   A.  For my company.

20   Q.  Right.  Not for other companies.

21  A.  I have done it for other companies also.

22  Q.  But predominantly yours.

23  A.  Yes.

24  Q.  Now, I want to direct your attention back to Sammie

25  Williams Six Tape 1, Page 2.  Right after you get in the car,

Jones - Cross

1  Mr.Jones, you say, "What's happening?"  Sidney Dubuclet says,

2  "Hey Blood," and right away Mr. Davis says, "Like shit like

3  that with them MF's there, that was just an idea of what I'm

4  talking about.  People looking around, see the MF's right

5  away."  Mr. Jones, "They're going to have them tinted-ass

6  F'ing windows.  Yeah, but some of them play like that."

7      Mr.Jones, what you're talking about is the people you're

8  about to follow, you're wondering if they're going to have

9  tinted windows so the police can't look in, isn't that a fact,

10  sir?

11  A.  No, it's not.

12  Q.  That's not -- it's not what you're talking about there?

13  A.  No, it's not.

14  Q.  Davis, Line 10, "You dig, but anything we see that looks

15  suspicious, I run plates.  We run F'ing plates."  Darrel

16  Jones, "when me and Zoo be together, we handle it."

17      Davis is talking about running plates of people to see if

18  they're law enforcement, isn't that what he's doing, sir?

19  A.  No.  My understanding that when we be together or they run

20  plates is guys to see if a car's stolen or something like that

21  to run a plate.  If the car's going to come back stolen and

22  the run the plates on them.

23  Q.  Who is Zoo?

24  A.  Reynard Smith.

25   Q.  He's a police officer?

Jones - Cross

1   A.  Yes, he was.

2   Q.  He was.  Where is he right now?

3   A.  He's incarcerated.

4   Q.  He's charged with conspiracy to possess with intent to

5   distribute in excess of 50 kilograms of cocaine, am I correct?

6   A.  I don't know what he's charged with.

7   Q.  He's charged with drugs, isn't he?

8   A.  I don't even know what he's charged with.

9   Q.  He's in jail.

10   A.  He's in jail.

11   Q.  What are you doing riding around -- you were a police

12   officer.

13   A.  No, I wasn't.

14        MR. WINTERS:  Okay, I'd ask the jury now to go to SW

15   6, Tape 1, Page 12, Line 9.  That's Track 4.

16   BY MR. WINTERS:

17   Q.  Do you have that, Mr.Jones?

18   A.  Yes, I have.

19   Q.  Okay.

20        (Whereupon, the following excerpt of the audio tape of

21   Defendant's Exhibit SW 6 T1, a conversation which occurred

22   November 18, 1994, inside a blue Chevrolet Caprice between

23   LEN DAVIS, DARREL JONES and SIDNEY DUBUCLET was then played

24   for the jury:)

25        "MR. DAVIS:  I'm gonna drop Darrel by his car, drop

Jones - Cross

1    you off and go and park this bitch and get in my car.  And
2    then we probably go to work and then they gonna call us, right
3    in the 5th District, we gonna get the ends.  Then I call
4    ya'll, bring you, tell ya'll meet me here, meet me there, and
5    I'm going to give ya'll your ends and it's a done deal.  Just
6    that simple."
7                        (Taped stopped)
8    BY MR. WINTERS:
9    Q.  Isn't it a fact, Mr.Jones, that this is right before
10   Mr.Davis lets you off and what he's talking about there is
11   we're going to call the people that are going to pay us and
12   we're going to go get the ends.  "Ends" is money, isn't that
13   so?
14   A.  I don't know if that's what they call it or not.
15   Q.  You don't know what ends is?
16   A.  No, I didn't even really pay no attention to what he said
17   about that.
18   Q.  Oh, you weren't paying any attention.
19   A.  No.
20   Q.  Okay.  And then doesn't he say, "Then I'll call ya'll,"
21   meaning you, right?  Bring you -- tell ya'll where to meet me,
22   just like he did.  You met him at Galvez and Tulane and I'm
23   going to give you all the ends and it's a done deal.  Isn't
24   that what he's telling you, he's going to give you the money?
25   A.  I told -- I told Len I was going to get with him later on

                                                    66
                        Jones - Cross
1    of reference of these bond forfeitures I had to pick up,
2    because I had made copies to give to him.
3    Q.  Are you telling this --

 4    A.  And I told him I would get with him later on it.

 5    Q.  Are you telling this jury that he wasn't telling you that

 6    he's going to give you the money, he's going to call you and

 7    give you the money?

 8    A.  He didn't give me any money exactly.

 9    Q.  He didn't give you any money, huh?

10    A.  No.

11    Q.  Did you ask him:  Hey, what's ends?  I don't know what

12    you're talking about.  Do you see that in the transcript?

13    A.  Well, I didn't have -- he wasn't referring to me, so I

14    didn't have a reason to ask him that.

15    Q.  Weren't you in the car, sir?

16    A.  Yes, I was in the car.

17    Q.  There was two of you all in the car, "ya'll," you and

18    Sidney Dubuclet.

19    A.  Well, there was conversations that we had prior to that

20    and he wasn't talking to me, he was talking to the other guy

21    that was in the front.

22    Q.  Who did you think he was talking to when he said, "ya'll"?

23    A.  Well, more sure he would have called my name if he was

24    talking to me, but he wasn't -- I don't think he was talking

25    to me at the time, because he would have said that he was

                                                              67
                          Jones - Cross

 1    talking to me.

 2    Q.  Did you ask him what ends was if you don't know what --

 3    did you say --

 4    A.  No, I don't --

 5    Q.  -- what are you talking --

 6    A.  -- have any reason to ask him about that.

7   Q.  He's addressing "ya'll" and you're saying you don't

8   understand what he's talking about, but you didn't question

9   him, did you?

10  A.  No, I don't have a reason to question.

11  Q.  Get -- please go to Sammie Williams Tape 3, Page 8, Line

12  5.

13  A.  (Witness complies)

14      (Whereupon, the following excerpt of the audio tape of

15  Defendant's Exhibit SW 6 T3, a conversation which occurred

16  November 18, 1994, inside a blue Chevrolet Caprice between

17  LEN DAVIS, DARREL JONES and SIDNEY DUBUCLET was then played

18  for the jury:)

19      "MR. DAVIS:  (Unintelligible) Thirty-five minutes,

20  depending on what we gotta go do at this other spot.

21      "MR. JONES:  If it be after seven, Len?

22      "MR. DAVIS:  What calling you?

23      "MR. JONES:  (Unintelligible)

24      "MR. DAVIS:  Man, it ain't go be nowhere near after

25  seven.

68

                        Jones - Cross

1       "MR. JONES:  All right, I -- I -- I was going tell

2   you where I was going to be at on my detail.

3       "MR. DAVIS:  You ain't gotta worry about that.  It

4   ain't gonna be nowhere after that.  We should be -- everything

5   should be -- I should have everything and be ready at no later

6   than 3:00.

7       "MR. JONES:  All right.

8       "MR. DAVIS:  'Cause I'm going have to go to roll call

9   and shit.  (Unintelligible) Get the -- we're going have to get

10  the police car and then we probably go pickup the ends."

11                              (Taped stopped)

12      BY MR. WINTERS:

13      Q.  Now, Mr. Davis is talking to you in that passage, right?

14      A.  Oh, I guess he is talking to me at the time.

15      Q.  Well, aren't you responding?  Isn't "DJ" --

16      A.  Well, when I told him about beating him, that was in the

17      time that I talked to him about these bond forfeitures picking

18      up, that was during that morning time.  And he told me once he

19      come out of roll call, he may be able to handle it then, or he

20      may be able to get with me later on.  But I told him if it was

21      after 7:00, I couldn't make it.

22      Q.  Mr. Jones, did you see anything talking about bond

23      forfeitures here?  What he's telling you is, we're going to

24      have to get the police car and then we're going to pick up the

25      ends, the money.  Isn't he saying that?

1       A.  Well, that's what the tape's saying, I'm assuming.  But it

2       was things that was --

3       Q.  Did you --

4       A.  -- it was things that was left out on the conversation

5       that never came up on the transcripts either.

6       Q.  Are you aware that your attorney got tape recordings, the

7       entire tape recordings?  Did you hear him play any of the tape

8       recordings at this trial?

9       A.  Yes, I heard some of the tapes.

10      Q.  All right, did he play anything -- did he not play

11      something that you wanted him to play?

12      A.  Some of the stuff wasn't on the tape.

13      Q.  "Some of the stuff wasn't on the tape"?

14  A.  Yeah, that we was up talking --

15  Q.  Well, you're saying the tapes were doctored?

16  A.  No, all I was saying when you asked me the question, I'm

17  answering your question to the best of my knowledge.  When we

18  was talking a lot of the conversation wasn't on the tapes.

19  Q.  On what tapes, the tapes played or any of the tapes?

20  A.  The tapes that you presented to my lawyer.

21  Q.  So some of the tapes -- some of the conversations you're

22  saying wasn't recorded?

23  A.  Yeah.

24  Q.  Okay.  So did you question Mr. Davis and ask him:  What do

25  you mean we're probably going to go pickup the ends?  What are

                                                    70
                        Jones - Cross

 1  you talking about?

 2  A.  I didn't question it.  That wasn't me questioning him

 3  about picking up no ends.

 4  Q.  You didn't ask -- he was talking to you though, wasn't he?

 5  A.  No, he didn't question me about picking up no ends at all.

 6  Q.  He was talking to you in this exchange.  It's Len Davis,

 7  Darrel Jones; Len Davis, Darrel Jones.

 8  A.  Well, I'm relating it to you as I'm telling it to you.  He

 9  didn't talk to me about no ends.

10  Q.  "He didn't talk to you about no ends."

11  A.  No.

12          MR. WINTERS:  I'd ask the jury now to turn to SW9,

13  Line 9.

14      (Whereupon, the following excerpt of the audio tape of

15  Defendant's Exhibit SW T9, a conversation which occurred

16  November 18, 1994, inside a blue Chevrolet Caprice between

17  LEN DAVIS, DARREL JONES and SIDNEY DUBUCLET was then played

18  for the jury:)

19          "MR. DAVIS:  Where you at?

20          "MR. JONES:  Up on Tulane and White.  What you got?

21  Where you want me to meet you?

22          "MR. DAVIS:  Well, fuck, you right where -- you right

23  around us then.  Let me see.  I'm at Canal and Robertson right

24  now.  So, --

25          "MR. JONES:  Where you want to meet you, by the

                                          71
                      Jones - Cross

1   McDonald's?

2           "MR. DAVIS:  By what McDonald's?

3           "MR. JONES:  On Canal, or further than that.

4           "MR. DAVIS:  All right.  You at Tulane and what?  Oh,

5   okay, you up the street by the bank.

6           "MR. JONES:  Yeah.

7           "MR. DAVIS:  You in a car?

8           "MR. JONES:  Yeah.

9           "MR. DAVIS:  All right.  Well, come on down and meet

10  me at -- meet me at Galvez and Tulane.

11          "MR. JONES:  Galvez and Tulane?

12          "MR. DAVIS:  Come right now.

13          "MR. JONES:  All right."

14                          (Tape stopped)

15  BY MR. WINTERS:

16  Q.  That's you and Len Davis talking, am I correct?

17  A.  Yes.

18  Q.  And you're talking after he had dropped you off after you

19  traveled on the Interstate, am I correct?

20  A.  Well, it wasn't right after he dropped me off.

21  Q.  It was after he dropped you off.

22  A.  Yes.

23  Q.  Okay.  You're talking about meeting him to get paid.

24  A.  No, I was meeting him on bringing him some copies I made

25  for the bond forfeitures.

Jones - Cross

1  Q.  Do you remember talking to the FBI on January 10th, 1995?

2  A.  I don't remember the dates, but I remember talking to

3  them.

4  Q.  Now, you weren't arrested, were you?

5  A.  No, I wasn't.

6  Q.  And you didn't get brought into the FBI in handcuffs, you

7  were invited to come in, am I correct?

8  A.  Yes.

9  Q.  And after you finished talking to the FBI, they let you

10  leave, am I correct?

11  A.  Yes, they let me leave.

12  Q.  In fact, you weren't arrested until August of 1997, were

13  you?

14  A.  Yeah.

15  Q.  Okay.  Do you recall how many agents you talked to?

16  A.  No, I don't recall how many it was.

17  Q.  Do you recall they asked you about the Mardi Gras Truck

18  Stop and what you did, et cetera?

19  A.  I can't recall exactly what they asked me.  It's been --

20  that was three years ago, and I can't really remember what

21  they asked me.

22  Q.  Well, let me see if I can refresh your memory, because I

23  have a report --

24  A.  Okay.

25   Q.   -- of what you told them, okay?

                         Jones - Cross
1    A.   Uh-huh (Affirmative response)
2    Q.   You were asked after Davis left you off if you ever talked
3    to Len Davis.
4    A.   Uh-huh.  (Affirmative response)
5    Q.   And your response was, "Jones advised that he had not
6    communicated with Len Davis since the day he was let out of
7    the truck at the Texaco gas station."  So, you lied to the
8    FBI, didn't you?
9    A.   Like I say, I didn't recall.  I don't know when it was or
10   when did I talk to Len, but I'm assuming I did meet with him
11   sometime that day to give him the forfeitures, because I had
12   talked with him --
13   Q.   Well, why did you tell the FBI you hadn't talked to him
14   after that?
15   A.   Well, I didn't recall at the time.
16   Q.   You didn't recall at the time.
17   A.   No, I didn't.
18   Q.   Now you recall, but back in --
19   A.   Well, by you all giving me the tape --
20   Q.   -- January of '95, you didn't recall.
21   A.   No, I didn't.
22        MR. WINTERS:  I'd ask the jury now to go to SW 6 Tape
23   1, Page 8, Line 22.  That's Track 3.
24        (Whereupon, the following excerpt of the audio tape of
25   Defendant's Exhibit SW 6 T1, a conversation which occurred

1   November 18, 1994, inside a blue Chevrolet Caprice between

2   LEN DAVIS, DARREL JONES and SIDNEY DUBUCLET was then played for

3   the jury:)

4        "MR. DUBUCLET:  Ya'll got to find a better way

5   (unintelligible).

6        "MR. DAVIS:  We was going to get some two-way walkie

7   talkies.  But fuck, that kind of shit could be picked up too.

8        "MR. JONES:  Uh-huh. (affirmative response)"

9        "MR. DUBUCLET:  (Unintelligible)

10        "MR. DAVIS:  If we got two-way walkie talkies, --

11        "MR. DUBUCLET:  They use signals.

12        "MR. DAVIS:  -- them frequencies can fucking be

13   picked.  See, but the conversation we holding, it's not saying

14   nothing.  It's saying --

15        "MR. DUBUCLET:  No, no, not the book.  I'm talking

16   about as far as --

17     (Police radio in background)"

18        "MR. JONES:  But, you know, I got -- matter of fact,

19   at my office I'm gonna have two -- whenever we roll it

20   again, --

21        "MR. DAVIS:  Uh-huh. (affirmative response)

22        "MR. JONES:  -- I'm gonna have two radios."

23                    (Taped stopped)

24   BY MR. WINTERS:

25   Q.  What did you mean when you told Davis and Dubuclet, that

1   you know, "Matter of fact, at my office I'm going to have two

2   whenever we roll it again."  What are you talking about?

3   A.  I was talking of a detail that he was supposed to tell me

4    that he was going to bring me to on a detail, and that's what

5    I thought it was going to consist of needing --

6    Q.  What do you mean, "roll it again"?

7    A.  That's all consist of him going on a detail.  I didn't

8    know -- he was supposed to drop me off to a detail and I never

9    did get on to it.  And when I realized that what he was

10   driving in a car, I figured he was just doing an escort detail

11   and I thought maybe he had to relate to them or something like

12   that.

13                      (Tape restated)

14         "MR. JONES:  Could we use them, like -- they within a

15   mile apart, you can talk to one another.

16         "MR. DAVIS:  See, a two-way walkie talkie?

17         "MR. JONES:  That's --

18         "MR. DAVIS:  You can pick up -- these cellulars

19   picked -- get picked up, them fucking two-way walkie talkies

20   could be pick up.

21         "MR. DUBUCLET:  Yeah.

22         "MR. JONES:  But you know how I got these?

23         "MR. DUBUCLET:  (Unintelligible)

24         "MR. JONES:  I got these from a construction site

25   company.


                                                      76
                      Jones - Cross

1         "MR. DAVIS:  Uh-huh. (affirmative response)

2         "MR. JONES:  These two radios.

3         "MR. DAVIS:  Uh-huh. (affirmative response)

4         "MR. JONES:  Anything can be picked up.

5         "MR. DAVIS:  Yeah, Radio Shack got --".

6                      (Tape stopped)

 7  BY MR. WINTERS:

 8  Q.  What are you concerned about things getting picked up for?

 9  A.  Well, I don't even think that's me saying, "Things can be

10  picked up."

11  Q.  So, that's not you.

12  A.  No, I don't --

13  Q.  But you're in the conversation.

14  A.  I'm in the car, but I don't think that's me saying about,

15  "Things can be picked up."

16  Q.  So every time we have "DJ" here, that's not you.

17  A.  No, on some of them it's not me.

18                    (Tape restarted)

19          "MR. DAVIS:  -- got some good ones, but what the

20  fuck, it's going to be the same fucking thing.

21          "MR. JONES:  Yeah.

22          "MR. DAVIS:  You dig?  If a mother fucker trying to

23  zero in on you, they gonna zero in on you, regardless.

24          "MR. JONES:  Right.

25          "MR. DAVIS:  But --"

 1          "MR. DAVIS:  -- as far as with us, what we've been

 2  discussing, you just heard my conversation.

 3          "MR. DUBUCLET:  Oh, no.  It's nothing incriminating,

 4  no.

 5          "MR. JONES:  Right.

 6          "MR. DAVIS:  Yeah, you heard my conversation.

 7          "MR. JONES:  Right.

 8          "MR. DAVIS:  He's gonna pull in here.  We gonna go

 9  here.  We going to go there.

10          "MR. JONES:  Right.

11          "MR. DAVIS:  That's it, you ain't --

12          "MR. JONES:  So, that was it.

13          "MR. DAVIS:  And that's all you going to hear.  You

14    ain't going to hear about what the fuck we doing."

15          "MR. JONES:  Right.

16          "MR. DAVIS:  You dig, you ain't going never

17    (unintelligible)."

18                              (Tape stopped)

19    BY MR. WINTERS:

20    Q.  What did Davis mean to you when he said, and you agreed

21    with him --

22    A.  All right, well --

23    Q.  -- "You ain't going to hear about what the fuck we're

24    doing."

25    A.  All right, what page are you on?

78

Jones - Cross

1    Q.  I'm on Page 10, Line 7.

2    A.  And what tape?  I'm not on the same page with you.  What

3    we --

4    Q.  We're on Tape 1.

5    A.  Okay.  Now --

6    Q.  Page 10, Line 7.

7    A.  Page 10.  Okay, now I see where you at.  Now, what your

8    question is?

9    Q.  Excuse me?

10    A.  What the question is?

11    Q.  What did Davis -- what do you think Davis meant when he

12    said, "You ain't going to hear about what the fuck we doing."

13    what do you think he meant?

14  A.  Oh, I don't have no idea what he meant on that.

15  Q.  But you responded to him, didn't you?

16  A.  What -- what did I respond on that?  I'm on -- you said --

17  Q.  Page 10, Line 7 and 8 when Davis --

18  A.  SW 7, what tape you on?

19  Q.  SW 6.

20  A.  SW 6?

21  Q.  Tape 1, Page 10, Line 7 and 8 and 9.

22  A.  Now what -- give me the tape again, one, two, or three?

23  Q.  SW 6, Tape 1.

24  A.  All right, I'm on tape -- Page 10, right?

25  Q.  Page 10.

Jones - Cross

 1  A.  Okay.

 2  Q.  Lines 7 and 8 and 9.

 3  A.  Okay.

 4  Q.  And I'll read it for you and I'll ask you the question.

 5  "You ain't going to hear about what the fuck we doing."

 6      And your response is, "Right."  What do you think Davis

 7  was talking about when he said, "About what the fuck we

 8  doing"?

 9  A.  I didn't pay no attention to Len Davis, and I don't know

10  if that's me saying, "right," or not.

11                          (Tape restarted)

12      "MR. JONES:  We could be going to meet some bitches,

13  or anything."

14      "MR. DAVIS:  In our -- in the privacy of our own

15  fucking home or wherever we at, we don't discuss words like

16  that.

17      "MR. JONES:  Right."

18                        (Tape stopped)

19   BY MR. WINTERS:

20   Q.  What did you mean when you said, "Because we're going to

21   meet some bitches anything."  You weren't going to meet women,

22   were you?

23   A.  That wasn't me saying, "We going to meet bitches."

24   Q.  Oh, that wasn't you.

25   A.  No.


                                                      80
                        Jones - Cross

1    Q.  Okay.

2    A.  I don't address women as being bitches.

3    Q.  You don't curse.

4    A.  (No response)

5    Q.  Mr. Jones, you don't curse?

6    A.  Yeah, I say a curse word, but I don't call a woman out a

7    name like that.

8                        (Tape restated)

9         "MR. DAVIS:  Because it's already known, so why is it

10   necessary to say it.

11        "MR. JONES:  What's happening.

12        "MR. DAVIS:  And if you know what we're talking

13   about, --"

14   BY MR. WINTERS:

15   Q.  "Cause it's already known, so why is it necessary to say

16   it?"

17        Darrel Jones, "what's happening."

18        You know what's happening, right, sir?

19   A.  No, I don't know what's happening.

20   Q.  Then why are you responding that you know what's

                        Page 71

21  happening?

22  A.  Well, you got me saying -- you got me asking him what's

23  happening.  I trying to find out what's going on.

24  Q.  Now, Mr.Jones, you're saying that in response to, "Cause

25  it's already known, so why is it necessary to say it."  And

Jones - Cross

1   you're responding to, "It's already known what's happening."

2   A.  Well, I'm asking -- and the point is showing you I'm

3   asking what's happening.

4   Q.  That's you talking now.

5   A.  Yeah, you have it down here as me.

6                           (Tape restarted)

7           "MR. DAVIS:  And if you know what we're talking

8   about, --

9           "MR. JONES:  Right.

10          "MR. DAVIS:  -- you don't need to go into detail

11  about no (inaudible).  So, fuck that.  We know what we talked

12  about.

13          "MR. DUBUCLET:  Right.

14          "MR. DAVIS:  So, let's just talk about what we need

15  to do.  I been told them that from the first day I met them.

16  We stripped down buck naked.  He stripped down buck naked

17  checking each other and shit.  And then, I told him, I said,

18  'Bro, we not using no words like that."

19                          (Tape stopped)

20  BY MR. WINTERS:

21  Q.  What do you think Davis was talking about when he said,

22  "And we stripped down buck naked and they stripped down buck

23  naked"?

24  A.  In some of the conversations by me sitting in the back the

25   way the car was made, I couldn't hear some of Len's

                          Jones - Cross

1   conversations at all.

2   Q.  Oh, you couldn't hear him.

3   A.  He had the radio on and I couldn't hear some of his

4   conversations at all.

5   Q.  But you never said, wait, I didn't hear, what did you say?

6   You never said that, did you?

7   A.  Well, he could have been talking to the guy Sidney

8   Dubuclet.

9   Q.  He could have been talking to both of you all, too,

10   couldn't he?

11   A.  It's possible, but I didn't think he was talking to me.

12                        (Tape restarted)

13         "MR. DAVIS:  One time he had a word -- a habit of

14   using the word 'load.'  I said I don't want to use that.

15         "MR. DUBUCLET:  Right.

16         "MR. DAVIS:  I don't want to use no words.  We don't

17   even discuss that.

18         "MR. JONES:  (Unintelligible)

19         "MR. DAVIS:  All we say now, 'Yeah, bro.  It's

20   starting.  Meet us at the place.'

21         "MR. JONES:  And that's -- and that's all you need.

22   Place could be anywhere."

23                        (Tape stopped)

24   BY MR. WINTERS:

25   Q.  What did you mean in response to that when you said, "And

1  that's all you need.  Place could be anywhere."

2  A.  Okay, I guess sometime I reference where he meet -- meet

3  people there.  He could meet anybody.

4  Q.  Mr.Jones, you --

5  A.  No one in particular that I'm talking about he meeting,

6  you know.

7  Q.  Mr.Jones, you're responding to him talking about not

8  using words like "load," and "It's starting, meet us at the

9  place," okay.

10     Your response is, "And that's all you need.  Place could

11  be anywhere."

12     My question to you is:  What do you mean in response to

13  Davis when you say, "And place could be anywhere"?

14  A.  Okay, as I told you, he could have been meeting anybody.

15  Who he was going meet, I don't know.

16  Q.  So you didn't know what he was talking about.

17  A.  No.

18  Q.  Go to SW 6 Tape 2, please, Page 4, Line 7 -- strike that.

19     Let me just ask you this question.  You did have your gun

20  out there when you were sitting in that car, following that

21  car on the Interstate, am I correct?

22  A.  Yes, I did have my gun with me.

23  Q.  You did have your gun.  Then let's go to SW 6 Tape 2,

24  Page 5, Line 17.

25     (whereupon, the following excerpt of the audio tape of

1  Defendant's Exhibit SW 6 T2, a conversation which occurred

2  November 18, 1994, inside a blue Chevrolet Caprice between

3  LEN DAVIS, DARREL JONES and SIDNEY DUBUCLET was then played

4    for the jury:)

5        "MR. DUBUCLET:  Yeah, because I don't want to talk to

6    none of those niggers, and I don't want to meet none of them.

7        "MR. JONES:  (Laughter)  I know that's right.  Ya'll

8    -- you see, you like me.  I'm going with you and that's all I

9    need to mother fucking know."

10        "MR. DUBUCLET:  Yeah.  I don't want to do nothing.  I

11    don't want nothing but my money.  That's it.  That wraps it.

12        "MR. JONES:  That's it.  I don't want to know nothing

13    about the two mother fuckers.

14        "MR. DUBUCLET:  No friends, no nothing.  Just ya'll

15    all go down and do whatever ya'll got to do.

16        "MR. JONES:  That's right, you like me."

17                    (Tape stopped)

18    BY MR. WINTERS:

19    Q.  Isn't it a fact, Mr.Jones, right there what you and

20    Mr.Dubuclet is discussing is -- discussing is you don't want

21    to meet those drug dealers, right?

22    A.  No, he was talking about in reference of the detail and

23    taking to a detail and I don't need to know nothing about the

24    detail.

25    Q.  You mean to tell me you work details and you don't even

                                                    85
                        Jones - Cross

1    know what you're doing?

2    A.  No, if somebody ask me -- there have been several

3    occasions police officers done called me and said:  I need you

4    to take a detail from me for such and such a time.  I go take

5    it.  I don't ask them what is it.  I just go take it.

6    Q.  So you work a detail and you don't even know what the

7    detail's about?  Is that what you're saying?

8    A.  No, they'll -- they'll -- no, they'll tell me based on you

9    just need to be here at a certain time.  They give me the

10   address and I go and I meet the people once I get there.

11   Q.  But here you're saying you don't --

12   A.  And they tell me -- they tell me exactly what I have to

13   do.  He's not telling me that I don't know -- I wasn't talking

14   to him about him with the detail or nothing like that.  Like I

15   said, when they tell me to take a detail, I just take it.  If

16   I'm available, I'm going to take the detail.

17   Q.  But here you're telling him you don't want to meet the

18   people.

19   A.  Well, I never did meet anyone.  I never did --

20   Q.  You didn't want to meet them, did you?

21   A.  I never -- well, I can't meet them until I get there.

22   Q.  Again, when you talked to the FBI on January 10th --

23   A.  Uh-huh (Affirmative response)

24   Q.  -- you were asked, "Did you and Sidney Dubuclet talk about

25   anything at the Mardi Gras Truck Stop?"

1        And your response was, "Jones stated while at the Mardi

2    Gras Truck Stop he and Sidney did not engage in conversation."

3    A.  Okay, well I didn't recall I did bring up a conversation

4    of basketball with Sidney.  I thought about that.

5    Q.  So you didn't recall discussing this.

6    A.  No.

7    Q.  Okay.  Go to SW 6 Tape 2, Page 8, Line 15.

8    A.  What tape are you talking on?

9    Q.  SW 6, Tape 2, Line 15.

10   A.  Now what page now?

11  Q.  SW 6 Tape 2, Page 8, Line 15.
12                          (Tape started)
13          "MR. DAVIS:  Uh-huh. (affirmative response)  Keep
14  your eyes opened for any kind of cars.
15          "MR. JONES:  Oh, yeah.
16          "MR. DAVIS:  Anybody follow us too fucking long.
17          "MR. JONES:  Yeah."
18                          (Tape stopped)
19  BY MR. WINTERS:
20  Q.  You're looking out for people.  Isn't it a fact that
21  you're looking out for people.  Isn't it a fact you're looking
22  out and seeing who's following you all?
23  A.  No, I'm not.
24  Q.  Oh, you're not.  So when Davis says, "Uh-huh, keep your
25  eyes open for any kind of cars."  Your response is, "Oh,

87
                        Jones - Cross

1  yeah."  Aren't you telling him you're going to look out for
2  cars?
3  A.  Oh, what he was talking about, we was talking about, we
4  was talking about police work and we was talking of guys
5  looking suspicious and stuff like that that's following you.
6  That's what we was talking about.
7  Q.  Police work, you're following a car full of cocaine and
8  Davis is telling you to keep your eyes out for any cars.
9  A.  Well, I didn't know nothing about any cocaine.
10  Q.  Oh, you didn't know anything about it.
11  A.  No.
12                          (Tape restarted)
13          "MR. JONES:  Yeah, because the mother fucker ain't

14  going to follow you too far.

15         "MR. DAVIS:  Uh-huh. (affirmative response)"

16         "MR. JONES:  If you can't pick a mother fucker up

17  that's following you, something wrong.  I mean, like that time

18  the mother fucker Sam got with the 44 kilos, you couldn't

19  think a mother fucker follow you that far."

20                         (Tape stopped)

21  BY MR. WINTERS:

22  Q.  Mr. Jones, you're driving down the highway.  You're

23  following a car --

24  A.  Uh-huh (Affirmative response)

25  Q.  -- that contains drugs.  Davis tells you to keep your eyes

                          Jones - Cross

1   open and suddenly you start discussing if you can't pick up

2   somebody that's following you, something's wrong.  And then

3   you start discussing 44 kilograms of cocaine.

4   A.  Okay, that was the time I told you Sam Pool -- was

5   actually when Sam and them -- Sam Pool made a bust on a guy

6   that he following out of town.  That's what my conversation was

7   on.

8   Q.  Mr.Jones, you're discussing that in reference to

9   following a car that contains cocaine.

10  A.  I didn't know nothing about any cocaine.

11  Q.  You didn't know anything about it.

12  A.  No, I just thought it was a guy that Len met or something

13  like that and it was reference of escorting a detail somebody

14  -- you know he did it out with going though his ranking

15  officer.

16                         (Tape restarted)

17         "MR. DAVIS:  who dat?

18          "MR. JONES:  When Sam fooled them -- them, when they
19   did that --
20          "MR. DAVIS:  Yeah, when he followed the mother
21   fucker.
22          "MR. JONES:  Yeah.
23          "MR. DAVIS:  That was more than forty-four, huh?
24          "MR. JONES:  I thought it was forty-four.  They
25   was --


                                                      89
                      Jones - Cross
 1          "MR. DAVIS:  I think it was a hundred.
 2          "MR. JONES:  Oh, all right.  And you can't see a
 3   mother fucker following you.
 4          "MR. DAVIS:  Yeah, he followed across the canal on
 5   his own."
 6                      (Tape stopped)
 7   BY MR. WINTERS:
 8   Q.  What did you mean when you said, "You can't see a mother
 9   fucker following you"?
10   A.  Okay, what it mean, if you -- I'm driving from South
11   Claiborne and going to Baton Rouge, I have to know somebody
12   behind me -- just in reference of a car tailing you, that's
13   all.
14   Q.  And that's what -- that's what you assuring Davis.  Isn't
15   it a fact that you're telling him, I'll be on the lookout for
16   people that are following us, like law enforcement.
17   A.  Oh, no I'm not telling him that.
18   Q.  Oh, you're not.
19   A.  No, I'm not.  Because I didn't know nothing about no drugs
20   in any car.

21               (Tape restarted)

22        (Unintelligible)

23                 (Tape stopped)

24        MR. WINTERS:  All right, I'd ask, ladies and

25   gentlemen, that you now go to SW 6 Tape 2, Page 10, Line 6.

 1     (Whereupon, the following excerpt of the audio tape of

 2   Defendant's Exhibit SW 6 T2, a conversation which occurred

 3   November 18, 1994, inside a blue Chevrolet Caprice between

 4   LEN DAVIS, DARREL JONES and SIDNEY DUBUCLET was then played

 5   for the jury:)

 6          "MR. DAVIS:  Yeah, bro.  See, that's the problem with

 7   niggers in this game here.  They get relaxed then they figure,

 8   man, fuck it, I got it going on.

 9          "MR. DUBUCLET:  Right.

10          "MR. DAVIS:  Smooth.  I ain't gotta worry about

11   nothing, and that's when the fucking problems start.

12          "MR. JONES:  Exactly.  When they -- when the first

13   time they relax.  I had a little thing going in the district

14   so long that we had to --"

15          "MR. DUBUCLET:  I'd have a nigger, in his late --".

16                 (Tape stopped)

17   BY MR. WINTERS:

18   Q.  What did you think Davis was talking about when he said,

19   "The problem with niggers in this game."  What game?  Drug

20   game, right?

21   A.  I guess that's what he's talking about.

22   Q.  That's what it meant to you, right, the drug game?

23   A.  I don't know, I guess so.  I assume that's what he's

24   talking about.

25   Q.  Okay.  And what do you mean when Davis is referring to

                        Jones - Cross

 1   people in the drug game, the game that you're following -- the
 2   car that you're following, the car that you're following in
 3   the drug game when you said, "Exactly.  When the first time
 4   they relax."  What do you mean there?  What you're saying --
 5   A.  I wasn't talking about them relaxing.  I was talking about
 6   police relaxing, that's what I was talking about.
 7   Q.  Police relaxing --
 8   A.  When you all -- if you'll --
 9   Q.  Do you see anything about police?
10   A.  No, it's not in there.
11   Q.  It's not in there.
12   A.  No.
13   Q.  You're referring to Mr. Davis talking about those people
14   in the car and as soon as they relax is when they might get
15   arrested.  That's what you're talking about, isn't it?
16   A.  No, I don't recall that.
17                        (Tape restarted)
18        "MR. DUBUCLET:  -- in his late twenties, early
19   thirties, by his self suited up, little briefcase and sit in
20   the fucking car.
21        "MR. DAVIS:  You give them a cellular too?
22        "MR. DUBUCLET:  And you could drive that fucking
23   Lincoln.  And a nigger -- because a police could stop you and
24   you could still talk to them, let them check your license.
25        "MR. DAVIS:  Yep.

1    "MR. DUBUCLET:  Check everything, and still not have

2  no fucking problems, if you handle your fucking business.

3    "MR. JONES:  Right.

4    "MR. DAVIS:  And one thing we discussed with these

5  niggers, just drive the speed limit.  Don't give a mother

6  fucker a reason to stop you.

7    "MR. DUBUCLET:  No reason to stop you.  Yeah."

8    "MR. JONES:  There you go.

9    "MR. DUBUCLET:  And if they do stop you, you know,

10  you get out (inaudible).

11    "MR. JONES:  You go through the routine.

12    "MR. DUBUCLET:  Yeah.

13    "MR. JONES:  Don't be nervous.

14    "MR. DUBUCLET:  Because, hey, I guarantee you,

15  probably seventy-five to eighty percent of the mother fuckers

16  who busted, the police didn't know they had dope in the car

17  until they stopped them.

18    "MR. DAVIS:  Fuck no, until they stopped them."

19    "MR. JONES:  But then, not only that, a lot of them

20  get busted, a nigger put them on them when they get busted."

21                    (Tape stopped)

22  BY MR. WINTERS:

23  Q.  In response to Mr. -- you're following a car and

24  Mr.Dubuclet's saying, "Seventy-five percent or 80 percent of

25  the people that get busted with drugs, that the police didn't

1  know about it until they stopped them."  And your response is?

2  A.  All right, where it's saying "get busted with drugs" at?

3  Q.  Page 11, Line 5.

4    A.   I'm on Page 11.   Okay, I see where you're talking about.

5    Where they said, "The mother fucker who get busted."

6    Q.   Yeah.

7    A.   Okay, I see what you're saying.

8    Q.   And doesn't he say, "The police didn't know they had dope

9    in the car, like the car you're following until they stopped

10   them.

11       And your response is, "But then only that a lot of times

12   they get busted."   What do you mean by "busted"?

13   A.   Okay, I guess that's guys -- I don't know consist of what

14   they mean by being -- I guess when they get busted by the

15   police, that's all I can see they're talking about.

16   Q.   You know what busted means, don't you?

17   A.   That's all I could see they're talking about being busted

18   by the police.

19   Q.   Okay, so you -- what you're saying is a lot of them, a lot

20   of people with drugs in the car, like the people you're

21   following, get busted.   A nigger put them -- put them on them

22   when they get busted.   What you're talking about is what?

23   A.   No, I'm not talking about it because of me following a

24   car, that's how they get busted.   I'm just talking about drug

25   dealers and period that's on the corners or wherever they

94
                    Jones - Cross

1    doing their drugs at.

2    Q.   You just happened to be following a car full of drugs and

3    you happened to be talking about this, it's coincidence?

4    A.   As -- I didn't know any -- as I told you, when we got in

5    the car, it was based up on police work that we was talking

6    about.

```
 7                    (Tape restarted)
 8          "MR. DAVIS:  That's right, too.  Somebody gotta rat.
 9          "MR. JONES:  Rat?
10          "MR. DAVIS:  You ain't gonna just know that we
11   following this car" --
12                         (Tape stopped)
13   BY MR. WINTERS:
14   Q.  What do you mean when you say somebody -- when you say
15   "rat"?
16   A.  I don't even know.
17   Q.  You don't know.
18   A.  I don't even know if that's me or not.
19   Q.  What you're talking about, Mr.Jones, is an informant
20   tells the police that somebody's carrying drugs.  You do know
21   that another word for an informant is a rat, right?
22   A.  Well, that's on several occasions with a lot of stuff, you
23   know.
24   Q.  Is that right?
25   A.  I guess so.
```

                         Jones - Cross

```
 1                    (Tape restarted)
 2          "MR. DAVIS:  --  unless somebody told you.
 3          "MR. JONES:  That's right.  That's right.  Nigger
 4   won't even know what's happening.  That's why it's so bad,
 5   because you figured you're with a nigger.
 6          "MR. DAVIS:  I'm checking every white person that
 7   passes.  (Laughter)
 8          "MR. JONES:  Yeah, but he can't be driving and all
 9   that shit.  He's gotta do his role.  Go like he's going that's
10   all.
```

11          "MR. DAVIS:  See, what that is, these people here,

12   this is their first time.  These people --

13          "MR. JONES:  Doing it?

14          "MR. DAVIS:  Dealing with us."

15                        (Tape stopped)

16   BY MR. WINTERS:

17   Q.  Davis says, "See" -- Line 22, "See what it is, these

18   people here, this is their first time these people."

19       And you say, "Doing it."  "Doing" what, Mr.Jones?

20   A.  I don't even know what he's talking about.

21   Q.  You just happened to respond to "doing it," but you don't

22   know what he's talking about.

23   A.  Some things I responded to, like I tell you in the

24   offices, some conversation I didn't understand exactly what

25   Len was saying.


                                                     96
                         Jones - Cross

 1   Q.  Did you ask him, what are you talking about?

 2   A.  No, I didn't

 3                        (Tape restarted)

 4          "MR. DAVIS:  Dealing with us.

 5          "MR. JONES:  Oh, all right."

 6          "MR. DAVIS:  We been dealing with the other people.

 7   This is some people that he brought in with him.

 8          "MR. JONES:  Oh, all right.

 9          "MR. DAVIS:  All right.  And --"

10                        (Tape stopped)

11   BY MR. WINTERS:

12   Q.  What did you think Davis meant when he said, "We've been

13   dealing with the other people.  This is some people that he

14   brought in with him."

15       And you say, "Oh, all right."  What do you think he meant?

16   A.  Read that again?

17   Q.  The top of Page 12.

18   A.  Okay.

19   Q.  "We've been dealing with the other people.  This is some

20   people that he brought in with him."

21       And you say, "Oh, all right."  What do you think he meant

22   there?

23   A.  I don't know, they have me saying "All right."  I don't

24   know.

25                       (Tape restarted)


                                                    97
                         Jones - Cross

 1       "MR. DAVIS:  And they want our protection, so what it

 2   is, these people never had this with us before.

 3       "MR. DUBUCLET:  (Inaudible)

 4       "MR. JONES:  Right.  Right.  Because they don't know

 5   where we --

 6       "MR. DAVIS:  Yeah.

 7       "MR. JONES:  -- coming from."

 8                       (Tape stopped)

 9   BY MR. WINTERS:

10   Q.  What do you think Davis meant when he said, "And they want

11   our protection.  These people never had this with us before."

12   What do you think he meant by "protection"?

13   A.  As I thought, Len Davis met some people that he wanted to

14   do, as I told you, an escort detail.  And without going

15   through his office or his rank, they just called him and got

16   in touch with him.

17   Q.  Escorting what?

18  A.  I done saw several officers -- police officers do that on

19  occasion.

20  Q.  Escorting what?

21  A.  It could be a car, whatever it is.  It could be different

22  things that they could escort.

23  Q.  Did you ask Davis what it was?

24  A.  No, I didn't ask him what it was.

25  Q.  Because you know what it was.


                                                        98
                        Jones - Cross

 1  A.  No, I didn't know.

 2                      (Tape restarted)

 3          "MR. DAVIS:  This is the other mother fucker.  They

 4  -- they -- they kinda, they probably still paranoid.  You dig?

 5  They got a car with a Five-O behind them, not knowing that we

 6  gonna fucking say  to pull over or not.

 7          "MR. JONES:  Right.  Yeah, that's enough to spook

 8  you.

 9          "MR. DAVIS:  Because it's a good chance" --

10                      (Tape stopped)

11  BY MR. WINTERS:

12  Q.  What's "Five-O"?

13  A.  That's pertaining of a police officer.

14  Q.  Okay.  And what do you mean when you respond when Davis

15  says, "They got a car with Five-O behind him," meaning the car

16  with the drugs in it.  You all are in the car behind them,

17  right?

18  A.  If that's what you say.

19  Q.  Well, you were there, sir.  I wasn't there.

20  A.  All right --

21  Q.  Were you behind that car?

22  A.  You're asking me what is Five-O.  I'm giving you what is

23  Five-O.

24  Q.  All right, and then I'm saying -- I'm asking you, weren't

25  you following the car that contained the drugs?  Weren't you

1  following --

2  A.  Okay, as I realize --

3  Q.  -- a blue -- were you following a blue Lincoln?

4  A.  I don't know what kind of car it was.  All I know he told

5  me that he was going -- when I realized it, we was on the

6  Interstate.

7  Q.  Weren't you following a car?

8  A.  Yeah.

9  Q.  And you don't remember what kind of car.

10  A.  No, I don't.

11  Q.  What do you mean when you say in response to Davis saying,

12  "Not knowing whether we're going to say pull-over or not," you

13  say, "Right.  Yeah, that's enough to spook you."

14  A.  Okay, what I mean by that, sometimes people can say by

15  them being the police figure they're going to just pull them

16  over.  By them telling this an escort that they're doing, and

17  like I say, by him going through -- without going through his

18  district, ranking officer, that's what I was talking about.

19  Q.  What does his not having gone through his ranking officer

20  have to do with --

21  A.  Well, by him -- all right, they might have figured by him

22  asking them to escort, I don't know what it was.  I could have

23  been money they had.  And some people he might have met and

24  they figured they'd get to a certain point, they can turn back

25   around and go back.  He just escorted them to a certain point.

                        Jones - Cross

1   That's what I'm talking --

2   Q.  Money?  Money?  What kind of money, drug money?

3   A.  Oh, I don't know.  I'm just assuming that's -- I'm saying

4   that it could have been people that he knew that had plenty

5   money or something like that, and that's what made him -- them

6   ask him for the escort.

7   Q.  Well, why would they be spooked if they asked him for the

8   escort and wanted police, why would they be spooked?

9   A.  Well, some people get like that.  I guess they don't know

10  what reason.  This probably would have been somebody he knew

11  or somebody could have gave him the detail and he took the

12  detail without reporting it.

13  Q.  Mr.Jones, are you telling this jury that if somebody

14  asked police to follow him, then they would get nervous and

15  spooked?

16  A.  On some occasions, yeah, I would say that.  Normally, you

17  shouldn't get nervous, but by them -- probably they know Len

18  Davis offhand.  As I say, it could have went through Len.  He

19  might have know them and he might didn't know them.

20                        (Tape restarted)

21          "MR. DAVIS:  -- a good chance that mother fucker is

22  as paranoid as this dude that's playing with us, not our

23  people but the nigger he fucking with.

24          "MR. JONES:  Uh-huh. (affirmative response)

25          "MR. DAVIS:  I wouldn't be surprised if this car

1  empty and everything in that other one.  The nigger might just
2  play us just like that, because --
3          "MR. JONES:  I hear you.  Yeah, you right.  You
4  right."
5                          (Tape stopped)
6  BY MR. WINTERS:
7  Q.  What do you think Len Davis means and you respond when he
8  says, "I think this car might be empty.  The nigger might just
9  play us like that."
10      And you say, "Yeah.  Yeah, you're right.  You're right."
11 A.  I don't even know if that's me saying that.
12 Q.  You don't know if it's you saying that.
13 A.  No.
14 Q.  What you meaning, Mr.Jones, is that this might be a decoy
15 and all the drugs are in the other car going west, isn't that
16 a fact?
17 A.  No.
18 Q.  Go to SW 6 Tape 2, Page 13.
19 A.  SW 2?
20 Q.  Yes, sir -- SW 6 Tape 2.
21 A.  And what page you're on?
22 Q.  Page 13, Line 1.
23      (Whereupon, the following excerpt of the audio tape of
24 Defendant's Exhibit SW 6 T2, a conversation which occurred
25 November 18, 1994, inside a blue Chevrolet Caprice between

1  LEN DAVIS, DARREL JONES and SIDNEY DUBUCLET was then played
2  for the jury:)
3          "MR. DAVIS:  I wouldn't give a fuck what I'm

4    following.

5        "MR. DUBUCLET:  He could put a box of chicken in that

6    bitch for all I give a fuck.

7        (Laughter)

8        "MR. JONES:  I don't want to even know what's in the

9    mother fucker.

10       "MR. DAVIS:  I don't either.  We don't never know.  I

11   couldn't tell you what --

12       "MR. JONES:  Hell no.

13       "MR. DAVIS:  I couldn't tell you right now, what's up

14   in there.

15       "MR. JONES:  What's up in there?

16       "MR. DAVIS:  I couldn't tell you."

17                        (Tape stopped)

18   BY MR. WINTERS:

19   Q.  You think you're following a box of chicken, Mr.Jones?

20   A.  No.  As I'm saying, I don't know.  As he said about doing

21   the detail, I'm just assuming it was a escort that he had did.

22   And that's exactly what I thought it was.

23   Q.  Escorting what, Mr.Jones?  Do you think somebody's going

24   to -- you think somebody's going to ask for an escort for

25   nothing?


                                                    103
                        Jones - Cross

1    A.  Sometimes people can have an escort.  It could be people

2    that maybe are from out of town.  He might have got the detail

3    through somebody and they wanted escort to a certain point and

4    then he could turn around.  Some people don't feel comfortable

5    by being in the New Orleans area.

6    Q.  Escort for what reason?

 7  A.  I don't know what reason it could have been.  I don't know

 8  what reason it could have been.

 9                              (Tape started)

10       "MR. DAVIS:  I couldn't tell you.  You ain't got to never

11  worry about me saying a fucking thing because I don't know

12  nothing about it.  Man, I can't tell you.

13       "MR. DUBUCLET:  That's a car, right?

14       "MR. DAVIS:  Yeah, a fucking car.  What you was

15  sitting on?  I was sitting on a mother fucking building that

16  was a detail, for detailing and shit.  The name in the yellow

17  pages and everything.  Fuck, yeah.

18       "MR. JONES:  Right.  And they can't hold you for that

19  shit if there is to come down."

20                              (Tape stopped)

21  BY MR. WINTERS:

22  Q.  What do you mean when you respond to Davis sitting on a

23  detail --

24  A.  Uh-huh.  (Affirmative response)

25  Q.  -- on a building and you say, "Right, they can't hold you

 1  for that shit."  Who can't hold you?

 2  A.  Okay, I'm talking about with his officer -- with his rank

 3  about sitting out there working a detail.

 4  Q.  You're talking about his rank, or the fact you're talking

 5  about if he gets arrested he can say he don't know what's in

 6  the building.  That's what you're talking about.

 7  A.  Well, I'm talking consisted of his rank you asked me and

 8  that's what I was answering -- responding to.

 9  Q.  SW 6 Tape 2, Page 14, Line 4.

10  A.  What -- you said tape 2?

11    Q.  Yes, sir.

12    A.  And what page we're on?

13    Q.  Page 14, Line 4.

14        (Whereupon, the following excerpt of the audio tape of

15    Defendant's Exhibit SW 6 T2, a conversation which occurred

16    November 18, 1994, inside a blue Chevrolet Caprice between

17    LEN DAVIS, DARREL JONES and SIDNEY DUBUCLET was then played

18    for the jury:)

19            "MR. JONES:  They just got over behind us.

20            "MR. DAVIS:  Yeah, I'm watching.  Hey, them niggers

21    ain't nothing."

22                        (Tape stopped)

23    BY MR. WINTERS:

24    Q.  You're looking out, aren't you, Mr.Jones?

25    A.  I don't know who they're talking about.  We just got over

                    Jones - Cross

1    behind them.

2    Q.  Well, you're saying, "They just got over behind us."

3    You're talking about another car.  You're acting as a look-

4    out, aren't you?

5    A.  No, I'm not.

6    Q.  Well, what do you mean by, "They just got over behind us"?

7    A.  I don't know what I'm responded to on that there.

8    Q.  You don't know what it means when you said, "They just got

9    over behind us," and you're going down the Interstate?

10    A.  No, I didn't.

11                        (Tape restarted)

12            "MR. DAVIS:  I wrote it down.  They don't want none

13    of this fucking carload right here.  If they had plans on

14  that, they ain't gonna fuck with it while we behind them."

15      "MR. DUBUCLET:  (Inaudible)

16      "MR. DAVIS:  And see, that's what I used to try and

17  tell stupid ass Charlie.  Like, I say, 'Nigger, just the idea

18  of people knowing I --'

19      "MR. JONES:  Right.

20      "MR. DAVIS:  '-- fuck with you, you dig?  That's how

21  I kept niggers off your ass.'  Just for them people" --

22                  (Tape stopped)

23  BY MR. WINTERS:

24  Q.  What do you think Davis meant when he said, "It's just

25  like I used to try and tell stupid ass Charlie, like I say,

1  just the idea of people knowing," and you say, "Right."  Who's

2  Charlie?

3  A.  I don't even know who Charlie is.

4  Q.  Okay.  But you didn't ask him, did you?

5  A.  No, I didn't.

6  Q.  No.

7                  (Tape restarted)

8      "MR. DAVIS:  -- let's say that carload was a carload

9  of (inaudible).

10      "MR. DUBUCLET:  Uh-huh. (affirmative response)

11      "MR. DAVIS:  Once they rolled up and seen us right

12  here.

13      "MR. JONES:  Uh-huh. (affirmative response)

14      "MR. DAVIS:  That idea is gone.

15      "MR. JONES:  It's gone.

16      "MR. DAVIS:  You dig?"

17                  (Tape stopped)

18  BY MR. WINTERS:

19  Q.  What do you think Davis meant, "Once they rolled up and

20  seen us right here, that idea is gone."  And you agree, "It's

21  gone."  Who's "they"?

22  A.  Well, they're saying, "It's gone."  I don't even know if

23  that was me saying that.

24  Q.  You don't know if that was you.

25  A.  No, I don't.

Jones - Cross

1                    (Tape restarted)

2          "MR. DAVIS:  Now, if they willing to lay in the back

3  and follow us and see how far we gonna follow and then if I

4  see that going on, I'm gonna stop them people.

5          "MR. JONES:  There you go.

6          "MR. DAVIS:  You dig?  I'll stop them bitches at the

7  twin bridges.  I'll speed up and be out like this.  'Bitch,

8  pull that mother fucker over.'

9          "MR. JONES:  Hey there, nigger.  What you going this

10  mother fucking way for all the time?

11          "MR. DAVIS:  You turn the fuck around."

12                    (Tape stopped)

13  BY MR. WINTERS:

14  Q.  What do you mean when you respond to Davis, "Pulling them

15  over," and he's talking about people following you all, and

16  you say, "Hey, there nigger, what's you do going this MF'ing

17  way for all the time?"  What are you responding to?

18  A.  Okay, what I was saying I think at the time when like Len

19  said, if somebody following us, he'll get behind them and pull

20  them over and ask them why is they following him so far.

21  Q.  Following for what?

22  A.  I don't know what reason.

23  Q.  Oh, you don't know.

24  A.  All -- no, I don't know.

25  Q.  You were just responding.

Jones - Cross

1  A.  In reference of a car following.

2                    (Tape restarted)

3          "MR. DAVIS:  You turn the fuck around.

4          "MR. JONES:  But I -- I -- I -- I -- my ass.  Turn

5  the fuck around and go the other way.  Go the long way, bitch.

6          "MR. DAVIS:  Yeah, go the long way, nigger.

7          "MR. JONES:  Yeah, nigger.  You gotta -- you gotta

8  change your route right now."

9                    (Tape stopped)

10         MR. WINTERS:  All right, I ask that the ladies and

11  gentlemen of the jury just to go down to Line 17, Tape 2, Page

12  15, just a little bit down and please play the tape.

13  BY MR. WINTERS:

14  Q.  You have that, Mr.Jones?

15  A.  Yeah, I'm on Page 15.

16  Q.  Okay, right.

17                    (Tape restarted)

18         "MR. DAVIS:  You need to get right about here.  You

19  don't want to tailgate, but you don't want nobody else getting

20  in between.

21         "MR. JONES:  In between.

22         "MR. DAVIS:  Say a Five-O was up here, they looking

23  at you and you right behind these mother fuckers going the

24  speed he going, they ain't gonna think about something.  And

25    if it's just a regular unit trying to pull them over, I would

                            Jones - Cross

1    tell them, say, "Look, that's my people, bro, going to

2    Slidell, blah, blah, blah." All right. If it's fucking DEA,

3    ATF --

4                "MR. JONES: Right.

5                "MR. DAVIS: -- they know but they ain't stopping

6    no --"

7                            (Tape stopped)

8    BY MR. WINTERS:

9    Q.  What do you think Davis is talking about when he's talking

10   about following that car and if it's a regular unit -- what

11   does he mean by a regular unit?

12   A.  I don't know.

13   Q.  Oh, you don't know.

14   A.  No.  All I could guess he's talking about a regular

15   policeman.

16   Q.  Okay.  "Try to pull him over," he's talking about pulling

17   the car over with the drugs, right?

18   A.  Not that I know of.

19   Q.  Not that you know of.

20   A.  No.

21   Q.  "I would tell them, say, look, that's my people bro, going

22   to Slidell, blah, blah, blah, all right, if it's fucking DEA

23   and AFT."  Who's DEA and ATF?

24   A.  I guess that's police officers.

25   Q.  You guess?  You've never heard of DEA?

Jones - Cross

1  A.  Yeah, I've heard of them.

2  Q.  Okay, well what are they?

3  A.  They're police officers.

4  Q.  They're Federal drug agents, aren't they?

5  A.  I done heard of them a lot.  Now, I guess they is, I don't

6  know.

7  Q.  Right.

8                          (Tape restarted)

9          "MR. DAVIS:  -- but they ain't stopping no traffic

10  stop.

11          "MR. JONES:  No, not at all.

12          "MR. DAVIS:  They know what you got.  So, if they

13  pulling them over, just get in the middle lane and keep the

14  fuck going.  Get on the phone.  'Jay, they got them.'"

15          "MR. DAVIS:  That's all I can do.

16          "MR. JONES:  And tell that nigger to go to running."

17                          (Tape stopped)

18  BY MR. WINTERS:

19  Q.  What do you think Davis means, Mr.Jones, when he says

20  when he's referring to DEA and ATF, "They know, but they ain't

21  going to -- they ain't stopping no traffic stop."  They know

22  what?  They know you're carrying drugs, right?

23  A.  No, not that I know of.

24  Q.  And you say, "Not at all."  What do you mean when you

25  respond when he says, "If they get them, I'm going to call

Jones - Cross

1  Jay."

2      And you say, "Tell that nigger to go to running."  What do

3  you mean?

4   A.  Okay, like I said, they got me saying this, but I don't

5   think that's me saying that.

6   Q.  Oh, you don't think it was you saying that.

7   A.  No.

8                        (Tape restarted)

9        "MR. DAVIS:  I ain't shooting it out.  They ain't

10  paying me enough to shoot it out with the DEA.

11       "MR. JONES:  No, no, no.

12       "MR. DAVIS:  You got to be talking millions."

13                        (Tape stopped)

14  BY MR. WINTERS:

15  Q.  Davis says, "I ain't shooting it out.  They're paying me

16  to -- they ain't paying enough to shoot it out with DEA."

17       And you say, "No, no, no."

18       What do you think he means when he says, "I ain't shooting

19  it out with DEA?"

20  A.  I don't know what the response of that, but I see "No, no,

21  no," here, but I don't know if I said that.

22  Q.  You don't know if you said that.

23  A.  No, no, I don't.  I see it on here though.

24                        (Tape restarted)

25       "MR. JONES:  What's good for the DEA (inaudible) --

                                                    112
                         Jones - Cross

1   nigger gonna take the task squad.

2        "MR. DAVIS:  Come on out.  Nigger, come on out.

3        "MR. DUBUCLET:  Nigger, take the task squad run into

4   that.

5        (Laughter)

6        "MR. DAVIS:  Nigger be ripping off all these shirts.

                         Page 99

7      (Laughter)

8          "MR. DAVIS:  And come out, that bitch in his drawers,

9    talking about, nigger, I was swimming.  Oh, I was mother

10   fucking swimming.

11         "MR. JONES:  I'd like a nice dip.  Ya'll see my

12   towel?"

13                          (Tape stopped)

14   BY MR. WINTERS:

15   Q.  What do you mean there when you say, "I'd like a nice dip,

16   you seen my towel"?

17   A.  Well, at the time I had a cold and I asked where my towel

18   was.  I'm assuming that's what that was.

19   Q.  You asked -- you had a cold and you asked for your towel?

20   A.  It was a small face towel that I had.

21   Q.  So what do you mean by, "I'd like a nice dip"?

22   A.  I don't know what it -- they got "dip" here.  I don't know

23   where the "dip" come from.

24   Q.  Coming from what you're saying.

25   A.  I didn't say that.

                                                    113
                        Jones - Cross

1    Q.  You didn't say that.

2    A.  No, I didn't.

3    Q.  That's not you.  You said, "You all see my towel."  But

4    you didn't say right before, "I'd like a nice dip."

5    A.  What I could be responding to with that, I don't know what

6    reason I would say, "Like a nice dip."

7    Q.  Aren't you responding and aren't you all laughing about

8    the fact that these people get arrested and you all can say

9    you were swimming and you had nothing -- I don't known anything

10   about it.  That's why you're saying, "I'd like a nice dip.

11 Have you see my towel?"

12 A.  Could you -- could I ask you something?  How could I go

13 swimming without -- with a uniform on?

14 Q.  I guess you could take it off.

15                          (Tape restarted)

16          "MR. DUBUCLET:  (Inaudible)

17          "MR. DAVIS:  Absolutely.  There ain't no one person

18 gonna fuck with this, not while I'm here.  He better come with

19 a backup.  Because if the bitch came by himself, he on a jack

20 move.  Mother fucker not gonna have information on nothing

21 like this.

22          "MR. JONES:  Yeah."

23          "MR. DAVIS:  And come by yourself.  (Inaudible)  We

24 in this car because our people want insurance, just for the

25 double security.


                                                      114
                        Jones - Cross

1          "MR. JONES:  Yeah.

2          "MR. DAVIS:  The dude wanted a show of force and our

3 people said well, just to make sure.  That's like a nigger --

4 nigger have a padlock on something and say, 'Fuck, put a

5 combination lock on it too.'"

6                          (Tape stopped)

7 BY MR. WINTERS:

8 Q.  What do you think Davis meant when he was referring to,

9 "He better come with the backup if this bitch came by

10 himself," talking about trying to -- following that car, "He

11 on a jack move."  What do you think he meant by that?

12 A.  I don't have no idea.

13 Q.  You don't know what a jack move is?

14  A.  No.

15  Q.  But you responded, "Yeah."

16  A.  Well, it have my initials here.

17  Q.  So, it wasn't you?

18  A.  I don't know if it was me.

19  Q.  What do you think Davis meant when he said, "The dude

20  wanted a show of force and our people said, well, just to make

21  sure."  What do you think a show of force is, sir?

22  A.  I don't know.

23  Q.  You don't know.

24  A.  No.

25  Q.  Tape 6 -- excuse me, Sammie Williams 6, Tape 3, Page 2,

Jones - Cross

1  Line 9.

2  A.  What -- Page 2?

3  Q.  Tape 3, Page 2, Line 9.

4      (Whereupon, the following excerpt of the audio tape of

5  Defendant's Exhibit SW 6 T3, a conversation which occurred

6  November 18, 1994, inside a blue Chevrolet Caprice between

7  LEN DAVIS, DARREL JONES and SIDNEY DUBUCLET was then played

8  for the jury:)

9          "MR. DAVIS:  You know when I knew these dudes was big

10  time?  When they was testing us, they sent us to follow a

11  nigger to go pick up money, and follow him back.  Guess how

12  much (inaudible)?  A hundred grand."

13          "MR. DUBUCLET:  A hundred thousand?

14          "MR. DAVIS:  Needless to say, we didn't know he was

15  going to get that.  We knew he was going get money, but we

16  didn't know it was a hundred grand.

17          "MR. JONES:  You would have asked for more money.

18          "MR. DAVIS:  We wouldn't have fucked with it anyway

19     though, because, I mean, I'm like this, I'm not greedy and

20     when you play that greedy game -- that's when you get

21     problems.

22          "MR. DUBUCLET:  You're right."

23                         (Tape stopped)

24     BY MR. WINTERS:

25     Q.  What did you think Davis meant when he was talking to you


                                                       116
                        Jones - Cross

1     and Mr.Dubuclet when he said, "You know when I know these

2     dudes was big time."  What do you think he meant by "big

3     time"?

4     A.  I didn't even hear him say that.

5     Q.  Oh, you didn't hear him say that.

6     A.  No, I didn't.

7     Q.  Oh, okay.

8     A.  I was sitting in the back of the car.

9     Q.  Oh, you were sitting in the back.

10         Did you hear him say, "And follow him back.  Guess how

11    much money they picked up, a hundred grand."  Did you hear him

12    say that?

13    A.  Not offhand.

14    Q.  Not offhand.

15    A.  No.

16    Q.  Okay.  So why did you respond on Line 17, "But we didn't

17    know it was a hundred grand," you say, "That much?"

18    A.  Yeah, I see they have me saying, "That much."  Like I say,

19    I don't recall the conversation.

20    Q.  Well, is that your voice?

21 A.  I can't really tell from that tape.  I really can't tell.

22 Q.  Go to SW 6 Tape 3, Page 3, Line 13.

23 A.  You said Line 13?

24 Q.  Yes, sir.

25      (Whereupon, the following excerpt of the audio tape of

Jones - Cross

1 Defendant's Exhibit SW 6 T3, a conversation which occurred

2 November 18, 1994, inside a blue Chevrolet Caprice between

3 LEN DAVIS, DARREL JONES and SIDNEY DUBUCLET was then played

4 for the jury:)

5      "MR. DAVIS:  I don't even ask them no questions.  I

6 don't even want to know.

7      "MR. JONES:  I hear you.  All you want is like you

8 say.

9      "MR. DAVIS:  You fucking right.

10      "MR. JONES:  To get paid.

11      "MR. DAVIS:  I can tell you, he -- he would never

12 have to worry about me ratting, because I could never tell

13 people nothing.

14      "MR. JONES:  Tell them -- where it going.

15      "MR. DAVIS:  I don't know what's in there,

16 amount, or where the fuck it is.

17      "MR. JONES:  But you know something you like, that's

18 the way it go.  All you want is your money.  Do what you got

19 to do" --

20                          (Tape stopped)

21 BY MR. WINTERS:

22 Q.  What do you think Davis was saying when he said, "He would

23 never have to worry about me ratting, because I could never

24 tell people nothing."

Page 104

25      And you answer is, "Where it's going."

                        Jones - Cross

1   A.  I don't recall about that.

2   Q.  Where what's going?

3   A.  I don't have an idea.  Like I said, I don't even recall

4   the conversation.  Like I said, they had me answering some of

5   these things and I don't recall answering some.

6   Q.  But you're in the car, aren't you?

7   A.  I am in the car with Len Davis.

8   Q.  What do you mean when you say in response to Davis saying,

9   "I know -- I don't know what's in there, amount."  "Amount" of

10  what?

11  A.  I don't know.

12  Q.  You don't know.

13  A.  No.

14  Q.  "Or where the fuck" --

15  A.  I was just -- I was reading the question --

16  Q.  Yeah.

17  A.  -- that's what I was doing.

18  Q.  Okay.  You don't know what he means by amount, is that

19  what you're telling us?

20  A.  No --

21  Q.  Okay.

22  A.  -- like I said, some of the conversation that was said, I

23  couldn't hear it by me sitting the back and I couldn't really

24  hear.  He wasn't talking to me at all times.

25  Q.  Now what do you mean when you respond when he says, "I

1   don't know what's in there, amount, or where the fuck it is,"

2   referring to the drugs, and you say, "But you know something

3   you like that's the way it go.  All you want is your money.

4   Do what you got to do."  what do you mean by that?

5   A.  Okay, I did mark that off and that's not me saying that.

6   Q.  Oh, that's not you saying that.

7   A.  That's not me.

8   Q.  Sammie Williams 6, Tape 3, Page 5, Line 22.

9   A.  What page?

10   Q.  Page 5.

11   (whereupon, the following excerpt of the audio tape of

12   Defendant's Exhibit SW 6 T3, a conversation which occurred

13   November 18, 1994, inside a blue Chevrolet Caprice between

14   LEN DAVIS, DARREL JONES and SIDNEY DUBUCLET was then played

15   for the jury:)

16       "MR. JONES:  So, you got all the numbers on me, Len,

17   whenever we --

18       "MR. DAVIS:  Yeah.  I'm going be calling you --

19       "MR. JONES:  -- when we roll?

20       "MR. DAVIS:  -- once -- once we finish with this --

21   other thing.

22       "MR. JONES:  I ain't on the other -- I'm talking

23   about on this time.

24       "MR. DAVIS:  Oh, okay.  Yeah, I'm gonna holler at

25   you.

1       "MR. JONES:  Yeah.

2       "MR. DAVIS:  But be the fuck on time.

3       "MR. JONES:  Yeah."

4                          (Tape stopped)

5    BY MR. WINTERS:

6    Q.  What you're talking about there is that the next time --

7    the next time this detail comes or this protection comes, you

8    want part of it, right?

9    A.  No, as I asked Len before, I said, when you get another

10   detail, he asked me -- when he did what he did -- he asked me

11   did he owe me anything.  I told him, no, you didn't owe my

12   anything.  When you get a detail just let me know.

13   Q.  Where did you see him say --

14   A.  It's not on here.

15   Q.  Oh, it's not on here.

16   A.  No, it's not.

17   Q.  We left that -- oh, we left that off.

18       Mr.Jones, Len Davis was arrested December the 6th,

19   1994--

20   A.  Uh-huh (Affirmative response)

21   Q.  -- about two weeks after you worked on the -- worked this

22   protection scenario.  At any time between November the 6th,

23   1994 and the date this trial started, did you ever come

24   forward and tell us anything about this?

25   A.  Well, I didn't know anything about it.


                                                    121
                          Jones - Cross

1    Q.  You didn't know anything.  Did you come forward and say --

2    said you were a witnesses to Davis?

3    A.  No, I didn't.

4        MR. WINTERS:  Okay.  Nothing further, Your Honor.

5        THE COURT:  Are you going to have further -- any

6    redirect?

7          MR. VOIGHT:  No, I'm not, Your Honor.

8          THE COURT:  All right, thank you.  You may step down

9     now.

10          THE WITNESS:  Thank you.

11          THE COURT:  Mr. Voight, what's next?

12          MR. VOIGHT:  We rest at this time, Your Honor.

13          THE COURT:  Now do you propose to put on a rebuttal

14     this afternoon?

15          MR. WINTERS:  I have one.

16          THE COURT:  Well, it's lunch time, so we'll do that

17     right after lunch.  So, the jury will be excused until 1:15.

18     But I need to see Counsel.  Will you all step up, please?

19       (Jury out at 12:15 p.m.)

20          THE COURT:  Anybody want to address any further

21     motions?

22          MR. RIEHLMANN:  I would re-urge the same motion.

23          THE COURT:  Re-urge.  Same ruling that was made

24     awhile ago.  I'm going to read this into the record now.

25          "The Government has now rested its case in chief.


                                                               122

1     The Court finds that the Government's evidence has established

2     by a preponderance of the evidence that a conspiracy as

3     described in the indictment existed and that Defendants Leon

4     Duncan and Darrel G. Jones joined in it, as did Len Davis and

5     Sammie Williams.  United States v Gonzales-Balderas, 11 F.3d

6     1218 to 1224, 5th Circuit 1994.  Thus, the statements made by

7     the co-conspirators may be admitted."

8          Anybody else further on the record now?

9          All right, you can cut the record.

10       (Recess from 12:15 p.m., until 1:50 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Newell - Direct

1          A F T E R N O O N   S E S S I O N

2               (The Jury is Present)

3          THE COURT:  Please be seated.  Well, ladies and

4   gentlemen, I've been around this building a long time, but I

5   still haven't learned one thing, how not to screw up on

6   Mondays.  I told you 1:15.  I told the lawyers 1:30, and then

7   I had somebody coming in for a quick thing in my chambers at

8   1:30.  So I have maintained, over the years that I've been

9   here, Monday screw up.  I'm sorry.

10          Go ahead, Mr. Winters.

11          MR. WINTERS:  One rebuttal witness, Your Honor,

12   brief.

13          The Government calls Earl Newell.

14          THE COURT:  As you'll recall, everybody's rested.

15   This is rebuttal.

16          EARL NEWELL, GOVERNMENT'S REBUTTAL WITNESS, SWORN

17                    DIRECT EXAMINATION

18   BY MR. WINTERS:

19   Q.  Keep you voice up, Mr. Newell.  Lean close to the

20   microphone.

21      How are you employed?

22   A.  I'm a Special Agent with the Federal Bureau of

23   Investigations.

24   Q.  How long have you been with the Bureau?

25   A.  Approximately eight and a half years.

1    Q.  And what office are you presently assigned?

2    A.  The New Orleans Office.

3    Q.  And what squad do you presently work on?

4    A.  Government fraud.

5    Q.  And what squad did you work on previous to the Government

6    Fraud Squad?

7    A.  Public Corruption.

8    Q.  And Mr. Vaughn -- Agent Vaughn (sic) were you involved in

9    the Len Davis, Darrel Jones, Leon Duncan investigation?

10   A.  Yes, sir.

11   Q.  I'm going to direct your attention now to January 10th,

12   1995, and ask you if on that date you interviewed the

13   Defendant Darrel Jones?

14   A.  Yes, sir, I did.

15   Q.  Now do you see Darrel Jones in the courtroom?

16   A.  Yes, sir, I do.

17   Q.  Would you point him out by the clothes he's wearing,

18  please?

19  A.  He's the gentleman in the bluish suit at the Defendant's

20  table.

21       MR. WINTERS:  Let the record reflect the witness has

22  identified the Defendant.

23  BY MR. WINTERS:

24  Q.  Where did you interview Mr. Jones?

25  A.  At the FBI Office here in New Orleans.

Newell - Direct

1  Q.  And where is the FBI Office in New Orleans?

2  A.  It's located at 1250 Poydras Street, Suite 2200.

3  Q.  And was there another agent present with you when you

4  talked to Mr. Jones?

5  A.  Yes, sir, Agent Jeffrey Santinni.

6  Q.  Is that standard procedure?

7  A.  Yes, sir, it is.

8  Q.  Now, how did Mr. Jones, if you know, get to the office?

9  Was he arrested?

10  A.  No, sir, he was not.  He was invited and he voluntarily

11  appeared.

12  Q.  And after the interview was conducted, did you all arrest

13  him?

14  A.  No, sir, we did not.

15  Q.  Okay.  Was he free to leave and did you tell him so?

16  A.  Yes, sir, he was free to leave and we advised him that.

17  Q.  And at any time during this interview did you threaten or

18  coerce him into saying anything?

19  A.  No, sir, we did not.

20  Q.  So this Defendant, Mr. Jones, at the time was not in

21 custody.

22 A.  No, sir, he was not.

23 Q.  After the interview, did you prepare what is known as an

24 FB -- FD302?

25 A.  Yes, sir.


126
Newell - Direct

1 Q.  A report of the interview?

2 A.  Yes, sir, we did.

3 Q.  And I'm going to show you what I've marked for purposes of

4 identification as EN, for Earl Newell, Number 1 and ask you if

5 that is the interview or the report of interview?

6 A.  Yes, sir, it is.

7 Q.  And you authored that, sir?

8 A.  Yes, sir, I did.

9 Q.  And what date is on the bottom of that interview as to

10 when it was conducted?

11 A.  It was conducted on the 10th of January, 1995.

12 Q.  Now, in conjunction also with that interview and in

13 preparing that FD302, did you take notes also?

14 A.  Yes, sir, I did.

15 Q.  As you were talking to this Defendant?

16 A.  Yes, sir, I did.

17 Q.  Now, I'm going to ask you now to look at what I've marked

18 as EN 2 in globo and ask you if those are the notes that you

19 prepared while interviewing Mr. Jones?

20 A.  Yes, sir, they are.

21 Q.  And that's your handwriting?

22 A.  Yes, sir.

23 Q.  Okay.  Now let's get to the interview, not the entire

24 thing, but some points in the interview, sir.  During the

25    interview on January 10th, 1995, did you ask Jones whether or

Newell - Direct

1    not after he was dropped off at a Texaco service station if he

2    ever communicated after that with Davis?

3    A.  Yes, sir, I did.

4    Q.  And what did he say?

5    A.  He said he did not.

6    Q.  He did not.

7    A.  Correct, sir.

8    Q.  Did you ask him if he ever met Davis later that day?

9    A.  Yes, sir, he was asked that question, and again he said

10   no.

11   Q.  Did you ask him if he ever worked any type of detail that

12   day for Davis?

13   A.  Yes, sir, we did ask him that question.

14   Q.  And what did he tell you?

15   A.  Again his answer was no, he did not.

16   Q.  Did you ask Jones if he recalled any conversations while

17   he was in the car about drugs?

18   A.  That question was asked of him, yes, sir.

19   Q.  And what did he say?

20   A.  And his answer again was no.

21   Q.  Did you ask him if he ever had any conversations that day

22   with Sidney Dubuclet?

23   A.  Yes, sir, he was asked that question.

24   Q.  Or Sidney?

25   A.  Yes, sir.

Newell - Direct/Cross

1  Q.  What did he say?

2  A.  He said he did not engage in conversation with Sidney.

3  Q.  Did you ask Jones what he was wearing that day?

4  A.  Yes, sir, we did ask him that question.

5  Q.  Did you ask him if he had any type of uniform on?

6  A.  No, sir.  We asked him what was he wearing and he said he

7  was wearing jeans and a sweatshirt.

8  Q.  Did you ask him if he knew he was guarding drugs?

9  A.  We asked him the question and he said he did not know

10 that.

11         MR. WINTERS:  Tender.

12         THE COURT:  Well, I suppose -- Mr. Riehlmann, I

13 suppose you have none.

14         MR. RIEHLMANN:  That's correct, Judge.

15         THE COURT:  Mr. Voight?

16                     CROSS-EXAMINATION

17 BY MR. VOIGHT:

18 Q.  Good afternoon, Agent Newell.

19 A.  Good afternoon, sir.

20 Q.  Did you ask Darrel how he came to be in the car with Len

21 Davis that day?

22 A.  Yes, sir, I did.

23 Q.  And what was his answer to you?

24 A.  He indicated he was picked up by Len Davis and they were

25 going to make a stop and then conduct a detail.


129
Newell - Cross

1  Q.  Did Mr. Jones inform you how Mr. Davis had initiated this

2  whole contact with Mr. Jones?

3  A.  Yes, sir, he did.

 4  Q.  And what did Mr. Jones tell you?

 5  A.  He indicated he had met with Mr. Davis that same day, the

 6  18th of November, 1994, with the idea of -- Mr. Davis engaged

 7  him in conversation and asked him if he wanted to work a

 8  detail.

 9  Q.  And what did Mr. Jones tell you about his desiring to work

10  a detail?

11  A.  He said, yes, he was interested in working a detail,

12  because he could use the extra money for the upcoming

13  holidays.

14  Q.  And what did Mr. Jones tell you that he was expecting to

15  be paid for this?

16  A.  He expected to be paid $15 an hour for the detail.

17  Q.  Did Mr. Jones indicate to you whether or not he had ever

18  been paid?

19  A.  He indicated he'd never been paid.

20  Q.  Did Mr. Jones -- strike that.

21          MR. VOIGHT:  I have nothing further, Your Honor.

22          THE COURT:  Any redirect?

23          MR. WINTERS:  No redirect, Your Honor.  In

24  conjunction with this witness' testimony, I would offer,

25  introduce and file into evidence EN-1 and EN-2 in globo.


                                                      130


 1          THE COURT:  Hearing no objections, those exhibits

 2  will be received.

 3          THE COURT:  Thank you, sir.  You may step down.

 4          THE WITNESS:  Thank you, sir.

 5          THE COURT:  Your next rebuttal witness?

 6          MR. WINTERS:  The Government rests, Judge.

7          THE COURT:  Well, ladies and gentlemen, that means

8    that all of the evidence and testimony has been presented to

9    you.  The case is over from that point of view and all that

10   remains are the closing arguments of Counsel, and then I'll

11   give you the instructions of law, and then you deliberate.

12          I just want to remind you again that the closing

13   arguments, like the opening statements, are not evidence.

14   You've heard all the evidence.  That's been concluded.  Now,

15   the attorneys are going to tell you what they think that

16   evidence leads to.  The Government goes first, followed by

17   each Defendant and then the Government has a right of

18   rebuttal.

19          Mr. McMahon or Mr. Winters, are you going to present

20   the --

21          MR. McMAHON:  I'm going to start, Your Honor.

22          THE COURT:  All right.

23          MR. McMAHON:  May it please the Court, good

24   afternoon, ladies and gentlemen.  I want to sum up what you've

25   heard the last several days of testimony, and I'm not going to


131

1    be that long.  I know you've listened.  You've been a very

2    attentive jury.  You've heard a lot of conversations, but I

3    want to just touch on certain points.

4          Early on in this case, when Mr. Riehlmann gave his

5    opening statement, he wrote down a phrase and I'm going to

6    keep referring back to that phrase, because that's what's

7    going to control this case and that's what controlled this

8    case.  What he told you was, "Consider the source."  And we

9    agree with that 100 percent.  Because the source of this

10   evidence, the source of the incriminating evidence against

11    Darrel Jones and Leon Duncan was Darrel Jones and Leon Duncan.

12    That's the source.

13         You know there's that old adage, it's a cliche.  I

14    don't like to use cliches.  Straight from the horse's mouth.

15    Straight from Darrel Jones' mouth and straight from Leon

16    Duncan's mouth.  That's the evidence.  That's the source.

17    That's what you heard, and I'm going to go into it in a little

18    bit more detail.

19         But you'll probably hear in the arguments that are

20    going to follow mine what an evil creature Sammie Williams

21    was.  I didn't hear anything earlier about what an evil

22    creature Lemmie Rodgers was.  But we didn't need Sammie

23    Williams in this case, we didn't need Lemmie Rodgers; because

24    the Defendants, Darrel Jones and Leon Duncan, by their own

25    words, their own mouths, provided the evidence in this case.


                                                      132

1          Now, you have to remember they didn't realize there

2     was a bug in those cars on November the 18th, 1994.  And just

3     employ your common sense, they weren't play acting there.

4     They weren't performing.  What you heard there was real.  What

5     they spoke about in those cars, the car that Duncan was riding

6     in with Lemmie Rodgers, a fellow police officer, and the car

7     that Jones was riding in with Sammie Williams and Sidney

8     Dubuclet, that was real.  So you listen to what they said, and

9     what you do is you listen and you apply the context.

10         The Defense attorneys had the unedited versions of

11    those tapes for months.  They could have played you anything

12    they wanted from those tapes.  But what you heard, and the

13    whole conversation, was about dope, drugs, protecting drugs.

14          Now think about the context.  You know you're going
15  off -- I mean they weren't driving up to Baton Rouge to see a
16  football game.  You know people talk about what they're doing.
17  If you have a -- and in this case they had a specific mission.
18  They had a specific job.  And that job, that mission was
19  working for Len Davis to make sure that that cocaine in the
20  cars they followed was safety escorted to a particular point.
21  And they didn't have to know how much, because you could tell
22  from the context of their conversation that they weren't
23  protecting widgets, or CD's, or something, because all the
24  talk was about dope.
25          Now I want to tell -- I'm going to deal with Darrel

133

1   Jones first.  Well, you heard him say:  If I didn't know Len,
2   Len Davis all these years, I wouldn't have handled this here.
3   Now, I mean let's just -- let's just look at the words a
4   little bit.  Why if he's doing something innocent, well,
5   what's the worry?  I mean what does how long he knew Len Davis
6   have to do with anything?  But see that indicates that he was
7   doing something that he normally wouldn't want to do, but he
8   knew Len -- he knew Davis.  And we all know what Len Davis
9   was.  He was the organizer behind this whole thing.
10          And Darrel Jones had a very, you know, a very
11  selective memory.  And I noted a couple of points in his
12  testimony.  When he's asked about certain things, well, he
13  knew all about as he put it, this little -- that little detail
14  on Tonti Street.  You remember that?  Oh, he knew all about
15  that one, about the 966 boys.  I'm referring to SW 6 Tape 2.
16  Oh, he knew, he's up there, he knew all about that one, about,
17  oh, 96, I'm in law enforcement and the 966 boys, those are the

18    little guys out on the corner selling dope.

19         But then when he's pressed, when he's pressed on

20    obviously incriminating conversation, he had a memory lapse.

21    He couldn't remember anything.  And you notice that was a

22    pattern in his testimony.  It was a pattern.  And it also got,

23    you know, it almost got to be funny.  It almost got to be

24    humorous.

25         And let me just give you an example.  SW 6 Tape 6,

134

1    Page 3, and you heard it, I'm not going to bother to play it.

2    This is Darrel Jones is in the car.  Davis, Len Davis says,

3    "He would never have to worry about me ratting, because I

4    could never tell people nothing."  Now the "he" of course is

5    the big dope dealer that they thought they were working for.

6         Now "ratting," "worry about ratting," if you're doing

7    something innocent, are you worried about anybody ratting?

8    And then here's Mr. Law Enforcement here, this guy like --

9    like remember he kept on saying, well, we're just talking

10    about police work, police work, law enforcement work.  He

11    doesn't know what ratting means?  He didn't know what "ends"

12    meant, the slang for money.  He knew every other slang curse

13    word in the English language, but he didn't know what "ends"

14    meant.  He lied to you.

15         Let me continue.  Darrel Jones, "Tell them where it's

16    going."  Davis, "I don't know what's in there, amount, or

17    where the fuck it is."  Now, let's put that in context.  What

18    is he talking about?  He's talking about dope.

19         Jones, "But you know something, you like, that's the

20    way it go.  All you want is your money.  Do what you got to

21  do."  Davis, "I'm going."  Jones interrupts him, "And keep --
22  to do my job and keep going."  And again, that's SW 6 Tape 3,
23  Pages 3 and 4.
24        That's scary.  That is scary, because you know what
25  we have here?  We have people in uniforms.  We have people

135

1  using the badge, and even though he was a phony, a 112.
2  Remember 112?  Using the power and the trust and the authority
3  and the comfort.  We're supposed to feel comfortable when we
4  see the cops, when we see the police.  It's supposed to give
5  us a feeling of security.  They were using the power that they
6  have to escort all that cocaine out of this city.
7        And I'm going to propose a question to you right at
8  the very end of my argument, and they're not going to be too
9  much longer, and I want you to remember my question when you
10  heard the Defense Counsels' argument and see if they can
11  answer the question I'm going to propose to you.
12        And then Jones says -- he didn't remember about that
13  when he was asked, because I noted it.  And you can remember.
14  He -- well I don't -- I really don't know what I was -- I
15  can't remember that.  But he remembers all this other silly
16  nonsense, but when he's pressed, he doesn't remember anything.
17        Another point, Len Davis -- no, SW, Sam Williams 6
18  Tape 2, Pages 15 and 16.  And this is an exchange between
19  Davis and Darrel Jones.  And you heard -- Len Davis has a very
20  distinctive voice.  Sidney Dubuclet's voice was low and deep.
21  You heard him and he's up there on that witness stand telling
22  you that's not his voice?
23        Davis said, you don't want to tailgate, but you don't
24  want nobody else getting in between.  Jones echoes him, "In

25    between."  Davis, "Say a Five-O is up here.  They looking at

1    you and you right behind these mother fuckers going the speed
2    he going.  They ain't going to think about something.  And if
3    it's just a regular unit trying to pull them over, I would
4    tell them, say, look, that's my people bro.  Go in Slidell,
5    blah, blah, blah.  All right?"
6         This is Len Davis.  "If it's fucking DEA/AFT."
7    Jones, "Right."  Davis, "They know, but they ain't stopping no
8    traffic stop."  Meaning if it's DEA and AFT, they're not
9    worried about traffic stops.  If they stop a car that means
10   they're stopping a car in there -- DEA doesn't deal with
11   traffic stops.  They deal with dope stops, drug stops.
12        Jones, "No, no, not at all."  Len Davis, "They know
13   what you got, drugs."  So if they pulled them over just get in
14   the middle lane and keep going, meaning -- remember we got the
15   testimony early on, Len Davis said, I can handle the locals.
16   I can handle the sheriffs.  I can handle NOPD.  But if you get
17   stopped by the Feds, baby, you're on your own.  That's what
18   he's talking about there.
19        Davis says, "Baby, I'm going to get in that middle
20   lane and I'm keep on going, because I can't help you.  You
21   lost the dope."  Get on the phone, Jay, they got them.  That's
22   all I can do.  Darrel Jones, "Tell that nigger to go to
23   running," meaning you tell JJ, the big dope dealer, he better
24   get out of town.
25        I was just responding to what Len told me.  That's

136 137

1   what he said.  But he remembers all the little stuff, but all
2   the sudden he gets this memory loss.
3           After Jones says, "Tell the nigger to get to
4   running," what does Len Davis say?  "I ain't shooting it out.
5   They ain't paying me enough to shoot it out with the DEA."
6           Jones, "No, no, no."  Len Davis, "Got to be talking
7   millions."  And then he goes in to talk about -- they almost
8   -- they start joking about it in a way, well, if they get
9   stopped by the DEA, well they're going to start tearing their
10  shirts off, their blue shirts.  Davis, "Nigger be ripping off
11  all these shirts, cut out that bitch in his drawers, talking
12  about nigger I was swimming, Ooh!  Ooh!  And then Jones comes
13  in joking as if they're fantasizing about what's going to
14  happen if the DEA shops them why they tore their shirts off.
15  "I'd like a dip.  You all see my towel?"
16          What did he tell you about that little exchange
17  there?  I'd like -- you all seen my towel?  I ha a -- I had a
18  runny nose and I was asking for my towel because I had a runny
19  nose.  That's ridiculous.  By their words you shall know him.
20          His testimony, ladies and gentlemen, was laughable,
21  utterly laughable, if not for the fact that when that car they
22  were following continued to speed across the twin spans when
23  they made that little cut there.  And anybody who goes to
24  Slidell you see it right before -- right before you get on
25  those twin spans there's a little --  you know, there's a

                                                        138

1   little dirt and you can barely see it right there, a little
2   dirt part where you can swing back so before you get on the
3   bridge.  Of course there's no where to turn on the bridge.

4    And that's what they did.

5            And as that car containing 25 kilos of cocaine sped

6    across the twin spans, Jones laughs, "Later brother, later."

7    That is scary.  That is scary.  Because that's going to relate

8    to the question I'm going to propose to you at the end.  But

9    let's turn to Duncan now.

10           The other day when Sammie Williams was on the witness

11   stand under cross-examination, I noted Mr. Riehlmann started

12   in on Sammie Williams and a little after 11:00 and then we

13   broke for lunch about noon.  And in that whole time the cross

14   of Sammie Williams, you know, we heard him painted, you know,

15   as, you know, the devil incarnate.  Sammie Williams is an evil

16   person.  We're not saying Sammie Williams -- Sammie Williams

17   is a despicable human being.  Sammie Williams is the lowest of

18   the low because he's a dirty cop.  There's nothing lower than

19   a dirty cop.

20           But you want to know what?  So is he (indicating).

21   So is he.  It's not Sammie Williams, it's his words from those

22   tapes, him (indicating) and him (indicating) posing as a cop,

23   Mr. Law Enforcement.  Oh, I'm in law enforcement.

24           Sammie Williams in that first hour of cross-

25   examination was not asked one question, not one, about what

139

1    was said in those cars -- in that car by Duncan on November the

2    18th, 1994.  Not one.  So we go to lunch and I figure, well,

3    he's probably going to -- he's probably going to do it after

4    lunch.  So we go to lunch, come back at 1:15.  The cross-

5    examination of Sammie Williams continues after lunch for about

6    another hour.  So, he's on the stand for about two hours on

7  cross-examination.  And he doesn't mention anything at all
8  about November 18th, 1994, or the conversations after that.
9        That conversation with Len Davis and Duncan on
10 November the 29th, when Duncan's telling Len Davis:  You
11 better watch out what you're doing with that warehouse,
12 because people are talking.  These big mouths are talking.
13 You got to get rid of that warehouse.
14        And you know, you know what they're talking about.
15 We didn't need Sammie Williams to tell you what these things
16 meant.  You heard it.  He was there basically -- he explained
17 some terms, "in the game down."  But we didn't need him to
18 explain those things to you.  Those tapes spoke for
19 themselves.  They're pretty explicit.
20        So what does Leon Duncan talk about.  Well, Leon
21 Duncan talks about -- well, first of all, let's back up a
22 little bit and what does Len Davis, when talking to Juan
23 Jackson, what does Len Davis say?  And this is going back to
24 Wednesday the 16th.  This is that meeting at the warehouse.
25        Davis, "Try his best," his being it's this fictional

140

1  person.  There's no other he.  Juan Jackson was posing as a
2  big time dope dealer, because what we were trying to do was we
3  were trying to identify and try to get incriminating evidence
4  on corrupt New Orleans cops, of which there were many.  And in
5  order to expand the operation, the reason given was that Juan
6  Jackson had -- there was another big time dope dealer who was
7  so happy with the way that Davis and his crew were protecting
8  Juan Jackson that he wanted to be protected too.  He wanted to
9  use New Orleans as a transshipment point.  Bring the coke in.
10 Let it set.  Get it out again under the protection of the

11    police.

12         Davis tells him, try his best to do it where our

13    officers don't have plain view with what they're unloading.

14    We don't want to see it.

15         JJ, "Okay.  We don't want to know nothing."

16         Davis, "My people know what time of day it is."

17         Now, that doesn't meant that they -- that doesn't

18    mean they all have accurate watches.  It means they know what

19    they're doing.  It means they're criminals.  They're using the

20    gun.  They're using the badge to protect dope.  That's what

21    that means.

22         Davis, "We don't never want to see it.  We don't

23    never want to be around it.  I don't want no parts of it."

24         JJ, "Uh-huh."

25         Davis, "You dig?  We strictly security.  That's your


                                        141


1    job."  Meaning you get the dope out, we protect the dope for

2    you.

3         It doesn't take -- I mean Stevie Wonder and Ray

4    Charles could see through this one.  And remember, this is

5    spontaneous conversation.  Lemmie Rodgers testified he didn't

6    want to get involved in this thing.  You know, he was leery

7    about this from day one.  Okay?  Now, that's corroborated.

8         This case is not, like I said, this is not Sammie

9    Williams.  This case is corroborated meaning it's backed up by

10   those tapes.  What does Davis tell you?  Well, Davis tells

11   you, and this is on November 18th, and he's laughing.  "I'm

12   laughing at that Lemmie asshole," and he laughed, Lemmie

13   Rodgers.  And I'm not going to abbreviate the curse words,

14 because those aren't my words. It's their words. And I'm not
15 going to sugarcoat their words. That's the way they talk.
16      "Because Leon," and then he pauses, "He," meaning
17 back to Lemmie, "He was leery from the first fucking time we
18 went at it months ago and Dunc got him to come on," Dunc, Leon
19 Duncan. That's what that means. And that wasn't from Sammie
20 Williams, that's from Len Davis in a spontaneous recording.
21 See, this isn't the words of those guys on that witness stand.
22 It's their words.
23      And what does Duncan say when he gets in that car?
24 Now, he's in the middle of -- he's in the middle of that car.
25 Oh, yeah, that reminds me just a little bit. I just had -- I

142

1 know I'm finished with Jones, but I have to go back a little
2 bit, because the way the car was constructed prevented Jones
3 from hearing what was going on in the car. This wasn't a
4 police unit. It didn't have the cage. So I was just curious
5 as to what about the construction of that car. See, another
6 one of these things he throws out at you and expects you to
7 buy this stuff?
8      Back to the car, Sammie Williams, Lemmie Rodgers and
9 Leon Duncan. Lemmie -- see, Lemmie is still a little nervous.
10 "How solid you think this is, Sam?" Now, if people are doing
11 something innocently, are you worried about this? I mean if
12 you're doing a legitimate detail, are you worried? No. Give
13 me a -- do my job, give me my money.
14      "Well, we've been dealing with it for a long time
15 now. I personally know it's solid." Oh, let's see to
16 convince you how solid it is, "Ain't nothing going to happen.
17 You ain't got to do shit, because you in the car with me."
                    Page 126

18  And then a little later they say -- and they said -- remember,
19  remember Sammie said that, you know, and you could tell by his
20  talk, Duncan -- Duncan says, "If anything do happen, I'm just
21  saying you just picked me up."
22      Sammie, "I just picked you up and I'm just taking a
23  ride with you."  Again, it doesn't take Stevie Wonder -- I
24  mean to be able to see through this one.
25      Duncan, again -- actually, Sammie, "All them worst


                                                        143

1  case scenarios going through your head, in the worst case
2  scenarios just say you were making a case on me."
3      Lemmie, "That ain't -- that ain't even funny."
4      Duncan, "Huh?"
5      "I said that wasn't even funny."
6      Duncan, "Hum."
7      Is this the kind of talk, ladies and gentlemen, you
8  would expect from people doing a legitimate security detail?
9  No.  You put it in context.
10      Again, Duncan asked, "Does he have different drivers
11  each time?"
12      Sammie, "No, see, this is something different from
13  what we usually do, right?"
14      See, Duncan's been aware of this the whole time.
15  He's the one who guided them.  What we wanted to do from the
16  beginning was have Agent Jackson meet these cops so we could
17  get them on film the way we did in the Hilton.  Duncan backed
18  them off and says, man, don't do that.
19      MR. RIEHLMANN:  Judge, I'm going to object to that.
20  I think that's outside the --
                        Page 127

21          MR. MCMAHON:  That's what Sammie Williams testified

22   to.

23          THE COURT:  No, wait --

24          MR. RIEHLMANN:  Wait, Mr. McMahon, I'm putting an

25   objection on the record now.


                                                    144

 1          I believe that's outside the evidence and I don't

 2   believe that this testimony --

 3          THE COURT:  Well, that's for the jury, of course, to

 4   remember from the evidence they heard.  Objection is

 5   overruled.

 6          MR. MCMAHON:  Now, Sammie, this is -- this is

 7   something different from what we usually do, right?  And these

 8   drivers are different.  But are the ones we put on the other

 9   location always be the same dudes.  Now, I would be suspicious

10   of this car right away.

11          Again, if you're working a legitimate, why are you

12   suspicious?  Because you're looking out for the cops, for the

13   feds.  Lemmie, "I ain't hear you."

14          Sammie, "I would be suspicious of this car right

15   away.  He's running with a commercial plate."

16          Duncan, "It's a rental car."

17          Lemmie, "Yeah, it's a rental."

18          Sammie, "Well, I would stop it."

19          Duncan, "Well, I would too.  Two niggers in a rental

20   car, got that "A" on the plates, uh-huh, commercial."

21          What's he worried -- see, he's worried that two

22   people -- two guys that look like that in a rental may arouse

23   law enforcement suspicion.  That's what Duncan's saying there.

24   And then, Duncan, "Get ahead of that car and get that license

25  plate number.  I'm going to have to call her."  And remember

1   what Sammie Williams said?  He sees a good looking woman in
2   another car, he says like well get ahead, I want to get the
3   license plate number.
4        And then Duncan the next line he said, "Well, bitch
5   might be DEA."  So he put it in context.  They're not driving
6   up to Baton Rouge to see the LSU Tigers play football on
7   November 18th.  They're talking dope.  Everything revolves
8   around that.  And you saw that.  Everything.
9        MR. McMAHON:  Now, I'm going to sit down.  This is
10  what I want you to think about.  I want you to think about
11  this question -- because they knew there was dope in those
12  cars, they thought, and there was dope in those cars -- is
13  that one car went east over the twin spans and that other car
14  went west beyond the Loyola Drive exit in Kenner.  How do they
15  explain, these two, because it didn't come from those tapes,
16  the fact that that cocaine was going out to some -- some other
17  community somewhere, a whole lot of cocaine, and they let it
18  go.  They let it go.  See if they can explain that in their
19  arguments.  They let it go.  That's scary.
20       And the fact that they had those guns on at that
21  time, they weren't acting as legitimate law enforcement
22  officers.  So they -- that -- those guns were carried during
23  the course of that conspiracy.
24       Both of these Defendants are guilty of both counts
25  charged against them.  And their own words proved it beyond a

1  reasonable doubt.  We're here to see that justice is served,
2  that the facts come out and you are the judges of the facts.
3  And the fact is, ladies and gentlemen, consider the source.
4  Thank you.
5          THE COURT:  Mr. Riehlmann.
6          MR. RIEHLMANN:  Thank you, Judge.
7          Good afternoon, ladies and gentlemen.  It's been
8  about a week since I last spoke directly to you.  I want to
9  thank you very much on behalf of Mr. Duncan, his family, and
10  myself, because as Mr. McMahon observed, and as I observed,
11  and as everyone in this courtroom observed, you persevered
12  through very tedious work in a most attentive manner,
13  listening to the conversations on the tapes, listening to the
14  speeches by lawyers I know can be very tedious and very
15  difficult.  I thank you for your attention.  I thank you for
16  your service and I just beg you to give me a little bit longer
17  and give Mr. Winters the same courtesy of listening to his
18  rebuttal argument.  I thank you.
19          You're going to hear after all the argument's over
20  the Judge's instructions on the law.  And he'll define for you
21  what beyond a reasonable doubt it.  And what it really means,
22  ladies and gentlemen, is that you have to be sure, just like
23  you're sure when you make the most difficult decisions of your
24  life.
25          All of us, fortunately rarely, are confronted with

147

1  very difficult decisions during the course of our life,
2  whether to put an elderly relative in a nursing home, whether
3  to consent to a loved one's surgical procedure or medical

4  procedure.  And they are the kind of decisions that take our
5  stomachs and tie them in a knot, prevent us from sleeping at
6  night and just make us crazy.  But we have to go forward.  We
7  have to make a decision and we do so only after giving it
8  great consideration and reaching a conclusion that you're
9  certain of.
10      Well, ladies and gentlemen, I suggest to you that the
11  decision that you'll be called upon to make as jurors today
12  should be ranked up there with all the other difficult
13  decisions that you have to make during your life, because
14  never have you had or never will you -- or you will never
15  again have an opportunity to make a decision that's going to
16  have such a profound impact on another person's life.  Your
17  decision could mean the loss of liberty from another -- by
18  another citizen.
19      And you should not undertake that decision-making
20  process lightly.  You should be sure.  You should be sure that
21  the integrity of the Government's case is that which you would
22  rely on without hesitation in making the most important
23  decisions of your life.  It's just that simple.
24      I presented to you today Stanley Hadden, the case
25  agent, the man -- the one man on the face of this planet who

148

1  knows more about this operation than anyone else.  And I did
2  it because I wanted you to realize that this notion that I
3  suggested to you in opening statement that Mr. Duncan believed
4  he was working a legitimate detail is not something I made up
5  of whole cloth.
6      It was a very real concern of Mr. Hadden and the FBI

7    Agents that planned this operations.  We must make sure that

8    Sammie Williams and Len Davis don't hoodwink police officers

9    into thinking that they're working legitimate details when in

10   reality they're guarding cocaine.  And we know that on at

11   least two occasions, at least initially, Len Davis and Sammie

12   Williams did precisely that.

13         Through the testimony of Mr.Hadden today we know

14   that Chris Evans went to that detail to guard that warehouse

15   not knowing that there was cocaine inside of it.  He later

16   found out.  He consented to continue working it, but the fact

17   remains that the first time he worked it, he did not know

18   there was cocaine in that warehouse.  The same was as much as

19   admitted by Special Agent Hadden insofar as Gregory Boldan.

20         From all the conversations we heard monitored and

21   listened to, we could not determine that Gregory Boldan knew

22   there was cocaine in that house -- in that warehouse.  The

23   possibility that Davis and Williams would hoodwink officers

24   was not only a fear, a concern, but it was realized insofar as

25   those two men were concerned, Gregory Boldan and Chris Evans.

149

1    They were hoodwinked.

2         The question before you is would you make one of the

3    most important decisions of your life based on the word of a

4    murderer, a convicted felon, a remorseless criminal like

5    Sammie Williams?  The question is also would you make one of

6    the most important decisions of your life insofar as the tapes

7    are concerned?  Do you have complete, unquestioning confidence

8    in the accuracy and reliability of those tapes?  And we'll get

9    to those tapes in a little while.

10        Integrity of the Government's case is what you're to

11 be concerned with, and the Judge's charge to you will tell you
12 as much.  Would integrity be a word that you would ever
13 associate with Sammie Williams?  Now, Mr. McMahon said, we
14 didn't need Sammie Williams.  These tapes in and of themselves
15 convict these men.  We didn't need Sammie Williams.  Well then
16 why play Santa Claus to a man like Sammie Williams?  Why give
17 him the kindness, generosity, and benevolence that the Federal
18 Government has seen fit to bestow upon him if you didn't need
19 him.
20         Now, let's talk about what Sammie Williams told us.
21 Sammie Williams told us on cross-examination, yes,
22 Mr.Riehlmann, it's my position, it's my contention that Leon
23 Duncan was a knowing co-conspirator on November the 18th,
24 because, Mr. Riehlmann, Leon Duncan knew there was cocaine in
25 the car in front of us and he rode with us while we followed

                                                  150

1 that car all the while talking about the plan.  That makes him
2 a knowing co-conspirator.
3         But when the same standard is applied to Sammie
4 Williams and his conduct of October the 13th, 1994,
5 Mr.Williams goes:  Well, no, no, I was not a knowing co-
6 conspirator in the murder of Kim Groves.  No, I knew that Len
7 Davis wanted to murder Kim Groves.  I rode with him all day,
8 even while hunting for Kim Groves.  I knew Paul Hardy, who was
9 to be her assassin, was armed.  Yes, we used my cell phone,
10 the very cell phone provided by the FBI to contact Paul Hardy
11 and tell him where Kim Groves was and how she was dressed,
12 but, no, Mr.Riehlmann, I was not a knowing co-conspirator.
13         Mr. Williams' testimony, what did you want me to do?

14  I had my tour of duty to work.  I had to work my shift with
15  Mr. Davis, partner.  What did you want me to do?  Now, does
16  anybody believe that for one minute?  Consider for a --
17  imagine for a moment that instead of sitting in this trial
18  that 15 of you were called upon to serve in the trial of the
19  United States of America v Sammie Williams for the murder of
20  Kim Groves, had that trial ever taken place.  Would any of you
21  have accepted that testimony from Sammie Williams as an
22  explanation of why he wasn't guilty of murder?  Absolutely
23  not.
24      Did Sammie Williams ever try to stop this plan?  No,
25  he doesn't.  Does he ever get out of the car?  No, he doesn't.


                                    151

1   Does he ever go try to warn Kim Groves?  No, he doesn't.  He
2   doesn't do all of these things, ladies and gentlemen, because
3   he wants her dead.  He knows she's to be killed and he doesn't
4   get in the way because he wants her dead, because after all,
5   who is the beneficiary of the execution of Kim Groves but
6   Sammie Williams, the man who pistol whipped her nephew.
7       He doesn't even have the integrity to admit that to
8   you.  It was an accident that he hit this man in the back of
9   his head with a gun.  So he pistol whips him.  He's the one
10  who set into sequence -- set into motion the sequence of
11  events that ultimately causes this woman to die and he does
12  not have one pang of remorse, one pang of guilt.
13      And for the Government to stand before you by their
14  questioning and say, well, Mr. Williams was there any evidence
15  that you participated in this?  That alone should cause you to
16  doubt the integrity of their case.  What on earth are we
17  talking about?  This man drove around, hunted this woman down,

18  supplied his cell phone at the very least to contact her
19  assassin and tell her where -- tell him where she was.  And
20  the Government says, oh, no, no, no, we have no evidence.
21  That is preposterous.
22        You be the judges of whether they had evidence that
23  he committed murder.  You be the judges of that, because it
24  all comes in -- I mean Mr. McMahon is going to tell you or
25  Mr.Winters will tell you on rebuttal that this has nothing to


152

1   do with his credibility.  But it would seem to me that we
2   would all, any reasonable person would certainly hesitate in
3   accepting the word of a murderer.
4         But let's go further, ladies and gentlemen.  The fact
5   that he was not prosecuted for murder, he faced life
6   imprisonment on murder.  He could have gotten the death
7   penalty on murder.  And he was not even prosecuted for it.  Do
8   you think that gift by the Government, we're not going to
9   prosecute you for that, that that would give him the
10  motivation to say whatever they wanted him to say?  Any
11  reasonable person would agree with that.
12        But is that where the Government's generosity
13  stopped?  Oh, no, the gifts kept coming.  Sammie Williams
14  admits that on many occasions he stole money from people with
15  a gun on his hip.  That is an armed robbery, is it not,
16  Mr.Williams?  Yes, it is.  And that's a crime for which you
17  can go to the penitentiary at Angola for five to 99 years
18  without parole.  Yes, that's true, Mr.Riehlmann.  Have you
19  ever been prosecuted by any prosecutorial agency for that?
20  No, I have not.

21        What is the response by the Government, by the
22    prosecuting -- both the U.S. Attorney's Office and
23    Mr.Connick's Office when Sammie Williams confesses these
24    armed robberies to them?  Go my son and sin no more.
25        But is that all he confessed?  Oh, no, no, no.  He

153

1    confessed, and I believe I have a list, insurance fraud,
2    public bribery, malfeasance, altering public records.  Again,
3    he confesses that to you; he confessed it to them.  Their
4    response is you're forgiven as long as you'll testify against
5    Darrel Jones and Leon Duncan.
6        He lets a murderer escape.  Remember we talked about
7    the murder of Carlos Adams.  He saw the men running or
8    walking, from the area from which he'd heard gun shots ring
9    out, with guns.  And then he says, oh, wait, those are friends
10   of Paul's.  He turns his car around and leaves.  He confesses
11   that crime to you.  Surely that's a crime as a police officer,
12   if not as a citizen to just leave like that, but he did.  And
13   what is the Government's response to that?  Well, Sammie, you
14   -- rather Sammie calls and says, you know what guys?  I'm a
15   little lonely.  I'm heartsick for my girlfriend.  Well,
16   Sammie, if -- you know, we'll do anything to make you happy.
17   How about we jet her up there.
18        Now, I'll bet the fact that Sammie had this happy
19   reunion with his girlfriend was great consolation to the
20   grieving family members of Kim Groves and Carlos Adams.
21        Now, was forgiving Sammie Williams of all the crimes
22   he committed and agreeing not to prosecute him, was that
23   payment enough for Sammie Williams to get on the witness stand
24   and say the things that they wanted him to say?  No.  Sammie
                            Page 136

25    Williams drives a hard bargain.  He is the most talented

1    negotiator I've ever seen.  When he gets out, and I suggest to

2    you that's not in the distance future, he ought to go get a

3    job as an agent or a labor negotiator, because he can

4    negotiate like all get out.

5         Because you know what?  Not only is he not being

6    prosecuted for everything, he says, you want me to testify?

7    Well, let's see.  First of all, don't prosecute me on the

8    dozens of gun counts that you could prosecute me for, because

9    I did guard cocaine dozens of times with guns.  Just one.  All

10   right, Sammie, we'll give you that, bearing in mind that each

11   one of those gun counts is another five years stacked on the

12   last one.

13        But Sammie says, that's not all, fellows.  I want a

14   5K.  Now, you've made me plead guilty to two counts, ten years

15   minimum on one, five consecutive to it.  You've made me plead

16   guilty to that, but I want a 5K.  I want you to go to bat for

17   me and ask for leniency in my sentencing.

18        Now, they would have you believe that this street-

19   smart gangster has cooperated all this time and still has no

20   idea what he's going to get.  You use your common sense and

21   decide whether or not that's believable.  But, we do know

22   this, he has spend over 100 hours with them.  You'd have to

23   think that this savvy criminal, Sammie Williams, is going to

24   say, hey, what kind of time am I looking at?  Don't you think

25   that question would have come up once in the 100 hours plus

1   that they met?  Are we that naive to think that that's never

2   been discussed?

3        Well, whatever they told him, we know this much, that

4   whatever they told him, Sammie still has some basis to hope

5   that he's going to get probation or that he's going to get

6   time served.  This man committed more crimes than we could

7   ever count, horrible crimes that should mean that he should be

8   behind bars for the rest of his life, and he hopes for

9   probation or time served.  That isn't a reason for you to

10   doubt his testimony?

11        One day don't be surprised if you're crossing Canal

12   Street at rush hour and you bump into a person and look up and

13   you see that it's Sammie Williams.  Check your wallet though

14   if you do that.

15        Now, he's got plenty reason to lie and we haven't

16   even gotten to the particulars of his testimony.  Let's talk

17   about the first thing -- or let's first talk about the meeting

18   that he alleges he had with Len Davis where Leon Duncan and

19   Lemmie Rodgers were informed they'd be guarding cocaine,

20   whether at the warehouse or in any other setting.

21        Lemmie Rodgers said no, no, no, that meeting never --

22   that never occurred.  So, you're going to have to pit Lemmie

23   Rodgers' testimony against Sammie Williams', because one of

24   those two guys is lying.

25        Sammie Williams says that Lemmie and Leon were

156

1   clearly told that there's cocaine in that car.  Did Lemmie

2   Rodgers testify to that?  Lemmie Rodgers, if he used it once,

3   he must have used it a dozen times, said, we were told there

4    would be drugs, money, or whatever in the car.

5          Now, Mr. McMahon in his summation had the audacity,

6    in my opinion, to talk about Darrel Jones' selective memory.

7    And I think everybody knows where I'm going with this, that he

8    would have the audacity to talk about Darrel Jones' selective

9    memory when Sammie Williams spent two days with us?  I think

10   Mr. McMahon has no memory, because clearly Sammie Williams

11   demonstrated a selective memory.

12         Sammie Williams, when he was testifying under direct

13   examination by Mr. Winters, answers questions two seconds

14   after Mr. Winters finished.  Did that sound like a well

15   rehearsed conversation to you?  I was tempted to go look at

16   that television that he was looking at to see if in fact it

17   was a teleprompter, because he had every answer (snaps

18   fingers) like that.

19         He remembered dates.  He remembered times.  He

20   remembered money amounts.  He even remember facial expressions

21   that people had nearly four years ago.  That's believable that

22   he can remember a facial expression another person had four

23   years ago?  But, despite that memory, that memory that he

24   demonstrated on direct examination that was a thing to behold,

25   his memory was amazing.  We took a recess, we came and we

157

1    started cross, and then the script was gone.

2          And I asked him, well, let's just talk about these

3    four meetings that Agent Jackson has just described for us a

4    little before you took that stand.  Do you remember this?  No,

5    I don't remember that.  Do you remember this?  No, I don't

6    remember that.  Remember?  No, I don't remember that.  I don't

7  remember that.

8          I was tempted to say, well, during our recess,
9  Mr.Williams, did you stumble and strike your head?  You've
10 got like amnesia all of the sudden.  You could remember facial
11 expressions from four years ago on direct and now when I ask
12 you about these important meetings that occurred during this
13 drug protection scenario, you have no memory for it.  And they
14 want to talk about a selective memory?

15         And bear in mind, ladies and gentlemen, that while
16 these events were unfolding, he had no reason to think, well,
17 I've got to remember that facial expression that Leon just
18 showed me.  I've got to remember that.  I've got to remember
19 that.  Oh, I've got to remember that I stared at Leon just a
20 little while.  I've got to -- I've got to -- I mean these were
21 ordinary events of a day in his life.

22         He didn't have to start remembering anything until he
23 decides, I'd better cooperate with the Government and see what
24 I can do to get me out of this one hell of a jam I'm in where
25 I'm looking at a life sentence, at least.  And that was


                                                              158


1  several months later.  But his amazing powers of recall, he's
2  able to remember the most insignificant details.

3          Sammie Williams tells us that Lemmie and Leon were
4  sources of information about this drug dealer we've heard
5  about, Charles Boutin.  That's something Sammie Williams told
6  you when they played their videotape.  Well, right here where
7  Len Davis is saying he's got some boys in Narcotics.  He's
8  talking about -- he's got some people that are going to
9  Narcotics.  He's talking about Lemmie and Leon.

10         Well, Lemmie certainly wanted no part of that.  When

11  he testified, he said, no, I was never a source of

12  information.  So, again, we have Lemmie's testimony pitted

13  against Sammie's.  Somebody's lying.  And if it's Sammie lying

14  about Lemmie, then is it such as stretch, is it so difficult

15  for me to ask you to believe that  maybe Sammie's lying about

16  Leon Duncan being a source of information too?

17        And we know from the testimony Leon Duncan was long

18  gone from Narcotics in May of '94 when this conversation that

19  they played for us on videotape occurred.  So, Sammie's got to

20  come up for an explanation there.  Well, he was planning on

21  going back.  Yeah, that's it.  He was planning on going back.

22  Now, we have to accept his word on that, because there's

23  absolutely no corroboration for it.

24        Mr. -- I asked Mr. Hadden, did you think to look for

25  the records?  Yeah, I thought about it, but I didn't do it

159

1  because their record keeping procedures are so sloppy.  Well,

2  did you think to even like go interview the witnesses who can

3  corroborate Sammie Williams on this detail about Leon Duncan

4  going back?  Because Lord knows if there's ever been a witness

5  who walked through these doors in the courthouse who needed

6  corroboration it was Mr. Sammie Williams.  And we don't have

7  any of that.

8        We have to accept Sammie Williams' uncorroborated

9  word on so many things.  Sammie Williams says Leon Duncan

10  appeared at that warehouse.  Well, no, we don't have any

11  corroboration on that.  Nobody ever saw him other than Sammie.

12  Sammie's the only one that saw him.

13        I asked Mr. Williams, and this kind of goes into what

14  Mr. McMahon was saying, so, Mr. Williams, we have to rely on
15  your explanation for what these conversations means.  Well,
16  no, no, Mr.Riehlmann, we don't.  We don't, because the tapes
17  speak for themselves.  Well, what do we need you for?  Why
18  have you gotten the sweetheart deal of all sweetheart deals?
19  Why did the Government get in bed with you when we don't even
20  need you?
21       Let's talk about the tapes.  If these tapes are the
22  end all and be all, first of all then why is Sammie Williams
23  not behind bars for the rest of his life; but if these tapes
24  are the end all and be all, then I'm going to ask you all to
25  do me a favor.  Now, again, we talk about the integrity of the


                                                            160


1   Government's case.  You have to accept these tapes, these
2   transcripts, these CD's as being unaltered and absolutely
3   accurate recordations of these conversations.  You have to be
4   able to do that.
5        Now, let's talk about these tapes.  First of all, I
6   introduced today Duncan Number 4, the six supposedly unedited
7   cassettes.  I mean the supposedly unedited version of the
8   conversation that took place in the car on November the 18th,
9   1994.  I say supposed, because I've got some real doubts that
10  I'm about to share with you.
11       In cross-examination of Sammie Williams, we went to
12  Tape 1 of the conversation that took place in the car Sammie
13  Williams was driving, and I said, Mr. Williams, would you
14  agree with me that as Page 1 of SW 7T Tape 1, Line 8, where
15  you say, "What's up, gentlemen?", that is the moment that Leon
16  Duncan and Lemmie Rodgers got in your car?  He said, "Yes."
17  Okay.  Then I said, "And would you agree with me that at Page
                              Page 142

18  10, Line 22, when you're heard to say, that's them in that car
19  over there, would you agree with me that that's the point of
20  time in which you all reached the Mardi Gras Truck Stop."  He
21  agreed with me.
22        I went on.  I said, "Would you agree with me that you
23  picked Lemmie and Leon up at 11:57?"  He said, "Yes."  And
24  that's what I wrote over there.  I said, "Would you agree with
25  me that you arrived at the Mardi Gras Truck Stop at 12:14?"


161

1  He said, "Yes."  By my calculations, 11:57 a.m. to 12:14 p.m.
2  is 17 minutes.
3        I'd like you -- I'd like you to listen to all six of
4  these tapes, but most importantly I'd like you to listen to
5  the first tape and I hope or would imagine that somebody's got
6  a watch.  I'd like you to note the time on your watch and if
7  you've got a stop watch, that would be really helpful.  Note
8  the time on your watch when Leon and Lemmie get in the car and
9  then let this tape play, this supposedly unedited tape play to
10  the point where they arrive at the Mardi Gras Truck Stop.  And
11  see if your watch gets to 17 minutes.  See if your watch gets
12  to 15 minutes.  See if your watch gets to 12 minutes.  It
13  won't.
14        Do that much for me.  Conduct that experiment for me.
15  Because if your watch gets to, let's say ten or 11 minutes,
16  and Sammie Williams has already said it took is 17 minutes to
17  get from picking up Leon Duncan to arriving at the truck stop,
18  where did those seven minutes go?
19        I say that gives you the reason to doubt the
20  integrity of these tapes.  But that's not the only thing I'm

21 going to ask you to look at in these tapes.  Sammie Williams

22 testified that during the two hour period he was with Leon

23 Duncan and Lemmie Rodgers, during the two hour period that

24 these six tapes were made, he had with him the cell phone, the

25 bugged cell phone provided by the FBI.  He had both his and

162

1 another one.  I asked him, "Did you have the FBI cell phone?"

2 "Yeah, I had both mine and the other one."  Okay.

3          Listen to these tapes and while you're listening to

4 them, look at Government Exhibit 1A and compare it.  Because

5 Government Exhibit 1A is the Pen Register that reflects all

6 the activity with that bugged telephone.  And if you'll look

7 at it, and you pick up from 11:57 to 2:00 p.m. on November the

8 18th, you'll see that Sammie Williams' cell phone was used 29

9 times.  You won't find 29 telephone conversations in these six

10 tapes.  And you are being called upon to trust beyond a

11 reasonable doubt the integrity of those tapes?

12          You might remember during the testimony of Juan

13 Jackson that we talked about something that was in what has

14 been marked as Duncan 2.  Ms. Jenkins, first of all, said,

15 well, yeah, we deleted irrelevant conversations for trial

16 purposes.  We wanted to, you know, like speed this up so you

17 didn't have to listen to a bunch of irrelevant conversations.

18          Well, when I cross-examined Mr. Jackson, I said,

19 remember you all were talking about jacking and stuff like

20 that?  Yeah.  You all were talking about the police officers

21 that are being brought into the detail.  Yes, he agreed.  I

22 said, Mr. Jackson, when you are quoted in this transcript as

23 saying, "That's why he kept saying before about don't let the

24 mother fuckers know what's going on.  Let them niggers that

25    you all been dealing (intelligible) just don't tell them

1     niggers.  So how do they know one of them mother fuckers ain't
2     out there doing something else?  No, because you can't."
3     Lines 20 to 26, Page 10 of the transcript.
4           I said, Mr. Jackson, when you're talking about,
5     "Don't let them niggers know what's going on," you're talking
6     about the police officers that are being brought into the new
7     detail.  And he said, yeah, because it's obvious from the
8     context of this conversation.  You know what, ladies and
9     gentlemen?  You know why there's a Duncan 2?  It's because the
10    transcript you were presented with in those binders that you
11    were to follow along with, that paragraph that I just read to
12    you had been edited.  That's irrelevant conversation.
13          The conversation that talks about don't let the new
14    police officers know what's going on, that's irrelevant.  For
15    trial purposes that's irrelevant.  Well, no, it's not
16    irrelevant.
17          Now, after a break of overnight when they meet with
18    Mr. Jackson, Mr. Jackson comes up with an entirely different
19    explanation about what that meant.  Oh, that meant that we
20    didn't want to let them know what the location was.  But
21    still, if these transcripts are to be trusted and they have
22    been edited for irrelevant conversation, can you trust this
23    beyond a reasonable doubt?
24          Finally --
25          Judge, may I approach the jury?

1          THE COURT:  Yes.

2          MR. RIEHLMANN:  You'd think that there would be some

3     things that we could all accept pretty easily about these

4     tapes, about these transcripts.  You think that, you know, for

5     instance what time of day a conversation occurred.  I mean why

6     is anybody going to dispute that?  Why would that be something

7     we have to worry about?  Because I mean the conversation, for

8     instance the one I just read from, Duncan 2, the one of

9     November the 16th between JJ and Len Davis, JJ testified, as

10    their transcripts reflected, if you'd like to see the

11    transcript that they provided you with said that this

12    conversation took place at 12:10 p.m.  All right, no big deal.

13    I mean that seems to me to be a fact that we could all agree

14    upon.  Why would anybody, you know, play with that fact?

15         But when we look at Duncan 2, amazingly, which you

16    can compare to that transcript, instead of 12:10 p.m. when

17    this conversation between JJ and them took place, it says this

18    conversation took place at 9:29 a.m.  I'm not talking about

19    two different conversations here, ladies and gentlemen.  I'm

20    not talking about two different conversations.  You compare

21    these conversations.  You look, you put these transcripts side

22    by side, 12:10 p.m. becomes 9:29 a.m.  Why on God's green

23    earth do we have to change the time of conversations?

24         THE COURT:  Counsel, if you'd step back a little bit,

25    please.

                                                                165

1          MR. RIEHLMANN:  Yes, sir.  I apologize.

2          THE COURT:  No problem.

3          MR. RIEHLMANN:  Why on earth do we have to change the
                              Page 146

4   time of conversations?  If these transcripts, these CD's,

5   these tapes are to be trusted beyond a reasonable doubt, if

6   you are to have unquestioning confidence in the integrity of

7   these tapes, why on earth are we changing the time of day of

8   conversations?

9        Stanley hadn't testified today that Leon Duncan's

10   been a suspect in this investigation.  Well then I presented

11   him with what I've marked for identification and admitted as

12   Duncan Number 5, I said, didn't you submit a request that they

13   go through these voluminous evidence records to see if there

14   is like some evidence in the evidence records that would

15   corroborate your suspicions?

16        Yeah, that's what we did.  That's what we did.

17   That's what we did.

18        All right, well, find Leon Duncan's name in this list

19   of suspects.  You've got a Willie Bickham.  I've never heard

20   of him, but he was a suspect; a Briant Brown; a Len Davis; an

21   Adam Dees; Chris Evans; Keith Johnson; Nathan Magee, a new

22   name to me; Gene McGlory (phonetic), a new name to me; Tommy

23   Mercadel (phonetic), I never heard that name; Alonia Riggleton

24   (phonetic); Arnold Williams; but Mr. Duncan's name isn't in

25   this list of suspects that we want you to do a search of the

166

1   evidence records.

2        Now the Government presented you with Lemmie Rodgers

3   as well.  Lemmie Rodgers, I'm going out on a limb with this

4   statement, but Lemmie Rodgers might be the only guy whose a

5   better negotiator than Sammie Williams.  Because Lemmie

6   Rodgers was looking at a life sentence at the most, and agreed

7  that the sentencing guidelines for the crimes that he was

8  charged with, the same crimes that Mr. Duncan was charged

9  with, could expose him to 25 to 30 years in the federal

10  penitentiary.  He agreed with that.

11        But then he goes and meets with the Government and at

12  most seven, but maybe less, at most seven years, but maybe

13  less is dangled in front of him.  You don't think that's a

14  reason for him to get up here and say whatever he has to say?

15  Somebody's in jail looking at the potential of spending the

16  rest of their lives in jail and the Government says, hey,

17  how'd you like to be out in seven and maybe less, because we

18  will go to bat for you with a 5K and ask for a little

19  leniency.  So you could be out in seven, four, maybe even

20  less.

21        You don't think that your heart would be racing?  So

22  tell me what to do.  Tell me what I got to say.  Where do I

23  sign?  I'll take that deal right now.

24        You may recall during jury selection when we were --

25  when the Government was seeking your assurance that -- would

167

1  you be offended or would you have a problem with us making

2  lump sum payments to cooperating witnesses so that they can

3  restart their lives once this is all over.  And we had to get

4  your assurance, and each one of you all assured the Government

5  that you wouldn't hold it against them, that you could still

6  be fair to them.

7        But you know what?  The cooperating witnesses that

8  testified in this case when asked by me:  Are you getting any

9  lump sum payment to restart your life?

10        Oh, no, I'm not getting any lump sum payment.

11          Why do we go through this rigamarole of making sure
12     that you all had no problem with lump sum payments to
13     cooperating witnesses when these guys are going to say I
14     didn't get any money?  Do you think maybe perhaps these guys
15     said, you know what, if I get, if I tell this jury I'm getting
16     money to boot on top of all this leniency, then I'm not going
17     to be very believable.
18          And then I love that language.  Would you be offended
19     if we gave money to cooperating witnesses so they can restart
20     their lives?  I mean this isn't FEMA.  We're not talking about
21     people whose homes have been destroyed by hurricanes or
22     tornadoes.  We're talking about thugs and criminals that are
23     getting money to restart their lives.
24          Now, I've used the word integrity many times in my
25     remarks, the integrity of the Government's case, and I'm sure


                                                           168

1     in rebuttal that that choice of words is going to come back to
2     haunt me, because I'm sure on rebuttal the Government's going
3     to tell you, no, it's not the integrity of our case, it's the
4     integrity of Leon Duncan that's on trial here.  And he's got
5     none, because he's a corrupt cop.  He's a bad cop.  He's a
6     criminal with a badge so he's got no integrity.
7          Well, setting aside for the moment that you have to
8     accept the testimony of two men who have been generously
9     compensated for their testimony, Lemmie Rodgers and Sammie
10     Williams, to even conclude that he's a corrupt cop, setting
11     that aside for a moment, what's on trial here is not Leon
12     Duncan, it's the Government's case.  And the Judge's
13     instructions will tell you as much.  You must have unwavering

14  faith in the integrity of the Government's case before you can

15  say I don't have a reasonable doubt.  Because if you believe

16  that Sammie Williams' testimony was very necessary, what you

17  believe -- he may be lying.  He's got every reason on earth to

18  lie.  That's a reasonable doubt.

19        If you believe, if you say to yourself, you know

20  what, the kind of the examples that Mr.Riehlmann pointed out

21  about these tapes and these transcripts, that's a little queer

22  to me.  I mean why did they change the time of day even.  If

23  you have a doubt about whether these tapes are unaltered as

24  they would have you believe, then that's a reasonable doubt.

25        I'm just asking that you scrutinize this evidence.


                                                    169

1  That's what you're supposed to do as jurors.  You're supposed

2  to hold it up to examination, scrutinize it, examine it

3  critically.  You do that.  You be fair and that's all

4  Mr.Duncan and I can ask of you.  Thank you.

5        THE COURT:  Before we have the next argument, we'll

6  have a brief recess.  Ten minutes.

7     (Jury out at 3:10)

8     (Recess at 3:10 p.m., until 3:25 p.m.)

9        THE COURT:  Please be seated.

10    (Jury is present)

11        THE COURT:  You may proceed, Mr. Voight.

12        MR. VOIGHT:  Thank you, Your Honor.

13        Good afternoon, ladies and gentlemen.  I haven't had

14  or rather I didn't take the opportunity to address you

15  directly in the past, so this is my shot to tell you what this

16  case is all about.  You haven't been treated to me yet.  I'm

17  normally fairly long-winded.  I'm just going to begin at the

18    beginning.

19           The earth cooled.  One of those primordial beasts

20    that emerged from the ooze and the slime later evolved into

21    Sammie Williams.  Sammie Williams used to shake down drug

22    dealers and extort money from them.  You heard Mr.Riehlmann

23    talk to Sammie about whether or not those were armed

24    robberies.  You heard that Sammie Williams was somebody who

25    didn't feel any compunction about lying, filing false police


                                                            170

1     reports in connection to insurance scams, getting money on

2     little traffic accidents.

3            Well, in December '93, Sammie stepped up to Scaboo,

4     Terry Adams, and you heard how he shook him down originally

5     for $10,000, later negotiated down to $6,000, in December of

6     '93.  That's a crime.  You didn't hear anything in December of

7     '93 about Darrel Jones.

8            A new year, 1994, Len Davis -- up until now we've

9     only heard about Sammie.  Now we're going to hear about Len

10    Davis.  These two are the two most evil people, in living

11    memory perhaps, that have ever worn the blue of the New

12    Orleans Police Department.  And you heard how Terry Adams,

13    being afraid basically, went to the Government, and the

14    Government decided they were going to get Sammie and maybe --

15    maybe get more than Sammie.

16           So the Government has got a plan.  When the

17    Government has a plan it's called a plan, I suppose.  When you

18    and I have a plan, it might be called a conspiracy.  But the

19    Government is going to use cocaine and shipments of cocaine to

20    trap corrupt police officers.  And you heard about how Terry

                          Page 151

21    Adams used to go to various places, Schwegmann's and places

22    like that, and drop off drugs and how Sammie Williams and Len

23    Davis would protect him.

24           And you later heard how, I believe it was at the

25    Sheraton downtown, there was a big shipment of drugs -- rather


                                                              171

1     of drug money and how everybody was -- you know, how JJ, Juan

2     Jackson was nervous about the police presence.  It's a pretty

3     good story.  That's April of '94.  We haven't heard anything

4     about Darrel Jones yet.

5            We heard about the warehouse scenario, meetings in

6     hotel rooms in May where they stripped.  May of '95, we

7     haven't heard anything about Darrel Jones.

8            June of '94, this elaborate conspiracy, this plan,

9     this scheme, this sting is ready to take down New Orleans

10    police officers.  It concerns a warehouse and everybody's down

11    at the warehouse.  June of '94, you haven't heard anything

12    about Darrel Jones.

13           July '94, you haven't heard anything about Darrel

14    Jones.  August, September -- what's interesting about October

15    of 1994?  In October of 1994, two police officers are driving

16    around in a police car using a telephone, a telephone that's

17    given to them by the Government to monitor their activities

18    concerning this drug protection racket at this warehouse.  And

19    in the back seat is a hit man.  They're later going to have

20    Kim Groves killed.  And you heard Sammie Williams say he could

21    have stopped it, but he didn't.

22           They let it go.  That's scary, people.  They let it

23    go.  And you heard Agent Jackson say, well, the reason why we

24    closed down all the scenarios concerning drug protection was
                              Page 152

25    because of the murder and that's when they arrested everybody

1    in December.  On October 13th, when Kim Groves was being

2    hunted down all day, they let it go.  What's important here?

3         What did you hear about Darrel Jones in September,

4    October?  On November 15th, Len Davis is communicating -- he

5    has -- he had it altogether, the new thing.  And we know what

6    the new thing is, the Mardi Gras Truck Stop scenario.  And on

7    the 16th, he refers to the four horsemen.  And you heard

8    testimony that the four horsemen -- well, here are two

9    horsemen, and we've got Lemmie Rodgers, and we've got Sidney

10   Dubuclet.  Were they the four horsemen?

11        This is Jones 3 and this is that excruciatingly

12   boring piece of tape I played for you when I asked Sammie

13   Williams about basically what Len Davis was talking about.

14   There's a reason why I haven't played for you, although I

15   imagine I have had the opportunity to, all the unedited tapes,

16   one, it would be Thursday, not Monday, two, in this cold room

17   I don't want all of you asleep.

18        But one interesting conversation didn't make it on to

19   SW 6 Tape 1.  And this is the interesting conversation that

20   Len Davis has in the car before he picks up Darrel Jones.  And

21   you heard me ask Sammie Williams about this and insofar as

22   Sammie Williams can be truthful at all, perhaps he was when he

23   described what Len Davis was talking about.  Pick it up.  Give

24   it a read until the point where Darrel gets into the car and

25   then you can rely on what the Government's provided you in

1  your notebooks.  But this wasn't good enough to be in your
2  notebooks.
3         "Well, the way this shit started, Scaboo across the
4  canal -- Sam stepped up to the nigger one day and told the
5  nigger, look, I got information people trying to get you,
6  blah, blah, blah, take care of me and I'm going to look out
7  for you."  That sounds like December of 1993, December 24,
8  1993.
9         And who's in the car?  Len Davis and Sidney Dubuclet.
10  And what is Len Davis doing?  For one, he's got a big mouth,
11  but two, he's explaining the conspiracy from day one to Sidney
12  Dubuclet about what he's doing, about the new thing, about the
13  old thing, about the warehouse, about the details, about the
14  insurance, about everything.  He's going to tell Sidney
15  everything.  He's going to lay it right out on the table.
16  Sidney knows.  He's even going to describe what's going to
17  happen at the truck stop.  He's talking about 12 hour shifts,
18  all the police officers he's got in.
19         This conversation wasn't good enough for you to hear
20  in the Government's case.  Why is it important?  Because then
21  Darrel Jones gets in the car.  Now, at some point on these
22  tapes we learn that when did Len Davis get a hold of Sidney
23  Dubuclet?  That morning.  When did he get a hold of Darrel
24  Jones?  That morning.  Where?  In the courthouse, a place
25  where Darrel Jones is familiar.  Matter of fact, that's where

174

1  Lemmie says he knows Darrel from, insomuch as Lemmie's
2  testimony reflects in any way on Darrel Jones; he said, yeah,
3  I think I knew him from the courthouse.  And somewhere on the

4    tape, yeah, I think I knew him from the courthouse, that's it.

5         Well, Darrel Jones is very familiar to everybody in

6    the courthouse, because that's where a lot of his job takes

7    him.  And that's where it took him on November 18th, in the

8    morning.  And that's when he met up with Len Davis, a cop of

9    his acquaintance.  Len Davis has responded to an auto break-in

10   years earlier.  That's the connection between Darrel Jones and

11   Len Davis.

12        But Len's got a problem, you see.  He's told

13   everybody he's got it all together.  He's got the four

14   horsemen lined up.  Well, he doesn't have the four horsemen

15   lined up.  He's got to line two more up the morning of the

16   18th, and who shows up but the fake policeman, Sidney

17   Dubuclet, and a reserve civil sheriff's deputy who's told to

18   bring his uniform to a detail.  He brings his uniform and,

19   yeah, he brings Roscoe with him.

20        He takes Roscoe to every detail.  Why?  Because the

21   people who would be causing problems at details, what do they

22   look for?  They look for the uniform, the symbol of authority

23   and the second thing, they look for the gun.  That's a symbol

24   of force.  That's the iron fist inside of the velvet glove.

25   And that's what makes people stand around in front of shopping

                                                        175

1    centers, in front of movie theaters, in front of high school

2    basketball games, that's why they hire these people for the

3    show of authority in uniform and for the show of force, the

4    iron at the side.

5         Len says, I've got a detail for you to do.  And there

6    he is.  Now, given the conversation that Sidney Dubuclet has

7   with Len Davis at the beginning of it, now, we've heard some
8   interpretations of this conversation in this blue automobile,
9   ultimately being driven by Len Davis.  Sidney's in the front
10  seat, Darrel's in the backseat.  We heard Sammie Williams
11  interpret what happened line for line, most of his answers
12  ending, "protecting cocaine," or the "cocaine protection
13  scenario."  I don't think Sammie Williams ever used the word
14  "scenario" before he was prepared to go to court.  It doesn't
15  sound like a word in his vocabulary.
16          Had he ever met Darrel Jones?  No.  How did he know
17  Darrel Jones' voice?  Well, it says "DJ" right there.  That's
18  Darrel, right, because that's what it says at the top, right?
19  That's what Sammie Williams has to tell you about Darrel
20  Jones.
21          At the time, he's 39 now, a man in his mid-30's, if
22  you would have heard, if they had, if there was evidence that
23  this man was involved in nefarious illegal activities, you'd
24  have heard it.  All the sudden in his mid-30's he turns to a
25  life of crime.  Do you believe that?  That's what Sammie

                                                        176

1   Williams would have to believe.  Every line here, every
2   utterance, every nuance, illegal activity, cocaine protection.
3   Do you believe that?
4           Now, there's a conversation going on in the car and
5   Darrel Jones gets into that car, and that conversation
6   continues.  It's possible, even through the Government's
7   exhibits in your notebooks to trace the context.  Oh, there
8   are relevant things cut out of there.  There's the basketball
9   conversation and maybe that would add some flavor and let you
10  know, maybe give you a little bit of real time to know how
                        Page 156

11  long this was.  This wasn't 20 minutes.  You would have gotten
12  to hear some excerpts of music, and some dead time, and some
13  police radio dispatches.
14       But Darrel Jones gets into a car and there's a
15  conversation going on.  And the conversation has to do with a
16  conspiracy to protect drugs, warehouse scenario, what's going
17  to happen at the Mardi Gras Truck Stop.  Darrel gets into this
18  conversation and he's there.
19       Now, not everything in this transcript -- and we
20  don't actually know who prepared the transcript, or these
21  transcripts, but we're assuming it's somebody listening to the
22  tapes and saying, well, that sounds -- well, as Len Davis says
23  somewhere in here, he's got a distinctive ass voice.  Well,
24  you know, yeah, that's Len Davis.  And well, this is going to
25  by Sidney and this is going to be Darrel.  And sometimes when

177

1  it's unintelligible or where it's "Yeah," or "Right," or "No,"
2  I'll leave you -- I'll leave it to you to believe who actually
3  said what they said.  Okay?  It's not important.
4       There's a conversation going on in this car and
5  that's the heart of this case, because it doesn't -- when you
6  think about Darrel Jones, it's the heart of this case.  They
7  don't have anybody to -- I mean Sammie wasn't there.  He'd
8  love you to believe he knows exactly what these guys were
9  talking about.  But, I don't think anybody's believing that.
10      There's a conversation.  This conversation is going
11  on on two levels, because the knowledge that each one of these
12  parties brings to this conversation is different.  Obviously,
13  Len Davis knows what's going on.  He knows what time it is.

Page 157

14    He's down.  This is his baby.  This is his drug protection
15    conspiracy.  This is his baby.  He knows all about it.
16         Before Darrel Jones gets in the car, he tells Sidney
17    Dubuclet, and abbreviated version, but he tells Sidney all
18    about it.  Now, Darrel gets in.  Does Darrel know what these
19    two know?  You take a look at it.  Take -- when you consider
20    this conversation as being more subtle, perhaps like a
21    conversation you might have in real life.  Now, think about
22    how this conversation took place.  After Len Davis said
23    something, was there a break?  They're riding down the
24    highway.  Len Davis says something.  There's a break and you
25    hear the voice of Sammie Williams explaining to everybody what

                                                            178

 1    was just said.  Does it happen that way?  No, it doesn't
 2    happen that way.
 3         Darrel says something.  Stop.  The voice of Sammie
 4    Williams.  This is what Darrel means.  This is what Sidney
 5    means.  No, this is a conversation in a car going down the
 6    highway with the radio on and police radio on.
 7         Darrel's told you he didn't understand everything
 8    that was said.  Is that hard to believe?  Use your common
 9    sense.  That's what you're allowed to bring with you.  We
10    don't make you check your common sense at the door.  That's
11    not a requirement for being a juror.
12         Does he have a selective memory or does he just not
13    remember everything?  Now, Sammie remembers everything and he
14    wasn't there.  Do you believe that?  Now, here's a guy who was
15    there.  You've heard the tapes.  You've heard how these voices
16    -- sometimes you can hear them very clearly.  Sometimes you
17    can't.  It probably has to do with did he lean forward,

18    where's the mike.

19         In a car driving down a highway do you hear

20    everything that somebody says?  Maybe.  In real life does that

21    always happen?  Who's the guy most likely not to hear

22    everything?  The guy in the backseat.  Does he hear a lot?

23    Yeah, yeah, he does.  Does he participate?  Yeah.  Is his

24    participation the same as Sidney Dubuclet's?  Is it the same?

25    Does he know what Len Davis knows?  Has he had explained to


                                              179

1    him -- has the Government come forward and shown you where

2    somebody said, hey, Darrel, we've got drugs in this car and

3    we're going to pay you a grand, Merry Christmas, for guarding

4    these drugs.

5         Did someone come forward and say, yeah, I was with

6    Len in the courthouse in the hallway when he got Darrel aside

7    and said that?  No.  There's going to have to take things said

8    in the conversation in the car and you're going to work

9    backwards, because you, now, just like Len Davis and Sidney

10    Dubuclet, you've heard testimony before you ever heard these

11    tapes.  You know the framework.  You know how this was set up.

12    And you're going to be asked to pull that knowledge into this

13    conversation.

14         Well, what if you came to that conversation without

15    that knowledge?  Would you know exactly what they were talking

16    about?  If you weren't down?

17         What Darrel Jones, Darrel Jones' recollection about

18    these conversation isn't perfect.  I wish it were, but it's

19    not.  He hasn't had hundreds of hours to go over this.  He

20    hasn't polished his answers to always include the term:  No, I

21    was not conducting -- you know, I was not protecting cocaine

22    when I said this or that.

23          In some respects he sounds a little bit -- his

24    answers are not perfect.  He sounds a little bit like Lemmie.

25    Lemmie's answers aren't perfect either.  But you get Sammie up


                                                    180

1    there, boy, Sammie, boom, boom, boom, boom, boom.  Even on

2    cross he's, you know, he's going to work it back into what he

3    remembers he should have said.  Because believe me, every

4    question that I ask or that Riehlmann asked -- that

5    Mr.Riehlmann asked, somebody's asked him that question

6    before.  That didn't come out of left field.  Now, he may have

7    had to tap dance a little bit, but it didn't come out of left

8    field.

9          Well, what Lemmie said wasn't perfect either.  He

10    didn't say anything about Darrel, but what he did say wasn't

11    perfect.  He doesn't remember what a rig is.  I think he

12    probably does remember what a rig is.  I don't think you're a

13    police officer for eight years and you've never heard the term

14    "rig," referring to your belt containing your gun and your

15    radio.

16          Well, Darrel -- Darrell doesn't remember everything

17    exactly right either.  It's imperfect.  It's an imperfect

18    world.  It's an imperfect -- the information coming in was

19    imperfect.  He didn't understand it perfectly when it was

20    said.  And there was no benefit of "Stop the tape.  Now, what

21    was that?"  Well, let's read that in the transcript.  There

22    was no transcript in that car.

23          Look at the end of SW 6 Tape 3, now you all I'm --

24    eventually look at the end.  And what happens when Darrel

25    Jones gets out of the car?  Look what happens to that

1    conversation.  Look what Sidney says to Len Davis.  Look at

2    the conversation they have.

3        Now Darrel's out of the car.  The dupe that doesn't know

4    anything is out of the car, now we can talk freely.  It's the

5    same conversation they were having before Darrel got in the

6    car and Darrel gets in the car and they kind of talk vaguely.

7    And Darrel gets out of the car and boy it's specific again.

8    Sidney's going to lay it right on the line.  Len's going to

9    answer him directly.  These are two conversations, ladies and

10   gentlemen.  They happen in one place at one time, but with

11   different levels of understanding.

12        Who is Darrel Jones?  Thirty-five, 36 years old in

13   1994.  He's worked as a reserve criminal sheriff's deputy for

14   a number of years.  He's worked as a reserve civil sheriff's

15   deputy.  He works details.  He protects churches so that at

16   night in some of these neighborhoods these people can drive in

17   and out without the worry of being accosted by drug dealers on

18   the corner.

19        See, you can see Darrel Jones is somebody who has

20   always been attracted to law enforcement.  Now, that

21   attraction has never led him to be a New Orleans police

22   officer, but he's been around the system as a bounty hunter.

23   You go pick up the bad guy that doesn't show to court.  You're

24   saying the bondsman some money.  But what you also do is you

25   make sure that person's back in court.  And you use police

1    officers to help you, because sometimes you don't want to go
2    where the bad guy is without somebody to help you out.
3           So, he goes to the courthouse.  I've got this guy in
4    your district.  Can you help me?  That's why he's in the
5    courthouse.  That's how he interacts with police officers.
6           Now, hindsight is 20/20.  We know now that Len Davis
7    is a murderer.  And I don't remember off the top of my head
8    how many of you responded on the jury questionnaire to what
9    you knew about Len Davis, did you read about it in the paper,
10   or anything like that.  Well, I can -- if I were a betting
11   man, I'd put money right there on the corner of the lectern
12   that, you know, on November 18th, 1994, not a single one of
13   you knew that Len Davis was a murderer, or that Sammie
14   Williams was a murderer, or that they shook down drug dealers.
15   You didn't know it.
16          Who knew it?  Well, the FBI knew it.  Maybe the U.S.
17   Attorney's Office knew it, but no one else knew it.  That
18   wasn't a fact generally known.  And Darrel Jones didn't know
19   it.  Who's Len Davis to him?  He's a cop who helped him out
20   once when his wife's car got broken into.  He works in the
21   system, on the edge of the system, but he works in the system.
22   He looks up to cops.  He respects cops.  He believes what cops
23   do is right.
24          Now, we've heard a lot since 1994 about how bad the
25   New Orleans Police Department is or was.  That's knowledge we

183

1    have now and it comes from trials like this and evidence like
2    this.  But that wasn't known generally on November 18th, 1994.
3    And it wasn't known by Darrel Jones.

4          Look at what that conversation is when you look at
5    Darrel Jones' responses.  Find me a place where he disagrees
6    with something Len Davis says.  Even if he says no, it's in
7    response to some negative thing that Len has said.  Len says
8    it, Darrel agrees.  Sometimes he rephrases it and agrees.

9          He's riding around in a car with two people he
10   doesn't -- well, he doesn't know Sidney at all and he barely
11   knows Len Davis, and he's agreeing with them.  Yeah, you're
12   right.  He's agreeing with things he doesn't quite understand.
13   He doesn't see the level that Len Davis is on. He doesn't see
14   the level that Sidney Dubuclet understand these facts to be.
15   And he's there agreeing with them.  Is that scary?  No, it's
16   sad.  That's what it is.

17         The most important thing for you to consider when you
18   consider the case of The United States v Darrel Jones is what
19   was in Darrel's mind at that moment, that day, that two hours
20   in his life that have forever changed his life.  Because when
21   we talk about his conspiracy, before the morning of the 18th,
22   Darrel Jones doesn't exist, doesn't exist to anybody paying
23   attention to anybody surveilling.  He doesn't exist.  And
24   after November 18th, until everybody gets arrested, he doesn't
25   exist.  He's not a player.


                                                184


1          Beyond a reasonable doubt, that's what we're talking
2    about.  Did he know beyond a reasonable doubt?  What did he
3    know?  Have they proven it?
4          He had a gun.  I'm not worried about Count 3.  He
5    thought he was going to a detail.  He always takes his gun,
6    Roscoe, to the detail.  If you get to there, I'm not worried

7  about it and neither is he.  What we're concerned about is

8  what do you believe they've proven was in his head.  That's

9  where we draw the line.  That's the decision you have to make.

10      Is this the most important decision you're going to

11  make in your life?  No.  Not close.  Is it the most important

12  decision you're going to make in someone else's life?  Well,

13  in terms of Darrel Jones' life, yeah.  He's not looking at

14  credit for time served or probation like Sammie Williams.

15  When you see Sammie Williams on the street working as a

16  security guard working outside of Tastee Donuts or something,

17  think about where Darrel Jones is.

18      He took a ride with some people he barely knew and

19  one he didn't know.  They talked about things in a vague way.

20  And they didn't stop and pause and analyze everything.

21  They're in a car flying down the highway and it's going real

22  time now, people.  It's happening moment from moment.

23      What was in his head?  That's what you have to

24  decide.  I think if you look at everything and you look at the

25  context and if you know them by their words, you'll see that

185

1  Darrel Jones is not guilty.  That's what Darrel Jones would

2  like you to see as well.

3      Darrel Jones thanks you and I thank you.  And please

4  give all of what we've said consideration.  Thank you.

5      THE COURT:  Mr. Winters.

6      MR. WINTERS:  Yes.

7      Thank you ladies and gentlemen.  I'm sure you're

8  tired of hearing from lawyers and I'm going to try to be

9  brief.  I'm going to try to answer what these two counsel have

10  argued to you and maybe bring up a couple of other things that

11    I think you ought to consider.  But I thank you and

12    Mr.McMahon thanks you, and we appreciate your service over

13    the last seven -- eight, well, six days of trial.

14         You know, we're now in the sixth day of trial, the

15    fourth day of testimony, two arguments from two Counsel, and

16    neither one of them, none of them have gone into those

17    conversations on November the 18th.  None of them have tried

18    to explain to you those conversations.  You know why?  Because

19    they can't.  They can't explain those conversations to you.

20         Now, Mr.Riehlmann has made a big thing, and I don't

21    want to accuse him of misleading you, but let me tell you

22    something.  He knows good and well that the reason we didn't

23    pick up any of Sammie Williams' telephone conversations on

24    November the 18th, was because the wiretap and the Pen

25    Register on Sammie Williams' telephone was terminated on


                                                          186


1     September the 7th.  Look at the Government in globo 1, and I

2     promise you you won't see a court order for a Pen Register or

3     a wiretap on Sammie Williams' telephone, because we didn't

4     have one.  We terminated it.  We stayed on Len Davis'

5     telephone.

6          He makes a big thing out of that trying -- there's

7     something devious going on by the Government.  It's because we

8     terminated, because we knew Len Davis was the leader of this

9     group of corrupt law enforcement officers.

10         Another thing, he makes a big point out of some

11    transcript.  The final copy has 12:10 and the copy he showed

12    to you, the unedited copy has 9:29.  He knows good and well

13    the copy he showed you was a rough transcript.  You think we

14  have any interest in changing the time something happened?

15  That's ridiculous and he knows it's ridiculous.  But again,

16  just like he's been trying to do throughout his argument and

17  so has Mr. Voight, they're putting the Government on trial

18  because they don't want to address what their clients did.

19          Let me tell you something, if you want to go back in

20  that grand -- in that jury room and listen to these unedited

21  tapes, I invite you to.  You'll be here for awhile and that's

22  why we didn't play them in the unedited form, because I didn't

23  hear -- I didn't want to bore you with everything from their

24  sex lives to everything else that you would have heard.

25          Do you think for one minute that these two counsel,


187

1  if they thought there was anything that would help their

2  clients on these tapes wouldn't have played them for you?

3  They'd have played them in a heartbeat.  They've had these for

4  seven months.

5          Again, we hear about this chart that Mr.Riehlmann

6  started and I was wondering what that was about.  He tells you

7  go listen to see if you hear 17 minutes of -- of a unimportant

8  car ride.  See if it lasts 17 minutes.  If you recall,

9  yesterday he wanted us to stipulate and agree that Williams

10  picked up Duncan and Rodgers at 11:57.  We refused to because

11  the surveillance report of the FBI didn't show that.  Okay,

12  there's no evidence of that.  That's why we didn't agree to

13  it.  Again, again, trying to mislead you.

14          Let's talk about -- well, let me just say this:  Len

15  Davis and Sammie Williams, corrupt to the core.  We're the

16  people that convicted them.  Len Davis has the death sentence

17  and life imprisonment.  Sammie Williams is looking at life

18    imprisonment, which under the federal system is your natural

19    life, because there's no parole, and he's looking at five

20    years on top of that for the gun.  I don't know how he could

21    serve it, but that's what his maximum sentence is.

22         Did I go out and charge him with a five year offense

23    for doing a mail fraud?  No.  There's no need to.  He's

24    looking at everything I can give him, life.

25         Now, has Sammie Williams -- have I spent and

188

1    Mr.McMahon spent a hundred hours talking to Sammie Williams?

2    At least.  But it didn't only concern this case.  It concerned

3    a murder case.  It concerned over 20 other corrupt police

4    officers.  We would be absolutely derelict in our duties if we

5    didn't sit down with Sammie Williams and get every piece of

6    information that we could possibly get out of him.  That's

7    what we do, we prosecute.

8         Does that mean we told him what to testify to?  No.

9    We played him tapes and refreshed him memory and asked him

10   questions.  He was prepped to testify, and when I say prepped,

11   I don't mean told what to testify to.  He was prepped to

12   testify in three cases, all at separate times.  This

13   investigation is almost five years old.  Sammie Williams has

14   been in jail for three and a half years.

15         Has he asked me during all this time, has he asked

16   Mr. McMahon, what sentence do you think I'm going to get?

17   Absolutely.  Have I ever told him?  No, and he testified to

18   that.  You know why?  Because I don't know what sentence he's

19   going to get, because I'm not sentencing.  I don't wear a

20   robe.  I'm not a judge.  That judge that sentences him, one

21 floor above you right now on the fifth floor, is going to make
22 whatever decision he makes no matter what I think he ought to
23 get. I might think he ought to get 30 years. The judge might
24 think he ought to get ten years. It's up to the judge.
25 That's why I haven't told him. Because I don't know.

189

1        You know, it's real clever and it's an old defense
2 trick, let's talk about Sammie Williams. Let's divert the
3 attention off the Defendants. It's a smoke screen. Sammie
4 Williams isn't on trial and Sammie Williams told you that if
5 there is any evidence, that's why we asked him if there were
6 tapes. That's why we asked him if there was any evidence of
7 him committing the murder. Because he knows, like he said,
8 that we would charge him in a minute. Just like he said we
9 would. But we have to have evidence to charge him. Not that
10 he sat in a car, that he did something to participate in the
11 murder. That's why we asked him those questions.
12        Sammie Williams has no immunity for any crime that he
13 might have committed.
14        Now reasonable doubt, and the Judge is going to
15 explain this to you, so I'm sure not going to belabor this
16 point, it's not any doubt, it's reasonable doubt, what a
17 reasonable person would doubt.
18        Let's talk about Stan Hadden's testimony. Let's talk
19 about Chris Evans. Let's talk about Gregory Boldan. There
20 were no recorded conversations on Gregory Boldan.
21        Did myself, did I, Mr. McMahon and the agents want to
22 make sure that the police officers we charged knew what they
23 were doing? Absolutely. And that's why nobody who wasn't on
24 tape incriminated themselves was charged -- was not -- nobody

25    who didn't incriminate themselves was charged.  That's why we

190

1     didn't charge Gregory Boldan.  He wasn't on tape.  These two
2     individuals, these two Defendants, are all over tapes.
3          Use your common sense.  We've heard the expression
4     probably 15 times during this trial, dealing with people that
5     are down.  Put yourself for a minute in the position of a
6     corrupt police officer.  You're Len Davis, you're Sammie
7     Williams.  You're going to guard what you know is cocaine.
8     You know that you could be arrested and go to jail for a long
9     time.  Would anybody in their right mind hire law enforcement
10    officers that weren't corrupt?  Would they run the risk of a
11    law enforcement officer who wasn't dirty, who wasn't down
12    having them arrested.  It doesn't even make sense.  It's
13    ludicrous.
14         Let's talk about Lemmie Rodgers.  You know, I'm not
15    going to apologize for -- Lemmie Rodgers is corrupt.  He told
16    you he's corrupt.  Lemmie Rodgers is in this situation looking
17    at jail time because of this corrupt narcotics, former
18    narcotics officer.  He was brought in by Leon Duncan.
19         Lump sum payments, big thing, lump sum payments.
20    "The Government is going to pay Sammie Williams."  "The
21    Government is going to pay Lemmie Rodgers."  They testified
22    they weren't getting -- they're not getting paid.  The reason
23    that question was added is because Terry Adams was given a sum
24    of money.
25         MR. RIEHLMANN:  Judge, I'm going to object to that as

191

1  being outside the evidence.  There was no testimony --

2         MR. WINTERS:  They raised it, Your Honor.

3         THE COURT:  The jury -- the jury can remember on its

4  own that which was presented to them.  Objection is overruled.

5         MR. WINTERS:  That's why that was a question on the

6  questionnaire.

7         Now let's talk a little bit about Darrel Jones.  You

8  know, it doesn't make any difference if he participated one

9  month, two months, three months, four months, or two hours.

10  It's not how much you said, it's what you said.  That's why

11  Darrel Jones is before you today, because of what he said.

12  What he said which showed his knowledge of what he was doing.

13         Mr. Voight makes a big point out of playing part of

14  the unedited tape for you all, this one right here, where we

15  didn't play it for you where Len Davis explains everything to

16  Sidney Dubuclet.  The reason we didn't play it for you is

17  because Sidney Dubuclet's not on trial.  Darrel Jones is on

18  trial.  And if I would have played that part of the tape for

19  you, then they'd be accusing me of trying to mislead you.

20  That's why we started the tape when Darrel Jones got in the

21  car.

22         If anybody expects, and again I'm referring to

23  Mr.Voight's argument, that you're going to hear corrupt law

24  enforcement officers, people that are down, people that are in

25  the know, people that are in narcotics, people that are around

                                              192

1  the system like Darrel Jones, if you think they're going to

2  get in a car and say:  Ah, yeah, that cocaine we're guarding,

3  how much cocaine you think is in that car up there.  You know,
                        Page 170

4  how much you think those drug dealers are going to pay us for
5  guarding the cocaine.

6        It doesn't work like that in the real world.  That's
7  why you hear all these cryptic references and calling it "it,"
8  and "him," and "them," because these people don't talk like
9  that.  Because they think if they don't talk about it, and
10  this ought to be abundantly clear after the testimony, then
11  they can't be held for it.

12        I'd like to characterize Mr. Jones, and you heard
13  Mr.Jones' testimony, many of the times he didn't even know
14  what he said.  When I asked him, "What did you mean by that"?
15  I don't know what I meant.  I was just responding.  It's not
16  that he didn't recollect, it's that he was evasive.

17        I'll be honest with you, in the number of years I've
18  prosecuted, and I'm sure you can tell it's been awhile, I've
19  never heard the term "rig" referred to as a police belt.  So,
20  I don't know what the big point about that was, but let me --
21  let me just very, very briefly, I'm not going to play any
22  tapes for you, but I want you -- let's talk about, first of
23  all, Mr. Duncan.  Let's talk about Mr. Duncan.

24        I'm going to show you the blow-up of a conversation
25  that quite frankly, ladies and gentlemen, if I had Mr. Duncan

                                                    193

1  on video tape that I could play for you on those screen
2  saying, I'm guilty, I did it, I knew I was guarding cocaine;
3  it couldn't be anymore clear than this conversation right
4  here.  This is the infamous, if that's the correct term,
5  Disney World conversation.  This is where Mr. Duncan is
6  explaining to Sammie Williams that he'd be happy to use his

7  family as camouflage to throw off any suspicion and bring a
8  load of cocaine down to Florida.  What do you think he means
9  when he says right here, when Sammie Williams says, "And you
10 say you're going to go to Florida?"
11          Duncan, "Fucking right, that's how they do it, bro."
12          And then Duncan says over here -- bear with me --
13 "You know ten grand, drive a car there with your wife and
14 kids.  Make the reservations for them.  So you're willing to
15 do that."
16          Then he says, he catches himself, "Well, I'm just
17 bull-shitting you, Sam, I'm just --".  But guess what?  It
18 doesn't take away the fact he had knowledge of what he was
19 following, a car full of cocaine.
20          Finally, Mr. Duncan, and this is a very interesting
21 conversation, which I hope you -- I know you heard, and I hope
22 you listen to again.  And think about it, it was Sammie
23 Williams 11.  I'm not asking you to pull it out.  It was like
24 a who's who in police corruption in the New Orleans Police
25 Department.  This is a little excerpt from that conversation.

1          In that conversation Duncan -- and this is why
2  Duncan's charged, not only is he guarding the cocaine, not
3  only is he acting as a lookout, but he's giving advice when he
4  tells them, "I told you don't discuss this --" he's talking
5  about the warehouse, "-- with anybody that ain't down."  Okay,
6  and he goes on to say, "You know what I'm saying?  Yeah, and
7  well, well like say the main thing, but you got to watch, just
8  like I told you before.  Just like I told you when I advised
9  you early on in this thing, watch meeting in hotel rooms.
10 Watch meeting face to face with these people.  They might be

11    recording your conversation.  They might have airplanes up

12    that can read your -- the license plates."

13          Let's talk a little bit about Mr. Jones and a couple

14    of his conversations that have not been explained in any way,

15    shape, or form.  This is just, if you would believe Mr. Jones'

16    testimony, just a very innocent, you know, conversation, just

17    happened to be following a car full of cocaine.  Of course,

18    according to him, he doesn't know it.  Sidney Dubuclet,

19    "Cause, hey, I guarantee you probably 75 to 80 percent of that

20    mother fuckers who busted, the police didn't even know they

21    had dope in the car until they stopped them."  Following a car

22    full of cocaine, but he doesn't know what they're talking --

23    he doesn't know there's cocaine.

24          "That's right, too.  Somebody got to rat."  He's

25    talking about an informant telling the police that there's


                                                              195

1     cocaine in the car.  That's what he's talking about.  Of

2     course on cross, he didn't even remember what the word "rat"

3     meant.  That's somebody who's been around the system for a

4     number of years.  "Keep our eyes open for any kind of cars."

5          Darrel Jones, "Oh, yeah.

6          "Anybody follow us too long."

7          Darrel Jones, "Yeah, because the mother fucker ain't

8     going to follow you too far."  He's talking about policemen.

9     He's talking about a policeman is going to arrest you if you

10    let him follow him too far.  Then all of the sudden, what

11    everybody talks about when they're riding down the Interstate,

12    "If you can't pick a mother fucker up that's following you,

13    something wrong.  I mean like the time the mother fucker, Sam,

                            Page 173

14    got with the 44 kilos."

15         He's talking about drugs.  As Mr. McMahon told you,

16    their whole gist of this conversation is about drugs, because

17    they're protecting drugs.  And they're knowingly protecting

18    drugs.

19         Now, he don't want to ask him any questions, because

20    he wants to be able to say -- Len Davis, "I don't want to ask

21    him no questions.  I don't even want to know."  "I hear you.

22    All you want is like to say, fucking right, get paid."

23         They don't want to ask him any questions, because

24    they think they can tell law enforcement if they're ever

25    stopped, hey, man, I was just driving down the highway.  You

196

1     know, I was protecting the -- what did he say, a box of

2     chicken?

3          This is probably -- they're all incriminating.  Len

4     Davis, referring to the car going down the highway full of

5     cocaine.  "So they know what you got if they pulled them over.

6     Just get in the middle lane and keep the fuck going.  Get on

7     the phone, "Jay" --" the undercover agent, "-- they got them.

8     That's all I can do."

9          Darrel Jones, "Tell the nigger to go to running so he

10    don't get arrested."  He's talking about who?  "Jay".

11         Finally, ladies and gentlemen, Darrel Jones, he

12    didn't get paid, no, uh-uh.  He doesn't know what "ends" is.

13    That's him getting paid right there.  "Where you at?"  "Up on

14    Tulane and white by the Criminal District Court."  "What you

15    got?"  "Where you want to meet?"  "All right, come on down and

16    meet me at -- meet me at Galvez and Tulane."

17         Darrel Jones, "Galvez and Tulane.  Come right now,

18    all right."

19         If Darrel Jones was worried about Len Davis helping

20    him arrest bond fugitives, he could have told him on the

21    phone, but he couldn't get the money on the phone.

22         Mr. McMahon asked you in his opening argument to keep

23    one question in mind.  It's not been addressed.  He was right,

24    it's not been addressed.  Remember, he asked you, and I'll ask

25    you to consider this, how could these two, one narcotics


                                           197


1    officer, former narcotics officer, NOPD officer at the time,

2    another one that's been around the system for eight years, how

3    could they let a car full of dope just go?  You know why?

4    Because they got paid to do it.  They got paid to do it.

5         Ladies and gentlemen, you drive around this city, you

6    go around the City of New Orleans, you see a police car, you

7    see a criminal sheriff's car.  You see on the side of a police

8    car, "To protect and serve."  You see on the side of a

9    sheriff's deputy's car, "To serve and protect."  That does not

10    mean to protect and serve, or serve and protect drug dealers.

11    They're supposed to be protecting and serving the citizens.

12         You all have an opportunity -- is this an important

13    case?  Very important.  Very important.  It's not only

14    important for Darrel Jones and Leon Duncan, it's important for

15    the citizens of this community, of this whole area.  And you

16    have a right to send a message and a duty to send a message

17    based on this evidence that these people are guilty and that

18    we're not going to put up with corrupt law enforcement.  Thank

19    you.

20         THE COURT:  Well, ladies and gentlemen, it's my turn

                          Page 175

21   now.  I have to read you some instructions and I'll give each

22   of you a copy that you can read along with me.

23        Ladies and gentlemen of the jury, in any jury trial

24   there are in effect two judges.  I am one of the judges; the

25   other is the jury.  It is my duty to preside over the trial

                                   198

1    and to decide what evidence is proper for your consideration.

2    It is also my duty at the end of the trial to explain to you

3    the rules of law that you must follow and apply in arriving at

4    your verdict.

5         First, I will give you some general instructions

6    which apply in every case:  For example, instructions about

7    burden of proof and how to judge the believability of

8    witnesses.  Then I will give you some specific rules of law

9    about this particular case.  Finally, I will explain to you

10   the procedures you should follow in your deliberations.

11        You, as jurors, are the judges of the facts.  But in

12   determining what actually happened, that is, in reaching your

13   decision as to the facts, it is your sworn duty to follow all

14   of the rules of law as I explain them to you.

15        You have no right to disregard or give special

16   attention to any one instruction, or to question the wisdom or

17   correctness of any rule I may state to you.  You must not

18   substitute or follow your own notion or opinion as to what the

19   law is or ought to be.  It is your duty to apply the law as I

20   explain it to you, regardless of the consequences.

21        It is also your duty to base your verdict solely upon

22   the evidence, without prejudice or sympathy.  That was the

23   promise you made and the oath you took before being accepted

24   by the parties as jurors, and they have the right to expect

25    nothing less.

1         The Defendants have been charged by the Government
2    with violating federal laws.  The indictment is simply the
3    description of the charges made by the Government against the
4    Defendants.  It is not evidence of their guilt.  The law
5    presumes every defendant innocent.  The presumption of
6    innocence means that each defendant starts the trial with a
7    clean slate.  In other words, I instruct you that each
8    defendant is presumed by you to be innocent throughout your
9    deliberations until such time, if ever, you as a jury are
10   satisfied that the Government has proven that defendant guilty
11   beyond a reasonable doubt.  Unless you are satisfied beyond a
12   reasonable doubt that the defendant is guilty, the presumption
13   of innocence alone is sufficient to find the defendant not
14   guilty.
15        The law does not require any defendant to prove his
16   innocence or produce any evidence at all, and no inference
17   whatever may be drawn from the election of any defendant not
18   to testify.  The Government has the burden of proving each
19   defendant guilty beyond a reasonable doubt, and if it fails to
20   do so, you must acquit that defendant.
21        While the Government's burden of proof is a strict or
22   heavy one -- burden, it is not necessary that the defendants'
23   guilty be proved beyond all possible doubt.  It is only
24   required that the Government's proof exclude any "reasonable
25   doubt" concerning the defendants' guilt.

1          A "reasonable doubt" is a doubt based upon reason and

2     common sense after careful and impartial consideration of all

3     the evidence in the case.  Proof beyond a reasonable doubt,

4     therefore, is proof of such a convincing character that you

5     would be willing to rely and act upon it without hesitation in

6     the most important of your own affairs.

7          As I told you earlier, it is your duty to determine

8     the facts.  In doing so, you must consider only the evidence

9     presented during the trial, including the sworn testimony of

10    the witnesses and the exhibits.  Remember that any statements,

11    objections, or arguments made by the lawyers are not evidence.

12    The function of the lawyers is to point out those things that

13    are most significant or most helpful to their side of the

14    case, and in so doing call your attention to certain facts or

15    inferences that might otherwise escape your notice.  In the

16    final analysis, however, it is your own recollection and

17    interpretation of the evidence that controls in the case.

18    What the lawyers say is not binding on you.

19         During the trial I may have sustained an objection to

20    certain questions.  You must disregard those questions

21    entirely.  Do not speculate as to what the witness would have

22    said if permitted to answer the question.  Your verdict must

23    be based solely on the legally admissible evidence and

24    testimony.

25         Do not assume from anything I may have done or said

                                                        201

1     during the trial that I have any opinion concerning any of the

2     issues in this case.  Except for the instructions to you on

3     the law, you should disregard anything I may have said during

4    the trial in arriving at your own findings as to the facts.

5         While you should consider only the evidence, you are
6    permitted to draw such reasonable inferences from the
7    testimony and exhibits as you feel are justified in the light
8    of common experience.  In other words, you may make deductions
9    and reach conclusions that reason and common sense lead you to
10   draw from the facts which have been established by the
11   evidence.

12        In considering the evidence, you should not be
13   concerned about whether the evidence is direct or
14   circumstantial.  "Direct evidence" is the testimony of one who
15   asserts actual knowledge of a fact, such as an eye witness.
16   "Circumstantial evidence" is proof of a chain of facts and
17   circumstances indicating that the defendant is either guilty
18   or not guilty.  The law makes no distinction between the
19   weight you may give to either direct or circumstantial
20   evidence.

21        I remind you that it is your job to decide whether
22   the Government has proved the guilt of the Defendants beyond a
23   reasonable doubt.  In doing so, you must consider all the
24   evidence.  This does not mean, however, that you must accept
25   all of the evidence as true or accurate.


                                                              202


1         You are the sole judges of the credibility or
2    "believability" of each witness and the weight to be given the
3    witness' testimony.  An important part of your job will be
4    making judgments about the testimony of the witnesses who
5    testified in this case.  You should decide whether you believe
6    what each person had to say, and how important that testimony

7    was.

8         In making that decision I suggest that you ask

9    yourself a few questions:  Did the person impress you as

10   honest?  Did the witness have any particular reason not to

11   tell the truth?  Did the witness have a personal interest in

12   the outcome of the case?  Did the witness have any

13   relationship with either the Government or the Defense?  Did

14   the witness seem to have a good memory?  Did the witness have

15   the opportunity and ability to understand the questions

16   clearly and answer them directly?  Did the witness' testimony

17   differ from the testimony of other witnesses?  These are a few

18   of the consideration that will help you to determine the

19   accuracy of what each witness said.

20        In making up your mind and reaching a verdict, do not

21   make any decisions simply because there were more witnesses

22   testifying on one side than on the other.  Your job is to

23   think about the testimony of each witness that you have heard

24   and decide how much you believe of what each witness had to

25   say.

203

1         As stated before, each defendant has a right not to

2    testify and no inference at all may be drawn from the decision

3    of any defendant not to testify.

4         In this case, the Government called alleged

5    accomplices, who have pled guilty to the crimes charged in the

6    indictment.  An alleged accomplice is not prohibited from

7    testifying.  On the contrary, the testimony of such a witness

8    may alone be of sufficient weight to sustain a verdict of

9    guilty.  You should keep in mind that such testimony is always

10   to be received with caution and weighed with great care.  You

11    should never convict a defendant upon the unsupported

12    testimony of an alleged accomplice unless you believe that

13    testimony beyond a reasonable doubt.  The fact that an

14    accomplice has entered a plea of guilty to the offense charged

15    is not evidence, in and of itself, of the guilt of any other

16    person.

17            The testimony of an alleged accomplice, and the

18    testimony of one who provided evidence against a defendant as

19    an informer for pay, or in the hope of leniency in sentencing,

20    or for personal advantage or vindication, must always be

21    examined and weighed by the jury with greater care and caution

22    that the testimony of ordinary witnesses.  You, the jury, must

23    decide whether the witness' testimony has been affected by any

24    of those circumstances, or by the witness' interest in the

25    outcome of the case, or by prejudice against a defendant, or


                                                              204


1     by the benefits that the witness has received either

2     financially or hopes to receive in the form of a reduced

3     sentence.  You keep in mind that such testimony is always to

4     be received with caution and weighed with great care.

5             You should never convict any defendant upon the

6     unsupported testimony of such a witness unless you believe

7     that testimony beyond a reasonable doubt.

8             You have been provided transcript which purport to be

9     the transcripts of recorded conversations with were played for

10    you as part of the Government's case.  I have allowed the

11    Government to provide you with transcripts for the limited and

12    secondary purpose of aiding you in following the content of

13    the conversation as you listen to the recording, and also to

14    aid you in identifying the speakers.

15         However, you are specifically instructed that whether

16    the transcripts correctly or incorrectly reflect the content

17    of the conversations or the identity of the speakers is

18    entirely for you to determine based upon your own evaluation

19    of the testimony you have heard concerning the preparation of

20    the transcripts, and from your own examination of the

21    transcripts in relation to your hearing of the recording

22    itself as the primary evidence of its own contents; and, if

23    you should determine that the transcripts are in any respect

24    incorrect or unreliable, you should disregard them to that

25    extend.


                                                              205


1         The indictment charges in Count 1 that from on or

2    about December 1, 1993, and continuously thereafter until on

3    or about December 7, 1994, in the Eastern District of

4    Louisiana, and elsewhere, Defendants Leon R. Duncan and Darrel

5    G. Jones did knowingly and intentionally combine, conspire,

6    confederate, and agree with other persons known and unknown to

7    the grand jury, including Len E. Davis and Sammie L. Williams,

8    Jr., to possess with intent to distribute in excess of five

9    kilograms of cocaine, a Schedule II narcotic drug controlled

10    substance, in violation of 21 U.S.C.  841(a)(1).

11         The indictment charges in Count 2 that on or about

12    November 18, 1994, in the Eastern District of Louisiana,

13    Defendant Leon R. Duncan did knowingly use and carry a firearm

14    during and in relation to a drug trafficking crime for which

15    he may be prosecuted in a United States District Court,

16    namely, conspiracy to possess with intent to distribute

17    cocaine.

18          The indictment charges in Count 3 that on or about
19   November 18, 1994, in the Eastern District of Louisiana,
20   Defendant Darryl G. Jones did knowingly use and carry a
21   firearm during and in relation to a drug trafficking crime for
22   which he may be prosecuted in a United States District Court,
23   namely, conspiracy to possess with intent to distribute
24   cocaine.
25          Count 1 of the indictment charges the Defendants with


206

1    violations of 21 U.S.C.  846.  Title 21, United States Code,
2    Section 846, makes it a crime for anyone to conspire with
3    someone else to commit a violation of certain controlled
4    substances laws of the United States.  In this case, the
5    Defendants are charged with conspiring to possess with intent
6    to distribute a controlled substance, cocaine hydrochloride.
7          A "conspiracy" is an agreement between two or more
8    person to join together to accomplish some unlawful purpose.
9    It is a kind of "partnership in crime" in which each member
10   becomes the agent of every other member.
11         For you to find a defendant guilty of this crime, you
12   must be convinced that the Government has proved each of the
13   following beyond a reasonable doubt:
14         First:  That two or more persons, directly or
15   indirectly, reached an agreement to possess with intent to
16   distribute a controlled substance;
17         Second:  That the Defendant knew of the unlawful
18   purpose of the agreement; and
19         Third:  That the Defendant joined in the agreement
20   willfully, that is, with the intent to further its unlawful

21    purpose.

22         One may become a member of a conspiracy without

23    knowing all of the details of the unlawful scheme or the

24    identities of all of the other alleged conspirators.  If a

25    Defendant understands the unlawful nature of a plan or scheme


                                                              207

1    and knowingly and intentionally joins in that plan or scheme

2    on one occasion, that is sufficient to convict him for

3    conspiracy even though the Defendant had not participated

4    before and even though the Defendant played only a minor part.

5         The Government need not prove that the alleged

6    conspirators entered into any formal agreement, nor that they

7    directly stated between themselves all the details of the

8    scheme.  Similarly, the Government need not prove that all of

9    the details of the scheme alleged in the indictment were

10   actually agreed upon or carried out.  Nor must it prove that

11   all of the person alleged to have been members of the

12   conspiracy were such, or that the alleged conspirators

13   actually succeeded in accomplishing their unlawful objectives.

14        Mere presence at the scene of an event, even with

15   knowledge that a crime is being committed, or the mere fact

16   that certain persons may have associated with each other and

17   may have assembled together and discussed common aims and

18   interests, does not necessarily establish proof of the

19   existence of a conspiracy.  Also, a person who has no

20   knowledge of a conspiracy, but happens to act in such a way

21   which advances some purpose of a conspiracy, does not thereby

22   become a conspirator.

23        In order to find a Defendant guilty of conspiracy,

24   you must find that the Defendant knew of the unlawful purpose

25    of the agreement and willfully and intentionally joined in the

1    agreement, intending to further its unlawful purpose.

2         You may find that a Defendant had knowledge of a fact

3    if you find the Defendant deliberately closed his eyes to what

4    would otherwise be obvious to him.  While knowledge on the

5    part of the Defendant cannot be established merely by

6    demonstrating that the Defendant was negligent, careless, or

7    foolish, knowledge can be inferred if the Defendant

8    deliberately blinded himself to the existence of a fact.

9         The Defendants are charged with conspiring to possess

10   with intent to distribute a controlled substance, cocaine

11   hydrochloride.  Title 21, United States Code, Section

12   841(a)(1), makes it a crime for anyone to knowingly or

13   intentionally possess with intent to distribute a controlled

14   substance.

15        Cocaine hydrochloride is a controlled substance

16   within the meaning of this law.

17        To possess with intent to distribute means simply to

18   possess with the intent to deliver or transfer possession of a

19   controlled substance to another person, with or without any

20   financial interest in the transaction.

21        Possession, as that terms is used in this case, may

22   be of two kinds, either actual or constructive.  A person who

23   knowingly has direct physical control over a thing, at a given

24   time, is then in actual possession of it.

25        A person who, although not in actual possession,

~8923937.dat

1  knowingly has both the power and the intention, at a given
2  time, to exercise dominion or control over a thing, either
3  directly or through another person or persons, is then in
4  constructive possession of it.
5       Count 2 charges Defendant Leon Duncan with knowingly
6  carrying a firearm during and in relation to the commission of
7  a drug trafficking offense.  Count 3 charges Defendant Darryl
8  Jones with knowingly carrying a firearm during and in relation
9  to the commission of a drug trafficking offense.  This offense
10  is a violation of Title 18 U.S.C.  924(c)(1), which makes it
11  a crime for anyone to use and carry a firearm during and in
12  relation to a drug trafficking crime.
13       For you to find the Defendants guilty of this crime,
14  you must be convinced that the Government has proven each of
15  the following beyond a reasonable doubt:
16       First:  That the Defendant committed the drug
17  trafficking offense charged in Count 1 of the indictment, that
18  is, conspiracy to possess with the intent to distribute
19  cocaine; and
20       Second:  That the Defendant knowingly used and
21  carried a firearm during and in relation to the Defendant's
22  commission of the crime alleged in Count 1.
23       The term "firearm" means any weapon which will or is
24  designed to or may readily be converted to expel a projectile
25  by the action of an explosive.  The term "firearm" also

210

1  includes the frame or receiver of any such weapon, or any
2  firearm muffler or firearm silencer, or destructive device.
3       To prove that the Defendant "used" a firearm in

4    relation to a drug trafficking crime, the Government must

5    prove that the Defendant actively employed the firearm in the

6    commission of Count 1, such as a use that is intended to or

7    brings about a change in the circumstances of the commission

8    of Count 1.  "Active employment" may include brandishing,

9    displaying, referring to, bartering, striking with, firing, or

10   attempting to fire the firearm.  Use is more than mere

11   possession of a firearm or having it available during the drug

12   trafficking crime.

13          "To carry" a firearm during and in relation to a drug

14   trafficking crime means (1) that the Defendant knowingly

15   transported a firearm on or about his person or in his motor

16   vehicle, (2) which had some purpose or effect with respect to

17   the drug trafficking crime and (3) that the Defendant had a

18   present ability to exercise dominion and control over the

19   firearm, that is, it was within easy reach or was immediately

20   available for use by the Defendant.

21          The Defendant's carrying of the firearm cannot be

22   merely coincidental or unrelated to the drug trafficking

23   crime.

24          "In relation to" means that the firearm must have

25   some purpose, role, or effect with respect to the drug


                                                    211


1    trafficking crime.

2           Thus, in order to find the Defendant Leon guilty of

3    Count 2 of the indictment and the Defendant Darryl Jones

4    guilty of Count 3, you must first find each guilty of Count 1,

5    conspiracy to possess with intent to distribute cocaine.

6           You have heard evidence of acts of Defendant Leon R.

7   Duncan which may be similar to those charged in the

8   indictment, but which were committed on other occasions.  You

9   must not consider any of this evidence in deciding if the

10   Defendant Duncan committed the acts charged in the indictment.

11   However, you may consider this evidence for other, very

12   limited, purposes.

13          If you find beyond a reasonable doubt from other

14   evidence in this case that the Defendant did commit the acts

15   charged in the indictment, then you may consider evidence of

16   the similar acts allegedly committed on other occasions to

17   determine whether the Defendant had the state of mind or

18   intent necessary to commit the crime charged in the

19   indictment, whether the Defendant had a motive or the

20   opportunity to commit the acts charged in the indictment,

21   whether the Defendant acted accordingly to a plan or in

22   preparation for commission of a crime, or whether the

23   Defendant committed the acts for which he is on trial by

24   accident or mistake.

25          You must only consider this evidence in the case


212


1   against Defendant Duncan.  This evidence cannot be considered

2   in the case against Defendant Jones.

3          These are the limited purposes for which any evidence

4   of other similar acts may be considered.

5          A separate crime is charged against the Defendants in

6   each count of the indictment.  Each count, and the evidence

7   pertaining to it, should be considered separately.  The case

8   of each Defendant should be considered separately and

9   individually.  The fact that you may find one or more of the

10   accused guilty or not guilty of any of the crimes charged

11    should not control your verdict as to any other crime or any
12    other defendant.  You must give separate consideration to the
13    evidence as to each Defendant.
14         You are instructed that you may not find the
15    Defendant guilty of any count of the indictment unless you
16    find beyond a reasonable doubt that every element of the
17    offense charge in the count as defined in these instructions
18    was committed by the Defendant with the intent to violate the
19    law.  You must further decide the Defendant's guilt on each
20    count of the indictment separately.
21         You are here to decide whether the Government has
22    proved beyond a reasonable doubt that the Defendants are
23    guilty of the crimes charged.  The Defendants are not on trial
24    for any act, conduct, or offense not alleged in the
25    indictment.  Neither are you concerned with the guilt of any


                                                              213


1    other person or persons not on trial as a defendant in this
2    case.
3         If any Defendant is found guilty, it will be my duty
4    to decide what the punishment will be.  You should not be
5    concerned with punishment in any way.  It should not enter
6    your consideration or discussion.
7         To reach a verdict, whether it is guilty or not
8    guilty, all of you must agree.  Your verdict must be unanimous
9    on each count of the indictment.  Your deliberations will be
10    secret.  You will never have to explain your verdict to
11    anyone.
12         It is your duty to consult with one another and to
13    deliberate in an effort to reach agreement if you can do so.

14  Each of you must decide the case for yourself, but only after
15  an impartial consideration of the evidence with your fellow
16  jurors.  During your deliberations, do not hesitate to
17  reexamine your own opinions and change your mind if convinced
18  that you were wrong.  But do not give up your honest beliefs
19  as to the weight or effect of the evidence solely because of
20  the opinion of your fellow jurors, or for the mere purpose of
21  returning a verdict.
22          Remember at all times, you are judges, judges of the
23  facts.  Your sole interest is to seek the truth from the
24  evidence in the case, to decide whether the Government has
25  proved the Defendant guilty beyond a reasonable doubt.


                                                             214

1           When you go to the jury deliberation room, the first
2   thing that you should do is select one of your number to act
3   as your foreperson, who will help to guide your deliberations
4   and will speak for you here in the courtroom.
5           You will also be given in the jury room a verdict
6   form, which is very simple.  There's one form for each
7   Defendant.  On one of them -- on Mr. Duncan's form, it's Count
8   1:  We the jury unanimously find the Defendant Leon Duncan,
9   guilty or not guilty.  And Count 2, the same thing.
10          On Mr. Jones, Count 1 is the same and instead of
11  Count 2, his, the second count there is Count 3.  You'll have
12  no difficulty with that.
13          The foreperson will write the unanimous answer of the
14  jury in the space provided for in each count of the
15  indictment, either guilty or not guilty.  At the conclusion of
16  your deliberations, the foreperson should date and sign the
17  verdict form and hand it to the Marshal.

18          And if you need to communicate with me during your
19   deliberations, the foreperson, or any other member of the
20   jury, should write the message and give it to the Marshal.  I
21   will either reply in writing or bring you back into the
22   courtroom to answer your message.
23          And bear in mind that you are never to reveal to any
24   person, not even to the court, how the jury stands
25   numerically or otherwise, on any count of the indictment,


                                                         215

1    until after you have reached a unanimous verdict.
2          Thank you.  In a moment I'll send you to the jury
3    room and the evidence will be brought in for your
4    consideration and use.  So, has Counsel checked the evidence
5    and its ready to go into the jury room, you can do that.  It
6    won't take long.  So, perhaps the first thing you should do is
7    elect your foreperson and then you will receive the evidence
8    and be able to deliberate.
9          The three alternate jurors I'll ask that they remain
10   in the box while the jury is brought into the jury room.
11      (Jury escorted to the jury room to begin deliberations)
12          THE COURT:  Well, inasmuch as nothing happened during
13   the trial, no one got sick or had any problem and had to leave
14   so that one of you or more of you could have been substituted
15   in their place, the jury has now gone to deliberate and I want
16   to thank you on behalf of the Court, staff, and all the
17   parties for your very conscientious service this past week as
18   an alternate juror in the case.  And if you would like, just
19   tell Carol -- if you'd like to know the result, we can
20   telephone you.  And otherwise, I thank you very much for your

21  service and you're excused.

22      Does the Government have any objection to the Court's

23  instruction of law?

24      MR. WINTERS:  No, sir.

25      THE COURT:  Does the Defendant Duncan have any

1  objection to the Court's instruction of law?

2      MR. RIEHLMANN:  Yes, sir, the objection that I noted

3  was insofar as the deliberate ignorance charge for the

4  reasons.

5      THE COURT:  What page are you on?

6      MR. RIEHLMANN:  It was Page 13.

7      THE COURT:  Page what?

8      MR. RIEHLMANN:  Thirteen.

9      THE COURT:  Thirteen?

10      MR. RIEHLMANN:  Deliberate ignorance charge for the

11  reasons stated in my memorandum that I had previously

12  submitted to the Court.

13      THE COURT:  That objection will be overruled.

14      MR. RIEHLMANN:  And, Judge, also the Court's refusal

15  to give a charge --

16      THE COURT:  Speak a little louder please, and tell me

17  what page you're on.

18      MR. RIEHLMANN:  I'm sorry.  To the Court's refusal to

19  give a charge on immunity, I objected to that as well.

20      THE COURT:  Overruled.  Does Defendant Jones have

21  any?

22      MR. VOIGHT:  Your Honor, I join in the objection to

23  the deliberate ignorance charge on Page 13.

24      THE COURT:  That will be overruled also.  Thank you.

25          Any objection by anyone to the verdict forms?

1          MR. WINTERS:  No, sir, the Government has none.

2          MR. RIEHLMANN:  No, sir.

3          MR. VOIGHT:  No, Your Honor.

4          THE COURT:  Thank you.  We'll stand in recess.

5      (Recess from 4:40 p.m., until 5:05 p.m.)

6          THE COURT:  A moment ago I received this note from

7  the jury.  "We would like to have the CD player and audio tape

8  player."  Signed by Juror Kenneth J. Livaudais.

9          I gathered everyone here and would ask that if you

10  insist, it will be brought into the jury room, but otherwise

11  you can sit here or on those other chairs and the operator

12  will play for you what you want.  None of us will be present

13  in the courtroom.  So do you want it one, in the jury room, or

14  just from here?  Anyone that wants it in the jury room, please

15  raise your hand.

16          All right, so you'll be able to tell him what you

17  want played and he will play it.

18      (The Technician is sworn to silence while replaying tapes

19  for jury)

20          THE COURT:  Any Counsel have any objection to this

21  procedure?

22          MR. RIEHLMANN:  Judge, I don't have any objection,

23  but I just ask that the jury, I guess, also be told not to

24  deliberate in the presence of this technician.

25          THE COURT:  Oh, well of course the jurors should not

1  deliberate at all in the presence of this outsider.

2        JUROR LIVAUDAIS:  So you want us to -- you want us --

3  I'm just asking this, because I'm sure it's going to come up,

4  do you want us to stay in the room and when we need to -- when

5  we want to have a particular tape or CD played, you want me to

6  send a note out just to that effect saying that we would like

7  such and such --

8        THE COURT:  Oh, you contemplate maybe more than one

9  tape?  You don't know?

10        JUROR LIVAUDAIS:  I mean we're just getting started,

11  so I mean it was -- it was something that we thought if it was

12  going to take awhile to move the equipment into the room, we

13  wanted to let you all know right away.

14        THE COURT:  Uh-huh (Affirmative response)

15        JUROR LIVAUDAIS:  You know, we may get finished -- we

16  might be in the room and decide, well, we don't need to have

17  anything played, but we didn't want to not have --

18        THE COURT:  Well, it might be a little awkward,

19  but--

20        JUROR LIVAUDAIS:  -- the equipment.

21        THE COURT:  You would have to -- maybe the simple

22  thing is let me know if you want another tape played, and I

23  can ask the recorder to come back from outside the door, and

24  come in and do it.

25        Anybody have any objection with this total procedure?

219

1        MR. WINTERS:  The Government has none.

2        MR. RIEHLMANN:  No, sir.

3        MR. VOIGHT:  No objection.

4          THE COURT:  Very well.  Well then all of us will
5    depart.  Call me if you need me.  And I do want to mention one
6    other thing to you, if the hour gets late or anything and you
7    all have problems, let me know, about moving cars, or if you
8    want to come back at 9:30 tomorrow morning, just let me know.
9    I'm trying to accommodate you.  Let me know how you want to do
10   things.  Thank you.
11       (Recess from 5:10 p.m., until 5:30 p.m.)
12          THE COURT:  Another note from the jury.  "After the
13   Tape Number 1," which they want played apparently, "we'd like
14   to break until the morning at 9:30."  And the top of it is,
15   "11/18/94 Number 1, tape of --"
16          MR. McMAHON:  I think that's "maroon LeSabre".
17          MR. VOIGHT:  I believe that's "maroon LeSabre."
18          THE COURT:  The what?
19          MR. McMAHON:  "Maroon LeSabre," that's the -- that's
20   Sammie William's car, right.
21          THE COURT:  Maroon LeSabre, so we'll play that tape
22   for them and then as soon as it's over, if you'll let me know,
23   I'll excuse them until tomorrow morning at 9:30.  So, we'll
24   all abandon -- you're ready to play the tape?  You've
25   identified it?  That's fine.


                                                          220


1          We'll all abandon ship right now.  Would you let the
2    CSO know, the Marshal know, he'll be outside the door when
3    it's completed and then I'll come in and excuse them.
4          THE MARSHAL:  Do you want to just leave them in here
5    after they finish listening to it?
6          THE COURT:  Oh, yeah, yeah.  As soon as it's over,

7    I'll come back in and tell them 9:30.

8              MR. WINTERS:  I'm sorry, Judge, what are we going to

9    do?

10              THE COURT:  We'll play one tape and then go home.

11              MR. RIEHLMANN:  I just wanted to get word to him what

12   was going on.

13              MR. WINTERS:  Tape of what?

14              MR. VOIGHT:  Maroon LeSabre.

15              MR. WINTERS:  Maroon --

16              THE COURT:  We can phone the Marshals and tell them

17   -- tell them not to bring them down, unless you want them

18   down.

19              MR. RIEHLMANN:  No, I don't want him down, I just

20   wanted him to know --

21              THE COURT:  We'll let him know.

22              MR. RIEHLMANN:  -- why.

23              MR. WINTERS:  So what do you want us to do, Judge,

24   just wait around until --

25              THE COURT:  No really.  Anybody have any problem with

1    that procedure?

2              MR. RIEHLMANN:  No, sir.

3              MR. VOIGHT:  No, Your Honor.

4              MR. WINTERS:  And the procedure is -- I'm sorry.

5              THE COURT:  We're going to play this one tape --

6              MR. WINTERS:  Right, Tape 1 --

7              THE COURT:  -- and then I'm going to be notified when

8    it's completed and you'll notify the CSO and I'll say come

9    back tomorrow morning at 9:30.

10              MR. WINTERS:  Okay.  So you want us to stay around

11  until you cut them.

12      THE COURT:  I don't see any need for you all to stay

13  around.

14      MR. RIEHLMANN:  Great.

15      MR. WINTERS:  Okay, so we can leave now?

16      THE COURT:  But I will not do anything else until

17  tomorrow morning at 9:30.

18      MR. WINTERS:  Okay, so we can leave now.

19      THE COURT:  Yes, indeed.  I just want to let you know

20  what's going on.

21      MR. WINTERS:  Thank you, Judge.

22      THE COURT:  You can leave.

23     (Recess from 5:35 p.m., until 6:20 p.m.)

24      JUROR LIVAUDAIS:  We stopped it right where we want

25  to start in the morning.  We're not finished with it.


222

1      THE COURT:  So tomorrow morning you want to come in

2  here privately again -- well, there may be people present, and

3  then we'll all leave, and you can come in tomorrow morning

4  privately and do you thing.

5      JUROR LIVAUDAIS:  Yes, sir.

6      THE COURT:  So for right now then you're excused and

7  see you tomorrow morning.

8          (Whereupon, the proceedings were adjourned)

9                  *   *   *   *   *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

223

1            C E R T I F I C A T E

2

3        I certify that the foregoing is a correct transcript

4    from the electronic sound recording of the proceedings in the

5    above-entitled matter.

6

7

/S/DOROTHY M. BOURGEOIS                        9-23-98
8    _____          _____
     Dorothy M. Bourgeois                        Date
9

10

11

12

13

14

15

16

17

18
19
20
21
22
23
24
25